No. 22-2090

In the

# United States Court of Appeals

## For the Fourth Circuit

———————————

GMS Industrial Supply, Inc.,

*Plaintiff-Appellee,*

v.

Westly L. Greer,

*Defendant-Appellant,*

and

G&S Supply, LLC; Sabrina Greer; Greer Group, LLC; Gregory K. Spires; Country Roads, LLC; Thomas Hayes; Mike Welton; WarTech Industries, LLC; HMC Supply, LLC,

*Defendants.*

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia at Norfolk
Case No. 2:19-cv-00324
The Honorable Roderick C. Young, District Judge
The Honorable Lawrence R. Leonard, Magistrate Judge

———————————

**JOINT APPENDIX – VOLUME II OF IV (pp. 306-713)**

———————————

| | |
|---|---|
| Robert W. McFarland | Jeffrey Wilson |
| V. Kathleen Dougherty | William A. Lascara |
| Jeanne E. Noonan | Thomas S. Berkley |
| McGuireWoods LLP | Pender & Coward, PC |
| 9000 World Trade Center | 222 Central Park Avenue |
| 101 West Main Street | Suite 400 |
| Norfolk, VA 23510 | Virginia Beach, VA 23462 |
| T: (757) 640-3716 | T: (757) 502-7341 |
| *Counsel for Appellant* | *Counsel for Appellee* |

*(additional counsel listed on inside cover)*

Sean A. McClelland
MCGUIREWOODS LLP
888 16th Street, N.W.
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2838

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

**Volume I (pp. 1-305)**

E.D. Va. Docket Sheet (Case No. 2:19-cv-00324-RCY-LRL) ...............................1

Dkt. 1:
    Complaint (June 20, 2019) .............................................................40

    Dkt. 1-1: Civil Cover Sheet ........................................................118

    Dkt. 1-2: Exhibit 1 to Complaint, Apr. 3, 2019 Termination,
    Cease and Desist and Litigation Hold Notice Letter ..................................119

    Dkt. 1-3: Exhibit 2 to Complaint, GMS Catalogue ...................................133

    Dkt. 1-4: Exhibit 3 to Complaint, G&S Catalogue ...................................219

    Dkt. 1-5: Exhibit 4 to Complaint, Comparison .........................................241

    Dkt. 1-6: Exhibit 5 to Complaint, Email Details ......................................267

    Dkt. 1-7: Exhibit 6 to Complaint, Apr. 17, 2019 Supplemental
    Termination, Cease and Desist and Litigation Hold Notice Letter
    and Demand for Return of Property ...........................................................270

    Dkt. 1-8: Exhibit 7 to Complaint, Report .................................................272

    Dkt. 1-9: Exhibit 8 to Complaint, GMS Trademark Use Examples ..........273

    Dkt. 1-10: Exhibit 9 to Complaint, G&S Designation Use Examples .......280

    Dkt. 1-11: Exhibit 10 to Complaint, May 24, 2019 Second
    Supplemental Termination, Cease and Desist and Litigation
    Hold Notice Letter and Demand for Return of Property ...........................297

    Dkt. 1-12: Exhibit 11 to Complaint, Declaration of Garry A. Pate............298

i

Dkt. 1-13: Exhibit 12 to Complaint, Declaration of William A.
Lascara ........................................................................................304

## Volume II (pp. 306-713)

Dkt. 3-1:
>    Exhibit 1 to Memorandum in Support of Motion for Temporary
>    Restraining Order and Temporary Injunction – Contracts
>    Between Plaintiffs and Defendants (June 21, 2019) ..................306

Dkt. 156:
>    Third Amended Verified Complaint (Dec. 1, 2020) ..................346

Dkt. 193:
>    Defendants' Motion for Sanctions Pursuant to Rule 11 (July 8, 2021) .....432

Dkt. 194:
>    Memorandum in Support of Defendants' Motion for Sanctions
>    Pursuant to Rule 11 (July 8, 2021) ............................................435

Dkt. 205:
>    GMS Industrial Supply, Inc.'s Response to Defendants' Motion
>    for Sanctions Pursuant to Rule 11 (July 22, 2021)....................467

Dkt. 207:
>    Reply in Support of Defendants' Motion for Sanctions Pursuant
>    to Rule 11 (July 28, 2021) ........................................................495

Dkt. 249:
>    Order Denying Rule 11 Motion (Mar. 22, 2022) .......................517

Dkt. 250:
>    Memorandum Opinion re: Rule 11 Motion (Mar. 22, 2022) ....................518

Dkt. 266:
>    Proposed Jury Instructions (May 9, 2022) ................................539

## Volume III (pp. 714-1070)

Dkt. 271:
Defendants' Objections To Plaintiff's Proposed Jury Instructions
(May 12, 2022) ........................................................................714

Dkt. 289:
Defendants' Pretrial Bench Brief (May 26, 2022) ....................723

Dkt. 291:
Plaintiff's Bench Brief (May 26, 2022)......................................738

Dkt. 323:
Transcript of Jury Trial (Excerpt of Proceedings) (June 2, 2022) .............754

Donna Grace Rupley, Direct Examination By Mr. Gordon .......................757

Donna Grace Rupley, Cross-Examination By Mr. McFarland .................799

Donna Grace Rupley, Redirect Examination By Mr. Gordon ..................807

Danielle Renee Robichaux, Direct Examination By Mr. Berkley .............810

Dkt. 329:
Transcript of Proceedings (Excerpt Testimony of Danielle Renee
Robichaux) (June 3, 2022)........................................................885

Danielle Renee Robichaux, Direct Examination By Mr. Berkley .............887

Danielle Renee Robichaux, Cross-Examination By Mr.
McFarland................................................................................950

Danielle Renee Robichaux, Redirect Examination By Mr.
Berkley.....................................................................................983

Dkt. 361:
Transcript of Proceedings re: Initial Oral Rule 50 Motion
(Motions Excerpt) (June 3, 2022)............................................988

## Volume IV (pp. 1071-1446)

Dkt. 340:
    Transcript of Proceedings (Excerpt of Proceedings – Westly
    Greer) (June 6, 2022)................................................................1071

    Westly Greer, Direct Examination By Mr. McFarland ...........................1074

    Westly Greer, Cross-Examination By Mr. Lascara..................................1126

Dkt. 341:
    Transcript of Proceedings (Excerpt Testimony of Westly Greer)
    (June 7, 2022) ...........................................................................1170

    Westly Greer, Cross-Examination By Mr. Lascara..................................1174

    Westly Greer, Redirect Examination By Mr. McFarland .......................1196

Dkt. 342:
    Transcript of Proceedings (Excerpt Testimony of Sabrina Greer)
    (June 7, 2022) ...........................................................................1199

    Sabrina Star Greer, Direct Examination By Mr. McFarland...................1202

    Sabrina Star Greer, Cross Examination By Mr. Gordon .........................1224

Dkt. 362:
    Transcript of Proceedings re: Renewed Oral Rule 50 Motion
    (June 7, 2022) ...........................................................................1244

Dkt. 310:
    Order re: Defendants' Motion for Judgment As A Matter of Law
    Under Rule 50 (June 8, 2022).................................................1281

Dkt. 311:
    Order re: Defendants' Renewed Motion for Judgment As A
    Matter of Law Under Rule 50 (June 8, 2022) ..........................1283

Dkt. 316-1:
Exhibit and Witness List (June 10, 2022) ...................................1285

Dkt. 317:
Jury Verdict (June 10, 2022) .....................................................1298

Dkt. 319:
Jury Instructions (June 10, 2022) .............................................1333

Dkt. 321:
Clerk's Judgment (June 10, 2022)...........................................1406

Dkt. 331:
Notice of Appeal (July 8, 2022) ..............................................1407

Dkt. 363-1:
Trial Exhibit P3 – Independent Agent Agreement Between GMS
Industrial Supply, Inc. and Westly Greer ..................................1409

Dkt. 363-2:
Trial Exhibit P4 – GMS Industrial Supply, Inc. Zone Manager
Addendum...............................................................................1413

Dkt. 363-3:
Trial Exhibit P5 – GMS Document re: Westly Greer's New Title
of Director of Sales..................................................................1414

Dkt. 363-4:
Trial Exhibit P6 – Employment Agreement for Westly Greer As
District Manager .....................................................................1415

Dkt. 363-5:
Trial Exhibit P8 – Independent Sales Agent Agreement for
Sabrina Greer .........................................................................1417

Dkt. 363-6:
Trial Exhibit P12 – Independent Sales Agent Agreement
Between GMS & County Roads (Greg Spires).........................1421

Dkt. 363-7:
>    Trial Exhibit P14 – Independent Sales Agent Agreement for
>    Thomas Hayes ........................................................................1425

Dkt. 363-8:
>    Trial Exhibit P16 – Independent Sales Agent Agreement for
>    Michael Welton ....................................................................1429

Dkt. 363-9:
>    Trial Exhibit P28 – Independent Sales Agent Agreement for
>    Sabrina Greer ........................................................................1433

Dkt. 363-10:
>    Trial Exhibit P32 – Independent Sales Agent Agreement for
>    County Roads, LLC (Greg Spires) .......................................1438

Dkt. 363-11:
>    Trial Exhibit P49 – Employee Non-Compete Agreement for
>    Westly Greer ..........................................................................1442

Dkt. 363-12:
>    Trial Exhibit P52 – Sales Agent Agreement for Gregory Spires .............1444

## **EXHIBIT 1**

1.1     Westly Greer - 2012 Employment Agreement

1.2     Westly Greer - 2019 Sales Agent Agreement

1.3     Greg Spires - 2017 Sales Agent Agreement

1.4     Sabrina Greer - 2017 Sales Agent Agreement

1.5     Michael Welton - 2016 Sales Agent Agreement

1.6     Michael Welton - 2019 Sales Agent Agreement

1.7     Wayne Side - 2015 Sales Agent Agreement

1.8     Thomas Hayes - 2016 Sales Agent Agreement

1.9     Sky Spires - 2016 Sales Agent Agreement



**GMS Industrial Supply Inc.**

# Employment Agreement

**Employee Statement**

In accepting employment with GMS Industrial Supply (EMPLOYER), as an exempt employee, I, Westly Greer, (EMPLOYEE) agree:

(1) my yearly salary is $60,000.00 to be paid **biweekly** at a rate of $2,307.70.

(2) (2) my job title as District Manager will begin on November 5, 2012. I have received the GMS Industrial Supply employee handbook, and agree to comply with its provisions and any other rules. Neither the handbook, practices, nor any communications create an employment contract or term. I understand that the policies and benefits communicated to me are subject to change, interpretation, and review by GMS Industrial Supply at any time.

(3) Bonus structure will be based on the following things:

- For territories/accounts where that I consistently and regularly work, I will receive the difference of the commission of an independent sales agent and my regular salary if the difference is greater to be paid out on a quarterly basis.

- 3% quarterly bonus override based on total sales from any Sales Agent that I directly and consistently work with.

- A company credit card will be provided for the following expenses; gas, lodging, and meals when traveling outside of my regular customer base. Expenses beyond a monthly total $1500.00. Should expenses exceed this amount or deemed not fit by GMS that amount will be deducted from my salary on a quarterly basis. Expenses will be monitored consistently on a monthly basis. Complete and accurate reporting of expenses (to include receipts) is to be turned in to the corporate office on a monthly basis.

- If the criteria for bonus is met, expenses related to training will be deducted from salary at a rate of 50% of total expenses. If criteria for bonus is not met, expenses could be carried over to the following quarter.

GMS Industrial Supply may impart, to me, confidential information, including, without limitation, designs, pricing, financial information, personnel information, real estate information, marketing strategies, customer profiles, and the like (collectively "confidential information"). I hereby acknowledge GMS Industrial Supply's exclusive ownership of such confidential information.

I agree: (1) only to use the confidential business information to provide services or goods to GMS Industrial Supply; (2) only to communicate the confidential information to fellow employees on a need-to-know basis; and (3) not to otherwise disclose or use, at any time, any confidential information. As an example, and not as a limitation, I understand that I am not to use or provide confidential information for the purpose of trading any securities of GMS Industrial Supply. Upon demand of GMS Industrial Supply or termination of my employment, I will deliver to GMS Industrial Supply all blueprints, manuals, designs, photographs, recordings, and any other medium by which, through which, or on which confidential information has been recorded or stored, which are in my possession, custody, or control.

I further agree that the disclosure or use of any confidential information, in breach of this understanding, would cause irreparable harm to GMS Industrial Supply and, accordingly, not only can GMS Industrial Supply seek damages, but I agree to the issuance of a permanent injunction against me restraining such disclosure and use, and I agree that any court of competent jurisdiction, selected by GMS Industrial Supply, shall have personal jurisdiction over me.

I agree that neither this document nor any other communication shall bind GMS Industrial Supply, to employ me now or in the future, that no consideration has been furnished to GMS Industrial Supply for my employment, other than my services, and that my employment may be terminated by GMS Industrial Supply or me, with or without notice, at any time. I further agree that if my employment is terminated by GMS Industrial Supply, it can be done without liability to me for wages or salary, except such as may have been earned or which may be due by

**EXHIBIT**

tabbies®

1.1



GMS Industrial Supply, Inc.

virtue of applicable statutes. I understand that only the President of GMS Industrial Supply has any authority to enter into any agreement for employment for any specified period, or to assure any benefits or terms or conditions of employment, or to make any agreement contrary to this statement. I also understand and agree that this agreement may not be modified orally, and that, if such a modification is made it must be in writing and signed by the President of GMS Industrial Supply.

I agree not to recruit and not to assist any other entity in recruiting any other employee who worked for GMS Industrial Supply during the last twelve (12) months in which I worked for GMS Industrial Supply. Further, I will not reveal the identity of any supplier to any competitor of GMS Industrial Supply. These restrictions will apply during my employment and for twelve (12) months subsequent to my employment. I understand that in establishing the precise amount of damages for breach of this provision, for each person recruited about whom I have provided information in violation of this provision, liquidated damages for such violation shall be the amount of annual compensation of that person at GMS Industrial Supply.

Employee Signature _____    Date _____

Employee Printed Name _____    Social Security # _____

# Independent Agent Agreement

**THIS INDEPENDENT AGENT AGREEMENT** ("Agreement") is made as of January 21, 2019 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and Westly Greer (the "Agent") of 8102 Hardwood Circle, Colorado Springs, CO 80908 [Agent Address]

**WHEREAS**:

(A)     The Company is a supplier of certain industrial maintenance products (the "Products").

(B)     The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Colorado and Kansas (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      <u>Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory.</u> Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory. The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals. The Agent shall be free to set its own hours and appointments. The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products. Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable. If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.      <u>Training Assistance.</u> The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee"). The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company.

3.      <u>Independent Contractor.</u> The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.      <u>Commission.</u> As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion. Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date. Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns. Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of non-payment by customer. As a straight commission paid Agent, the Company will issue Agent a 1099

Agent Initials WG

**EXHIBIT**

tabbies

1.2

Rev 6.2016

**JA309**

at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5.    **Bonus/Annual Sales Agent Trip.** Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6.    **Agent Expenses – Product Samples.** The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7.    **Customer Default.** Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8.    **No Sale outside of Territory.** The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9.    **Term and Termination.** This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10.    **Return of New Agent Kit.** In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11.    **Commission Payments after Termination.** The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12.    **Confidentiality.** Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or

Agent Initials __WG__                                           Rev 6.2016

**JA310**

in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13.  Authority of Agent – Indemnity of Company. The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement. Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement. In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14.  Non-Solicitation. During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15.  Notices. Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

Agent Initials  WG                                                                 Rev 6.2016

16. Severability. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17. Governing Law/Venue & Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18. Assignment by Agent. Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19. Entire Agreement. This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20. Counterparts. This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

GMS INDUSTRIAL SUPPLY, INC.

**AGENT:**

Sign: _Westly Greer_

Rachel Gorken, President

Name: _Westly Greer_

Agent Initials _WG_

Rev 6.2016

**JA312**



# GMS INDUSTRIAL SUPPLY, INC
## *Great Material, Superior Service*

2702 Southport Way, Suite F
National City, CA
91950-8400

212 Denn Lane
Virginia Beach, VA
23462-2506

PHONE    (757) 473-1467
FAX      (757) 337-3734
E-MAIL   sales@gmsindustrialsupply.com
WEB SITE http://www.gmsindustrialsupply.com



SBA-WOSB

Zone Manager Addendum:
This addendum does not supersede the Independent Account Manager Agreement
Sales support to primary customer accounts.
Assist Account Managers with customer accounts
Provide product knowledge training to customers and Account Managers
Report customer activity to Marketing Team.
Participation in weekly Sales calls
All responsibilities also listed on the "Account Manager Expectations" document.

Bonus/Override:
Accounts in which he relinquishes responsibilities of daily account maintenance to other
Account Managers of GMS, but continues to assist and advise the Agent on a regular and
consistent basis, with appropriate documentation and planning, he will receive a bonus
override on a quarterly basis. An override of 4% will be received on sales of core items.
Bonus override on non-core items will be scaled down according to sales commission
code.

Westly Greer
Agent Print

Rachel Gorken, President
GMS Industrial Supply, Inc.

Agent Signature

01/12/19
Date

Proudly Serving Government and Military Accounts with Over 50 Years Combined Experience
GSA Advantage Schedules GS-07F-0369V · DOD EMALL Contracts SP47W115D0002

JA313



# GMS INDUSTRIAL SUPPLY, INC
## Great Material, Superior Service

2520 Hoover Ave. Suite A
National City, CA
91950-8400

212 Denn Lane
Virginia Beach, VA
23462-2506

PHONE   (757) 473-1467
FAX      (757) 337-3734
E-MAIL   sales@gmsindustrialsupply.com
WEB SITE http://www.gmsindustrialsupply.com



SBA-WOSB

January 11, 2019

Westly Greer
8102 Hardwood Circle
Colorado Springs, CO 80908

Westly,

Per our recent conversations, your request to transition to an Independent Account
Manager will be accepted. GMS Industrial Supply (GMS) will provide you with the
Independent Account Manager (IAM) agreement separately. In transitioning your role,
the following will take place:

Final training trip to Ft. Hood 1/14/19 – 1/17/19 (accommodations previously scheduled)
Submit final reimbursements by 1/18/19
GMS will pay out any remaining holdbacks on the next scheduled upcoming pay period.
Terminate employment agreement effective 1/18/19
Effective 1/21/19, Independent Account Manager Agreement will be effective working at
Fort Carson and Fort Riley
An Addendum to the IAM will be provided as a Zone Manager to oversee and assist
Amber Wenrick.

Signature

Westly Greer
Printed Name

01/12/19
Date

Proudly Serving Government and Military Accounts with Over 50 Years Combined Experience
GSA Advantage Schedules GS-07F-0369V · DOD FedMALL Contracts SP47W115D0002

JA314

| Form **W-9** (Rev. November 2017) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** ▶ Go to *www.irs.gov/FormW9* for instructions and the latest information. | **Give Form to the requester. Do not send to the IRS.** |
|---|---|---|

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Westly L Greer

**2** Business name/disregarded entity name, if different from above

Greer Group, LLC

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☑ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

8102 Hardwood Circle

**6** City, state, and ZIP code

Colorado Springs, CO 80908

Requester's name and address (optional)

**7** List account number(s) here (optional)

## Part I     Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

| | | | – | | | – | | | | |

or

**Employer identification number**

| | | – | | | | | | | |

## Part II     Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| Sign Here | Signature of U.S. person ▶ *Westly Greer* | Date ▶ 1/14/19 |
|---|---|---|

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

Cat. No. 10231X                Form **W-9** (Rev. 11-2017)

## Direct Deposit Authorization Form

Employee Name:    Westly Greer/ Greer Group, LLC
Department:    IAM
Social Security #:    ▮▮▮▮▮▮

Name, address, and phone number of bank to which funds will be sent:

Bank name:    ▮▮▮▮▮▮
Bank address:    1311 NW Sheridan Rd
     Lawton, OK 73505
Phone number:    580-581-0279

Account number(s)* to which funds will be deposited:

| Checking or Savings? | Routing Number | Amount ($) |
|---|---|---|
| ▮▮▮▮▮ | ▮▮▮▮▮▮ | 100% |
|  |  |  |

*If depositing to a checking account, please provide a voided blank check below.

Employee authorization:

I authorize GMS _____ to deposit my paycheck to the institution specified in the manner
     Company Name
and amounts stated above. This authorization will remain in effect unless canceled by me in writing.

_Willy Greer_             1/14/19
Employee Signature           Date

ATTACH CHECK HERE IF APPLICABLE
*Same as Sabrina Greer*

# Independent Sales Agent Agreement

**THIS INDEPENDENT SALES AGENT AGREEMENT** ("Agreement") is made as of January 6, 2017 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and Country Roads LLC, (Greg Spires) (the "Agent") of 13476 SW Tinney Rd, Faxon, OK 73540[Agent Address]

**WHEREAS**:

(A)     The Company is a supplier of certain industrial maintenance products (the "Products").

(B)     The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Oklahoma and Texas (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.     Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory. Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory. The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals. The Agent shall be free to set its own hours and appointments. The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products. Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable. If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.     Training Assistance. The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee"). The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company.

3.     Independent Contractor. The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.     Commission. As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion. Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date. Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns. Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of non-payment by customer. As a straight commission paid Agent, the Company will issue Agent a 1099

Agent Initials _GS_          Rev 6.2016

**EXHIBIT**

tabbies

1.3

**JA317**

at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5.    Bonus/Annual Sales Agent Trip. Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6.    Agent Expenses – Product Samples. The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7.    Customer Default. Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8.    No Sale outside of Territory. The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9.    Term and Termination. This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10.    Return of New Agent Kit. In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11.    Commission Payments after Termination. The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12.    Confidentiality. Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or

Agent Initials _G_ _US_                                  Rev 6.2016

**JA318**

16. Severability. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17. Governing Law/Venue & Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18. Assignment by Agent. Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19. Entire Agreement. This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20. Counterparts. This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

GMS INDUSTRIAL SUPPLY, INC.

AGENT:

Sign: _____

Rachel Gorken, President

Name: _____

Agent Initials _G|CJ_

Rev 6.2016

**JA319**

in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13.  Authority of Agent - Indemnity of Company. The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement. Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement. In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14.  Non-Solicitation. During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15.  Notices. Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

Agent Initials __ᐸ)ℓᵢ__                                               Rev 6.2016

**JA320**

# Independent Sales Agent Agreement

**THIS INDEPENDENT SALES AGENT AGREEMENT** ("Agreement") is made as of January 10, 2017 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and Greer Group LLC, (Sabrina Greer) (the "Agent") of 8102 Hardwood Circle, Colorado, CO 80908 [Agent Address]

**WHEREAS**:

(A)   The Company is a supplier of certain industrial maintenance products (the "Products").

(B)   The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Colorado (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.   Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory. Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory. The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals. The Agent shall be free to set its own hours and appointments. The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products. Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable. If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.   Training Assistance. The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee"). The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company.

3.   Independent Contractor. The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.   Commission. As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion. Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date. Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns. Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of

Agent Initials ⟨⟩ƒ                                                                                Rev 6.2016

**EXHIBIT**

tabbies®

1.4

non-payment by customer. As a straight commission paid Agent, the Company will issue Agent a 1099 at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5.    Bonus/Annual Sales Agent Trip. Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6.    Agent Expenses – Product Samples. The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7.    Customer Default. Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8.    No Sale outside of Territory. The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9.    Term and Termination. This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10.   Return of New Agent Kit. In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11.   Commission Payments after Termination. The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12.   Confidentiality. Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other

Agent Initials.                                                                Rev 6.2016

person or entity, any Confidential Information of the Company (except as required by applicable law or in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13.    Authority of Agent – Indemnity of Company. The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement. Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement. In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14.    Non-Solicitation. During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15.    Notices. Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying

Agent Initials 𝒮𝒥                                      Rev 6.2016

with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

16.   Severability. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17.   Governing Law/Venue & Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18.   Assignment by Agent. Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19.   Entire Agreement. This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20.   Counterparts. This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.

COMPANY:                                AGENT:

GMS INDUSTRIAL SUPPLY, INC.             Sign: _Sabrina Greer_

Rachel Gorken, President                Name: _Sabrina Greer_

Agent Initials _SG_                              Rev 6.2016

**Direct Deposit Authorization Form**

Employee Name: Greer Group LLC
Department:
Social Security #: ▓▓▓▓▓▓▓▓

Name, address, and phone number of bank to which funds will be sent:

Bank name: ▓▓▓▓▓▓▓▓
Bank address: 1311 NW Sheridan Rd
Lawton, OK 73505
Phone number: 580-581-0279

Account number(s)* to which funds will be deposited:

| Checking or Savings? | Routing Number | | Amount ($) |
| --- | --- | --- | --- |
| | | | All |
| | ▓▓▓▓▓▓▓ | | |

*If depositing to a checking account, please provide a voided blank check below.

Employee authorization:

I authorize GMS Industrel Supply to deposit my paycheck to the institution specified in the manner
            Company Name
and amounts stated above. This authorization will remain in effect unless canceled by me in writing.

_Sabrina Greer_                     1-10-17
Employee Signature                  Date

ATTACH CHECK HERE IF APPLICABLE

# Independent Sales Agent Agreement

**THIS INDEPENDENT SALES AGENT AGREEMENT** ("Agreement") is made as of June 15, 2016 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and Michael Welton (the "Agent") of 12112 Gallery St., Denton, TX, 76207. [Agent Address]

**WHEREAS:**

(A)    The Company is a supplier of certain industrial maintenance products (the "Products").

(B)    The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Texas – See attached addendum (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory. Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory. The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals. The Agent shall be free to set its own hours and appointments. The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products. Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable. If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.    Training Assistance. The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee"). The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company.

3.    Independent Contractor. The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.    Commission. As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion. Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date. Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns. Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of non-payment by customer. As a straight commission paid Agent, the Company will issue Agent a 1099

Agent Initials _MW_

Rev 6.2016

**EXHIBIT**

tabbies

1.5

**JA326**

at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5.  Bonus/Annual Sales Agent Trip. Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6.  Agent Expenses – Product Samples. The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7.  Customer Default. Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8.  No Sale outside of Territory. The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9.  Term and Termination. This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10. Return of New Agent Kit. In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11. Commission Payments after Termination. The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12. Confidentiality. Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or

Agent Initials _M W_                                                        Rev 6.2016

in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13. Authority of Agent – Indemnity of Company. The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement. Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement. In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14. Non-Solicitation. During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15. Notices. Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

Agent Initials _MW_                                                     Rev 6.2016

16. Severability. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17. Governing Law/Venue & Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18. Assignment by Agent. Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19. Entire Agreement. This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20. Counterparts. This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the date first above written.

COMPANY:                                AGENT:

GMS INDUSTRIAL SUPPLY, INC.             Sign: _____

Rachel Gorken, President                Name: _____

Agent Initials _____                              Rev 6.2016

# Statutory Employment Agreement

**THIS STATUTORY EMPLOYMENT AGREEMENT** ("Agreement") is made as of ___4/1/2019___ [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and _Michael Welton_ (the "Statutory Employee") of _1212 Gallery St. Denton, TX 76201_ [Statutory Employee Address].

**WHEREAS**:

(A)  The Company is a supplier of certain industrial maintenance products as detailed the Company's product catalogs from time to time (the "Products").

(B)  The Statutory Employee wishes to become the non-exclusive sales agent of Company for the Products.

**NOW THEREFORE** in consideration of the above recitals which are incorporated herein, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.  Designation as Non-exclusive Sales Agent of the Products for the Company for Approved Customers.

    a.  **Appointment as Non-exclusive Sales Agent.**  Company hereby appoints Statutory Employee as its non-exclusive sales agent for the Products for approved customer accounts, in accordance with CFR §31.3121(d)(iv). The Statutory Employee acknowledges and agrees that the Company shall have the right to appoint one or more other agents to sell the Products.

    b.  **Treatment of Customer Accounts.**  Company has thrived due to the high level of service that has been provided to its customers. In keeping with the Company's reputation, Statutory Employee shall use its best efforts to provide direct personal support and contact to all Company customers. It is strongly recommended that Statutory Employee will maintain in person contact with all Company customers at least once every two (2) weeks on average and never less than once every four (4) weeks. Individual customer accounts properly serviced by Statutory Employee will be treated as exclusive to Statutory Employee by the Company so long as orders are placed by that customer account no less frequently that every three (3) months (deploying customers, etc. can be planned and accounted for with your Manager) and Statutory Employee provides Sales Reports in compliance with the Company's then current reporting recommendations. Solely to prevent conflicts with other sales agents, Statutory Employee shall not contact any new potential customers without first identifying the prospective customer in writing to Company and receiving Company's written approval. Statutory Employee shall not contact any customer that Company identifies as already being served by the Company or any of its other sales agents.

    c.  **Consultant Program.**  Statutory Employee acknowledges that in certain situations, the use of a "Consultant Program" may be applicable. If Statutory Employee chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

**EXHIBIT**

tabbies

1.6

2.  Personal Service by Employee. The Statutory Employee agrees that the services described herein will be performed personally by the Statutory Employee. The Statutory Employee shall not assign or sub-contract any of its rights or delegate any of its duties without the Company's prior written approval. The Company will not control the specific manner of the Statutory Employee's sales efforts, and the Statutory Employee shall be free to set its own hours and appointments. The Statutory Employee agrees to: (i) aggressively promote the sale of the Products; (ii) to service the customers of the Company in a manner consistent with good sales procedure and customer relations; and (iii) to make regular calls on its Company customers at regular intervals. The Statutory Employee shall submit reports ("Sales Reports") via the Company's online reporting tool of customer contacts and sales activities in compliance with the Company's then current reporting recommendations. The Statutory Employee acknowledges they will not be entitled to payment for mileage

3.  Training Assistance. The Statutory Employee can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee"). The Company may wave the Training Assistance Fee if the Statutory Employee agrees to and does submit Sales Reports on a weekly basis detailing both Statutory Employee's customer contacts with respect to sales of the Products and Statutory Employee's weekly sales plan for the Products to the Company for no less than twelve (12) months.

4.  Statutory Employee. The Statutory Employee expressly acknowledges that it will be acting as a "statutory employee" for all purposes, including payment of Medicare and Social Security withholding tax and all other federal, state and local taxes. The Statutory Employee shall not be entitled to common law employee benefits including retirement plans and health insurance coverage. As a straight commission paid Statutory Employee, the Company will issue Statutory Employee a Form W-2 with the "statutory employee" box checked at the end of the year for tax purposes.

5.  Commission. As its sole compensation under this Agreement, Statutory Employee will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion. Company shall provide a copy of its current Commission Schedule to Statutory Employee and shall provide Statutory Employee notice of any changes at least two weeks prior to their effective date. Commission is based upon the type of Products sold and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns. Commissions due to the Statutory Employee will be payable no later than two weeks after verification of delivery of an order to a customer, subject to adjustment as provided below in the event of non-payment by customer. For certain military customers, Statutory Employee understands and acknowledges that orders are not placed directly with the Company but are ordered from within the respective military department. Accordingly, in order for Statutory Employee to verify delivery of an order to a military account customer that does not order directly from the Company ("Order Verification"), Statutory Employee must: (i) be current with its Sales Reports in compliance with Company's then current reporting requirements; and (ii) provide a copy of a customer order confirmation form or report then used by or obtainable from the respective military customer in compliance the Company's current reporting requirements;. Company's Order Verification process may be changed by the Company at any time in the exercise of its sole discretion on not less than two (2) weeks advance written notice. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Statutory Employee and to refuse to ship the goods described therein; or (b)

to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Statutory Employee in writing of such refusals, allowances or adjustments.

6.  Statutory Employee Expenses – Product Samples. The Statutory Employee will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Statutory Employee at no additional cost as part of a "New Agent Kit". Statutory Employee will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Statutory Employee will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7.  Customer Default. Commissions paid to the Statutory Employee on billings on which a customer defaults in payment will be charged back to the Statutory Employee when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Statutory Employee less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Statutory Employee, and then the customer made a late payment, the commission paid to the Statutory Employee would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8.  Term and Termination. This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice (the "Term"). Either party may terminate this Agreement immediately in the event of a material breach by the other.

9.  Return of New Agent Kit. In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Statutory Employee shall pay Company $1,500 for the value of such New Agent Kit.

10. Commission Payments after Termination. The Statutory Employee will be paid commissions on all orders from Statutory Employee's approved customers accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Statutory Employee's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

11. Confidentiality. Statutory Employee recognizes and acknowledges that Statutory Employee will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Statutory Employee will not during the term of this Agreement, or for three (3) years thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or in connection with the performance of Statutory Employee's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements, personnel policies, the substance of agreements with customers,

JA332

suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement) that is used or employed by the Company in the actual performance of its business operations.

12.   Authority of Statutory Employee – Indemnity of Company.  The Statutory Employee shall perform its services under this Agreement as a Statutory Employee.  The Statutory Employee does not have a substantial investment in the facilities used for the performance of this Contract, with the exception of the Statutory Employee's personal automobile which may be used in the course of the Statutory Employee's business.  Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or common law employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party.  Statutory Employee's sole authority shall be to solicit orders for the Products in accordance with the terms of this Agreement.  Statutory Employee also agrees that it will not hold itself out as a partner, joint venturer, co-principal or common law employee of the Company by reason of the Agreement.  In the event that the Company is adjudicated to be a partner, joint venturer or co-principal of or with the Statutory Employee, the Statutory Employee shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

13.   Non-Solicitation. During the term of this Agreement, and for a period of one year thereafter, Statutory Employee may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company to work for a business competitive with the business of the Company or for a business owned, managed by or at which Statutory Employee works; (ii) entice, solicit or encourage any independent contractor with whom Statutory Employee had contact with during the Term (as defined below) or learned of during the Term by virtue of Statutory Employee's employment with Company, to sever its engagement with the Company ; and may not (iii) directly or indirectly, entice, solicit or encourage any client or customer with whom Statutory Employee had contact or became aware of as a result of Statutory Employee's work with the Company or any known (during the Term) prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Statutory Employee will not reveal the identity of any supplier to any competitor of Company. Statutory Employee understands and agrees that establishing the precise amount of damages for breach of Section 15(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 15(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Statutory Employee acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not

affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

14. Notices. Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

15. Severability. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

16. Governing Law/Venue & Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

17. Entire Agreement. This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Statutory Employee and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Statutory Employee.

18. Counterparts. This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the date first above written.

COMPANY:                                      STATUTORY EMPLOYEE:

GMS INDUSTRIAL SUPPLY, INC.

By:_____           _____

    Rachel Gorken, President                  Printed Name: Michael Weston

# Sales Agent Agreement

**THIS AGREEMENT** made as of November 5, 2015 (Date) between **GMS Industrial Supply** (the "Seller") of 212 Denn Ln. Virginia Beach, VA 23462 and Wayne Side (the "Agent") of, 24367 Allen Rd, Alexandria Bay, NY, 13607 (Agent Address) **WHEREAS:**

(A)    This agreement shall supersede any previous agreement between GMS Industrial Supply and the Agent

(B)    The Seller is a supplier of certain Industrial Maintenance products (the "Products").

(C)    The Agent wishes to become the non-exclusive sales agent of Seller for the Products in the state(s) of New York (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Non-exclusive Sales Agents of the Products for the Seller in the Territory. The Agent acknowledges and agrees that the Seller shall have the right to appoint one or more other agents within the Territory to sell the Products. Agent acknowledges that in certain territories, the use of a Consultant Program may be applicable. If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.    The Agent can request extended training assistance from corporate personnel at a rate of $750.00/day. This fee can be waived on a case by case basis if the Sales Agent submits complete and regular ACR's and weekly sales plan to their Sales Manager.

3.    The Agent will be entitled to receive a commission of 5% - 25%. Commission is based upon the type of products sold as well as service related to those products, excluding applicable taxes. Commissions due to the Agent will be payable on the pay period in which the seller shipped the items, no later than two weeks after shipment is delivered. As a straight commission paid Agent, the Seller will issue a 1099 at the end of the year for tax purposes.

4.    The Agent will be responsible for all expenses unless otherwise approved in writing by an authorized representative of the Seller. Independent Sales Agents will be responsible for 40% of the cost for novelties/samples. Once a $300.00 threshold has been reached, agents will be responsible for 100% of the cost for novelty/sample materials. Deductions will be taken from bi-weekly commissions. Initial shipments of new products and novelties will be sent to the Agent at no additional cost. New Agent Kits will be provided to the Agent no initial cost.

5.    Commissions paid to the Agent on billings on which the customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more. If the customer pays at some future date, these commissions will be repaid to the Agent with a 10% penalty to the commission rate (25% -> 15%).

6.    The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Seller in a manner consistent with good sales procedure and customer relations, and to

Agent Initials  W.S.-

**EXHIBIT**

tabbies

1.7

**JA335**

Rev 10.2015

make regular calls on its customers at regular intervals. If it is determined that this is not the case and the Agent is representing the company in an other than favorable manner, the Seller will notify the Agent that their agreement is cancelled immediately and arrangements to return on New Agent Sales Kit will be made.

7.     The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Seller, which consent may be withheld by the Seller.

8.     The Agent agrees to abide by and comply with all sales policies and operating procedures of the Seller so long as they are not in conflict with governmental regulations.

9.     The Agent will not obligate or contract on behalf of the Seller unless it has specific written authority to do so from an authorized representative of the Seller.

10.     This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party. The Seller has the right to terminate agreement immediately if it is deemed the Agent is not meeting the terms of the agreement.

11.     At the time of separation, initiated by either party, should the "New Agent Kit" not be returned within 30 (thirty days) from separation date, a cost of $1500.00 will be incurred by the Agent.

12.     The Agent will be paid commissions on all orders from the Territory accepted by the Seller prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Final paycheck will be held for 60 days to ensure all customer accounts have paid in full.

13.     The Agent acknowledges that he/she may have access to the Seller's confidential and proprietary information. Such confidential information may include, without limitation: i) business and financial information, ii) business methods and practices, iii) technologies and technological strategies, iv) marketing strategies and v) other such information as the Seller may designate as confidential ("Confidential Information"). Agent agrees to not disclose to any other person (unless required by law) or use for personal gain any Confidential Information at any time during or after the Agreement Term, unless the Seller grants express, written consent of such a disclosure. In addition, Agent will use his/her best efforts to prevent any such disclosure. Confidential information will not include information that is in the public domain, unless such information falls into public domain through Agent's unauthorized actions.

14.     The Agent agrees that GMS has the right to take photographs of me in connection with GMS property and materials. The Agent agrees that GMS may use such photographs of me with or without my name and for any lawful purpose, including for example such purposes as publicity, illustration, advertising, and Web content.

15.     The Agent shall perform its services under this Agreement as an Independent Contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or relationship of principal and agent or employer and employee between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. The Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Seller by reason of the Agreement. In the event that the Seller is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the

Agent Initials W.S.

Rev 10.2015

JA336

Agent shall indemnify and hold harmless the Seller from and against any and all claims for loss, liability or damages arising therefrom.

16.    I agree not to recruit and not to assist any other entity in recruiting any other employee or "Agent" who worked for GMS Industrial Supply during the last twelve (12) months in which I worked for GMS Industrial Supply. Further; I will not reveal the identity of any supplier to any competitor of GMS Industrial Supply; Nor will I become the employee or "Agent" or any competitor of GMS Industrial Supply, Inc. These restrictions will apply during my employment and for twelve (12) months subsequent to my employment. I understand that in establishing the precise amount of damages for breach of the provision, for each person recruited about whom I have provided information in violation of this provision, liquidated damages for such violation shall be the amount of annual compensation of that person at GMS Industrial Supply.

17.    If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

18.    This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia. Any dispute that should arise will be handled accordingly.

19.    This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contain all the representations and warranties of the respective parties relating to the subject matter hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the date first above written.

Wayne S. Side
**Sales Agent Name**

Rachel    Gorken,    President,    GMS Industrial Supply, Inc.

Agent Initials  W.S.

Rev 10.2015

**JA337**

# Independent Sales Agent Agreement

**THIS INDEPENDENT SALES AGENT AGREEMENT** ("Agreement") is made as of July 27, 2016 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and Thomas Hayes (the "Agent") of 826 Briarwood Circle, Leesville, LA, 71446 [Agent Address]

**WHEREAS**:

(A)     The Company is a supplier of certain industrial maintenance products (the "Products").

(B)     The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Louisiana (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.     Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory. Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory. The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals. The Agent shall be free to set its own hours and appointments. The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products. Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable. If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.     Training Assistance. The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee"). The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company.

3.     Independent Contractor. The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.     Commission. As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion. Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date. Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns. Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of non-payment by customer. As a straight commission paid Agent, the Company will issue Agent a 1099

Agent Initials  _THJ_

**EXHIBIT**

tabbies®

1.8

Rev 6.2016

**JA338**

at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5. Bonus/Annual Sales Agent Trip. Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6. Agent Expenses – Product Samples. The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7. Customer Default. Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8. No Sale outside of Territory. The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9. Term and Termination. This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10. Return of New Agent Kit. In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11. Commission Payments after Termination. The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12. Confidentiality. Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or

Agent Initials ___THJ___                                        Rev 6.2016

in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13. **Authority of Agent – Indemnity of Company.** The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement. Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement. In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14. **Non-Solicitation.** During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15. **Notices.** Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

Agent Initials _THJ_                                            Rev 6.2016

16.    Severability. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17.    Governing Law/Venue & Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18.    Assignment by Agent. Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19.    Entire Agreement. This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20.    Counterparts. This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**                  **AGENT:**

GMS INDUSTRIAL SUPPLY, INC.    Sign:

Rachel Gorken, President          Name: _Thomas Hayes Jr._

Agent Initials _THJ_               Rev 6.2016

# Independent Sales Agent Agreement

**THIS INDEPENDENT SALES AGENT AGREEMENT** ("Agreement") is made as of October 3, 2016 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and **Gregory Sky Spires** (the "Agent") of 13476 SW Tinney Rd, Faxon, OK 73540 [Agent Address]

## WHEREAS:

(A)     The Company is a supplier of certain industrial maintenance products (the "Products").

(B)     The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Oklahoma (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory. Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory. The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals. The Agent shall be free to set its own hours and appointments. The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products. Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable. If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.    Training Assistance. The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee"). The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company.

3.    Independent Contractor. The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.    Commission. As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion. Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date. Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns. Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of non-payment by customer. As a straight commission paid Agent, the Company will issue Agent a 1099

Agent Initials  G SS

**EXHIBIT**

1.9

**JA342**

Rev 6.2016

at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5.    Bonus/Annual Sales Agent Trip.  Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6.    Agent Expenses – Product Samples.  The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7.    Customer Default.  Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8.    No Sale outside of Territory.  The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9.    Term and Termination.  This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10.    Return of New Agent Kit.  In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11.    Commission Payments after Termination.  The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12.    Confidentiality.  Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or

Agent Initials  $\underline{6\,S\,S}$                                         Rev 6.2016

**JA343**

in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13.    Authority of Agent -- Indemnity of Company. The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement. Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement. In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14.    Non-Solicitation. During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15.    Notices. Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

Agent Initials _____                                                    Rev 6.2016

**JA344**

16. Severability. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17. Governing Law/Venue & Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18. Assignment by Agent. Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19. Entire Agreement. This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20. Counterparts. This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.


**COMPANY:**

GMS INDUSTRIAL SUPPLY, INC.

Rachel Gorken, President


**AGENT:**

Sign: _____

Name: _____


Agent Initials _GSS_

Rev 6.2016

JA345

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**GMS INDUSTRIAL SUPPLY, INC.**

        **Plaintiff,**

    **v.**                                      **Civil Action No. 2:19-cv-324**

**G&S SUPPLY, LLC, WESTLY L. GREER**

**SABRINA GREER, GREER GROUP, LLC**

**GREGORY K.  SPIRES, COUNTY ROADS, LLC**

**THOMAS HAYES, GREGORY S.  SPIRES,**

**MIKE WELTON, HMC SUPPLY, LLC, AND**

**WARTECH INDUSTRIES, LLC**

        **Defendants.**

## THIRD  AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE AND LEGAL RELIEF

NOW COMES GMS INDUSTRIAL SUPPLY, INC. ("GMS"), and as and for its Second Amended Complaint against Defendants G&S Supply, LLC ("G&S"), Westly Greer ("Westly"), Sabrina Greer ("Sabrina"), Greer Group, LLC ("Greer Group"), Gregory Greg Spires ("Greg Spires"), County Roads, LLC ("County Roads"), Thomas Hayes ("Hayes"),  Gregory S. Spires ("Sky Spires"),Mike Welton ("Welton"), Wayne Side ("Side"),[1] HMC Supply, LLC ("HMC"), and WarTech Industries, LLC ("WarTech")  (collectively, "Defendants") in accordance with  this Court's Order entered  November 24, 2020  as Doc. 157, directing GMS to file its Third Amended Verified Complaint:

---

[1] This Court dismissed all claims against defendant Wayne Side in its Order dated January 16, 2020 (Doc. 98) to which plaintiff GMS Industrial Supply, Inc. has objected on the record.

## PRELIMINARY STATEMENT

1.      This action is brought to remedy Defendants' disloyal and unlawful conduct in breaching fiduciary duties of loyalty and written contracts and violating numerous common law duties and federal and state statutes while employed by, and/or under independent sales agent contract with HMC and GMS, which sold industrial supply products and equipment to the U..S. Military, by soliciting and diverting existing GMS sales agents and customers to HMC and G&S, the competitor companies they clandestinely organized and/or worked for while still under employ and contract with GMS, and misappropriating GMS' property, including GMS' confidential, proprietary and Trade Secret information, resources, property and goodwill.   As stated herein, GMS worked for 18 years to develop proprietary, Trade Secret processes for marketing and selling its products to a very select group of consumers: military bases.  While GMS was relying on the Defendants to use these Trade Secrets in performing as GMS' its salesforce, the Defendants were instead selling their own competing products under the clandestinely formed and operated HMC and the synonymously named G&S.  Once they were discovered in April 2019, these double agents threw aside any pretense and began openly using GMS's trade name, Trade Secrets, and other proprietary information to continue to sell their mostly substantially similar, but in notable cases, substandard, illegal products to GMS's customers, causing financial damages, while at the same time damaging GMS's goodwill and reputation.  Every day the Defendants continue to operate, they irreparably injure the business that GMS has built. In the following thirteen Counts, GMS seeks temporary and permanent injunctive relief and monetary damages.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

JA347

## PARTIES

2.      Plaintiff GMS Industrial Supply, Inc. ("GMS" or the "Plaintiff") is a Virginia Limited Liability Company with its principal place of business in Virginia Beach, Virginia. All of the membership interests of GMS are owned by Rachel Gorken ("Rachel"), a citizen of the State of California.

3.      Defendants Westly L. Greer ("Westly") and Sabrina Greer ("Sabrina") are individual citizens of Colorado, residing at 8102 Hardwood Circle, Colorado Springs, Colorado 80908. Westly and Sabrina are married.

4.      Defendant Greer Group LLC ("Greer Group") is a Colorado Limited Liability Company with its principal address located at 8102 Hardwood Circle, Colorado Springs, Colorado 80908, and is controlled and operated by its owner and agent, Sabrina.

5.      Defendant Gregory K. Spires ("Greg Spires") is an individual who is a citizen of the State of Oklahoma, residing at 13476 SW Tinney Road, Faxon, Oklahoma 73540.

6.      Defendant County Roads, LLC ("County Roads") is an Oklahoma Limited Liability Company with its principal address located at 13476 SW Tinney Road, Faxon, Oklahoma 73540, and is owned, controlled and operated by its owner and agent Greg Spires.

7.      Defendant Thomas Hayes ("Hayes") is an individual who is a citizen of the State of Oklahoma, residing at 3367 Belview Road, Leesville, Louisiana 71446.

8.      Defendant Gregory S. Spires ("S. Spires") is an individual who is a citizen of the State of Oklahoma, residing at 13476 SW Tinney Road, Faxon, Oklahoma.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 3 of 86

**JA348**

9.     Defendant Mike Welton ("Welton") is an individual who is a citizen of the State of Texas, residing at 12112 Gallery Street, Denton, Texas 76207.

10.    Defendant Wayne Side ("Side") is an individual who is a citizen of the State of New York, residing at 24367 Allen Road, Alexandria Bay, New York 13607.

11.    Defendant G&S Supply, LLC ("G&S") is a Colorado Limited Liability Company with its principal address located at 8102 Hardwood Circle, Colorado Springs, Colorado 80908, and is owned, controlled and operated by its owners and agents, Westly Greer and Greg Spires.

12.    Defendant HMC Supply, LLC ("HMC") was an Oklahoma Limited Liability Company with its principal address located at 13476 SW Tinney Road, Faxon, Oklahoma.  Upon information and belief, HMC was owned and operated by Greg Spires and Westly Greer.

13.    Defendant WarTech Industries, LLC ("WarTech") is a Louisiana Limited Liability Company with its principal address located at 3367 Belview Road, Leesville, Louisiana.  Upon information and belief, WarTeach is owned and operated by Greer Group. LLC, County Times, LLC, and Hayes & Associates, LLC.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction of this action under Article III, §2 of the United States Constitution and 28 U.S.C. §1332.

15.    The matter in controversy exceeds, exclusive of interest and costs, the sum of Seventy Five Thousand Dollars ($75,000) and is between citizens of different states.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 4 of 86

JA349

16.     Venue in this jurisdictional district and in this division is appropriate pursuant to 28 U.S.C. §1391 as to all Counts because it is the jurisdictional district because a substantial part of the events giving rise to the claim occurred in this judicial district and division.

17.     Venue is also appropriate as to all Counts because it is the judicial district in which all of the Defendants except G&S consented to such venue in various contractual agreements, detailed below, and those individual Defendants are the agents of G&S. Venue is appropriate as to WarTech and HMC because the former is a successor corporation to G&S, and it and HMC are owned by the individual defendants.

18.     This Court has personal jurisdiction over each of the individual Defendants and Defendants County Roads and Greer Group because each has contractually agreed to such jurisdiction.  In addition, this Court has personal jurisdiction over all of the Defendants because of (i) intentional actions taken by each in the Commonwealth of Virginia, where GMS, a Virginia corporation is headquartered and where GMS performs and the Defendants participated in many administrative, management and sales activities; (ii) intentional actions of each taken in another forum but directed at the Commonwealth of Virginia and causing tortious injury in this Commonwealth through a persistent course of conduct specifically intended to damage and harm GMS; (iii) conspiratorial activity undertaken by one or more Defendants in Virginia in furtherance of the conspiracy to injure GMS in its trade or business. Further, this Court has personal jurisdiction over G&S because this Court has jurisdiction over the agents of G&S. This Court has personal jurisdiction over WarTech Industries, LLC because it is the successor company to G&S.

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

## FACTS APPLICABLE TO ALL PARTIES

19.    In 2001, Gorken's Maintenance Specialists started in a small warehouse in Virginia Beach, VA with one employee and developed a specialty line of industrial maintenance products for the US Navy.

20.    The company name was changed to GMS Industrial Supply, Inc. (GMS) in October 2007.  GMS is a small, women-owned business, owned 100% by Rachel Gorken. In the beginning, the small team of three worked with the Navy installations in the Hampton Roads area.  Over the next five years, GMS grew into a larger operations facility in Virginia Beach with over 10 internal employees. GMS expanded sales into areas of Oklahoma, Florida and Texas and hired several traveling sales managers. The new technology available allowed GMS to dictate very meticulous planning, methods of execution, and specialized communications procedures which GMS incorporated into its operations and required its sales force to participate in. All of GMS' business was, and is, controlled, originated and distributed from the Virginia Beach office, but the customers benefit from GMS' on-site sales representatives in all of the different geographical areas GMS serves due to GMS' ability to be nimble and proactive to the customers' needs. This business model enabled GMS to grow as one of the preferred suppliers to the Army, Navy and Marine Corps bases. Over years GMS investment in meticulously doing the right thing, selling materials that were in full compliance of all of the federal regulations, and  management of its General Services Administration ("GSA") and Defense Logistics Agency ("DLA") contracts resulted in the awards of larger contracts in the supply of industrial products to these defined segments of the federal government.

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 6 of 86

JA351

21.     The Trade Agreements Act (19 U.S.C. § 2501—2581) ("TAA"), which is intended to foster fair and open international trade, requires that products must be produced or undergo "substantial transformation" within the United States or a designated country, including countries that have reciprocal trade agreements with the United States, Caribbean Basin countries and certain "least developed" countries. If you supply products for GSA, DLA and other government contracts, those products must comply with TAA. Failure to comply with TAA can lead to award cancellation, multimillion dollar fines, suspension and debarment due to increased governmental oversight, "whistleblower" lawsuits and TAA related bid protests.

22.     GMS expanded to the West Coast in 2010, but retained its headquarters any in Virginia Beach, Virginia.

23.     GMS's headquarters, central office many operating functions remain in Virginia Beach, Virginia, including: i) all corporate planning and administration; ii) all accounting;       iii) contracts and sales orders are submitted by sales personnel, developed and processed iv) the marketing department functions of marketing and sales planning, product development, sales analysis, bonus and goal achievement planning; v) weekly hosting of sales manager meetings and quarterly meetings of sales personnel are hosted via video chat and recorded; vi) sales personnel travel arrangements are submitted and responded to and sales personnel reimbursement requests are made, reviewed and paid; vii) sales personnel payroll and other commission requests are submitted, reviewed and paid viii) most all of product sourcing requests are processed, and all vendors accounts are based in the Virginia office, where all accounting and banking is conducted. The 7 non-corporate Defendant sales representatives and their related limited liability companies

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 7 of 86

**JA352**

(the "Sales Agent Defendants") engaged in constant contact, communication and interaction with GMS' Virginia Beach headquarters with respect to the foregoing functions relating to products and sales, as well as administrative and financial transactions.

24.     GMS was granted its first national stock number ("NSN") items in 2012 due to the volume and continuous ordering of GMS' unique material.  A NSN is a unique identifier that recognizes "standardized material items of supply" by NATO countries, including the United States Department of Defense.  This is the preferred method of procuring material by the military because the material has been verified to meet compliance standards, past performance characteristics, shipping data, special handling and other relevant information.   It is a very difficult, costly and lengthy process for a company to be assigned NSNs, and GMS developed confidential processes and procedures to seek and be awarded NSNs, which are included among GMS' Trade Secrets. The ability to develop and obtain assignment of NSN products provides GMS a competitive advantage to sell more product to military bases because it is easier for them to order.

25.     In 2013, due to GMS' continued good standing, volume, and demand, DLA began to stock GMS NSN items in the depots to ensure prompt delivery to the customer.  To meet the depot stocking requirement, there are strict packaging and shipping guidelines that must be adhered to.

26.     Over the years, GMS has been awarded several coveted government contracts from GSA and DLA. These contracts continue to be renewed by GMS' customers due to GMS' excellent past performance and service, continually meeting strict government standards, and very consistent

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 8 of 86

**JA353**

demand for these GMS NSN products for many years. Due to the 18 years of its performance being excellent and passing annual audits and every other type of evaluation process used by GMS' customers, GMS was awarded national stock numbers ("NSNs") for 57 separate products, and 22 of 57 of GMS' NSNs are product kits. Product kits are combinations of several products often used in combination with each other by customers combined together in a kit, and are created by GMS using knowledge, research and experience with its customers and their purchasing needs and preferences. These NSN materials make up between 20% and 35% of GMS' customers' needs, since 65% to 90% of the customer requests are for special-order, non-NSN items, referred to as cage code part number ("CCPN") items. In the instant case, G&S is unlawfully competing with GMS in selling CCPN items, specifically to the U.S Army at various Army bases, and due to its misappropriation of GMS' Trade Secrets, G&S is using the misappropriated GMS Trade Secrets to work toward being assigned NSNs of its own to unlawfully compete with GMS by selling NSNs of its own.

27.     In January 2018, GMS received the award of a Long Term Contract (LTC) for DLA to process direct awards for the 22 NSN stocked product kit items without having to go through the solicitation (bidding) process. This is an added benefit to the end user, because it eliminates delay of long lead times to receive material.

28.     GMS' success is due, in large part, to its development of confidential, proprietary and trade secret processes, procedures, means, methods, protocols, techniques and plans, including:

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 9 of 86

**JA354**

a.  customer contacts lists with specific names and contact information ("Customer Lists");

b.  customer purchasing preferences, identified and constantly honed and memorialized by GMS in confidential records ("Customer Preference Data");

c.  developed database of trusted, reliable sources of products that are TAA compliant and meet customer preferences ("Products Source List");

d.  developed protocol to simplify the complex process of inputting products and materials with the proper information into the Army's automated internet based purchase systems named Global Combat Support System-Army (GCSS-Army) and Army Enterprise Systems Integration Program (AESIP) to ensure products and materials are properly input into the correct class and category so that the customer can easily and efficiently order GMS' products ("Load Sheet Protocol");

e.  sales personnel training based upon detailed protocols intended to gain trust and respect of GMS by the customer purchasing agents, engender loyalty between the customer and GMS and demonstrate delivery upon customer needs at competitive prices ("Sales Agent Training Protocol");

f.  models and methods for pricing of supplies ("Pricing Methods"); and

g.  marketing methods of creating kits of industrial materials based upon Customer Preference Data, creating names for the kits and techniques of marketing such kits and other products to the customer, including means and methods of obtaining assignment of NSNs for products and product kits ("Marketing Techniques").

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 10 of 86

JA355

29.    GMS' confidential and proprietary Customer Lists, Customer Preference Data, Products Source List, Load Sheet Protocol, Sales Agent Training Protocol, Pricing Methods and Marketing Techniques constitute "trade secrets" under applicable laws hereinafter cited, and are hereinafter referred to as, GMS' "Trade Secrets."

30.    GMS' Trade Secrets are available to GMS' sales agents only by virtue of their employment or independent contractor contractual relationship with GMS, and GMS Sales Agents are able to use the Trade Secrets solely to further GMS' business, customer sales and goodwill, by virtue of the policies and procedures, employee handbook and contractual agreements of GMS with its employees and independent contractors limiting the use and disclosure of such proprietary, confidential and Trade Secret information, and the solicitation of GMS' customers and employees. A competitor who had access to this proprietary, confidential, Trade Secret data and analysis would have an unfair competitive advantage that could enable them, as an example, to use GMS' own data and analysis to underprice GMS' price quotes to its customers, to divert GMS's customers and/or to serve GMS' customers as well as GMS.

31.    GMS has taken reasonable measures to protect its proprietary, confidential and Trade Secret information, including the following: i) use of confidentiality, non-disclosure and non-solicitation agreements with all sales employees and independent sales agents; ii) employee handbook policies and provisions which include confidentiality, non-disclosure and non-solicitation requirements; iii) conducting on the job training regarding its confidential, proprietary and Trade Secret information with employees and agents; iv) requiring password protected access

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 11 of 86

**JA356**

to company data and Trade Secret information; and v) employing physical security measures, such as placing locks on offices and doors and by securing sensitive data in file cabinets.

32.     GMS' confidential, proprietary and Trade Secret information has independent economic value in that it consists of information that is neither generally known nor readily ascertainable within the industry through lawful means. GMS has made reasonable efforts to ensure the secrecy of its confidential, proprietary and Trade Secret information, and its confidential, proprietary and Trade Secret information constitute "trade secrets" under applicable laws cited herein that merit legal protection from unauthorized disclosure, misappropriation and dissemination and/or use.

33.     During all times relevant herein, training and communication with Sales Account Managers and Sales Agents occurred regularly at GMS, hosted from the Virginia Beach Headquarters Office.  Every Friday afternoon sales account managers, including the Sales Agent Defendants, participated in management video call meetings hosted from the Virginia Beach Headquarters Office.  The sales Account Managers were responsible for, and provided, the information received in the meetings to their sales agent teams, including the Sales Agents Defendants. In early 2018, GMS also started having quarterly Account Manager video calls with the entire sales force, including the Sales Agent Defendants, during which GMS Management, Marketing and Regulatory Compliance Department representatives and the Sales Agent Defendants discussed new developments, new products, share marketing and sales strategies, discussed customer accounts and preferences, exchanged sales tips, provided demonstrations and techniques to the sales team to help them be successful.  Through these meetings, all Sales Agent

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

Defendants gained knowledge of and became familiar with, and knowledgeable of all customers of GMS, and the GMS Trade Secrets.

34.     On October 22, 2015, Spires incorporated HMC Supply, LLC in the state of Oklahoma using his home address as the address for the registered agent.  Upon information and belief, Spires joined together with Westly through criminal and unlawful means to establish HMC as a business competing with G&S. At the time, Westly was an employee of GMS and Spires was under contract with GMS as a sales agent.  During this time, Westly and Spires concealed HMC so that they could use the company to steal GMS's corporate opportunities while having GMS pay them to do so.  HMC created catalogs containing products that directly competed with products sold by GMS.  HMC also began using the same product suppliers as GMS to provide goods it was selling to GMS clients.  Upon information and belief, HMC, through Spires and Westly, obtained and used GMS's confidential information and trade secrets.

35.     Commencing in or about 2017, the disloyal Sales Agent Defendants and HMC joined together through criminal or unlawful means as detailed herein to establish G&S as their undisclosed principal and a competing business of GMS that has injured, and continues to injure, GMS.  HMC provided the initial "seed money" to help get G&S up and running.  During this time, the Sales Agent Defendants were under contracts with GMS that required their loyalty, prohibited competitive conduct and solicitation of GMS' customers or sales representatives, and their disclosure or use of proprietary information and Trade Secrets.   The Sales Agent Defendants concealed their disloyal and unlawful acts from GMS by telling lies to GMS and its owners and officers, and, at other times, remaining silent when they had a duty to speak.  They did so to

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 13 of 86

**JA358**

perpetuate their employment with GMS over a period of many months, and with some, up to two (2) years, so they could continue to draw GMS paychecks while they conspired to, and actually, misappropriated GMS' Trade Secrets, solicited GMS' sales personnel to leave GMS, solicited GMS' current and ongoing customers to abandon GMS in favor of their new business, G&S, and misappropriate GMS' name recognition, goodwill and trade name in the marketplace. The G&S name was intentionally created to sound identical to GMS, and the Sales Agent Defendants misrepresented it as a "sister company" of GMS, so they could profit from GMS' name recognition in the unsuspecting customer base.

36.     As a new startup company fueled by the unlawful misconduct of the Defendants, between November 2017 and April 2019, G&S secured nearly $1,000,000 in awarded and shipped orders to GMS' customers, of products that compete with GMS' competing products, causing GMS lost profits of $350,000. G&S has secured an additional $1,035,000 in pending orders, which, when consummated, will cause GMS lost profits of $362,250. These awarded and pending orders were placed through the US Army using DLA as the purchasing method during this 18 month period by the Defendant's soliciting GMS' customers and selling them competitive products to those offered by GMS. In the process, the Defendants misappropriated GMS' proprietary, confidential and Trade Secret information and data, thereby causing GMS further reparable and irreparable damages.

37.     Each of the Sales Agent Defendants that were previously sales agents of GMS were sent a cease and desist letter dated April 3, 2019, copies of which are attached hereto as Exhibit #1, terminating their relationships with GMS for cause and demanding they quit soliciting GMS'

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 14 of 86

**JA359**

customers and sales representatives, and preserve all documents and evidence of their actions. They have nevertheless continued to siphon substantial amounts in sales awards and in solicitations (pending awards) from GMS to G&S since the April 3, 2019 cease and desist letters were sent. See Declaration of William A. Lascara, attached as Exhibit #12 hereto, with respect to Exhibits #1, #6 and #10.

### Facts Applicable to Each Of The Parties Defendant

### Westly Greer

38.　　Gary Gorken, Rachel Gorken's husband and GMS' Director of Regulatory Compliance, hired Westly on April 4, 2011. At the time, Westly was living in Oklahoma and was a dishwasher at Denny's. He told Gary Gorken had a pregnant girlfriend and needed a better job. He had no experience whatsoever in the sale of industrial products to the US Army, or any other branch of the service, but seemed to be honest and hard-working.

39.　　Over the course of the next few years, Westly came to work every day and seemed content. GMS rewarded his efforts frequently with pay increases and gave him more responsibilities. Throughout his time with GMS, GMS and Gorken family treated Westly like a son. In November 2012, during an annual company trip, Westly proposed to Sabrina in front of his GMS Family. In 2013, the Gorkens paid for Westly's and Sabrina's destination wedding in the Dominican Republic.

40.　　Westly continuously learned how GMS' business worked and continued to gain experience as GMS continued to invest in him by training him, purchasing and providing him every state of the art piece of equipment Westly desired, including phone, desktop computer,

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.　2:19-cv-324
Third Amended Verified Complaint

laptop computer and tablet computer, sending people to work with him, and sending him to places to learn from the work of others as well.

41.     In November 2012, Westly was promoted to the position of District Manager to oversee the sales agents to be certain that they were doing things in accordance with GMS' high standards of taking care of the customers and working to grow business opportunities for GMS. In order to protect its business interests, including GMS' Trade Secrets, loyal customer base and a stable sales force, GMS required Westly to sign an at will Employment Agreement on or about November 1, 2012 (the "Westly 2012 Employment Agreement").

42.     The relevant terms of the Westly 2012 Employment Agreement included the following:

    a.  Westly's employment "at will";

    b.  A non-disclosure provision with respect to GMS' confidential information:

    GMS Industrial Supply may impart, to me, confidential information, including, without limitation, designs, pricing, financial information, personal information, real estate information, marketing strategies, customer profiles, and the like (collectively "confidential information"). I hereby acknowledge GMS Industrial Supply's exclusive ownership of such confidential information.

    I agree: (1) only to use the confidential business information to provide services or goods to GMS Industrial Supply; (2) only to communicate the confidential information to fellow employees on a need-to-know basis; and (3)not to otherwise disclose or use, at any time, any confidential information. As an example, and not as a limitation, I understand that I am not to use or provide confidential information for the purpose of trading any securities of GMS Industrial Supply. Upon demand of GMS Industrial Supply or termination of my employment, I will deliver to GMS Industrial Supply all blueprints, manuals, designs, photographs, recordings, and any

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 16 of 86

JA361

other medium by which, through which, or on which confidential information has been recorded or stored, which are in my possession, custody, or control.

I further agree that the disclosure or use of any confidential information, in breach of this understanding, would cause irreparable harm to GMS Industrial Supply, and, accordingly, not only can GMS Industrial Supply seek damages, but I agree to the issuance of a permanent injunction against me restraining such disclosure and use, and I agree that any court of competent jurisdiction, selected by GMS Industrial Supply, shall have personal jurisdiction over me.

    c.  A Non-Solicitation provision with respect to GMS employees:

I agree not to recruit and not to assist any other entity in recruiting any other employee who works for GMS Industrial Supply during the last twelve (12) months in which I worked for GMS Supply. Further, I will not reveal the identity of any supplier to any competitor of GMS Industrial Supply. These restrictions will apply during any employment and for twelve (12) months subsequent to my employment. I understand that in establishing the precise amount of damages for breach of the provision, for each person recruited about whom I have provided information in violation of this provision, liquidated damages for such violation shall be the amount of annual compensation of that person at GMS Industrial Supply.

43.    As an employee, and as set forth in the Westly 2012 Employment Agreement, Westly was provided the GMS employee handbook and Westly agreed to "comply with its provisions and any other rules." Included among those rules are requirements:

    a.  to not disclose company proprietary, confidential and trade secret information, as set forth below:

GMS Industrial Supply Inc. requires all employees to sign a confidentiality agreement as a condition of employment due to employees' potential access to information that is confidential and/or intended for company use only. All employees are required to maintain such information in strict confidence. This policy benefits employees by protecting the interests of GMS Industrial Supply Inc.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

**JA362**

and protecting confidential, unique and valuable information from competitors or others.

Should an occasion arise in which an employee is unsure of his or her obligations under this policy, he or she must consult a supervisor. Failure to comply with this policy could result in disciplinary action, up to and including termination of employment.

The protection of confidential business information and trade secrets is vital to the success of GMS Industrial Supply Inc. Such confidential information includes, but is not limited to, the following examples:

☐ Any material developed using company resources and/or time
☐ Compensation data
☐ Computer processes
☐ Computer programs and codes
☐ Conversations between any persons associated with the company
☐ Customer lists
☐ Customer preferences
☐ Financial information
☐ Marketing strategies
☐ New materials research
☐ Pending projects and proposals
☐ Proprietary production processes
☐ Personnel/payroll records
☐ Research and development strategies
☐ Scientific data
☐ Scientific formulae
☐ Scientific prototypes
☐ Technological data
☐ Technological prototypes

Employees who improperly use or disclose any type of confidential business information will be subject to disciplinary action and/or legal action, even if they do not personally benefit from the disclosure of such information.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

b.    to not simultaneously hold a competing job, by limiting outside employment by providing that "Employees may hold outside jobs in unrelated businesses or occupations as long as the employee meets the performance standards of the position with GMS";

c.    to preclude "insubordination" and "unauthorized disclosure on any confidential information"; and

d.    to require "immediate suspension" or "termination of employment" for "[d]ivulging GMS Industrial Supply Inc.'s business practices or and confidential information" or for "[a]ny misrepresentation of GMS Industrial Supply Inc. to a customer, a prospective customer, the general public, or any employee."

44.    In July 2015, Westly was promoted to Director of Sales, the head of the entire sales team, overseeing the other Sales Managers and working directly with GMS' Marketing Department and corporate home office in Virginia, while remaining under the terms of the Westly 2012 Employment Agreement and the GMS employee handbook. As Director of Sales, Westly's primary responsibility was to communicate with GMS' Virginia office daily, sometimes even hourly to disseminate and communicate all directives and managing all activities for GMS' best interest.  As the Director of Sales, Westly had access to GMS' confidential, proprietary and Trade Secret information.

45.    Commencing on or about October 2015, Westly joined with Spires to create HMC to be a company that they could use to directly compete with GMS while remaining, respectively, as an employee and sales agent of GMS.  On behalf of HMC, Westly and Spires began using GMS' proprietary information and trade secrets to build a catalog and sales kits for HMC, contact and

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 19 of 86

JA364

USCA4 Appeal: 22-2090 Doc: 20-2 Filed: 01/19/2023 Pg: 68 of 417

build relationships with GMS' suppliers, and sell competing goods to GMS' customers. Upon information and belief, while Westly and Spires were working with GMS, they were instead letting GMS pay their expenses while they sold goods on behalf of HMC to GMS customers. In doing so, Westly, Spires, and HMC wrongfully misappropriated GMS' trade secrets and other proprietary information for their own use.

46. Under the common law of Virginia, an employee, including an employee-at-will, owes a fiduciary duty of loyalty to its employer during its employment, and Westly owed GMS a fiduciary duty of loyalty under the common law of Virginia, including the duty to not compete against GMS, misappropriate GMS' Trade Secrets, misuse GMS' confidential information for personal gain, conspire with others to injure GMS in its trade or business, or solicit GMS' clients and customers or GMS' other employees prior to termination of his employment.

47. Effective January 21, 2019, Westly abruptly quit his position of Director of Sales and decided to become a GMS independent sales agent. In order to protect its business interests, including GMS' Trade Secrets, loyal customer base and a stable sales force, and unaware of the true facts, concealed by Westly from GMS, that Westly had been soliciting GMS's customers and sales agents and competing against GMS since June 2017 through the G&S competitor that Westly and others created and operated, GMS required Westly to sign an Independent Sales Agent Agreement on or about January 21, 2019 (the "Westly 2019 Sales Agent Agreement").

48. The relevant terms of the Westly 2019 Sales Agreement follow:

12. <u>Confidentiality</u>. Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

relationships.  Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or in connection with the performance of Agent's duties and responsibilities hereunder).  The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement).  This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company;

***

14. <u>Non-Solicitation</u>.  During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company.  Agent will not reveal the identity of any supplier to any competitor of Company.  Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach.  In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available.  The seeking

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*                    PENDER & COWARD, P.C.
Case No.  2:19-cv-324                                                    www.pendercoward.com
Third Amended Verified Complaint

Page 21 of 86

**JA366**

of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

***

     17. <u>Governing Law/Venue & Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions.  Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

     49.     Commencing in or about January 2017, Gary Gorken was diagnosed with cancer with an uncertain prognosis and requiring surgery and many months of recovery.  Gary Gorken conveyed this unfortunate news to Westly and emphasized the importance of his good faith, loyal service in Gary Gorken's and GMS' time of need and Westly responded that Gary and GMS could count on him.

     50.     Commencing in or about June 2017, Westly conspired with Greg Spires to form G&S as a competitive company to GMS through which all of the disloyal Sales Agent Defendants have sold products competitive to GMS products while still remaining sales agents of GMS. Acting in concert, they funded G&S' bank account with money from HMC and began using G&S as the primary vehicle for competing unlawfully against GMS.

     51.     Commencing in or about June 2017, and throughout his remaining tenure at GMS through April 3, 2019, Westly continued to sell the GMS NSN items and deceived, and conspired with and directed the other disloyal Sales Agent Defendants to deceive, GMS' customers into ordering non-standard (CCPN) items from G&S by falsely stating G&S was a sister company to GMS, and by having G&S sell identical products to GMS' customers. This deceit not only

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 22 of 86

JA367

deprived GMS of revenue, but has injured GMS's good reputation with its customers as G&S has provided materials to GMS' customers that are non-compliant with the TAA and caused confusion and uncertainty in GMS' customer base.

52.     Furthermore, Westly intentionally, with the help of Defendants Greg Spires and Thomas Hayes, impeded and prevented the ordering of GMS materials in the AESIP portal (this portal is for non-standard non NSN cage code part number kits to be entered for purchase), by intentionally having GMS' products entered incorrectly in AESIP. Once it was discovered that the GMS product kits were entered incorrectly into that system, GMS management demanded that Westly get GMS' incorrectly entered kits fixed in AESIP. Instead Westly, Greg Spires and Thomas Hayes used the company's time they were being paid for to input their G&S competitive system part numbers into the AESIP system and had their competitive G&S product line entered in the correct way, therefore impeding and preventing the ability of GMS' products to be ordered by GMS' customers, while at the same time facilitating the purchase of G&S' products.

53.     Westly thereby started sales and distribution of G&S' product line by substituting it in place of GMS' product lines with GMS' customers for non-NSN products.  Unbeknownst to GMS, Westly also solicited the other six individual Defendants, and their related limited liability Defendants, while they were independent sales agents with GMS, and trained and engaged them to sell G&S' competitive product line instead of the GMS product line on all non-NSN purchases, which they all have done to GMS' detriment. In addition to soliciting and concerting these six disloyal GMS sales agents to G&S, Westly solicited GMS sales agent Billy Miles who, rejected the recruitment by Westly at Fort Hood Texas. Westly upon his disappointment with Billy's

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*                          PENDER & COWARD, P.C.
Case No.   2:19-cv-324                                                             www.pendercoward.com
Third Amended Verified Complaint

Page 23 of 86

JA368

decision to not switch companies or at least sell the G&S products in November 2018 trumped up false accusations of bad performance against Billy that led to his termination. Westly then quickly, with Mike Welton's help, converted, all of GMS' customers serviced by Billy Miles to G&S.

54.     Westly and G&S, unlawfully using the GMS Trade Secrets which were misappropriated from GMS, is in the process of using such Trade Secrets to apply for and to obtain its own NSNs to further compete with GMS.  With Westly's personal knowledge and experience with GMS' misappropriated Trade Secrets, the process for G&S to obtain NSNs, which took GMS 12 years, at great expense to GMS, is unlawfully shortened significantly, to G&S' benefit, and GMS' competitive detriment.

55.     In addition, G&S, at Westly's direction, and with the assistance of the other Defendants' knowledge of the GMS customer base and preferences, created G&S product kits intended to be identical to the proprietary product kits prepared and sold by GMS. Their catalogue mimics GMS catalogue as can be seen by comparison of GMS' catalogue at Exhibit #2 and G&S' catalogue at Exhibit #3. Many of the product kits are substantially similar, demonstrating that Westly and Greg Spires misappropriated GMS' Trade Secret Customer Preference Data, Products Source List and Pricing Methods.  The copycat nature of G&S' product kits is revealed in the comparison to GMS' catalogue attached hereto as Exhibit #4, which reveals 28 substantially similar kits in name appearance and content, and 96 like kits.

56.     However, some of G&S' product kits have supplies and products that are not TAA compliant supplies as are GMS'. As customers are being told by the Defendants that G&S is a

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 24 of 86

sister company of GMS, and the fact that some products they are selling are not TAA compliant, GMS' valuable goodwill is being injured.

57.     For approximately three and one-half years (3 1/2) years, from in or about October 2015 to April 3, 2019, when Westly was terminated as a GMS sales agent for cause, and continuing thereafter, in combination with, and with the aid and assistance of, Greg Spires and the other Defendants, Westly, individually, clandestinely, in violation of his and its contractual duties,

a.   participated with Greg Spires in the creation and organization of HMC  and G&S and worked with Greg Spires and the other Defendants to have HMC and G&S solicit GMS' customers and sales representatives;

b.   used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for HMC and G&S sales, and selling GMS', HMC's and G&S' products to GMS' customers;

c.   solicited GMS' sales representatives, including the Defendants other than HMC and G&S, to join with he and Greg Spires at G&S, to take customers and sales away from GMS for his and their personal benefit, and disclosed GMS' Trade Secrets to the other Defendants for use in soliciting GMS' customers;

d.   misrepresented to GMS' customers that G&S was a sister company of GMS; and

e.   disregarded his on-going duty for one year after termination of his sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

**JA370**

and sell them competitive products, thereby causing GMS both monetary damages and irreparable damages, including the permanent loss of customers and the loss of GMS' goodwill.

58.    On April 3, 2019 GMS sent Westly a cease and desist termination letter (see Exhibit #1), terminating his sales agent contract and directing Westly to cease all activities on behalf of GMS and to return all GMS property and materials, which included the three (3) GMS computing devices (a desktop, a laptop and a tablet computer) in Westly's possession on April 3, 2019 and to cease and desist from using or disclosing GMS confidential information.

59.    On April 3, 2019, after the cease and desist termination letter was sent to Westly by GMS' counsel, without authorization or authority, Westly accessed one of the GMS computer devises in his possession and attempted to download GMS' Google Data, but GMS' IT Department was able to re-route it away from Westly and avoided the piracy of that data as of that date (See Exhibit #5 hereto), but caused GMS to conduct a computer forensic analysis of what occurred by this conduct and to incur computer forensic analysis and related costs.

60.    Without authority or authorization, and despite his termination as a sales agent of GMS, the revocation of his authority to use the GMS computer devices or use or disclose GMS confidential information, Westly retained and accessed GMS' computers for nineteen (19) additional days during the period April 3, 2019 to April 22, 2019, and downloaded, and used a File Shredder program to delete and/or destroy, thousands of documents resident on the several computing devices owned by GMS and provided by GMS to Westly for use in GMS' business.

61.    By letter dated April 17, 2019, from GMS' counsel to Westly, GMS again demanded that Westly cease and desist from soliciting GMS' customers, employees and

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

independent contractors for his own personal benefit and that of G&S which he formed to compete

with GMS, and to again demanded return of three (3) computing devices which were GMS'

property that Westly had been given to use in conducting GMS' business. See Exhibit #6 hereto.

The computer devices were not shipped to GMS by Westly until April 22, 2019, and were received

by GMS on April 25, 2019. BDO was engaged by Pender & Cowards, PC to perform digital

forensics and e-discovery with respect to the misappropriation of trade secrets, intellectual

property theft, violation of trademarks and to recover stolen or deleted data from various computers

and other devices. *See* Declaration of Garry A. Pate attached as Exhibit #11.

     62.    A forensic examination of the desktop computer returned by Westly demonstrates

that on April 1, 2019, the date GMS and Gary Gorken first learned from a GMS sales representative

of the existence of G&S as a competitor and of the existence of nearly two (2) years of

misappropriation of sales agents and customers by the Defendants, Westly, who was informed of

GMS' knowledge that same day, April 1, 2019, attached a USB device to GMS' desktop computer

assigned to Westly and began to download GMS' data. Again, on April 2, 2019, after Westly

received two text messages from Gary Gorken on April 1, 2019, the first advising that he needed

to talk to Westly "right away" and the second stating "We have a major problem. We need to talk

ASAP", on April 2, 2019, Westly attached a USB device to GMS' desktop computer assigned to

Westly and downloaded GMS' data. Again, on April 19, 2019, after Westly had received both the

April 3, 2019 and April 17, 2019 Cease and Desist letters and demand for return of the GMS

computers, Westly again attached a USB to the desktop computer and downloaded GMS' data.

*See* Exhibit #7 hereto.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*         PENDER & COWARD, P.C.
Case No.   2:19-cv-324         www.pendercoward.com
Third Amended Verified Complaint

Page 27 of 86

**JA372**

63.    A review of data on the two of the three computing devices returned by Westly to GMS indicate that from April 3, 2019 to April 22, 2019, the computers were accessed by Westly, during which access GMS data was downloaded, and over 19,000 files were deleted from GMS' computing devices between April 3, 2019 to April 22, 2019. The history on the laptop and desktop computers also revealed that a program called File Shredder, which can permanently destroy files and Windows Registry entries, was installed and used on these computers to destroy GMS' files, documents and data that were resident on the computers that GMS owned. These actions were intentional acts by Westly to cover up his unlawful acts of misappropriation of GMS' confidential, proprietary and Trade Secret information, and destruction of its data, all of which caused, and continues to cause, damages to GMS.

64.    The known lost profits suffered by GMS and attributable at this time to Westly's individual competitive sales through G&S, which sales are at least $76,000, are at least $26,600, and the loss of GMS' customer base is evidenced by the dwindling sales by Westly for GMS' benefit before he was terminated on April 3, 2019.

**Gregory K. Spires/County Roads, LLC**

65.    Greg Spires, who is a full-time government employee at the ROTC at Fort Sill, Oklahoma, was a GMS customer serviced by Westly. In January 2013 he came on board as a sales representative with GMS.  Unbeknownst to GMS prior to his termination on April 3, 2019, Greg Spires has been to numerous Army bases selling G&S' competitive product line for at least the last two years, while he was a G&S sales agent selling GMS products. This is evidenced by his

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

multiple trips to Fort Bliss, Texas, and Fort Sill Oklahoma area bases in addition to the G&S sales data attributable to Greg Spires that GMS has learned about since April 3, 2019.

66.     On January 22, 2013, Greg Spires signed a Sales Agent Agreement with GMS which appointed him as an independent, non-exclusive sales agent of GMS products in Oklahoma (the "Greg Spires 2013 Sales Agent Agreement"). The Greg Spires 2013 Sales Agent Agreement included a nondisclosure provision intended to protect GMS' confidential, proprietary and trade secret information by which Greg Spires agreed not to disclose or use for personal gain any of GMS' confidential, proprietary and trade secret information during the term of the agreement. The Greg Spires 2013 Sales Agent Agreement included a clause requiring him to "aggressively promote the sale of [GMS' products] in [his sales] Territory…."

67.     Commencing on or about October 2015, Spires joined with Westly to create HMC to be a company that they could use to directly compete with GMS while remaining, respectively, as an employee and sales agent of GMS.  On behalf of HMC, Westly and Spires began using GMS' proprietary information and trade secrets to build a catalog and sales kits for HMC, contact and build relationships with GMS' suppliers, and sell competing goods to GMS' customers.

68.     On January 6, 2017, Greg Spires signed an Independent Sales Agent Agreement with GMS which appointed him individually and his limited liability company, County Roads, LLC, of which he is the sole agent, as an independent, non-exclusive sales agent of GMS products in Oklahoma and Texas (the "Greg Spires 2017 Sales Agent Agreement"). The Greg Spires 2017 Sales Agent Agreement defines the Agent as "Country [sic] Roads, LLC (Greg Spires) (the

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*                    PENDER & COWARD, P.C.
Case No.   2:19-cv-324                                                    www.pendercoward.com
Third Amended Verified Complaint

Page 29 of 86

**JA374**

"Agent")" and he signed it in his individual capacity, with his personal signature under the heading "AGENT:".

69.    Greg Spires assisted, cooperated and conspired with Westly to organize and create G&S to compete against GMS, and to solicit GMS' customers to buy competitive products from G&S and solicit GMS' sales agents who are named as Defendants herein to sell competitive products for G&S.  Greg Spires has also used his status as a veteran to falsely portray G&S as a veteran owned business. As part of the mandatory sams.gov website registration, G&S and its cage code are listed as a veteran-owned business. Wesley has no past service with the US government.

70.    The relevant terms of the Greg Spires 2017 Sales Agent Agreement include the following:

12.    Confidentiality.  Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships.  Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or in connection with the performance of Agent's duties and responsibilities hereunder).  The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement).  This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company;

*** 

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

14. <u>Non-Solicitation</u>.  During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company.  Agent will not reveal the identity of any supplier to any competitor of Company.  Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach.  In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available.  The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

*** 

17. <u>Governing Law/Venue & Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions.  Any dispute that should arise will be handled accordingly.  Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

71.     For approximately three and one-half (3 1/2) years, from in or about October 2015 to April 3, 2019, when he was terminated as a GMS sales agent for cause, and continuing thereafter, in combination with, and with the aid and assistance of, Westly and the other

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

Defendants, Greg Spires, individually, and as agent for County Roads, LLC, clandestinely, in violation of his and its contractual duties,

      a.   participated with Westly in the creation and organization of HMC and G&S and worked with Westly and the other Defendants to have HMC and G&S solicit GMS' customers and sales representatives;

      b.   used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for HMC and G&S sales, and selling GMS', HMC's, and G&S' products to GMS' customers;

      c.   solicited GMS' sales representatives, including his son, Gregory S. Spires, to join with he and Westly at G&S, to take customers and sales away from GMS for his and their personal benefit;

      d.   misrepresented to GMS' customers that G&S was a sister company of GMS; and

      e.   disregarded his on-going duty for one year after termination of his sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers and sell them competitive products, thereby causing GMS both monetary damages and irreparable damages, including the permanent loss of customers and the loss of GMS' goodwill.

    72.   The known lost profits suffered by GMS and attributable at this time to Greg Spires' and County Roads, LLC's individual competitive sales through G&S, which sales are at least $572,000, are at least $200,200, and the loss of GMS customer base is shown in the dwindling

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 32 of 86

**JA377**

sales for GMS' benefit before Greg Spires and County Roads, LLC were terminated on April 3, 2019.

### Sabrina Greer/Greer Group, LLC

73.     On or about May 13, 2013, Sabrina Greer, then Sabrina Stricklin and living in Missouri, joined the GMS sales team by signing a Sales Agent Agreement which appointed her as an independent, non-exclusive sales agent of GMS products in Missouri (the "Sabrina Greer 2013 Sales Agent Agreement"). The Sabrina Greer 2013 Sales Agent Agreement included a nondisclosure provision at paragraph 13. intended to protect GMS' confidential, proprietary and trade secret information by which Sabrina Greer agreed not to disclose or use for personal gain any of GMS' confidential, proprietary and trade secret information during the term of the agreement.

74.     On or about May 27, 2015, Sabrina Greer, then married to Westly and living in Colorado, signed a Sales Agent Agreement which appointed her as an independent, non-exclusive sales agent of GMS products in Colorado (the "Sabrina Greer 2015 Sales Agent Agreement"). The Sabrina Greer 2015 Sales Agent Agreement included a nondisclosure provision at paragraph 13. intended to protect GMS' confidential, proprietary and trade secret information by which Sabrina Greer agreed not to disclose or use for personal gain any of GMS' confidential, proprietary and trade secret information during the term of the agreement.

75.     On January 10, 2017, Sabrina Greer signed an Independent Sales Agent Agreement with GMS which appointed her individually and her limited liability company, Greer Group, LLC, of which she is the sole agent, as an independent, non-exclusive sales agent of GMS products in

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 33 of 86

### JA378

Colorado (the "Sabrina Greer 2017 Sales Agent Agreement"). The Sabrina Greer 2017 Sales Agent

Agreement defines the Agent as "Greer Group, LLC (Sabrina Greer) (the "Agent")" and she signed

it in her individual capacity, with her personal signature under the heading "AGENT:"

76.     Sabrina Greer assisted and conspired with Westly to organize and create G&S to

compete against GMS, and to solicit GMS' customers to buy competitive products from G&S and

solicit GMS' sales agents who are named as Defendants herein to sell competitive products for

G&S.

77.     Relevant terms of the Sabrina Greer 2017 Sales Agent Agreement follow:

12.     Confidentiality.  Agent recognizes and acknowledges that Agent will have
access to Confidential Information (as defined below) relating to the business or
interests of the Company or of persons with whom the Company may have business
relationships.  Except as permitted herein, Agent will not during the term of this
Agreement, or at any time thereafter, use, disclose or permit to be known by any
other person or entity, any Confidential Information of the Company (except as
required by applicable law or in connection with the performance of Agent's duties
and responsibilities hereunder).   The term "Confidential Information" means
information relating to the Company's business affairs, proprietary technology,
trade secrets, patented processes, research and development data, know-how,
market studies and forecasts, competitive analyses, pricing policies, employee lists,
employment agreements (other than this Agreement), personnel policies, the
substance of agreements with customers, suppliers and others, marketing
arrangements, customer lists, commercial arrangements, or any other information
relating to the Company's business that is not generally known to the public or to
actual or potential competitors of the Company (other than through a breach of this
Agreement).  This obligation shall continue until such Confidential Information
becomes publicly available, other than pursuant to a breach of this Section by
Agent, regardless of whether Agent continues to be employed by the Company;

***

14. Non-Solicitation.  During the term of this Agreement, and for a period of one
year thereafter, Agent may not (i) entice, solicit or encourage any Company
employee to leave the employ of the Company or any independent contractor to
sever its engagement with the Company; and may not (ii) directly or indirectly,

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*                    PENDER & COWARD, P.C.
Case No.  2:19-cv-324                                                 www.pendercoward.com
Third Amended Verified Complaint

Page 34 of 86

**JA379**

entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

*** 

17. <u>Governing Law/Venue & Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

78.     For approximately three and one-half (3 1/2) years, from in or about June 2017 to April 3, 2019, when she was terminated as a GMS sales agent for cause, and continuing thereafter, in combination with, and with the aid and assistance of, Westly and the other Defendants, Sabrina Greer, individually, and as agent for Greer Group, LLC, clandestinely, in violation of her and its contractual duties,

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

**JA380**

      a.   participated with Westly in the creation and organization of HMC and G&S and worked with Westly and the other Defendants to have HMC and G&S solicit GMS' customers and sales representatives;

      b.   used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for HMC and G&S sales, and selling GMS', HMC's, and G&S' products to GMS' customers;

      c.   solicited GMS' sales representatives to join with she and Westly at G&S, to take customers and sales away from GMS for her and their personal benefit;

      d.   misrepresented to GMS' customers that G&S was a sister company of GMS; and

      e.   disregarded her on-going duty for one year after termination of her sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers and sell them competitive products.

79.   The known lost profits suffered by GMS and attributable at this time to Sabrina Greer's and Greer Group, LLC's individual competitive sales through G&S, which sales are in excess of $150,000, are  at least $53,200, and the loss of customer base is shown in the dwindling sales for GMS' benefit before she was terminated on April 3, 2019.

### Michael Welton

80.   On or about June 15, 2016, Welton joined the GMS sales team by signing an Independent Sales Agent Agreement which appointed him as an independent, non-exclusive sales agent of GMS products in Texas (the "Welton 2016 Sales Agent Agreement"). The Welton 2016

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Sales Agent Agreement defines the Agent as "Michael Welton (the "Agent")" and he signed it in his individual capacity, with his personal signature under the heading "AGENT:"

81.    Welton assisted, cooperated and conspired with Westly to organize and create G&S to compete against GMS, and to solicit GMS' customers to buy competitive products from G&S and solicit GMS' sales agents who are named as Defendants herein to sell competitive products for G&S.

82.    The relevant terms of the Welton 2016 Sales Agent Agreement follow:

12.    <u>Confidentiality</u>.  Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships.  Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or in connection with the performance of Agent's duties and responsibilities hereunder).  The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement).  This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company;

*** 

14. <u>Non-Solicitation</u>.  During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

**JA382**

relationship with the Company or refrain from establishing or expanding a relationship with the Company.  Agent will not reveal the identity of any supplier to any competitor of Company.  Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach.  In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available.  The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

***

17. <u>Governing Law/Venue & Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions.  Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

83.     On or about April 1, 2019, Welton signed a Statutory Employee Agreement which appointed him as an independent, non-exclusive sales agent of GMS products (the "Welton 2019 Sales Agent Agreement").

84.     The relevant terms of the Welton 2019 Sales Agent Agreement follow:

11.     <u>Confidentiality</u>.  Statutory Employee recognizes and acknowledges that Statutory Employee will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Statutory Employee will not during the term of this Agreement, or for three (3) years thereafter, use, disclose or permit to be known by any other person or entity,

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 38 of 86

**JA383**

any Confidential Information of the Company (except as required by applicable law or in connection with the performance of Statutory Employee's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements, personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement) that is used or employed by the Company in the actual performance of its business operations.

***

13.    <u>Non-Solicitation</u>. During the term of this Agreement, and for a period of one year thereafter, Statutory Employee may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company to work for a business competitive with the business of the Company or for a business owned, managed by or at which Statutory Employee works; (ii) entice, solicit or encourage any independent contractor with whom Statutory Employee had contact with during the Term (as defined below) or learned of during the Term by virtue of Statutory Employee's employment with Company, to sever its engagement with the Company ; and may not (iii) directly or indirectly, entice, solicit or encourage any client or customer with whom Statutory Employee had contact or became aware of as a result of Statutory Employee's work with the Company or any known (during the Term) prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Statutory Employee will not reveal the identity of any supplier to any competitor of Company. Statutory Employee understands and agrees that establishing the precise amount of damages for breach of Section 15(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 15(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Statutory Employee acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

16.   Governing Law/Venue & Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly.  Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement

85.   For approximately two (2) years, from in or about June 2017 to April 3, 2019, when he was terminated as a GMS sales agent for cause, and continuing thereafter, in combination with, and with the aid and assistance of, Westly and the other Defendants, Welton clandestinely, in violation of his contractual duties,

a.   participated with Westly in the creation and organization of G&S and worked with Westly and the other Defendants to have G&S solicit GMS' customers and sales representatives;

b.   used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for G&S sales, and selling GMS' and G&S' products to GMS' customers;

c.   solicited GMS' sales representatives to join with he and Westly at G&S, to take customers and sales away from GMS for his and their personal benefit;

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

d.  misrepresented to GMS' customers that G&S was a sister company of GMS; and

e.  disregarded his on-going duty for one year after termination of his sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers and sell them competitive products.

86.    The known lost profits suffered by GMS and attributable at this time to Welton's individual competitive sales through G&S, which sales are at least $141,000, are at least $49,350, and the loss of customer base is shown in the dwindling sales for GMS' benefit before he was terminated on April 3, 2019.

### **Wayne Side**

87.    On or about November 5, 2015, Side joined the GMS sales team by signing a  Sales Agent Agreement which appointed him as an independent, non-exclusive sales agent of GMS products in New York (the "Side 2015 Sales Agent Agreement"). The Side 2015 Sales Agent Agreement defines the Agent as "Wayne Side (the "Agent")" and he signed it in his individual capacity, with his personal signature above the line designated as "Sales Agent Name".

88.    Side assisted, cooperated and conspired with Westly to organize and create G&S to compete against GMS, and to solicit GMS' customers to buy competitive products from G&S and solicit GMS' sales agents who are named as Defendants herein to sell competitive products for G&S.

89.    The relevant terms of the Side 2015 Sales Agent Agreement follow:

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 41 of 86

**JA386**

13.    The Agent acknowledges that he/she may have access to the Seller's confidential and proprietary information. Such confidential information may include, without limitation: i) business and financial information, ii) business methods and practices, iii) technologies and technological strategies, iv) marketing strategies and v) other information as the Seller may designate as confidential ("Confidential Information"). Agent agrees to not disclose to any other person (unless required by law) or use for personal gain any Confidential Information at any time during or after the Agreement Term, unless the seller grants express, written consent of such disclosure. In addition, agent will use his/her best efforts to prevent any such disclosure. Confidential Information will not include information that is in the public domain, unless such information falls into public domain through Agents unauthorized actions.

***

16.  I agree not to recruit and not to assist any other entity in recruiting any other employee or "Agent" who worked for GMS industrial Supply during the last twelve (12) months in which I worked for GMS Industrial Supply. Further, I will not reveal be identity of any supplier to any competitor of GMS Industrial Supply; Nor will I become the employee or "Agent" or any competitor of GMS Industrial Supply, Inc. These restrictions will apply during my employment and for twelve (12) months subsequent to my appointment. I understand that in establishing the precise amount of damages for breach of the provision, for each person recruited about whom I have provided information in violation of this provision, liquidated damages for such violation shall be the amount of annual compensation of that person at GMS Industrial Supply.

***

18.  This agreement shall be governed by and construed in accordance with the laws of the state of Virginia. Any dispute that should arise will be handled accordingly.

90.    For approximately one and three quarters (1 3/4) years, from in or about June 2017 to March 5, 2019, when he was terminated as a GMS sales agent for decreased sales, and continuing thereafter, in combination with, and with the aid and assistance of, Westly and the other Defendants, Side clandestinely, in violation of his contractual duties,

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*            PENDER & COWARD, P.C.
Case No.  2:19-cv-324                                                www.pendercoward.com
Third Amended Verified Complaint

Page 42 of 86

JA387

a. participated with Westly in the creation and organization of G&S and worked with Westly and the other Defendants to have G&S solicit GMS' customers and sales representatives;

b. used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for G&S sales, and selling GMS' and G&S' products to GMS' customers;

c. solicited GMS' sales representatives to join with he and Westly at G&S, to take customers and sales away from GMS for his and their personal benefit;

d. misrepresented to GMS' customers that G&S was a sister company of GMS; and

e. engaged, in combination with Westly and Thomas Hayes, in fraudulent misrepresentations to GMS to conceal from GMS the true facts of his solicitation of, and sales to, GMS' customers of G&S' products while still working as sales agent for GMS, whereby Sides' sales numbers and volume for sale of GMS' products dropped to almost nothing during the second half of 2018 and the first quarter of 2019, and in combination with Hays and Side, Westly claimed the drop in sales was due to Hayes being investigated by the criminal investigative division of the US Army for involvement in sales with his wife, who was employed in the procurement office at Ft. Polk, La., where a portion of the 10th Mountain Division was based, and this impacted Side at Ft. Drum, NY, where a portion of the 10th Mountain Division was also based. Eventually, GMS terminated Side on March 5, 2019, based on the significant drop in his sales; however, the true facts, concealed by Westly, Side and Thomas to avoid disclosure of the competitive sales being

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

made to GMS' customers by side as agent for G&S, demonstrate a significant decrease in sales for GMS due to the significant increase in sales to GMS' customers of G&S products by Side;

    f. disregarded his on-going duty for one year after termination of his sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers and sell them competitive products.

  91. The known lost profits suffered by GMS and attributable at this time to Side's individual competitive sales through G&S, which sales are at least $323,000, are at least $113,050, and the loss of customer base is shown in the dwindling sales for GMS' benefit before he was terminated on March 5, 2019.

### Thomas Hayes

  92. On or about June 27, 2016, Hayes joined the GMS sales team by signing an Independent Sales Agent Agreement which appointed him as an independent, non-exclusive sales agent of GMS products in Louisiana (the "Hayes 2016 Sales Agent Agreement"). The Hayes 2016 Sales Agent Agreement defines the Agent as "Thomas Hayes (the "Agent")" and he signed it in his individual capacity, with his personal signature under the heading "AGENT:"

  93. Hayes assisted, cooperated and conspired with Westly to organize and create G&S to compete against GMS, and to solicit GMS' customers to buy competitive products from G&S and solicit GMS' sales agents who are named as Defendants herein to sell competitive products for G&S.

  94. The relevant terms of the Hayes 2016 Sales Agent Agreement follow:

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*      PENDER & COWARD, P.C.
Case No.  2:19-cv-324          www.pendercoward.com
Third Amended Verified Complaint

Page 44 of 86

**JA389**

12.    <u>Confidentiality</u>.  Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships.  Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or in connection with the performance of Agent's duties and responsibilities hereunder).   The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement).  This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company;

***

14.    <u>Non-Solicitation</u>.  During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company.  Agent will not reveal the identity of any supplier to any competitor of Company.  Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach.  In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without

_GMS Industrial Supply, Inc v. G&S Supply, LLC, et al_
Case No.   2:19-cv-324
Third Amended Verified Complaint

<span style="float:right">PENDER & COWARD, P.C.
www.pendercoward.com</span>

**JA390**

posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

***

17. Governing Law/Venue & Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

95.     For approximately two (2) years, from in or about June 2017 to April 3, 2019, when he was terminated as a GMS sales agent for cause, and continuing thereafter, in combination with, and with the aid and assistance of, Westly and the other Defendants, Hayes clandestinely, in violation of his contractual duties,

a.  participated with Westly in the creation and organization of G&S and worked with Westly and the other Defendants to have G&S solicit GMS' customers and sales representatives;

b.  used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for G&S, and selling GMS' and G&S' products to GMS' customers;

c.  solicited GMS' sales representatives to join with he and Westly at G&S, to take customers and sales away from GMS for his and their personal benefit;

d.  misrepresented to GMS' customers that G&S was a sister company of GMS; and

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

e. disregarded his on-going duty for one year after termination of his sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers and sell them competitive products.

96. The known lost profits suffered by GMS and attributable at this time to Hayes' individual competitive sales through G&S, which sales are at least $771,000, are at least $269,850, and the loss of customer base is shown in the dwindling sales for GMS' benefit before he was terminated on April 3, 2019.

### Sky Spires

97. On or about October 3, 2016, Sky Spires joined the GMS sales team by signing an Independent Sales Agent Agreement which appointed him as an independent, non-exclusive sales agent of GMS products in Oklahoma (the "Sky Spires 2016 Sales Agent Agreement"). The Sky Spires 2016 Sales Agent Agreement defines the Agent as "Gregory Sky Spires (the "Agent")" and he signed it in his individual capacity, with his personal signature under the heading "AGENT:"

98. Sky Spires assisted, cooperated and conspired with Westly and Greg Spires to organize and create G&S to compete against GMS, and to solicit GMS' customers to buy competitive products from G&S and solicit GMS' sales agents who are named as Defendants herein to sell competitive products for G&S.

99. Relevant terms of the Sky Spires 2016 Sales Agent Agreement follow:

12. <u>Confidentiality</u>. Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

# JA392

Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or in connection with the performance of Agent's duties and responsibilities hereunder).  The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement).  This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company;

\*\*\*

14. <u>Non-Solicitation</u>.  During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company.  Agent will not reveal the identity of any supplier to any competitor of Company.  Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach.  In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available.  The seeking of such injunction or order shall

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*                    PENDER & COWARD, P.C.
Case No.   2:19-cv-324                                                    www.pendercoward.com
Third Amended Verified Complaint

Page 48 of 86

**JA393**

not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.
***
17. <u>Governing Law/Venue & Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions.  Any dispute that should arise will be handled accordingly.  Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

100.    For approximately two (2) years, from in or about June 2017 to April 3, 2019, when he was terminated as a GMS sales agent for cause, and continuing thereafter, in combination with, and with the aid and assistance of, Westly, Greg Spires and the other Defendants, Sky Spires clandestinely, in violation of his contractual duties,

a.  participated with Westly and Greg Spires in the creation and organization of G&S and worked with Westly and the other Defendants to have G&S solicit GMS' customers and sales representatives;

b.  used and disclosed GMS' Trade Secrets to solicit GMS' customers, serving as a duel agent soliciting GMS' customers for G&S, and selling GMS' and G&S' products to GMS' customers;

c.  solicited GMS' sales representatives to join with he, Greg Spires and Westly at G&S, to take customers and sales away from GMS for his and their personal benefit;

d.  misrepresented to GMS' customers that G&S was a sister company of GMS; and

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 49 of 86

e. disregarded his on-going duty for one year after termination of his sales agent position with GMS to not solicit GMS customers, and continues to solicit GMS customers and sell them competitive products.

101. The known lost profits suffered by GMS and attributable at this time to Sky Spires' individual competitive sales through G&S, are unknown at this time, but upon information and belief his sales for G&S were combined into Greg Spires sales for G&S, as it is believed he assisted Greg Spires in sales for G&S much as he did in sales for GMS.

### **WarTech Industries, LLC**

102. On August 30, 2019, this Court issued an order on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. In that order, the Court required that Greer, Hayes, and Spires "change the name of their limited liability company, ''G&S Supply, LLC'… [and] provide the [C]ourt evidence that the new entity has been properly registered in the chosen states as of September 30, 2019…[and] that G&S Supply, LLC has been terminated as a corporate entity in all the states of its registration as of [that date]."

103. G&S was dissolved by the State of Colorado on October 1, 2019.

104. In order to comply with the Court's Order, Westly, Spires, and Hayes created WarTech and incorporated the company in the State of Louisiana on August 2, 2019. They each own and operate the company through other corporate entities they own and control. WarTech is the successor entity to G&S and has continued, generally, carrying out the business of G&S.

105. WarTech has continued the business of G&S and is its successor corporation.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

## JA395

## Count I:  Breach of Duty Of Loyalty (Westly)

106.    All of the foregoing allegations in paragraphs 1-105 of this Complaint are incorporated into this Count I, as if fully set forth herein.

107.    While employed by GMS under the Westly 2012 Employment Agreement, Westly owed fiduciary duties to GMS, including the duty of loyalty to not: compete against GMS, misappropriate GMS' Trade Secrets, misuse GMS' confidential information for personal gain, conspire with others to injure GMS in its trade or business, or solicit GMS' clients and customers or GMS' other employees prior to termination of his employment to GMS during the employment relationship. This duty survives termination of the employment relationship with respect to the continuation of solicitation transactions that began during the existence of the employment relationship.

108.    Westly breached his fiduciary duty of loyalty to GMS by misappropriating Trade Secrets for his, HMC's and G&S' financial benefit, conspiring with other individual Defendants to injure GMS in its trade or business, misusing and disseminating GMS's confidential information for his, HMC's, and G&S' financial benefit, organizing, outfitting, leading and managing HMC and G&S to directly compete against GMS while still employed by and working for GMS and failing to disclose the truth to GMS.

109.    Westly was conscious of his conduct, and conscious, from his knowledge of existing conditions, that injury to GMS would result from his conduct.

110.    Westly acted deliberately, intentionally, and with malice to injure GMS and benefit himself directly, and indirectly as agent of HMC and G&S.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 51 of 86

**JA396**

111.    GMS was damaged by, among other damages, loss of revenue and goodwill as a direct result of Westly's unlawful acts and is entitled to recover compensatory and punitive damages from Westly.

### Count II:  Breach of Westly 2012 Employment Agreement  (Westly)

112.    All of the foregoing allegations in paragraphs 1-111 of this Complaint are incorporated into this Count II, as if fully set forth herein.

113.    As set forth hereinabove, in the Westly 2012 Employment Agreement, including by incorporation be reference from the GMS employee handbook, Westly agreed: i) to only use GMS confidential information to provide services or goods to GMS and not to otherwise disclose or use the confidential information; ii) that the disclosure of GMS' confidential information would cause irreparable harm to GMS and that GMS could not only  seek damages but Westly agreed to the issuance of a permanent injunction restraining him from disclosure and use of such confidential information and that any court selected by GMS would have jurisdiction over him for that purpose; iii) during any employment and for twelve (12) months subsequent to his employment not to recruit and not to assist any other entity in recruiting any other employee who works for GMS during the last twelve (12) months in which he worked for GMS Supply; iv) during any employment and for twelve (12) months subsequent to my employment not to reveal the identity of any supplier to any competitor of GMS Industrial Supply; and v) to not simultaneously hold a competing job, wherein the employee handbook provided that "Employees may hold outside jobs in unrelated businesses or occupations as long as the employee meets the performance standards of the position with GMS".

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 52 of 86

**JA397**

114.    As set forth hereinabove, in the Westly 2019 Sales Agreement, Westly agreed: i) that he would not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of GMS; ii) during the term of the agreement, and for a period of one year thereafter, to not (a) entice, solicit or encourage any GMS employee to leave the employ of GMA or any independent contractor to sever its engagement with GMS; (b) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of GMS to cease doing business with GMS, reduce its relationship with GMS or refrain from establishing or expanding a relationship with GMS; iii) to not reveal the identity of any supplier to any competitor GMS.

115.    Westly breached his contractual obligations in paragraphs 104-105 above as set forth fully herein.

116.    As a direct and proximate cause of Westly's breach of his obligations set forth in the Westly 2012 Employment Agreement and the Westly 2019 Sales Agreement, GMS has suffered extensive damage, in excess of $75,000, the exact amount to be determined at trial.

117.    GMS will continue to be directly and proximately damaged, and its goodwill irreparably harmed, if Westly is not enjoined from further violation of these agreements, and if Westly is not ordered by this Court to comply therewith, and prohibited from using a disclosing GMS' confidential, proprietary and Trade Secret information and precluded from soliciting GMS' customers and sales agents. GMS has no adequate remedy at law, as money damages alone will not fully compensate GMS, and injunctive relief is warranted to prevent further irreparable harm to GMS. GMS accordingly seeks damages and preliminary and permanent injunctive relief.

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

**Count III:  Breach of Sales Agent Agreements  (All Defendants Except Side, HMC and G&S)**

118.    The foregoing allegations in paragraphs 1-117 of this Complaint are incorporated into this Count III, as if fully set forth herein.

119.    Each of the below named Defendants owed to GMS, and materially breached, the contractual obligations set forth herein below.

120.     Each of the following Defendants breached his, her respective and/or its agreements with GMS by knowingly and willfully failing to properly fulfill their duties as contracted:

a    In his 2019 Independent Agent Agreement, Westly agreed to "aggressively promote the sale of [GMS] Products in [his] Territory."

i.    This duty was material to Westly's 2019 Independent Agent Agreement, and GMS would have never entered the agreement without it.

ii.    GMS faithfully performed its duties under Westly's 2019 Independent Agent Agreement.

iii.    As described more fully herein, during the term of his agreement, Westly breached his duties under his 2019 Independent Agent Agreement by intentionally and improperly promoting and selling the competing goods of G&S to the customers of GMS within his territory, and thereby failing to "aggressively promote the sale of [GMS] Products in [his] Territory.".

iv.    As a direct and proximate cause of Westly's breach, GMS has been damaged in excess of $75,000, the exact amount to be determined at trial.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 54 of 86

JA399

b.      In his 2013 Sales Agent Agreement, Greg Spires agreed to "aggressively promote the sale of [GMS] Products in [his sales] Territory."

    i.      This duty was material to the 2013 Sales Agent Agreement, and GMS would have never entered the agreement without it.

    ii.     GMS faithfully performed its duties under the 2013 Sales Agent Agreement with Greg Spires.

    iii.    As described more fully herein, during the term of its and his 2013 Sales Agent Agreement, Greg Spires breached his duties under the agreement by intentionally and improperly promoting and selling the competing goods of HMC to the customers of GMS within its and his territory, and thereby failing to "aggressively promote the sale of [GMS] Products in [his sales] Territory.".

    iv.     As a direct and proximate cause of Greg Spires's breach, GMS has been damaged in excess of $75,000, the exact amount to be determined at trial.

c.      In its and his 2017 Independent Agent Agreement, Country Roads, LLC and Greg Spires agreed to "aggressively promote the sale of [GMS] Products in [its/his] Territory."

    i.      This duty was material to the 2017 Independent Agent Agreement, and GMS would have never entered the agreement without it.

    ii.     GMS faithfully performed its duties under the 2017 Independent Agent Agreement with Country Roads, LLC and Greg Spires.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 55 of 86

**JA400**

    iii.    As described more fully herein, during the term of its and his agreement, County Roads, LLC and Greg Spires breached its and his duties under the 2017 Independent Agent Agreement by intentionally and improperly promoting and selling the competing goods of G&S to the customers of GMS within its and his territory, and thereby failing to "aggressively promote the sale of [GMS] Products in [its/his] Territory.".

    iv.    As a direct and proximate cause of Greg Spires's breach, GMS has been damaged in excess of $75,000, the exact amount to be determined at trial.

d.    In its and her 2017 Independent Agent Agreement, Greer Group, LLC and Sabrina Greer agreed to "aggressively promote the sale of [GMS] Products in [its/her] Territory."

    i.    This duty was material to the 2017 Independent Agent Agreement, and GMS would have never entered the agreement without it.

    ii.    GMS faithfully performed its duties under the 2017 Independent Agent Agreement with Greer Group, LLC and Sabrina Greer.

    iii.    As described more fully herein, during the term of its and her agreement, Greer Group, LLC and Sabrina breached its and her duties under the 2017 Independent Agent Agreement by intentionally and improperly promoting and selling the competing goods of G&S to the customers of GMS within her territory, and thereby failing to "aggressively promote the sale of [GMS] Products in [its/her] Territory.".

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

iv.     As a direct and proximate cause of Greer Group, LLC's and Sabrina's breach, GMS has been damaged in excess of 75,000, the exact amount to be determined at trial.

e.     In his 2016 Independent Agent Agreement, Welton agreed to "aggressively promote the sale of [GMS] Products in [his] Territory." In his 2019 Statutory Employment Agreement, Welton agreed to "aggressively promote the sale of [GMS] Products."

i.     This duty to "aggressively promote the sale of [GMS] Products in [his] Territory" was material to his 2016 Independent Agent Agreement, and this duty to "aggressively promote the sale of [GMS] Products" was material to his 2019 Statutory Employment Agreement and GMS would have never entered the agreements without his agreement to "aggressively promote the sale of [GMS] Products".

ii.     GMS faithfully performed its duties under Welton's 2016 Independent Agent Agreement and Welton's 2019 Statutory Employment Agreement.

iii.     As described more fully herein, during the term of his 2016 Independent Agent Agreement, Welton breached his duties by intentionally and improperly promoting and selling the competing goods of G&S to the customers of GMS within his territory, and thereby failing to "aggressively promote the sale of [GMS] Products in [his] Territory." .

iv.     As described more fully herein, during the term of his 2019 Statutory

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*          PENDER & COWARD, P.C.
Case No.   2:19-cv-324                                          www.pendercoward.com
Third Amended Verified Complaint

Page 57 of 86

JA402

Employment Agreement, Welton breached his duties by intentionally and improperly promoting and selling the competing goods of G&S to the customers of GMS within his territory.

    v.   As a direct and proximate cause of Welton's breaches, GMS has been damaged in excess of $75,000, the exact amount to be determined at trial.

f.   In his 2016 Independent Agent Agreement, Hayes agreed to "aggressively promote the sale of [GMS] Products in [his] Territory."

    i.   This duty was material to the 2016 Independent Agent Agreement with Hayes, and GMS would have never entered the agreement without it.

    ii.   GMS faithfully performed its duties under the 2016 Independent Agent Agreement with Hayes.

    iii.   As described more fully herein, during the term of his agreement, Hayes breached his duty to "aggressively promote the sale of [GMS] Products in [his] Territory" under the 2016 Independent Agent Agreement by intentionally and improperly promoting and selling the competing goods of G&S to the customers of GMS within his territory, and thereby failing to "aggressively promote the sale of [GMS] Products in [his] Territory.".

    iv.   As a direct and proximate cause of Hayes's breach of the 2016 Independent Agent Agreement, GMS has been damaged in excess of $75,000, the exact amount to be determined at trial.

g.   In his 2016 Independent Agent Agreement, Sky Spires agreed to "aggressively

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

promote the sale of [GMS] Products in [his] Territory."

    i.    This duty was material to the 2016 Independent Agent Agreement, and GMS would have never entered the agreement without it.

    ii.    GMS faithfully performed its duties under the 2016 Independent Agent Agreement with Sky Spires.

    iii.    As described more fully herein, during the term of his agreement, Sky Spires breached his duty to "aggressively promote the sale of [GMS] Products in [his] Territory" under the 2016 Independent Agent Agreement by intentionally and improperly promoting and selling the competing goods of G&S to the customers of GMS within his territory, and thereby failing to "aggressively promote the sale of [GMS] Products in [his] Territory.".

    iv.    As a direct and proximate cause of Sky Spires's breach, GMS has been damaged in excess of $75,000, the exact amount to be determined at trial.

121.    GMS has been directly and proximately damaged, and its goodwill irreparably harmed, by the Defendants' material breaches of their respective contracts to "aggressively promote the sale of [GMS] Products in [his/her] Territory", as detailed herein.  Plaintiff respectfully requests that this Court find that Defendants breached their contracts entered into with GMS, that said breaches caused substantial injury to GMS, and require Defendants to pay GMS damages for their breach, including, but not limited to, the amount of net profits received by Defendants, and for such other and further relief as this Court deems just and proper.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

### Count IV:  Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. §1836, *et seq*  (All Defendants)

122.    All of the foregoing allegations in paragraphs 1-121 of this Complaint are incorporated into this Count IV, as if fully set forth herein.

123.    As alleged hereinabove, Westly accessed a computer without authorization and used such access to obtain or alter information in the computer that he was not entitled to so obtain or alter.

124.    GMS owned and possessed certain confidential, proprietary and Trade Secret information as alleged hereinabove.

125.    Plaintiff has taken reasonable measures to keep such information secret and confidential, including those alleged in Paragraph 30 above.

126.    This confidential, proprietary and trade secret information derived independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information, as alleged hereinabove.

127.    In violation of GMS' rights, Defendants misappropriated the confidential, proprietary and trade secret information of GMS in the improper and unlawful manner as alleged hereinabove.

128.    Despite demand therefore, Defendants have failed to return GMS' confidential and Trade Secret information, and attempted to conceal their theft and misappropriation of such information. If Defendants conduct is not remedied, and if Defendants are not in enjoined,

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 60 of 86

**JA405**

Defendants will continue to misappropriate and disclose, and use for their own benefit, and to GMS his detriment and injury, GMS his trade secret information.

129.    As the direct and proximate result of the Defendants conduct as aforesaid, GMS has suffered and, if Defendants' conduct is not stopped, GMS will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial, as well as an award of exemplary damages and attorney's fees.

130.    Because GMS' remedy at law is in adequate, GMS seeks, in addition to damages, temporary, preliminary and permanent injunctive relief to recover and protect GMS' confidential, proprietary and Trade Secret information and other legitimate business interests. GMS' business is based upon, and relies upon, its business reputation and goodwill with its customers, and in its ability to maintain and grow its client base in a competitive market and will continue suffering irreparable harm absent injunctive relief.

131.    GMS has a substantial likelihood of success on the merits because of the Defendants willful, blatant, and malicious misappropriation of GMS' Trade Secrets through the improper and unlawful methods, as alleged herein,

## Count V:  Misappropriation of Trade Secrets Under the Virginia Uniform Trade Secrets Act, Virginia Code §§ 59.1-336 to 343 (All Defendants)

132.    All of the foregoing allegations in paragraphs 1-131 of this Complaint are incorporated into this Count V, as if fully set forth herein.

133.    GMS' confidential and proprietary Customer Lists, Customer Preference Data, Products Source List, Load Sheet Protocol, Sales Agent Training Protocol, Pricing Methods and

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

## JA406

Marketing Techniques constitute Trade Secrets as such term is defined under the Virginia Uniform Trade Secrets Act, in that they derive independent economic value, actual or potential, from not being generally known to, and not readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use. GMS spent significant amounts of money to create, protect and improve the Trade Secrets.

134. As alleged in Paragraph 28-29 hereinabove, GMS used and uses efforts that are reasonable under the circumstances to maintain the secrecy of the Trade Secrets.

135. Defendants, in their individual capacities, and in their capacity as agents for their respective Defendant limited liability companies and for Defendant HMC and G&S, willfully and maliciously misappropriated GMS is trade secrets for their and G&S' own benefit, without GMS' is authorization, consent or approval, and without a right or privilege to do so, to the detriment and harm of Plaintiff GMS.

136. GMS' Trade Secrets were disclosed to the individual Defendants, and their respective Defendant limited liability companies other than HMC and G&S, while in a confidential relationship with GMS, and for a nearly three and one-half (3 1/2) year period from in or about October 2015, when they created HMC, through April 3, 2019, when they were terminated from GMS, while the individual Defendants were surreptitiously acting as undisclosed dual agents of HMC and G&S, companies formed and used by Defendants to compete against GMS while the Defendants were employed by, or under sales agent agreements with, GMS. The Defendant's use of GMS' Trade Secrets is causing injury to GMS.

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No. 2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 62 of 86

JA407

137.    The individual Defendants are wrongfully using, and as agents of their respective limited liability companies, HMC, and G&S, aiding, abetting and permitting the limited liability Defendants to wrongfully use, GMS' Trade Secrets and, as a result, the Defendants have converted and wrongfully misappropriated for his, her, their and its use and benefit such proprietary and Trade Secret information.

138.    As a result of said conversion and misappropriation of GMS his trade secrets, GMS has suffered damages in an amount in excess of $75,000.

139.    Unless defendants are restrained by this Court from continuing to misappropriate and use GMS is trade secrets, GMS will suffer immediate, substantial and irreparable injury.

140.    The benefits to GMS in obtaining injunctive relief are equal to or outweigh the potential harm which Defendants would incur if this Court granted the requested injunctive relief.

141.    The public interest, including that served under the Virginia Uniform Trade Secrets Act, is best served by granting the requested injunction.

## Count VI:  Fraud In The Inducement Of Performance Of Executory Contracts
### (All Defendants Except HMC and G&S)

142.    All of the foregoing allegations in paragraphs 1-141 of this Complaint are incorporated into this Count VI, as if fully set forth herein.

143.    Commencing on June 22, 2017, and continuing through April 3, 2019,Westly and Greg Spires perpetrated a fraud on GMS by fraudulently inducing GMS to continue performance and payment of Westly and Greg Spires under their respective employment and sales agent agreement executory contracts described herein when on June 22, 2017 they formed G&S and they

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

**JA408**

and G&S began using G&S to compete against GMS through solicitation of its customers and sales agents, misappropriation of its Trade Secrets, use and disclosure of GMS' confidential and proprietary information for competitive purposes. Westly concealed this information from GMS although Westly was still also employed by GMS and owed GMS the duty of loyalty, including the duty of full disclosure, through and including January 29, 2019, when he resigned as Director of Sales and signed the Westly 2019 Sales Agent Agreement. Greg Spires concealed this information from GMS although Greg Spires was serving as a sales agent for GMS and knew that GMS was unaware of such direct competition against GMS, solicitation of GMS' sales agents and misappropriation of its proprietary and Trade Secret information, and knew that GMS would not continue to perform under its sales agent contract with Greg Spires by continuing to contract with and pay him if GMS was aware of his disloyal and unlawful behavior in this regard.

144.    Westly perpetrated another fraud on GMS by fraudulently inducing GMS to continue performance and payment of Westly under his sales agent agreement contract commencing on January 29, 2019, when he induced GMS to enter into the Westly 2019 Sales Agent Agreement by concealment of the same facts and conduct identified in the foregoing paragraph, which second fraud continued to April 3, 2019, when GMS learned of the material misrepresentations of fact related to Westly's and G&S' competitive activities and terminated him as a sales agent. During the period of January 29, 2019 through April 3, 2019, Westly concealed this information from GMS although Westly was serving as a sales agent for GMS and knew that GMS was unaware of such direct competition against GMS, solicitation of GMS' sales agents and misappropriation of its proprietary and Trade Secret information, and knew that GMS would not

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 64 of 86

**JA409**

continue to perform under its sales agent contract with Westly by continuing to contract with and pay him if GMS was aware of his disloyal and unlawful behavior.

145.     Westly perpetrated a third fraud on GMS commencing on February 3, 2019, and continuing through April 22, 2019, when he downloaded and misappropriated GMS documents and confidential, proprietary and trade secret data, and destroyed or deleted such GMS data, from the three GMS computers in his possession, and concealed such actions from GMS, by withholding return of this computer equipment from April 3, 2019 to April 22, 2019, and using a File Shredder program to conceal the fraudulent misappropriation and destruction of GMS' data.

146.     From October 22, 2015 through April 3, 2019, all of the Defendants except G&S perpetrated fraud in the inducement or conspired to perpetrate fraud in the inducement upon GMS, causing GMS to refrain from terminating such Defendants' executory contracts, by concealing material misrepresentations of fact that they had a duty to disclose to GMS, because they knew GMS was not terminating their employment and/or sales agency relationship based upon GMS' lack of knowledge of their disloyal and unlawful acts described above and herein below in subsections a. to e.  The Defendants other than G&S concealed such facts that were material to the business transactions between GMS and the Defendant sales agents, knowing that GMS was acting on the assumption that no such fact existed, and therefore such concealment is as much a fraud as if the existence of the fact were expressly denied, or the reverse of it expressly stated by such Defendants. The Defendants other than G&S concealed from GMS several material facts set forth hereinabove, namely

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 65 of 86

**JA410**

a.      that in October 2015, Westly, then an employee of GMS, along with Greg Spires, then an independent sales agent of GMS, formed a plan to establish a competing industrial supply business to sell the same or similar products to GMS' customers;

b.      That on October 22, 2015, Spires, with the consent and assistance of Westly, formed and incorporated HMC as a competing company to GMS and thereafter, until the formation of G&S as described herein, Spire, Westly, and Sabrina Greer used HMC to sell the same or similar products to GMS' customers to GMS' detriment.

c.      That on June 22, 2017, Westly, with the consent and assistance of Greg Spires, formed G&S as a competing company to GMS and thereafter, to present, the Defendants other than G&S used G&S to sell the same or similar products to GMS' customers, to GMS' detriment;

d.      that Defendants were all irretrievably committed to, and agreed to, keeping the plan, and all sales activities in accordance with the plan, secret from GMS, while remaining in the duel employment and/or independent sales agent capacity at GMS, with the purpose and intent of generating as much revenue as they could for themselves while serving in the capacity as sales agents for HMC and G&S, soliciting away GMS' customers to HMC and G&S; and

e.      that Westly and the other Defendants other than HMC and G&S had misappropriated GMS' Trade Secrets and has implemented them in HMC and

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 66 of 86

JA411

G&S' new competing businesses, and were using GMS' Trade Secrets to compete against GMS.

The fiduciary duty of loyalty that Westly owed to GMS included a duty of disclosure, but Westly intentionally and knowingly concealed these material facts even as he knew that GMS was acting upon the assumption that these facts did not exist.

147.     The Defendants effected this concealment with the intent to mislead GMS, GMS reasonably relied on the misrepresentations and acted on the assumption that the foregoing facts the Defendants concealed from them did not exist and GMS was damaged as a result thereof in an amount in excess of $75,000.00.

148.     Defendants other than HMC and G&S were conscious of their conduct in intentionally concealing the foregoing facts from GMS, and conscious from his knowledge of existing conditions and GMS' business, that injury to GMS would result from such Defendants' material misrepresentations of fact by concealment.

149.     Such Defendants acted deliberately, intentionally, and with malice to injure GMS and benefit themselves to the detriment of GMS.

150.     GMS was damaged by, among other damages, loss of revenue and goodwill as a result and is entitled to recover compensatory, punitive damages, and reasonable attorney's fees and costs from the Defendants.

**Count VII: Federal Computer Fraud And Abuse Act 18 U.S.C.S. §1030 (Westly and G&S)**

151.     All of the foregoing allegations in paragraphs 1-150 of this Complaint are incorporated into this Count VII, as if fully set forth herein.

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 67 of 86

**JA412**

152.     The Federal Computer Fraud and Abuse Act ("CFAA") permits a private party who suffers damage or loss by reason of a violation of the statute to bring a civil action to obtain compensatory damages and injunctive relief or other equitable relief pursuant to 18 U.S.C. §1030(g).

153.     Westly's actions described above, including, but not limited to Paragraphs 55. -59. and 124., acting individually and as agent of G&S, violate both 18 USC §§ 1030 (a)(4)and (a)(5).

154.     The desktop computer GMS provided to Westly is a "protected computer" under the CFAA because it was used to conduct interstate and foreign commerce and communication.

155.     The laptop computer GMS provided to Westly is a "protected computer" under the CFAA because it was used to conduct interstate and foreign commerce and communication.

156.     The tablet computer GMS provided to Westly is a "protected computer" under the CFAA because it was used to conduct interstate and foreign commerce and communication.

157.     Westly, acting individually and as agent for G&S, knowingly, intentionally and without authorization, copied and downloaded for himself and G&S, and provided to the Sales Agent Defendants, sensitive, confidential, proprietary and GMS Trade Secret documents and information, and deleted thousands of GMS documents, all in violation of his and G&S' contractual, statutory and other obligations owed to GMS.

158.     Westly knowingly and intentionally and without authorization, returned his GMS provided desktop and laptop after deleting the information contained on them, all in violation of his contractual and statutory  obligations owed to GMS.

_GMS Industrial Supply, Inc v. G&S Supply, LLC, et al_
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

**JA413**

159.    By accessing, copying and/or deleting sensitive, confidential, proprietary and Trade Secret information using improper means, knowing that he no longer worked for GMS and that the means of acquiring these Trade Secrets was improper, but an agent of G&S, and planning to, and actually, competing against GMS, Westly knowingly and with intent to defraud accessed documents and information without GMS' his authorization, and then concealed such actions from GMS, with the intent to defraud GMS.

160.    As a result of Westly's and G&S' actions, GMS has suffered and will continue to suffer losses in excess of $5,000, including the loss of sensitive, confidential, proprietary and Trade Secret information and substantial cost of conducting a computer forensic investigation.

161.    Additionally, Westly and G&S' knowingly and intentionally caused information to be deleted in a manner that prevents recovery of deleted material, thereby depriving GMS of it's confidential, proprietary and Trade Secret information, and deleting and destroying material evidence when he had a duty not to.

162.    Neither Westly nor G&S were authorized to permanently delete GMS' documents and data before or after his termination of Westly's employment and/or as sales agent of GMS.

163.    As a result of Westly's and G&S' unauthorized access, copying and permanent deletion of GMS of documents and other information, GMS suffered significant damages in excess of $5,000 to its laptop and desktop computers and due to Westly's refusal to provide the access code to the tablet computer device owned by GMS which he returned to GMS on April 25, 2019, despite the demand for such access code as set forth in the letter from Pender & Coward, PC, dated

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 69 of 86

JA414

May 24, 2019, attached as Exhibit #10 hereto, GMS suffered damages in excess of $5,000 to that protected tablet computer as well.

## Count VIII:  Virginia Computer Crimes Act Va. Code §§ 18.2-152.1 to 18.2-152.15
## (All Defendants)

164.    All of the foregoing allegations in paragraphs 1-163 of this Complaint are incorporated into this Count VIII, as if fully set forth herein.

165.    The Virginia Computer Crimes Act prohibits, among other things, any person "without authority" to use a computer or computer network to "make… an unauthorized copy… of computer data." Virginia Code § 18.2–152.4.

166.    Virginia Code § 18.2-152.2 provides that a person is "without authority" when he or she knows or reasonably should know that he or she has no right, agreement, or permission or acts in a manner knowingly exceeding such right, agreement, or permission that was actually granted to him or her.

167.    The Defendants, individually, and in their capacity as agents for HMC and G&S, had no authority to access GMS' computer server system, computer networks, computer programs and software to make unauthorized copies of, or use, GMS' confidential, proprietary and Trade Secret information for purposes of using it in a competitive business, such as G&S, which they did.

168.    The Defendants, individually, and in their capacity as agents for HMC and G&S, willfully and maliciously used GMS' computer server system, computer networks, computer programs and software to make unauthorized copies of GMS' confidential, proprietary and Trade

_GMS Industrial Supply, Inc v. G&S Supply, LLC, et al_
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Secret information, and used that information to compete against GMS by soliciting and selling the same or similar industrial supply products to GMS' customers on behalf of HMC and G&S, all in violation of Va. Code §§ 18.2-152.3 and 18.2-152.4

169.    Westly's conduct as alleged in Count VII above also constitutes a violation of Va. Code §§ 18.2-152.3 and 18.2-152.4.

170.    GMS was damaged by, among other damages, loss of revenue and goodwill as a result of these actions by the Defendants. As a direct and proximate cause of the Defendants unauthorized actions, GMS has sustained damages, which, in part, are undeterminable, and, in part, in an amount to be determined by evidence at trial, but not less than $2 million.

171.    Under Va. Code § 18.2-152.12(A), GMS is entitled to recover damages and costs, which includes the costs of retaining computer forensics experts to discover exactly what confidential information was accessed, what confidential information was printed, and to determine whether such information was subsequently stored in the Defendants computers.

### Count IX:  Tortious Interference With Contract or Contract Expectancy (All Defendants)

172.    All of the foregoing allegations in paragraphs 1-171 of this Complaint are incorporated into this Count IX, as if fully set forth herein.

173.    GMS has a valid contractual relationship or business expectancy with its current and ongoing customers, which without improper interference would have provided probable future economic benefit to GMS.  GMS had built the contractual relationship and business expectancy

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 71 of 86

JA416

with its customers over a course of 18 years whereby the customers grew to trust and count on GMS when they needed industrial supply products.

174.    The Defendants knew of the relationship or expectancy.

175.    There is a reasonable certainty that, in the absence of the intentional misconduct by the Defendants, GMS would have continued the contractual relationship or realized the expectancy with its customers with whom the Defendants converted many sales from GMS to G&S.

176.    The Defendants intentionally, through use of improper methods, interfered with the relationship or expectancy.  The Defendants' improper methods included breach of the duties of loyalty, breach of contracts, misappropriation of GMS' Trade Secrets under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 and the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336, *et seq.*, common law fraud in the inducement of performance of executory contracts, the Virginia Computer Crimes Act, Va. Code §18.2-152.1, *et seq*, the Federal Computer Fraud and Abuse Act,  18 U.S.C. §1030, business conspiracy in violation of Va. Code §§ 18.2-499 and 500, common law conspiracy to injure one in its trade or business, Trademark Infringement in violation of 15 U.S.C. § 1125(a) and Trade Dress Infringement in violation of15 U.S.C. § 1125(a).

177.    The actions by the Defendants caused a breach or termination of the relationship or expectancy.

178.    The Defendants' actions were willful and wanton. Each of the Defendants acted deliberately, intentionally, and with malice to injure GMS and benefit themselves.

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 72 of 86

JA417

179.    GMS was damaged by, among other damages, loss of revenue and goodwill as a result and is entitled to recover compensatory and punitive damages from the defendants who are named in this Count IX.

## Count X:  Business Conspiracy in Violation of Va. Code §18.2-499 (Sales Agent Defendants and HMC)

180.    All of the foregoing allegations in paragraphs 1-179 of this Complaint are incorporated into this Count X, as if fully set forth herein.

181.    No later than October 22, 2015, Westly, Greg Spires, and HMC formed a combination of two or more persons, willfully and maliciously, motivated by greed and depraved moral turpitude, and entered into a conspiracy for the purpose of using GMS' proprietary, confidential and Trade Secret information, including, but not limited to GMS' sales force, customer contacts, preferences and pricing information to establish a competing entity against GMS to benefit their own economic advantage, and causing loss and damage to GMS

182.    Quickly thereafter, Westly and Greg Spires recruited the other Sales Agent Defendants and they willfully, deliberately and intentionally joined the conspiracy and ratified and adopted the prior actions of their co-conspirators, Westly and Greg Spires, as set forth hereinabove.

183.    The conspiracy was perpetrated, in part, by the formation of G&S, which was intentionally named to sound almost identical to GMS, to confuse the marketplace in which GMS in G&S sold goods so that the Sales Agent Defendant conspirators could take advantage of GMS' goodwill and good reputation amongst GMS' customers, who were the target of the Sales Agent

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

# JA418

Defendants' conspiracy. This was done intentionally and maliciously to misappropriate GMS' business and customers for themselves and G&S.

184.    As set forth hereinabove, the Sales Agent Defendants and HMC's actions were willful, malicious, intentional, without legal justification, and designed to injure GMS in its trade or business, in violation of Virginia Code §18.2-499.

185.    As a direct and proximate result of the foregoing conspiracy, GMS has been damaged in amount to be determined by the evidence at trial, but not less than $2 million, and has been irreparably harmed by the loss of its customer base, good will and good reputation.

186.    Under Virginia Code §18.2-500, GMS is entitled to recover treble damages plus its attorney's fees and costs incurred in connection with this lawsuit.

### Count XI:  Common Law Conspiracy (Sales Agent Defendants and HMC)

187.    All of the foregoing allegations in paragraphs 1-186 of this Complaint are incorporated into this Count XI, as if fully set forth herein.

188.    The Sales Agent Defendants and HMC combined to accomplish through their concerted action, some criminal or unlawful purpose, or some lawful purpose by a criminal or unlawful means.  Specifically, such defendants, in concert, committed the following unlawful, acts among others:

a.    Conspired with other GMS employees and sales agents and assisted them to breach their common law duty of loyalty and/or contractual obligations to GMS, and various Federal and state statutes as detailed above in such a manner as to cause injury to GMS;

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

b.    Interfered with GMS's contracts and/or destroyed its legitimate business expectancy; and

c.    Wrongfully obtained and used GMS's confidential, proprietary information and Trade Secret information in violation of its and their duties owed to GMS.

189.    In performing these acts, these defendants acted in concert to damage GMS's business intentionally, maliciously and without lawful justification.

190.    GMS was damaged by, among other damages, loss of revenue and goodwill as a result of the acts committed by the Defendants in furtherance of their conspiracy, and is entitled to compensatory and punitive damages.

## COUNT XII TRADEMARK INFRINGEMENT IN VIOLATION OF 15 U.S.C. § 1125(a)
## (All Defendants)

191.    All of the foregoing allegations in paragraphs 1-190 of this Complaint are incorporated into this Count XII, as if fully set forth herein.

192.    Since GMS changed its name in October 2007 and began operating and marketing goods as "GMS Industrial Supply, Inc.," it used and the acronym "GMS" to identify itself in the marketplace, and since that time, GMS has continuously used its GMS trade name and mark (collectively, "trademark") in the marketplace. GMS has sold $67,200,000, worth of product to GMS customers using that trademark from October 2007 to April 30, 2019.

193.    In the years following GMS's entry into the marketplace, its operations have grown dramatically and it has become one of the preferred industrial suppliers to the GSA, DLA, Army, Navy, and Marine Corps.

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 75 of 86

JA420

194.    GMS began marketing and selling supply goods to military bases in the in the following states and at the following dates using the GMS trademark: Oklahoma in 2011; Texas in 2012; Colorado in 2015; New York in 2015; and Louisiana in 2016.

195.    GMS has used the GMS trademark continuously in these states since October 2007 to refer to its brand of industrial supplies, and has extensively marketed its goods under the GMS trademark to its military customers in these States, as well as and in Japan and Europe. GMS prominently displays such trademark on its marketing materials, catalogues, stationary, e-mails, website, sales personnel clothing and correspondence, and the trademark is well-known within the procurement community of military bases located within each of these States.

196.    GMS prides itself on its quality industrial goods and customer service and expends considerable time and effort in marketing and advertising to cultivate the goodwill and reputation that it has developed with its clients.

197.    As part of its promotion and advertisement of its products and services, GMS has used the GMS trademark continuously in DLA, GSA and Department of Defense sales and marketing to identify its industrial supply products for more almost 12 years. During that time, the GMS trademark has become imbued with goodwill and renown, which is exclusively associated with GMS, and has become famous in the DLA, GSA and Department of Defense industrial product market.

198.    Examples of GMS's use of the GMS trademark are attached as Exhibit #8.

199.    GMS has extensively advertised using its trademark to customers and potential customers, including by doing the following:

_GMS Industrial Supply, Inc v. G&S Supply, LLC, et al_
Case No.   2:19-cv-324
Third Amended Verified Complaint

**JA421**

a.      Creating catalogues containing GMS industrial products and product kits,  with some materials and products acquired from confidential suppliers and maintaining a sales force who are trained to market to these customers using the GMS catalogues;

b.      Maintaining a website designed to market GMS's industrial products its client and potential clients;

c.      Creating, distributing, and maintaining a free web application that allows customers to review and purchase GMS industrial products directly;

d.      E-mail links to product purchase websites and catalogues.

200.    In October 2015, Spires and Westly created and build HMC as a vehicle to directly compete against GMS.  Despite the months of effort put forth by Spires and Westly to market and sell goods through HMC they suddenly abandoned the company name, created an entirely new company under the name "G&S," and transferred $5,000 of assets from HMC to GMS.  Upon information and belief, Defendant G&S Supply, LLC ("G&S") began operating in 2017, and its founders were at that time Plaintiffs' employees or independent sales agents.  At that time and at all times since, Defendants have misappropriated the GMS trademark by using the infringing designation "G&S" (the "Infringing Designation) in the marketplace.

201.    Defendants' market and sell industrial products similar, and in some cases identical, to those sold by GMS.  As part of its marketing, Defendant G&S and its Defendant sales agents fraudulently informed GMS' customers that the two organizations were "sister companies."

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 77 of 86

JA422

202.    Upon information and belief, Defendants operated and marketed goods similar to those marketed by GMS under the Infringing Designation that was and is intended to be similar to the GMS trademark, and has done so as to confuse potential customers into thinking that Defendant is GMS or is otherwise affiliated with GMS.

203.    Defendants have used the G&S designation to market its competing industrial products to the same client base as GMS in the states of Colorado, Louisiana, New York, Oklahoma, and Texas, and through the AESIP portal.  Defendant has marketed its products using the G&S designation through catalogues similar to those used by GMS.  In its catalogues, Defendant G&S' products that not only be identical to those marketed in GMS's, but which contain the same product identification numbers.

204.    Examples of G&S' use of the designation in the market place are attached as Exhibit #9.

205.    Defendants chose the Infringing Designation to confuse and deceive GMS' customers that their products were associated with, approved by, or sponsored by GMS.

206.    While working as employees or contractors of GMS, the Sales Agent Defendants marketed products from both GMS and G&S to GMS's clients, which was intended to further confuse GMS' clients into believing that Defendant G&S' products were the same as or affiliated with GMS' products.

207.    Defendants' activities have and continue to create confusion among customers and potential customers of GMS, thus depriving GMS of the business opportunities and sales that otherwise should have benefitted it.

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

**JA423**

208.     The products offered by Defendants in connection with the Infringing Designation are highly similar to and directly competitive with the products offered by GMS under its GMS trademark, except in those instances when the sell products that violate the TAA.

209.     GMS has no association, affiliation, sponsorship, or any other connection to Defendant G&S.

210.     Customers of GMS are experiencing actual confusion caused by Defendants' use of the Infringing Mark, including, among others, the following instances:

a.     On January 10, 2019, GMS sales agent Amber Wenrick, a GMS sales agent, received an emailed order from a GMS customer that contained requests for materials he thought were being purchased from GMS, but used Defendant G&S' product numbers for nine (9) of the eleven items being ordered.  The G&S products were designated by the same numerals, but preceded with "GS" instead of GMS, demonstrating the customers' confusion between the two companies and their products;

b.     On May 19, 2019, GMS sales agent Greg Naschansky visited a GMS customer at Fort Polk in Louisiana on a sales call.  While there, the Army procurement officer stated that one of GMS' salespersons, referring to Thomas Hayes, who had been terminated by GMS on April 3, 2019, due to his sales made on behalf of G&S, had visited with him the day before. Further discussion revealed that it was a G&S salesperson who had visited, and the procurement officer was confused with the difference between GMS and G&S, believing they were sister companies.

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

Page 79 of 86

JA424

211.    Defendants' use in commerce of the Infringing Designation on and in connection with the sale of its products, without permission or consent of GMS, has caused and is likely to cause confusion, or to cause mistake, or to deceive and mislead customers and potential customers as to the origin, source, sponsorship or approval of Defendants' products and commercial activities, or to believe that Defendants' products and services are associated with, authorized, sponsored or supported by GMS, all in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

212.    Defendants know or should have known of GMS' ownership of the GMS trademark and its use of the GMS trademark in the marketplace at all times herein, and the aforesaid infringement by Defendants was committed willfully, knowingly, maliciously, and in conscious disregard of GMS's rights.

213.    Defendant has not registered the Infringing Mark or any similar trademark with the United States Patent and Trademark office.

214.    The aforesaid infringement by Defendants has caused, and unless restrained by this Court will continue to cause, immediate and irreparable injury to GMS' property and business, for which GMS has no adequate remedy at law.  GMS has also been damaged by no less than $2,000,000.

## COUNT XIII

## TRADE DRESS INFRINGEMENT, UNFAIR COMPETITION, AND FALSE DESIGNATION OF ORIGIN IN VIOLATION OF SECTION 43(A) OF THE LANHAM ACT (15 U.S.C. § 1125(a)) (ALL DEFENDANTS)

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.   2:19-cv-324
Third Amended Verified Complaint

PENDER & COWARD, P.C.
www.pendercoward.com

JA425

215.    All of the foregoing allegations in paragraphs 1-214 of this Complaint are incorporated into this Count XIII, as if fully set forth herein.

216.    Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a), provides that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(1)(a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

217.    GMS and Defendants are competitors for purposes of the Lanham Act.  As detailed further herein, GMS and Defendants acquire, market, supply and sell similar goods and supplies to the same narrow group of customers.

218.    By making unauthorized use, in interstate commerce, of the GMS trademark, by actively and directly misrepresenting to customers of GMS that G&S is a "sister company" of GMS, and by using the same or similar product invoice numbers and images of GMS on their own products, the Defendants have used a "false designation of origin" that is likely to cause confusion, mistake or deception as to the affiliation or connection of the Defendants with GMS and as to the origin, sponsorship, association or approval of the Defendants' services and goods by GMS, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

219.    Defendants are knowingly and intentionally misrepresenting and falsely designating to GMS' customers and potential customers the affiliation, connection, association, origin, source, endorsement, sponsorship, and approval of Defendants' products so as to create a

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*
Case No.  2:19-cv-324
Third Amended Verified Complaint

likelihood of confusion by the public as to the affiliation, connection, association, origin, source endorsement, sponsorship, and approval of Defendants' products.

220.    The Defendants' acts constitute the use in commerce of false designations of origin and false and/or misleading descriptions or representations, tending to falsely or misleadingly describe and/or represent the Defendants' products as those of GMS, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

221.    Through its palming off of GMS' products, the Defendants have willfully misappropriated and trade off of the strength and goodwill associated with GMS' trademarks for its inferior products.  In doing so, Defendants harm GMS' goodwill and misappropriate its business opportunities.

222.    The Defendants' egregious conduct in selling infringing products and misrepresenting that its products are the products of GMS is willful and intentional.

223.    The Defendants' acts have caused and will continue to cause irreparable injury to the Plaintiff though the loss of business to its customers, and loss of goodwill and reputation in the marketplace. The Plaintiff has no adequate remedy at law and is thus damaged in an amount yet to be determined.

224.    The Defendants' wrongful acts will continue unless enjoined by this Court.

WHEREFORE, plaintiff respectfully requests that the Court enter an Order as follows:

A.    Temporarily and permanently enjoining and restraining the Defendants from soliciting customers or former customers of GMS for the purpose of selling or providing them

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*    PENDER & COWARD, P.C.
Case No.   2:19-cv-324    www.pendercoward.com
Third Amended Verified Complaint

Page 82 of 86

JA427

industrial products and/or fulfilling any solicitations or pending awards to customers or former customers of GMS;

B.      Ordering Defendants to deliver to GMS or their counsel any and all GMS Confidential Information or Trade Secrets in their possession, whether it exists in tangible or intangible form and thereafter not otherwise use, duplicate, or distribute such information in any manner;

C.      Temporarily and permanently enjoining and restraining Defendants from using the GMS or G&S mark in connection with the sale of industrial products;

D.      Temporarily and permanently enjoining and restraining Defendants from using or disclosing any GMS Confidential Information or Trade Secrets in a manner that would violate the provisions of the confidentiality covenant between GMS and each respective Defendant;

E.      Temporarily and permanently enjoining and restraining Defendants from contacting current employees and sales agents of GMS and soliciting or encouraging them to leave the employ of GMS or to sever their relationships with GMS;

F.      Ordering all Defendants, jointly and severally, to pay compensatory damages to GMS in an amount to be proved at trial, which totals over $2,000,000.00 as of the date hereof;

G.      Ordering all Defendants, jointly and severally, to pay treble compensatory damages, and/or punitive damages to GMS in the amount of $6,000,000.00, and to pay GMS's legal fees and costs to GMS, as authorized under various Counts above;

H.      Temporarily and permanently enjoining and restraining Defendants from interfering with GMS' contracts and contract expectancy with its customers; and

---

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*                    PENDER & COWARD, P.C.
Case No.   2:19-cv-324                                     www.pendercoward.com
Third Amended Verified Complaint

Page 83 of 86

**JA428**

I.    Awarding GMS such further and general relief as is necessary to serve the ends of justice in this legal action.

JURY TRIAL DEMANDED:    Plaintiff hereby demands a trial by jury on all claims.


GMS INDUSTRIAL SUPPLY, INC.

By:  /s/ William A. Lascara
     William A. Lascara, Of Counsel


William A. Lascara, Esquire
Virginia State Bar No. 23118
Jeffrey D. Wilson, Esquire
Virginia State Bar No. 75734
Thomas S. Berkley, Esquire
Virginia State Bar No. 40124
PENDER & COWARD
222 Central Park Avenue #400
Virginia Beach, VA 23462
(757) 490-6265 Direct Dial
(757)502-7358 Facsimile
wlascara@pendercoward.com
jwilson@pendercoward.com
tberkley@pendercoward.com

_____
*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*    PENDER & COWARD, P.C.
Case No.  2:19-cv-324                                      www.pendercoward.com
Third Amended Verified Complaint

Page 84 of 86

**JA429**

**VERIFICATION**

I, Rachel Gorken, a citizen of the United States and a resident of the State of California, the President, sole owner and full time employee of GMS Industrial Supply, Inc., have read the forgoing Verified Complaint for Injunctive and Legal Relief, and declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746 that the forgoing is true and correct.

Executed this 1st day of December, 2020        \_\_\_\_\_/s/Rachel Gorken_____
                                                          Rachel Gorken

**VERIFICATION**

I, Gary Gorken, a citizen of the United States and a resident of the State of California, the and GMS' Director of Regulatory Compliance and a full time employee of GMS Industrial Supply, Inc., have read the forgoing Verified Complaint for Injunctive and Legal Relief, and declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746 that the forgoing is true and correct.

Executed this 1st day of December, 2020        \_\_\_\_\_/s/Gary Gorken_____
                                                          Gary Gorken

**CERTIFICATE OF SERVICE**

I hereby certify that December 1, 2020, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, including the following:

> Robert W. McFarland, Esquire
> V. Kathleen Dougherty, Esquire
> McGuireWoods, LLP
> World Trade Center
> 101 West Main Street, Suite 9000
> Norfolk, VA 23510
> rmcfarland@mcguirewoods.com
> vkdougherty@mcguirewoods.com

_____

*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*                    PENDER & COWARD, P.C.
Case No.  2:19-cv-324                                                     www.pendercoward.com
Third Amended Verified Complaint

**JA430**

J. Patrick McNichol, Esquire
McGuireWoods, LLP
800 E. Canal Street
Richmond, VA 23219
pmcnichol@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*
*G&S Supply, LLC, et al.*



                              _____/s/_____
                              William A. Lascara, Esq., VSB #23118
                              Jeffrey D. Wilson, Esq., VSB #75734
                              Thomas S. Berkley, Esq., VSB #40124
                              PENDER & COWARD, P.C.
                              222 Central Park Avenue #400
                              Virginia Beach, VA 23462
                              (757) 502-7326 Direct Dial
                              (757) 502-7372 Facsimile
                              *wlascara@pendercoward.com*
                              *jwilson@pendercoward.com*
                              *tberkley@pendercoward.com*
                              *Counsel for Plaintiff,*
                              *GMS Industrial Supply, Inc.*

_____
*GMS Industrial Supply, Inc v. G&S Supply, LLC, et al*          PENDER & COWARD, P.C.
Case No.   2:19-cv-324                                          www.pendercoward.com
Third Amended Verified Complaint

Page 86 of 86

# JA431

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | | |
|---|---|---|
| GMS INDUSTRIAL SUPPLY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-324-RCY-LRL |
| | ) | |
| G&S SUPPLY, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION
<u>FOR SANCTIONS PURSUANT TO RULE 11</u>**

NOW COME Defendants G&S Supply, LLC, WarTech Industries, LLC, HMC Supply, LLC, Defendants/Counterclaimants Westly Greer, Sabrina Greer, Greer Group, LLC, Gregory K. Spires, County Roads, LLC, Thomas Hayes, and Mike Welton (collectively "Defendants"), by counsel, pursuant to Rule 11 of the Federal Rules of Civil Procedure, and hereby move this Court for entry of an order dismissing this case with prejudice.  In support of this Motion, Defendants refer the Court to their Memorandum in Support, filed contemporaneously herewith.

WHEREFORE, for the reasons stated in the accompanying Memorandum in Support of this Motion for Protective Order, Defendants respectfully request this Court (1) grant their Motion for Sanctions and dismiss Plaintiff's Third Amended Complaint with prejudice; (2) award Defendants their costs and expenses, including attorneys' fees in defending this suit and bringing this Motion for Sanctions; (3) and awarding such further relief as the Court deems appropriate.

**JA432**

Dated: July 8, 2021

Respectfully submitted,

**G&S SUPPLY, LLC, WESTLY L. GREER,
SABRINA GREER, GREER GROUP, LLC,
GREGORY K. SPIRES, COUNTY ROADS,
LLC, THOMAS HAYES, MIKE WELTON,
WARTECH INDUSTRIES, LLC AND HMC
SUPPLY, LLC**

By: */s/ Robert W. McFarland*
Robert W. McFarland (VSB # 24021)
V. Kathleen Dougherty (VSB # 77294)
Micaylee A. Noreen (VSB # 92433)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Ste. 9000
Norfolk, Virginia 23510
Phone:  (757) 640-3716
Fax:  (757) 640-3966
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*

**JA433**

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2021, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

By: */s/ Robert W. McFarland*
Robert W. McFarland (VSB # 24021)
V. Kathleen Dougherty (VSB # 77294)
Micaylee A. Noreen (VSB # 92433)
McGuireWoods LLP
World Trade Center
101 West Main Street, Ste. 9000
Norfolk, Virginia 23510
Phone:  (757) 640-3716
Fax:  (757) 640-3966
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*

**JA434**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

GMS INDUSTRIAL SUPPLY, INC.,      )
                                         )
         Plaintiff,         )
v.                                 )      Case No. 2:19-cv-324-RCY-LRL
                                         )
G&S SUPPLY, LLC, et al.,          )
                                         )
         Defendants.      )

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SANCTIONS PURSUANT TO RULE 11**

Defendants G&S Supply, LLC, WarTech Industries, LLC, HMC Supply, LLC, Defendants/Counterclaimants Westly Greer, Sabrina Greer, Greer Group, LLC, Gregory K. Spires, County Roads, LLC, Thomas Hayes, and Mike Welton (collectively "Defendants"), submit their Memorandum in Support of Defendants' Motion for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure and state as follows:

**I.    INTRODUCTION**

Throughout this case Defendants have searched in vain for the factual support for the multitude of claims asserted by Plaintiff GMS Industrial Supply, Inc. ("Plaintiff" or "GMS"). Following GMS's 30(b)(6) deposition, it is evident that no factual support exists for the claims in Plaintiff's original Verified Complaint (ECF No. 1), First Amended Verified Complaint (ECF No. 108), Second Amended Verified Complaint (ECF No. 151), or the operative Third Amended Verified Complaint (ECF No. 156) (collectively, "the Verified Complaints"). In violation of Rule 11, Plaintiff's counsel failed to conduct a reasonable inquiry before initiating this litigation on June 20, 2019, and doubled down on that failure by filing first, second, and third amended versions of the Verified Complaint to add additional claims, defendants, and allegations, without

**JA435**

the facts to support them. None of GMS's three amendments to the original Verified Complaint correct or remove any of GMS's unsupported allegations or claims. For example, despite the fact that Wayne Side was dismissed from this case in January 2020, *see* ECF No. 98, the Third Amended Verified Complaint, filed in December 2020, includes allegations and claims against him. ECF No. 156 at 41-44. On Thursday May 6, 2021, GMS's corporate designee, Gary Gorken, an individual who personally verified all versions of Plaintiff's Verified Complaints, testified that he could not state the factual basis for the allegations asserted in GMS's Third Amended Verified Complaint filed seven (7) months ago, after Plaintiff conducted exhaustive written discovery. The claims asserted against Defendants in this case are, and have been, without factual support, and were filed and maintained to punish Defendants through baseless and costly litigation.

## II.   STATEMENT OF FACTS AND PROCEDURAL POSTURE

This Court is aware of the factual backdrop of this case, given the extensive manner in which it has been litigated. In light of this, Defendants' Statement of Facts and Procedural Posture provides a limited overview of this case, focusing on the facts and procedures that compel Defendants' instant motion.

### A.   Factual Background.

Gregory K. Spires ("Spires"), Gregory S. Spires ("Sky"), Westly Greer ("Greer"), Sabrina Greer, Mike Welton, and Thomas Hayes (the "Individual Defendants") were all former independent sales agents for GMS prior to their termination in early April 2019.[1] Defendants sold standard industrial products, such as mechanical lubricants, paper towels, trash bags, and

---

[1] Commissions were paid to them or their companies, including Defendants County Roads LLC (for Gregory K. Spires) and Greer Group, LLC (for Westly and Sabrina Greer).

**JA436**

cleaning supplies, for GMS to military customers by establishing and maintaining relationships with those customers. GMS's sales focused on "kits" – groups of products that the Defense Logistics Agency ("DLA") had pre-authorized for sale.

From 2017-2019 GMS discouraged and, at times, disallowed its sales agents from selling customers individual products (that is, items not part of a kit), or customizing its kits in order to meet customers' needs. After observing how GMS's inflexible sales policy resulted in poor customer interactions and lost sales to GMS's competitors, Defendants Spires and Greer formed G&S Supply, LLC ("G&S Supply" or "G&S"), in mid-2017, as a vehicle to provide customized orders to their military customers for products GMS largely declined to sell. The efforts of G&S Supply were complementary to sales on behalf of GMS and, in fact, benefitted GMS, because the option of G&S provided their mutual customers the opportunity to purchase all their products through one sales agent, as opposed to GMS losing sales to a competitor who offered both DLA-approved kits and customizable products. Notably, even after G&S Supply began operations, GMS's sales and profits *increased* significantly from 2017-2019, and Defendants remained GMS's top performing sales agents. After learning of G&S Supply, GMS terminated its relationship with the Individual Defendants on April 3, 2019, issued cease and desist letters and shortly thereafter filed suit.

### B.    The Verified Complaints.

GMS initiated this action on June 20, 2019, by a Verified Complaint for Injunctive and Legal Relief ("Verified Complaint").[2] ECF No. 1. Gary Gorken, GMS's Director of Regulatory

---

[2]   While not required to initiate a case, verified complaints are afforded evidentiary weight. A verified complaint is akin to an affidavit. It is considered evidence for purposes of temporary or preliminary injunctive relief, and may be used as evidence in support or opposition of a motion for summary judgment. *See* Fed. R. Civ. P. 65; *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). This is so because "'[v]erification forces the claimant to place himself at risk of perjury

Compliance, and Rachel Gorken, GMS's President, both verified the Verified Complaint. ECF No. 1 at 78. Plaintiff's counsel, William Lascara, also appended his signature to the Verified Complaint, per the requirements of Federal Rule of Civil Procedure 11 ("Rule 11"). *Id.* at 77.

GMS's initial Verified Complaint alleged thirteen counts against Defendants, contending they breached their contractual obligations, fiduciary duties, misappropriated GMS's trade secrets, engaged in computer crimes, tortuously interfered with GMS's customer relationships, conspired against GMS, and infringed on GMS's trademark and trade dress. District Judge Rebecca Beach Smith held a three-day evidentiary hearing from July 22-24, 2019, on GMS's Motion for Temporary Restraining Order and Preliminary Injunction, at which Gary and Rachel Gorken, representing GMS, as well as a number of their employees, testified. *See* ECF No. 70. Indeed, during his testimony at that hearing Gary Gorken affirmed his verification and all the allegations in the Verified Complaint on the witness stand:

> Q    And do you here today affirm that the allegations of fact that are set forth in that verified complaint are true and correct?
> A    Yes.

*See* Tr. Test. of G. Gorken (July 25, 2019), ECF No. 53 at 21:1-3.[3] On August 30, the Court ordered G&S Supply to change its name to avoid potential confusion with GMS, ECF No. 70 at 14, and required the Individual Defendants to return <u>any</u> alleged confidential, proprietary, or trade secrets documents of GMS still in their possession. *Id.*at 15. The Court did not make a finding as to which GMS documents were trade secrets, but directed GMS to identify to

---

for a false claim.'" *United States v. Various Vehicles, Funds and Real Props.*, No. 2:11-1528-DCN-SVH, 2011 U.S. Dist. LEXIS 139643, at *9 (D.S.C. Oct. 25, 2011) (quoting *United States v. 35 Firearms*, 123 F. App'x 204, 207 (6th Cir. 2005)). Gary and Rachel Gorken verified *all four* complaints in this matter.
[3] Rachel Gorken did not reaffirm her verification when she testified at the preliminary injunction hearing. *See* ECF No. 54 at 250-57.

**JA438**

Defendants the documents they considered to be confidential, proprietary, or trade secrets, to aid in Defendants' production of those documents.  *Id.*  The Court denied the remainder of GMS's requested relief.  *Id.* at 13.  Notably, the Court did not enjoin Defendants from continuing to sell industrial products, noting that Plaintiff "has failed to establish that the public interest is served by an injunction entirely prohibiting the Defendants from doing business with GMS Industrial's customers" and Plaintiff's "likelihood of success on the merits on this claim and irreparable harm are weak."  *Id.* at 8-9; *see id.* at 12 (declining to enjoin Defendants from tortiously interfering with GMS's contracts); *id.* at 13 ("GMS Industrial is not entitled to injunctive relief to prevent the Defendants from soliciting current customers or former customers of GMS Industrial, to prevent the Defendants from soliciting any current GMS Industrial employees or sales agents to leave GMS Industrial, or to prevent the Defendants from interfering with GMS Industrial's contracts").

In compliance with the Court's directives, G&S Supply ceased its corporate existence and formed WarTech Industries, LLC, as its successor in interest.  *See* ECF No. 72.  Defendants also returned all documents in their possession that GMS had designated, regardless of whether they were, objectively, trade secrets or confidential or proprietary.  *See* ECF Nos. 79-85.  GMS never complained that Defendants failed to comply with these obligations.

On March 23, 2020, GMS filed its First Amended Verified Complaint for Injunctive and Legal Relief ("First Amended Verified Complaint"), adding additional allegations against the Defendants.  *See* ECF Nos. 104, 108.  As before, the pleading was signed by Plaintiff's counsel, William Lascara, and verified by Gary and Rachel Gorken.  ECF No. 108 at 81-82.  On November 16, 2020, Plaintiff filed its Second Amended Verified Complaint for Injunctive and Legal Relief ("Second Amended Verified Complaint") adding HMC Supply, LLC ("HMC"), as a

Defendant. ECF Nos. 134, 151. This was signed, again, by Plaintiff's counsel, William Lascara, and verified by Gary and Rachel Gorken. ECF No. 151 at 82-83. On December 1, 2020, GMS filed its Third Amended Verified Complaint for Injunctive and Legal Relief ("Third Amended Verified Complaint") adding WarTech Industries, LLC, as a defendant. ECF Nos. 130, 156. This, too, was signed by Plaintiff's counsel, William Lascara, and verified by Gary and Rachel Gorken. ECF No. 156 at 84-85. Notably, none of the amended complaints encompass the Court's rulings on Defendants' motion to dismiss, which included dismissal of Count IX, alleging interference with contract or contract expectancy. ECF No. 93 at 40-45 (R&R finding GMS failed to state a claim for tortious interference); ECF No. 203 at 15-18 (Overruling GMS's objections to the R&R on tortious interference). Moreover, none of them reflect the evidence revealed in discovery. Indeed, the Third Amended Verified Complaint reads almost identically to its initial predecessor. All four Verified Complaints named Gregory S. Spires as a Defendant.

### C. Discovery Yields No Factual Support.

On June 24, 2020, Defendants served GMS with interrogatories and requests for production, which GMS responded to on August 5, 2020. GMS supplemented its answers to interrogatories on January 27, 2021, and supplemented its responses to Defendants requests for production on January 27, 2021, February 18, 2021, April 23, 2021, April 30, 2021, May 4, 2021, and May 7, 2021. *See* GMS's Interrog. Answers (**Exhibit 1**). Gary Gorken verified GMS's answers to Defendants' interrogatories on August 20, 2020. GMS's Verification (**Exhibit 2**). Even with supplementations, GMS has not produced any documents that corroborate Defendants' alleged wrongdoing. Indeed, when asked in written discovery for facts and sources of information regarding Defendants' alleged wrongdoing, GMS merely pointed to and relied upon the Verified Complaint. *See, e.g.*, **Ex. 1**, No. 9.

Having obtained virtually no pertinent information through written discovery, Defendants undertook depositions. On April 16, 2021, Defendants' counsel served a Rule 30(b)(6) notice seeking deposition testimony from GMS's corporate representatives. *See* Notice of 30(b)(6) Dep. for GMS (**Exhibit 3**).[4] GMS did not note any objections to the deposition topics until May 5, the day before the deposition, when GMS objected solely to Topic 13, regarding GMS's discovery responses. *See* Obj. to Notice of 30(b)(6) Dep. for GMS (**Exhibit 4**). Defendants' Notice identifies among the topics they intend to cover in this deposition are the factual and documentary basis for Plaintiff's Verified Complaints and the allegedly misappropriated trade secrets. *See* **Ex. 3**, Ex. A ¶ 5.

Gary Gorken was designated as GMS's representative for most of the noticed topics, including Topic 5 – the factual and documentary basis for the lawsuit. *See* GMS 30(b)(6) Dep. Tr. (**Exhibit 5**) at 98:16-24 (confirming with G. Gorken that he was designated for all topics except 9, 12, 14, and 17-18, which were designated to Renee Robichaux). Mr. Gorken was wholly unprepared to testify on the designated topics, and provided no factual basis for the multitude of claims filed against Defendants.[5] *See id.*; *see also* Video Recording of GMS 30(b)(6) Dep. (**Exhibit 6**). Similarly, GMS's President, Rachel Gorken, was wholly unable to provide any factual support for GMS's contentions, despite her signature on all four Verified

---

[4] By mutual agreement, the parties moved GMS's Rule 30(b)(6) deposition from April 26, 2021, to May 6, 2021, and Defendants' counsel provided an identical notice reflecting the new date to GMS's counsel.

[5] During his deposition as GMS's corporate represented, Gary Gorken provided responses of "I don't know" fifty (50) times; "I don't recall" seventy-seven (77) times; and "I'm not sure" eighty-five (85) times. *See generally* **Ex. 5**.

**JA441**

Complaints.[6]  *See* R. Gorken Dep. Tr. (**Exhibit 7**); *see also* Video Recording of R. Gorken Dep.

(**Exhibit 8**).

After nearly two years of litigation and extensive written discovery – none of which unearthed any factual basis for GMS's allegations – Mr. Gorken's testimony as GMS's corporate representative and Mrs. Gorken's testimony as GMS's President conclusively established that: (a) this action was initiated in anger without adequate factual investigation and (b) Plaintiff lacks the required basis for its allegations of wrongdoing.  This is not simply a matter for summary judgment.  For almost two (2) years, Defendants have sought the factual basis to defend the serious claims filed against them.  Defendants have incurred over $600,000 in legal fees defending this lawsuit.  The multiple violations of Rule 11 by GMS's counsel, Gary Gorken, and Rachel Gorken require dismissal of this action.

## III.  **LEGAL STANDARD**

Federal Rule of Civil Procedure 11 states, in pertinent part:

(a) SIGNATURE. Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name—or by a party personally if the party is unrepresented. . . .

(b) REPRESENTATIONS TO THE COURT. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*:

(1) it is *not being presented for any improper purpose*, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are *warranted by existing law* or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the *factual contentions have evidentiary support* . . . [.]

---

[6]  Recognizing that Mrs. Gorken's deposition was much shorter than Mr. Gorken's 30(b)(6) testimony, she faired no better, providing responses of "I can't recall" six (6) times and "I don't know" twenty-one (21) times. *See generally* **Ex. 7**.

**JA442**

(c) SANCTIONS.

(1) *In General.* If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction *on any attorney, law firm, or party that violated the rule or is responsible for the violation.* Absent exceptional circumstances, a law firm *must* be held jointly responsible for a violation committed by its partner, associate, or employee.

Fed. R. Civ. P. 11 (emphasis added).

The Fourth Circuit has summarized these three prongs of Rule 11 – any one of which may serve as a basis to find a violation – as follows:

(1) whether the plaintiff made a reasonable inquiry to determine that the complaint stood well grounded in fact; (2) whether the plaintiff made a reasonable inquiry to determine that the complaint was warranted by existing law; and (3) whether the complaint was filed for an improper purpose.

*See In re Kunstler*, 914 F.2d 505, 523 (4th Cir. 1990). The Supreme Court has held that Rule 11 "imposes on any party who signs a pleading, motion or other paper . . . an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing." *Bus. Guides v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991). A request for sanction under Rule 11 should be assessed under an "objectively reasonable" standard, which requires that the signing attorney conduct an objectively reasonable investigation of the factual and legal basis for his claim before filing. *Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991).

Under the first prong, for a factual inquiry to be objectively reasonable, the signing attorney is required to seek credible information rather than proceed on mere suspicions or supposition. *See Cabell v. Petty*, 810 F.2d 463, 466 (4th Cir. 1987). The "prefiling factual investigation must uncover *some* information to support the allegations in the complaint." *Brubaker*, 943 F.2d at 1373 (emphasis added). "Factual allegations fail to satisfy Rule 11(b)(3) when they are unsupported by any information obtained prior to filing." *Morris v. Wachovia Secs., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006). Therefore, "a complaint containing allegations

**JA443**

unsupported by *any* information obtained prior to filing, or allegations based on information which minimal factual inquiry would disprove, will subject the author to sanctions." *In re Kunstler*, 914 F.2d at 516 (emphasis in original). In conducting a pre-filing investigation, it is not objectively reasonable to exclusively rely on a client for factual information because of the limitations on a client's knowledge and the client's stake in the outcome that tends to color his or her perceptions and recollections. *See Blue v. United States Dept. of Army*, 914 F.2d 525, 542-43 (4th Cir. 1990) (noting also that it is not "enough for an attorney to claim he acted in good faith, or that he was personally unaware of the groundless nature of an argument or claim").

Under the second prong, Rule 11 requires counsel to conduct an objectively reasonable pre-filing inquiry that confirms some basis in law to support each claim in the complaint. *Brubaker*, 943 F.2d at 1373. A complaint's legal claims do not pass muster under Rule 11 unless there is "some 'chance of success under the existing precedent.'" *Joseph Giganti Veritas Media Grp. Inc. v. Gen-X Strategies, Inc.*, 22 F.R.D. 299, 310 (E.D. Va. 2004) (quoting *Brubaker*, 943 F.2d at 1373).

Under the third prong, even if the complaint has a proper legal and factual basis, a court may still grant sanctions if it concludes that it was filed for an improper purpose. *In re Kunstler*, 914 F.2d. at 518. While Rule 11 provides examples of improper purpose, such as harassment, these examples of improper purpose are not exclusive and "must be derived from the motive of the signer in pursing the suit." *Id.* at 518-19. In the first instance, "whether or not a pleading has a foundation in fact or is grounded in law will often influence the determination of the signer's purpose." *Id.* at 518. To be sure, if it is "revealed through an admission that the signer knew the motion or pleading was baseless but filed it nonetheless" that is sufficient under Rule 11 to find improper purpose. *Id.* at 519. Circumstantial facts surrounding the filing(s), such as the

outrageous nature of the claims made, are also sufficient to show an improper purpose. *Id.* Where "so many allegations in the complaint lacked a basis in law or fact" that "strongly supports the court's finding of improper purpose." *Id.* And if counsel willfully files a baseless complaint, a court may properly infer that it was filed either for purposes of harassment, or some purpose other than to vindicate rights through the judicial process. *Id.*

## IV.  <u>ARGUMENT</u>

As counsel and the affiants failed to make a reasonable inquiry to determine that the complaint stood well-grounded in fact and was warranted by existing law, and nonetheless continued to prosecute those claims, sanctions are appropriate for GMS's counsel and for Mr. and Mrs. Gorken.  Fed. R. Civ. P. 11(c)(1) ("the *court may impose an appropriate sanction on any* attorney, law firm, or *party that violated the rule or is responsible for the violation*."); *accord Aggarwal v. Sikka*, No. 1:12cv60, 2013 U.S. Dist. LEXIS 160422, at *22 (E.D. Va. Nov. 7, 2013) ("A court may impose sanctions on a represented party where that party signs a document submitted to the court.").  Further, as substantial evidence supports that Mr. and Mrs. Gorken filed this action for an improper purpose, sanctions are also appropriate against them under the first and third prongs of the Rule 11 analysis.

### A.  <u>None of Plaintiff's Verified Complaints are Well-Grounded in Fact.</u>

In violation of Fed. R. Civ. P. 11, Gary Gorken, Rachel Gorken, and their counsel filed GMS's initial Verified Complaint without conducting the required pre-filing investigation. Rather, drawing on speculation and fabricated allegations, counsel drafted a Complaint – which the Gorkens verified attempting to exact revenge for perceived wrongs committed by Defendant Westly Greer.  As was laid bare from Gary Gorken's deposition, counsel did not bother to

ascertain accurate, supporting facts before filing the original Verified Complaint – nor any of the amended Verified Complaints that followed.

Both Plaintiff and its counsel failed to make a reasonable inquiry and to plead only those facts that such an inquiry would support. *See In re Kunstler*, 914 F.2d at 513. Indeed, counsel's reliance on their client is not sufficient to satisfy the independent duty to conduct a pre-litigation investigation. *See id.* (quoting *S. Leasing Partners Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986)). Additionally, an attorney may not rely on the prospect of future discovery as a means of attempting to support initially "outrageous and frivolous claims for which there is *no* support. Unsubstantiated claims . . . constitute an abuse of the judicial process for which *Rule 11* sanctions were designed." *Id.* (emphasis in original).

After GMS's 30(b)(6) Deposition, it is now plain that not only did GMS lack a legitimate factual basis at the time suit was filed, but notwithstanding reams of written discovery and depositions, it still cannot factually support its claims. The deposition of GMS's corporate representative, Gary Gorken, confirms the failure of Plaintiff's counsel to conduct a reasonable pre-filing investigation into the Verified Complaint's allegations. *See Aggarwal*, 2013 U.S. Dist. LEXIS 160422, at *27-30 (finding that the failure of counsel to conduct a reasonable pre-filing investigation was made clear from plaintiff's deposition).

Through written discovery, Defendants sought information regarding the factual basis for Plaintiff's Verified Complaint. In answering, under oath, the Defendants' substantive questions about those allegations, Plaintiff pointed to and relied upon its Verified Complaint, and vague, non-specific answers. *See, e.g.*, **Ex. 1**, Nos. 2, (identifying individuals with knowledge, most of whom are identified as having only general knowledge of broad topics), 6 (providing the legal definition of trade secrets and referring to allegations in GMS's First Amended Verified

**JA446**

Complaint), and 8-10 (relying on allegations in the First Amended Verified Complaint).  The over 11,000 pages GMS has produced likewise do not establish the allegations of wrongdoing still pleaded in GMS's Third Amended Verified Complaint.[7]

With no actual evidentiary basis for Plaintiff's claims, Defendants deposed GMS's 30(b)(6) designated witness on those topics.  In fact, the individual serving as GMS's corporate representative on the topic of GMS's Third Amended Verified Complaint is the same individual who verified every iteration of GMS's Verified Complaint and GMS's interrogatory answers – Gary Gorken.  He was questioned on claims and key issues.  *See* **Ex. 5** at 248-285.  His testimony was non-responsive to the designated topics, as well as largely irrelevant and argumentative.[8]  After two (2) years of searching, and incurring over $600,000 in defense costs, Defendants still lack the factual and documentary evidence on which GMS's suit was filed and maintained.

### 1.  No Factual Support Exists for GMS's Allegations of Trade Secret Misappropriation

The crux of GMS's allegations is that Defendants misappropriated and used GMS's trade secrets to create G&S Supply and unfairly compete.  Therefore, *what* trade secrets, *how* they were misappropriated, and *how* they were used are all fundamental, foundational issues in this case.  In its responses to Defendants' inquiries through written discovery, GMS has never identified with clarity the documents it contends constitute its trade secrets that Defendants misappropriated.  In September 2019, GMS provided Defendants a list of all documents they

---

[7]  In fact, in the two weeks before GMS's deposition, it produced over 1,000 pages in response to Defendants' June 24, 2020 requests.  Many of those documents bore date stamps in the upper left-hand corner indicating they were printed in 2019, before the TRO hearing, but were not produced until late April/early May 2021.  *See, e.g.*, Sampling of Documents Produced by GMS Between April 30, 2021 and May 7, 2021 (**Exhibit 9**).

[8]  *See also, supra* note 5.

**JA447**

purported were "confidential, proprietary, and trade secrets," in compliance with the Court's preliminary injunction order. *See* ECF No. 76. Defendants disputed then and now that what was requested were trade secrets, but provided all GMS documents in their possession  The documents that GMS identified during discovery as the  "trade secrets" that Defendants misappropriated, however, include a collection of emails dated after this lawsuit began, a military rank abbreviation chart, photographs of GMS products, and Defendants' own customer lists, none of which can legally qualify as trade secrets. *See* GMS's Second Sup. Resp. to Def.s' Req. for Produc. No. 19 and a Sampling of Documents Produced in Resp. to No. 19 (**Exhibit 10**).[9]  With only the allegations in the Verified Complaint and the list of documents in ECF No. 76, Defendants are still left guessing as to what trade secrets they allegedly misappropriated, let alone used.

Defendants further inquired about GMS's alleged trade secrets and their misappropriation through deposition.  During his deposition as GMS's 30(b)(6) representative for Topic 4 (identification of trade secrets), after multiple opportunities, the only specific document Mr. Gorken could identify as a misappropriated trade secret was a "customer list" of GMS employee Ken Reynolds, allegedly on Greer's computer.  *See* **Ex. 5** at 187-203; and particularly 196-201. Neither Mr. Gorken nor anyone else at GMS has provided evidence any Defendant ever used that list.  In his capacity as a District Manager, Greer properly possessed the list, particularly as he investigated whether Reynolds improperly claimed commissions on other GMS agents' sales.

---

[9] Defendants have endeavored to include **_all_** documents produced by GMS in response to No. 19 that are also contained in GMS's trade secrets list submitted to the Court. *Compare* **Ex. 10** *with* ECF No. 76.  Notably, GMS produced unidentified customer data spreadsheets as GMS 011820-34 in native excel format.  Due to that format, those documents could not be included in **Ex. 10**. However, as discussed in greater detail *infra*, customer data such as names, addresses, phone numbers, and emails, cannot legally constitute trade secrets.

**JA448**

Mr. Gorken could not identify a single other trade secret document Defendants misappropriated.[10]   Indeed, the only documents Gary Gorken could identify – customer lists – are not trade secrets, as Mr. Gorken previously acknowledged under oath in this litigation.  *See* ECF No. 53 at 77:1-7 (admitting that GMS's "confidential" customer contact lists constitute information "that are public information for any place" including "the name and the address and the command and phone number.").

GMS's trade secrets claims are even more troubling when viewed in conjunction with prior litigation GMS and the Gorkens filed in this Court through their current counsel.  In that Complaint, they submitted allegations diametrically opposed to positions they take now.  In 2007, the Gorkens brought suit against their former employer, Drummond American Corporation – a provider of chemical and industrial cleaning products to state and federal government entities and other customers – seeking to declare that several provisions in the Gorkens' independent sales agent agreements were unenforceable.  *See* Drummond Compl. (ECF No. 1) at 2 ¶ 35, *Gary B. Gorken, et al. v. Drummond Am. Corp.*, 2:07cv560-JBF-FBS (**Exhibit 11**).  As do the GMS sales agent agreements, the Drummond agent agreements included prohibitions on soliciting Drummond customers, disclosing the information of Drummond customers, and disclosing and using confidential information and trade secrets learned through the Gorkens' affiliation with Drummond.  *See* **Ex. 11**, Drummond Compl. at Ex. 4.  Because the Gorkens wished to "enter into business selling industrial products competitive to Drummond," through GMS Industrial Supply, and Mr. Gorken's business, G Cubed, they contended the Drummond provisions were

---

[10] The few other trade secrets Mr. Gorken purported to identify were merely categories of documents.  *See* **Ex. 5** at 203:13-202:22.  However, beyond the customer lists, GMS has not identified in its trade secrets list, ECF No. 76, or produced in discovery, *see* **Ex. 10**, ***any document Defendants can identify as deserving trade secret protection***.

unenforceable.  **Ex. 11** at 2.

> Among other points, the Gorkens argued that:

> "Drummond is engaged in a highly competitive industry selling *common chemical and industrial cleaning products that are readily available from other suppliers*. Within the industry, there is no secret that the target customers for purchasing chemicals and industrial cleaning products include state and federal governmental entities, schools, churches, municipalities, institutions, private companies, etc. *Such customers are easily ascertainable* by opening the telephone book in any locale, searching state, local and federal public contract solicitations or reviewing public documents of solicitations from and purchases by state, local and federal government agencies, departments or other entities. . . . Drummond similarly cannot demonstrate that [Gary] Gorken or [his competing sales company] learned 'trade secrets' or acquired 'other confidential information' through his affiliation with Drummond, or that he subsequently tried to use such information for his own benefit. This is partially due to the fact that customer identities do not amount to "trade secret" or "other confidential information" under Illinois law.[11]

**Ex. 11** at ¶¶ 35-36 (emphasis added); *see also* **Ex. 11** at ¶ 33 (arguing that customer information are not trade secrets), ¶ 38 (same).  During his individual deposition in this matter, Mr. Gorken confirmed that the products he sold for Drummond were similar to the ones sold by GMS, as were their customers.  *See* G. Gorken Dep. at 55:11-21 (**Exhibit 12**) (stating GMS was a plaintiff in the Drummond suit because of "the nature of the customer and the – and the intertwining business that we had"), 57:15-20 (admitting products sold by Gorken at Drummond "are similar to the products that GMS Industrial sells or sold from 2015 through April 3rd of 2019").

In short, in 2007 when GMS and the Gorkens sued Drummond – a company in the same industry as GMS and G&S Supply – they took pains to argue that the nature of the business, customers, and products were so common, fungible, and "easily ascertainable" that they did not

---

[11] The definitions of trade secrets under Illinois law (Drummond) and Virginia law (GMS) are almost identical.  *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 3:16-cv-545, 2018 U.S. Dist. LEXIS 64196, at *23 n.9 (E.D. Va. Apr. 16, 2018) (collecting cases of state trade secrets acts that define trade secrets similarly).

warrant legal protection.  Now that the shoe is on the other foot, GMS and the Gorkens –
represented by the same counsel – argue that this information is proprietary, and not readily
ascertainable by proper means.  This 180° shift results solely from GMS's desire for litigation,
not because GMS's information is different in nature than what the Gorkens obtained and used
during their tenure with Drummond.  Indeed, a comparison of Drummond's Counterclaim in the
2007 Gorken Litigation with GMS's Verified Complaints reveals extensive similarities and
overlapping issues.  Drummond Counterclaim (ECF No. 13), *Drummond Am. Corp.*, 2:07cv560-
JBF-FBS (**Exhibit 13**).

### 2.  GMS Lacks Factual Support for the Claims Asserted Against HMC

Notwithstanding the allegations against HMC and Plaintiff's insistence it be added as a
party,[12] GMS's interrogatory answers and responses to Defendants' request for production of
documents regarding HMC provide nothing more substantive than the mere fact of its former
existence.[13]  There is no evidence that HMC ever competed with GMS as claimed in the Third
Amended Verified Complaint.  *Compare* ECF No. 156 at 19-25, 29-32 *with* Spires Dep. Tr. at
23:10-17 (**Exhibit 14**) (noting HMC was created to distribute products to "bus barns").  Again,
lacking any information from written discovery to substantiate GMS's allegations, including in
Paragraph 45 of the Third Amended Verified Complaint that HMC unfairly competed against
GMS and used GMS's trade secrets to achieve that end, Defendants inquired of its corporate
representative, Gary Gorken, about the evidence supporting the allegations against HMC:

Q     Then was are the factual basis for the allegations in Paragraph 45?

---

[12] Based on the ***allegations*** Defendants knew GMS would assert, Defendants did not contest
GMS's request to add HMC as a defendant.

[13] Indeed, GMS has never supplemented its interrogatory answers to include factual information
about HMC.

# JA451

> A       I told you I don't recall right this minute.
> Q       When are you going to recall?
> A       I'm not sure.

**Ex. 5** at 265:24-266:4.

> Q       I am at the bottom of page 19 of 86 [of the *Third Amended Verified Complaint*],
> paragraph 45. . . and I am asking you, sir, I have been asking you, what is the factual
> basis for that very serious allegation?
> A       I'm not sure, but it's a fact that they did that.

*Id.* at 267:12-21.

> Q       What facts do you have to support that [Gregory K.] Spires and Westly [Greer]
> abandoned the company [HMC] and created an entirely new company under the name
> G&S and transferred 5,000 of assets?
> A       I'm not sure.

*Id.* at 269:3-7.

> Q       What did you have on December 1st, 2020 [the day the *Third Amended Verified
> Complaint* was filed], that you don't have now, but enabled you on December 1st, 2020,
> to verify that allegation?
> A       I'm not sure.

*Id.* at 270:3-11.

Gorken was unable to provide any information to support GMS's claims against HMC.

*See id.* at 252-270.  In fact, Mr. Gorken's testimony established Plaintiff's wholly inadequate

investigation before adding HMC as a Defendant in October, 2020.  After initially feigning

ignorance that his brother, Greg Gorken, was an owner of HMC, Mr. Gorken admitted that he

did not speak with his brother about HMC until "about a month" before the deposition.  *Id.* at

261:4-6.  Incredibly, neither Mr. Gorken nor his counsel spoke with Greg Gorken about HMC

before filing the Second, or even Third Amended Complaints.  When Mr. Gorken finally spoke

to his brother, he was informed that HMC was created to sell products to bus barns.  *Id.* at

262:18-21.  Gary Gorken testified he does not know what a bus barn is and he is not aware that

GMS has ever sold products to bus barns.  *Id.* at 262:22-23, 263:15-18.

**JA452**

Mr. Gorken was asked by Defendants' counsel why he did not inquire with his brother prior to adding HMC as a defendant. His answer is telling, and indicative of what Defendants have endured throughout this litigation:

> Q        Did you not think it important to call your brother about HMC before your counsel put an allegation about how they're directly competing against GMS, filed with the court under oath, and you verified it?
> A        Does that – ***there's nothing that disputes what I wrote there*** [in ¶ 45 of the Third Amended Verified Complaint]. Sorry. This just happened.

*Id.* at 261:7-14 (emphasis added). Indeed, Mr. Gorken's posits that because he failed to obtain readily available information on HMC, it was appropriate for him to assert, and maintain under penalty of perjury, unsubstantiated contentions about HMC. *Id.* at 261:7-14; *see also* ECF No. 134. Discovery is now closed and there is no evidence to support the Second and Third Amended Verified Complaints' allegations against HMC. And, there was no factual foundation of wrongdoing at the time HMC was added as a defendant last fall.

### 3.    No Evidence Exists Supporting the Allegations Against Sky Spires

Similarly lacking is any factual basis to support the allegations against Sky Spires, outside of the incorrect contentions in the Verified Complaints.[14] *See* **Ex. 1**, No. 9. There exists not a single document or shred of evidence demonstrating that Sky Spires had *any* involvement with G&S Supply for the limited period he made sales for GMS. Indeed, in his sworn Declaration filed on July 18, 2019, Sky Spires specifically stated he only made a few small sales for GMS in 2016 and 2017, and was never involved in G&S Supply. ECF No. 43, Ex. F at 2. In her Preliminary Injunction Order, Judge Smith noted the substantial lack of evidence presented

---

[14] Plaintiff's filing a voluntary dismissal of Sky Spires on July 7, 2021, ECF No. 187, (over three (3) weeks after Plaintiff's counsel received draft versions of this Memorandum), and the Court's entry of the order of dismissal, ECF No. 188, does not cure the lack of evidence Plaintiff and its counsel possessed when they sued Sky Spires not just initially, but four (4) times.

against Sky Spires. ECF No. 70 at 6 & n.5 ("The Court did not receive evidence to contradict the Declaration of Gregory Sky Spires"). In the almost two years since then, Plaintiff has presented nothing to refute Sky's Declaration. The lack of information supporting any allegations of wrongdoing by Sky Spires was confirmed during Gary Gorken's deposition testimony as GMS's representative. *See* **Ex. 5** at 277-285.

> Q    What facts do you have to support the allegation in paragraph 98 [of the Third Amended Verified Complaint] that Sky Spires assisted, cooperated, and conspired with Westly [Greer] and Greg Spires to organize and create [G&S] to compete against GMS, and to solicit GMS customers to buy competitive products from G&S and solicit GMS sales agents who are named as defendants herein to sell competitive products for G&S.
>
> What facts do you have to support the allegations as to Sky Spires alleged involvement in the conspiracy?
> A    I don't recall the exact information.

*Id.* at 278:23-279:9.

> Q    What did you have when you – when the Third Amended Complaint was filed in December of 2020? Because the case has already been pending for over a year and a half, so you certainly have done some discovery. So what did you have that indicated that Sky Spires conspired with the other defendants to harm GMS?
> A    I answered this question. I am going to answer it again I don't recall what the information is.

*Id.* at 279:20-280:3.

> Q    I asked you about paragraph 100 [of the Third Amended Verified Complaint], which contains some pretty serious allegations against Sky Spires. And I'm asking you sitting here today, at this point in time, what evidence do you have to support those allegations?
> A    **Today, I don't have any evidence here**, and I don't recall exactly what it is, but I can get it for you.

*Id.* at 282:7-14 (emphasis added).

> Q    Well my question is, you keep saying there's information, you just can't remember it today, and you can't remember it – what it was when you signed the Verified Complaint on December 1st. So I'm asking you where the information is. Did you give it to your counsel?
> A    I'm not sure. **I know the information exists**.
> Q    So where is it?
> A    I don't know. I'm not sure.

> Q      How are you going to get it?
> A      I'm not sure.

*Id.* at 282:23-283:9 (emphasis added).

As this Court is well aware, in making the choice to attest to the Verified Complaints, Gary Gorken, on behalf of GMS, certified he possessed factual information to support the specific and serious allegations of wrongdoing against Sky Spires. By also verifying the Verified Complaints, Rachel Gorken likewise placed on herself the responsibility of complying with Rule 11.

> Q      You are aware, ma'am, that the Complaint makes a lot of allegations about my clients and brings cause - -- what we call causes of actions or claims against them. And I'm asking then, although one doesn't have to, the Complaint in this case is a Verified Complaint, meaning that representatives of the client or the plaintiff have signed it. And I'm pretty confident that you are, along with your husband, one of the persons who verified the original Complaint. Do you agree with me on that?
> A      Yes.
> Q      Okay. And so I'm asking you before you ha[d] verified the Complaint, what did you do to make sure what was in it was accurate?
> A      We did all of the research we could. I mean, I don't – I don't know.

**Ex. 7** at 80:16-81:8. The inability of GMS's President and affiant to tell how and what she did to verify the Complaints' assertions invokes Rule 11 sanctions.

Despite their verifications, it is clear that the Gorkens do not have any information of Sky Spires' wrongdoing and never did. Equally troublingly, GMS's counsel also signed all four Verified Complaints naming Sky Spires, notwithstanding that the required inquiry of looking behind their clients' assertions would have revealed the total lack of evidence against him. *Aggarwal*, 2013 U.S. Dist. LEXIS 1260422, at *31 (finding counsel violation Rule 11 because "a simple conversation with [plaintiff] would have revealed the complete lack of factual support for [his] claims"). Tellingly, although they deposed every other current and former Defendant, GMS

**JA455**

did not depose Sky Spires.  It takes no great powers of deduction to conclude that Sky was sued solely to inflict further pain on his father, Gregory K. Spires.

It is clear that neither GMS nor its counsel conducted a reasonable inquiry to ensure the original Verified Complaint or its subsequent iterations "stood well grounded in fact."  *In re Kunstler*, 914 F.2d at 523.  Indeed, if any such inquiry was conducted, Plaintiff felt no obligation to abide by the results of that investigation before filing its pleadings.  Gary Gorken testified that even after hours of preparation for these clearly defined topics and almost two (2) years of intense litigation, he/GMS still could not provide factual information to support the allegations against HMC and Sky Spires, nor could he identify a single GMS trade secret that Defendants took and improperly used for their own ends

In *Aggarwal v. Sikka*, *supra*, a recent Eastern District of Virginia decision, the Court granted sanctions pursuant to Rule 11 based on plaintiff's deposition testimony that confirmed there was no basis for the assertions in his complaint.  2013 U.S. Dist. LEXIS 160422, at *29. Indeed, similar to Mr. Gorken's testimony in his representative capacity for GMS, Mr. Aggarwal "testified that he was aware of no facts supporting" several of his claims.  *Id.*  The *Aggarwal* court noted that "[a]s a simple conversation with [plaintiff] would have revealed the complete lack of factual support for [his claims], it is clear that counsel for [plaintiff] either neglected to conduct such an interview, or decided to proceed knowing these claims lacked factual support." *Id.* at *30-31.  The facts here are even more egregious than in *Aggarwal*, because the Verified Complaint and each iteration thereafter were verified by both Gary Gorken and Rachel Gorken under penalty of perjury.

It is a violation of Rule 11 for GMS's counsel to have blindly relied on their clients' representations without conducting a further investigation.  *In re Kunstler*, 914 F.2d at 514.  Like

the attorneys in *Aggarwal*, it is clear that GMS's counsel had the ability to conduct an investigation into the factual basis for the Verified Complaint, including further probing of their client's knowledge, and independently confirm that facts outside Plaintiff's bald assertions support the Verified Complaint.  As in *Aggarwal*, GMS's counsel abdicated their obligations under Rule 11 to appropriately investigate the facts, not only as they related to the original Verified Complaint, but as information was obtained in discovery; GMS's counsel repeatedly failed in that obligation, ignoring the lack of evidentiary support but nonetheless filing the Third Amended Verified Complaint, over a year after the instigation of this action.  "[A] complaint containing allegations unsupported by *any* information obtained prior to filing, or allegations based on information which minimal factual inquiry would disprove, will subject the author to sanctions."  *In re Kunstler*, 914 F.2d at 516 (emphasis in original).

This case has proceeded for over two years. Discovery is closed. Yet there exists no factual evidence to support the allegations of trade secret misappropriation and use, no evidence to support the allegations against HMC, no evidence to support the allegations against Sky Spires, and nothing to support the balance of GMS's claims.

**B.    <u>Plaintiff's Claims are Not Warranted by Existing Law.</u>**

By the signing a complaint, counsel certifies under Rule 11(b)(2) that "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying or reversing existing law or for establishing new law."  A pre-filing investigation of the law "will not pass muster under Rule 11" unless there is "some 'chance of success under the existing precedent.'"  *Joseph Giganti Veritas Media Grp, Inc.*, 22 F.R.D. at 310 (quoting *Brubaker*, 943 F.2d at 1373)).

**JA457**

GMS's Verified Complaints each assert thirteen claims against Defendants. Plaintiff's counsel violated their obligation under Rule 11(b)(2) when they filed each of the Verified Complaints, asserting claims not warranted by existing law, including Count V (misappropriation of trade secrets under Virginia law), Count VI (fraud in the inducement of performance of executory contracts), and Count VIII (violation of the Virginia Computer Crimes Act).

### 1. Count V for Misappropriation Under the Virginia Uniform Trade Secrets Act is not a Viable Cause of Action Against Defendants

In Count V of the Verified Complaints Plaintiff asserts that *all* Defendants misappropriated trade secrets in violation of the Virginia Uniform Trade Secrets Act ("VUTSA"). Va. Code § 59.1-336, *et seq.* Notably, although Plaintiff's principal place of business is in Virginia, none of the Defendants have ever lived or worked in Virginia, nor are there any allegations that Defendants' alleged misappropriation occurred in Virginia. ECF No. 156 at 3-4, 61-63. Misappropriation of trade secrets is a tort at common law. *Variable Annuity Life Ins. Co. v. Coreth*, No. 3:21cv223, 2021 U.S. Dist. LEXIS 77329, at *48 (E.D. Va. Apr. 21, 2021) (citing *MicroStrategies Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 415 (E.D. Va. 2004)). When deciding which state's law is appropriately applied for such torts, including torts under the VUTSA, "Virginia applies the *lex loci delicti*, the law of the place of the wrong to the tort actions." *Id.* at *48-49 (quoting *Milton v. IIT Res. Inst.*, 138 F.3d 519, 521 (4th Cir. 1998) and applying *lex loci deliciti* to determine whether the VUTSA applies over another state's misappropriation law). "Virginia's choice of law rule selects the law of the state *in which the wrongful act took place*." *Milton*, 138 F.3d at 522 (emphasis added). Plaintiff has not even alleged Defendants committed acts of misappropriation in Virginia. Nor is there any evidence to suggest the same. Plaintiff's claim of trade secret misappropriation under the VUTSA is,

**JA458**

therefore, plainly inapplicable.  Yet this claim has been asserted and re-asserted in all GMS's Verified Complaints.

### 2. Count VI for Fraud in the Inducement of Performance of Executory Contracts is not a Cognizable Cause of Action

In Count VI of the Verified Complaints Plaintiff asserts a claim for "Fraud in the Inducement of Performance of Executory Contracts."  Plaintiffs assert that the Individual Defendants "fraudulently induc[ed] GMS to continue performance and payment" to them under their respective employment and independent agent agreements by purportedly concealing the existence of G&S and its alleged competition with GMS, among other things.  *See, e.g.*, ECF No. 156 at ¶¶ 143-44.  Fraud in the inducement under Virginia law requires "(1) falsely misrepresenting a material fact (2) for the purpose of ***procuring a contract***, and that the plaintiff (3) relied on that representation and (4) was induced by it to ***enter the contract***."  *Blevins v. Booker*, No. 1:17cv00012, 2017 U.S. Dist. LEXIS 83637, at *18 (W.D. Va. June 1, 2017) (emphasis added) (citing *George Robberecht Seafood, Inc. v. Maitlan Bros. Co.*, 220 Va. 109, 255 S.E.2d 682 (Va. 1979)).  By its very definition, fraud in the inducement requires inducement to enter into a contract.  *Id.*

GMS's Count VI, however, does not allege any of the Defendants induced it to enter into any contract.  Rather, Count VI alleges inducements of continued performance under a previously executed contract.  Defendants' counsel has searched extensively, without success, for authority that provides a legal basis for GMS's claim that a party can be fraudulently induced into continuing to perform under an existing, contract.[15]  There exists no legally available action for fraud in the inducement for ***continued*** performance.  By asserting this claim, unfounded by

---

[15] Defendants have also requested the factual basis for this claim.  Not surprisingly, no specific facts on inducement have been provided.

# JA459

existing law, counsel for Plaintiff violated their obligations under Rule 11 to investigate the legal basis for his client's claims. Had Plaintiff's counsel reviewed the elements for a fraud in the inducement claim under Virginia law, they would have found the requirement that plaintiff be induced to **enter into** a contract. Despite its wholly absent legal basis, GMS asserted and re-asserted it in all four Verified Complaints.

### C.    <u>Plaintiff's Complaint was Filed for an Improper Purpose.</u>

By signing a complaint, the signer certifies to the court that the pleading is not "being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1). The lack of factual support and unfounded legal theories asserted by Plaintiff's counsel in and of themselves are sufficient for this Court to find improper purpose. *In re Kunstler*, 914 F.2d at 519 (noting that if it is "revealed through an admission that the signer knew the motion or pleading was baseless but filed it nonetheless" that alone is sufficient to find improper purpose. Additionally, "if counsel willfully files a baseless complaint, a court may properly infer that it was filed either for purposes of harassment, or some purpose other than to vindicate rights through the judicial process").

Beyond these deficiencies, the Gorkens' testimonies present strong evidence that GMS pursued this case as a means of punishing Defendants, and particularly Greer, for their perceived betrayals, regardless of the absence of factual and legal support for their claims. The Court may consider these facts and testimony in determining whether the Gorkens have acted with an improper purpose. *See Id.* at 519 (noting that circumstantial facts surrounding the filing maybe considered as "evidence of the signer's purpose"). In finding improper purpose, this Court is entitled to consider the "synergistic effect of all the factors [i.e. circumstantial evidence] in

combination with the number of frivolous claims alleged ***and maintained***." *Blue*, 914 F.2d at

540 (emphasis added).

The Gorkens' true motivations are confirmed by Rachel Gorken's testimony.[16]  In her

deposition, Rachel Gorken repeatedly commented on Defendants' betrayals, but could not link

those betrayals to facts supporting the claims.  In fact, she had great difficulty even explaining

how she learned about G&S Supply.  When asked how she came to learn of G&S Supply's

existence, Mrs. Gorken responded as follows, turning her answer into a diatribe against Greer,

but without citing facts:

> A       We were in the house. It was -- it was amazing. I wish you were a fly on the wall.
> Too bad. I'm like you got to be kidding me. What in the world? Dude, we loved that man
> Westly. Man we -- we -- we gave him a wedding. We -- we -- I mean, I mean, I love their
> family. I could not believe the deceit. Can you believe it? I was -- I was floored. I had no
> idea how fooled and deceived I was. Please take all of this down, sweetie court reporter. I
> love you. Thank you. Sad. He [Westly Greer] had no idea. He thought he was so smart.
> And I'm so sorry he's going through hell right now. But you know what? Consequences
> are inevitable. And that's okay. To live in the light and know you're a sinner and you
> need salvation? So sad. But, hey, the Lord has been gracious. We have been fruitful since
> they left, since God let them walk. Get out of here. God. Praise God. I don't know who
> you're trying to defend, sweetie, Rob, sir, but it's -- it's -- it's sad.

**Ex. 7** at 53:11-54:8.

After she could not recall what information she learned pre-suit, *id.* at 55:12-59:7, Mrs.

Gorken was asked what steps she took to verify the claims before filing this case.  Mrs. Gorken

could only say that legal action is required when people "betray you":

> Q       Ok. How did we get then, ma'am, from the investigation that you can't recall
> anything about to a lawsuit that brings us all here today?
> A       What do you mean? I mean - -
> Q       Well - -
> A       - - people betray you, you have to take action.  There's consequences for people's
> action.  Bottom line.

---

[16] On behalf of GMS, Mr. Gorken testified that it was Rachel Gorken, GMS's President, who
made the ultimate decision to pursue litigation.  *See* **Ex. 5** at 130:12-16.  Her testimony is thus
particularly relevant as to GMS's improper purpose.

*Id.* at 59:8-15.

> Q      I'll go back, ma'am, to my question. How did we get to a lawsuit if there was an investigation, the results of which you cannot remember?
> A      When we found out who they [Defendants] were, they had to go and we have to put a suit on them.
> Q      ok.  And why did you have to put a suit on them?
> A      Because they took from - - they stole.  They - - they schemed.  There was a scheme.  There was a betrayal.  It's like if your wife cheated on you.
> Q      How - -
> A      There's consequences to your actions.

*Id.* at 61:21-62:4.  She also noted "they [Defendants] will learn from this." *Id.* at 71:4.  As to

Sabrina Greer being named a Defendant, Mrs. Gorken could only state:

> Q      Yes, ma'am.  Sabrina Greer is my client.  You have filed a lawsuit against her.  You understand that; correct?
> A      I forgot about her.  I love her dearly.
> Q      But, nonetheless, you decided to file a lawsuit against her; right?
> A      There's always consequences to your actions, yes, sadly.

*Id.* at 78:18-25.

In addition to this evidence of purpose, since GMS terminated Defendants on April 3, 2019, Gary Gorken has sent several text messages to Defendants indicating the goals of punishment and revenge, because Defendants had the nerve to start their own, lawful business.

- On May 3, 2019, Gary Gorken sent a lengthy email to Sabrina Greer, reading:

  o "I still cannot get over the fake hugs from strait [sic] up demons . . . How cold is it to invite people into your home while You [sic] are raping them – and stealing and scheming and lying and conniving from them?"
  o "you dirt bags were stealing and scheming …. what Scum!"
  o "What the heck do you think you got coming down the road of Karma?... It's called Hell . . . Most people don't seek God until it gets really bad…"
  o "there's a huge price to pay for this kind of crime . . . It's going to get real ugly."
  o "May God have mercy on you all."

  May 3, 2019 Email from G. Gorken to S. Greer (**Exhibit 15**).

- On July 5, 2019, a few days after Defendants were served with the original Verified Complaint, Gary Gorken sent Westly Greer an image of the Punisher

skull.  This photo was not accompanied by any text.  July 5, 2019 Text Message from G. Gorken to W. Greer (**Exhibit 16**).[17]

And, on July 21, 2019, days before the preliminary injunction hearing, Gary Gorken sent Mike Welton a text messages that "Everything's getting ready to get Real Mike. Do you want to talk?" July 21, 2019 Text Message from G. Gorken to M. Welton (**Exhibit 17**).

The testimonies and actions of GMS's representatives and the absence of a factual and legal basis for the Verified Complaints establishes GMS's "shoot first, ask questions later" *modus operandi*, which violates Rule 11, and has unjustly harmed all the Defendants.

### D. **Appropriate Sanctions.**

Once a court determines Rule 11 has been violated it, it may impose monetary and/or non-monetary sanctions against any attorney, law firm, or party that violated the rule or is responsible for the violation.  Rule 11(c).  "It is important to bear in mind the purpose of sanctions under Rule 11, those being [(1)] punishing the violating party, [(2)] compensating the

---

[17] The ominous intent behind this message is evident from the Punisher's history. *See* Punisher, https://en.wikipedia.org/wiki/Punisher (last visited June 4, 2021) (noting the Punisher is a "vigilante who employs murder, kidnapping, extortion, coercion, threats of violence, and torture in his campaign against crime."); Punisher Logo, https://1000logos.net/punisher-logo/ (last visited June 4, 2021) ("Apart from just making the Punisher instantly recognizable, the death's head skull emblem serves other purposes, too.  It helps to lure the enemies' fire to the area of his armor that is protected much better than the rest, and it helps to intimidate them.  Also, it's the symbol of the injustice returning to criminals.  The symbol is typically the last thing his victims see.").  Additionally, since 2017, The Punisher has been a widely viewed television show on the streaming platform Netflix. https://en.wikipedia.org/wiki/The_Punisher_(TV_series) (last visited June 4, 2021).  In an effort to downplay the true meaning of his text, Mr. Gorken testified the skull photo he sent to Greer was "a symbol used by special warfare."  **Ex. 12** at 87:20-23.  However, he admitted neither he nor Greer had any direct connection with special warfare operations, *see id.* at 87:24-88:6, and he could not provide a reason why he would send such a photo to Greer, *id.* at 88:7-23.  In trying to explain the photo he stated that "Westly [Greer] and I had discussed good and bad, good versus evil, and I just thought about it, missed him - - believe it or not, I missed him over the holiday [July 4th], and I just sent it to him."  *Id.* at 82:6-9.  Mr. Gorken texting The Punisher skull to Greer because he "missed him" strains credibility beyond reason.

victim of the violation, and, most importantly, [(3)] deterring future violations." *Aggarwal*, 2013 U.S. Dist. LEXIS 160422, at *34 (internal quotation marks and citation omitted). In assessing an award of attorneys' fees, "The Fourth Circuit has identified four factors courts should consider when imposing rule 11 sanctions: '(1) the reasonableness of the opposing party's attorney's fees; (2) the minimum to deter; (3) the [violators' ability to pay; and (4) factors relating to the severity of the Rule 11 violation.'" *Myers v. Am.'s Servicing Co.*, 227 F.R.D. 268, 270 (E.D. Va. 2005) (quoting *In re Kunstler*, 914 F.2d at 523).

The actions and inactions of Plaintiff and its counsel in instituting and maintaining this unfounded litigation require its dismissal. Plaintiff's case should be dismissed with prejudice and Plaintiff ordered to pay Defendants' costs and fees for their defense of this action. After the Court rules on the instant motion, Defendants respectfully request permission to submit specific pleadings and materials on their incurred fees and costs, for a monetary sanctions award.

## V.    **CONCLUSION**

This case has been litigated for two years, with Defendants incurring over $600,000 in attorneys' fees and costs defending unsubstantiated claims. The continued violations of Rule 11 cannot be countenanced. Rule 11 requires a sanction sufficient to address the severity of the violations and deter future-similar conduct: dismissal of this lawsuit and an award of fees and costs.

WHEREFORE, Defendants respectfully request that this Court grant their Motion for Sanctions; and dismiss Plaintiff's Third Amended Complaint with prejudice, and award them their attorneys' fees and costs incurred for defending this action.

**JA464**

**<u>CERTIFICATION</u>**

Defendants file this Motion and Memorandum only after first providing Plaintiff's counsel drafts on June 15, 2021, and provided Plaintiff more than twenty-one (21) days to correct the issues addressed herein. The only action Plaintiff took in that period was to voluntarily dismiss Defendant Gregory Sky Spires on July 7, 2021.

Dated: July 8, 2021

Respectfully submitted,

**G&S SUPPLY, LLC, WESTLY L. GREER, SABRINA GREER, GREER GROUP, LLC, GREGORY K. SPIRES, COUNTY ROADS, LLC, THOMAS HAYES, MIKE WELTON, WARTECH INDUSTRIES, LLC AND HMC SUPPLY, LLC**

By: */s/ Robert W. McFarland*
Robert W. McFarland (VSB # 24021)
V. Kathleen Dougherty (VSB # 77294)
Micaylee A. Noreen (VSB # 92433)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Ste. 9000
Norfolk, Virginia 23510
Phone: (757) 640-3716
Fax: (757) 640-3966
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*

**JA465**

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2021, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

Respectfully submitted,

By: */s/ Robert W. McFarland*
Robert W. McFarland (VSB # 24021)
V. Kathleen Dougherty (VSB # 77294)
Micaylee A. Noreen (VSB # 92433)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Ste. 9000
Norfolk, Virginia 23510
Phone:  (757) 640-3716
Fax:  (757) 640-3966
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*

**JA466**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**GMS INDUSTRIAL SUPPLY, INC.**

        **Plaintiff,**

    **v.**                    **Civil Action No. 2:19-cv-324-RBS-RJK**

**G&S SUPPLY, LLC,** *et al.*

    **Defendants.**

## GMS INDUSTRIAL SUPPLY, INC.'S RESPONSE TO
## DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO RULE 11

COMES NOW Plaintiff GMS Industrial Supply, Inc. ("GMS"), by counsel, and pursuant to Local Rule 7, files its Response to the Motion for Sanctions Pursuant to Rule 11 filed by all Defendants.

## I.    <u>INTRODUCTION</u>

Defendants seek dismissal of Plaintiff's suit as a Rule 11 sanction, as well as an award of attorneys' fees. The Motion follows Defendants' 30(b)(6) deposition of Plaintiff's president and corporate representative who is suffering from stage four esophageal cancer and who, at the time of his deposition, was (and still is) undergoing chemotherapy infusion treatment. In various instances, the witness stated he could not recall the answer to the question he was asked. Memory and concentration problems are known side effects of chemotherapy.

Approximately a week after the deposition, Defendants deposed the witness, Mr. Gary Gorken, in his personal capacity. In doing so, Defendants' counsel studiously avoided asking Mr. Gorken whether he had had the opportunity to recall the answers to any of the questions he had struggled with in his 30(b)(6) deposition. It is reasonable to infer that counsel did not want to have

Mr. Gorken provide clarity as to any of those issues and instead sought a "gotcha" scenario from the prior deposition.    Also following the first deposition, Plaintiff offered to provide another corporate representative who could be more successful in answering Defendants' questions.[1] Defendants declined the offer, again evidencing their preference for a "gotcha" scenario.

Defendants' Rule 11 motion is a transparent and improper attempt to argue summary judgment by attacking the weight of the evidence and Plaintiff's legal conclusions. In doing so, Defendants misstate the facts, the law, and requirements under the Rule itself.  By granting Plaintiff's request for a preliminary injunction, this Court already has ruled that GMS has demonstrated a likelihood of success on the merits for many of the same claims.  Defendants now attack these claims as factually and legally unenforceable.

Not surprisingly, when falsely asserting Plaintiff lacks facts to support its claims, Defendants, who were in sole possession of much of the evidence, ignore their clandestine spoliation of evidence through running a shredder program on a GMS owned laptop computer containing evidence of their wrongdoing before returning it to GMS.[2]  Defendants deleted thousands of files shortly after receiving Plaintiff's litigation hold letter.

Defendants attempt, without basis, to have the Court find that Plaintiff's counsel signed and filed the Complaints for an "improper purpose," and with no factual basis other than the subjective beliefs of Plaintiff's agents. Moreover, Defendants request that the Court dismiss ***all***

---

[1] *See e.g. Power Home Solar, LLC v. Sigora Solar*, LLC, Civil Action No. 3:20-cv-00042, 2021 U.S. Dist. LEXIS 119269, at *35 (W.D. Va. May 20, 2021) ("A party may, under certain circumstances, cure a deficient Rule 30(b)(6) designee by promptly proffering an alternate corporate representative.").

[2] Defendants' intentional spoliation of evidence, and the factual inferences the Court should draw in Plaintiff's favor as a result, are the subject of Plaintiff's recently filed and pending Motion for Sanctions. [ECF No. 196].

*claims* against them as a Rule 11 sanction, despite the fact that Defendants do not attack a majority of those claims.

This Motion is a "swing for the fence" attempt by Defendants, who already know or do not want to know the answers to their questions but wish to avoid having to deal with the steep (and insurmountable) hurdle of a summary judgment motion and sanctions for their intentional spoliation. This Court should see Defendants' improper attempt for what it is and dismiss the Motion.

## II.  <u>STANDARD OF REVIEW</u>

"Rule 11 mandates that every pleading, motion, or other paper filed with the court be the product of a 'reasonable inquiry' on the part of the attorney or party ***signing the document***, and that the document be 'well grounded in fact and . . . warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it . . . not [be] interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.'" *Blue v. U.S. Dep't of Army*, 914 F.2d 525, 533 (4th Cir. 1990) (emphasis added; quoting Fed. R. Civ. P.11). "[I]n imposing Rule 11 sanctions, the court is to avoid hindsight and resolve all doubts in favor of the signer." *Olivieri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986).

"[Rule 11 motions] should not be employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes. Nor should Rule 11 motions be prepared to emphasize the merits of a party's position,… [or] to intimidate an adversary into withdrawing contentions that are fairly debatable. . ." Fed. R. Civ. P. 11, Advisory Committee Notes; *see also MetLife Bank, N.A. v. Badostain*, 2010 U.S. Dist. LEXIS 138261, at *26 (D. Idaho Dec. 30, 2010); *Dome Patent L.P. v. Permeable Techs., Inc.*, 190

F.R.D. 88, 1999 U.S. Dist. LEXIS 16157 (W.D.N.Y. 1999) ("FRCivP 11 should not be used to raise issues of legal sufficiency...."). The rules of civil procedure offer other means, such as Fed. R. Civ. P. 12(b)(6) motions, for such purposes. *MetLife*, 2010 U.S. Dist. LEXIS 138261, at *26. Moreover, "[e]ven if [movant's] theory of the case is correct, a motion for sanctions pursuant to Rule 11 is not the proper venue to argue one's case," and, using such a motion to obtain a preview of the nonmovant's affirmative case violates the intent of the rule. *Id., Universal Surveillance Corp. v. Checkpoint Sys.*, 2013 U.S. Dist. LEXIS 187040, * 43 (N.D. Ohio October 16, 2013). Where a movant files a Rule 11 motion for such improper purposes or with ill-grounded facts or law, a court can impose sanctions against the movant. *Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 421 (S.D.N.Y. 2003).

A Rule 11 violation only occurs when it becomes patently clear that a non-withdrawn claim has absolutely no chance of success. *E. Gluck Corp. v. Rothenhaus*, 252 F.R.D. 175, 179 (S.D.N.Y. 2008); *Gissendaner v. Credit Corp. Sols.*, 358 F. Supp. 3d 213, 226 (W.D.N.Y. 2019). The test is whether a reasonable attorney in like circumstances could believe his actions to be factually and legally justified. *Kosnoski v. Howley*, 1992 U.S. App. LEXIS 24263, * 16 (4th Cir. September 24, 1992). If the nonmovant has an "objective glimmer of a chance of prevailing on an issue," a court should not impose sanctions. *Id*. And, counsel need only possess some evidence obtained before filing to support factual allegations. *Brown v. GNC Corp.*, 789 F.3d 505, 515 (4th Cir. 2015); *Carraballa v. Russell*, 586 Fed. Appx. 620, 621 (4th Cir. 2013). Moreover, should a court ultimately deem sanctions appropriate, the court possesses significant discretion in determining what sanctions, if any, to impose. *Rothenhaus*, 252 F.R.D. at 179.

Rule 11(b)(4) states,

A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The

> sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

"In choosing a sanction '[t]he basic principle ... is that the least severe sanction adequate to serve the purpose should be imposed.'" *Cabell v. Petty*, 810 F.2d 463, 466 (4th Cir. 1987). The Notes of Advisory Committee explain that, before 1983, Rule 11 included a provision for "striking pleadings and motions as shams and false." That provision was deleted because "decisions thereunder…tended to confuse the issue of attorney honesty with the merits of the action…[that are] better dealt with under Rules 8, 12, or 56. Fed. R. Civ. P. 11, Notes of Advisory Committee on Rules – 1983 Amendment (citing *Murchison v. Kirby*, 27 F.R.D. 14 (S.D.N.Y. 1961)).

### III.    LEGAL ANALYSIS

### A.    GMS has a Factual Basis for its Claims

Defendants argue that GMS lacked a factual basis for filing its Complaint and all subsequent Amended Complaints against the Defendants. Defendants' argument is premised upon select quotes, without context, from GMS' 30(b)(6) deposition and GMS' 30(b)(6) witness' inability to remember certain information while in the deposition hot seat opposite an aggressive attorney. Defendants' argument fails, because (1) Defendants' issues with GMS' 30(b)(6) testimony are not appropriately made under Rule 11, and (2) the argument ignores all of the other evidence in the case.

In the Motion for Sanctions, Defendants baldly assert that Mr. and Mrs. Gorken, *and their counsel*, filed the Complaint and Amended Complaints, without conducting a pre-filing investigation. As stated above, a plaintiff does not need *all* of the evidence to support its claims before filing, it only needs some evidence – enough that a "reasonable attorney in like circumstances could believe his actions to be factually and legally justified." *Kosnoski*, 1992 U.S.

App. LEXIS 24263 at *16.  In other words, an attorney must undertake a reasonable prefiling

factual investigation to "'uncover some information to support the allegations in the complaint.'"

*Guerrero v. Weeks*, Civil Action No. 1:13cv0837, 2014 U.S. Dist. LEXIS 24803, at *12 (E.D. Va.

Jan. 10, 2014) (quoting Brubaker v. City of Richmond, 943 F.2d 1363, 1373 (4th Cir. 1991)).  An

attorney may not rely on his client's recitation of the facts underlying a claim but must instead

make his own investigation of the pertinent facts. *Segen v. Buchanan Gen. Hosp., Inc.*, 552 F.

Supp. 2d 579, 585 (W.D. Va. 2007).  To satisfy Rule 11(b)(3), an attorney need not even rely upon

direct evidence to support his factual allegations. *DE Techs., Inc. v. Dell Inc*., Civil Action No.

7:04cv00628, 2006 U.S. Dist. LEXIS 7553, at *10 (W.D. Va. Feb. 28, 2006).

Notably, an asserted legal position violates Rule 11(b) only if it has "absolutely no chance

of success under the existing precedent." *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 153

(4th Cir. 2002).  A party only runs afoul of Rule 11(b)(3) when it makes allegations that "are

'unsupported by *any* information obtained prior to filing.'" *Morris v. Wachovia Sec., Inc*., 448

F.3d 268, 277 (4th Cir. 2006) (emphasis added, quoting *Brubaker*, 943 F.2d at 1373). Thus, to

avoid sanctions, an "allegation merely must be supported by *some* evidence." *Brubaker*, 943 F.2d

at 1377 (emphasis in original).

Here, Defendants' entire argument is premised upon Defendant's claim that GMS'

corporate representative was "wholly unprepared to testify on designated topics" and "provided

responses of 'I don't know' fifty (50) times; 'I don't recall" seventy-seven (77) times; and 'I'm

not sure' eighty-five (85) times."  Not only does this tally appear to be factually inaccurate,[3] but

Defendants are equating an allegedly unprepared witness with GMS not having a factual basis for

---

[3] Defendants appear to have substantially overstated the total instances.  Moreover, Defendants
fail to acknowledge that many of the answers regarding lack of memory or information were made
in response to questions outside of the scope of the designated 30(b)(6) deposition topics.

pleading its claim in the first place.  In other words, Defendants' argument presumes that "I don't

know," "I don't recall," and "I'm not sure" mean that neither the witness or GMS' counsel, nor

any of its employees or witnesses, have any evidence to support its claims, nor did they when they

filed the Complaints.  That is not what those responses mean – they simply mean that at the time

of the deposition, the deponent simply did not know or could not recall the answer.  The responses

certainly do not mean that Plaintiff had no factual basis for making the allegations in the Complaint

and its Amendments.

As noted above, Mr. Gorken, GMS' main corporate designee is undergoing infusion

chemotherapy in connection with treatment for his stage 4 esophageal cancer.  See excerpts of

Deposition Transcript of Gary Gorken, a copy of which is attached hereto as **Exhibit 1**, at 6:15 –

7:1. The treatment is known to lead to a condition sometimes called "chemo brain," which involves

difficulties with memory and concentration.[4]

---

[4]   *See, e.g.,* comments from the Mayo Clinic at https://www.mayoclinic.org/diseases-
conditions/chemo-brain/symptoms-causes/syc-20351060

> Chemo brain is a common term used by cancer survivors to describe thinking and memory
> problems that can occur during and after cancer treatment. Chemo brain can also be called
> chemo fog, cancer-related cognitive impairment or cognitive dysfunction.

> Though chemo brain is a widely used term, the causes of concentration and memory
> problems aren't well-understood. It's likely that there are multiple causes.

> No matter the cause, chemo brain can be a frustrating and debilitating side effect of cancer
> and its treatment. Researchers are working to understand the memory changes that people
> with cancer experience.

*See also* similar discussion at: https://www.cancer.org/treatment/treatments-and-side-
effects/physical-side-effects/changes-in-mood-or-thinking/chemo-brain.html

Page **7** of **28**

**JA473**

If Defendants took issue with the memory and/or preparation for GMS' corporate witness, their remedy was not to file a motion seeking terminating sanctions for the entire lawsuit. Rule 11(d) expressly states that the Rule "does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37." Instead Defendants could have filed a Motion under Rule 37 requesting another deposition and fees, which would be an appropriate remedy for an unprepared 30(b)(6) witness. *See e.g. LifeNet Health v. LifeCell Corp.*, 2014 U.S. Dist. LEXIS 154481, *20-21 (USDA ED. Va. October 31, 2014), *Marker v. Union Fid. Life Ins. Co*., 125 F.R.D. 121, 127 (M.D.N.C. 1989).

**Following the deposition, GMS offered to Defendants an opportunity to reconvene the 30(b)(6) deposition with another designee for any testimony that it felt was missing, at GMS' cost, yet Defendants rejected the offer.** Also as noted above, Defendants also took Mr. Gorken's individual deposition *after* the 30(b)(6) deposition yet avoided any questions regarding the information that is at issue in this Motion. The strong inference is that Defendants are not actually interested in obtaining (or acknowledging they already have) the information over which they feign outrage in the instant Motion for Sanctions.

Defendants would love to keep evidence of their own misdeeds from the jury, and, indeed, they fail even to recognize the testimony and evidence regarding *the other claims GMS has against Defendants*. Defendants' seek dismissal of the *entire lawsuit and all claims therein*, despite only claiming there is no factual basis for certain of the claims (trade secret misappropriation, claims against HMC, and claims against Sky Spires). Argument regarding each of these specific claims is addressed below. But it is important to note that Defendants fail to acknowledge in their Motion the multitude of the other claims against them in this case, including claims for breach of loyalty, breach of employment agreements, breach of sale agent agreements, conspiracy, trademark and

trade dress infringement, and other statutory claims.  GMS has ample evidence to support all of its claims, and, indeed, the Court already granted GMS a preliminary injunction with respect to certain of the claims following a two-day evidentiary hearing in which GMS elicited testimony from six witnesses and introduced numerous exhibits into evidence.

GMS was able to obtain the preliminary injunction at the outset of this case, because it had conducted a robust pre-filing investigation.  GMS first learned of Defendants' misconduct on April 2, 2019.  At that time, GMS reached out to counsel, and together they began an extensive investigation into Defendants' actions.  It was not until ten weeks of fact-finding and reviewing the law,[5] that GMS filed its original, Verified Complaint on June 20, 2019.  ECF No. 1.  Just over a month later, on July 25, 2020, the Court held an evidentiary hearing on GMS' request for a preliminary injunction.  The Court granted the preliminary injunction, in part, and made comments supportive of GMS' claims.[6]

---

[5] As part of its inquiry, GMS sent a request to Westly Greer to return a desktop computer, laptop computer, and tablet that had been provided to him by GMS.  Greer returned the electronic devices but did so after irrevocably deleting all of the user-created information off of the computers.  He also refused to provide a password needed to access the tablet.  As GMS noted in its Complaints and during the TRO hearing, Greer was the ringleader of the Defendants' conspiracy, and he was the only one with almost complete access to GMS' trade secrets.  After destroying evidence with a computer shredder program before GMS filed its original complaint, Defendant audaciously now seeks to benefit by having the court sanction GMS for a lack of pre-filing evidence.

[6] The Court's comments from the injunction hearing are telling.  With respect to the trade secrets claims, this Court explained, "there's evidence here, in my mind, of trade secrets.  I can tell you which ones at this point.  There are at least four or five of them that are potential trade secrets.  You [Defendants] can't use them and you can't use their name…you cannot go out and compete and mislead the customers, mislead the Army, mislead the Navy."  Transcript of Temporary Restraining Order Hearing ("TRO T."), ECF No. 55 at 344:3-17. During the hearing, the Court also explained, with respect to the trademark/trade dress claims, "there is a real problem with using G&S.  I think you've got a trademark problem, and you may have a real problem using that and referring yourself as a sister company.  I think you can compete.  Nobody has a lock on this type of business.  It's competitive, but it has to be on a proper playing field, and you [Defendants] can't do it by infringing or doing something confusing with somebody's name and trademark or with their proprietary information….to me it seems confusing."  TRO T., ECF No. 33 at 244:12-20.

Given this Court's own remarks during the two day evidentiary hearing, together with GMS' offer to provide another corporate representative, it is clear that Defendants' motion is an attempt to turn a discovery dispute into a "Get out of Jail Free" pass. Nevertheless, GMS addresses Defendants specific arguments below.

i.   _GMS has a Factual Basis for its Trade Secrets Claims_

Defendants claim that GMS has no evidence to support its allegations that Defendants misappropriated any trade secrets and that GMS has never identified to Defendants what evidence it relies upon. Defendants are mistaken. On August 5, 2020, eight months before the GMS corporate deposition, GMS answered corporate interrogatories identifying 537 bate stamped pages of trade secrets misappropriated by Defendants. *See* **Exhibit 2,** Exhibit 10 to GMS 30(b)(6) Deposition, Irog 22. At that time, GMS also explained that the evidence will show Greer downloaded those documents from electronic devices given to him by GMS onto portable drives. *Id*. GMS had earlier provided Defendants with an affidavit from its digital forensics expert, who had examined Greer's desktop computer provided by GMS. *See* Declaration of Gary Pate [ECF No. 47]. The forensic analysis of Greer's computer revealed that, in addition to downloading the documents, Greer had also used a file shredder program to delete and destroy nine thousand files from its desktop a mere 16 days after GMS had provided a litigation hold notice to Greer to preserve evidence.[7] *See* Litigation hold letter, attached hereto as **Exhibit 3**.

Despite this history and knowledge, G&S's counsel claimed during the 30(b)(6) deposition at issue in this Motion, "I need to know now, what are the trade secret documents that you allege my clients took and then what trade secret documents or proprietary information did they use."

---

[7] The Court should also note that Greer has refused to provide an effective password for the GMS tablet computer that he returned to GMS, and, as a result, GMS has not been able to review the contents of its tablet computer.

*See* **Exhibit 4**, Excerpts of Transcript from 30(b)(6) Deposition of GMS, 189:22 – 190:1. Defendants' counsel subsequently claimed, "[a]t the hearing on the temporary restraining order, I kept asking, where are the documents, what specific documents did my client supposedly take that are the trade secrets or proprietary information. And I've been asking it ever since and I still haven't gotten the answer." *Id*. at 191:13-18. He followed up by attacking GMS' against counsel: "[i]f you're going to bring a trade secrets case and you're going to allege that my clients stole your trade secrets  and used them, you got to tell me what they are; and so far, he isn't able to do that." *Id*. at 193:11-14. Again, the suggestion that Defendants did not know the nature of the claims against them is false. It also has nothing to do with the question of whether GMS' counsel had a proper basis for signing the Complaints at the time they were filed.

Defendants are simply ignoring GMS' written answers to interrogatories, which identify the misappropriated trade secrets by Bates number.   During the 30(b)(6) deposition, Defendants' counsel offered those interrogatory answers as Exhibit 10, see *Id.* at 226, yet he refused to introduce the documents identified in the answers to the interrogatories as exhibits or question the corporate witness about them. Instead of showing GMS' corporate designee the documents and asking questions about the basis of GMS' claim, Defendants focused the deposition entirely and improperly upon the question of whether GMS' corporate representative could ***memorize*** the identity of the documents comprising the 537 pages of trade secrets. Put another way, instead of offering the documents GMS specifically identified in discovery for discussion during the deposition, Defendants' counsel played a game of cat and mouse with the witness. As this Court has already noticed in this case, such questioning by defense counsel is patently unfair.[8]   If

---

[8] For example, when Defendants' counsel cross examined a witness about matters in an employment agreement, the Court stated, "He doesn't have the agreement in front of him.  It's not

Defendants had wanted to discuss the trade secret documents, they could have.  They chose not to do so and did not allow the witness to look at them.

It also is important to consider the inherent evidentiary difficulty in proving a claim for trade secret misappropriation: i.e., direct evidence often does not exist.  In *Bulldog NY LLC v. Pepsico, Inc.*, 2010 U.S. Dist. LEXIS 158382 (D. Conn. June 17, 2010), the court, while addressing a Rule 11 motion, described the issue:

> [I]t is well recognized with respect to trade secrets that: [m]isappropriation and misuse can rarely be proved by convincing direct evidence.  In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construction of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything.

*Id*. at *4.  The court also noted that "[a]n alleged trade secret is not deprived of trade secret status simply because it is comprised of materials that are 'common [and] commercially available.' Rather, a 'plaintiff's ability to combine these elements into a successful process, like the creation of a recipe from common cooking ingredients is a trade secret entitled to protection.'" *Id*.

Courts have recognized that a plaintiff's difficulty in establishing proof of claims can be hampered by the defendant depriving it of access to information on the defendant's computer.  *See Atl. Recording Corp. v. Heslep*, 2007 U.S. Dist. LEXIS 35824, *16-17 (N.D. Tex. May 16, 2007), By intentionally denying GMS access to his computer data, Greer made it more difficult for GMS to establish its claims – particularly its trade secrets claim.

---

fair for him to be questioned about what's in an agreement."  *See* TRO T., ECF No. 53 at 197:9-15.

ii. _GMS has a Factual Basis for its Claims Against HMC_

Defendants claim GMS does not have a factual basis for its claims against HMC Supply, LLC ("HMC"). Once again, Defendants' claim is demonstrably false. Notably, Defendants did not even include HMC as a defendant in the original Complaint of First Amended Complaint.[9] It was not until Defendants produced over 30,000 pages of documents to GMS as part of the initial disclosures process that GMS learned that Greer and Spires had surreptitiously established HMC to compete with GMS.

GMS' review of those documents revealed that HMC was incorporated in 2015, it was registered at defendant Spires's address, the company created a catalog of industrial products competitive to GMS, had offered G&S its operating knowledge, had set up a "cage code" for sales to federal government customers (7HGY2)[10], had identified sources to provide good to customers, and that it even transferred funds to G&S when Greer and Spires created G&S to compete against GMS. (ECF 134).

GMS had a sufficient factual basis to amend its Complaint to include claims against HMC. Indeed, when GMS sought to amend its Amended Complaint to add HMC, Defendants **consented**

---

[9] It is not surprising that Gary Gorken did not recall the facts that formed the basis for the HMC claims, because GMS did not learn of HMC during its initial investigation of Defendants' misconduct. GMS discovered the factual basis supporting its claims against HMC during this litigation. GMS' discovery was based upon documents Defendants produced. The evidence of wrongdoing by HMC has increased during the case through depositions and third-party discovery.

[10] A "cage code" is a five-character alpha-numeric, unique identifier assigned by the Defense Logistics Agency (DLA) to businesses that wish to pursue contracts or grants from the United States federal government. _See_ Defense Logistics Agency: Business Operations, at https://www.dla.mil/DoingBusinessWith DLA/BusinessOperations/ (last visited on July 19, 2021).

**JA479**

to the joinder.  ECF 145.  Defendants cannot approbate and reprobate.  *See e.g. Hoffman v. Knox*, 50 F. 484, 492 (4th Cir. 1892).

Later, during depositions, GMS learned that HMC was created to sell industrial supplies, and that the company made two sales and both were to military customers.  Deposition testimony also confirmed the information that GMS had learned earlier.  Taken together, these facts create a strong inference that HMC was a predecessor corporation of G&S and was, like G&S, directly competing with GMS.

**B.      Plaintiff's Claims are Warranted by Existing Law**

In addition to their arguments regarding the preparedness of GMS' corporate witness, Defendants promote several allegedly dispositive legal theories for the first time in their Motion for Sanctions.  Specifically, Defendants assert that certain of GMS' claims are not warranted by existing law and that the Court should sanction GMS for that reason.  A legal argument violates Rule 11 when it has "absolutely no chance of success under the existing precedent." *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 153 (4th Cir. 2002) (quotation omitted).

The fact that Defendants did not raise these legal defenses until now, two years into the litigation and in a Motion for Sanctions, should reveal to this Court that sanctions are not warranted.  *See e.g. id.* at 152 ("It is important that [a Rule 11] motion be 'served promptly after the inappropriate paper is filed, and, if delayed too long, [it] may be viewed as untimely.'" (quoting Note, FRCP 11).  If the claims have "absolutely no chance of success" such that GMS should be sanctioned for even bringing such claims, then surely competent defense counsel would have raised the issue years ago at an appropriate time and in the appropriate pleading (i.e. in Defendants' 12(b)(6) Motion to Dismiss (ECF No. 60)).  It should be noted that the great majority of the Defendants' 12(b)(6) Motion to Dismiss were denied by the Court.  *See* Memorandum Opinion and Order (ECF No. 102).

Setting aside the odd/late timing of Defendants' arguments, GMS' claims are warranted by existing law, should not be dismissed under any procedural device, and must be decided by the jury in this case.  Defendants address the insufficiency of each of Defendants legal theories below.

 i. *GMS States a Colorable Claim for Misappropriation of Trade Secrets under VUTSA*

At the outset, the Court should note that it has already held that GMS is likely to be successful on the merits of its trade secret claims.[11]  After hearing testimony and taking evidence during the hearing on the preliminary injunction, the Court stated, "In terms of delivering any confidential information and trade secrets, I do think there are some potential trade secrets involved here."  TRO T., ECF No. 55 at 350:21-23.  In its order granting the preliminary injunction, the Court affirmed that GMS had submitted sufficient evidence on its trade secret claim to justify injunctive relief, stating, "GMS Industrial has established that it is likely to succeed on its misappropriation of trade secrets claim."  ECF No. 70 at *9.

Nevertheless, Defendants assert that GMS cannot prevail on its trade secret misappropriation claim under the Virginia Uniform Trade Secret Act ("VUTSA"), because the misappropriation did not occur in Virginia.  The crux of Defendant's argument is that Virginia applies the doctrine of *lex loci* to torts and that the proper law is "the law of the place of the wrong to the tort actions."  (ECF No. 194 at 24) (quoting *Milton v. IIT Research Inst.*, 138 F.3d 519, 521 (4th Cir. 1998)).  Again, seeking to argue the merits of the case, Defendants claim that, as there is no specific allegation or evidence that they "committed acts of misappropriation in Virginia," then GMS cannot maintain a claim under VUTSA.  *Id.*  Defendants are wrong.

---

[11] Although the TRO hearing took place a month after GMS filed its original complaint, all of the evidence presented arose out of GMS' pre-filing investigation and tracked the allegations in the complaint.  At that time, the parties had not yet engaged in any discovery.

In making their argument, Defendants fail to direct the Court to any precedent where a Virginia state or federal court has addressed the application of *lex loci* to claims under VUTSA. Likewise, the statute itself does not address the issue. The Fourth Circuit has stated that sanctions are not appropriate "[w]here neither the Supreme Court nor any courts within [the] circuit have ruled on the issue and the statute itself does not offer a clear answer." *CarMax Auto Superstores, Inc. v. Sibley*, 767 F. App'x 462, 465 (4th Cir. 2019) (quoting *Brubaker v. City of Richmond*, 943 F.2d 1363, 1378 (4th Cir. 1991)).

In this case, VUTSA applies because the confidentiality and choice of law provisions in Defendants' contracts provide an independent basis to apply VUTSA. Even if they did not and if Virginia law cannot be applied, GMS still has a claim under the Uniform Trade Secret Act, which has been adopted in the key states as it pertains to this case, and so the claim should be recast as a claim under any of those states' analogous statutory acts.

GMS valued its trade secrets and took steps to ensure that its contractual agreements with employees and agents contained the necessary protections and warnings. For instance, Greer's employment agreement contained the following clause:

> I agree: (1) only to use the confidential business information to provide services or goods to GMS Industrial Supply, (2) only to communicate the confidential information to fellow employees on a need-to-know basis; and (3) not to otherwise disclose or use, at any time, any confidential information....

*See* ECF No. 3-1 (1.1). And, the sales agent agreements for Greer and the remaining defendants contained the following language:

> Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relation to business or interests of the Company or of persons with whom the Company have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or

in connection with the performance of the Agent's duties and responsibilities hereunder).

*See* ECF No.3-1 (1.2-1.8), ¶12. Defendants are well aware of these clauses, because the Court rejected their earlier attempt to dismiss GMS' claim for breach of these clauses. *See* ECF Nos. 60-61. Defendants are also aware that each of the sales agent contracts contained a choice of law clause. The agent agreements stated that they "shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly." *See* ECF No. 3-1, (1.2-1.8), ¶17.

The Fourth Circuit has recognized that where a tort claim has a close relationship to a contract, a contract's choice of law clause can extend over the tort claims.[12] *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999); *see also White v. Potacska*, 589 F. Supp. 2d 631, 641 (E.D. Va. 2008) ("When a choice of law clause is broad enough to encompass contract-related tort claims…the Court of Appeals for the Fourth Circuit has honored the intent of the parties to choose the applicable law."). In applying the extension, the court should consider "the context of the entire agreement between the parties." *Pyott-Boone Elecs., Inc. v. IRR Tr. for Donald L. Fetterolf Dated December 9, 1997*, 918 F. Supp. 2d 532, 546 (W.D. Va. 2013). In applying the extension to the contract related tort claims, this court found it must consider the choice of law clause in the contract. *Id*. at 546. While the question may be one of first impression before this court, other courts have recognized that the misappropriation of trade secretes could qualify as contract-related tort subject to a choice of law clause. *See Volvo Grp. N. Am, LLC v.*

---

[12] The parties agree that a claim under VUTSA is a tort claim but disagree as to the choice of law issue. *See* Defendants' Memorandum [ECF No. 194] at p. 24. ("Misappropriation of trade secrets is a tort at common law" and "[w]hen deciding which state's law is appropriately applied for such torts, including torts under the VUTSA, 'Virginia applies the *lex loci deliciti…*'"). Because the pertinent contracts dictate that the relationship is governed by Virginia law, VUTSA is the appropriate statute.

*Forja De Monterrey S.A. de C.V.*, 2019 U.S. LEXIS 172435, *12 (M.D.N.C. October 4, 2019);

*Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1032 (D. Minn. 2013).

In *Hitachi*, the choice of law clause called for the "application of Virginia law in the interpretation of 'this Agreement and the rights of the parties hereunder…including all matters of construction, validity, and performance.'" *Id.*, 166 F.3d at 624. The Fourth Circuit found this language broad enough to cover contract-related torts. *Id.* at 628. In *Pyott-Boone Elecs., Inc.*, the court extended a choice of law clause that read, "This Agreement shall be governed by the laws of the State of Delaware without regard to any jurisdictions conflicts of law provisions." *Id.* at 537. In the present case, the confidentiality clauses governed the use of the trade secrets GMS developed by its employees and agents. Defendants misappropriation of GMS' trade secrets gives rise to a contract-related tort that VUTSA should govern.

Even if Defendants were correct regarding their *lex loci* argument, the remedy would not be dismissal of the count. Instead of dismissing the count, the Court may simply apply the uniform trade secret law of the *lex loci* jurisdiction, or, at least, allow GMS an opportunity to amend to include a Uniform Trade Secret Act claim from another jurisdiction.

In *DecisionQ Corp. v. GigM Techs., LLC*, 1:17-cv-00232; 2017 U.S.Dist. LEXIS 227919, 2017 WL 11504624 (E.D. Va. August 9, 2017), the Plaintiff filed four counts related to trade secrets under The Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, et seq.[13] *Id.* at *12. When the Defendant filed a Motion to Dismiss, the Court first analyzed the choice of law issue concerning trade secrets. The Court elected to analyze the trade secrets issue under the VUTSA, noting that "[f]ederal courts apply the trade secret law of the appropriate state." *Id.* (quoting *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1116 (Fed. Cir. 1996)). Although it

---

[13] GMS filed Count V under VUTSA, but also asserted Count IV under DTSA.

was faced with an applicable trade secret law different than the federal act pled in the complaint, the Court did not dismiss the action. Instead, it chose to apply a different state law. If Defendants had filed the objection in their Motion to Dismiss, the Court likely would have followed the same procedure. In the instant motion, this Court should not sanction the Plaintiff for alleging a count under Virginia's version of the uniform act, even if it determines that the conduct should be evaluated under a different state's version of the same uniform act. which would not have been dismissed on a Motion to Dismiss.

The application of a different states' trade secrets act is common because the Uniform Trade Secrets Act, with some modifications, has been adopted in 48 states and the District of Columbia. See Uniform Law Commission: Trade Secrets Act, https://www.uniformlaws.org/ committees/community-home?CommunityKey=3a2538fb-e030-4e2d-a9e2-90373dc05792 (last accessed July 21, 2021). Here, the harm was incurred in Virginia. Virginia has adopted the uniform act. The act also has been adopted in the jurisdictions where Defendants undertook the acts that form the basis of the trade secret violations. *See* La. Stat. Ann. § 51:1431 (2021) et seq.; Tex. Civ. Prac. & Rem. Code § 134A.002 (2021) et seq.; Okla. Stat. Tit. 78 § 86 (2021) et seq.; Colo. Rev. Stat. § 7-74-102 et seq. GMS' counsel did not act in bad faith or with an improper purpose by filing Count V. If there is any error in Count V, courts in this District have simply elected a different law and evaluated the claim in that manner.

Even if Defendants were correct regarding their "lex loci" argument, cognizable legal theories still exist whereby GMS may bring claims against Defendants under another appropriate state's Uniform Trade Secret Act.

*ii.* <u>*GMS has stated a claim for fraud in the inducement to perform an executory contract*</u>

Defendants claim that GMS' fraud claim is unenforceable as a matter of law. If so, the conclusion must not have been clear, since Defendants failed to include the fraud claim in their

motion to dismiss. Defendants assert "by its very definition, fraud in the inducement requires inducement to enter into a contract," and, thus Plaintiff has not brought a cognizable cause of action. ECF No. 194, pg. 25. They then boldly double down and exclaim they "have searched extensively, without success, for authority that provides a legal basis for GMS' claim that a party can be fraudulently induced into continuing to perform under an existing, contract." *See* ECF No. 194, pg. 25. Defendants missed key Virginia Supreme Court authority in their search.

It is well established in Virginia that fraudulent inducement claims involve one of two types: fraudulent inducement to enter into a contract and fraudulent inducement to perform a contract. *Ware v. Scott*, 220 Va. 317, 320, 257 S.E.2d 855, 857 (1979), *Modern Oil Corp. v. Cannady*, 2015 Va. Unpub. LEXIS 16, *12 ( Va. Dec. 30, 2015); *see also Sharma v. USA Int'l, LLC*, No. 1:13-cv-1573, 2015 U.S. Dist. LEXIS 86789, at *16 (E.D. Va. July 2, 2015); *CGI Fed., Inc. v. FCi Fed., Inc*., 94 Va. Cir. 138, 151 (Cir. Ct. 2016). As the Virginia Supreme Court explained in *Ware*:,

> An action for fraudulent inducement need not, however, be limited to the formation of the contract. Although formation was free of fraud, *performance* of an executory contract may be fraudulently induced. Such is the case when one party fraudulently leads the other to believe that a condition precedent to the latter's duty to perform has been fulfilled. By the same logic, fraudulent inducement to perform may arise when one party induces the other to perform by concealing some fact which excuses performance by the latter.

*Ware*, 220 Va. at 320, 257 S.E.2d at 857 (internal citation omitted) (emphasis in original), *See also Devine v. Buki*, 289 Va. 162, 175, 767 S.E.2d 459, 466 (2015). GMS has alleged facts that squarely follow precedent. That is, the individual defendants concealed material facts from GMS – including their sales of competing products to GMS customers – while continuing to receive pay and commissions from GMS. ECF No. 156, pg. 63-67.

Moreover, the Eastern District of Virginia has recognized for years that Virginia has adopted fraud in the inducement of the performance of a contract as a viable cause of action.

*Constr. Eng'g Consultants, Inc. v. Steel Solutions, Inc.*, 2010 U.S. Dist. LEXIS, 158832 (E.D. Va. July 30, 2010) (citing *Ware*).  The Court should deny the Motion for Sanctions.

## C.    The Attorney Who Signed the Complaints, William E. Lascara, Did Not Do So for an "Improper Purpose."

Defendants say GMS should also be sanctioned, because it filed the Complaint and Amendments with an "improper purpose," namely, to harass Defendants.  Defendants cite Mr. and Mrs. Gorken's displeasure towards the Defendants (which is completely justified, given the evidence) as the basis of their improper purpose argument.[14]  Defendants' argument misses the mark.  First, anger toward an opposing party does not mean that a plaintiff has filed a complaint for an improper purpose.  Second, the test under Rule 11 is the motivation of the *signor* of the Complaints, i.e. counsel for GMS.

"In determining whether a suit was motivated by an 'improper purpose,' a district court must judge the conduct of counsel under an objective standard of reasonableness rather than assessing subjective intent." *Guidry v. Clare*, 442 F. Supp. 2d 282, 289 (E.D. Va. 2006).  "In other words, it is not enough that the injured party subjectively believes that a lawsuit was brought to harass or to focus negative publicity on the injured party; instead, such improper purposes must be ascertained from the lack of a factual or legal basis for the lawsuit." *Id.*

---

[14] It is not surprising that Mr. and Ms. Gorken are hurt and angry with Defendants for the actions they took as outlined in the Complaints.  The Gorkens learned to their dismay that people they worked with and cared for were disloyal and, in essence, stole from the company. *See Kunstler*, 914 F.2d at 519 (recognizing that "plaintiffs and defendants are not often on congenial terms at the time a suit is brought.").  Mr. and Mrs. Gorken discovered these facts demonstrating the disloyalty of a key employee, Greer, and a host of contracted sales agents, while Mr. Gorken had been diagnosed with cancer and was fighting for his life.  As one court has noted, when a plaintiff shows anger at a defendant during a deposition, "this does not establish that he pursued the…litigation in bad faith." *See Rizvi v. St. Elizabeth Hosp. Med. Ctr.*, No. 4:08CV440, 2009 U.S. Dist. LEXIS 141233, at *13-14 (N.D. Ohio Nov. 9, 2009).

The party seeking to prove a document was filed for an "improper purpose" has the burden to "demonstrate that the filer lacked a sincere intent to pursue the claim." *United States v. Henry*, Civil Action No. 2:07cv342, 2017 U.S. Dist. LEXIS 40912, at *4 (E.D. Va. Mar. 20, 2017) (quoting *In re Kunstler*, 914 F.2d 505, 518 (4th Cir. 1990)).

The only evidence upon which Defendants rely in making their "improper purpose" allegations are statements of Mr. and Mrs. Gorken in their personal deposition testimony and emails. The statements can be interpreted any number of ways. The statements also indicate – understandably -- that the Gorkens believed Defendants' actions were improper and that there would be a reckoning.

Here, the facts demonstrate that Defendants committed misconduct in setting up a competing company under a similar name, misappropriating trade secrets and unfairly competing against their employer. Defendants say GMS brought the suit simply to harass them. However, "it is not enough that the injured party subjectively believes that a lawsuit was brought to harass, or to focus negative publicity on the injured party; instead, such improper purposes must be derived from the motive of the ***signer [of the complaint]*** in pursuing the suit." *Kunstler,* 914 F.2d at 518-19 (emphasis added).

As a matter of law, Gorkens' intentions are irrelevant to the question of improper purpose under Rule 11. Mr. and Mrs. Gorken did not sign the Complaints. Defendants are attempting a legal "sleight of hand" in focusing on Mr. and Ms. Gorken's personal, subjective beliefs to argue improper purpose. The appropriate analysis is the belief *of their counsel* who signed the Complaints.

Under Rule 11, only "an attorney or unrepresented party" can certify that "a pleading, written motion, or other paper…is not being presented for any improper purpose." Fed. R. Civ. P.

11. While Mr. and Mr. Gorken verified the Complaints on behalf of GMS, the company has, at all times relevant, been represented by counsel, and counsel signed each of the Complaints. "[I]n order to determine 'improper purpose,' a district court must judge the conduct of *counsel* under an objective standard of reasonableness rather than assessing subjective intent." *Kunstler,* 914 F.2d at 518 (quoting *Stevens v. Lawyers Mut. Liab. Ins. Co. of North Carolina*, 789 F.2d 1056, 1060 (4th Cir. 1986)) (emphasis added). The relevant question, then, is whether counsel filed the Complaints for an improper purpose. *See id.* ("Improper purposes must be derived from the motive of the signer in pursuing the suit."). In order to do so, Defendants must establish that "[counsel] knew that the motion or pleading was baseless but filed it nonetheless." *Id*. Defendants have presented no evidence that GMS' counsel acted in bad faith or intended to file a complaint for an improper purpose.

The Fourth Circuit has stated that the subjective beliefs of counsel may be considered "if such beliefs are revealed through an admission that the signer knew that the motion or pleading was baseless but filed it nonetheless." *Id.* At no time during this litigation has counsel made such an admission, nor has counsel or Mr. or Ms. Gorken indicated that they did not have legal or factual grounds to bring the Complaints or that they knew their claims were "baseless." The opposite is true. Additionally, nothing indicates that they or their counsel failed to undertake an appropriate investigation before filing suit.[15]

---

[15] With respect to the second ground for Rule 11 sanctions—whether the filing was frivolous and not warranted by existing law—a court must determine whether the attorney filing the motion or pleading conducted an objectively reasonable investigation of the factual and legal basis for his claim before filing. *Sanders v. Farina*, 197 F. Supp. 3d 892, 901 (E.D. Va. 2016). A prefiling factual investigation is objectively reasonable provided it "uncovers some information to support the allegations in the complaint." *Joseph Giganti Veritas Media Grp., Inc. v. Gen-X Strategies, Inc*., 222 F.R.D. 299, 310 (E.D. Va. 2004) (quoting *Hoover Universal, Inc. v. Brockway Imco, Inc*., 809 F.2d 1039, 1044 (4th Cir. 1987)).

**D. G&S Wrongfully Seeks to Sanction GMS for Allegations Against Greg S. Spires that GMS Has Dismissed**

Defendant's request for sanctions regarding the allegations against Gregory S. Spires ("Sky Spires") fails, because Defendants did not comply with Rule 11's mandatory safe harbor provision and because Sky Spires has already been dismissed from this proceeding.

To seek sanctions under Rule 11, the moving party must comply with the Rule's mandatory "safe harbor" requirements. "The requirements of the rule are straightforward: The party seeking sanctions must serve the Rule 11 motion on the opposing party at least twenty-one days before filing the motion with the district court, and sanctions may be sought only if the challenged pleading is not withdrawn or corrected within twenty-one days after service of the motion." *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc*., 369 F.3d 385, 389 (4th Cir. 2004); *see also* Rule 11(c)(2) (A motion for sanctions "must be served under Rule 5, but *it must not be filed or be presented to the court if the challenged . . . claim . . . is withdrawn or appropriately corrected within 21 days after service . . . .*" (emphasis added)).

---

Before counsel filed the original complaint, it engaged in a substantial investigation into the claims. In fact, counsel spent a total of 81 days investigating the claims before filing, during which seven attorneys and four paralegals collective spent 462 manhours investigating facts, researching the law, and drafting the original verified Complaint. *See* Declaration of William Lascara, attached hereto as **Exhibit 5,** at ¶ 6. During the prefiling period, both counsel and GMC conducted extensive interviews with witnesses who were recruited to sell industrial goods on behalf of G&S. *Id*. at ¶ 10. GMS instructed its sales agents in the field to question customers about their interactions with G&S and to report their findings, which were then reviewed by counsel. *Id*. Counsel also hired a forensic computer expert to analyze the computer equipment used by Westly Greer. *Id*. As part of their prefiling investigation, counsel reviewed (1) G&S corporate filings, (2) G&S catalogs collected by GMS sales agents, (3) public information regarding sales made by G&S, (4) comparisons made by GMS between its products and products sold by G&S, and (5)documents on GMS servers that demonstrated a likelihood of confusion between G&S and GMS products. *Id*. at ¶ 11.

Sitting *en banc* in *Brickwood,* the Fourth Circuit held that Rule 11's safe harbor requirements "impose[] mandatory obligations upon the party seeking sanctions, so that failure to comply with the procedural requirements precludes the imposition of the requested sanctions." *Id.*

Here, Defendants devote four pages of argument to GMS' claims against Sky Spires, despite the fact that GMS dismissing Sky Spires from the lawsuit within the 21-day safe harbor period. Defendants served counsel for GMS with drafts of the Motion for Sanctions and Memorandum in Support on June 15, 2021. On July 6, 2021, the 21st day following service of the draft pleadings, counsel for GMS advised counsel for Defendants by email that GMS was withdrawing all claims against Sky Spires. *See* July 6, 2021 email, attached hereto as **Exhibit 6**. GMS provided to Defendants a draft Stipulated Dismissal of Claims and proposed Order Granting Voluntary Dismissal, requesting that Defendants review the documents and return executed copies for filing. Having heard nothing back from Defendants by the end of the day, GMS filed the Stipulated Dismissal of Claims and proposed Order at 5:00 p.m. on July 6, 2021.[16]

---

[16] In the Certification attached to the Memorandum in Support of Motion for Sanctions, Defendants state that GMS voluntarily dismissed Sky Spires on July 7, 2021 – a day after the 21-day safe harbor period. The actual date of GMS' voluntary dismissal of Sky Spires is July 6, 2021, as clearly indicated on the ECF notifications and PACER.

Moreover, formal dismissal of the claim is not necessary to invoke the protection of Rule 11's safe harbor – a party may withdraw the offending claim "informally." *See* Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendments) ("if, during [the 21 day safe harbor] period, the alleged violation is corrected, as by withdrawing (*whether formally or informally*) some allegation or contention, the motion should not be filed with the court" (emphasis added)), *see also Dee-K Enters. v. Heveafil SDN. Bhd.*, 177 F.R.D. 351, 354-55 (E.D. Va. 1998) (finding that the plaintiff "informally" withdrew its claim against a defendant when the plaintiff requested leave to file an amended complaint not naming the complaining defendant and asking the Court to dismiss that defendant without prejudice). *Accord, Fiss v. Pro Pharma Pharm. Consultants, Inc.*, No. CV 07-3251 GAF (FFMx), 2008 U.S. Dist. LEXIS 131386, at *5-6 (C.D. Cal. Jan. 14, 2008) (email acknowledgment that a plaintiff would withdraw a claim was considered informal notice)

Here, GMS withdrew the claims against Sky Spires both formally and informally on July 6, 2021. On that date, GMS notified Defendants of its intent to voluntarily dismiss its claims against Sky

Even if GMS had not timely complied with the safe harbor provision, which it did, the Court must still deny Defendants' claim for attorneys' fees as to Sky Spires, because GMS dismissed him before Defendants filed the Motion for Sanctions. As Rule 11 requires that a party be given an opportunity to withdraw a challenged claim, a party cannot request sanctions after the claims against him have already been disposed of in the case. *See generally Brickwood*, 369 F.3d at 389. This is true regardless of whether the dismissal took place within the 21-day safe harbor, so long as the dismissal occurred prior to the filing of the Motion for Sanctions.[17]  *See Harding Univ. v. Consulting Servs. Grp., L.P.*, 48 F. Supp. 2d 765, 772 (N.D. Ill. 1999).

**E.**      **Dismissal Is an Inappropriate Sanction**

If this Court should find that GMS' counsel committed a sanctionable act under Rule 11 by signing the Complaints, which it should not, the Court should not grant terminating sanctions against GMS, as Defendants have requested. According to Rule 11, "[a] sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." In this case, terminating sanctions *of the entire action* would be completely unwarranted and go far beyond the scope of any misconduct. The main thrust of Defendants' request for sanctions is driven by GMS' 30(b)(6) deposition, and, importantly, Defendants' issue with that deposition is limited to a few discrete issues. Terminating sanctions for GMS' entire case would not be proportionate to the alleged misconduct, and therefore, it would not serve to deter only repetition of that action. While GMS believes that no sanctions are warranted, if the Court should find a violation of Rule 11, GMS respectfully submits that the

---

Spires and provided Defendants with drafts of the dismissal documents. Hearing nothing back from Defendants, it filed its Stipulated Dismissal at 5:00 p.m. that day.

[17] It should also be noted that the Court dismissed the claims "without prejudice," so Defendants are not "prevailing parties" under Rule 11, which is a requirement for attorneys' fees. ECF No. 188.

sanction should be limited to an additional deposition of GMS' corporate designee at GMS' expense, with respect to trade secrets and the claims against HMC.

### IV.    <u>CONCLUSION</u>

GMS respectfully requests this Court to deny Defendants' Motion for Sanctions Pursuant to Rule 11.

Respectfully submitted,                    **GMS INDUSTRIAL SUPPLY, LLC**


**By:**_____/s/_____

William A. Lascara, Esq., VSB #23118
Thomas S. Berkley, Esq., VSB #40124
Jeffrey D. Wilson, Esq., VSB #75734
PENDER & COWARD, P.C.
222 Central Park Avenue #400
Virginia Beach, VA 23462
(757) 502-7326 Direct Dial
(757) 502-7372 Facsimile
wlascara@pendercoward.com
tberkley@pendercoward.com
jwilson@pendercoward.com

**JA493**

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2021, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, including the following:

Robert W. McFarland, Esquire
V. Kathleen Dougherty, Esquire
Micaylee A. Noreen, Esquire
McGuireWoods, LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com

J. Patrick McNichol, Esquire
McGuireWoods, LLP
800 E. Canal Street
Richmond, VA 23219
pmcnichol@mcguirewoods.com
*Counsel for Defendants and Counterclaim*
*Plaintiffs G&S Supply, LLC, et al.*

_____/s/_____
William A. Lascara, Esq., VSB #23118
Thomas S. Berkley, Esq., VSB #40124
Jeffrey D. Wilson, Esq., VSB #75734
PENDER & COWARD, P.C.
222 Central Park Avenue #400
Virginia Beach, VA 23462
(757) 502-7326 Direct Dial
(757) 502-7372 Facsimile
wlascara@pendercoward.com
tberkley@pendercoward.com
jwilson@pendercoward.com
*Counsel for Plaintiff,*
*GMS Industrial Supply, Inc.*

## JA494

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

GMS INDUSTRIAL SUPPLY, INC.,        )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )        Case No. 2:19-cv-324-RCY-LRL
                                    )
G&S SUPPLY, LLC, et al.,            )
                                    )
        Defendants.                 )

REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SANCTIONS PURSUANT TO RULE 11

NOW COME Defendants and submit their Reply in Support of Defendants' Motion for

Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure, stating as follows:

## I.    INTRODUCTION

Over two years ago, Plaintiff GMS Industrial Supply, Inc. ("GMS" or "Plaintiff")

brought suit against Defendants for a litany of claimed wrongs. *See* ECF No. 1. The 13-count,

78-page, 215-paragraph Verified Complaint asserted very pointed allegations against Defendants

and was verified under penalty of perjury, respectively, by both GMS's President and its head of

compliance, Rachel and Gary Gorken. *See* ECF No. 1. Since that time, GMS's claims and

allegations against Defendants have only expanded.[1]

---

[1] Although this Court has dismissed certain of GMS's claims, GMS has reasserted these claims
in every subsequent iteration of its Verified Complaint and other than, finally, dismissing
Defendant Gregory Sky Spires, appears intent to still pursue them. For example, in January 2020
Judge Smith found GMS failed to state a claim of tortious interference in its Original Verified
Complaint. ECF No. 102. GMS did not attempt to amend its Verified Complaint and remedy the
deficiencies noted by the Court. Despite this, GMS's tortious interference claim has been re-pled
in GMS's First, Second, and Third Verified Complaints, as if it had not been dismissed. *See*
ECF Nos. 108 at 68, 151 at 70, 156 at 71. By signing each of the Verified Complaints GMS's
counsel verifies that GMS's tortious interference claim is supported by existing law and facts,
notwithstanding that the Court has already determined otherwise. To be sure, repeatedly
repleading a claim previously dismissed by the Court exactly as before violates Rule 11 by

In its Response to Defendants' Motion for Sanctions Pursuant to Rule 11 ("Response") GMS fails to oppose a number of Defendants' grounds for sanctions.  GMS is completely silent regarding:  (i) the striking similarity between this matter and Plaintiff's wholly inconsistent positions taken during its 2007 lawsuit against Drummond American Corporation; (ii) GMS's complete lack of evidence to support the allegations against Sky Spires; and (iii) Gary and Rachel Gorken's intent in and responsibility for bringing and maintaining this litigation. Plaintiff has, therefore, conceded each of these arguments.

Despite GMS's attempts to reframe Defendants' Rule 11 Motion as a mere discovery dispute over GMS's Rule 30(b)(6) deposition, it most certainly is not.  Since the preliminary injunction hearing in July 2019, Defendants have continuously demanded Plaintiff produce the factual basis and evidentiary support for its very serious claims.  Only after tens of thousands of pages of exchanged discovery and documents, dozens of third-party subpoenas, and numerous depositions – none of which yielded *any* support for the Verified Complaints' allegations of wrongdoing against Defendants – did Defendants get the opportunity to depose GMS.  The deposition of GMS's corporate representative confirmed what Defendants have known since this case began – that GMS's multiple Verified Complaints were filed without underlying factual support and are largely fictitious.

Discovery is long closed and there remains no evidentiary support for a majority of GMS's repeated allegations.  This is not simply a matter for resolution by a motion to dismiss or a motion for summary judgment – neither of which can fully redress GMS's misconduct.[2]  GMS

---

having "absolutely no chance of success."  *See Brubaker v. City of Richmond*,  943 F.2d 1363, 1373 (4th Cir. 1991).

[2] GMS asserts that Defendants' claims are inappropriate under Rule 11 and should have been brought through other pleadings (such as a motion to dismiss or motion for summary judgment). *See, e.g.*, ECF No. 205 at 2, 5, 15.  The relief afforded by other motions, however, is insufficient to remedy Plaintiff's misconduct.  Plaintiff argues, essentially, that Defendants have not properly

**JA496**

and its counsel have an independent duty to only raise good faith arguments and to only assert factually-supported allegations under Rule 11.[3]  Plaintiff's claims are unsupported, frivolous, and should never have been filed.  The Court should decline GMS's invitation to reframe their misconduct as a mere discovery dispute, and grant Defendants' Motion in full.

## II.    ARGUMENT

### A.  Plaintiff's Verified Complaints are Not Well-Grounded in Fact.

Plaintiff was required to conduct a ***reasonable pre-filing*** investigation.  *Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991).  A pre-filing investigation only satisfies the reasonableness requirement if it uncovers information to support the allegations in the complaint. *Id.*  A pre-filing investigation is insufficient where "there is no factual basis for plaintiff's allegations."  *Id.*  The inference drawn from this standard is that the resulting complaint may only contain factual allegations that are supported by evidence obtained during the pre-filing investigation.  Plaintiff makes much of the number of hours and number of individuals involved in its pre-filing investigation, but the length of time spent conducting the investigation is irrelevant if, as is the case here, plaintiff alleges facts that are not supported by investigatory findings.  *See* ECF No. 205 at 9.  Notably, but fatally, Plaintiff fails to identify how the results of

---

policed its misdeeds using dispositive motions, as if that is an appropriate excuse for its underlying failures.  It is not.  Plaintiff and its counsel are independently obligated to comply with Rule 11, and they did not.  "As the violation of Rule 11 is complete when the paper is filed," what the opposing party does thereafter is of no moment.  *In re Kunstler*, 914 F.2d 505, 513 (4th Cir. 1990).

[3] GMS similarly contends that Defendants are wielding the Rule 11 Motion to avoid evidence of Westly Greer's alleged spoliation.  ECF No. 205 at 2.  This is simply untrue; as Plaintiff did nothing about Greer's alleged spoliation for two years, it is apparent that this contention is an attempt to distract from Plaintiff's Rule 11 violations.  The parties have known of the facts giving rise to Plaintiff's now-pending spoliation motion since before this litigation began. *Compare* ECF No. 1 at 26 *with* ECF Nos. 195-196.  The first time GMS acted on the issue was ***after*** the 21-day safe harbor period on Defendants' Rule 11 Motion had already run.  Defendants' Rule 11 Motion has nothing to do with Greer's alleged spoliation.  ECF No. 206 at 2, 9, 12, 25-26.

## JA497

its investigation yielded evidentiary support for the factual allegations in the Verified Complaints.

Tellingly, Plaintiff largely still fails to state what evidence it possessed pre-filing, beyond the BDO Report. Instead of providing the Court with evidence supporting its allegations, Plaintiff sweepingly contends that all the evidence revealed by its pre-filing investigation was laid bare during the preliminary injunction proceedings that occurred in July 2019 before Judge Smith. ECF No. 205 at 9-10, 15 n.11. Plaintiff relies almost entirely on the preliminary injunction proceedings, as well as certain of Judge Smith's statements and findings, to support the sufficiency of its pre-filing investigation. *Id.* As discussed in greater detail, *infra*, this circular reasoning does not support Plaintiff's argument, and Plaintiff mischaracterizes both the evidence offered during the preliminary injunction hearing, as well as the conclusions reached by Judge Smith. Judge Smith considered the Verified Complaint as evidence in issuing her ruling. *See* ECF No. 53 at 20:18-21:3; ECF No. 70 at 4. Moreover, Judge Smith accepted at face value Plaintiff's description of its purported "trade secret" documents, without having those trade secrets documents before her. *See* ECF No. 52-2 (listing exhibits presented to the Court at the hearing), ECF No. 53 at 61:10-24 (accepting Gary Gorken's description of alleged proprietary training documents not before the Court), 68:22-69:11 (instructing Plaintiff's counsel to have GMS's witnesses describe the alleged proprietary PowerPoint GMS declined to admit into evidence), 160:20-161:2 (accepting Gary Gorken's testimony that pricing methods may be a trade secret).

Plaintiff also contends that GMS's inability to provide the factual basis supporting the Original Verified Complaint and its three amendments is somehow excused by Gary Gorken's medical condition. ECF No. 205 at 6-7. As outlined below, Plaintiff has not been candid with the Court regarding Gary Gorken's memory, and ignores the fact that Gary Gorken signed, under

**JA498**

penalty of perjury, each iteration of GMS's Verified Complaint. Further, GMS, not Defendants, designated Mr. Gorken as its primary 30(b)(6) witness, including for the topics that are the basis for Defendants' Motion.

### 1. __The Preliminary Injunction Proceedings and Judge Smith's Findings.__

In late July 2019, Judge Smith held a three-day evidentiary hearing on GMS's Motion for Temporary Restraining Order and Preliminary Injunction. ECF Nos. 2, 53-55. For purposes of the hearing, Judge Smith accepted the Verified Complaint as evidence when Gary Gorken re-affirmed his verification during his testimony. ECF No. 53 at 20:18-21:3. The Court also received a plethora of other documents, including documents attached as exhibits to the Verified Complaint and documents provided by counsel. *See* ECF No. 1; ECF No. 52-2. Notably, the Court was never provided with GMS's allegedly misappropriated trade secrets.

In fact, GMS declined to provide the Court with any of its proprietary or confidential documents. *See* ECF No. 53 at 48:1-52:14 (discussing GMS's intent to "question [Gary Gorken] about what types of things are discussed as opposed to the proprietary data contained in the document" or admitting documents into evidence), 68:1-11 (GMS's counsel declining to provide GMS's sales agent training PowerPoint to the Court or admit it into evidence); 68:12-21 (stating GMS will only "describe generally, not specifically" GMS's alleged proprietary information); *see also* ECF No. 70 at 2 n.2. Rather than requiring GMS to provide its alleged trade secrets documents, for the purpose of the immediate hearing, Judge Smith accepted Mr. Gorken's testimony describing what documents GMS contended were its trade secrets. *See, e.g.*, ECF No. 53 at 69:12-16 (instructing GMS's counsel that "[y]ou can have him testify about [GMS's proprietary information] and then we will see how we go from there"), 154:11-14 (Gary Gorken testifying that no confidential documents had been submitted to the Court), 160:1-161:2 (noting GMS's private documents are not before the Court and accepting Gary Gorken's testimony that

# JA499

GMS pricing methods may be a trade secret). We now know why GMS did not proffer the supposed trade secrets documents to the Court, even under seal: because none of them legally constitute trade secrets.

GMS fares no better on the element of misappropriation of the (non) trade secrets. Gary Gorken admitted that GMS granted Defendants initial access to those documents. ECF No. 53 at 72:13-20. GMS never provided any evidence, at the hearing or to date, that Defendants wrongfully obtained GMS's alleged trade secrets or used those documents for G&S Supply's business. *See generally* ECF Nos. 53-55. The only testimony supporting any alleged improper use of GMS's trade secrets was G&S Supply's relatively quick success. ECF No. 53 at 60:21-25 (Gary Gorken speculating that Defendants "were able to take the training they received from [GMS]" and that was the only way G&S Supply could have become successful so quickly). GMS also produced no evidence showing any wrongdoing by Gregory Sky Spires, as was noted by the Court. *See* ECF No. 70 at 6 & n.5.

After GMS presented all its evidence, Judge Smith correctly observed that Defendants could "go out and create [their] own company . . . us[ing their] knowledge that [they]'ve acquired, and [they] can use [their] contacts that [they]'ve acquired" so long as they did not use GMS's allegedly secret documents. ECF No. 54 at 344:6-10. The Court opined that it did not believe GMS could prevail on its employee and customer solicitation claims. *Id.* at 344:11-12. The Court's main concern following presentation of the evidence was customer confusion, because "GMS" and "G&S" sound similar. *Id.* at 344:18-21. In keeping with the Court's concern, Defendants changed G&S Supply's name to avoid any potential for future confusion. *Id.* at 345:14-25. Defendants also offered to return or destroy any GMS documents that may remain in their possession, to avoid even the suggestion of future trade secrets use. *Id.* at 346:19-347:6. The Court declined to decide whether potential trade secrets were involved, but rather

relied on Gary Gorken's testimony that those documents were developed over the course of years. *Id.* at 350:23-351:3. Judge Smith noted she was not concerned about several alleged trade secrets documents, such as GMS's load sheet protocol, its customer contact lists, and GMS's customer preference data, acknowledging she was "not exactly sure what that document is." *Id.* at 351:4-20.

On August 30, 2019, Judge Smith entered an Order granting in part and denying in part GMS's injunctive relief. ECF No. 70. The Court rejected GMS's request to enjoin defendants from soliciting GMS customers, employees, or agents.[4] *Id.* at 8. The Court noted that it received evidence that GMS maintained numerous documents in a password protected environment and that Defendants had access to those documents. *Id.* at 9-10. Notably, the Court did not discuss any evidence or make any conclusions about Defendants' use or misuse of any purported GMS trade secrets. Instead Judge Smith noted that Defendants are "entitled to use the experience and 'know-how' they have gained through their work as salespersons and employees at GMS Industrial." *Id.*; *see also* ECF No. 70 at 10 n.7 (stating the Court "did not receive sufficient evidence to determine that GMS Industrial possesses any trade secrets" except potentially those in GMS's customer service and data management portal). Further, the Court found no evidence to support injunctive relief for GMS's tortious interference claim. ECF No. 70 at 12. Ultimately, the Court ordered GMS to submit a list of its alleged trade secrets to allow Defendants to identify them.[5] *Id.* at 15. Without holding that all or anything on the list was a trade secret, the Court further instructed Defendants to return to GMS all documents on the list

---

[4] Judge Smith's Order only addressed five (5) of the thirteen (13) claims asserted in GMS's Verified Complaint and indicated that GMS may succeed on three (3) of those claims. *See generally* ECF No. 70; *see also* ECF No. 70 at 10 n.7 (acknowledging the Court received only minimal evidence to support GMS's trade secrets and confidentiality claims).

[5] GMS submitted its list of alleged trade secrets as ECF No. 76.

they still possessed, change G&S Supply's name, and submit an affidavit to the Court confirming those tasks had been completed. *Id.* at 14-15. Defendants fully complied.

GMS attempts to use Judge Smith's preliminary findings to bootstrap its insufficient pre-filing investigation. This aspect of the Rule 11 Motion, however, is governed by what GMS possessed factually when it filed its Verified Complaint. For GMS to assert that Judge Smith's ruling supports the sufficiency of GMS's pre-filing investigation puts the cart before the horse. GMS conveniently fails to mention in its Response that Judge Smith considered the Verified Complaint as evidence and relied upon the testimony of Gary Gorken – absent any additional documentary support – in reaching certain of her decisions. Even then, her opinion indicated Judge Smith was left with much doubt as to the viability of GMS's claims.

### 2. Gary Gorken's 30(b)(6) Deposition.

For the first time in this litigation, GMS now asserts that Gary Gorken's inability to appropriately respond to questions from defense counsel on pre-identified topics are the result of "chemo brain." *See* ECF No. 205 at 7 & n.4. This new excuse is neither legally, nor factually, supported. Factually, Plaintiff's contention is belied by Mr. Gorken's own testimony. On May 6, 2021, Gary Gorken, sitting as GMS's Rule 30(b)(6) designated representative, testified he had no problems with his memory. *See* ECF No. 194-5 at 119:3-9 (responding he was not "aware of any memory loss" that would affect his ability to competently testify), 242:23-243:16 (affirming his earlier response that he was not aware he had any memory problems). Only *later* at his individual deposition on May 13, 2021, did Mr. Gorken aver that his doctor had informed him that a potential side-effect of chemotherapy included short- and long-term memory loss. ECF No. 194-12 at 6:17-20; ECF No. 205-1 at 6:17-20. When asked, however, if *he* had experienced this particular side-effect, Mr. Gorken specifically stated that he had not. *See* ECF No. 194-12 at 6:21-25; *accord* ECF No. 205-1 at 6:21-25. Legally, as GMS chose Mr. Gorken as its

**JA502**

representative, it cannot now use his alleged memory loss as an excuse for GMS's inability to provide factual evidence.

"The purpose of [a Rule 30(b)(6) deposition is simple: the plaintiff must inform defendant of facts upon which it relies in bringing suit" and ***plaintiff*** must provide a witness knowledgeable enough to testify about those facts. *Founding Church of Scientology, Inc. v. FBI*, No. 78-0107, 1979 U.S. Dist. LEXIS 12757, at *4-5 (D.D.C. Apr. 26, 1979) (emphasis added). The chosen designee, here Gary Gorken, "speak[s] for the corporation" and the "corporation appears vicariously through its designee." *Humanscale Corp. v. CompX Int'l, Inc.*, No. 3:09-CV-86, 2009 U.S. Dist. LEXIS 120197, at *4 (E.D. Va. Dec. 24, 2009).

The wholly inadequate deposition of GMS's corporate representative is not a situation in which, because Plaintiff failed to provide a competent, adequately prepared witness to testify on its behalf, a second 30(b)(6) deposition is appropriate. Mr. Gorken testified about the lengths he went to to prepare for the GMS 30(b)(6) deposition on all topics for which he was responsible. *See* ECF No. 194-5 at 112:15-119:2, 162:20-23, 239:6-242:19. The only rational conclusion that can be drawn is that GMS, through Gary Gorken, was unable to adequately answer Defendants' questions about the evidence supporting the Verified Complaints ***because there is no factual support***. A second deposition is not going to change that. The importance of Gary Gorken's testimony[6] on GMS's behalf is elevated in that he signed each iteration of GMS's Verified Complaint, certifying under penalty of perjury that he had knowledge of evidence supporting the

---

[6] GMS alleges Defendants attempted a "gotcha" moment by declining to ask in Mr. Gorken's individual deposition questions already posed to him in GMS's 30(b)(6) deposition. ECF No. 205 at 8. This argument fundamentally misapprehends the purpose of a 30(b)(6) deposition versus a fact witness deposition. Moreover, there is no reason Mr. Gorken's individual testimony would have been any different on May 13, 2021, than one week earlier, when he was armed with all the collective knowledge of GMS.

9

facts stated therein.[7]  *See also* ECF No. 194 at 3 n.2 (outlining the practical significance of verification).  **Plaintiff** chose Gary Gorken to represent GMS as a person competent, knowledgeable, and adequately prepared to testify about the noticed topics.  Mr. Gorken's inability to answer basic questions on pre-identified topics is not because of "chemo brain," but because GMS's Verified Complaints were built without any factual foundation.  That neither Gary Gorken nor Rachel Gorken could identify the factual basis for GMS's verified allegations confirms the baselessness of GMS's claims.  Just as in *Aggarwal v. Sikka*, GMS's deposition only confirmed what was shown in discovery, that there was no factual basis for the Verified Complaints' assertions.  No. 1:12cv60, 2013 U.S. Dist. LEXIS 160422, at *22 (E.D. Va. Nov. 7, 2013).  GMS is bound by its deposition testimony.[8]

Plaintiff attempts to recast Defendants' questioning of GMS's 30(b)(6) witness as a "gotcha" moment.  Nothing could be farther from the truth.  GMS had an obligation to provide a competent witness knowledgeable on the topics provided to it well in advance of that deposition.  *Humanscale Corp.*, 2009 U.S. Dist. LEXIS 120197, at *4-5 (quoting *United States v. Taylor*, 166 F.R.D. 356 (M.D.N.C. 1996)).  Plaintiff chose Gary Gorken.

---

[7] GMS's President, Rachel Gorken, similarly testified she had no evidence to support the allegations in the Verified Complaints,  despite the fact that she also verified those pleadings. *See* ECF No. 194 at 27; ECF No. 194-7 at 80:4-82:2.  GMS, however, provides no excuse for why GMS's President could provide no facts to support this lawsuit.  *See generally* ECF No. 205.

[8] GMS also makes much of the fact that counsel offered Defendants an opportunity to reconvene GMS's 30(b)(6) deposition with another designee, at GMS's expense.  Defendants do not specifically recall any such offer – and it was not confirmed writing – but do not refute that GMS extended such an offer of a second deposition in passing.  However, any offer made was part of a larger conversation about the litigation generally, and **did not** confirm that GMS would bear the costs of a second 30(b)(6) deposition, including G&S Supply's attorneys' fees.  A second 30(b)(6) deposition would not remedy the harm inflicted by GMS's multiple unsupported Verified Complaints – and GMS was obligated in the first instance to produce a competent witness to testify on its behalf.

**JA504**

GMS now asserts that Gary Gorken's inability to accurately, appropriately, and fully respond to questions from defense counsel are the result of "chemo brain." *See* ECF No. 205 at 7. GMS is simply not being candid with the Court. Mr. Gorken testified in GMS's Rule 30(b)(6) deposition that he had no problems with his memory. *See* ECF No. 194-5 at 119:3-9 Further, at his personal deposition, Mr. Gorken stated that although memory loss was a potential side effect of chemotherapy, he has not suffered any memory loss due to his chemotherapy treatment. *See* ECF No. 194-12 at 6:17-25; *accord* ECF No. 205-1 at 6:17-25. And, Mr. Gorken was GMS's primary witness at the preliminary injunction hearing two (2) years ago. That GMS now proffers "chemo brain" as a justifiable rationale for why it is unable to produce the factual support for its claims only confirms that its suit has always been "the tail wagging the dog." GMS initially lacked, and has not provided for two (2) years, evidentiary support for its specious claims.

### 3. Plaintiff Identifies No Evidence Supporting its Trade Secrets Claims, Claims against HMC Supply, or Allegations against Sky Spires.

Because practical limitations prevent Defendants from detailing all the factual deficiencies in the almost eighty (80) pages of allegations that comprise Plaintiff's Verified Complaint, Defendants have focused on three key claims. The Response offers nothing factually to counteract that its trade secrets claims, claims against HMC Supply, and allegations against Sky Spires were unsupported by a reasonable pre-filing investigation, or even post-filing evidence.

### a) No Evidence Supports Plaintiff's Trade Secrets Claim

GMS has wholly failed to address several of Defendants' positions on the documents Plaintiff identified as trade secrets.[9]  For example, GMS ignores that its "trade secrets" include: (1) emails dated after Defendants were terminated in April 2019 and after this lawsuit began, and (2) documents such as a military rank abbreviation chart, which is public knowledge, photographs of GMS products, and Defendants' own customer lists – none of which qualify as trade secrets.  Further, many of the documents that GMS described to Judge Smith as trade secrets are noticeably absent from the materials identified as trade secrets in written discovery.  Indeed, GMS *never* produced to Defendants any document they can identify as GMS's load sheet protocol, the GMS sales agent training PowerPoint, or GMS's product source list.  Further, there is no evidence Defendants ever actually accessed or used these documents.

In order for GMS to prevail on its trade secrets claims, GMS must prove both "(1) the existence of a trade secret and (2) its misappropriation by a defendant."  *Vill. Builders on the Bay, Inc. v. Cowling*, F. Supp. 3d 624, 629 (E.D. Va. 2018).  Indeed, a document may only legally be afforded trade secret protection if it meets three specific criteria: (1) independent economic value; (2) not known or readily ascertainable by proper means; and (3) subject to reasonable efforts to maintain secrecy."  *Marsteller v. ECS Fed. Inc.*, No. 1:13cv593, 2013 U.S. Dist. LEXIS 126927, at *11 (E.D. Va. Sept. 5, 2013) (citing *Trident Prods. and Servs., LLC v. Canadian Soiless Wholesale LTD*, 859 F. Supp. 2d 771, 778 (E.D. Va. 2012)).  "The hallmark of

---

[9] Plaintiff agrees with Defendants that it previously identified its trade secrets by Bates Number during the exchange of written discovery.  ECF No. 205 at 10 (referencing its response to Defendants' Interrogatory No. 22).  Although Defendants have provided a representative sampling of GMS's alleged trade secrets, Defendants are willing to provide the Court all documents GMS has identified in response to Request for Production No. 19, which are identical to those identified in answer to Interrogatory No. 22.  The actual number of GMS "trade secrets" is approximately 100 documents, and 367 pages of which, Bates No. GMS 009225-9591, are merely lists compiled by GMS's forensic computer expert which are not trade secrets.

## JA506

a trade secret is not its novelty but its secrecy." *Avtec Sys v. Peiffer*, 21 F.3d 568, 575 (4th Cir. 1994) (vacating the judgment in plaintiff's favor on its trade secrets claim because there is no expectation of secrecy where documents were subject to publication at the will of a third party). GMS's alleged trade secrets are not economically valuable, the information contained therein is public knowledge, and GMS has now conceded those documents ***are not*** proprietary or confidential by failing to maintain their secrecy.

When Defendants filed their Rule 11 Motion they also filed a motion to seal GMS's alleged trade secrets included in Exhibit 10. *See* ECF Nos. 190, 194-10. In its response to Defendants Motion to Seal and supporting memorandum, GMS made no attempt to keep these documents sealed. ECF No. 202 at 8 ("certain of the documents [in ECF No. 194, Exhibit 10] are not confidential, nor are they Bates stamped as Confidential (GMS 000096-100, 000135, 000155-160, 000759, 000970-973, 000995) so they should not have been included in the Motion to Seal. . . . GMS will withdraw its Confidential designation for documents bearing Bates Nos. GMS 002016-19, GMS 002327 and GMS 002338."). Of the documents GMS had purported were its trade secrets, GMS requested that ***only*** Bates No. GMS 002339, GMS's New Account Manager Training Guide, remain sealed. *Id.*

In addition to the fact that GMS's documents do not meet the legal definition of trade secrets, there is also no evidence that the Defendants misappropriated any of them. There are two types of misappropriation: (1) misappropriation through improper acquisition and (2) misappropriation through improper disclosure or use. *Marstell*, 2013 U.S. Dist. LEXIS 126927, at *14. It is undisputed that GMS granted the individual Defendants access to GMS's Google Drive, such that they were authorized to view and acquire GMS's purported trade secrets. *See* ECF No. 53 at 72:13-20. To be sure, Defendants were not authorized to use GMS documents to further G&S Supply's business, however there is absolutely no evidence they ever did. The only

# JA507

evidence GMS offers is wholly theoretical, namely G&S Supply's rapid success.  *Id.* at 60:21-25.

There simply has never been evidence that Defendants used ***any*** GMS documents to further G&S

Supply,[10] nor does GMS even attempt to argue such evidence exists.  *See* ECF No. 205 at 12.  By

sidestepping this issue in its Response, Plaintiff tacitly concedes it cannot establish

misappropriation.[11]

### b)  No Evidence Supports Plaintiff's Allegations Against HMC Supply

GMS identifies narrow and specific information it had about HMC Supply when it

moved to amend the First Amended Complaint and add HMC as a defendant:

- It was incorporated in 2015 and registered at Greg Spires' address;
- It created a catalog of products that appeared competitive with GMS products;

---

[10] There is evidence, however, that G&S Supply's former owners, Westly Greer, Thomas Hayes, and Greg Spires each had extensive experience in industrial sales when they began running G&S Supply in mid-2017.  Westly Greer Dep., ECF No. 206-1 at 72:9-16 (when Greer was hired by GMS in 2011 he had prior experience in military sales), 72:17-24 (Greer was promoted to District Manager in 2012 and oversaw sales agents), 76:24-77:3 (Greer was promoted to Director of Sales in 2015), 71:6-14 (Greer trained GMS how the military ordering processes worked); Thomas Hayes Dep. (**Exhibit 1**) at 17:8-14 (Hayes had experience purchasing products when he was a member of the military), 99:22-100:24 (explaining that the military trained Hayes to use the GCSS ordering system and discussing his experience with that system), 112:18-22 (Hayes joined GMS after retiring from the military and many of Hayes' customers for GMS were his former military colleagues); Gregory K. Spires Dep., ECF No. 206-2 at 12:2-14 (noting Spires duties in his former employment with the National Guard and with the Army was in the area of military supply), 20:15-22 (noting Spires had twenty (20) years of experience in the military supply industry prior to joining GMS).  Furthermore, these defendants were all GMS's top sales agents, and their exceptional sales numbers continued for GMS at the same time they were establishing G&S Supply.  GMS Dep. (Renee Robichaux), ECF No. 194-5 at 23:22-25:7 (noting Greer, Hayes, and Spires all earned a 2018 trip to Mexico for being GMS's top sales agents).  It was not unsupported assumptions of misappropriation, but rather Defendants' experience, know-how, and exceptional sales skill, that caused G&S Supply's business to succeed.

[11] GMS also complains that Defendants have failed to address the merits of many of GMS's other claims.  However, GMS's trade secrets claim forms the foundation for almost all of GMS's other claims.  Without prevailing on its trade secrets claims (Counts IV and V) GMS has no viable claims for breach of the duty of loyalty (Count I), breach of the confidentiality provisions (Counts II and III), fraud in the inducement of continued performance (Count VI), business conspiracy (Count X), or common law conspiracy (Count XI).  Indeed, that G&S Supply purportedly unfairly competed with GMS by using GMS's trade secrets is a fundamental predicate to each of these claims.

- And it had set up a cage code for sales to the federal government.[12]

But these points are a far cry from what GMS actually asserted about HMC in its Second Amended Complaint. For example:

- HMC "sold industrial supply products and equipment to the U.S.. [sic] Military, *by soliciting and diverting existing GMS sales agents and customers to HMC*." ECF No. 151 at 2 (emphasis added).
- "On behalf of HMC, [Greer] and Spires *began using GMS' proprietary information and trade secrets to build a catalog and sales kits for HMC, contact and build relationships with GMS' suppliers, and sell competing goods to GMS' customers*." *Id.* at 28.

By failing to provide *any* evidence in its Response to support its unsubstantiated allegations that HMC Supply (1) built relationships with GMS's suppliers, (2) improperly used GMS's trade secrets or (3) sold goods to GMS's customers, GMS concedes it never had any facts to support those allegations. *See also* GMS Dep. (Gorken), ECF No. 194-5 at 157:17-21 (unable to provide facts to support that HMC was directly competing with GMS). Indeed, it is these factual allegations that give rise to GMS's claims against HMC. GMS had – but did not avail itself of – the opportunity to learn exactly what HMC was created to do, or indeed, what it actually did. GMS Dep. (Gorken), *Id.* at 260:21-262:23 (stating Gorken finally called his brother, an owner of HMC, in April 2021, and was told HMC was created to sell products to bus barns). Indeed, the actual evidence in this case demonstrates that HMC was not created to compete with GMS, and that it only made two sales, neither of which were competitive to GMS. Spires Dep., ECF No. 206-2 at 25:7-11, 35:21-23. Lastly, there has been no evidence whatsoever, or even argument, suggesting that HMC and GMS products were obtained from the same supplier. By signing

---

[12] GMS also baldly asserts it knew HMC "offered G&S [Supply] its operating knowledge" and that it "had identified sources to provide goods to customers," ECF No. 205 at 13, but provides no evidence to support these alleged facts.

**JA509**

three (3) complaints asserting these unsupported facts, Gary Gorken, Rachel Gorken, and GMS's counsel violated Rule 11.[13]

### c) Plaintiff Concedes There Exists No Evidence Against Sky Spires

GMS does not even attempt to refute that it lacked any factual support for the serious but specious allegations of wrongdoing it leveled repeatedly against Sky Spires. ECF No. 205 at 24-26. Judge Smith recognized early on that GMS failed to present any evidence against Sky Spires at the preliminary injunction hearing. ECF No. 70 at 5 n.6. Nor has any evidence materialized since then. Indeed, on the heels of the 21-day safe harbor deadline for Defendants' Motion, GMS sought to dismiss Sky Spires from this case, after pursuing him for well over two years and requiring him to incur substantial expenses to defend against GMS's baseless claims.[14] *See* ECF No. 188.

GMS unpersuasively contends that Defendants are barred from arguing GMS violated Rule 11 with regard to Sky Spires because it voluntarily dismissed him. ECF No. 205 at 24. It is true that Rule 11(c)(2) states a sanctions motion should not be filed ***if*** the opposing party

---

[13] Once again, GMS is not forthcoming with the Court in its attempted defense of suing HMC. From GMS's submissions, one would think HMC was a multi-million dollar entity, with sales similar to GMS. In fact, it sold two products in its existence, with gross revenues of less than $500. And GMS never advises the Court that Greg Gorken, Gary Gorken's brother, was a founder and owner of HMC and a former GMS employee.

[14] GMS argues that because Sky Spires was finally dismissed ***without prejudice*** he is barred from recovering any costs and fees in this case. ECF No. 205 at 26 n.17. That GMS would make this argument is disturbing. Defendants and Plaintiff agreed Sky would be dismissed ***with prejudice***, but in making modifications to GMS's proposed order, Defendants' counsel missed one "without" that he intended to delete. Indeed, upon the proposed order's filing, Defendants' counsel contacted Plaintiff about the error, and Plaintiff's counsel agreed to revise and resubmit its proposed order to dismiss Sky Spires ***with*** prejudice. *See* July 6, 2021 Correspondence between counsel (**Exhibit 2**). Despite its promise, GMS did not file a new proposed order and now relies on the fact that the Court dismissed Sky Spires ***without*** prejudice. But GMS's sanctionable conduct against Sky is not cured by dismissing him now, with or without prejudice. Sky Spires should never have been sued, and for over two years has had to defend GMS's baseless claims against him. This Court should award Sky Spires his attorneys' fees and costs.

"appropriately correct[s]" the alleged wrong raised in the motion within the 21-day safe harbor period. However, GMS only addressed one small piece of Defendants' Motion, and the problems with Sky Spires. GMS did not "appropriately correct[]" its wrongs by finally dismissing Sky Spires because it had continued to prosecute him even after the preliminary injunction hearing and has not reimbursed his attorneys' fees, as requested by Defendants when they served GMS with their draft Motion. This Court is entitled to know the wholescale absence of facts supporting the allegations against Sky Spires in keeping with Defendants' other Rule 11 grounds. This Court should consider the "synergistic effect of all the factors [i.e. circumstantial evidence] in combination with the number of frivolous claims alleged and maintained" in determining Plaintiff's improper purpose. *Blue v. United States Dept. of Army*, 914 F.2d 525, 540 (4th Cir. 1990).

## B. Plaintiff's Claims are Not Warranted by Existing Law.

### 1. Misappropriation Under Virginia Law is Not a Viable Claim

GMS argues sanctions are not appropriate against it for asserting the wrong state's law because "courts within the circuit have not ruled" on whether Virginia's *lex loci* doctrine applies to trade secrets claims. *Id.* at 16. But courts within this circuit, including this one, **have** addressed this very issue and found the *lex loci* doctrine applies to state trade secrets claims. *See, e.g., X-IT Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 640 (E.D. Va. 2001) (concluding Illinois and North Carolina law, not Virginia law, applies because alleged misappropriation occurred in those states).

GMS also argues that because certain Defendants' agreements with GMS have a Virginia choice of law provision, Virginia law should apply to GMS's trade secrets claim that "has a close relationship" to Defendants' contracts. Notably, though, Greer's Employment Contract did not contain a choice of law provision. *See* ECF No. 3-1 Moreover, the cases GMS cites in support

## JA511

of this assertion largely concern the tort of fraudulent inducement, and none address the application of this doctrine to the tort of trade secret misappropriation. *See* ECF No. 205 at 17-19.

Lastly, Defendants assert that, assuming the *lex loci* doctrine applies, the Court should simply read-in the applicable state law claim or, at this juncture, allow GMS to file yet another amendment to its Verified Complaint. ECF No. 205 at 18. GMS's proffered solution misses the mark. It is not the time for GMS or the Court to try and remedy GMS's unfounded Virginia trade secrets claim. GMS's proposal does nothing to cure its factual and legal deficiencies. Indeed, it is GMS's obligation in filing each of its Verified Complaints to engage in the appropriate level of due diligence and ensure each claim it files is well grounded in fact and law. As to the Virginia trade secrets claim, GMS failed on both counts. And GMS reaffirmed its lack of diligence by filing three (3) Amended Verified Complaints, still pursuing the Virginia trade secrets claim.

## 2. Fraud in the Inducement of Continued Performance is Not a Viable Claim

GMS asserts incorrectly that Defendants missed key case law indicating a common law claim for fraud in the inducement of continued performance is a recognized claim in Virginia. ECF No. 205 at 20. Beginning with *Ware v. Scott*,[15] 220 Va. 317 (1979), there are a few discrete cases in which Virginia courts have found a misrepresentation made ***after*** a contract was entered into but ***before*** performance occurred was actionable as fraud in the inducement. The cases

---

[15] GMS cites to several other cases which do not appropriately support its contentions. GMS relies on *CGI Fed., Inc. v. FCi Fed., Inc.*, 94 Va. Cir. 138 (Fairfax Cty. 2016). ECF No. 205 at 20. Therein, the court found the alleged fraud induced FCi ***to enter into*** a new contract by amendment and noted the fraud occurred before the defrauded party had begun performance. *Id.* at 152. GMS also relies on *Sharma v. USA Int'l LLC*, No. 1:13-cv-1573, 2015 U.S. Dist. LEXIS 86789 (E.D. Va. July 2, 2015). ECF No. 205 at 18. This decision, however, was vacated by the Fourth Circuit. *See Sharma v. USA Int'l, LLC*, 851 F.3d 308 (4th Cir. 2017).

**JA512**

endorsing this claim, however, largely – if not exclusively – concern real estate purchase contracts. *See Ware*, 220 Va. 317, 319-20 (finding concealment of a flood that had occurred, after purchasers had specifically asked about flooding and agreed to purchase the property upon seller's representations, fraudulently induced purchasers to proceed to closing). The only case GMS cites with any relevance here is *Modern Oil Corp. v. Cannaday*. ECF No. 205 at 20.

In *Modern Oil Corp.*, the Supreme Court of Virginia addressed the application of this claim to employment contracts. No. 141839, 2015 Va. Unpub. LEXIS 16 (E.D. Va. Dec. 30, 2015). The Court found that – regardless of whether the fraud was to induce the employees to enter into a new contract or to induce continued performance – plaintiffs had no viable fraud claim. *Id.* at *11-14. It observed Virginia's general rule not to allow breach of contract claims to form "the basis for an action in tort for fraud." *Id.* at *7 (quoting *Lloyd v. Smith*, 150 Va. 132, 145, 142 S.E. 363, 365 (1928)). The continued vitality of Virginia's source of duty and economic loss doctrines demonstrate its jurists' distaste for turning every breach of contract claim into a tort action. *Dunn Constr. Co. v. Cloney*, 278 Va. 260, 267, 682 S.E.2d 943, 946 ("we have consistently adhered to the rule that, in order to recover in tort, the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract"). Relying on these foundational principles, *Modern Oil* found the employees' fraud claim was barred as the dispute "involved duties and alleged liabilities arising solely out of the contractual relationship between them." *Modern Oil Corp.*, 2015 Va. Unpub. LEXIS 16, at *13.

The few cases following *Ware* demonstrate this claim does not apply to employment contracts or contracts in which the defrauded party has already begun performance. Here, in addition to the fact that Defendants made no actual misrepresentations to GMS and continued to be GMS's top independent sales agents, GMS's fraudulent inducement claim is further barred by

source of duty and economic loss principles. *Filak v. George*, 267 Va. 612, 618, 594 S.E.2d 610, 613 (Va. 2004) ("when a plaintiff alleges and proves noting more than disappointment economic expectations, the law of contracts, not the law of torts, provides a remedy for such economic losses."). GMS attempted to duplicate its claims, and its damages, by filing this factually and legally deficient claim. As such, GMS's counsel either (1) failed to conduct an appropriate pre-filing inquiry by not reviewing the applicable law and facts or (2) ignored the applicable law and facts in order to pursue an improper purpose.

## V.    <u>CONCLUSION</u>

GMS and its counsel did not conduct the required pre-filing inquiry before filing this case. Even worse, they failed to reassess GMS's claims after evidence from discovery provided no support for them. Rule 11 is meant to constrain the initial and repeated unfounded Verified Complaints that Plaintiff has prosecuted for over two years. The harm to Defendants from having to defend against GMS's claims is substantial, monetarily and emotionally. The breadth and depth of Gary and Rachel Gorken's violations – as well as those of their counsel – should not be countenanced.

Defendants respectfully request that this Court grant their Motion for Sanctions Pursuant to Rule 11, dismiss Plaintiff's Third Amended Complaint with prejudice, and award them their attorneys' fees and costs incurred for defending this action, as presented in a subsequent petition.

**JA514**

Dated: July 28, 2021                Respectfully submitted,

                                    **G&S SUPPLY, LLC, WESTLY L. GREER,
                                    SABRINA GREER, GREER GROUP, LLC,
                                    GREGORY K. SPIRES, COUNTY ROADS,
                                    LLC, THOMAS HAYES, MIKE WELTON,
                                    WARTECH INDUSTRIES, LLC AND HMC
                                    SUPPLY, LLC**

                                    By: */s/ Robert W. McFarland*
                                    Robert W. McFarland (VSB # 24021)
                                    V. Kathleen Dougherty (VSB # 77294)
                                    Micaylee A. Noreen (VSB # 92433)
                                    MCGUIREWOODS LLP
                                    World Trade Center
                                    101 West Main Street, Ste. 9000
                                    Norfolk, Virginia 23510
                                    Phone:  (757) 640-3716
                                    Fax:  (757) 640-3966
                                    rmcfarland@mcguirewoods.com
                                    vkdougherty@mcguirewoods.com
                                    mnoreen@mcguirewoods.com

                                    *Counsel for Defendants and Counterclaim Plaintiffs*

**JA515**

USCA4 Appeal: 22-2090    Doc: 20-2    Filed: 01/19/2023    Pg: 219 of 417

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2021, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

Respectfully submitted,

By: */s/ Robert W. McFarland*
Robert W. McFarland (VSB # 24021)
V. Kathleen Dougherty (VSB # 77294)
Micaylee A. Noreen (VSB # 92433)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Ste. 9000
Norfolk, Virginia 23510
Phone: (757) 640-3716
Fax: (757) 640-3966
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| GMS INDUSTRIAL SUPPLY, INC.. | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 2:19-cv-324 (RCY) |
| | ) | |
| G&S SUPPLY, LLC, *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER**

This matter is before the Court on Plaintiff's Motion for Sanctions Against Defendants

Westly L. Greer and G&S Supply, LLC (ECF No. 195) and Defendants' Motion for Sanctions

Pursuant to Rule 11 (ECF No. 193). For the reasons stated in the accompanying Memorandum

Opinion, the Court GRANTS Plaintiff's Motion for Sanctions Against Defendants Westly L. Greer

and G&S Supply, LLC and DENIES Defendants' Motion for Sanctions Pursuant to Rule 11. The

Court will issue an appropriate adverse inference charge to the jury.  The Court will also award

Plaintiff its reasonable attorneys' fees and costs incurred in preparing its Motion for Sanctions.

Let the Clerk file this Order electronically and notify all counsel accordingly.

It is so ORDERED.

_____ /s/

Roderick C. Young
United States District Judge

Richmond, Virginia
Date:  March 22, 2022

**JA517**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

GMS INDUSTRIAL SUPPLY, INC.,     )
    Plaintiff,     )
           v.     )     Civil Action No. 2:19-cv-324 (RCY)
                 )
G&S SUPPLY, LLC, *et al.*,     )
    Defendants.     )
_____)

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's Motion for Sanctions Against Defendants
Westly L. Greer and G&S Supply, LLC (ECF No. 195) and Defendants' Motion for Sanctions
Pursuant to Rule 11 (ECF No. 193). Both motions have been fully briefed, and the Court dispenses
with oral argument because the materials before it adequately present the facts and legal
contentions, and argument would not aid the decisional process. E.D. Va. Loc. Civ. R. 7(J). For
the reasons stated below, the Court will grant Plaintiff's Motion for Sanctions Against Defendants
Westly L. Greer and G&S Supply, LLC, and deny Defendants' Motion for Sanctions Pursuant to
Rule 11.

## I. BACKGROUND

GMS Industrial Supply, Inc. ("GMS" or "Plaintiff") is an industrial sales company that
sells its products almost exclusively to military customers throughout the United States, Europe,
and Asia. (Pl.'s Mem. Supp. Mot. Sanctions at 2, ECF No. 196.)[1] In order to sell its products,
GMS utilizes sales agents who operate within specified territories, often military bases, where they
contact personnel in areas that need industrial goods. (*Id.* at 2-3.) The sales agents are trained by

_____

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions.

## JA518

GMS and have regular virtual meetings with management. (*Id.* at 3.)  Nonetheless, GMS sales agents work independently with minimal company oversight.

GMS hired Westly L. Greer ("Greer") as a sales agent in 2011. (*Id.*)  The following year, he was promoted to district manager, so in addition to his continuing sales duties, he was responsible for overseeing sales agents within a certain region. (*Id.*)  In July of 2015, Greer was promoted to Director of Sales which made him the head of the entire sales team. (*Id.*)  As Director of Sales, he was tasked with overseeing the other sales managers and working directly with GMS' marketing department and corporate home office in Virginia. (*Id.*)  Greer's primary responsibility was to communicate frequently with the Virginia office and to disseminate all directives to the sales agents, train new sales agents, and manage all activities for GMS' best interests. (*Id.*)  He was also given almost unfettered access to GMS' confidential, proprietary, and trade secret information. (*Id.*)  The district managers reported directly to Greer, and he was the primary point of contact that sales agents had with GMS. (*Id.* at 4.)

In 2015—unbeknownst to GMS—Greer started a business, HMC Supply, LLC ("HMC"), with another sales agent, Gregory Spires ("Spires"), and two other GMS sales agents. (*Id.*)  In June of 2017, Greer and Spires started a new company, G&S Supply, LLC ("G&S"), through which they sold standard industrial products to GMS customers. (*Id.*; Defs.' Mem. Supp. Mot. Sanctions at 3, ECF No. 194.)  The pair later recruited other GMS sales agents to sell G&S goods to GMS customers. (Pl.'s Mem. Supp. Mot. Sanctions at 5.)  In January of 2019, Greer stepped down as Director of Sales for GMS and became a contract sales agent for the Company. (*Id.*)

On April 1, 2019, GMS discovered the existence of G&S and that Greer and Spires owned G&S. (*Id.*)  That same day, GMS contacted Greer to allegedly discuss G&S, but the parties disagree as to whether any conversations took place. (*Id.*; Defs.' Resp. at 6 n.8, ECF No. 206.)  By

**JA519**

April 2, 2019, GMS was aware of the breadth and depth of G&S and Greer's alleged ongoing conspiracy with other GMS sales agents to compete directly with GMS. (*Id.* at 6.) On the same day, allegedly warned by GMS' sudden demands to speak, Greer connected a USB device to his GMS-issued desktop at 7:39 a.m.[2] (ECF No. 196-9 at 5-6.)  On April 3, 2019, through counsel, GMS sent letters to Greer, Spires, and other sales agents working with G&S terminating their sales agreements with GMS. (Pl.'s Mem. Supp. Mot. Sanctions at 6.)  The letter that Greer received also informed him of his legal obligation to preserve all potentially relevant information and his responsibility to suspend any document destruction policies and automatic deletion functions. (*Id.* at 7.) On April 17, 2019, GMS sent another letter to Greer informing him of GMS' awareness that he continued to breach his contractual agreement and directing Greer to return GMS's property, including a laptop computer, a desktop computer, a computer tablet, and two computer monitors (collectively, "the Computer Equipment"). (*Id.*)  On approximately April 22, 2019, Greer mailed the Computer Equipment back to GMS. (*Id.*)  When GMS employees logged into the desktop and laptop computers, they discovered that all user-created files had been deleted from the desktop. (*Id.*)  When they attempted to use the computer tablet, they could not access it because it was password protected. (*Id.*)  Upon realizing that they could not access the tablet, GMS contacted Greer via email, requesting the password to the computer tablet. (*Id.*)  On May 31, 2019, Greer sent GMS an email stating that the password was a comma. (*Id.* at 8.)  Yet, when GMS attempted to gain access using the protected password, it reportedly did not work. (*Id.*)

---

[2] GMS later hired BDO USA, LLC ("BDO"), a digital forensics and cyber investigations firm, to perform a forensic examination on Greer's GMS-issued electronic devices. BDO issued GMS a Report of the examination findings. (Pl.'s Mem. Supp. Mot. Sanctions at 8.)

GMS sent the Computer Equipment to BDO where BDO performed a forensic examination on the laptop and desktop computers. (*Id.*)  The forensic examination found the following:

- Over 43,000 files and folders were deleted from the laptop computer, 7,075 of which were deleted after Greer was terminated and received the litigation hold letter from Haden. Per industry averages, this compares to over 330 bankers' boxes of documents;

- Over 24,000 files and folders were deleted from the desktop computer, 11,791 of which were deleted after Greer was terminated and received the litigation hold letter from Haden. Per industry averages, this compares to over 820 bankers' boxes of documents;

- Beginning in May 2017, seven unique data storage devices had been attached to the laptop computer;

- Beginning in October 2015, seven unique data storage devices had been attached to the desktop computer; and

- On April 19, 2019, after Greer received the second letter from Haden, he attached a data storage device to the desktop computer and accessed documents on the device.

(*Id.* at 8; ECF No. 196-9 at 5-6.)  According to BDO, on April 19, 2019, Greer connected a USB storage device to the desktop computer. (*Id.* at 9.)  Shortly thereafter, he ran a Google search for the term "fileshredder," visited the File Shredder website, and downloaded and installed the file shredding program. (*Id.*)  After the installation, Greer ran the file shredding program, permanently deleted 3,397 files from the computer, and then uninstalled the shredding program.[3] (*Id.*)  GMS now seeks to impose sanctions against G&S and Greer (collectively "Defendants") for the alleged spoliation of evidence housed on Greer's laptop, desktop, and tablet.

---

[3] Greer returned three GMS-issued devices, a laptop, a desktop, and a tablet. The forensic analysis that was later performed on the devices discusses the use of File Shredder on the "desktop," accordingly, the Court shall reference the "desktop" when discussing spoliation stemming from the use of File Shredder.

## II. PROCEDURAL HISTORY

Plaintiff filed a Complaint on June 20, 2019 (ECF No. 1) against G&S Supply, LLC, Westly L. Greer, Sabrina Greer, Greer Group, LLC, Gregory K. Spires, County Roads, LLC, Thomas Hayes, Gregory S. Spires, Mike Welton, and Wayne Side for injunctive relief and damages.  On June 21, 2019, Plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 2).  On August 6, 2019, Defendants filed Motions to Dismiss (ECF Nos. 58, 60). On August 30, 2019, the Court granted in part Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, granting a preliminary injunction to the extent specifically set forth on pages 13 through 16. (ECF No. 70).  On November 14, 2019, the Magistrate Judge issued a Report and Recommendation recommending dismissal of the claims against Wayne Side for lack of personal jurisdiction (ECF No. 90).  The Plaintiff objected to this Report and Recommendation, but on January 16, 2020, the Court "adopt[ed] and approve[d] in full" this Report and Recommendation. (ECF No. 98.)  On December 18, 2019, United States Magistrate Judge Robert J. Krask issued a Report and Recommendation granting in part and denying in part Defendants' Motion to Dismiss (ECF No. 60) various counts of the Complaint (ECF No. 93).  Both the Plaintiff and Defendants objected to this Report and Recommendation; thus, on February 28, 2020, the Court reviewed the Report and Recommendation *de novo* and granted in part and denied in part Defendant's Motion to Dismiss (ECF No. 102).  On March 23, 2020, Plaintiff filed a First Amended Complaint (ECF No. 108).  On November 13, 2020, the Court granted Plaintiff's unopposed Motion for Leave to Amend the First Amended Complaint (ECF No. 149).  On November 16, 2020, Plaintiff filed a Second Amended Complaint (ECF No. 151).  After the Court granted Plaintiff's Motion for Joinder (ECF No. 130) by Order entered on November 24, 2020 (ECF No. 153), Plaintiff filed a Third Amended Complaint on December 1,

2020 (ECF No. 156).  This is the operative Complaint.  There are also five Counterclaims pending.

(ECF Nos. 113-117.)  On July 7, 2021, the Court granted Plaintiff's Stipulation of Dismissal,

dismissing the claims against Gregory S. Spires without prejudice (ECF No. 188).

On July 8, 2021, Defendants filed a Motion for Sanctions Pursuant to Rule 11 (ECF No.

193). On July 13, 2021, Plaintiff filed a Motion for Sanctions against Defendants Westly Greer

and G&S Supply, LLC (ECF No. 195).  On July 22, Plaintiff filed a Response in Opposition to

Defendants' Motion for Sanctions Pursuant to Rule 11 (ECF No. 205). On July 27, 2021,

Defendants filed a Response in Opposition to Plaintiff's Motion for Sanctions against Defendants

Westly Greer and G&S Supply, LLC (ECF No. 206).  On July 28, 2021, Defendants filed a Reply

to Plaintiff's Response (ECF No. 207). On August 2, 2021, Plaintiff filed a Reply to Defendants'

Response (ECF No. 208).

### III. PLAINTIFF'S MOTION FOR SANCTIONS

#### A.  Spoliation of Evidence Standard of Review

"Spoliation refers to the destruction or material alteration of evidence or to the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citing *West v. Goodyear Tire &

Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999)).  "Under federal law, a court's authority to levy

sanctions on a spoliator ultimately derives from two main sources.  First, there is the 'court's

inherent power to control the judicial process and litigation, a power that is necessary to redress

conduct which abuses the judicial process.'" *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d

494, 505 (D. Md. 2009) (quoting *United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 263–

64 (2007)).  Second, there is Federal Rule of Civil Procedure 37(e) which governs spoliation of

electronically stored information ("ESI").  *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96,

### JA523

103 (E.D. Va. 2018). Movants must establish four threshold requirements "before a court decides if any spoliation sanction is appropriate: (1) ESI should have been preserved; (2) ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery." *Id.* (citing *Eshelman v. Puma Biotechnology, Inc.*, No. 7:16-CV-18-D, 2017 WL 2483800, at *4 (E.D.N.C. June 7, 2017)).

Spoliation requires "more than the 'negligent loss or destruction of evidence,' as 'the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction.'" *Id.* at 104 (citing *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013)). Further, "[c]ourts have broad discretion when deciding whether to impose spoliation sanctions." *Id.* at 103. (citing *Turner*, 736 F.3d at 281). "If spoliation has occurred, then a court may impose a variety of sanctions, ranging from dismissal or judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorney's fees and costs." *Goodman*, 632 F. Supp. 2d at 505 (citing *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 191 (S.D.N.Y. 2007)). Nonetheless, "the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Eshelman*, 2017 WL 2483800, at *4 (citing *Silvestri*, 271 F.3d at 590). While the burden of proof on a motion for spoliation sanctions is unsettled, "the general approach of courts in the Fourth Circuit has been to apply the clear and convincing evidence standard, especially where a relatively harsh sanction like an adverse inference is sought." *Steves & Sons, Inc.*, 327 F.R.D. at 104 (explaining that "[s]ome courts have applied a preponderance of the evidence standard."). As such, the Court shall impose a clear and convincing evidence standard here.

**JA524**

**B. Analysis**

**i. Timeliness of Spoliation Filing**

As a preliminary matter, Defendants argue that Plaintiff's spoliation motion was untimely filed. First, Defendants argue that Plaintiff's motion is a discovery motion governed by Rule 37(e) of the Federal Rules of Civil Procedure and is thus untimely under the express terms of this Court's 16(b) Scheduling Order. (Defs.' Resp. at 9, ECF No. 206.) Defendants allege that since Plaintiff's motion is a discovery motion, it should have been filed before the March 15, 2021 deadline for the completion of fact discovery. (*Id.* at 10.) Second, Defendants argue that Plaintiff's spoliation motion is untimely because it should have been filed during the discovery phase, not after it had closed. (*Id.*) Conversely, Plaintiff argues that while spoliation can touch upon discovery, at heart, its motion is an evidentiary issue and is timely under Rule 37. (Pl.'s Reply at 2, ECF No. 208.) Further, Plaintiff is not seeking discovery-related sanctions because there would be no point and it would waste the Court's time. (*Id.* at 3.)

Rule 37 "does not contain any specific reference to the timing of the filing of a motion seeking spoliation sanctions." *Goodman*, 632 F. Supp. 2d at 506 (citing *McEachron v. Glans*, No. 98–CV–17(LEK/DRH), 1999 WL 33601543, at *2 (N.D.N.Y. June 8, 1999)). However, Courts have identified several "factors that can be used to assess the timeliness of spoliation motions." *Id.* These factors include "how long after the close of discovery the relevant spoliation motion has been made;" "the temporal proximity between a spoliation motion and motions for summary judgment;" whether the spoliation was made on the eve of trial; "whether there was any governing deadline for filing spoliation motions in the scheduling order issued pursuant to Federal Rule 16(b) or by local rule;" and the explanation of the moving party as to why the motion was not filed earlier. (*Id.* at 506-08.)

Here, the parties do not dispute that Plaintiff's Spoliation Motion was filed after the close of discovery. (Defs.' Resp. at 9-10; Pl.'s Reply at 6.)  At the time of Plaintiff's filing, July 13, 2021, the parties were weeks away from their August 4, 2021 dispositive motion deadline. (Defs.' Resp. at 11; Pl.'s Reply at 6.)  Trial at the time of the filing was scheduled to commence on October 18, 2021, and there was no specific deadline in the rule 16(b) Scheduling Order for filing spoliation motions. (Defs.' Resp. at 12; Pl.'s Reply at 6; *see also* Amended Scheduling Order, ECF No. 159.) Defendants argue that there is no excuse for Plaintiff's delay in filing its Motion. (Defs.' Resp. at 12.)  Defendants assert that Plaintiff has known about this alleged spoliation for over two years— even at the time of the preliminary injunction filed early in this case—yet failed to seek a remedy from the Court until now. (*Id.*)  Plaintiff explains that while it was aware of the alleged spoliation during the preliminary injunction in this case, at the time, it did not have the opportunity to have an expert perform a full forensic examination of the computers or to perform any discovery to assist in determining what and how it had been affected by Greer's alleged spoliation. (Pl.'s Reply at 3.)  Further, Plaintiff's efforts to obtain additional information from Defendants were met with objections. (*Id.* at 3-4.)

While Plaintiff's instant motion is governed by Rule 37, it is not a discovery motion as argued by Defendants.  It is important to note "that spoliation sanctions motions often follow only where extensive ESI recovery efforts have failed, or after forensic review gives the movant a much better idea of the quantity and nature of unproduced, deleted ESI." *Steves & Sons, Inc.*, 327 F.R.D. at 108.  Not only did Plaintiff attempt to gather pertinent information via written discovery requests, it was also forced to wait until Greer's deposition to again ask Greer about the allegedly incorrect tablet password. (Pl.'s Reply at 4.)  Defendant cites to *Goodman* in support of its untimeliness argument. (Defs.' Resp. at 11-12.)  In *Goodman*, the Court found that the plaintiff's

spoliation motion was timely when it was filed "more than five months after the conclusion of

discovery, and more than two months after dispositive motions had been fully briefed." 632 F.

Supp. 2d at 509.  The Court reasoned that "Goodman was [not] dilatory in filing his Motion for

spoliation sanctions to a degree that would warrant denying it as untimely." *Id.*  The *Goodman*

Court noted that

> the dispositive motions had not yet been ruled on when Goodman's Motion was
> filed, Goodman did not attempt to reargue his summary judgment motion in his
> spoliation Motion, it was not filed on the eve on trial, and the relief granted in this
> Memorandum Opinion [would] not entail reopening discovery or delaying the
> upcoming trial.

*Id.*  Here, Plaintiff filed the instant motion weeks before the dispositive motion deadline and

months before trial, and additionally, the relief sought will not entail reopening discovery or

delaying trial.  As such, the Court finds that Plaintiff's spoliation motion is timely.

### ii. Required Elements for Spoliation

Of the four elements required to establish spoliation, Defendants agree that Plaintiff can

establish the first and third elements—that ESI should have been preserved and that the loss was

due to Greer's failure to take reasonable steps to preserve the ESI. (Defs.' Resp. at 14; *see* Pl.'s

Mem. Supp. Mot. Sanctions at 12-19.)  Accordingly, the Court will only examine the second and

forth elements.

### ESI Is Lost and Irreplaceable

"Information is lost for purposes of Rule 37(e) only if it is irretrievable from another source,

including other custodians." *Steves & Sons, Inc.*, 327 F.R.D. at 107 (citing *Agility Pub.

Warehousing Co. K.S.C. v. Dep't of Def.*, No. CV 14-1064, 2017 WL 1214424, at *2 (D.D.C. Mar.

30, 2017)).  Irreplaceability does not require a party to "pursue every possible avenue for replacing

or restoring the ESI, but it must show that it made some good-faith attempt to explore its

**JA527**

alternatives before pursuing spoliation sanctions." *Id.* at 109.  Plaintiff argues that the destroyed ESI is not available from another source. (Pl.'s Mem. Supp. Mot. Sanctions at 19.)  Plaintiff points to the DLA[4] documents downloaded by Greer onto the laptop that have never been produced or otherwise received by GMS as an example of lost ESI. (*Id.* at 20.)  According to BDO's forensic analysis, Greer downloaded twenty-one files from the DLA Internet Bid Board System ("DIBBS") onto the laptop, and the file names indicated that the downloaded files likely concerned competitive sales made by G&S to customers or potential customers of GMS. (*Id.* at 18.)  BDO was unable to recover those downloaded files and, while Defendants provided some DLA documents, none of the documents produced matched the request numbers of the files downloaded and deleted by Greer. (*Id.*)  In an effort to recover the DLA documents, Plaintiff issued a subpoena to DLA that was countered by a Motion to Quash from Defendants. (Pl.'s Reply at 13; *see also* Defs.' Mot. Quash, ECF No. 161.)  Furthermore, Plaintiff has been unable to obtain any information from third parties related to the DLA bids or sales with any of the request numbers of the downloaded files. (*Id.* at 18-19.)  Defendants claim that the DLA documents Plaintiff seeks are public information and that if Plaintiff does not have the documents that it needs, it is only because Plaintiff did not follow through on efforts to obtain them. (Defs.' Resp. at 18-19.)

Defendant's claim that the information sought by Plaintiff is public information misleading.  As highlighted by Plaintiff, documents on the DIBBS website are only retained for a few months which clearly limits Plaintiff's ability to access the sought-after documents.[5] (Pl.'s

---

[4] DLA documents refer to the Defense Logistics Agency ("DLA") through which most industrial sales to the military must be made. (Pl.'s Mem. Supp. Mot. Sanctions at 2-3.) The process begins when a customer agrees to purchase a product or kit through GMS; then sales agents work with the customer to ensure that the customer submits the proper information to DLA. (*Id.* at 3.) Once that occurs, DLA issues a "request for quotations" for the specific kit, which GMS's administrative staff provides to DLA. (*Id.*)

[5] The "DIBBS DOCUMENT RETENTION POLICY" on the DIBBS website provides that effective April 30, 2012, documents would be removed from the DIBBS website in accordance with specified timeframes. The longest of

**JA528**

Reply at 13.)  Plaintiff had Greer's laptop forensically examined, issued a subpoena to DLA, and sent discovery requests encompassing the documents in an effort to recover what Greer destroyed. It is apparent that Plaintiff has made a "good-faith attempt" to explore alternatives for replacing or restoring the destroyed DLA documents. *Sines v. Kessler*, No. 3:17-CV-00072, 2021 WL 4943742, at *9 (W.D. Va. Oct. 22, 2021).  Additionally, according to the BDO report, of the 3,397 files that Greer destroyed, BDO was only able to determine the original file names for 2,916 files before fileshredder destroyed the file names and contents. (BDO Report at 11, ECF No. 196-9.)  This means that BDO was unable to restore the names of 481 files destroyed by Greer. (Pl.'s Reply at 9 n.2.)  Because Plaintiff was unable to recover the names of those 481 files—and the files themselves—it is impossible for the parties to determine whether those files were relevant, let alone replace them.

As such, the Court finds that the DLA documents and the 481 permanently deleted files are both lost and irreplaceable. *See Steves & Sons, Inc.*, 327 F.R.D. at 109 (finding that supplier satisfied the loss of ESI element of rule governing failure to preserve ESI, with respect to documents that consultant deleted, that supplier did not receive from manufacturer, and that were still irretrievable); *Sines*, 2021 WL 4943742 at *9 (finding the ESI was both lost and irreplaceable where movant obtained some of missing ESI from other defendants and third parties but did not have a "complete record" of the sought-after documents); *Summers v. City of Charlotte*, No. 318CV00612 2022 WL 385163, at *5 (W.D.N.C. Feb. 8, 2022) ("While Plaintiffs have recovered select emails, they have not been able to obtain the complete records from the City. This is sufficient to show that the records are lost and irreplaceable.").

---

these timeframes is 120 days. *DIBBS Document Retention Policy*, Defense Logistics Agency (last visited February 17, 2022), https://www.dibbs.bsm.dla.mil/notices/msgdspl.aspx?msgid=675.

**JA529**

### iii. Sanctions Under Rule 37(e)(1) and (2)

"If the movant makes the threshold showing under Rule 37(e), the 'court must then consider whether the movant has established one of two options that would permit imposing sanctions.'" *Sines*, 2021 WL 4943742 at *3; *Steves & Sons, Inc.*, 327 F.R.D. at 109 ("[I]f the lost ESI cannot be restored or replaced by additional discovery, then the inquiry turns to the appropriate sanctions under the subsequent provisions of Rule 37(e)."). Sanctions under Rule 37(e)(1) require "finding prejudice to another party from loss of the information," while sanctions under Rule 37(e)(2) require a "finding that the party acted with the intent to deprive another party of the information's use in the litigation ." Fed. R. Civ. P. 37(e).

### a. Intent to Deprive

"The Fourth Circuit has not spoken about the level of intent that a court must find to impose a sanction under Rule 37(e)(2)." *Steves & Sons, Inc.*, 327 F.R.D. at 110 (citing *Jenkins v. Woody*, No. 3:15CV355, 2017 WL 362475, at *17 (E.D. Va. Jan. 21, 2017)). "However, cases preceding the 2015 amendments to Rule 37 indicate that the spoliating party's conduct does not need to be in bad faith to qualify as intentional." *Id.* (citations omitted.) Plaintiff argues that the evidence demonstrates that Greer irrevocably destroyed all his files and data dealing with G&S with the intent to deprive Plaintiff of use of the information in litigation. (Pl.'s Mem. Supp. Mot. Sanctions at 25.) Plaintiff asserts that by virtue of his position as Director of Sales for GMS, Greer had access to almost all of the company's trade secrets and proprietary information. (*Id.*) After Plaintiff terminated Greer's employment, he attempted to download additional information from GMS's systems that Plaintiff assumes was for the purpose of competing against GMS more effectively. (*Id.*) Greer was instructed to maintain all of his information that might be relevant to Plaintiff's preparation for litigation. (*Id.*) Instead, Plaintiff argues that he willfully and intentionally deleted

## JA530

all of his GMS and G&S work product and related information from two computers and has allegedly refused to provide Plaintiff with the password to the tablet that he used.[6] (*Id*)

Defendants argue that Greer did not act with an intent to deprive Plaintiff. (Defs.' Resp. at 24.) Defendants allege that the facts here demonstrate, at most, that the ESI was lost due to Greer's negligence, not any intentional misconduct. (*Id.*)  Furthermore, Defendants assert that there is no indication that Greer acted with the requisite intent to deprive Plaintiff of any relevant information as his use of the File Shredder program served to delete copies of GMS documents that were available to GMS from other sources. (*Id.* at 25.)

The plain text of Rule 37(e) "makes clear that it is the party's 'failure to reasonable steps to preserve' [ESI], with the intent to deprive another party from using it in litigation that supports a logical inference that the 'lost information was unfavorable to the party who lost it.'" *Sines*, 2021 WL 4943742 at *3 (citing Fed. R. Civ. P. 37(e)(2)).  Therefore, "a party's 'conscious dereliction of a known duty to preserve electronic data—whether passive or active—is both necessary and sufficient to find that the party acted with the intent to deprive another party of the information's use under Rule 37(e)(2).'" *Id.* at 10 (citing *Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*, 2019 WL 5694256, at *11 (E.D.N.Y. July 22, 2019)).

Greer's actions demonstrate an intent to deprive Plaintiff of use of the information stored on his desktop.  Defendants do not dispute that Greer received an April 3, 2019 letter from Plaintiff in which Greer was instructed to "preserve any potentially relevant documents and information relating to" Plaintiff's breach of contract allegations stemming from Plaintiff's discovery of G&S.

---

[6] It is unclear whether the password that Greer provided was incorrect or impossible, as claimed by Plaintiff. (Pl.'s Mem. Supp. Mot. Sanctions at 19.) Defendants assert that Greer provided the password to the tablet and refute Plaintiff's claim that the password could not be a comma (","), as argued by Plaintiff. (Defs.' Resp. at 9 n.13.) Defendant further argues that the tablet allows for a "pin password option" that can include symbols and no numerical limit. Presently, there is not enough information for the Court to determine whether Greer gave Plaintiff the wrong password or if such a password was permitted.

14

**JA531**

(ECF No. 196-11 at 4; Pl.'s Mem Supp. Mot. Sanctions at 6-7; Defs.' Resp. at 14.)  On April 17, 2019, Greer received another letter from Plaintiff, reiterating that Greer was obligated to "preserve any and all potentially relevant information" and to return all Computer Equipment in his possession to Plaintiff. (ECF No. 196-12 at 2-3.)  Despite the clear instructions to preserve potentially relevant documents and information[7]—as discovered by the forensic examination conducted by BDO—on April 19, 2019, Greer proceeded to download File Shredder onto his desktop and destroyed all of the user-created files. (ECF No. 196-9 at 8-9; Pl.'s Mem. Supp. Mot. Sanctions at 7.)

The File Shredder website clearly states that "File Shredder is a free desktop application for shredding (destroying) unwanted files beyond recovery."  File Shredder, https://www.fileshredder.org/ (last visited Feb. 18, 2022).  During his deposition, Greer admitted to installing File Shredder on his laptop and destroying all of the documentation on the laptop before returning it. (ECF No. 200-2 at 12.)  When asked why he destroyed all of the documentation on the laptop, Greer responded that he "had a lot of personal information on there that [he] didn't want them to have." (*Id.*)  Greer further cemented his disregard for his preservation obligations when asked why he did not simply delete his personal information, to which he responded that he did not "know if [he] could have gotten all of it off there," and that he would "have to search." (*Id.*)  The Court also notes that on April 2, 2019, Greer contacted a GMS sales agent trainee, Amber

---

[7] The April 3, 2019 letter informed Greer that he had a legal obligation to preserve potentially relevant information including:

> written and electronic documents and information, such as customer lists, email messages and all attachments, word processing documents, text messages, phone and call logs, spreadsheets, databases, calendar entries, accounting and billing records, reports, systems, and related data or any other documents or files created on computer systems, and sound and/or video recordings (such as voicemail messages and video/audio files)….

(ECF No. 196-11 at 4; Pl.'s Mem Supp. Mot. Sanctions at 7.)

Wenrick, and directed her to delete "anything involving G&S" including text messages and emails. (ECF no. 196-4 at 9-11.) While this request was sent before Greer received the litigation hold letters from Plaintiff, Greer's actions only further support his intent to cover his tracks by disposing of potentially relevant information.

Notwithstanding Greer's deposition testimony, Defendants make the bold assertion that Greer's actions were negligent at best and that there is "no indication that Greer acted with the requisite intent to deprive GMS of *any* relevant information." (Defs.' Resp. at 25 (emphasis in the original).) Defendants' argument that Greer's use of the File Shredder program served to delete copies of GMS documents that were available to GMS from other sources also falls flat.[8] Defendants fail to present a shred of evidence indicating that Greer made a conscious effort to delete documents that he knew would be retrievable elsewhere. Of the thousands of documents that Greer shredded, 481 of those files were unrecoverable both in content and name. As such, the parties and the Court have no way of determining the relevance of those 481 documents which further supports the Court's finding of willful spoliation. *Taylor v. Mitre Corp.*, 2012 WL 5473715, at *7 (E.D. Va. Sept. 10, 2012) (finding willful spoliation where plaintiff ran a program similar to File Shredder called CCleaner, resulting in the deletion of 16,000 documents, and for more than 6,000 of those documents, there was no way of telling what type of file was deleted). It is apparent from Greer's actions that he acted with the intent to deprive GMS of *all* information stored on his desktop, including possibly relevant documents. "Once an intent to deprive has been established,

---

[8] Defendants' claim that Greer's deletions were simply "imprecise" further strains credulity upon review of the File Shredder website's "Usage" page. (Defs.' Resp. at 15.) The page explains the various ways to go about shredding documents which include "Add File(s)" and "Add Folder(s)" options where users of the program can select the specific files or folders that they intend to shred. *Online Help For File* Shredder, File Shredder (last accessed Feb. 18, 2019), https://www.fileshredder.org/fileshredder-help.php. Instead of selecting those options to avoid deleting possibly relevant documents while disposing of his alleged personal documents in accordance with his preservation obligation, Greer decided to destroy everything indiscriminately. Such actions reach beyond simple and even gross negligence.

Rule 37(e)(2) does not require an additional finding of prejudice," accordingly, the Court declines to rule on the issue of prejudice. *Capricorn Mgmt. Sys., Inc.*, 2019 WL 5694256, at *12 (citing Fed. R. Civ. P. 37, Advisory Committee Note, 2015 Amendment). We now turn to the appropriate sanctions pursuant to the Court's finding of intent.

      b. Sanctions

      As a preliminary matter, Plaintiff requests that the Court also find G&S liable for Greer's spoliation. (Pl.'s Mem. Supp. Mot. Sanctions at 22.)  "A party may be held responsible for the spoliation of relevant evidence done by its agents." *Goodman*, 632 F. Supp. 2d at 522 n.16 (citing *New Jersey Mfrs. Ins. Co. v. Hearth & Home Techs., Inc.*, No. 3:06–CV–2234, 2008 WL 2571227, at *7 (M.D. Pa. June 25, 2008) ("A party to a law suit, and its agents, have an affirmative responsibility to preserve relevant evidence. A [party]. . . is not relieved of this responsibility merely because the [party] did not itself act in bad faith and a third party to whom [the party] entrusted the evidence was the one who discarded or lost it."))  Here, Greer is a partial owner of G&S and was employed by G&S at the time of the spoliation. (ECF No. 206-1 at 4; Pl.'s Mem. Supp. Mot. Sanctions at 4; Defs.' Resp. at 3.)  Greer also used the Plaintiff-issued laptop for work related to G&S. (Pl.'s Mem. Supp. Mot. Sanctions at 12.)  Because the laptop was clearly used in the course of his employment with G&S, and in "furtherance of the master's business," the Court finds that Greer was an agent of G&S at the time of the spoliation. *Nucor Corp. v. Bell*, 251 F.R.D. 191, 199 (D.S.C. 2008) (citing *Murphy v. Jefferson Pilot Commc'ns Co.*, 613 S.E.2d 808, 812 (S.C. App.2005)). As such, G&S is also liable for Greer's spoliation. *Id.* (finding agent's willful "alteration or destruction of relevant data" on laptop was directly attributable to defendant); *Goodman*, 632 F. Supp. 2d at 522 (same).

"[O]nly upon finding that the party acted with the intent to deprive another party of the information's use in the litigation,' the court may presume that the lost information was unfavorable to the party who lost it, instruct the jury that it may or must so presume, or dismiss the action or enter a default judgment." *Sines*, 2021 WL 4943742 at *3.  In terms of relief, Plaintiff "requests that the Court issue an adverse inference charge to the jury, alerting them to the fact that Greer, acting on his own behalf and as an agent of G&S, intentionally deleted potentially relevant files and that the jury should assume that whatever was on the Electronic Devices was unfavorable to Greer and G&S." (Pl.'s Mot. Sanctions at 1, ECF No. 195.)  Plaintiff also requests that the Court "strike Greer's counterclaim" and bar Greer from testifying at trial on his own behalf or on behalf of G&S, and that in the event Plaintiff calls Greer as an adverse witness at trial, Greer's cross-examination by defense counsel be limited to the scope of the direct examination." (*Id.* at 2.) Finally, Plaintiff requests that the Court "require Greer and G&S to pay for its reasonable attorneys' fees and costs incurred in preparing this Motion for Sanctions along with such other relief as the Court believes is necessary and just." (*Id.*)

The Court has found that Greer acted with an intent to deprive Plaintiff of the deleted information's use in litigation.  Accordingly, the Court may "instruct the jury that it may or must presume the information was unfavorable" to Defendants. (Pl.'s Mem. Supp. Mot. Sanctions at *10) (quoting Rule 37(e)).  The Court finds that Greer's blatant and intentional disregard for his obligation to preserve ESI on his desktop warrants an adverse inference instruction.  The Court further instructs that Greer and G&S shall pay Plaintiff's reasonable attorneys' fees and costs incurred in preparing its Motion for Sanctions. *See Goodman*, 632 F. Supp. 2d at 523 ("[I]n addition to a spoliation sanction, a court will award a prevailing litigant the litigant's reasonable expenses incurred in making the motion, including attorney's fees."); *Taylor*, 2012 WL 5473715

18

**JA535**

at *10 (E.D. Va. Sept. 10, 2012) (awarding reasonable attorneys' fees as a result of non-moving

party's spoliation).  The Court declines to impose any further sanctions requested by Plaintiff as

the adverse instruction and reasonable attorneys' fees and costs serve the "prophylactic, punitive,

and remedial rationales underlying the spoliation doctrine." *Eshelman*, 2017 WL 2483800, at *4

(citing *Silvestri*, 271 F.3d at 590); *Turner*, 736 F.3d at 281 ("Spoliation is a rule of evidence, and

the decision to impose sanctions for violations is one 'administered at the discretion of the trial

court.'").

### IV.  DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO RULE 11

Defendants filed a Motion for Sanctions Pursuant to Rule 11 seeking to dismiss Plaintiff's

Third Amended Complaint with prejudice and receive an award of Defendants' costs and

expenses. (Defs.' Mot. Sanctions at 1, ECF No. 193.)  Defendants claim that Plaintiff failed to

make a reasonable inquiry to determine that the Complaint "stood well-grounded in fact and was

warranted by existing law."  (Defs.' Mem. Supp. Mot. Sanctionsat 11, ECF No. 194.)

Rule 11 requires an attorney presenting a pleading to the Court to certify that "to the best

of the person's knowledge, information, and belief, formed after an inquiry reasonable under the

circumstances," the pleading is not presented for an improper purpose, the legal contentions are

"warranted by existing law," and the factual allegations are supported by the evidence. Fed. R.

Civ. P. 11(b).  "A complaint that is wholly unsupported by *any* information violates the

investigation required by Rule 11 before filing a complaint." *Crawford v. Deutsche Bank AG*, 271

F. Supp. 2d 829, 832 (E.D. Va. 2003) (emphasis in the original) (citing *In re Kunstler*, 914 F.2d

505, 514 (4th Cir.1990)).  "The Advisory Committee note to Rule 11 cautions against 'using the

wisdom of hindsight' and emphasize[s] that pleadings should be tested 'by inquiring what was

reasonable to believe at the time the pleading, motion, or other paper was submitted.'" *Ross v. R.A.*

*N. Dev., Inc.*, 2011 WL 7004136, at *4 (E.D. Va. Nov. 18, 2011) (quoting Fed. R. Civ. P. 11 Advisory Committee's Note, 97 F.R.D. 165, 199 (1983)). In evaluating reasonableness, courts "must remember that such sanctions are to be imposed sparingly" *Crawford*, 271 F. Supp. 2d at 832.

Defendants devote several pages arguing that Plaintiff should be sanctioned for its claims against Sky Spires. (Defs.' Mem. Supp. Mot. Sanctions at 19-23.) However, Defendants' claim violates Rule 11's safe-harbor provision that requires that a motion for sanctions pursuant to Rule 11 "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service." Fed. R. Civ. P. 11(c)(2). Here, Plaintiff filed a motion dismissing the claims against Sky Spires within the 21 days provided under the safe-harbor provision and two days before Defendants filed their Motion for Sanctions. (Pl.'s Resp. at 24-25, ECF No. 205; *see also* ECF Nos. 187, 188.) Accordingly, Defendants' failure to comply with the procedural requirements of Rule 11 "precludes the imposition of the requested sanctions." *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 389 (4th Cir. 2004) (citing *Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir.1995) ("The plain language of [Rule 11(c)(1)(A)] indicates that this notice and opportunity prior to filing is mandatory. Plaintiffs did not comply with this procedural prerequisite. Therefore, the sanction and payment of costs and attorneys' fees ordered by the district court cannot be upheld under Rule 11.")).

The Court finds that Plaintiff engaged in a reasonable and adequate investigation before filing its complaint.[9] Furthermore, the Court finds that Plaintiff's messages to Defendants airing

---

[9] The record demonstrates that the Court granted in part Plaintiff's Motion for Preliminary Injunction and denied in part Defendants' Motion to Dismiss. (*See* ECF Nos. 70, 102.) A complaint filed for an improper purpose would not survive such motions, especially considering the stringent standard that must be met for the Court to grant a

grievances regarding Defendants' conduct does not evidence an improper purpose to the extent required for Rule 11 sanctions. *See Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir.1995) ("[I]t would be counterproductive to use Rule 11 to penalize the assertion of non-frivolous substantive claims, even when the motives for asserting those claims are not entirely pure."); *Turton v. Virginia Dep't of Educ.*, No. 3:14CV446, 2015 WL 236699, at *3 (E.D. Va. Jan. 16, 2015) ("When a complaint is filed for the proper purpose of vindicating rights and one or more other purposes of which the Court 'does not approve,' sanctions are only appropriate if 'the added purpose is [ ] undertaken in bad faith or is [ ] so excessive as to eliminate a proper purpose.'"). There is no indication that Plaintiff acted in bad faith in filing suit

## V. CONCLUSION

For the reasons stated herein, the Court will grant Plaintiff's Motion for Sanctions Against Defendants Westly L. Greer and G&S Supply, LLC and deny Defendants' Motion for Sanctions Pursuant to Rule 11.

An appropriate Order shall issue.

_____ /s/
Roderick C. Young
United States District Judge

Richmond, Virginia
Date:  March 22, 2022

---

preliminary injunction. *Cohen v. Rosenstein*, 691 F. App'x 728, 729 (4th Cir. 2017) ("A preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought.")

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

GMS INDUSTRIAL SUPPLY, INC.

        Plaintiff,

     v.                                    Civil Action No. 2:19-cv-324(RCY)

G&S SUPPLY, LLC, ET AL.

        Defendants.

<u>**JOINT PROPOSED JURY INSTRUCTIONS**</u>

      Plaintiff GMS Industrial Supply, Inc. ("GMS Industrial") and G&S Supply, LLC, WarTech Industries, LLC, HMC Supply, LLC, Defendants/Counterclaimants Westly Greer, Sabrina Greer, Greer Group, LLC, Gregory K. Spires, County Roads, LLC, Thomas Hayes, and Mike Welton (collectively "Defendants"), all by counsel,, by counsel, in accordance with the Local Rules of Practice of this Court and this Court's Revised Scheduling Order (ECF No. 255), proposes the following jury instructions.

# <u>**PROPOSED JOINT INSTRUCTIONS**</u>

[*Instructions begin on next page*]

1

**JA539**

**J-1: OPENINING INSTRUCTIONS**

MEMBERS OF THE JURY, WE ARE ABOUT TO BEGIN THE TRIAL OF THE CASE ABOUT WHICH YOU HEARD ABOUT DURING   THE   JURY   SELECTION. BEFORE THE TRIAL BEGINS, I AM GOING TO GIVE YOU INSTRUCTIONS THAT WILL HELP YOU TO UNDERSTAND WHAT WILL BE PRESENTED TO YOU AND HOW YOU SHOULD CONDUCT YOURSELF DURING THE TRIAL.

DURING THE TRIAL YOU WILL HEAR ME USE A FEW TERMS THAT YOU MAY NOT HAVE HEARD BEFORE. LET ME BRIEFLY EXPLAIN SOME OF THE MOST COMMON TO YOU. THE PARTY WHO SUES IS CALLED THE PLAINTIFF.  IN THIS ACTION THE PLAINTIFF IS GMS INDUSTRIAL SUPPLY, INC.  THE PARTIES BEING SUED ARE CALLED THE DEFENDANTS.  IN THIS ACTION THE DEFENDANTS ARE G&S SUPPLY, LLC, WARTECH INDUSTRIES, LLC, HMC SUPPLY, LLC, WESTLY GREER, SABRINA GREER, GREER GROUP, LLC, GREGORY K. SPIRES, COUNTY ROADS, LLC, THOMAS HAYES, AND MIKE WELTON.

CERTAIN OF THE DEFENDANTS HAVE FILED WHAT IS KNOWN AS A COUNTERCLAIM IN WHICH THE DEFENDANTS SEEK TO RECOVER DAMAGES FROM THE PLAINTIFF, GMS INDUSTRIAL SUPPLY, INC., FOR INJURIES THAT THE DEFENDANTS CLAIM TO HAVE EXPERIENCED AS A RESULT OF PLAINTIFF'S CONDUCT.

YOU WILL SOMETIMES HEAR ME REFER TO "COUNSEL."  "COUNSEL" IS ANOTHER WAY OF SAYING "LAWYER" OR "ATTORNEY."  I WILL SOMETIMES REFER TO MYSELF AS THE "COURT."

**JA540**

WHEN I "SUSTAIN" AN OBJECTION, I AM EXCLUDING THE EVIDENCE FROM THIS TRIAL FOR A GOOD REASON.  WHEN YOU HEAR THAT I HAVE "OVERRULED" AN OBJECTION, I AM PERMITTING THE EVIDENCE TO BE ADMITTED.

WHEN I SAY "ADMITTED INTO EVIDENCE" OR "RECEIVED INTO EVIDENCE," THAT MEANS THAT THE PARTICULAR STATEMENT OR THE PARTICULAR EXHIBIT MAY BE CONSIDERED BY YOU IN MAKING THE DECISION YOU MUST MAKE AT THE END OF THE CASE.

BY YOUR VERDICT, YOU WILL DECIDE DISPUTED ISSUES OF FACT.  I WILL DECIDE ALL QUESTIONS OF LAW THAT ARISE DURING TRIAL.  BEFORE YOU BEGIN YOUR DELIBERATION AT THE CLOSE OF THE CASE, I WILL INSTRUCT YOU IN MORE DETAIL ON THE LAW THAT YOU MUST FOLLOW AND APPLY.

BECAUSE YOU WILL BE ASKED TO DECIDE THE FACTS OF THIS CASE, YOU SHOULD GIVE CAREFUL ATTENTION TO THE TESTIMONY AND EVIDENCE PRESENTED.  KEEP IN MIND THAT I WILL INSTRUCT YOU AT THE END OF THE TRIAL ABOUT DETERMING THE CREDIBILITY OR "BELIEVABILITY" OF THE WITNESSES.  DURING THE TRIAL YOU SHOULD KEEP AN OPEN MIND AND SHOULD NOT FORM OR EXPRESS AN OPINION ABOUT THE CASE UNTIL YOU HAVE HEARD ALL OF THE TESTIMONY AND EVIDENCE, THE LAWYERS' CLOSING ARGUMENTS, AND MY INSTRUCTIONS TO YOU ON THE LAW.

WHILE THE TRIAL IS IN PROGRESS, YOU MUST NOT DISCUSS THE CASE IN ANY MANNER AMONG YOURSELVES OR WITH ANYONE ELSE.  IN ADDITION, YOU SHOULD NOT PERMIT ANYONE TO DISCUSS THE CASE IN YOUR PRESENCE.  YOU SHOULD AVOID READING ANY NEWS ARTICLES THAT MIGHT BE PUBLISHED ABOUT THE CASE.  YOU SHOULD ALSO AVOID WATCHING OR LISTENING TO ANY

**JA541**

TELEVISION OR RADIO COMMENTS OR COMMENTS ON THE INTERNET ABOUT THE TRIAL.

WHILE THE TRIAL IS IN PROGRESS YOU MUST NOT DISCUSS THE CASE IN ANY MANNER AMONG YOURSELVES OR WITH ANYONE ELSE, NOR SHOULD YOU PERMIT ANYONE TO DISCUSS IT IN YOUR PRESENCE.

FROM TIME TO TIME DURING THE TRIAL I MAY MAKE RULINGS ON OBJECTIONS OR MOTIONS MADE BY THE LAWYERS.  IT IS THE LAYWER'S DUTY TO OBJECT WHEN THE OTHER SIDE OFFERS TESTIMONY OR OTHER EVIDENCE WHICH THE LAWYER BELIEVES IS NOTADMISSIBLE.  YOU SHOULD NOT BE BIASED OR PARTIAL AGAINST A LAWYER OR THE LAWYER'S CLIENT BECAUSE THE LAWYER HAS MADE OBJECTIONS.  IF I SUSTAIN OR UPHOLD AN OBJECTION TO A QUESTION THAT QUESTIONS GOES UNANSWERED BY THE WITNEES, YOU SHOULD NOT DRAW ANY INFERENCE OR CONCLUSIONS FROM THE QUESTION. YOU SHOULD NOT INFER OR CONCLUDE FROM ANY RULING OR OTHER COMMENT I MAY MAKE THAT I HAVE ANY OPINIONS ON THE MERITS OF THE CASE FAVORING ONE SIDE OR THE OTHER.  I DO NOT FAVOR ONE SIDE OR THE OTHER.

THE LAWYERS ARE NOT ALLOWED TO SPEAK WITH YOU DURING THIS CASE.  WHEN YOU SEE THE LAWYERS AT A RECESS OR PASS THEM IN THE HALLS AND THEY DO NOT SPEAK WITH YOU, THEY ARE NOT BEING RUDE OR UNFRIENDLY; THEY ARE SIMPLY FOLLOWING THE LAW.

DURING THE TRIAL, IT MAY BE NECESSARY FOR ME TO TALK WITH THE LAWYERS OUT OF YOUR HEARING ABOUT QUESTIONS OF LAW OR PROCEDURE. SOMETIMES, YOU MAY BE EXCUSED FROM THE COURTROOM DURING THESE DISCUSSIONS.  I WILL TRY TO LIMIT THESE INTERRUPTIONS AS MUCH AS

POSSIBLE, BUT YOU SHOULD REMEMBER THE IMPORTANCE OF THE MATTER YOU ARE HERE TO DETERMINE AND SHOULD BE PATIENT EVEN THOUGH THE ASE MAY SEEM TO GO SLOWLY.

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 101:01 (6TH ED 2006) (MODIFIED).

GIVEN: _____
REFUSED: _____
MODIFIED: _____

**JA543**

**J-2: ORDER OF TRIAL**

THE CASE WILL PROCEED AS FOLLOWS:

FIRST, THE LAWYERS FOR EACH SIDE MAY MAKE OPENING STATEMENTS. WHAT IS SAID IN THE OPENING STATEMENT IS NOT EVIDENCE, BUT IS SIMPLY AN OUTLINE OR SUMARY TO HELP YOU UNDERSTAND WHAT EACH PARTY EXPECTS THE EVIDENCE TO SHOW.  A PARTY IS NOT REQUIRED TO MAKE AN OPENING STATEMENT.

AFTER THE OPENING STATEMENTS, THE PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., WILL PRESENT EVIDENCE IN SUPPORT OF PLAINTIFF'S CLAIMS AND THE DEFENDANTS' LAWYER MAY CROSS-EXAMINE THE WITNESSES.  AT THE CONCLUSION OF THE PLAINTIFF'S CASE, THE DEFENDANTS MAY INTRODUCE EVIDENCE AND THE PLAINTIFF'S LAWYER MAY CROSS-EXAMINE THE WITNESSES. THE DEFENDANTS ARE NOT REQUIRED TO INTRODUCE ANY EVIDENCE OR CALL ANY WITNESSES.  IF THE DEFENDANTS INTRODUCE EVIDENCE, THE PLAINTIFF MAY THEN PRESENT REBUTTAL EVIDENCE.

AFTER THE EVIDENCE IS PRESENTED, THE PARTIES' LAWYERS MAKE CLOSING ARGUMENTS EXPLAINING WHAT THEY BELIEVE THE EVIDENCE HAS SHOWN.  WHAT IS SAID IN THE CLOSING ARGUMENT IS NOT EVIDENCE.

FINALLY, I WILL INSTRUCT YOU ON THE LAW THAT YOU ARE TO APPLY IN REACHING YOUR VERDICT.  YOU WILL THEN DECIDE THE CASE.

**JA544**

USCA4 Appeal: 22-2090 Doc: 20-2 Filed: 01/19/2023 Pg: 248 of 417

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 101:02 (6TH ED 2006) (MODIFIED).


GIVEN: _____

REFUSED: _____

MODIFIED: _____

7

**JA545**

**J-3: NOTETAKING – PERMITTED**

DURING THIS TRIAL, I WILL PERMIT YOU TO TAKE NOTES.  YOU ARE NOT REQUIRED TO TAKE NOTES.  IF YOU DO NOT TAKE NOTES, YOU SHOULD NOT BE INFLUENCED BY ANOTHER JUROR'S NOTES, BUT SHOULD RELY UPON YOUR OWN RECOLLECTION OF THE EVIDENCE.

A WORD OF CAUTION IS IN ORDER.  YOU MUST NOT ALLOW YOUR NOTETTAKING TO DISTRACT YOU FROM THE PROCEEDINGS.

FREQUENTLY, THERE IS A TENDANCY TO ATTACHED TOO MUCH IMPORTANCE TO WHAT A PERSON WRITES DOWN.  SOME TESTIMONY THAT IS CONSIDERED UNIMPORTANT AT THE TIME PRESENTED AND NOT WRITTEN DOWN MAY TAKE ON GREATER IMPORTANCE LATER IN THE TRIAL IN LIGHT OF ALL THE EVIDENCE PRESENTED, THE FINAL ARGUMENTS, AND MY INSTRUCTIONS ON THE LAW.

ACCORDINGLY, YOU ARE INSTRUCTED THAT YOUR NOTES ARE ONLY A TOOL TO AID YOUR OWN INDIVIDUAL MEMORY AND YOU SHOULD NOT COMPARE NOTES WITH OTHER JURORS IN DETERMINING THE CONTENT OF ANY TESTIMONY OR IN EVALUATING THE IMPORTANCE OF ANY EVIDENCE.  YOUR NOTES ARE NOT EVIDENCE, AND ARE BY NO MEANS A COMPLETE OUTLINE OF THE PROCEEDINGS OR A LIST OF THE HIGHTLIGHTS OF THE TRIAL.  YOUR MEMORY SHOULD BE YOUR GREATEST ASSET WHEN IT COMES TIME TO DECIDE THIS CASE.

**JA546**

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS §
101.15 (6TH ED. 2006) (MODIFIED).

GIVEN: _____
REFUSED: _____
MODIFIED: _____

**J-4: JUDGE'S QUESTIONS TO WITNESSES**


       DURING THE TRIAL, I MAY SOMETIMES ASK A WITNESS QUESTIONS.  PLEASE DO NOT ASSUME THAT I HAVE ANY OPINION ABOUT THE SUBJECT MATTER OF MY QUESTIONS.

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 101.30 (6TH ED. 2006).


GIVEN:      _____

REFUSED:     _____

MODIFIED:    _____

**JA548**

**J-5: PROVINCE OF JUDGE AND JURY**

AFTER THE EVIDENCE HAS BEEN HEARD AND INSTRUCTIONS ARE FINISHED, YOU WILL MEET TO MAKE YOUR DECISION.  YOU WILL DETERMINE THE FACTS FROM ALL THE TESTIMONY AND THE OTHER EVIDENCE THAT IS PRESENTED.  YOU ARE THE SOLE AND EXCLUSIVE JUDGES OF THE FACTS.  I MUST STRESS THAT YOU MUST ACCEPT THE RULES OF LAW THAT I GIVE YOU, WHETHER OR NOT YOU AGREE WITH THEM.

THE LAW PERMITS ME TO COMMENT ON THE EVIDENCE IN THE CASE DURING THE TRIAL OR WHILE INSTRUCTING THE JURY.  SUCH COMMENTS ARE ONLY EXPRESSIONS OF MY OPINION AS TO THE FACTS.  YOU MAY DISCREGARD THESE COMMENTS ENTIRELY, BECAUSE YOU ARE TO DETERMIN FOR YOURSELVES THE WEIGHT OF THE EVIDENCE AND THE CREDIBILITY OF EACH OF THE WITNESSES.

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 101.10 (6TH ED. 2006).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA549**

**J-6: JURY CONDUCT**

TO INSURE FAIRNESS, YOU MUST OBEY THE FOLLOWING RULES:

1.  DO NOT TALK TO EACH OTHER ABOUT THIS CASE OR ABOUT ANYONE INVOLVED WITH THIS CASE UNTIL THE END OF THE TRIAL WHEN YOU GO TO THE JURY ROOM TO DECIDE ON YOUR VERDICT.

2.  DO NOT TALK WITH ANYONE ELSE ABOUT THIS CASE OR ABOUT ANYONE INVOLVED WITH THIS CASE UNTIL THE TRIAL HAS ENDED AND YOU HAVE BEEN DISCHARGED AS JURORS. "ANYONE ELSE" INCLUDES MEMBERS OF YOUR FAMILY AND YOUR FRIENDS. YOU MAY TELL PEOPLE YOU ARE A JUROR, BUT DO NOT TELL THEM ANYTHING ELSE ABOUT THE CASE.

3.  OUTSIDE THE COURTROOM, DO NOT LET ANYONE TELL YOU ANYTHING ABOUT THE CASE, OR ABOUT ANYONE INVOLVED WITH IT UNTIL THE TRIAL HAS ENDED. IF SOMEONE SHOULD TRY TO TALK TO YOU ABOUT THE CASE DURING THE TRIAL, PLEASE REPORT IT TO ME IMMEDIATELY.

4.  DURING THE TRIAL YOU SHOULD NOT TALK WITH OR SPEAK TO ANY OF THE PARTIES, LAWYERS OR WITNESSES INVOLVED IN THIS CASE – YOU SHOULD NOT EVEN PASS THE TIME OF DAY WITH ANY OF THEM. IT IS IMPORTANT NOT ONLY THAT YOU DO JUSTICE IN THIS CASE, BUT THAT YOU ALSO GIVE THE APPEARANCE OF DOING JUSTICE.

5.  DO NOT READ ANY NEWS STORIES OR ARTICLES ABOUT THE CASE, OR ABOUT ANYONE INVOLVED WITH IT, OR LISTEN TO ANY RADIO OR TELEVISION REPORTS ABOUT THE CASE OR ABOUT ANYONE INVOLVED WITH IT.

**JA550**

6.      DO NOT DO ANY RESEARCH, SUCH AS ON THE INTERNET, OR SOCIAL MEDIA OR CHECKING DICTIONARIES, OR MAKE ANY INVESTIGATION ABOUT THE CASE ON YOUR OWN.

7.      DO NOT MAKE UP YOUR MIND DURING THE TRIAL ABOUT WHAT THE VERDICT SHOULD BE.  KEEP AN OPEN MIND UNTIL AFTER YOU HAVE GONE TO THE JURY ROOM TO DECIDE THE CASE AND YOU AND THE OTHER JURORS HAVE DISCUSSED ALL THE EVIDENCE.

8.      IF YOU NEED TO TELL ME SOMETHING, SIMPLY GIVE A SIGNED NOTE TO THE BAILIFF TO GIVE TO ME.

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 101.11 (6TH ED. 2006) (MODIFIED).

GIVEN:        _____
REFUSED:      _____
MODIFIED:     _____

**J-7: EVIDENCE IN THE CASE**

THE EVIDENCE IN THE CASE WILL CONSIST OF THE FOLLOWING:

1.  THE SWORN TESTIMONY OF THE WITNESSES, NO MATTER WHO CALLED A WITNESS.

2.  ALL EXHIBITS RECEIVED IN EVIDENCE, REGARDLESS OF WHO MAY HAVE PRODUCED THE EXHIBITS.

3.  ALL FACTS THAT MAY HAVE BEEN JUDICIALLY NOTICED AND THAT YOU MUST TAKE AS TRUE FOR PURPOSES OF THIS CASE.

DEPOSITIONS MAY ALSO BE RECEIVED IN EVIDENCE. DEPOSITIONS CONTAIN SWORN TESTIMONY, WITH THE LAWYERS FOR EACH PARTY BEING ENTITLED TO ASK QUESTIONS. IN SOME CASES, A DEPOSITION MAY BE PLAYED FOR YOU ON VIDEOTAPE. DEPOSITION TESTIMONY MAY BE ACCEPTED BY YOU, SUBJECT TO THE SAME INSTRUCTIONS THAT APPLY TO WITNESSES TESTIFYING IN OPEN COURT.

STATEMENTS AND ARGUMENTS OF THE LAWYERS ARE NOT EVIDENCE IN THE CASE, UNLESS MADE AS AN ADMISSION OR STIPULATION OF FACT. A "STIPULATION" IS AN AGREEMENT BETWEEN BOTH SIDES THAT CERTAIN FACTS ARE TRUE. WHEN THE LAWYERS ON BOTH SIDES STIPULATE OR AGREE TO THE EXISTENCE OF A FACT, YOU MUST, UNLESS OTHERWISE INSTRUCTED, ACCEPT THE STIPULATION AS EVIDENCE, AND REGARD THAT FACT AS PROVED.

I MAY TAKE JUDICIAL NOTICE OF CERTAIN FACTS OR EVENTS. WHEN I DECLARE THAT I WILL TAKE JUDICIAL NOTICE OF SOME FACT OR EVENT, YOU MUST ACCEPT THAT FACT AS TRUE.

IF I SUSTAIN AN OBJECTION TO ANY EVIDENCE OR IF I ORDER EVIDENCE

14

**JA552**

STRICKEN, THAT EVIDENCE MUST BE ENTIRELY IGNORED.

SOME EVIDENCE IS ADMITTED FOR A LIMITED PURPOSE ONLY. WHEN I INSTRUCT YOU THAT AN ITEM OF EVIDENCE HAS BEEN ADMITTED FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR THAT LIMITED PURPOSE AND FOR NO OTHER PURPOSE.

YOU ARE TO CONSIDER ONLY THE EVIDENCE IN THE CASE. BUT IN YOUR CONSIDERATION OF THE EVIDENCE YOU ARE NOT LIMITED TO THE STATEMENTS OF THE WITNESS. IN OTHER WORDS, YOU ARE NOT LIMITED SOLELY TO WHAT YOU SEE AND HEAR AS THE WITNESSES TESTIFIED. YOU MAY DRAW FROM THE FACTS THAT YOU FIND HAVE BEEN PROVED, SUCH REASONABLE INFERENCES OR CONCLUSIONS AS YOU FEEL ARE JUSTIFIED IN LIGHT OF YOUR EXPERIENCE.

AT THE END OF THE TRIAL YOU WILL HAVE TO MAKE YOUR DECISION BASED ON WHAT YOU RECALL OF THE EVIDENCE. YOU WILL NOT HAVE A WRITTEN TRANSCRIPT TO CONSULT, AND IT IS DIFFICULT AND TIME CONSUMING FOR THE REPORTER TO READ BACK LENGTHY TESTIMONY. I URGE YOU TO PAY CLOSE ATTENTION TO THE TESTIMONY AS IT IS GIVEN.

FED-JI §101.40; 3 FED. JURY PRAC. & INST. §101.40

GIVEN:　　　　＿＿＿＿＿＿＿

REFUSED:　　　　＿＿＿＿＿＿＿

MODIFIED:　　　＿＿＿＿＿＿＿

**JA553**

**J-8: EXPERT WITNESS**

THE RULES OF EVIDENCE ORDINARIY DO NOT PERMIT WITNESSES TO TESTIFY AS TO OPINIONS OR CONCLUSIONS.  THERE IS AN EXCEPTION TO THIS RULE FOR "EXPERT WITNESSES."  AN EXPERT WITNESS IS A PERSON WHO BY EDUCATION AND EXPERIENCE HAS BECOME EXPERT IN SOME ART, SCIENCE, PROFESSION, OR CALLING.  EXPERT WITNESSES GIVE THEIR OPINIONS AS TO MATTERS IN WHICH THEY PROFESS TO BE EXPERT, AND MAY ALSO STATE THEIR REASONS FOR THEIR OPINIONS.

YOU SHOULD CONSIDER EACH EXPERT OPINION RECEIVED IN EVIDENCE IN THIS CASE, AND GIVE IT SUCH WEIGHT AS YOU THINK IT DESERVES.  IF YOU SHOULD DECIDE THE OPINION OF AN EXPERT WITNESS IS NOT BASED UPON SUFFICIENT EDUCATION AND EXPERIENE, OR IF YOU SHOULD CONCLUDE THE REASONS GIVEN IN SUPPORT OF THE OPINION ARE NOT SOUND, OR IF YOU FEEL THE EXPERT IS OUTWEIGHED BY OTHER EVIDENCE, YOU MAY DISREGARD THE OPINION ENTIRELY.

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS §§ 104.40 (6TH ED. 2006).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA554**

**J-9: GENERAL INTRODUCTION AFTER CONCLUSION OF EVIDENCE**

NOW THAT YOU HAVE HEARD THE EVIDENCE AND THE ARGUMENT, IT IS MY DUTY TO INSTRUCT YOU ABOUT THE APPLICABLE LAW.

IT IS YOUR DUTY TO FOLLOW THE LAW AS I WILL STATE IT. YOU MUST APPLY THE LAW TO THE FACTS AS YOU FIND THEM FROM THE EVIDENCE IN THE CASE. DO NOT SINGLE OUT ONE INSTRUCTION AS STATING THE LAW, BUT CONSIDER THE INSTRUCTIONS AS A WHOLE. DO NOT BE CONCERNED ABOUT THE WISDOM OF ANY RULE OF LAW STATED BY ME. YOU MUST FOLLOW AND APPLY THE LAW.

THE LAWYERS HAVE PROPERLY REFERRED TO SOME OF THE GOVERNING RULES OF LAW IN THEIR ARGUMENTS. IF THERE IS ANY DIFFERENCE BETWEEN THE LAW STATED BY THE LAWYERS AND THESE INSTRUCTIONS, YOU MUST FOLLOW MY INSTRUCTIONS.

NOTHING I SAY IN THESE INSTRUCTIONS INDICATES I HAVE ANY OPINION ABOUT THE FACTS.

YOU, NOT I, HAVE THE DUTY TO DETERMINE THE FACTS.

YOU MUST PERFORM YOUR DUTIES AS JURORS WITHOUT BIAS OR PREJUDICE AS TO ANY PARTY. THE LAW DOES NOT PERMIT YOU TO BE CONTROLLED BY SYMPATHY, PREJUDICE OR PUBLIC OPINION. ALL PARTIES EXPECT THAT YOU WILL CAREFULLY AND IMPARTIALLY CONSIDER ALL THE EVIDENCE, FOLLOW THE LAW AS IT IS NOW BEING GIVEN TO YOU, AND REACH A JUST VERDICT, REGARDLESS OF THE CONSEQUENCES.

**JA555**

FED-JI §103.01
3 FED. JURY PRAC. & INST. §103.01


GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA556**

**J-10: EVIDENCE IN THE CASE**

UNLESS YOU ARE OTHERWISE INSTRUCTED, THE EVIDENCE IN THE CASE CONSISTS OF THE SWORN TESTIMONY OF THE WITNESSES REGARDLESS OF WHO CALLED THE WITNESS, ALL EXHIBITS RECEIVED IN EVIDENCE REGARDLESS OF WHO MAY HAVE PRODUCED THEM, AND ALL FACTS AND EVENTS THAT MAY HAVE BEEN ADMITTED OR STIPULATED TO.

STATEMENTS AND ARGUMENTS BY THE LAWYERS ARE NOT EVIDENCE. THE LAWYERS ARE NOT WITNESSES. WHAT THEY HAVE SAID IN THEIR OPENING STATEMENT, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE. HOWEVER, WHEN THE LAWYERS ON BOTH SIDES STIPULATE OR AGREE ON THE EXISTENCE OF A FACT, YOU MUST, UNLESS OTHERWISE INSTRUCTED, ACCEPT THE STIPULATION AND REGARD THAT FACT AS PROVED.

ANY EVIDENCE TO WHICH I HAVE SUSTAINED AN OBJECTION AND EVIDENCE THAT I HAVE ORDERED STRICKEN MUST BE ENTIRELY DISREGARDED.

FED-JI §103.30
3 FED. JURY PRAC. & INST. §103.30

GIVEN:        _____

REFUSED:      _____

MODIFIED:     _____

**JA557**

**J-11: DIRECT AND CIRCUMSTANTIAL EVIDENCE**

"DIRECT EVIDENCE" IS A DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT WHAT THE WITNESS SAID OR HEARD OR DID. "CIRCUMSTANTIAL EVIDENCE" IS PROOF OF ONE OR MORE FACTS FROM WHICH YOU COULD FIND ANOTHER FACT. YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE. THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE. YOU ARE TO DECIDE HOW MUCH WEIGHT TO GIVE ANY EVIDENCE.

FED-JI §101.42
3 FED. JURY PRAC. & INST. §101.42

GIVEN:          _____

REFUSED:       _____

MODIFIED:      _____

**JA558**

**J-12:  USE OF DEPOSITIONS AS EVIDENCE**


DURING THE TRIAL, CERTAIN TESTIMONY HAS BEEN PRESENTED BY WAY OF DEPOSITION. THE DEPOSITION CONSISTED OF SWORN, RECORDED ANSWERS TO QUESTIONS ASKED OF THE WITNESS IN ADVANCE OF THE TRIAL BY ATTORNEYS FOR THE PARTIES TO THE CASE. THE TESTIMONY OF A WITNESS WHO, FOR SOME REASON, IS NOT PRESENT TO TESTIFY FROM THE WITNESS STAND MAY BE PRESENTED IN WRITING UNDER OATH [OR ON A VIDEOTAPE]. SUCH TESTIMONY IS ENTITLED TO THE SAME CONSIDERATION AND IS TO BE JUDGED AS TO CREDIBILITY, AND WEIGHED, AND OTHERWISE CONSIDERED BY YOU, INSOFAR AS POSSIBLE, IN THE SAME WAY AS IF THE WITNESS HAD BEEN PRESENT AND HAD TESTIFIED FROM THE WITNESS STAND.


FED-JI §105:02
3 FED. JURY PRAC. & INST. 105:02

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**JA559**

**J-13: STIPULATIONS OF FACT**


THE PARTIES HAVE STIPULATED THAT CERTAIN FACTS ARE TRUE, AND THOSE STIPULATIONS HAVE BEEN READ TO YOU DURING THIS TRIAL. YOU MUST THEREFORE TREAT THESE FACTS AS HAVING BEEN PROVED FOR THE PURPOSES OF THIS CASE.

MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE THIRD CIRCUIT, INSTRUCTION NO. 2.4 (2014)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

JA560

**J-14:  INFERENCES**


YOU ARE TO CONSIDER ONLY THE EVIDENCE IN THE CASE.  HOWEVER, YOU ARE NOT LIMITED TO THE STATEMENTS OF THE WITNESSES.  YOU MAY DRAW FROM THE FACTS YOU FIND HAVE BEEN PROVED SUCH REASONABLE INFERENCES AS SEEM JUSTIFIED IN LIGHT OF YOUR EXPERIENCE.

"INFERENCES" ARE DEDUCTIONS OR CONCLUSIONS THAT REASON AND COMMON SENSE LEAD YOU TO DRAW FROM FACTS ESTABLISHED BY THE EVIDENCE IN THE CASE.


FED-JI §104:20
3 FED. JURY PRAC. & INST. 104:20

GIVEN:        _____

REFUSED:      _____

MODIFIED:     _____

**JA561**

**J-15: IMPEACHMENT – INCONSISTENT STATEMENT OR CONDUCT**

A WITNESS MAY BE DISCREDITED OR IMPEACHED BY CONTRADICTORY EVIDENCE OR BY EVIDENCE THAT AT SOME OTHER TIME THE WITNESS HAS SAID OR DONE SOMETHING, OR HAS FAILED TO SAY OR DO SOMETHING THAT IS INCONSISTENT WITH THE WITNESS' PRESENT TESTIMONY.

IF YOU BELIEVE ANY WITNESS HAS BEEN IMPEACHED AND THUS DISCREDITED, YOU MAY GIVE THE TESTIMONY OF THAT WITNESS SUCH CREDIBILITY, IF ANY, YOU THINK IT DESERVES.

IF A WITNESS IS SHOWN KNOWINGLY TO HAVE TESTIFIED FALSELY ABOUT ANY MATERIAL MATTER, YOU HAVE A RIGHT TO DISTRUST SUCH WITNESS' OTHER TESTIMONY AND YOU MAY REJECT ALL THE TESTIMONY OF THAT WITNESS OR GIVE IT SUCH CREDIBILITY AS YOU MAY THINK IT DESERVES.

AN ACT OR OMISSION IS "KNOWINGLY" DONE, IF VOLUNTARILY AND INTENTIONALLY, AND NOT BECAUSE OF MISTAKE OR ACCIDENT OR OTHER INNOCENT REASON.

JURY PRACTICE AND INST., 6TH ED., 105.04

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**JA562**

**J-16: CREDIBILITY OF WITNESSES**


IN DECIDING THE FACTS, YOU MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE. YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, PART OF IT, OR NONE OF IT. IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE INTO ACCOUNT MANY FACTORS, INCLUDING THE WITNESS' OPPORTUNITY AND ABILITY TO SEE OR HEAR OR KNOW THE THINGS THE WITNESS TESTIFIED ABOUT; THE QUALITY OF THE WITNESS' MEMORY; THE WITNESS' APPEARANCE AND MANNER WHILE TESTIFYING; THE WITNESS' INTEREST IN THE OUTCOME OF THE CASE; ANY BIAS OR PREJUDICE THE WITNESS MAY HAVE; OTHER EVIDENCE THAT MAY HAVE CONTRADICTED THE WITNESS' TESTIMONY; AND THE REASONABLENESS OF THE WITNESS' TESTIMONY IN LIGHT OF ALL THE EVIDENCE. THE WEIGHT OF THE EVIDENCE DOES NOT NECESSARILY DEPEND UPON THE NUMBER OF WITNESSES WHO TESTIFY.




FED-JI §101.43
3 FED. JURY PRAC. & INST. §101.43


GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA563**

**J-17:  BURDEN OF PROOF – PREPONDERANCE OF THE EVIDENCE**

PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., HAS THE BURDEN OF PROOF IN A CIVIL ACTION, SUCH AS THIS, TO PROVE EVERY ESSENTIAL ELEMENT OF PLAINTIFF'S CLAIMS BY A PREPONDERANCE OF THE EVIDENCE.  IF PLAINTIFF SHOULD FAIL TO ESTABLISH ANY ESSENTIAL ELEMENT OF ANY OF ITS CLAIMS BY A PREPONDERANCE OF THE EVIDENCE, YOU SHOULD FIND FOR DEFENDANTS AS TO THAT CLAIM.

AS TO THE COUNTERCLAIM, THE DEFENDANTS ARE IN THE POSITION OF A PLAINTIFF AND THE DEFENDANTS HAVE THE BURDEN OF PROVING THE ESSENTIAL ELEMENTS OF THEIR COUNTERCLAIM.

TO "ESTABLISH BY A PREPONDERANCE OF THE EVIDENCE" MEANS TO SHOW THAT THE FACT SOUGHT TO BE PROVED IS MORE PROBABLE THAN NOT.  IN OTHER WORSDS, A PREPONDERANCE OF THE EVIDENCE MEANS SUCH EVIDENCE, AS WHEN CONSIDERED AND COMPARED WITH THE EVIDENCE OPPOSED TO IT, HAS MORE CONVICING FORCE, AND PRODUCED IN YOUR MINDS BELIEF THAT WHAT IS SOUGHT TO BE PROVED IS MORE LIKELY TRUE THAN NOT TRUE. THIS STANDARD DOES NOT REQUIRE PROOF TO AN ABSOLUTE CERTAINTY, SINCE PROOF TO AN ABSOLUTE CERTAINTY IS SELDOM POSSIBLE IN ANY CASE.

IN DETERMINING WHETHER ANY FACT IN ISSUE HAS BEEN PROVED BY A PREPONDERANCE OF THE EVIDENCE, UNLESS OTHERWISE INSTRUCTED, YOU MAY CONSIDER THE TESTIMONY OF ALL WITNESSES, INCLUDING ALL DEPOSITION TESTIMONY, REGARDLESS OF WHO MAY HAVE CALLED THEM, AND

**JA564**

USCA4 Appeal: 22-2090    Doc: 20-2      Filed: 01/19/2023    Pg: 268 of 417

ALL EXHIBITS RECEIVED IN EVIDENCE, REGARDLESS OF WHO MAY HAVE PRODUCED THEM.

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 104.01 (6TH ED. 2006) (MODIFIED).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

JA565

**J-18: CONTRACTS MUST BE COMPLETE AND REASONABLY CERTAIN**

A CONTRACT MUST BE BOTH COMPLETE AND REASONABLY CERTAIN. IT IS COMPLETE IF IT INCUDES ALL THE ESSENTIAL TERMS. IT IS REASONABLY CERTAIN IF ALL THE ESSENTIAL TERMS ARE EXPRESSED IN A CLEAR AND DEFINITE WAY.

VMJI NO. 45.170

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA566**

**J-19: ELEMENTS OF BREACH OF FIDUCIARY DUTY OF LOYALTY**

IN THIS CASE, THE PLAINTIFF, GMS INDUSTRIAL SUPPLY, LLC ALLEGES THAT THE DEFENDANT, WESTLY GREER, VIOLATED HIS FIDUCIARY DUTY OF LOYALTY AS AN EMPLOYEE OF THE COMPANY.  WESTLY GREER DENIES VIOLATING HIS FIDUCIARY DUTY OF LOYALTY TO GMS.

FOR GMS TO RECOVER FROM *WESTLY GREER* ON ITS CLAIM OF BREACH OF FIDUCIARY DUTY, YOU MUST FIND THAT ALL THE FOLLOWING HAVE BEEN PROVED BY A PREPONDERANCE OF THE EVIDENCE:

1. DEFENDANT WESTLY GREER, BREACHED HIS FIDUCIARY DUTY TO THE PLAINTIFF, GMS;

2. THE PLAINTIFF HAD DAMAGES; AND

3. WESTLY GREER'S BREACH OF FIDUCIARY DUTY WAS A CAUSE OF THE PLAINTIFF'S DAMAGES.

IF YOU FIND THAT ANY ONE OR MORE OF THESE THREE STATEMENTS HAS NOT BEEN PROVED, THEN YOUR VERDICT MUST BE FOR THE DEFENDANT.

ON THE OTHER HAND, IF YOU FIND THAT ALL THESE THREE STATEMENTS HAVE BEEN PROVED, THEN YOUR VERDICT MUST BE FOR THE PLAINTIFF.

SUPPORT: COLORADO PATTERN CIVIL JURY INSTRUCTIONS, § 26.1.

GIVEN:          _____
REFUSED:      _____
MODIFIED:    _____

**JA567**

**J-20: BURDEN OF PROOF FOR BREACH OF FIDUCIARY DUTY OF LOYALTY**

GMS HAS THE BURDEN OF PROVING ITS BREACH OF FIDUCIARY DUTY

CLAIM BY A PREPONDERANCE OF THE EVIDENCE.

WHITE V. PIERSON-ANDERSEN (IN RE ESTATE OF HEYN), 47 P.3D 724, 726 (COLO. APP. 2002)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

JA568

**J-21:  BURDEN OF PROOF FOR ESTABLISHING DAMAGES FOR BREACH OF 2012 EMPLOYMENT AGREEMENT**

THE BURDEN IS ON GMS TO PROVE BY GREATER WEIGHT OF THE EVIDENCE THAT IT SUSTAINED DAMAGES.  GMS IS NOT REQUIRED TO PROVE THE EXACT AMOUNT OF ITS DAMAGES, BUT IT MUST SHOW SUFFICIENT FACTS AND CIRCUMSTANCES TO PERMIT YOU TO MAKE A REASONABLE ESTIMATE OF THEM.  IF GMS FAILS TO DO SO, THEN IT CANNOT RECOVER.

VIRGINIA MODEL JURY INSTRUCTIONS – CIVIL, INSTRUCTION NO. 45.510

GIVEN:        _____

REFUSED:      _____

MODIFIED:     _____

**JA569**

**J-22: DEFINITION OF GREATER WEIGHT**

THE GREATER WEIGHT OF ALL THE EVIDENCE IS SOMETIMES CALLED THE

PREPONDERANCE OF THE EVIDENCE. IT IS THAT EVIDENCE WHICH YOU FIND

MORE PERSUASIVE, WHEN EVALUATED AGAINST ALL OF THE EVIDENCE THAT

HAS BEEN ADMITTED IN THE CASE. THE TESTIMONY OF ONE WITNESS WHOM

YOU BELIEVE CAN BE THE GREATER WEIGHT OF THE EVIDENCE.

VIRGINIA MODEL JURY INSTRUCTIONS – CIVIL, INSTRUCTION NO. 3.100

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA570**

**J-23:  CONSEQUENTIAL DAMAGES FOR BREACH OF 2012 EMPLOYMENT CONTRACT**

CONSEQUENTIAL DAMAGES ARE DAMAGES RESULTING FROM THE BREACH OF THE CONTRACT THAT ARISE FROM SPECIAL CIRCUMSTANCES ACTUALLY FORESEEN OR REASONABLY FORESEEABLE BY THE PARTIES WHEN THEY MADE THE CONTRACT. IF YOU FIND YOUR VERDICT IN FAVOR OF GMS YOU MAY AWARD IT SUCH DAMAGES AS YOU BELIEVE BY THE GREATER WEIGHT OF THE EVIDENCE THAT GMS SUSTAINED AS A RESULT OF THE BREACH.

VIRGINIA MODEL JURY INSTRUCTIONS – CIVIL, INSTRUCTION NO. 45.530

GIVEN:    _____

REFUSED:    _____

MODIFIED:    _____

**JA571**

**J-24:  DEFINITION OF TRADE SECRET UNDER THE DEFEND TRADE SECRETS ACT**

THE TERM "TRADE SECRET" MEANS ALL FORMS AND TYPES OF FINANCIAL, BUSINESS, SCIENTIFIC, TECHNICAL, ECONOMIC, OR ENGINEERING INFORMATION, INCLUDING PATTERNS, PLANS, COMPILATIONS, PROGRAM DEVICES, FORMULAS, DESIGNS, PROTOTYPES, METHODS, TECHNIQUES, PROCESSES, PROCEDURES, PROGRAMS, OR CODES, WHETHER TANGIBLE OR INTANGIBLE, AND WHETHER OR HOW STORED, COMPILED, OR MEMORIALIZED PHYSICALLY, ELECTRONICALLY, GRAPHICALLY, PHOTOGRAPHICALLY, OR IN WRITING IF

(A) THE OWNER THEREOF HAS TAKEN REASONABLE MEASURES TO KEEP SUCH INFORMATION SECRET; AND

(B) THE INFORMATION DERIVES INDEPENDENT ECONOMIC VALUE, ACTUAL OR POTENTIAL, FROM NOT BEING GENERALLY KNOWN TO, AND NOT BEING READILY ASCERTAINABLE THROUGH PROPER MEANS BY, ANOTHER PERSON WHO CAN OBTAIN ECONOMIC VALUE FROM THE DISCLOSURE OR USE OF THE INFORMATION.

18 U.S.C.S. § 1839(3); VARIABLE ANNUITY LIFE INS. CO. V. CORETH, 535 F. SUPP. 3D 488, 515 (E.D. VA. 2021)

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**JA572**

**J-25:  BURDEN OF PROOF FOR MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT**

IN ORDER FOR GMS TO PREVAIL ON ITS CLAIM FOR MISAPPROPRIATION OF A TRADE SECRET UNDER THE DEFEND TRADE SECRETS ACT, GMS MUST ESTABLISH EACH ELEMENT OF THE OFFENSE BY A PREPONDERANCE OF THE EVIDENCE.

PREPONDERANCE OF THE EVIDENCE IS NOT MERELY THE LARGER NUMBER OF WITNESSES OR THE GREATER AMOUNT OF EVIDENCE.  IT DOES NOT DEPEND ON WHAT PARTY INTRODUCES THE EVIDENCE.  IF THE EVIDENCE IN YOUR OPINION IS EVENLY BALANCED, THE PLAINTIFF HAS NOT CONVINCED YOU BY A GREATER WEIGHT.  IT IS A LITTLE DIFFICULT TO DEFINE SOMETIMES BUT IT HAS BEEN COMPARED FREQUENTLY TO THE BALANCING OF SCALES.  AS LONG AS THE SCALES REMAIN EVEN, THERE HAS BEEN NO GREATER WEIGHT OF EVIDENCE PRODUCED BUT THERE MUST BE SUFFICIENT TO DIP THE SCALES AND WHEN THAT IS DONE THE PLAINTIFF HAS PRODUCED THE GREATER WEIGHT OR PREPONDERANCE OF THE EVIDENCE.

STEVES & SONS, INC. V. JELD-WEN, INC., 2019 U.S. DIST. LEXIS 139818, AT *9 (E.D. VA. AUG. 16, 2019); SHIP CABIN CLUB, INC. V. CRENSHAW, 1951 U.S. DIST. LEXIS 4426, AT *4-5 (E.D. VA. JAN. 10, 1951)

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**J-26: VIRGINIA BUSINESS CONSPIRACY ACT – "WILLFULLY AND MALICIOUSLY" DEFINED**

"WILLFULLY AND MALICOUSLY" MEANS THAT THE CONSPIRATORS ACTED INTENTIONALLY, PURPOSEFULLY, WITHOUT LAWFUL JUSTIFICATION, AND FOR THE PURPOSE OF HARMING PLAINTIFF GMS INDUSTRIAL SUPPLY, INC.

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn*, 144 F. Supp. 2d 558, 601 (W.D. Va. 2001) (quoting *Simmons v. Miller*, 261 Va. 561, 578 (2001)).

GIVEN: _____
REFUSED: _____
MODIFIED: _____

**J-27: VIRGINIA BUSINESS CONSPIRACY ACT – "WITHOUT LAWFUL JUSTIFICATION" DEFINED**

WITHOUT LAWFUL JUSTIFICATION MEANS THE DEFENDANTS INTENDED TO ACCOMPLISH SOME CRIMINAL OR UNLAWFUL PURPOSE OR TO ACCOMPLISH SOME LAWFUL PURPOSE THROUGH CRIMINAL OR UNLAWFUL MEANS.

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn*, 144 F. Supp. 2d 558, 605 (W.D. Va. 2001) (quoting *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F/2d 1280, 1284 (4th Cir. 1987).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**J-28: DEFINITION OF TRADEMARK**

A TRADEMARK IS A WORD, SYMBOL, OR COMBINATION OF WORDS OR SYMBOLS USED BY A PERSON TO IDENTIFY HIS PRODUCT, TO DISTINGUISH HIS PRODUCT FROM THOSE MANUFACTURED OR SOLD BY OTHERS, AND TO INDICATE THE SOURCE OF HIS PRODUCT.

SEVENTH CIRCUIT FEDERAL JURY PRACTICE AND INSTRUCTIONS.

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA576**

**J-29: VERDICT NOT TO BE BASED ON SYMPATHY, BIAS, GUESSWORK, OR SPECULATION**

YOU MUST NOT BASE YOUR VERDICT IN ANY WAY UPON SYMPATHY, BIAS, GUESSWORK OR SPECULATION.  YOUR VERDICT MUST BE BASED SOLELY UPON THE EVIDENCE AND THE COURT'S INSTRUCTIONS.

VMJI NO. 2.220

GIVEN:          _____

REFUSED:          _____

MODIFIED:          _____

**JA577**

**J-30: VERDICT – UNANIMOUS – DUTY TO DELIBERATE**

THE VERDICT MUST REPRESENT THE CONSIDERED JUDGMENT OF EACH JUROR.  TO RETURN A VERDICT, IT IS NECESSARY THAT EACH JUROR AGREE. YOUR VERDICT MUST BE UNANIMOUS.

IT IS YOUR DUTY, AS JURORS, TO CONSULT WITH ONE ANOTHER, AND TO DELIBERATE WITH A VIEW TO REACHING AN AGREEMENT, IF YOU CAN DO SO WITHOUT DISREGARD OF INDIVIDUAL JUDGMENT.  YOU MUST EACH DECIDE THE CASE FOR YOURSELF, BUT ONLY AFTER AN IMPARTIAL CONSIDERATION OF THE EVIDENCE IN THE CASE WITH YOUR FELLOW JURORS.  IN THE COURSE OF YOUR DELIBERATIONS, DO NOT HESITATE TO REEXAMINE YOUR OWN VIEWS, AND CHANGE YOUR OPINION, IF CONVINCED IT IS ERRONEOUS.  BUT DO NOT SURRENDER YOUR HONEST CONVICTION AS TO THE WEIGHT OR EFFECT OF EVIDENCE, SOLELY BECAUSE OF THE OPINION OF YOUR FELLOW JURORS, OR FOR THE MERE PURPOSE OF RETURNING A VERDICT.

REMEMBER AT ALL TIMES THAT YOU ARE NOT PARTISANS.  YOU ARE JUDGES - JUDGES OF THE FACTS.  YOUR SOLE INTEREST IS TO SEEK THE TRUTH FROM THE EVIDENCE IN THE CASE.

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 106.01 (6TH ED 2006).

GIVEN:          _____

REFUSED:       _____

MODIFIED:      _____

**JA578**

**J-31: ELECTION OF A FOREPERSON - VERDICT**

UPON RETIRING TO THE JURY ROOM, YOU WILL SELECT ONE OF YOUR MEMBERS TO ACT AS YOUR FOREPERSON. THE FOREPERSON WILL PRESIDE OVER YOUR DELIBERATIONS, AND WILL BE YOUR SPOKESPERSON HERE IN COURT.

VERDICT FORMS HAVE BEEN PREPARED FOR YOUR CONVENIENCE.

YOU WILL TAKE THESE FORMS TO THE JURY ROOM AND, WHEN YOU HAVE REACHED UNANIMOUS AGREEMENT AS TO YOUR VERDICT, YOU WILL HAVE YOUR FOREPERSON FILL IN, DATE AND SIGN THE FORM WHICH SETS FORTH THE VERDICT UPON WHICH YOU UNANIMOUSLY AGREE; AND THEN RETURN WITH YOUR VERDICT TO THE COURTROOM.

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 106.04 (6TH ED 2006).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA579**

# **Plaintiff's Proposed Jury Instructions**

**P-1: "IF YOU FIND" OR "IF YOU DECIDE"**

WHEN I INSTRUCT YOU THAT A PARTY HAS THE BURDEN OF PROOF ON ANY PROPOSITION OR USE THE EXPRESSION "IF YOU FIND" OR "IF YOU DECIDE," I MEAN THAT YOU MUST BE PERSUADED, CONSIDERING ALL THE EVIDENCE IN THE CASE, THAT THE PROPOSITION IS MORE PROBABLY TRUE THAN NOT.

FED-JI §104.04
3 FED. JURY PRAC. & INST. §104.04

GIVEN: _____

REFUSED: _____

MODIFIED: _____

43

**JA581**

**P-2: EVIDENCE IN THE CASE**

UNLESS YOU ARE OTHERWISE INSTRUCTED, THE EVIDENCE IN THE CASE CONSISTS OF THE SWORN TESTIMONY OF THE WITNESSES REGARDLESS OF WHO CALLED THE WITNESS, ALL EXHIBITS RECEIVED IN EVIDENCE REGARDLESS OF WHO MAY HAVE PRODUCED THEM, AND ALL FACTS AND EVENTS THAT MAY HAVE BEEN ADMITTED OR STIPULATED TO.

STATEMENTS AND ARGUMENTS BY THE LAWYERS ARE NOT EVIDENCE. THE LAWYERS ARE NOT WITNESSES. WHAT THEY HAVE SAID IN THEIR OPENING STATEMENT, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE. HOWEVER, WHEN THE LAWYERS ON BOTH SIDES STIPULATE OR AGREE ON THE EXISTENCE OF A FACT, YOU MUST, UNLESS OTHERWISE INSTRUCTED, ACCEPT THE STIPULATION AND REGARD THAT FACT AS PROVED.

ANY EVIDENCE TO WHICH I HAVE SUSTAINED AN OBJECTION AND EVIDENCE THAT I HAVE ORDERED STRICKEN MUST BE ENTIRELY DISREGARDED.

FED-JI §103.30
3 FED. JURY PRAC. & INST. §103.30

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA582**

**P-3: DISCREPANCIES IN TESTIMONY**

YOU ARE THE SOLE JUDGES OF THE CREDIBILITY OF THE WITNESSES AND THE WEIGHT THEIR TESTIMONY DESERVES. YOU MAY BE GUIDED BY THE APPEARANCE AND CONDUCT OF THE WITNESS, OR BY THE MANNER IN WHICH THE WITNESS TESTIFIES, OR BY THE CHARACTER OF THE TESTIMONY GIVEN, OR BY EVIDENCE CONTRARY TO THE TESTIMONY.

YOU SHOULD CAREFULLY EXAMINE ALL THE TESTIMONY GIVEN, THE CIRCUMSTANCES UNDER WHICH EACH WITNESS HAS TESTIFIED, AND EVERY MATTER IN EVIDENCE TENDING TO SHOW WHETHER A WITNESS IS WORTHY OF BELIEF. CONSIDER EACH WITNESS' INTELLIGENCE, MOTIVE AND STATE OF MIND, AND DEMEANOR OR MANNER WHILE TESTIFYING.

CONSIDER THE WITNESS' ABILITY TO OBSERVE THE MATTERS AS TO WHICH THE WITNESS HAS TESTIFIED, AND WHETHER THE WITNESS IMPRESSES YOU AS HAVING AN ACCURATE RECOLLECTION OF THESE MATTERS. ALSO, CONSIDER ANY RELATION EACH WITNESS MAY HAVE WITH EITHER SIDE OF THE CASE, THE MANNER IN WHICH EACH WITNESS MIGHT BE AFFECTED BY THE VERDICT, AND THE EXTENT TO WHICH THE TESTIMONY OF EACH WITNESS IS EITHER SUPPORTED OR CONTRADICTED BY OTHER EVIDENCE IN THE CASE.

INCONSISTENCIES OR DISCREPANCIES IN THE TESTIMONY OF A WITNESS, OR BETWEEN THE TESTIMONY OF DIFFERENT WITNESSES MAY OR MAY NOT CAUSE YOU TO DISCREDIT SUCH TESTIMONY. TWO OR MORE PERSONS SEEING AN EVENT MAY SEE OR HEAR IT DIFFERENTLY.

IN WEIGHING THE EFFECT OF A DISCREPANCY, ALWAYS CONSIDER

**JA583**

WHETHER IT PERTAINS TO A MATTER OF IMPORTANCE OR AN UNIMPORTANT DETAIL, AND WHETHER THE DISCREPANCY RESULTS FROM INNOCENT ERROR OR INTENTIONAL FALSEHOOD.

AFTER MAKING YOUR OWN JUDGMENT, YOU WILL GIVE THE TESTIMONY OF EACH WITNESS SUCH WEIGHT, IF ANY, THAT YOU MAY THINK IT DESERVES. IN SHORT, YOU MAY ACCEPT OR REJECT THE TESTIMONY OF ANY WITNESS, IN WHOLE OR IN PART.

IN ADDITION, THE WEIGHT OF THE EVIDENCE IS NOT NECESSARILY DETERMINED BY THE NUMBER OF WITNESSES TESTIFYING TO THE EXISTENCE OR NONEXISTENCE OF ANY FACT. YOU MAY FIND THAT THE TESTIMONY OF A SMALL NUMBER OF WITNESSES AS TO ANY FACT IS MORE CREDIBLE THAN THE TESTIMONY OF A LARGER NUMBER OF WITNESSES TO THE CONTRARY.

FED-JI §105.01
3 FED. JURY PRAC. & INST. §105.01

GIVEN: _____

REFUSED: _____

MODIFIED: _____

JA584

**P-4: KNOWLEDGE OF AGENT IMPUTED TO PRINCIPAL**

AS A GENERAL RULE, THE KNOWLEDGE OF AN AGENT IS IMPUTED TO

HIS PRINCIPAL.

ALLEN REALTY CORP. V. HOLBERT, 227 VA. 441, 443, 318 S.E.2D 592, 593 (1984).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA585**

**P-5: PRINCIPAL BOUND BY ACTS OF AGENT**

A PRINCIPAL IS BOUND BY THE ACTS OF HIS AGENT WITHIN THE SCOPE OF

THE AGENT'S OSTENSIBLE OR APPARENT AUTHORITY.

E. AUGUSTA MUT. FIRE INS. CO. V. HITE, 219 VA. 677, 680, 250 S.E.2D 348, 351 (1979)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

48

**JA586**

**P-6: SUCCESSOR LIABILITY**

IN THIS CASE, GMS SEEKS TO HOLD WARTECH INDUSTRIES, LLC LIABLE

FOR ALL AMOUNTS FOR WHICH G&S SUPPLY, LLC IS LIABLE UNDER A THEORY

OF SUCCESSOR LIABILITY.

YOU MAY FIND WARTECH IS LIABLE FOR G&S'S LIABILITY IF IT APPEARS

THAT (1) WARTECH EXPRESSLY OR IMPLIEDLY AGREED TO ASSUME SUCH

LIABILITIES, (2) THE CIRCUMSTANCES SURROUNDING THE TRANSACTION

WARRANT A FINDING THAT THERE WAS A CONSOLIDATION OR *DE*

*FACTO* MERGER OF THE TWO CORPORATIONS, (3) WARTECH IS MERELY A

CONTINUATION OF G&S, *OR* (4) THE TRANSACTION IS FRAUDULENT IN FACT.

HARRIS V. T.I., INC., 243 VA. 63, 70, 413 S.E.2D 605, 609 (1992)

GIVEN:              _____

REFUSED:        _____

MODIFIED:     _____

**P-7: EVIDENTIARY SANCTIONS DEFENDANTS WESTLY L. GREER AND G&S SUPPLY, LLC**

IN A FEDERAL CIVIL ACTION LIKE THIS CASE, PARTIES ARE ENTITLED TO THE DISCLOSURE OF ALL RELEVANT, NON-PRIVILEGED EVIDENCE THE OTHER SIDE POSSESSES OR CONTROLS, INCLUDING RELEVANT DOCUMENTS AND ELECTRONICALLY STORED INFORMATION. THIS PRE-TRIAL PROCESS IS KNOWN AS "DISCOVERY."

DURING THE DISCOVERY PROCESS IN THIS CASE, THE COURT FOUND THAT DEFENDANTS WESTLY L. GREER, ACTING ON HIS OWN BEHALF AND AS AN AGENT OF AND G&S SUPPLY, LLC, FAILED TO COMPLY WITH THEIR DISCOVERY OBLIGATIONS, SPECIFICALLY IN THAT GREER INTENTIONALLY DESTROYED DOCUMENTS AND ELECTRONICALLY STORED INFORMATION ON GREER'S GMS-ISSUED DESKTOP COMPUTER THAT HE WAS REQUIRED TO PRODUCE TO PLAINTIFF. THE COURT ALSO FOUND THAT GREER ACTED WITH AN INTENT TO DEPRIVE PLAINTIFF OF THE DELETED INFORMATION'S USE IN LITIGATION.

ON ACCOUNT OF DEFENDANT WESTLY L. GREER AND G&S SUPPLY, LLC'S BLATANT AND INTENTIONAL DISREGARD FOR THEIR OBLIGATION TO PRESERVE ELECTRONICALLY STORED INFORMATION ON GREER'S DESKTOP, I HAVE IMPOSED AS A SANCTION ON BOTH GREER AND G&S THAT YOU MUST INFER THAT THE INFORMATION DELETED BY GREER WAS UNFAVORABLE TO DEFENDANTS GREER AND G&S.

**JA588**

YOU ARE CAUTIONED, HOWEVER, THAT EACH PARTY IS ENTITLED TO HAVE THE CASE DECIDED SOLELY ON THE EVIDENCE THAT APPLIES TO THAT PARTY. SANCTIONS AGAINST GREER AND G&S HAVE NO BEARING ON OTHER PARTIES.

FED. R. CIV. P. 37(E); GMS INDUS. SUPPLY, INC. V. G&S SUPPLY, LLC, CIVIL ACTION NO. 2:19-CV-324 (RCY), 2022 U.S. DIST. LEXIS 51657 (E.D. VA. MAR. 22, 2022); SINES V. KESSLER, CIVIL ACTION NO. 3:17-CV-0072, ECF NO. 1461 AT P. 50-51;

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA589**

**P-7[ALTERNATE]: EVIDENTIARY SANCTIONS DEFENDANTS WESTLY L. GREER AND G&S SUPPLY, LLC**

IN A FEDERAL CIVIL ACTION LIKE THIS CASE, PARTIES ARE ENTITLED TO THE DISCLOSURE OF ALL RELEVANT, NON-PRIVILEGED EVIDENCE THE OTHER SIDE POSSESSES OR CONTROLS, INCLUDING RELEVANT DOCUMENTS AND ELECTRONICALLY STORED INFORMATION. THIS PRE-TRIAL PROCESS IS KNOWN AS "DISCOVERY."

DURING THE DISCOVERY PROCESS IN THIS CASE, THE COURT FOUND THAT DEFENDANTS WESTLY L. GREER, ACTING ON HIS OWN BEHALF AND AS AN AGENT OF AND G&S SUPPLY, LLC, FAILED TO COMPLY WITH THEIR DISCOVERY OBLIGATIONS, SPECIFICALLY IN THAT GREER INTENTIONALLY DESTROYED DOCUMENTS AND ELECTRONICALLY STORED INFORMATION ON GREER'S GMS-ISSUED DESKTOP COMPUTER THAT HE WAS REQUIRED TO PRODUCE TO PLAINTIFF. THE COURT ALSO FOUND THAT GREER ACTED WITH AN INTENT TO DEPRIVE PLAINTIFF OF THE DELETED INFORMATION'S USE IN LITIGATION.

ON ACCOUNT OF DEFENDANT WESTLY L. GREER AND G&S SUPPLY, LLC'S BLATANT AND INTENTIONAL DISREGARD FOR THEIR OBLIGATION TO PRESERVE ELECTRONICALLY STORED INFORMATION ON GREER'S DESKTOP, I HAVE IMPOSED AS A SANCTION ON BOTH GREER AND G&S THAT YOU MAY INFER THAT THE INFORMATION DELETED BY GREER WAS UNFAVORABLE TO DEFENDANTS GREER AND G&S.

**JA590**

YOU ARE CAUTIONED, HOWEVER, THAT EACH PARTY IS ENTITLED TO HAVE THE CASE DECIDED SOLELY ON THE EVIDENCE THAT APPLIES TO THAT PARTY. SANCTIONS AGAINST GREER AND G&S HAVE NO BEARING ON OTHER PARTIES.

FED. R. CIV. P. 37(E); GMS INDUS. SUPPLY, INC. V. G&S SUPPLY, LLC, CIVIL ACTION NO. 2:19-CV-324 (RCY), 2022 U.S. DIST. LEXIS 51657 (E.D. VA. MAR. 22, 2022); SINES V. KESSLER, CIVIL ACTION NO. 3:17-CV-0072, ECF NO. 1461 AT P. 50-51;

GIVEN: _____

REFUSED: _____

MODIFIED: _____

JA591

**P-8: SOURCE OF DUTY OF LOYALTY**

AS AN EMPLOYEE, WESTLY GREER OWED GMS A FIDUCIARY DUTY OF

LOYALTY TO HIS EMPLOYER DURING HIS EMPLOYMENT.

JET COURIER SERVICE, INC. V. MULEI, 771 P.2D 486, 492 (CO. SP. CT. 1989)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**P-9: BREACH OF FIDUCIARY DUTY OF LOYALTY (NOT TO COMPETE)**

THE FIDUCIARY DUTY OF LOYALTY DICTATES THAT, DURING HIS EMPLOYMENT WITH GMS, WESTLY GREER NOT EXPLOIT GMS'S TRUST SO AS TO OBTAIN AN UNFAIR ADVANTAGE IN COMPETING WITH GMS IN A MATTER CONCERNING GMS'S BUSINESS.

THUS, ONE FACET OF WESTLY GREER'S DUTY OF LOYALTY IS THE DUTY NOT TO COMPETE WITH GMS CONCERNING THE SUBJECT MATTER OF HIS EMPLOYMENT WITH GMS.  A LIMITING CONSIDERATION IN DELINEATING THE SCOPE OF WESTLY GREER'S DUTY NOT TO COMPETE IS SOCIETY'S INTEREST IN FOSTERING FREE AND VIGOROUS ECONOMIC COMPETITION.  IN ATTEMPTING TO ACCOMMODATE THE COMPETING POLICY CONSIDERATIONS OF HONESTY AND FAIR DEALING ON THE ONE HAND AND FREE AND VIGOROUS ECONOMIC COMPETITION ON THE OTHER, THE LAW RECOGNIZES A PRIVILEGE IN FAVOR OF EMPLOYEES WHICH ENABLES THEM TO PREPARE OR MAKE ARRANGEMENTS TO COMPETE WITH THEIR EMPLOYERS PRIOR TO LEAVING THE EMPLOY OF THEIR PROSPECTIVE RIVALS WITHOUT FEAR OF INCURRING LIABILITY FOR BREACH OF THEIR FIDUCIARY DUTY OF LOYALTY.  THE NATURE OF THE EMPLOYEE'S PREPARATIONS IS WHAT IS SIGNIFICANT IN DETERMINING WHETHER A BREACH HAS OCCURRED.

GENERALLY, THE PRIVILEGE OF AN EMPLOYEE TO MAKE PREPARATIONS TO COMPETE AFTER TERMINATION OF HIS EMPLOYMENT ENTITLED WESTLY GREER TO ADVISE HIS CURRENT CUSTOMERS THAT HE WOULD BE LEAVING HIS CURRENT EMPLOYMENT WITH GMS.  HOWEVER, WESTLY GREER WAS NOT

**JA593**

ENTITLED TO SOLICIT THOSE CUSTOMERS FOR A NEW COMPETING BUSINESS

BEFORE HIS TERMINATION.

JET COURIER SERVICE, INC. V. MULEI, 771 P.2D 486, 492 (CO. SP. CT. 1989); ATLAS BIOLOGICALS INC. V. KUTRUBES, 2019 U.S. DIST. LEXIS 161501, AT *64 (D. COLO. SEP. 23, 2019)

GIVEN:          _____

REFUSED:       _____

MODIFIED:      _____

**JA594**

**P-10: BREACH OF FIDUCIARY DUTY OF LOYALTY (NOT TO SOLICIT OF CO-WORKERS)**

GENERALLY, AN EMPLOYEE BREACHES HIS DUTY OF LOYALTY IF PRIOR TO THE TERMINATION OF HIS OWN EMPLOYMENT, HE SOLICITS HIS CO-EMPLOYEES TO JOIN HIM IN HIS NEW COMPETING ENTERPRISE.

IN DETERMINING WHETHER WESTLY GREER'S ACTIONS AMOUNT TO AN IMPERMISSIBLE SOLICITATION OF CO-WORKERS, YOU SHOULD CONSIDER THE NATURE OF THE EMPLOYMENT RELATIONSHIP, THE IMPACT OR POTENTIAL IMPACT OF WESTLY GREER'S ACTIONS ON GMS'S OPERATIONS, AND THE EXTENT OF ANY BENEFITS PROMISED OR INDUCEMENTS MADE TO CO-WORKERS TO OBTAIN THEIR SERVICES FOR THE NEW COMPETING ENTERPRISE.  NONE OF THESE FACTORS ARE DISPOSITIVE, NOR MUST WESTLY GREER HAVE BEEN SUCCESSFUL IN HIS SOLICITATION OF CO-WORKERS TO ESTABLISH A BREACH OF HIS DUTY OF LOYALTY.

YOU MUST EXAMINE THE FULL NATURE OF WESTLY GREER'S PREPARATIONS TO COMPETE TO DETERMINE IF THEY AMOUNT TO IMPERMISSIBLE SOLICITATION.

JET COURIER SERVICE, INC. V. MULEI, 771 P.2D 486, 492 (CO. SP. CT. 1989)

GIVEN:          _____

REFUSED:      _____

MODIFIED:     _____

**JA595**

**P-11: FIDUCIARY DUTY DOES NOT END AT TERMINATION**

THE TERMINATION OF WESTLY GREER'S EMPLOYMENT WITH GMS DID NOT AUTOMATICALLY FREE HIM FROM HIS FIDUCIARY OBLIGATIONS TO THE COMPANY.  IF YOU FIND THAT WESTLY GREER ENGAGED IN TRANSACTIONS THAT HAD THEIR INCEPTION BEFORE HIS TERMINATION FROM GMS OR THAT WERE BASED ON INFORMATION OBTAINED DURING HIS EMPLOYMENT WITH GMS, THEN YOU MUST FIND THAT WESTLY GREER BREACHED HIS FIDUCIARY DUTY OF LOYALTY TO GMS.

T.A. PELSUE CO. V. GRAND ENTERS., 782 F. SUPP. 1476, 1485-86 (D. COLO. 1991)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA596**

**P-12: DAMAGES FOR BREACH OF DUTY OF LOYALTY (WESTLY)**

GMS HAS THE BURDEN OF PROVING, BY A PREPONDERANCE OF THE EVIDENCE, THE NATURE AND EXTENT OF ITS DAMAGES. IF YOU FIND IN FAVOR OF GMS, YOU MUST DETERMINE THE TOTAL DOLLAR AMOUNT OF GMS'S DAMAGES, IF ANY, THAT WERE CAUSED BY THE BREACH OF FIDUCIARY DUTY BY THE DEFENDANT, WESTLY GREER.

IN DETERMINING SUCH DAMAGES, YOU SHALL CONSIDER ANY ECONOMIC LOSSES WHICH PLAINTIFF HAS HAD OR WILL PROBABLY HAVE IN THE FUTURE, INCLUDING:

A. ANYTHING OF VALUE OR ANY PROFIT THE DEFENDANT, WESTLY GREER, RECEIVED AS A RESULT OF THE BREACH OF FIDUCIARY DUTY;

B. ANY LOSS OF PROFITS WHICH GMS COULD REASONABLY HAVE EXPECTED TO EARN HAD THE FIDUCIARY DUTY NOT BEEN BREACHED; AND

C. ANY COMPENSATION DEFENDANT WESTLY GREER RECEIVED FROM GMS FOR SERVICES PERFORMED DURING THE PERIOD IN WHICH HE ENGAGED IN ACTIVITIES CONSTITUTING A BREACH OF HIS DUTY OF LOYALTY, EVEN IF PART OF THOSE SERVICES MAY HAVE BEEN PROPERLY PERFORMED.

**JA597**

COLORADO PATTERN CIVIL JURY INSTRUCTIONS, § 26.5; <u>KOONTZ V. ROSENER</u>, 787 P.2D 192, 197 (COLO. APP. 1989); <u>GMS INDUS. SUPPLY, INC. V. G&S SUPPLY, LLC</u>, 2022 U.S. DIST. LEXIS 51657, AT *14 (E.D. VA. MAR. 22, 2022)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**P-13: BREACH OF WESTLY GREER'S 2012 EMPLOYMENT AGREEMENT –**
**ELEMENTS OF LIABILITY**

IN THIS CASE, THE PLAINTIFF, GMS INDUSTRIAL SUPPLY, LLC, ALLEGES
THAT DEFENDANT WESTLY GREER BREACHED HIS CONTRACT WITH GMS, THE
2012 EMPLOYMENT AGREEMENT.  WESTLY GREER DENIES BREACHING THE
EMPLOYMENT AGREEMENT.

YOU SHALL FIND YOUR VERDICT FOR GMS IF IT HAS PROVED BY THE
GREATER WEIGHT OF THE EVIDENCE THAT:

(1) THE EMPLOYMENT AGREEMENT WAS A CONTRACT BETWEEN GMS AND
WESTLY GREER; AND

(2) WESTLY GREER BREACHED THE EMPLOYMENT AGREEMENT.

YOU SHALL FIND YOUR VERDICT FOR THE DEFENDANT IF THE PLAINTIFF
FAILED TO PROVE EITHER OR BOTH ELEMENTS ABOVE.

VIRGINIA MODEL JURY INSTRUCTIONS – CIVIL, INSTRUCTION NO. 45.600

GIVEN:        _____
REFUSED:     _____
MODIFIED:    _____

**JA599**

**P-14: BREACH OF WESTLY GREER'S 2012 EMPLOYMENT AGREEMENT – CONTRACTS GENERALLY**

A CONTRACT IS AN AGREEMENT, FOR CONSIDERATION, BETWEEN TWO OR MORE PARTIES.  A CONTRACT ARISES WHEN AN OFFER IS ACCEPTED.

AN OFFER IS A PROPOSAL OF THE TERMS ON WHICH A PERSON WILL ENTER INTO AN AGREEMENT IF THAT PROPOSAL IS ACCEPTED BY THE PERSON TO WHOM IT IS MADE.

ACCEPTANCE OF AN OFFER IS A VOLUNTARY EXPRESSION OF ASSENT TO BE BOUND BY THE TERMS OF THE OFFER.

CONSIDERATION IS WHAT IS GIVEN IN EXCHANGE FOR A PROMISE.

VIRGINIA MODEL JURY INSTRUCTIONS – CIVIL, INSTRUCTIONS NO. 45.010-040.

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA600**

**P-15: ORDINARY MEANING OF WORDS**

WHEN INTERPRETING CONTRACTS, WORDS USED BY THE PARTIES
SHOULD BE GIVEN THEIR ORDINARY, USUAL, AND POPULAR MEANING, UNLESS
YOU FIND THAT THE PARTIES CLEARLY INTENDED SUCH WORDS TO HAVE
ANOTHER MEANING.

VIRGINIA MODEL JURY INSTRUCTIONS – CIVIL, INSTRUCTION NO. 45:305

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA601**

**P-16: DAMAGES FOR BREACH OF 2012 EMPLOYMENT AGREEMENT**

IF YOU FIND YOUR VERDICT FOR GMS, THEN IT IS ENTITLED TO RECOVER AS DAMAGES ALL OF THE LOSSES IT SUSTAINED THAT ARE A NATURAL AND ORDINARY RESULT OF THE BREACH AND THAT IT HAS PROVED BY THE GREATER WEIGHT OF THE EVIDENCE.

VIRGINIA MODEL JURY INSTRUCTIONS – CIVIL, INSTRUCTION NO. 45:500

GIVEN:          _____

REFUSED:        _____

MODIFIED:       _____

**JA602**

**P-17: ELEMENTS OF CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, *ET SEQ.***

IN THIS CASE, GMS ALLEGES THAT EACH OF THE DEFENDANTS MISAPPROPRIATED TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT. EACH OF THE DEFENDANTS DENIES MISAPPROPRIATING ANY TRADE SECRETS FROM GMS.

WITH RESPECT TO EACH DEFENDANT, YOU SHALL FIND YOUR VERDICT FOR GMS IF IT HAS PROVED THAT

1. THE DEFENDANT ACTED WITH INTENT TO CONVERT GMS'S TRADE SECRET (OR TRADE SECRETS) THAT IS/ARE RELATED TO A PRODUCT OR SERVICE USED IN OR INTENDED FOR USE IN INTERSTATE OR FOREIGN COMMERCE, TO THE ECONOMIC BENEFIT OF ANYONE OTHER THAN GMS; AND

2. THE DEFENDANT DID SO INTENDING OR KNOWING THAT THE OFFENSE WOULD INJURE GMS; AND

3. THE DEFENDANT KNOWINGLY DID ANY **ONE OR MORE** OF THE FOLLOWING:

    A. STEAL, OR WITHOUT AUTHORIZATION APPROPRIATE, TAKE, CARRY AWAY, OR CONCEAL, OR BY FRAUD, ARTIFICE, OR DECEPTION OBTAIN SUCH INFORMATION;

    B. WITHOUT AUTHORIZATION COPY, DUPLICATE, SKETCH, DRAW, PHOTOGRAPH, DOWNLOAD, UPLOAD, ALTER, DESTROY, PHOTOCOPY, REPLICATE, TRANSMIT, DELIVER, SEND, MAIL, COMMUNICATE, OR CONVEY SUCH INFORMATION;

**JA603**

C.   RECEIVE, BUY, OR POSSESS SUCH INFORMATION, KNOWING THE

SAME TO HAVE BEEN STOLEN OR APPROPRIATED, OBTAINED, OR

CONVERTED WITHOUT AUTHORIZATION;

D.   ATTEMPT TO COMMIT ANY OFFENSE DESCRIBED IN (A) THROUGH

(C); OR

E.   CONSPIRE WITH ONE OR MORE OTHER PERSONS TO COMMIT ANY

OFFENSE DESCRIBED IN (A) THROUGH (C), AND ONE OR MORE OF

SUCH PERSONS DO ANY ACT TO EFFECT THE OBJECT OF THE

CONSPIRACY.

YOU SHALL FIND YOUR VERDICT FOR THE DEFENDANT IF THE PLAINTIFF

FAILED TO PROVE ANY OF THE FOUR ELEMENTS ABOVE.

ALTHOUGH THIS INSTRUCTION IS APPLICABLE TO CLAIMS BY GMS

AGAINST ALL OF THE DEFENDANTS, YOU MUST CONSIDER FOR EACH

DEFENDANT WHETHER THEY MISAPPROPRIATED A TRADE SECRET UNDER THE

DEFEND TRADE SECRETS ACT.

18 U.S.C. § 1832

GIVEN:          _____

REFUSED:     _____

MODIFIED:   _____

66

**JA604**

**P-18:  REASONABLE MEASURES TO PROTECT TRADE SECRETS**

TO SATISFY THE REASONABLE EFFORTS REQUIREMENT, GMS IS NOT REQUIRED TO SHOW THAT IT UTILIZED THE FULL RANGE OF POTENTIALLY PROTECTIVE MEASURES THAT MIGHT HAVE BEEN AVAILABLE.  GMS ONLY HAS TO SHOW THAT THE EFFORTS IT TOOK WERE REASONABLE UNDER THE CIRCUMSTANCES TO MAINTAIN ITS SECRECY.  EXTREME AND UNDULY EXPENSIVE PROCEDURES NEED NOT BE TAKEN.

HESKA CORP. V. QORVO US, INC., 2020 U.S. DIST. LEXIS 180337, AT *17 (M.D.N.C. SEP. 30, 2020); HERTZ V. LUZENAC GRP., 576 F.3D 1103, 1112 (10TH CIR. 2009)

GIVEN:        _____

REFUSED:      _____

MODIFIED:     _____

**JA605**

**P-19:  TRADE SECRET CAN CONTAIN PUBLICLY AVAILABLE INFORMATION**

A TRADE SECRET CAN EXIST IN THE UNIQUE COMBINATION OF OTHERWISE KNOWN COMPONENTS; ALTHOUGH EACH OF ITS PARTS, BY ITSELF, MAY BE IN THE PUBLIC DOMAIN, THE UNIFIED PROCESS, DESIGN AND OPERATION OF THE COMBINATION MAY BE THE ESSENCE OF THE SECRET.

A UNIQUE COMBINATION OF GENERALLY KNOWN ELEMENTS OR STEPS CAN QUALIFY AS A TRADE SECRET IF IT REPRESENTS A VALUABLE CONTRIBUTION ATTRIBUTABLE TO THE INDEPENDENT EFFORTS OF THE ONE CLAIMING TO HAVE CONCEIVED IT. THE COMBINATION MUST DIFFER MATERIALLY FROM OTHER METHODS REVEALED BY THE PRIOR ART.

WOVEN ELECS. CORP. V. ADVANCE GRP., INC., 1991 U.S. APP. LEXIS 6004, AT *7 (4TH CIR. APR. 15, 1991); PRYSMIAN CABLES & SYS. USA, LLC PRYSMIAN V. SZYMANSKI, 2021 U.S. DIST. LEXIS 229102, AT *27 (D.S.C. NOV. 29, 2021)

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**JA606**

**P-20:  LEVEL OF SECRECY OF TRADE SECRET**

WHILE IT'S TRUE THAT AN ITEM CAN BE A TRADE SECRET EVEN IF IT'S PUBLICLY AVAILABLE — FOR INSTANCE, IF IT APPEARS IN AN UNSEALED COURT FILING — IT STILL MUST BE RELATIVELY SECRET.  A TRADE SECRET MUST NOT BE OF PUBLIC KNOWLEDGE OR OF A GENERAL KNOWLEDGE IN THE TRADE OR BUSINESS.

STEVES & SONS, INC. V. JELD-WEN, INC., 988 F.3D 690, 726 (4TH CIR. 2021)

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**JA607**

**P-21:  DEFINITION OF MISAPPROPRIATION AND IMPROPER MEAN UNDER THE DEFEND TRADE SECRETS ACT**

MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT OCCURS WHEN A PERSON EITHER (1) ACQUIRES A TRADE SECRET WHILE KNOWING, OR HAVING REASON TO KNOW, THAT THE TRADE SECRET WAS ACQUIRED BY IMPROPER MEANS, OR (2) USES OR DISCLOSES THE TRADE SECRET AFTER ACQUIRING IT THROUGH IMPROPER MEANS.  THE PHRASE "IMPROPER MEANS," WHEN USED IN THE CONTEXT OF ACQUIRING A TRADE SECRET 'INCLUDES THEFT, BRIBERY, MISREPRESENTATION, BREACH OR INDUCEMENT OF A BREACH OF A DUTY TO MAINTAIN SECRECY, OR ESPIONAGE THROUGH ELECTRONIC OR OTHER MEANS.

VARIABLE ANNUITY LIFE INS. CO. V. CORETH, 535 F. SUPP. 3D 488, 515 (E.D. VA. 2021); 18 U.S.C. § 1839(5)-(6)

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**P-22: DAMAGES FOR MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT**

IF YOU FIND YOUR VERDICT FOR PLAINTIFF, GMS, THEN IT IS ENTITLED TO RECOVER DAMAGES FOR ACTUAL LOSS CAUSED BY THE MISAPPROPRIATION OF THE TRADE SECRET, AND DAMAGES FOR ANY UNJUST ENRICHMENT CAUSED BY THE MISAPPROPRIATION OF THE TRADE SECRET THAT IS NOT ADDRESSED IN COMPUTING DAMAGES FOR ACTUAL LOSS.

18 U.S.C. § 1836(B)(3)(B)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

71

**JA609**

**P-23:  AWARD OF EXEMPLARY DAMAGES FOR MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT**

IF YOU FIND THAT THE DEFENDANTS WILLFULLY AND MALICIOUSLY MISAPPROPRIATED PLAINTIFF'S TRADE SECRET, YOU MAY AWARD GMS EXEMPLARY DAMAGES IN AN AMOUNT NOT MORE THAN TWO TIMES THE AMOUNT OF THE ACTUAL LOSS AND UNJUST ENRICHMENT DAMAGES.

18 U.S.C. § 1836(B)(3)(B)-(C)

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**JA610**

**P-24: ATTORNEYS' FEES FOR BAD FAITH MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT**

IF YOU FIND THAT ANY OF THE DEFENDANTS WILLFULLY AND MALICIOUSLY MISAPPROPRIATED ANY OF GMS'S TRADE SECRETS, YOU MAY FIND THAT GMS IS ENTITLED TO AN AWARD OF ITS ATTORNEYS' FEES AND COSTS.

18 U.S.C. § 1836(B)(3)(D)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

73

**JA611**

**P-25:  DEFINITION OF WILLFULLY AND MALICIOUSLY**

FOR THE PURPOSE OF THE DEFEND TRADE SECRETS ACT, WILLFULLY AND

MALICIOUSLY MEANS ACTING WITH AN INTENT TO CAUSE INJURY OR HARM.

18 U.S.C. § 1836(B)(3)(B)-(C)

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**JA612**

**P-26: INJUNCTIVE RELIEF FOR MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT**

IF YOU FIND YOUR VERDICT FOR THE PLAINTIFF, GMS, THEN IT IS

ENTITLED TO AN INJUNCTION TO PREVENT ACTUAL OR THREATENED

MISAPPROPRIATION OF ITS TRADE SECRETS.

18 U.S.C. § 1836(B)(3)(A)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA613**

**P-27: ELEMENTS OF MISAPPROPRIATION OF TRADE SECRETS UNDER VIRGINIA UNIFORM TRADE SECRETS ACT**

IN THIS CASE, GMS ALLEGES THAT EACH OF THE DEFENDANTS MISAPPROPRIATED TRADE SECRETS UNDER THE VIRGINIA UNIFORM TRADE SECRETS ACT.  EACH OF THE DEFENDANTS DENIES MISAPPROPRIATING ANY TRADE SECRETS FROM GMS.

WITH RESPECT TO EACH DEFENDANT, YOU SHALL FIND YOUR VERDICT FOR GMS IF IT HAS PROVED TWO ELEMENTS: (1) THE EXISTENCE OF A "TRADE SECRET"; AND (2) THE "MISAPPROPRIATION" OF THAT TRADE SECRET BY THE DEFENDANT.

YOU SHALL FIND YOUR VERDICT FOR THE DEFENDANT IF THE PLAINTIFF FAILED TO PROVE ANY OF THE ELEMENTS ABOVE.

ALTHOUGH THIS INSTRUCTION IS APPLICABLE TO CLAIMS BY GMS AGAINST ALL OF THE DEFENDANTS, YOU MUST CONSIDER FOR EACH DEFENDANT WHETHER THEY MISAPPROPRIATED A TRADE SECRET UNDER THE VIRGINIA UNIFORM TRADE SECRETS ACT.

<u>VARIABLE ANNUITY LIFE INS. CO. V. CORETH</u>, 535 F. SUPP. 3D 488, 512-13 (E.D. VA. 2021)

GIVEN:       _____

REFUSED:     _____

MODIFIED:    _____

JA614

**P-28:   DEFINITION OF TRADE SECRET UNDER VIRGINIA UNIFORM TRADE SECRETS ACT**

THE VIRGINIA UNIFORM TRADE SECRETS ACT DEFINES A "TRADE SECRET" AS INFORMATION THAT:

> (1) DERIVES INDEPENDENT ECONOMIC VALUE, ACTUAL OR POTENTIAL, FROM NOT BEING GENERALLY KNOWN TO, AND NOT BEING READILY ASCERTAINABLE BY PROPER MEANS BY, OTHER PERSONS WHO CAN OBTAIN ECONOMIC VALUE FROM ITS DISCLOSURE OR USE; AND,

> (2) IS THE SUBJECT OF EFFORTS THAT ARE REASONABLE UNDER THE CIRCUMSTANCES TO MAINTAIN ITS SECRECY.

NEARLY ANY TYPE OF INFORMATION CAN BE SUBJECT TO TRADE SECRET PROTECTIONS UNDER THE VIRGINIA UNIFORM TRADE SECRETS ACT, AND IT CAN INCLUDE, BUT IS NOT LIMITED TO, FORMULAS, PATTERNS, COMPILATIONS, PROGRAMS, DEVICES, METHODS, TECHNIQUES, OR PROCESSES.

VA. CODE § 59.1-336, <u>VARIABLE ANNUITY LIFE INS. CO. V. CORETH</u>, 535 F. SUPP. 3D 488, 512-13 (E.D. VA. 2021)

GIVEN:        _____

REFUSED:     _____

MODIFIED:   _____

JA615

**P-29: DEFINITION OF MISAPPROPRIATION UNDER VIRGINIA UNIFORM TRADE SECRETS ACT**

TO ESTABLISH "MISAPPROPRIATION," GMS MUST ESTABLISH TWO ELEMENTS:

(1) THAT THE DEFENDANT ACQUIRED, DISCLOSED, OR USED A TRADE SECRET DEVELOPED BY GMS THROUGH IMPROPER MEANS (NAMELY, WITHOUT EXPRESS OR IMPLIED CONSENT); AND

(2) THAT THE DEFENDANT KNEW OR HAD REASON TO KNOW THAT ITS KNOWLEDGE OF THE TRADE SECRET WAS EITHER ACQUIRED UNDER CIRCUMSTANCES GIVING RISE TO A DUTY TO MAINTAIN ITS SECRECY OR DERIVED THROUGH A PERSON OWING SUCH A DUTY TO GMS

WHERE THE DEFENDANT DID NOT UTILIZE "IMPROPER MEANS" TO ACQUIRE A TRADE SECRET, MISAPPROPRIATION CAN STILL EXIST IF THE DEFENDANT DISCLOSED OR USED THAT SECRET.  MISAPPROPRIATION DOES NOT REQUIRE OUTRIGHT THEFT; IT CAN OCCUR WHEN AN EMPLOYEE FORMERLY ENTRUSTED WITH TRADE SECRET INFORMATION USES OR DISCLOSES THAT INFORMATION AFTER THE AGENCY OR FIDUCIARY RELATIONSHIP BETWEEN HIM OR HER AND THE EMPLOYER HAS ENDED.

VARIABLE ANNUITY LIFE INS. CO. V. CORETH, 535 F. SUPP. 3D 488, 512-13 (E.D. VA. 2021)

GIVEN:           _____

REFUSED:      _____

MODIFIED:     _____

**JA616**

**P-30:  BURDEN OF PROOF FOR MISAPPROPRIATION OF TRADE SECRETS UNDER VIRGINIA UNIFORM TRADE SECRETS ACT**

UNDER THE VIRGINIA UNIFORM TRADE SECRETS ACT, GMS BEARS THE

BURDEN OF PROVING BY A PREPONDERANCE OF THE EVIDENCE THAT THE

DEFENDANTS MISAPPROPRIATED GMS'S TRADE SECRETS.

PREPONDERANCE OF THE EVIDENCE IS NOT MERELY THE LARGER

NUMBER OF WITNESSES OR THE GREATER AMOUNT OF EVIDENCE.  IT DOES NOT

DEPEND ON WHAT PARTY INTRODUCES THE EVIDENCE.  IF THE EVIDENCE IN

YOUR OPINION IS EVENLY BALANCED, THE PLAINTIFF HAS NOT CONVINCED

YOU BY A GREATER WEIGHT.  IT IS A LITTLE DIFFICULT TO DEFINE SOMETIMES

BUT IT HAS BEEN COMPARED FREQUENTLY TO THE BALANCING OF SCALES.  AS

LONG AS THE SCALES REMAIN EVEN, THERE HAS BEEN NO GREATER WEIGHT OF

EVIDENCE PRODUCED BUT THERE MUST BE SUFFICIENT TO DIP THE SCALES AND

WHEN THAT IS DONE THE PLAINTIFF HAS PRODUCED THE GREATER WEIGHT OR

PREPONDERANCE OF THE EVIDENCE.

ZUP, LLC V. NASH MFG., INC., 229 F. SUPP. 3D 430, 455 (E.D. VA. 2017);
MICROSTRATEGY INC. V. LI, 268 VA. 249, 264, 601 S.E.2D 580, 589 (2004); SHIP CABIN
CLUB, INC. V. CRENSHAW, 1951 U.S. DIST. LEXIS 4426, AT *4-5 (E.D. VA. JAN. 10,
1951)

GIVEN:          _____

REFUSED:       _____

MODIFIED:     _____

**JA617**

**P-31: DAMAGES FOR MISAPPROPRIATION OF TRADE SECRETS UNDER VIRGINIA UNIFORM TRADE SECRETS ACT**

IF YOU FIND THAT ANY OR ALL OF THE DEFENDANTS MISAPPROPRIATED GMS'S TRADE SECRETS, GMS IS ENTITLED TO DAMAGES THAT CAN INCLUDE BOTH THE ACTUAL LOSS CAUSED BY MISAPPROPRIATION AND THE UNJUST ENRICHMENT CAUSED BY MISAPPROPRIATION THAT IS NOT TAKEN INTO ACCOUNT IN COMPUTING ACTUAL LOSS.

VA. CODE § 59.1-338(A)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA618**

**P-32: PUNITIVE DAMAGES FOR WILLFUL AND MALICIOUS MISAPPROPRIATION OF TRADE SECRETS UNDER VIRGINIA UNIFORM TRADE SECRETS ACT**

IF YOU FIND THAT THE DEFENDANTS MISAPPROPRIATED GMS'S TRADE SECRETS AND THAT, IN DOING SO, THEY ACTED WILLFULLY AND MALICIOUSLY, YOU MAY AWARD GMS PUNITIVE DAMAGES IN AN AMOUNT NOT EXCEEDING TWICE GMS'S DAMAGES OR $350,000, WHICHEVER AMOUNT IS LESS.

VA. CODE § 59.1-338(B)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA619**

**P-33: ATTORNEYS' FEES FOR BAD FAITH MISAPPROPRIATION OF TRADE SECRETS UNDER THE VIRGINIA UNIFORM TRADE SECRETS ACT**

IF YOU FIND THAT ANY OF THE DEFENDANTS WILLFULLY AND MALICIOUSLY MISAPPROPRIATED ANY OF GMS'S TRADE SECRETS, YOU MAY FIND THAT GMS IS ENTITLED TO AN AWARD OF ITS ATTORNEYS' FEES AND COSTS.

VA. CODE § 59.1-338.1

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA620**

**P-34:   INJUNCTIVE RELIEF FOR MISAPPROPRIATION OF TRADE SECRETS UNDER VIRGINIA UNIFORM TRADE SECRETS ACT**

IF YOU FIND YOUR VERDICT FOR THE PLAINTIFF, GMS, THEN IT IS

ENTITLED TO AN INJUNCTION TO PREVENT ACTUAL OR THREATENED

MISAPPROPRIATION OF ITS TRADE SECRETS.

VA. CODE § § 59.1-337

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA621**

**P-35: ELEMENTS OF CLAIM UNDER FEDERAL COMPUTER FRAUD AND ABUSE ACT**

IN THIS CASE, GMS CLAIMS THAT WESTLY AND G&S VIOLATED THE FEDERAL COMPUTER FRAUD AND ABUSE ACT.  WESTLY AND G&S DENY VIOLATING THE FEDERAL COMPUTER FRAUD AND ABUSE ACT.

WITH RESPECT TO EACH WESTLY GREER AND G&S, YOU SHALL FIND YOUR VERDICT FOR GMS IF IT HAS PROVED EITHER OR BOTH OF THE FOLLOWING:

(1) THE DEFENDANTS KNOWINGLY AND WITH INTENT TO DEFRAUD, ACCESSED A PROTECTED COMPUTER WITHOUT AUTHORIZATION, OR EXCEEDED AUTHORIZED ACCESS, AND BY MEANS OF SUCH CONDUCT FURTHERS THE INTENDED FRAUD AND OBTAINS ANYTHING OF VALUE, UNLESS THE THING OBTAINED CONSISTS ONLY OF THE USE OF THE COMPUTER AND THE VALUE OF SUCH USE IS NOT MORE THAN $5,000 IN ANY ONE YEAR PERIOD; AND/OR

(2) THE DEFENDANTS INTENTIONALLY ACCESSED A PROTECTED COMPUTER WITHOUT AUTHORIZATION, AND AS A RESULT OF SUCH CONDUCT, EITHER (A) RECKLESSLY CAUSED DAMAGE OR (B) CAUSES DAMAGE AND LOSS.

YOU SHALL FIND YOUR VERDICT FOR THE DEFENDANT IF THE PLAINTIFF FAILED TO PROVE ANY OF THE ELEMENTS ABOVE.

ALTHOUGH THIS INSTRUCTION IS APPLICABLE TO CLAIMS BY GMS AGAINST WESTLY GREER AND G&S, YOU MUST CONSIDER FOR EACH OF THESE

84

**JA622**

DEFENDANTS WHETHER THEY VIOLATED THE FEDERAL COMPUTER FRAUD AND

ABUSE ACT.

18 U.S.C. § 1030(A)(4)-(5)

GIVEN:          _____

REFUSED:          _____

MODIFIED:          _____

**JA623**

**P-35: DEFINITION OF "PROTECTED COMPUTER"**

THE TERM "PROTECTED COMPUTER" MEANS A COMPUTER WHICH IS USED IN OR AFFECTING INTERSTATE OR FOREIGN COMMERCE OR COMMUNICATION.

18. U.S.C. § 1030(E)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA624**

**P-36: FEDERAL COMPUTER FRAUD AND ABUSE ACT – EXCEEDING AUTHORIZED ACCESS**

TO EXCEED AUTHORIZATED ACCESS MEANS TO ACCESS A COMPUTER WITHOUT AUTHORIZATION AND TO USE SUCH ACCESS TO OBTAIN OR ALTER INFORMATION IN THE COMPUTER THAT THE ACCESSER IS NOT ENTITLED SO TO OBTAIN OR ALTER.

"WITHOUT AUTHORIZATION" AND "EXCEEDS AUTHORIZED ACCESS" ARE TO BE INTERPRETED NARROWLY, AND NEITHER OF THESE DEFINITIONS EXTENDS TO THE IMPROER USE OF INFORMATION THAT IS VALIDLY ACCESSED.

18 U.S.C. § 1030(e)(6) (MODIFIED); *WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 206 (4th Cir. 2012).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA625**

**P-37: FEDERAL COMPUTER FRAUD AND ABUSE ACT – "DAMAGE" DEFINED**

TO CAUSE DAMAGE MEANS TO IMPAIR THE INTEGRITY OR AVAILABILITY OF DATA, A PROGRAM, SYSTEM, OR INFORMATION.

18 U.S.C. § 1030(e)(8) (MODIFIED).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

88

**JA626**

**P-38:  FEDERAL COMPUTER FRAUD AND ABUSE ACT – "LOSS" DEFINED**

LOSS MEANS A REASONABLE COST TO A VICTIM, SUCH AS THE COST OF RESPONDING TO AN OFFENSE, CONDUCTING A DAMAGE ASSESSMENT, AND RESTORING THE DATA, PROGRAM, SYSTEM, OR INFORMATION TO ITS CONDITION PRIOR TO THE OFFENSE, AND ANY REVENUE LOST OR COST INCURRED.

18 U.S.C. § 1030(e)(9) (MODIFIED).

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**JA627**

**P-39: DAMAGES UNDER FEDERAL COMPUTER FRAUD AND ABUSE ACT**

IF YOU FIND THAT WESTLY GREER AND/OR G&S VIOLATED THE FEDERAL COMPUTER FRAUD AND ABUSE ACT, THEN YOU MAY AWARD GMS ALL OF ITS ECONOMIC DAMAGES.

ECONOMIC DAMAGES MEANS ALL ACTUAL DAMAGES AS WELL AS ALL CONSEQUENTIAL DAMAGES.

18 U.S.C. § 1030(G); <u>A.V. V. IPARADIGMS, LLC</u>, 562 F.3D 630, 645-46 (4TH CIR. 2009)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA628**

USCA4 Appeal: 22-2090    Doc: 20-2    Filed: 01/19/2023    Pg: 332 of 417

**P-40:  ELEMENTS UNDER VIRGINIA COMPUTER CRIMES ACT**

IN THIS CASE, GMS CLAIMS THAT THE DEFENDANTS VIOLATED THE VIRGINIA COMPUTER CRIMES ACT. THE DEFENDANTS DENY VIOLATING THE VIRGINIA COMPUTER CRIMES ACT.

WITH RESPECT TO EACH DEFENDANT, YOU SHALL FIND YOUR VERDICT FOR GMS IF IT HAS PROVED THE DEFENDANTS WITH A MALICIOUS INTENT, OR THROUGH INTENTIONALLY DECEPTIVE MEANS AND WITHOUT AUTHORITY, DID ONE OR MORE OF THE FOLLOWING:

1. TEMPORARILY OR PERMANENTLY REMOVED, HALTED, OR OTHERWISE DISABLED ANY COMPUTER DATA, COMPUTER PROGRAMS OR COMPUTER SOFTWARE FROM  A COMPUTER OR COMPUTER NETWORK;

2. ALTERED, DISABLED, OR ERASED ANY COMPUTER DATA, COMPUTER PROGRAMS, OR COMPUTER SOFTWARE,

3. USED A COMPUTER OR COMPUTER NETWORK TO CAUSE PHYSICAL INJURY TO THE PROPERTY OF ANOTHER, AND/OR

4. USED A COMPUTER OR COMPUTER NETWORK TO MAKE OR CAUSE TO BE MADE AN UNAUTHORIZED COPY, IN ANY FORM, INCLUDING, BUT NOT LIMITED TO, ANY PRINTED OR ELECTRONIC FORM OF COMPUTER DATA, COMPUTER PROGRAMS, OR COMPUTER SOFTWARE RESIDING IN, COMMUNICATED BY, OR PRODUCED BY A COMPUTER OR COMPUTER NETWORK

**JA629**

YOU SHALL FIND YOUR VERDICT FOR THE DEFENDANT IF THE PLAINTIFF FAILED TO PROVE ANY OF THE ABOVE VIOLATIONS.

ALTHOUGH THIS INSTRUCTION IS APPLICABLE TO CLAIMS BY GMS AGAINST ALL OF THE DEFENDANTS, YOU MUST CONSIDER FOR EACH DEFENDANT WHETHER THEY VIOLATED THE VIRGINIA COMPUTER CRIMES ACT.

VA. CODE § 18.2-152.4

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA630**

**P-41: DAMAGES UNDER VIRGINIA COMPUTER CRIMES ACT**

IF YOU FIND THAT ANY OF THE DEFENDANTS VIOLATED THE VIRGINIA COMPUTER CRIMES ACT, THEN YOU MAY AWARD GMS ALL OF ITS DAMAGES, INCLUDING LOST PROFITS.

VA. CODE § 18.2-152.12

GIVEN: _____

REFUSED: _____

MODIFIED: _____

JA631

**P-42:  BUSINESS CONSPIRACY IN VIOLATION OF VA. CODE § 18.2-499**

IN THIS CASE, GMS CLAIMS THAT WESTLY GREER, SABRINA GREER, GREER GROUP, LLC, COUNTY ROADS, LLC, THOMAS HAYES, GREGORY K. SPIRES, AND MIKE WELTON CONSPIRED WITH HMC SUPPLY, LLC TO INJURE GMS IN ITS REPUTATION, TRADE, BUSINESS, OR PROFESSION IN VIOLATION OF VIRGINIA'S BUSINESS CONSPIRACY STATUTE.

YOU SHALL FIND YOUR VERDICT FOR GMS IF IT HAS PROVEN BY CLEAR AND CONVINCING EVIDENCE:

(1) THAT AT LEAST TWO OF THE FOLLOWING:  WESTLY GREER, SABRINA GREER, GREER GROUP, LLC, COUNTY ROADS, LLC, THOMAS HAYES, GREGORY K. SPIRES, MIKE WELTON AND HMC SUPPLY, LLC ACTED IN CONCERT, AGREED, ASSOCIATED, MUTUALLY UNDERTOOK OR COMBINED TOGETHER;

(2) THAT THEY INTENTIONALLY, PURPOSEFULLY, AND WITHOUT LAWFUL JUSTIFICATION INJURED THE GMS'S REPUTATION, TRADE, BUSINESS, AND/OR PROFESSION; AND

(3) GMS SUFFERED DAMAGES AS A RESULT OF THESE ACTS.

YOU SHALL FIND YOUR VERDICT FOR THE DEFENDANTS IF THE PLAINTIFF FAILED TO PROVE ANY ONE OR MORE OF THESE ELEMENTS.

**JA632**

IF YOU FIND IN FAVOR OF GMS, YOUR VERDICT SHOULD BE LIMITED TO

ONLY THOSE DEFENDANTS THAT YOU FIND TO HAVE PARTICIPATED IN THE

CONSPIRACY.

VIRGINIA MODEL JURY INSTRUCTIONS – CIVIL, INSTRUCTION NO. 40-350

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA633**

**P-43: PURPOSE OF BUSINESS CONSPIRACY**

IN ORDER TO ESTABLISH A BUSINESS CONSPIRACY, GMS DOES NOT NEED TO PROVE THAT THE CONSPIRATORS' PRIMARY AND OVERRIDING PURPOSE IS TO INJURE ANOTHER IN HIS TRADE OR BUSINESS.

COMMERCIAL BUS. SYS. V. BELLSOUTH SERVS., 249 VA. 39, 47, 453 S.E.2D 261, 267 (1995)

GIVEN:           _____

REFUSED:           _____

MODIFIED:           _____

**JA634**

**P-44: CLEAR AND CONVINCING STANDARD**

GMS HAS THE BURDEN OF PROVING ITS BUSINESS CONSPIRACY CLAIM BY CLEAR AND CONVINCING EVIDENCE.  THIS MEANS THAT GMS MUST PRODUCE EVIDENCE THAT CREATES IN YOUR MINDS A FIRM BELIEF OR CONVICTION THAT HE HAS PROVED ELEMENTS OF THE CLAIM.

VIRGINIA MODEL JURY INSTRUCTIONS, CIVIL – INSTRUCTION NO. 3.110

GIVEN:          _____

REFUSED:       _____

MODIFIED:    _____

**JA635**

**P-45: DAMAGES UNDER VIRGINIA'S BUSINESS CONSPIRACY STATUTE**

IF YOU FIND THAT ANY OF THE DEFENDANTS CONSPIRED TO INJURE GMS IN ITS REPUTATION, TRADE, BUSINESS, OR PROFESSION IN VIOLATION OF VIRGINIA'S BUSINESS CONSPIRACY STATUTE, THEN YOU SHALL AWARD GMS THREE TIMES ITS DAMAGES, INCLUDING LOST PROFITS.

VA. CODE § 182.-500

GIVEN:        _____

REFUSED:      _____

MODIFIED:     _____

**JA636**

**P-46: AWARD OF ATTORNEYS' FEES UNDER VIRGINIA'S BUSINESS CONSPIRACY STATUTE**

IF YOU FIND THAT ANY OF THE DEFENDANTS CONSPIRED TO INJURE GMS IN ITS REPUTATION, TRADE, BUSINESS, OR PROFESSION IN VIOLATION OF VIRGINIA'S BUSINESS CONSPIRACY STATUTE, THEN YOU SHALL AWARD GMS ITS ATTORNEYS' FEES AND COSTS INCURRED IN CONNECTION WITH THIS LITIGATION.

VA. CODE § 182.-500

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA637**

**P-47: COMMON LAW CONSPIRACY**

IN THIS CASE, GMS CLAIMS THAT WESTLY GREER, SABRINA GREER, GREER GROUP, LLC, COUNTY ROADS, LLC, THOMAS HAYES, GREGORY K. SPIRES, MIKE WELTON AND HMC SUPPLY, LLC ENGAGED IN A CONSPIRACY.  THESE DEFENDANTS DENY THEY ENGAGED IN A CONSPIRACY.

YOU SHALL FIND YOUR VERDICT FOR GMS IF IT HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT

(1) TWO OR MORE OF WESTLY GREER, SABRINA GREER, GREER GROUP, LLC, COUNTY ROADS, LLC, THOMAS HAYES, MIKE WELTON, GREGORY K. SPIRES, AND HMC SUPPLY, LLC COMBINED TO ACCOMPLISH, BY SOME CONCERTED ACTION, SOME CRIMINAL OR UNLAWFUL PURPOSE OR SOME LAWFUL PURPOSE BY A CRIMINAL OR UNLAWFUL MEANS; AND

(2) DAMAGE CAUSED BY THE ACTS COMMITTED IN FURTHERANCE OF THE CONSPIRACY.

YOU SHALL FIND YOUR VERDICT FOR THE DEFENDANTS IF THE PLAINTIFF FAILED TO PROVE EITHER OF THESE ELEMENTS.

IF YOU FIND IN FAVOR OF GMS, YOUR VERDICT SHOULD BE LIMITED TO ONLY THOSE DEFENDANTS THAT YOU FIND TO HAVE PARTICIPATED IN THE CONSPIRACY.

**JA638**

COMMERCIAL BUS. SYS. V. BELLSOUTH SERVS., 249 VA. 39, 48, 453 S.E.2D 261, 267 (1995)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

101

**JA639**

**P-48:  DAMAGES FOR CONSPIRACY**

IF YOU FIND THAT SOME OR ALL OF THE DEFENDANTS ENGAGED IN A CONSPIRACY, THEN YOU SHALL AWARD GMS ALL DAMAGES CAUSED BY THE CRIMINAL OR UNLAWFUL ACTS TAKEN IN FURTHERANCE OF THE CONSPIRACY, REGARDLESS OF WHICH OF THE CONSPIRATORS PERFORMED THE CRIMINAL OR UNLAWFUL ACTS.

LA BELLA DONA SKIN CARE, INC. V. BELLE FEMME ENTERS., LLC, 294 VA. 243, 256, 805 S.E.2D 399, 406 (2017)

GIVEN:         _____

REFUSED:       _____

MODIFIED:      _____

**JA640**

**P-49: PURPOSE OF TRADEMARK PROTECTION AND PROHIBITION OF INFRINGEMENT**

IN THIS CASE, GMS SEEKS TO RECOVER MONEY DAMAGES FROM EACH OF THE DEFENDANTS FOR WHAT THE PLAINTIFF CLAIMS TO BE TRADEMARK INFRINGEMENT.

THE DEFENDANTS DENY INFRINGING GMS'S TRADEMARKS. THE LEGAL PRINCIPLES REGARDING THE LAW OF TRADEMARK INFRINGEMENT DISCUSSED IN THESE INSTRUCTIONS RESULT FROM ATTEMPTS TO BALANCE THE FOLLOWING CONFLICTING POLICY OBJECTIVES:

(1) THE NEED TO PROTECT THE PUBLIC FROM BEING MISLED ABOUT THE NATURE AND SOURCE OF THE GOODS THEY BUY;

(2) THE NEED TO PROTECT THE PROPERTY RIGHTS OF A BUSINESS TO IDENTIFY ITSELF AND ITS GOODS TO THE PUBLIC; AND

(3) THE NEED TO TRY TO ACHIEVE THESE GOALS WHILE ENCOURAGING FAIR COMPETITION AMONG THOSE PROVIDING GOODS IN OUR FREE-MARKET ECONOMY.

IN SHORT, FAIR COMPETITION AMONG THOSE MANUFACTURING AND SELLING GOODS IS ENCOURAGED, BUT UNFAIR COMPETITION, INCLUDING TRADEMARK AND TRADE DRESS INFRINGEMENT, IS DESTRUCTIVE OF THIS COMPETITIVE PROCESS AND IS ILLEGAL.

BECAUSE OF THE CONFLICTING POLICY OBJECTIVES INVOLVED IN CASES OF THIS TYPE, EACH CASE MUST BE DECIDED LARGELY ON ITS SPECIFIC FACTS. YOU, THE JURY, ARE THE JUDGE OF THE FACTS.

**JA641**

4 MODERN FEDERAL JURY INSTRUCTIONS-CIVIL P 86A.02 (2021)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA642**

**P-50: ELEMENTS OF LIABILITY FOR TRADEMARK INFRINGEMENT**

IN THIS CASE, GMS CLAIMS THAT THE DEFENDANTS INFRINGED UPON GMS'S TRADEMARKS.   THE DEFENDANTS DENY INFRINGING UPON GMS' TRADEMARKS.

YOU SHALL FIND YOUR VERDICT FOR GMS IF YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT:

(1) GMS HAS ESTABLISHED "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS AS A TRADEMARK FOR PLAINTIFF'S PRODUCTS;

(2) GMS HAD ESTABLISHED "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS AS A TRADEMARK BEFORE THE DEFENDANTS BEGAN TO MARKET THE DEFENDANT'S PRODUCTS IN THE AREA WHERE THE PLAINTIFF SELLS ITS PRODUCTS; AND

(3) THE DEFENDANTS USED THE NAME "G&S SUPPLY, LLC" AND "G&S" A MANNER LIKELY TO CAUSE CONFUSION ABOUT THE SOURCE OF THE PRODUCTS AMONG A SIGNIFICANT NUMBER OR ORDINARY PURCHASERS.

THE PLAINTIFF, GMS, HAS THE BURDEN OF PROVING EACH OF THESE ELEMENTS BY A PREPONDERANCE OF THE EVIDENCE. PREPONDERANCE OF THE EVIDENCE MEANS THAT YOU MUST BE PERSUADED BY THE EVIDENCE THAT IT IS MORE PROBABLY TRUE THAN NOT TRUE THAT THE PLAINTIFF HAS PROVED EACH ELEMENTS. IF YOU FIND THAT THE PLAINTIFF HAS PROVED THESE ELEMENTS BY

**JA643**

A PREPONDERANCE OF THE EVIDENCE, YOU MAY THEN FIND THE DEFENDANT

LIABLE FOR TRADEMARK INFRINGEMENT. YOU WILL THEN CONSIDER THE ISSUE

OF DAMAGES UNDER SEPARATE INSTRUCTIONS.

4 MODERN FEDERAL JURY INSTRUCTIONS-CIVIL P 86A.02 (2021)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA644**

**P-51:  VALIDITY OF TRADEMARK**

IN THIS CASE, GMS CONTENDSTHAT PLAINTIFF HAS ESTABLISHED "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS AS TRADEMARKS FOR ITS PRODUCTS.  IN DETERMINING WHETHER THE PLAINTIFF HAS ESTABLISHED "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS AS TRADEMARKS, THE FIRST QUESTION FOR YOU, THE JURY, TO DECIDE IS WHETHER THE PUBLIC RECOGNIZES THE PLAINTIFF'S "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS IN CONNECTION WITH THE SALE OF PLAINTIFF'S PRODUCTS AND DISTINGUISHING IT FROM THOSE SOLD BY OTHERS.  TO DETERMINE WHETHER THE PLAINTIFF HAS PROVED THIS, YOU MUST CONSIDER WHETHER THE EVIDENCE SHOWS THAT THE PLAINTIFF'S "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS ARE INHERENTLY DISTINCTIVE, OR THAT, EVEN IF NOT INHERENTLY DISTINCTIVE,  "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS HAVE BECOME DISTINCTIVE THROUGH THE ACQUISITION OF "SECONDARY MEANING."  IF THE TRADEMARK IS INHERENTLY DISTINCTIVE, THEN NO DETERMINATION REGARDING SECONDARY MEANING NEED BE MADE.  THESE CONCEPTS OF INHERENTLY DISTINCTIVE TRADEMARKS AND THE ACQUISITION OF SECONDARY MEANING WILL BE FURTHER EXPLAINED TO YOU IN SUBSEQUENT INSTRUCTIONS.

**JA645**

4 MODERN FEDERAL JURY INSTRUCTIONS-CIVIL P 86A.02 (2022)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA646**

**P-52:  DISTINCTIVENESS OF TRADEMARK**

GMS CLAIMS THAT "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS ARE TRADEMARKS FOR PLAINTIFF'S PRODUCTS. IN TRADEMARK USAGE, WORDS MAY BE CLASSIFIED ACCORDING TO THE DEGREE OF THEIR DISTINCTIVENESS. THIS CLASSIFICATION IS ALONG A CONTINUUM FROM THOSE WORDS THAT ARE INHERENTLY DISTINCTIVE TO THOSE THAT ARE NOT DISTINCTIVE AT ALL, OR MERELY GENERIC.

A "COINED" WORD IS AN ARTIFICIAL WORD THAT HAS NO LANGUAGE MEANING EXCEPT AS A TRADEMARK, AND BEARS NO RELATIONSHIP TO THE PRODUCT OR SERVICE WITH WHICH IT IS ASSOCIATED. "EXXON" IS A COINED WORD USED BY AN OIL COMPANY.

A "FANCIFUL" WORD IS LIKE A COINED WORD IN THAT IT IS INVENTED FOR THE SOLE PURPOSE OF FUNCTIONING AS A TRADEMARK, AND BEARS NO RELATIONSHIP TO THE PRODUCT OR SERVICE WITH WHICH IT IS ASSOCIATED. HOWEVER, IT DIFFERS FROM THE COINED WORD IN THAT IT MAY BEAR A RELATIONSHIP TO ANOTHER WORD OR IT MAY BE AN OBSOLETE WORD. FOR EXAMPLE, "FAB" IS A SHORTENED VERSION OF "FABULOUS" AND IS A FANCIFUL WORD USED FOR DETERGENT.

AN "ARBITRARY" WORD IS ONE IN COMMON USE, BUT WHEN USED WITH THE GOODS IN ISSUE, NEITHER SUGGESTS NOR DESCRIBES ANY INGREDIENT, QUALITY OR CHARACTERISTIC OF THOSE GOODS, BUT IS USED ONLY IN AN ARBITRARY CAPACITY. AN ARBITRARY WORD BEARS NO RELATIONSHIP TO THE

PRODUCT WITH WHICH IT IS ASSOCIATED. "APPLE" TO DESIGNATE A COMPUTER IS AN EXAMPLE OF AN ARBITRARY TERM.

A "SUGGESTIVE" WORD IS ONE THAT SUGGESTS, RATHER THAN DESCRIBES, A CHARACTERISTIC OR QUALITY OF THE PRODUCT. "STRONGHOLD" FOR THREADED NAILS IS SUGGESTIVE OF THEIR SUPERIOR HOLDING POWER.

A MERELY "DESCRIPTIVE" WORD IS ONE THAT IDENTIFIES OR DESCRIBES A CHARACTERISTIC OR QUALITY OF A PRODUCT, SUCH AS ITS INTENDED USE, INGREDIENTS, OR DESIRABLE FEATURES. "TENDER VITTLES" IS A DESCRIPTIVE TERM FOR CAT FOOD. SIMILARLY, A "GEOGRAPHICALLY DESCRIPTIVE" WORD IS ONE USED TO INDICATE THE LOCATION OR ORIGIN OF PRODUCTS. "CALIFORNIA APPAREL" AS APPLIED TO CLOTHING PRODUCED IN THAT STATE IS GEOGRAPHICALLY DESCRIPTIVE.

A GENERIC WORD IS ONE THAT IS THE COMMON NAME FOR THE PRODUCT. "BUTTER" IS THE LANGUAGE WORD FOR BUTTER. THERE CAN BE NO TRADEMARK RIGHTS IN A GENERIC TERM, WHICH REMAINS IN THE PUBLIC DOMAIN AS A PART OF OUR LANGUAGE.

THE RIGHT TO PROTECTION OF A TRADEMARK COMES FROM ITS UTILITY IN IDENTIFYING A SPECIFIC PRODUCT. WE SPEAK OF STRONG AND WEAK MARKS IN TERMS OF THE AMOUNT OF USE NECESSARY TO CREATE PROTECTED RIGHTS. A STRONG MARK IS ONE THAT IDENTIFIES OR SIGNIFIES A SINGLE SOURCE OR ORIGIN. A WEAK MARK IS ONE THAT DOES NOT IDENTIFY OR SIGNIFY A SINGLE SOURCE OR ORIGIN. WORDS THAT ARE COINED, FANCIFUL, ARBITRARY, OR

JA648

SUGGESTIVE ARE STRONG MARKS. WORDS THAT ARE MERELY DESCRIPTIVE ARE WEAK MARKS.

WEAK MARKS DO NOT OBTAIN PROTECTION SOLELY FROM THEIR USE AS A TRADEMARK. WEAK MARKS MUST FIRST ACQUIRE DISTINCTIVENESS FROM THE EFFECT OF THE OWNER'S EFFORTS IN THE MARKETPLACE. THIS IS WHAT IS CALLED THE DEVELOPMENT OF SECONDARY MEANING. FOR INSTANCE, A MERELY DESCRIPTIVE TERM USED AS A TRADEMARK MUST HAVE BEEN SO USED THAT ITS PRIMARY SIGNIFICANCE IN THE MINDS OF THE CONSUMING PUBLIC IS NOT THE PRODUCT ITSELF, BUT INSTEAD THE IDENTIFICATION OF IT WITH A SINGLE SOURCE.

PLAINTIFF CLAIMS THAT "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS ARE PROTECTED AS A TRADEMARK BECAUSE IT IS COINED AND THEREFORE INHERENTLY DISTINCTIVE.

THIS IS A QUESTIONS FOR YOU, THE JURY, TO DECIDE ARE "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS COINED IN ACCORDANCE WITH HOW I HAVE DEFINED THESE TERMS FOR YOU.

IF YOUR ANSWER TO THAT QUESTION IS THAT "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS ARE INHERENTLY DISTINCTIVE, YOU WILL THEN CONSIDER WHETHER THE QUANTITY AND QUALITY OF THE PLAINTIFF'S USE OF THIS TERM HAS ESTABLISHED PLAINTIFF'S PRIORITY SO AS TO EARN LEGAL PROTECTION OF THE TERM AS A TRADEMARK. ON THE OTHER HAND, IF YOU FIND THAT GMS IS NOT INHERENTLY DISTINCTIVE,

THEN YOU WILL CONSIDER WHETHER THE EVIDENCE SHOWS THAT THE TERM

HAS DEVELOPED SECONDARY MEANING.

4 MODERN FEDERAL JURY INSTRUCTIONS-CIVIL P 86A.02 (2022)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA650**

**P-53: SECONDARY MEANING**

BY THE TERM "SECONDARY MEANING," THE LAW MEANS THAT A TERM THAT IS NOT INHERENTLY DISTINCTIVE HAS BEEN SO USED THAT ITS PRIMARY SIGNIFICANCE IN THE MINDS OF THE CONSUMING PUBLIC IS NOT THE PRODUCT ITSELF, BUT INSTEAD THE IDENTIFICATION OF IT WITH A SINGLE SOURCE. THIS DOES NOT MEAN THAT THE CONSUMING PUBLIC MUST KNOW THE EXACT IDENTITY OF THAT SINGLE SOURCE IN THE SENSE THAT IT KNOWS THE NAME OF THE CORPORATION OR OTHER ENTITY PRODUCING OR SELLING THE PRODUCT. ALL THAT IS NECESSARY TO ESTABLISH SECONDARY MEANING IS THAT THE ORDINARY CONSUMER ASSOCIATES THE PRODUCT WITH A SINGLE SOURCE, REGARDLESS OF WHETHER THE CONSUMER KNOWS WHO OR WHAT THAT SOURCE IS.

YOU MUST FIND, THEREFORE, FROM A PREPONDERANCE OF THE EVIDENCE, THAT A SIGNIFICANT NUMBER OF THE CONSUMING PUBLIC ASSOCIATES "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS WITH A SINGLE SOURCE. IT IS FOR YOU TO DECIDE HOW MANY CONSTITUTE A SIGNIFICANT NUMBER, KEEPING IN MIND THAT THE PLAINTIFF NEED NOT PROVE THAT ALL OR EVEN A MAJORITY OF THE CONSUMING PUBLIC UNDERSTANDS THIS SECONDARY MEANING. THE PLAINTIFF HAS THE BURDEN OF PROVING SECONDARY MEANING.

THE MERE FACT THAT PLAINTIFF IS "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR CORRESPONDING MARKS, OR THAT PLAINTIFF BEGAN TO USE

**JA651**

THEM BEFORE THE DEFENDANT, DOES NOT ESTABLISH SECONDARY MEANING.

SIMILARLY, THE MERE FACT "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND

THEIR CORRESPONDING MARKS MAY BE UNIQUE IS NOT ENOUGH TO ESTABLISH

SECONDARY MEANING. NOR IS MERE POPULARITY OF THE PRODUCT SUFFICIENT

TO SHOW SECONDARY MEANING.

IN DETERMINING WHETHER  "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS"

AND THEIR CORRESPONDING MARKS HAVE ACQUIRED SECONDARY MEANING,

IT IS APPROPRIATE FOR YOU TO CONSIDER ANY EVIDENCE RELATING TO

A.  THE LENGTH AND MANNER OF ITS USE;

B.  THE NATURE AND EXTENT OF ADVERTISING AND PROMOTION;

C.  SALES VOLUME;

D.  OTHER EFFORTS MADE BY THE PLAINTIFF TO PROMOTE THE CONNECTION
    BETWEEN "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND THEIR
    CORRESPONDING MARKS AND THE PLAINTIFF;

E.  CONSUMER SURVEYS;

F.  CONSUMER TESTIMONY AS TO THE IDENTITY OF THE SOURCE OF
    PRODUCTS DISPLAYING  "GMS INDUSTRIAL SUPPLY, LLC" AND "GMS" AND
    THEIR CORRESPONDING MARKS; AND

G.  COPYING BY OTHERS.

THERE IS NO PARTICULAR TIME WITHIN WHICH SECONDARY MEANING NEED BE

ESTABLISHED. THE QUESTION FOR YOU TO DETERMINE IS WHETHER

SECONDARY MEANING HAS BEEN ESTABLISHED, NOT IN HOW LONG OR SHORT A

TIME THIS WAS DONE.

4 MODERN FEDERAL JURY INSTRUCTIONS-CIVIL P 86A.02 (2022)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

JA653

**P-54:  INJUNCTIVE RELIEF FOR TRADEMARK INFRINGEMENT**

IF YOU FIND DEFENDANTS INFRINGED UPON GMS'S TRADEMARK OR TRADEMARKS, THEN GMS IS ENTITLED TO AN INJUNCTION TO PREVENT ANY FURTHER INFRINGEMENT.

15 U.S.C. § 1125

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**JA654**

**P-55: DEFINITION OF TRADE DRESS**

IN GENERAL, TRADE DRESS SERVES THE SAME FUNCTION AS

TRADEMARKS: PROMOTING COMPETITION BY PROTECTING FEATURES THAT

IDENTIFY A PRODUCT'S MANUFACTURER OR SOURCE.  RATHER THAN

CONSISTING OF A BRAND NAME OR LOGO, TRADE DRESS IS THE TOTAL IMAGE

OF A PRODUCT AND MAY INCLUDE FEATURES SUCH AS SIZE, SHAPE, COLOR OR

COLOR COMBINATIONS, TEXTURE, GRAPHICS, OR EVEN PARTICULAR SALES

TECHNIQUES.

CTB, INC. V. HOG SLAT, INC., 954 F.3D 647, 656 (4TH CIR. 2020)

GIVEN:          _____

REFUSED:        _____

MODIFIED:       _____

117

**JA655**

**P-56: TRADE DRESS INFRINGEMENT UNDER LANHAM ACT**

IN THIS CASE, GMS CLAIMS THE DEFENDANTS INFRINGED UPON GMS'S TRADE DRESS.  THE DEFENDANTS DENY THEY INFRINGED UPON GMS'S TRADE DRESS.

YOU SHALL FIND YOUR VERDICT FOR GMS IF IT HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THE FOLLOWING:

1. GMS'S TRADE DRESS IS PRIMARILY NON-FUNCTIONAL;

2. GMS'S TRADE DRESS IS INHERENTLY DISTINCTIVE OR HAS ACQUIRED A SECONDARY MEANING TO CUSTOMERS; AND

3. THE DEFENDANTS INFRINGEMENT CREATES A LIKELIHOOD OF CONFUSION AMONG CUSTOMERS AS TO A PRODUCT'S SOURCE.

YOU SHALL FIND YOUR VERDICT FOR THE DEFENDANTS IF THE PLAINTIFF FAILED TO PROVE ANY OF THESE ELEMENTS.

IF YOU FIND IN FAVOR OF GMS, YOUR VERDICT SHOULD BE LIMITED TO ONLY THOSE DEFENDANTS THAT INFRINGED UPON GMS'S TRADE DRESS.


CTB, INC. V. HOG SLAT, INC., 954 F.3D 647, 656 (4TH CIR. 2020)

GIVEN:          _____

REFUSED:        _____

MODIFIED:       _____

**JA656**

**P-57: TRADE DRESS FUNCTIONALITY**

WHEN DISCUSSING WHETHER A TRADE DRESS IS FUNCTIONAL OR NON-FUNCTIONAL, IT IS CONSIDERED FUNCTIONAL IF IT IS ESSENTIAL TO THE USE OR PURPOSE OF THE ARTICLE OR IF IT AFFECTS THE COST OR QUALITY OF THE ARTICLE.  PUT SIMPLY, A FEATURE IS FUNCTIONAL IF IT IS THE REASON THE DEVICE WORKS.  THE CRITICAL FUNCTIONALITY INQUIRY IS NOT WHETHER EACH INDIVIDUAL COMPONENT OF THE TRADE DRESS IS FUNCTIONAL, BUT RATHER WHETHER THE TRADE DRESS *AS A WHOLE* IS FUNCTIONAL.

CTB, INC. V. HOG SLAT, INC., 954 F.3D 647, 656 (4TH CIR. 2020)

GIVEN:          _____

REFUSED:        _____

MODIFIED:       _____

**JA657**

**P-58: UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN UNDER LANHAM ACT**

IN THIS CASE, GMS CLAIMS THE DEFENDANTS VIOLATED THE LANHAM ACT'S UNFAIR COMPETITION RESTRICTIONS.  THE DEFENDANTS DENY THEY VIOLATED THE LANHAM ACT.

YOU SHALL FIND YOUR VERDICT FOR GMS IF IT HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THE FOLLOWING:

1.  THE DEFENDANTS, IN CONNECTION WITH ANY GOODS OR SERVICES, OR ANY CONTAINER FOR GOODS, USED IN COMMERCE ANY WORD, TERM, NAME, SYMBOL, OR DEVICE, OR ANY COMBINATION THEREOF, OR ANY FALSE DESIGNATION OF ORIGIN, FALSE OR MISLEADING DESCRIPTION OF FACT, OR FALSE OR MISLEADING REPRESENTATION OF FACT, WHICH

    A.  IS LIKELY TO CAUSE CONFUSION, OR TO CAUSE MISTAKE, OR TO DECEIVE AS TO THE AFFILIATION, CONNECTION, OR ASSOCIATION OF SUCH PERSON WITH ANOTHER PERSON, OR AS TO THE ORIGIN, SPONSORSHIP, OR APPROVAL OF HIS OR HER GOODS, SERVICES, OR COMMERCIAL ACTIVITIES BY ANOTHER PERSON, AND/OR

    B.  IN COMMERCIAL ADVERTISING OR PROMOTION, MISREPRESENTS THE GEOGRAPHIC ORIGIN OF HIS OR HER OR ANOTHER PERSON'S GOODS, SERVICES, OR COMMERCIAL ACTIVITIES.

**JA658**

YOU SHALL FIND YOUR VERDICT FOR THE DEFENDANTS IF THE PLAINTIFF FAILED TO PROVE ANY OF THESE ELEMENTS.

IF YOU FIND IN FAVOR OF GMS, YOUR VERDICT SHOULD BE LIMITED TO ONLY THOSE DEFENDANTS THAT YOU FIND ENGAGED IN UNFAIR COMPETITION AND/OR MISREPRESENTED THE GEOGRAPHICAL ORIGIN OF HIS, HERS OR ANOTHER PERSON'S GOODS, SERVICES OR COMMERCIAL ACTIVITIES.

15 U.S.C. § 1125(A)(1); <u>BELMORA LTD. LIAB. CO. V. BAYER CONSUMER CARE AG</u>, 819 F.3D 697, 706 (4TH CIR. 2016)

GIVEN:        _____

REFUSED:      _____

MODIFIED:     _____

JA659

**P-59: DAMAGES FOR UNFAIR COMPETITION**

IF YOU FIND THAT DEFENDANTS VIOLATED THE LANHAM ACT'S UNFAIR COMPETITION RESTRICTIONS, THEN YOU SHALL AWARD GMS (1) DEFENDANT'S PROFITS, (2) ANY DAMAGES SUSTAINED BY GMS, AND (3) THE COSTS OF THE ACTION.

15 U.S.C. § 1117(A)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA660**

USCA4 Appeal: 22-2090 Doc: 20-2 Filed: 01/19/2023 Pg: 364 of 417

**P-60: AFFIRMATIVE DEFENSES TO COUNTERCLAIM**

GENERALLY SPEAKING, AN AFFIRMATIVE DEFENSE IS A DEFENSE TO A CLAIM THAT, IF PROVEN, CONSTITUTES AN ABSOLUTE BAR TO RECOVERY ON THE CLAIM. GMS INDUSTRIAL SUPPLY HAS ASSERTED SEVERAL AFFIRMATIVE DEFENSES TO THE COUNTERCLAIMS FILED BY WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS, LLC, THOMAS HAYES, SABRINA GREER, GREER GROUP, LLC, AND MIKE WELTON.

MONAHAN V. OBICI MED. MGMT. SERVS., 271 VA. 621, 633, 628 S.E.2D 330, 337 (2006)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

## P-61: ESTOPPEL AS AFFIRMATIVE DEFENSE TO COUNTERCLAIMS

GMS INDUSTRIAL SUPPLY, INC. HAS ASSERTED THE DOCTRINE OF ESTOPPEL AS AN AFFIRMATIVE DEFENSE TO THE COUNTERCLAIMS FILED BY WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS, LLC, THOMAS HAYES, SABRINA GREER, GREER GROUP, LLC, AND MIKE WELTON.

IF YOU FIND THAT ANY OF THESE INDIVIDUALS HAS MET HIS, HER, OR ITS BURDEN OF ESTABLISHING HIS, HER, OR ITS COUNTERCLAIM AGAINST GMS, YOU SHALL NEVERTHELESS FIND YOUR VERDICT FOR GMS IF YOU FIND THAT GMS HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT:

(1) WITH RESPECT TO EACH DEFENDANT THAT HE, SHE, OR IT TOOK AN ACTION OR MADE A REPRESENTATION,

(2) THAT GMS, IN RELIANCE UPON THE ACTION AND/OR REPRESENTATION, CHANGED ITS POSITION,

(3) AND THAT GMS'S CHANGE IN POSITION WAS TO ITS DETRIMENT.

IF YOU FIND IN FAVOR OF GMS, YOUR VERDICT SHOULD BE LIMITED TO ONLY THOSE DEFENDANTS WITH COUNTERCLAIMS FOR WHICH GMS HAS PROVEN ITS AFFIRMATIVE DEFENSE BY A PREPONDERANCE OF THE EVIDENCE.


WAYNESBORO VILL., L.L.C. V. BMC PROPS., 255 VA. 75, 82, 496 S.E.2D 64, 68 (1998); KHOURY V. CMTY. MEM'L HOSP., INC., 203 VA. 236, 243, 123 S.E.2D 533, 538 (1962)

GIVEN:           _____

REFUSED:       _____

MODIFIED:     _____

**JA662**

**P-62: WAIVER AS AN AFFIRMATIVE DEFENSE TO COUNTERCLAIMS**

GMS INDUSTRIAL SUPPLY, INC. HAS ASSERTED THE DOCTRINE OF WAIVER AS AN AFFIRMATIVE DEFENSE TO THE COUNTERCLAIMS FILED BY WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS, LLC, THOMAS HAYES, SABRINA GREER, GREER GROUP, LLC, AND MIKE WELTON.

IF YOU FIND THAT ANY OF THESE INDIVIDUALS HAS MET HIS, HER, OR ITS BURDEN OF ESTABLISHING HIS, HER, OR ITS COUNTERCLAIM AGAINST GMS, YOU SHALL NEVERTHELESS FIND YOUR VERDICT FOR GMS IF YOU FIND THAT GMS HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT, FOR EACH DEFENDANT, THE DEFENDANT INTENTIONALLY GAVE UP HIS, HER OR ITS CONTRACTUAL RIGHTS WHICH WOULD HAVE BEEN BENEFICIAL TO HIM, HER OR IT.  SUCH WAIVER MAY BE IMPLIED FROM CONDUCT, BUT A PARTY CANNOT WAIVE A RIGHT UNLESS HE, SHE, OR IT HAS FULL KNOWLEDGE OF IT.

IF YOU FIND IN FAVOR OF GMS, YOUR VERDICT SHOULD BE LIMITED TO ONLY THOSE DEFENDANTS WITH COUNTERCLAIMS FOR WHICH GMS HAS PROVEN ITS AFFIRMATIVE DEFENSE BY A PREPONDERANCE OF THE EVIDENCE.

VMJI 45.410

GIVEN:          _____

REFUSED:      _____

MODIFIED:   _____

**JA663**

**P-63: UNCLEAN HANDS AS AN AFFIRMATIVE DEFENSE**

GMS INDUSTRIAL SUPPLY, INC. HAS ASSERTED THE DOCTRINE OF UNCLEAN HANDS AS AN AFFIRMATIVE DEFENSE TO THE COUNTERCLAIMS FILED BY WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS, LLC, THOMAS HAYES, SABRINA GREER, GREER GROUP, LLC, AND MIKE WELTON. UNDER THE DOCTRINE OF UNCLEAN HANDS, A PARTY IS DENIED RELIEF BECAUSE OF HIS OWN INEQUITABLE CONDUCT. HOWEVER, THE PURPOSE OF THE UNCLEAN HANDS DOCTRINE IS TO SECURE JUSTICE AND EQUITY, NOT TO AID ONE IN ACQUIRING PROPERTY TO WHICH HE HAS NO RIGHT.

IF YOU FIND THAT ANY OF THESE INDIVIDUALS HAS MET HIS, HER, OR ITS BURDEN OF ESTABLISHING HIS, HER, OR ITS COUNTERCLAIM AGAINST GMS, YOU SHALL NEVERTHELESS FIND YOUR VERDICT FOR GMS IF YOU FIND THAT GMS HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT, FOR EACH DEFENDANT, THE DEFENDANT, THROUGH HIS, HER OR ITS OWN INEQUITABLE CONDUCT, HAS UNCLEAN HANDS IN ASSERTING THAT GMS BREACHED ITS CONTRACT WITH THE DEFENDANT.

IF YOU FIND IN FAVOR OF GMS, YOUR VERDICT SHOULD BE LIMITED TO ONLY THOSE DEFENDANTS WITH COUNTERCLAIMS FOR WHICH GMS HAS PROVEN ITS AFFIRMATIVE DEFENSE BY A PREPONDERANCE OF THE EVIDENCE.

BROWN V. KITTLE, 225 VA. 451, 456, 303 S.E.2D 864, 867 (1983); RICHARDS V. MUSSELMAN, 221 VA. 181, 185-86, 267 S.E.2D 164, 167 (1980)

GIVEN:        _____

REFUSED:      _____

MODIFIED:     _____

**JA664**

**P-64: FIRST MATERIAL BREACH AS AFFIRMATIVE DEFENSE TO COUNTERCLAIMS**

GMS INDUSTRIAL SUPPLY, INC. HAS ASSERTED THE DOCTRINE OF FIRST MATERIAL BREACH AS AN AFFIRMATIVE DEFENSE TO THE COUNTERCLAIMS FILED BY WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS, LLC, THOMAS HAYES, SABRINA GREER, GREER GROUP, LLC, AND MIKE WELTON. UNDER THE FIRST MATERIAL BREACH DOCTRINE, A PARTY WHO COMMITS THE FIRST BREACH OF A CONTRACT IS NOT ENTITLED TO ENFORCE THE CONTRACT.

IF YOU FIND THAT ANY OF THESE INDIVIDUALS HAS MET HIS, HER, OR ITS BURDEN OF ESTABLISHING HIS, HER, OR ITS COUNTERCLAIM AGAINST GMS FOR BREACH OF CONTRACT, YOU SHALL NEVERTHELESS FIND YOUR VERDICT FOR GMS IF YOU FIND THAT GMS HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT, FOR EACH DEFENDANT, THE DEFENDANT COMMITTED THE FIRST MATERIAL BREACH OF HIS, HER, OR ITS RESPECTIVE CONTRACT WITH GMS. A MATERIAL BREACH IS A FAILURE TO DO SOMETHING THAT IS SO FUNDAMENTAL TO THE CONTRACT THAT THE FAILURE TO PERFORM THAT OBLIGATION DEFEATS AN ESSENTIAL PURPOSE OF THE CONTRACT.

IF YOU FIND IN FAVOR OF GMS, YOUR VERDICT SHOULD BE LIMITED TO ONLY THOSE DEFENDANTS WITH COUNTERCLAIMS FOR WHICH GMS HAS PROVEN ITS AFFIRMATIVE DEFENSE BY A PREPONDERANCE OF THE EVIDENCE.

**JA665**

USCA4 Appeal: 22-2090    Doc: 20-2    Filed: 01/19/2023    Pg: 369 of 417

HORTON V. HORTON, 254 VA. 111, 115, 487 S.E.2D 200, 203 (1997)

GIVEN: _____

REFUSED: _____

MODIFIED: _____

# Defendants' Proposed Jury Instructions

**JA667**

**D-1:  CLAIMS AND DEFENSES**

THE POSITIONS OF THE PARTIES CAN BE SUMMARIZED AS FOLLOWS:

PLAINTIFF GMS INDUSTRIAL SUPPLY, LLC, CLAIMS THAT DEFENDANT WESTLY GREER BREACHED HIS DUTY OF LOYALTY TO PLAINTIFF.  PLAINTIFF ALSO CLAIMS THAT WESTLY GREER BREACHED HIS EMPLOYMENT AGREEMENT WITH PLAINTIFF.  PLAINTIFF CLAIMS THAT DEFENDANTS WESTLY GREER, GREGORY SPIRES, COUNTY ROADS LLC, THOMAS HAYES, SABRINA GREER, GREER GROUP LLC, AND MIKE WELTON EACH BREACHED THEIR RESPECTIVE SALES AGENT AGREEMENTS WITH PLAINTIFF.

PLAINTIFF GMS INDUSTRIAL SUPPLY, LLC, CLAIMS ALL DEFENDANTS MISAPPROPRIATED PLAINTIFF'S TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT.

PLAINTIFF GMS INDUSTRIAL SUPPLY, LLC, CLAIMS DEFENDANTS WESTLY GREER, GREGORY SPIRES, COUNTY ROADS LLC, THOMAS HAYES, SABRINA GREER, GREER GROUP LLC, MIKE WELTON, AND HMC SUPPLY LLC ENGAGED IN BUSINESS CONSPIRACY AND COMMON LAW CONSPIRACY.

PLAINTIFF CLAIMS ALL DEFENDANTS INFRINGED ON PLAINTIFF'S TRADEMARK.

DEFENDANTS DENY PLAINTIFF'S ALLEGATIONS, AND SPECIFICALLY CONTEND THAT DEFENDANTS DID NOT BREACH ANY CONTRACTUAL OR LEGAL OBLIGATIONS TO PLAINTIFF, DID NOT MISAPPROPRIATE PLAINTIFF'S TRADE

**JA668**

SECRETS, DID NOT CONSPIRE AGAINST PLAINTFF, AND DID NOT INFRINGE ON PLAINTIFF'S TRADEMARK.  DEFENDANTS FURTHER CONTEND THAT PLAINTIFF DID NOT SUFFER ANY DAMAGES RESULTING FROM ANY ALLEGED VIOLATIONS.

DEFENDANTS WESTLY GREER, SABRINA GREER, GREER GROUP, LLC, GREGORY K. SPIRES, COUNTY ROADS, LLC, THOMAS HAYES, AND MIKE WELTON HAVE BROUGHT A COUNTERCLAIM AGAINST PLAINTIFF GMS INDUSTRIAL SUPPLY, LLC.  THEY CLAIM THAT PLAINTIFF GMS INDUSTRIAL SUPPLY BREACHED ITS SALES AGENT AGREEMENTS WITH THEM BY FAILING TO PAY THEM COMMISSIONS AND BONUSES EARNED ON SALES THEY MADE FOR PLAINTIFF.

PLAINTIFF DENIES THESE ALLEGATIONS AND CONTENDS THAT IT DOES NOT OWE DEFENDANTS WESTLY GREER, SABRINA GREER, GREER GROUP, LLC, GREGORY K. SPIRES, COUNTY ROADS, LLC, THOMAS HAYES, AND MIKE WELTON ANY COMMISSIONS OR BONUSES UNDER THE TERMS OF THEIR SALES AGENT AGREEMENTS.

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 101:03 (6TH ED 2006) (MODIFIED).

GIVEN:      _____

REFUSED:      _____

MODIFIED:      _____

JA669

**D-2: QUESTIONS BY JURORS – PERMITTED**


JURORS NORMALLY DO NOT ASK A WITNESS QUESTIONS.  HOWEVER, I WILL ALLOW JURORS TO ASK IMPORTANT QUESTIONS DURING THE TRIAL UNDER CERTAIN CONDITIONS.

IF YOU FEEL THE ANSWER TO YOUR QUESTION WOULD BE HELPFUL IN UNDERSTANDING THE ISSUES IN THE CASE, PLEASE RAISE YOUR HAND AFTER THE LAWYERS HAVE COMPLETED THEIR EXAMINATION BUT BEFORE I HAVE EXCUSED THE WITNESS.  YOU WILL THEN BE GIVEN A PEN WITH PAPER WITH WHICH TO WRITE YOUR QUESTION FOR THE WITNESS.

I WILL TALK PRIVATELY WITH THE LAWYERS AND DECIDE WHETHER THE QUESTION IS PROPER UNDER THE LAW.  IF THE QUESTION IS PROPER, I WILL ASK THE WITNESS THE QUESTION.  SOME QUESTIONS MAY BE REWORDED OR REJECTED.  DO NOT BE CONCERNED IF THE QUESTION IS NOT ASKED.

DO NOT DISCUSS YOUR QUESTION WITH ANYONE, INCLUDING THE MARSHAL OR CLERK.  REMEMBER, YOU ARE NOT TO DISCUSS THE CASE WITH THE OTHER JURORS UNTIL IT IS SUBMITTED FOR YOUR DECISION.

IF YOU HAVE DIFFICULTY HEARING A WITNESS OR LAWYER, PLEASE RAISE YOUR HAND IMMEDIATELY.

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 101.17 (6TH ED. 2006) (MODIFIED).

GIVEN:        _____

REFUSED:        _____

MODIFIED:        _____

**JA670**

**D-2:  CREDIBILITY OF WITNESSES, DISCREPANCIES IN TESTIMONY**

IN DECIDING THE FACTS, YOU MAY HAVE TO DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, PART OF IT, OR NONE OF IT.  IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE INTO ACCOUNT MANY FACTORS, INCLUDING THE WITNESS' OPPORTUNITY AND ABILITY TO SEE OR HEAR OR KNOW THE THINGS THE WITNESS TESTIFIED ABOUT; THE QUALITY OF THE WITNESS' MEMORY; THE WITNESS' APPEARANCE AND MANNER WHILE TESTIFYING; THE WITNESS' INTEREST IN THE OUTCOME OF THE CASE; ANY BIAS OR PREJUDICE THE WITNESS MAY HAVE; OTHER EVIDENCE THAT MAY HAVE CONTRADICTED THE WITNESS' TESTIMONY; AND THE REASONABLENESS OF THE WITNESS' TESTIMONY IN LIGHT OF ALL THE EVIDENCE.  THE WEIGHT OF THE EVIDENCE DOES NOT NECESSARILY DEPEND UPON THE NUMBER OF WITNESSES WHO TESTIFY.

YOU ARE THE SOLE JUDGES OF THE CREDIBILITY OF THE WITNESSES AND THE WEIGHT THEIR TESTIMONY DESERVES.  YOU MAY BE GUIDED BY THE APPEARANCE AND CONDUCT OF THE WITNESS, OR BY THE MANNER IN WHICH THE WITNESS TESTIFIES, OR BY THE CHARACTER OF THE TESTIMONY GIVEN, OR BY THE EVIDENCE CONTRARY TO THE TESTIMONY.

YOU SHOULD CAREFULLY EXAMINE ALL THE TESTIMONY GIVEN, THE CIRCUMSTANCES UNDER WHICH EACH WITNESS HAS TESTIFIED, AND EVERY MATTER IN EVIDENCE TENDING TO SHOW WHETHER A WITNESS IS WORTHY OF

**JA671**

BELIEF. CONSIDER EACH WITNESS' INTELLIGENCE, MOTIVE AND STATE OF MIND, AND DEMEANOR OR MANNER WHILE TESTIFYING.

CONSIDER THE WITNESS' ABILITY TO OBSERVE THE MATTERS AS TO WHICH THE WITNESS HAS TESTIFIED, AND WHETHER THE WITNESS IMPRESSES YOU AS HAVING AN ACCURATE RECOLLECTION OF THESE MATTERS. ALSO, CONSIDER ANY RELATION EACH WITNESS MAY HAVE WITH EITHER SIDE OF THE CASE, THE MANNER IN WHICH EACH WITNESS MIGHT BE AFFECTED BY THE VERDICT, AND THE EXTENT TO WHICH THE TESTIMONY OF EACH WITNESS IS EITHER SUPPORTED OR CONTRADICTED BY OTHER EVIDENCE IN THE CASE.

INCONSISTENCIES OR DISCREPANCIES IN THE TESTIMONY OF A WITNESS, OR BETWEEN THE TESTIMONY OF DIFFERENT WITNESSES MAY OR MAY NOT CAUSE YOU TO DISCREDIT SUCH TESTIMONY. TWO OR MORE PERSONS SEEING AN EVENT MAY SEE OR HEAR IT DIFFERENTLY.

IN WEIGHING THE EFFECT OF A DISCREPANCY, ALWAYS CONSIDER WHETHER IT PERTAINS TO A MATTER OF IMPORTANCE OR AN UNIMPORTANT DETAIL, AND WHETHER THE DISCREPANCY RESULTS FROM INNOCENT ERROR OR INTENTIONAL FALSEHOOD.

A WITNESS MAY BE DISCREDITED OR IMPEACHED BY CONTRADICTORY EVIDENCE OR BY EVIDENCE THAT AT SOME OTHER TIME THE WITNESS HAS SAID OR DONE SOMETHING, IR HAS FAILED TO SAY OR DO SOMETHING THAT IS INCONSISTENT WITH THE WITNESS' PRESENT TESTIMONY. IF A WITNESS IS SHOWN KNOWINGLY TO HAVE TESTIFIED FALSELY ABOUT ANY MATERIAL MATTER, YOU HAVE A RIGHT TO DISTRUST SUCH WITNESS' OTHER TESTIMONY

JA672

AND YOU MAY REJECT ALL THE TESTIMONY OF THAT WITNESS OR GIVE IT

SHUCH OTHER CREDIBILITY AS YOU MAY THINK IT DESERVES.

A WITNESS MAY ALSO BE DISCREDITED OR IMPEACHED BY EVIDENCE

THAT THE WITNESS HAS BEEN CONVICTED OF A FELONY, THAT IS, AN OFFENSE

PUNISHABLE BY DETAH OR IMPRISONMENT FOR IN EXCESS OF ONE YEAR, OR

THAT THE WITNESS HAS BEEN CONVICTED OF A CRIME INVOLVING DISHONESTY

OR FALSE STATEMENT, REGARDLESS OF THE PUNISHMENT.  IF YOU BELIEVE

THAT ANY WITNESS HAS BEEN IMPEACHED AND DISCREDITED, IT IS YOUR

EXCLUSIVE RESPONSIBILITY TO GIVE THE TESTIMONY OF THAT WITNESS SUCH

CREDIBILITY, IF ANY, AS YOU THINK IT DESERVES.

AFTER MAKING YOUR OWN JUDGMENT, YOU WILL GIVE THE TESTIMONY

OF EACH WITNESS SUCH WEIGHT, IF ANY, THAT YOU MAY THINK IT DESERVES.

IN SHORT, YOU MAY ACCEPT OR REJECT THE TESTIMONY OF ANY WITNESS, IN

WHOLE OR IN PART.

IN ADDITION, THE WEIGHT OF THE EVIDENCE IS NOT NECESSARILY

DETERMINED BY THE NUMBER OF WITNESSES TESTIFYING TO THE EXISTENCE

OR NONEXISTENCE OF ANY FACT.  YOU MAY FIND THAT THE TESTIMONY OF A

SMALL NUMBER OF WITNESSES AS TO ANY FACT IS MORE CREDIBLE THAN THE

TESTIMONY OF A LARGER NUMBER OF WITNESSES TO THE CONTRARY.

**JA673**

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS §§

101.43, 105.01, 105.04, 105.05 (6TH ED. 2006).

GIVEN:          _____

REFUSED:        _____

MODIFIED:       _____

**JA674**

**D-4: PARTY BOUND BY HIS OWN TESTIMONY**

WHEN ONE OF THE PARTIES TESTIFIES UNEQUIVOCALLY TO FACTS WITHIN HIS

OWN KNOWLEDGE, THOSE STATEMENTS OF FACT AND THE NECESSARY

INFERENCES FROM THEM ARE BINDING UPON HIM.  HE CANNOT RELY ON THE

EVIDENCE IN CONFLICT WITH HIS OWN TESTIMONY TO STRENGTHEN HIS CASE.

    HOWEVER, YOU MUST CONSIDER HIS TESTIMONY AS A WHOLE AND YOU

MUST CONSIDER A STATEMENT MADE IN ONE PART OF HIS TESTIMONY IN THE

LIGHT OF ANY EXPLANATION OR CLARIFICATION MADE ELSEWHERE IN HER

TESTIMONY.

VIRGINIA MODEL JURY INSTRUCTION (HEREINAFTER "VMJI") NO. 2.060

GIVEN:        _____

REFUSED:      _____

MODIFIED:     _____

**JA675**

**D-5: MULTIPLE DEFENDANTS**


ALTHOUGH THERE IS MORE THAN ONE DEFENDANT IN THIS ACTION, IT DOES NOT FOLLOW FROM THAT FACT ALONE THAT IF ONE DEFENDANT IS LIABLE TO THE PLAINTIFF, ALL DEFENDANTS ARE LIABLE.  EACH DEFENDANT IS ENTITLED TO FAIR CONSIDERATION OF THE EVIDENCE.  NO DEFENDANT IS TO BE PREJUDICED SHOULD YOU FIND AGAINST ANOTHER.


3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 103.14 (6TH ED. 2006) (MODIFIED).


GIVEN:          _____

REFUSED:          _____

MODIFIED:          _____

**JA676**

**D-6: BURDEN OF PROOF – CLEAR AND CONVINCING EVIDENCE**

SOME OF PLAINTIFF' GMS INDUSTRIAL SUPPLY, INC.'S, CLAIMS MUST BE PROVED

BY "CLEAR AND CONVINCING EVIDENCE."  CLEAR AND CONVINCING EVIDENCE

REQUIRES A HIGHER STANDARD THAN PROOF BY A PREPONDERANCE OF THE

EVIDENCE.  CLEAR AND CONVINCING EVIDENCE PROOF LEAVES NO

SUBSTANTIAL DOUBT IN YOUR MIND.  IT IS PROOF THAT ESTABLISHES IN YOUR

MIND, NOT ONLY THE PROPOSITION AT ISSUE IS PROBALE, BUT THAT IT IS

HIGHLY PROBABLE.

3 KEVIN F. O'MALLEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS §

101.41 (6TH ED. 2006); LEONARD B. SAND, ET AL., MODERN FEDERAL JURY

INSTRUCTION, INSTRUCTION 74-13, (VOL. 4 1999); *SEE ALSO MULTICHANNEL TV*

*CABLE CO. V. CHARLOTTESVILLE QUALITY CABLE OPERATING CO*., 108 F. 3D 522, 526

(4TH CIR. 1997).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA677**

**D-7: DUTY OF LOYALTY**

PLAINTIFF GMS INDUSTRIAL SUPPLY ALLEGES DEFENDANT WESTLY GREER
BREACHED HIS DUTY OF LOYALTY TO PLAINTIFF. TO PREVAIL, PLAINTIFF GMS
INDUSTRIAL SUPPLY, INC., MUST PROVE THAT DEFENDANT WESTLY GREER
BREACHED HIS DUTY OF LOYALTY BY A PREPONDERANCE OF THE EVIDENCE.
AN EMPLOYEE HAS A GENERAL DUTY OF LOYALTY TO HIS EMPLOYER DURING
THE PERIOD OF EMPLOYMENT. LIABILITY FOR BREACH OF THE DUTY OF
LOYALTY CAN BE IMPOSED IF THE EMPLOYEE MISAPPROPRIATES TRADE
SECRETS, MISUSES THE EMPLOYER'S CONFIDENTIAL INFORMATION, OR
COMPETES AGAINST THE EMPLOYER DURING THE PERIOD OF HIS EMPLOYMENT.
THE FACT THAT PARTICULAR CONDUCT OF AN EMPLOYEE CAUSED HARM TO
HIS EMPLOYER DOES NOT ESTABLISH THAT THE CONDUCT BREACHED ANY
DUTY TO THE EMPLOYER.

*WILLIAMS V. DOMINION TECH. PARTNERS, L.L.C.*, 265 VA. 280, 289-290, 576 S.E.2D 752,
757, 759 (2003); *FEDDEMAN & CO. V. LANGAN ASSOCS., P.C.*, 260 VA. 35, 142, 530
S.E.2D 668, 672 (2009).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA678**

**D-8:  DEFINITION OF CONTRACT**

PLAINTIFF GMS INDUSTRIAL SUPPLY, LLC, ALLEGES CLAIMS FOR BREACH OF CONTRACT.  TO PREVAIL, PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., MUST PROVE ITS BREACH OF CONTRACT CLAIMS BY A PREPONDERANCE OF THE EVIDENCE.  SPECIFICALLY, GMS INDUSTRIAL SUPPLY, LLC, ALLEGES :

1.      DEFEDANT WESTLY GREER BREACHED HIS 2012 EMPLOYMENT AGREEMENT WITH PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., BY REVEALING THE IDENTITIES OF PLAINTIFF'S SUPPLIERS TO PLAINTIFF'S COMPETITORS.

2.      DEFENDANT WESTLY GREER BREACHED HIS 2019 SALES AGENT AGREEMENT WITH PLAINTIFF BY IMPORPERLY USING OR DISCLOSING PLAINTIFF'S CONFIDENTIAL INFORMATION OR BY ENCOURAGING PLAINTIFF'S EMPLOYEES OR AGENTS TO SEVER THEIR RELATIONSHIP WITH PLAINTIFF.

3.      DEFENDANTS WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS LLC, THOMAS HAYES, SABRINA GREER, GREER GROUP LLC, AND MIKE WELTON EACH BREACHED THEIR INDEPENDENT SALES AGENT AGREEMENTS WITH PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., BY FAILING TO AGRESSIVELY PROMOTE THE SALE OF PLAINTIFF'S PRODUCTS IN THEIR RESPECTIVE TERRITORIES.

ON THE ABOVE ISSUES, PLAINTIFF BEARS THE BURDEN OF PROOF. IN THEIR COUNTERCLAIM, DEFENDANTS WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS LLC, THOMAS HAYES, SABRINA GREER, GREER GROUP, LLC, AND MIKE WELTON ALLEGE PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., BREACHED ITS INDEPENDENT SALES AGENTS WITH DEFENDANTS WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS LLC, THOMAS HAYES, SABRINA

**JA679**

GREER, GREER GROUP, LLC, AND MIKE WELTON BY FAILING TO PAY THEM

COMMISSION AND BONUSES EARNED FOR SALES EACH OF THEM MADE FOR

PLAINTIFF.

ON THIS ISSUE, DEFENDANTS WESTLY GREER, GREGORY K. SPIRES,

COUNTY ROADS LLC, THOMAS HAYES, SABRINA GREER, GREER GROUP, LLC,

AND MIKE WELTON BEAR THE BURDEN OF PROOF.

THE EMPLOYMENT AGREEMENT AND THE SALES AGENT AGREEMENTS

ARE CONTRACTS.   A CONTRACT IS AN AGREEMENT, FOR CONSIDERATION,

BETWEEN TWO OR MORE PARTIES.

TO BREACH A CONTRACT

1.    THERE MUST BE A LEGALLY ENFORCEABLE OBLIGATION OF ONE PARTY

TO THE OTHER PARTY;

2.    THE PARTY MUST HAVE VIOLATED OR BREACHED THAT OBLIGATION;

AND

3.    INJURY OR DAMAGE TO THE OTHER PARTY WAS CAUSED BY THE BREACH

OF THE OBLIGATION.


VMJI NOS. 45.010, 45.000; *SEE RAMOS V. WELLS FARGO BANK, N.A.*, 289 VA. 321, 323

(2015) (QUOTING *FILAK V. GEORGE*, 267 VA. 612, 629 (2004)) (MODIFIED)


GIVEN:       _____

REFUSED:      _____

MODIFIED:      _____

**D-9:  INTENT**

INTERPRETATION OF A CONTRACT IS PRIMARILY A DETERMINATION OF WHAT

THE PARTIES INTENDED.  IN DETERMINING THEIR INTENT YOU SHOULD FIRST

CONSIDER THE WORDS THEY USED.  THE WORDS SHOULD BE GIVEN THEIR PLAIN

AND ORDINARY MEANING UNLESS AND OBVIOUS DIFFERENT MEANING IS

APPARENT.  YOU MAY ALSO CONSIDER THE SUBJECT MATTER OF THE

CONTRACT, THE SITUATION OF THE PARTIES, THE PURPOSE OF THE PARTIES IN

MAKING THE CONTRACT, AND THE SURROUNDING CIRCUMSTANCES.

VMJI NOS. 45.190

GIVEN:     _____

REFUSED:     _____

MODIFIED:   _____

**JA681**

**D-10: CONSTRUCTION AGAINST THE DRAFTER**

   IN INTERPRETING A CONTRACT, YOU SHOULD RESOLVE ANY DOUBTS

ABOUT THE MEANING OF A WORD OR PHRASE AGAINST THE PARTY WHO

PREPARED THE CONTRACT.

VMJI NOS. 45.310

GIVEN:     _____

REFUSED:     _____

MODIFIED:     _____

**JA682**

**D-11: TRADE SECRET – DEFINED**

A TRADE SECRET IS:

1.    INFORMATION THAT DERRIVES INDEPENDENT ECONOMIC VALUE FROM NOT BEING GENERALLY KNOWN TO, AND NOT BEING REASONABLY ASCERTAINABLE BY PROPER MEANS BY ANOTHER WHO COULD OBTAIN ECONOMIC VALUE FROM ITS DISCLOSURE OR USE; AND

2.    SUCH INFORMATION WAS THE SUBJECT OF EFFORTS THAT WERE REASONABLE UNDER THE CIRCUMSTANCES TO MAINTAIN ITS SECRECY.

THE TYPE OF INFORMATION THAT CAN CONSTUTITE A TRADE SECRET INCLUDES ALL FORMS AND TYPES OF FINANCIAL, BUSINESS, SCIENTIFIC, TECHNICAL, ECONOMIC, OR ENGINEERING INFORMATION, INCLUDING PATTERS, PLANS, COMPILATIONS, PROGRAM DEVICES, FORMULAS, DESIGNS, PROTOTYPES, METHODS, TECHNIQUES, PROCESSES, PROCEDURES, PROGRAMS, OR CODES, WHETHER TANGIBLE OR INTANGIBLE, AND WHETHER HOW STORED, COMPILED, OR MEMORIALIZED PHYSICALLY, ELECTRONICALLY, GRAPHICALLY, OR IN WRITING.

FOR A TRADE SECRET TO HAVE ECONOMIC VALUE, IT MUST NOT BE READILY ASCERTAINABLE THROUGH LEGITIMATE MEANS.  IF A COMPETITOR COULD EASILY DISCOVER THE INFORMATION LEGITIMATELY, THEN THE INFORMATION IS CONSIDERED TO BE EITHER PUBLIC, OR OF NO ECONOMIC VALUE.

**JA683**

18. U.S.C. § 1839(3); *MICROSTRATEGY INC. V. BUS. OBJECTS, S.A.*, 331 F. SUPP. 2D 396, 416-17 (E.D. VA. 2004).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

JA684

**D-12: TRADE SECRET MISAPPROPRIATION**

THERE ARE SEVERAL DIFFERENT TYPES OF CONDUCT THAT CONSTITUTE TRADE SECRETS MISAPPROPRIATION.  MISAPPROPRIATION CAN OCCUR WHEN A DEFENDANT:

1.    ACQUIRES A TRADE SECRET OF ANOTHER IF THE DEFENDANT KNEW OR HAD REASON TO KNOW IT WAS ACQUIRING IT BY IMPROPER MEANS.

2.    USES OR DISCLOSES A TRADE SECRET OF ANOTHER WITHOUT EXPRESS OR IMPLIED PERMISSION IF THE DEFENDANT USED IMPROPER MEANS TO ACQUIRE THE TRADE SECRET.

3.    USES OR DISCLOSES A TRADE SECRET OF ANOTHER WITHOUT EXPRESS OR IMPLIED PERMISSION IF, AT THE TIME OF USE OR DISCLOSURE, THE DEFENDANT KNEW OR HAD REASON TO KNOW THAT THE TRADE SECRET WAS DERIVED FROM OR THROUGH A THIRD PARTY WHO HAD USED IMPROPER MEANS TO ACQUIRE IT.

4.    USES OR DISCLOSES A TRADE SECRET OF ANOTHER WITHOUT EXPRESS OR IMPLIED PERMISSION IF, AT THE TIME OF USE OR DISCLOSURE, THE DEFENDANT KNEW OR HAD REASON TO KNOW IT HAD ACQUIRED IT UNDER CIRCUMSTANCES GIVING RISE TO A DUTY TO MAINTAIN ITS SECRECY OR LIMIT ITS USE.

5.    USES OR DISCLOSES A TRADE SECRET OF ANOTHER WITHOUT EXPRESS OR IMPLIED PERMISSION IF, AT THE TIME OF THE USE OR DISCLOSURE, THE DEFENDANT KNEW OR HAD REASON TO KNOW THAT THE TRADE SECRET WAS DERIVED FROM OR THROUGH A THIRD PARTY WHO OWED A DUTY TO MAINTAIN ITS SECRECY OR LIMIT ITS USE.

**JA685**

6.      USES OR DISCLOSES A TRADE SECRET OF ANOTHER WITHOUT EXPRESS OR

IMPLIED PERMISSION IF, AT THE TIME OF USE OR DISCLOSURE, THE DEFENDANT

KNEW OR HAD REASON TO KNOW THAT THE TRADE SECRET WAS ACQUIRED BY

ACCIDENT OR MISTAKE.

VA. CODE § 59.1-336; 18 U.S.C. § 1839(5); *MICROSTRATEGY V. BUS. OBJECTS*, 331 F.

SUPP. 2D 396, 417 (E.D. VA. 2004)

GIVEN:          _____

REFUSED:        _____

MODIFIED:       _____

**JA686**

**D-13:  TRADE SECRET MISAPPROPRIATION – DISCLOSURE**

INFORMATION MAY LOSE ITS TRADE SECRET STATUS BY PLAINTIFF'S DISCLSOURE OF THE TRADE SECRET, INCLUDING TO A THIRD PARTY WITHOUT REQUIRING THAT PARTY'S CONFIDENTIALITY, THROUGH ADVERTISING, TRADE CIRCULARS, OR IN AN ANALOGOUS MANNER.

1 MILGRIM ON TRADE SECRETS § 1.05 (MODIFIED); *SECURE SERVS. TECH. V. TIME & SPACE PROCESSING, INC.*, 722 F. SUPP. 1354, 1361 (E.D. VA. SEPT. 29, 1989).

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**JA687**

**D-14:  FEDERAL COMPUTER FRAUD AND ABUSE ACT - PURPOSE**

THE FEDERAL COMPUTER FRAUD AND ABUSE ACT DOES NOT COVER ACTS OF DISLOYAL EMPLOYEES WHO WALK OFF WITH CONFIDENTIAL INFORMATION. THE PURPOSE OF THE FEDERAL COMPUTER FRAUD AND ABUSE ACT IS TO PUNISH TRESPASSERS AND HACKERS.

*NRT MID-ATL., LLC V. D'AMBROSIA*, DKC 2008-0166, 2008 U.S. DIST. LEXIS 132657, AT *18 (D. MD. DEC. 22, 2008) (QUOTING *AM. FAMILY MUT. INS. CO. V. RICKMAN*, 554 F. SUPP. 2D 766, 771 (N.D. OHIO 2008)).

GIVEN:              _____

REFUSED:            _____

MODIFIED:           _____

**D-15: VIRGINIA COMMON LAW CONSPIRACY - ELEMENTS**

PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., CLAIMS THAT DEFENDANTS WESTLY
GREER, GREGORY K. SPIRES, COUNTY ROADS LLC, THOMAS HAYES, SABRINA
GREER, GREER GROUP LLC, MIKE WELTON, AND HMC SUPPLY LLC HAVE
COMMITTED CIVIL CONSPIRACY.  TO PREVAIL, PLAINTIFF GMS INDUSTRIAL
SUPPLY, INC., MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT
DEFENDANTS WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS LLC,
THOMAS HAYES, SABRINA GREER, GREER GROUP LLC, MIKE WELTON, AND HMC
SUPPLY LLC:

1.      HAD AN AGREEMENT TO PARTICIPATE IN AN UNLAWFUL ACT, OR A
LAWFUL ACT IN AN UNLAWFUL MANNER;

2.      AN INJURY WAS CAUSED TO PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., BY
AN UNLAWFUL OVER ACT PERFORMED BY ONE OF THE PARTIES TO THE
AGREEMENT; AND

3.      THAT THE OVERT ACT WAS DONE PURSUANT TO AND IN FURTHERANCE
OF A COMMON SCHEME.


*SKILLSTORM, INC. V. ELEC. DATA SYS., LLC*, 666 F. SUPP. 2D 610, 618 (E.D. VA. 2009);
*GELBER V. GLOCK*, 293 VA. 497, 533 (2017).


GIVEN:          _____

REFUSED:        _____

MODIFIED:       _____

**JA689**

**D-16:  TRADEMARK INFRINGEMENT – DEFINITION AND ELEMENTS**

PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., CLAIMS THAT G&S SUPPLY

INFRINGED ON ITS TRADEMARK.  A TRADEMARK IS A WORD, NAME, SYMBOL, OR

DEVICE, THAT IS USED BY A PERSON TO IDENTIFY OR DISGINGUISH HIS OR HER

GOODS, INCLUDING A UNIQUE PRODUCT, FROM THOSE MANUFACTURED OR

SOLD BY OTHERS AND TO INDICATE THE SOURCE OF THE GOODS.  TO PREVAIL,

PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., MUST PROVE BY A PREPONDERANCE

OF THE EVIDENCE THAT:

      1.      PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., POSSESSED A MARK;

      2.      THE G&S SUPPLY USED THE MARK IN COMMERCE AND IN

CONNECTION WITH THE SALE, OFFERING FOR SALE, DISTRIBUTION, OR

ADERTISING OF GOODS OR SERVICES; AND

      3.      THE G&S SUPPLY USED THE MARK IN A MANNER LIKELY TO

CONFUSE CUSTOMERS.

15 U.S.C. § 1127; *PETA V. DOUGHNEY*, 263 F.3D 359, 364 (4TH CIR. 2001).

GIVEN:      _____

REFUSED:      _____

MODIFIED:      _____

**JA690**

**D-17: TRADEMARK INFRINGEMENT – LIKELIHOOD OF CONFUSION – FACTORS**

TO DETERMINE WHETHER THERE IS A LIKELIHOOD OF CONFUSION, YOU SHOULD CONSIDER:

1.      THE DISTINTIVENESS OF THE MARKS;

2.      THE SIMILARITY OF THE MARKS;

3.      THE SIMILARITY OF THE GOODS AND SERVICES THE MARKS IDENTIFY;

4.      THE SIMILARITY OF THE FACILITIES THE TWO PARTIES USE IN THEIR BUSINESS;

5.      THE SIMILARITY OF THE ADVERTISING USED BY THE TWO PARTIES;

6.      THE DEFENDANTS' INTENT; AND

7.      IF THERE WAS ANY ACTUAL CONFUSION BY CUSTOMERS.

*VOLVO TRADEMARK HOLDING AB V. UNINCORPORATED ASSNS. IDENTIFIED IN SCHEDULE A*, NO. 1:19-CV-00974, 2019 U.S. DIST. LEXIS 223097, AT *16 (E.D. VA. NOV. 13, 2019).

GIVEN:      _____

REFUSED:      _____

MODIFIED:      _____

**JA691**

**D-18:  TRADEMARK INFRINGEMENT – CONFUSION**

TO DETERMINE WHETHER CONFUSION EXISTS, YOU SHOULD CONSIDER

WHETHER THE ALLEGEDLY INFRINGING USE CAUSES CONFUSION WHEN USED IN

THE CONTEXT IN WHICH IT IS SEEN BY THE CONSUMER.

*ANHEUSER-BUSCH, INC. V. L&L WINGS, INC.*, 962 F.2D 316, 318 (4TH CIR. 1992).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA692**

**D-19:  COMPENSATORY DAMAGES – GENERAL INSTRUCTIONS**

IF YOU DECIDE IN FAVOR OF PLAINTIFF GMS INDUSTRIAL SUPPLY, INC.,
ON ANY OR ALL OF ITS CLAIMS, YOU SHOULD THEN DECIDE HOW MUCH THE
DEFENDANT OR DEFENDANTS WHO YOU BELIEVE VIOLATED THE LAW SHOULD
PAY IN COMPENSATORY DAMAGES.

THE PURPOSE OF THE LAW OF DAMAGES IS TO AWARD JUST AND FAIR
MONETARY COMPENSATION FOR THE LOSS, IF ANY, WHICH RESULTED FROM A
DEFENDANT'S VIOLATION OF PLAINTIFF'S RIGHTS.  COMPENSATORY DAMAGES
ARE MEANT TO COMPENSATE A PARTY FOR THE ACTUAL INJURY CAUSED.
THESE DAMAGES ARE CALLED "COMPENSATORY DAMAGES" AND ARE MEANT
TO MAKE A PARTY WHOLE – THAT IS, TO COMPENSATE HIM OR HER FOR THE
DAMAGE SUFFERED THROUGH THE PAYMENT OF MONEY.

AN AWARD OF COMPENSATORY DAMAGES MUST BE FAIR AND
REASONABLE AND BE NEITHER INADEQUATE NOR EXCESSIVE.  YOU SHOULD
NOT AWARD COMPENSATORY DAMAGES FOR SPECULATIVE INJURIES AND
SHOULD ONLY AWARD DAMAGES FOR THOSE INJURIES PLAINTIFF HAS
ACTUALLY SUFFERED.

IN AWARDING COMPENSATORY DAMAGES, YOU MUST BE GUIDED BY
DISPASSIONATE COMMON SENSE.  COMPUTING DAMAGES MAY BE DIFFICULT,
BUT YOU MUST NOT LET THAT DIFFICULT LEAD YOU TO ENGAGE IN
ARBITRATORY GUESSWORK.  PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., IS NOT
REQUIRED TO PROVE THE EXACT AMOUNT OF DAMAGES, BUT MUST SHOW

**JA693**

SUFFICIENT FACTS TO PERMIT YOU TO MAKE AN ACCURATE ESTIMATE OF

THEM.

SIMILARLY, IF YOU DECIDE IN FAVOR OF ANY (OR ALL) OF THE DEFENDANTS

WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS LLC, THOMAS HAYES,

SABRINA GREER, GREER GROUP LLC, AND MIKE WELTON ON ANY OR ALL OF

THEIR COUNTERCLAIMS AGAINST PLAINTIFF GMS INDUSTRIAL SUPPLY, INC.,

YOU SHOULD THEN DECIDE HOW MUCH PLAINTIFF SHOULD PAY THESE

DEFENDANTS IN COMPENSATORY DAMAGES.

LEONARD B. SAND, ET AL., MODERN FEDERAL JURY INSTRUCTION, § 77.01,

INSTRUCTION 77-3 (VOL. 4 1999); *STORY PARCHMENT CO. V. PATERSON PARCHMENT*

*PAPER CO.*, 282 U.S. 555 (1931); FIFTH CIRCUIT PATTERN CIVIL JURY INSTRUCTION

15.2.

GIVEN:        _____

REFUSED:      _____

MODIFIED:     _____

**JA694**

**D-20:  TRADE SECRETS MISAPPROPRIATION - DAMAGES**

IF YOU FIND THAT DEFENDANTS MISAPPROPRIATED PLAINTIFF GMS INDUSTRIAL SUPPLY, INC.'S, TRADE SECRETS, YOU MAY AWARD PLAINTIFF COMPENSATORY DAMAGES.  THERE ARE SEVERAL WAYS OF CALCULATING COMPENSATORY DAMAGES FOR TRADE SECRETS MISAPPROPRIATION:

1.     PLAINTIFF GMS INDUSTRIAL SUPPLY, INC.'S, ACTUAL LOSS CAUSED BY THE MISAPPROPRIATION;

2.     UNJUST ENRICHMENT TO THE DEFENDANTS AS A DIRECT RESULT OF THE MISAPPROPRIATION; OR

3.     THE COST OF REASONABLE ROYALTIES FOR THE DEFENDANTS' UNAUTHORIZED USE OF TRADE SECRETS.

YOU MAY ONLY USE ONE OF THESE CALCULATION METHODS TO DETERMINE PLAINTIFF'S DAMAGES, IF ANY.  PLAINTIFF IS NOT ENTITLED TO DOUBLE RECOVERY. YOU MAY ONLY AWARD AN AMOUNT THAT WOULD FAIRLY COMPENSATE PLAINTIFF FOR DAMAGES ACTUALLY CAUSED BY DEFENDANTS' MISAPPROPRIATION OF PLAINTIFF'S TRADE SECRETS.

LIKE COMPENSATORY DAMAGES FOR OTHER TYPES OF CLAIMS, COMPENSATORY DAMAGES FOR TRADE SECRETS MISAPPROPRIATION MUST BE FAIR AND REASONABLE AND BE NEITHER INADEQUATE NOR EXCESSIVE.  YOU SHOULD NOT AWARD COMPENSATORY DAMAGES FOR SPECULATIVE INJURIES AND SHOULD ONLY AWARD DAMAGES FOR THOSE INJURIES PLAINTIFF HAS ACTUALLY SUFFERED.

USCA4 Appeal: 22-2090 Doc: 20-2 Filed: 01/19/2023 Pg: 399 of 417

18 U.S.C. § 1836(B)(3)(B); VA. CODE § 59.1-338(A); *AM. SALES CORP. V. ADVENTURE TRAVEL INC.*, 862 F. SUPP. 1476, 1479 (E.D. VA. 1994).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA696**

**D-21: PUNITIVE DAMAGES – GENERAL INSTRUCTIONS**

ON SOME OF PLAINTIFF'S CLAIMS YOU MAY AWARD PUNITIVE DAMAGES. THE PURPOSE OF PUNITIVE DAMAGES IS TO PUNISH THE DEFENDANT OR DEFENDANTS FOR HIS BAD ACTS.

THE AWARD OF PUNITIVE DAMAGES IS WITHIN YOUR DISCRETION. YOU ARE NOT REQUIRED TO AWARD THEM. IF YOU DECIDE TO AWARD PUNITIVE DAMAGES, YOU MUST USE SOUND REASON IN SETTING THE AMOUNT. THE AMOUNT OF PUNITIVE DAMAGES MUST NOT REFLECT BIAS, PREJUDICE, OR SYMPATHY TOWARD ANY PARTY. THE AMOUNT MAY BE AS SMALL OR LARGE AS YOU BELIEVE NECESSARY TO FULFILL THE PURPOSE OF PUNITIVE DAMAGES. IN THIS REGARD, YOU MAY CONSIDER THE FINANCIAL RESOURCES OF DEFENDANTS IN DETERMINING THE AMOUNT OF PUNITIVE DAMAGES. PUNITIVE DAMAGES SHOULD BEAR A REASONABLE RELATIONSHIP TO THE COMPENSATORY DAMAGES AWARDED. SELDOM SHOULD PUNITIVE DAMAGES BE TWO, THREE, OR FOUR TIMES THE COMPENSATORY DAMAGES AWARD.


*PEACOCK BUICK, INC. V. DURKIN*, 221 VA. 1133, 1137, 277 S.E.2D 225, 227 (VA. 1981); *HAMILTON DEV. CO. V. BROAD ROCK CLUB, INC*. 248 VA. 40, 45, 445 S.E.2D 140, 143 (VA. 1994) (CITING *GIANT OF VIRGINIA, INC. V. PIGG,* 207 VA. 679, 685, 152 S.E.2D 271, 277 (1967)); *SEE GENERALLY STATE FARM MUT. AUTO. INS. CO. V. CAMPBELL*, 538 U.S. 408, 418 (2003); FIFTH CIRCUIT PATTERN CIVIL JURY INSTRUCTION 15.13.

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA697**

**D-22: TRADE SECRETS MISAPPROPRIATION - PUNITIVE DAMAGES**

IF YOU FIND THAT DEFENDANTS MISAPPROPRIATED PLAINTIFF'S TRADE SECRETS, YOU MUST THEN DETERMINE IF THE MISAPPROPRIATION WAS DONE "WILLFULLY AND MALICIOUSLY."

IF YOU FIND THE MISAPPROPRIATION WAS DONE "WILLFULLY AND MALICIOUSLY" YOU MAY, WITHIN YOUR DISCRETION, AWARD PLAINTIFF PUNITIVE DAMAGES ON ITS TRADE SECRETS CLAIM. WILLFUL AND MALICIOUS MISAPPROPRIATION OCCURS WHEN THE DEFENDANT ACTS WITH CONCIOUS DISREGARD OF PLAINTIFF'S RIGHTS OR ACTS WITH RECKLESS INDIFERENCE TO THE CONSEQUENCES, WITH THE DEFENDANT AWARE, FROM HIS KNOWLEDGE OF THE EXISTING CIRCUMSTANCES THAT HIS CONDUCT WOULD CAUSE PLAINTIFF INJURY. MALICIOUS CONDUCT OCCURS WHEN A PARTY ACTS WITH ILL WILL OR SPITE.

AS PREVIOUSLY INSTRUCTED, THE AWARD OF PUNITIVE DAMAGES FOR THIS CLAIM IS WITHIN YOUR DISCRETION. YOU ARE NOT REQUIRED TO AWARD IT. IF YOU DECIDE TO AWARD PUNITIVE DAMAGES, YOU MUST USE SOUND REASON IN SETTING THE AMOUNT. FOR WILLFUL AND MALICIOUS MISAPPROPRIATION, YOU MAY AWARD NOT MORE THAN TWO TIMES PLAINTIFF'S COMPENSATORY DAMAGES FOR MISAPPROPRIATION OF ITS TRADE SECERTS.

**JA698**

18 U.S.C. § 1836(B)(3)(C); VA. CODE  § 59.1-338(B); *HAIR CLUB FOR MEN, LLC V.*

*EHSON*, NO. 1:16-CV-236, 2017 U.S. DIST. LEXIS 51379, AT *6 (E.D. VA. APR. 3, 2017);

*AM. SALES CORP. V. ADVENTURE TRAVEL INC*., 862 F. SUPP. 1476, 1479 (E.D. VA. 1994);

VMJI NO. 9.080; *PEACOCK BUICK, INC. V. DURKIN*, 221 VA. 1133, 1137, 277 S.E.2D 225,

227 (VA. 1981); *HAMILTON DEV. CO. V. BROAD ROCK CLUB, INC.*  248 VA. 40, 45, 445

S.E.2D 140, 143 (VA. 1994) (CITING *GIANT OF VIRGINIA, INC. V. PIGG,* 207 VA. 679, 685,

152 S.E.2D 271, 277 (1967));

GIVEN:          _____

REFUSED:          _____

MODIFIED:          _____

**JA699**

**D-23:  VIRGINIA BUSINESS CONSPIRACY ACT - PUNITIVE DAMAGES**

IF YOU FIND THAT DEFENDANTS VIOLATED THE VIRGINIA BUSINESS

CONSPIRACY ACT, YOU MAY AWARD PUNITIVE DAMAGES TO PLAINTIFF.

AS PREVIOUSLY INSTRUCTED, THE AWARD OF PUNITIVE DAMAGES FOR THIS

CLAIM IS WITHIN YOUR DISCRETION.  YOU ARE NOT REQUIRED TO AWARD IT.  IF

YOU DECIDE TO AWARD PUNITIVE DAMAGES, YOU MUST USE SOUND REASON IN

SETTING THE AMOUNT.  FOR VIOLATIONS OF THE VIRGINIA BUSINESS

CONSPIRACY ACT, YOU MAY AWARD NOT MORE THAN THREE TIMES

PLAINTIFF'S COMPENSATORY DAMAGES FOR ITS BUSINESS CONSPIRACY CLAIM.

VA. CODE § 18.2-500(A); *PEACOCK BUICK, INC. V. DURKIN*, 221 VA. 1133, 1137, 277

S.E.2D 225, 227 (VA. 1981); *HAMILTON DEV. CO. V. BROAD ROCK CLUB, INC.*  248 VA.

40, 45, 445 S.E.2D 140, 143 (VA. 1994) (CITING *GIANT OF VIRGINIA, INC. V. PIGG,* 207

VA. 679, 685, 152 S.E.2D 271, 277 (1967));

GIVEN:  _____

REFUSED:  _____

MODIFIED:  _____

**JA700**

**D-24:  FINDING INSTRUCTION – DUTY OF LOYALTY**

YOU SHALL FIND YOUR VERDICT FOR PLAINTIFF GMS INDUSTRIAL

SUPPLY, INC., ON ITS BREACH OF THE DUTY OF LOYALTY CLAIM AGAINST

DEFENDANT WESTLY GREER IF PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., HAS

PROVEN DEFENDANT WESTLY GREER MISAPPROPRIATED PLAINTIFF'S TRADE

SECRETS OR COMPETED AGAINST PLAINTIFF DURING THE PERIOD OF HIS

EMPLOYMENT.

YOU SHALL FIND YOUR VERDICT FOR DEFENDANT WESTLY GREER IF PLAINTIFF

FAILED TO PROVE ANY ONE OR MORE OF THE ELEMENTS ABOVE.

*WILLIAMS V. DOMINION TECH. PARTNERS, L.L.C.*, 265 VA. 280, 289-290, 576 S.E.2D 752,

757, 759 (2003);  *FEDDEMAN & CO. V. LANGAN ASSOCS., P.C.*, 260 VA. 35, 142, 530

S.E.2D 668, 672 (2009).

GIVEN:            _____

REFUSED:            _____

MODIFIED:            _____

**JA701**

**D-25:  FINDING INSTRUCTION – BREACH OF EMPLOYMENT AGREEMENT (WESTLY GREER)**

YOU SHALL FIND YOUR VERDICT FOR PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., ON ITS  BREACH OF CONTRACT CLAIM AGAINST DEFENDANT WESTLY GREER, FOR HIS ALLEGED VIOLATION OF HIS 2012 EMPLOYMENT AGREEMENT IF PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT:

1.	DEFENDANT WESTLY GREER HAD A LEGALLY ENFORCABLE OBLIGATION TO THE PLAINTIFF UNDER HIS 2012 EMPLOYMENT AGREEMENT; AND

2.	DEFENDANT WESTLY GREER VIOLATED OR BREACHED HIS OBLIGATION UNDER THE 2012 EMPLOYMENT AGREEMENT NOT TO REVEAL THE IDENTITIES OF PLAINTIFF GMS INDUSTRIAL SUPPLY, INC.S', SUPPLIERS TO PLAINTIFF'S COMPETITORS; AND

3.	THERE WAS INJURY OR DAMAGE TO PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., CAUSED BY THE BREACH OF THE OBLIGATION.

YOU SHALL FIND YOUR VERDICT FOR DEFENDANT WESTLY GREER IF PLAINTIFF FAILED TO PROVE ANY ONE OR MORE OF THE ELEMENTS ABOVE.


*RAMOS V. WELLS FARGO BANK, N.A.*, 289 VA. 321, 323 (2015) (QUOTING *FILAK V. GEORGE*, 267 VA. 612, 629 (2004)).

GIVEN:	_____

REFUSED:	_____

MODIFIED:	_____

**JA702**

**D-26: FINDING INSTRUCTION – BREACH OF SALES AGENT AGREEMENTS**

YOU SHALL FIND YOUR VERDICT FOR PLAINTIFF GMS INDUSTRIAL

SUPPLY, INC., ON ITS BREACH OF CONTRACT CLAIM AGAINST DEFENDANTS

WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS LLC, THOMAS HAYES,

SABRINA GREER, GREER GROUP LLC, OR MIKE WELTON FOR THEIR ALLEGED

VIOLATION OF THEIR SALES AGENT AGREEMENTS IF PLAINTIFF GMS

INDUSTRIAL SUPPLY, INC., HAS PROVEN BY A PREPONDERANCE OF THE

EVIDENCE THAT EACH OF THE AFOREMENTIONED DEFENDANTS:

1.          HAD A LEGALLY ENFORCABLE OBLIGATION TO THE PLAINTIFF

UNDER THEIR SALES AGENT AGREEMENT; AND

2.           VIOLATED OR BREACHEDTHEIR OBLIGATION UNDER THEIR SALES

AGENT AGREEMENT TO "AGGRESSIVELY PROMOTE" PLAINTIFF'S PRODUCTS IN

HIS/HER/ITS TERRITORY; AND

3.          THERE WAS INJURY OR DAMAGE TO PLAINTIFF GMS INDUSTRIAL

SUPPLY, INC., CAUSED BY THE BREACH OF THE OBLIGATION.

YOU SHALL FIND YOUR VERDICT FOR ANY ONE OR ALL OF THE

AFOREMENTIONED DEFENDANTS IF PLAINTIFF FAILED TO PROVE ANY ONE OR

MORE OF THE ELEMENTS ABOVE.

*RAMOS V. WELLS FARGO BANK, N.A.*, 289 VA. 321, 323 (2015) (QUOTING *FILAK V.*

*GEORGE*, 267 VA. 612, 629 (2004)).

GIVEN:          _____

REFUSED:          _____

MODIFIED:          _____

**JA703**

**D-27: FINDING INSTRUCTION – TRADE SECRET MISAPPROPRIATION**

YOU SHALL FIND YOUR VERDICT FOR PLAINTIFF GMS INDUSTRIAL SUPPLY, INC.,

ON ITS TRADE SECRETS MISAPPROPRIATION CLAIM AGAINST DEFENDANTS

WESTLY GREER, GREGORY K. SPIRES, THOMAS HAYES, SABRINA GREER, AND

MIKE WELTON, IF YOU FIND PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., HAS

PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT EACH OF THE

AFOREMENTIONED DEFENDANTS:

1.      ACQUIRED A TRADE SECRET BELONGING TO PLAINTIFF AND  KNEW OR

HAD REASON TO KNOW IT WAS ACQUIRING IT BY IMPROPER MEANS.

2.      USED OR DISCLOSED A TRADE SECRET BELONGING TO PLAINTIFF

WITHOUT EXPRESS OR IMPLIED PERMISSION AND USED IMPROPER MEANS TO

ACQUIRE THE TRADE SECRET.

3.      USED OR DISCLOSED A TRADE SECRET BELONGING TO PLAINTIFF

WITHOUT EXPRESS OR IMPLIED PERMISSION AND, AT THE TIME OF USE OR

DISCLOSURE, KNEW OR HAD REASON TO KNOW THAT THE TRADE SECRET WAS

DERIVED FROM OR THROUGH A THIRD PARTY WHO HAD USED IMPROPER MEANS

TO ACQUIRE IT.

4.      USED OR DISCLOSED A TRADE SECRET BELONGING TO PLAINTIFF

WITHOUT EXPRESS OR IMPLIED PERMISSION AND,  AT THE TIME OF USE OR

DISCLOSURE, KNEW OR HAD REASON TO KNOW IT HAD ACQUIRED IT UNDER

CIRCUMSTANCES GIVING RISE TO A DUTY TO MAINTAIN ITS SECRECY OR LIMIT

ITS USE.

5.      USED OR DISCLOSED A TRADE SECRET BELONGING TO PLAINTIFF

WITHOUT EXPRESS OR IMPLIED PERMISSION AND, AT THE TIME OF THE USE OR

**JA704**

DISCLOSURE, KNEW OR HAD REASON TO KNOW THAT THE TRADE SECRET WAS

DERIVED FROM OR THROUGH A THIRD PARTY WHO OWED A DUTY TO MAINTAIN

ITS SECRECY OR LIMIT ITS USE.

6.      USED OR DISCLOSED A TRADE SECRET BELONGING TO PLAINTIFF

WITHOUT EXPRESS OR IMPLIED PERMISSION AND, AT THE TIME OF USE OR

DISCLOSURE, KNEW OR HAD REASON TO KNOW THAT THE TRADE SECRET WAS

ACQUIRED BY ACCIDENT OR MISTAKE.

YOU SHALL FIND YOUR VERDICT FOR ANY OR ALL OF THE AFOREMENTIONED

DEFENDANTS IF PLAINTIFF FAILED TO PROVE EACH ELEMENT OF ANY ONE OF

THE CIRCUMSTANCES ABOVE.

VA. CODE § 59.1-336; 18 U.S.C. § 1839(5); *MICROSTRATEGY V. BUS. OBJECTS*, 331 F.

SUPP. 2D 396, 417 (E.D. VA. 2004)

GIVEN:        _____

REFUSED:        _____

MODIFIED:        _____

**JA705**

**D-28: FINDING INSTRUCTION - VIRGINIA BUSINESS CONSPIRACY ACT**

YOU SHALL FIND YOUR VERDICT FOR PLAINTIFF GMS INDUSTRIAL SUPPLY, INC.,

ON ITS VIRGINIA BUSINESS CONSPIRACY ACT CLAIM AGAINST TWO OR MORE OF

DEFENDANTS WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS LLC,

THOMAS HAYES, SABRINA GREER, GREER GROUP LLC, MIKE WELTON, AND HMC

SUPPLY LLC IF YOU FIND PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., HAS

PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT:

     1.     TWO OR MORE OF THE DEFENDANTS COMBINED, ASSOCIATED,

AGREED, OR ACTED IN CONCERT TOGETHER FOR THE PURPOSE OF WILLFULLY

AND MALICIOUSLY INJURING PLAINTIFF GMS INDUSTRIAL SUPPLY, INC.'S,

REPUTATION, TRADE, BUSINESS, OR PROFESSION.

     2.     THAT PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., SUFFERED

DAMAGE AS A RESULT.

YOU SHALL FIND YOUR VERDICT FOR DEFENDANTS WESTLY GREER, GREGORY

K. SPIRES, COUNTY ROADS LLC, THOMAS HAYES, SABRINA GREER, GREER

GROUP LLC, MIKE WELTON, AND HMC SUPPLY LLC IF PLAINTIFF FAILED TO

PROVE ANY ONE OR MORE OF THE ELEMENTS ABOVE.

**JA706**

VA. CODE § 18.2-499; *E.I. DUPONT DE NEMOURS & CO. V. KOLON INDUS., INC*., 688 F. SUPP. 2D 443, 453 (E.D. VA. 2009) (PAYNE, J.); VMJI NO. 40.300; *MULTI-CHANNEL TV CABLE CO. V. CHARLOTTESVILLE QUALITY CABLE OPERATING CO.*, 108 F.3D 522, 526 (4TH CIR. 1997); *SEE ALSO. ADV. MARINE ENTERS., INC. V. PRC, INC*., 256 VA. 106, 124, 501 S.E.2D 148 (1998).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

JA707

**D-29: FINDING INSTRUCTION - VIRGINIA COMMON LAW CONSPIRACY**

YOU SHALL FIND YOUR VERDICT FOR PLAINTIFF GMS INDUSTRIAL SUPPLY, INC.,

ON ITS VIRGINIA COMMON LAW CONSPIRACY CLAIM AGAINST TWO OR MORE OF

DEFENDANTS WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS LLC,

THOMAS HAYES, SABRINA GREER, GREER GROUP LLC, MIKE WELTON, AND HMC

SUPPLY LLC IF YOU FIND PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., HAS

PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT TWO OR MORE

DEFENDANTS:

1.      HAD AN AGREEMENT TO PARTICIPATE IN AN UNLAWFUL ACT, OR A

LAWFUL ACT IN AN UNLAWFUL MANNER;

2.      AN INJURY WAS CAUSED TO PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., BY

AN UNLAWFUL OVER ACT PERFORMED BY ONE OF THE PARTIES TO THE

AGREEMENT; AND

3.      THAT THE OVERT ACT WAS DONE PURSUANT TO AND IN FURTHERANCE

OF A COMMON SCHEME.

YOU SHALL FIND YOUR VERDICT FOR DEFENDANTS WESTLY GREER, GREGORY

K. SPIRES, COUNTY ROADS LLC, THOMAS HAYES, SABRINA GREER, GREER

GROUP LLC, MIKE WELTON, AND HMC SUPPLY LLC IF PLAINTIFF FAILED TO

PROVE ANY ONE OR MORE OF THE ELEMENTS ABOVE.

*SKILLSTORM, INC. V. ELEC. DATA SYS., LLC*, 666 F. SUPP. 2D 610, 618 (E.D. VA. 2009);

*GELBER V. GLOCK*, 293 VA. 497, 533 (2017).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

**JA709**

**D-30: FINDING INSTRUCTION - TRADEMARK INFRINGEMENT (G&S SUPPLY LLC)**

YOU SHALL FIND YOUR VERDICT FOR PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., ON ITS CLAIM THAT G&S SUPPLY, LLC, HAS INFRINGED ON ITS TRADEMARKB IF YOU FIND PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT:

1.      PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., POSSESSED A MARK;

2.      DEFENDANT G&S SUPPLY, LLC, USED THE MARK IN COMMERCE AND IN CONNECTION WITH THE SALE, OFFERING FOR SALE, DISTRIBUTION, OR ADERTISING OF GOODS OR SERVICES; AND

3.      THE DEFENDANT G&S SUPPLY, LLC, USED THE MARK IN A MANNER LIKELY TO CONFUSE CUSTOMERS.

YOU SHALL FIND YOUR VERDICT FOR DEFENDANT G&S SUPPLY, LLC, IF PLAINTIFF FAILED TO PROVE ANY ONE OR MORE OF THE ELEMENTS ABOVE.

15 U.S.C. § 1127; *PETA V. DOUGHNEY*, 263 F.3D 359, 364 (4TH CIR. 2001).

GIVEN:          _____

REFUSED:       _____

MODIFIED:      _____

172

**JA710**

**D-31:  FINDING INSTRUCTION – BREACH OF CONTRACT (COUNTERCLAIMS)**

YOU SHALL FIND YOUR VERDICT FOR DEFENDANTS WESTLY GREER, GREGORY K. SPIRES, COUNTY ROADS LLC, THOMAS HAYES, SABRINA GREER, GREER GROUP LLC, AND MIKE WELTON ON THEIR BREACH OF CONTRACT CLAIMS AGAINST PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., FOR ITS ALLEGED VIOLATION OF EACH OF THEIR SALES AGENT AGREEMENT IF DEFENDANTS HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT:

1.        PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., HAD A LEGALLY ENFORCABLE OBLIGATION TO THE DEFENDANT UNDER THE SALES AGENT AGREEMENT; AND

2.        PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., VIOLATED OR BREACHED ITS OBLIGATION UNDER THE SALES AGENT AGREEMENT TO PAY COMMISSIONS AND/OR BONUSES EARNED BY DEFENDANT; AND

3.        THERE WAS INJURY OR DAMAGE TO DEFENDANT CAUSED BY THE BREACH OF THE OBLIGATION.

YOU SHALL FIND YOUR VERDICT FOR PLAINTIFF GMS INDUSTRIAL SUPPLY, INC., ON ANY ONE OR ALL OF THE AFOREMENTIONED DEFENDANTS CLAIMS IF THEY FAILED TO PROVE ANY ONE OR MORE OF THE ELEMENTS ABOVE.

JA711

*RAMOS V. WELLS FARGO BANK, N.A.*, 289 VA. 321, 323 (2015) (QUOTING *FILAK V.*

*GEORGE*, 267 VA. 612, 629 (2004)).

GIVEN: _____

REFUSED: _____

MODIFIED: _____

JA712

Date:  May 9, 2022

Respectfully submitted,

**GMS Industrial Supply, Inc.**
*By Counsel*

*/s/ William A. Lascara*
William A. Lascara (VSB No. 23118)
Jeffrey D. Wilson (VSB No. 75734)
Thomas S. Berkley (VSB No. 40124)
PENDER & COWARD
222 Central Park Avenue #400
Virginia Beach, VA 23462
Email: wlascara@pendercoward.com
Email: jwilson@pendercoward.com
Email: tberkley@pendercoward.com


SEEN AND AGREED


**G&S SUPPLY, LLC, WESTLY L. GREER,
SABRINA GREER, GREER GROUP, LLC,
GREGORY K. SPIRES, COUNTY ROADS,
LLC, THOMAS HAYES, MIKE WELTON,
WARTECH INDUSTRIES, LLC AND HMC
SUPPLY, LLC**

By: */s/ Robert W. McFarland*
Robert W. McFarland (VSB # 24021)
V. Kathleen Dougherty (VSB # 77294)
Micaylee A. Noreen (VSB # 92433)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Ste. 9000
Norfolk, Virginia 23510
Phone:  (757) 640-3716
Fax:  (757) 640-3966
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*

**JA713**

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2023, I filed the foregoing with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Robert W. McFarland*
Robert W. McFarland

*Counsel for Defendant-Appellant*