No. 22-2090

In the

# United States Court of Appeals
## For the Fourth Circuit

———————————

GMS Industrial Supply, Inc.,

*Plaintiff-Appellee,*

v.

Westly L. Greer,

*Defendant-Appellant,*

and

G&S Supply, LLC; Sabrina Greer; Greer Group, LLC; Gregory K. Spires; Country Roads, LLC; Thomas Hayes; Mike Welton; WarTech Industries, LLC; HMC Supply, LLC,

*Defendants.*

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia at Norfolk
Case No. 2:19-cv-00324
The Honorable Roderick C. Young, District Judge
The Honorable Lawrence R. Leonard, Magistrate Judge

———————————

**JOINT APPENDIX – VOLUME III OF IV (pp. 714-1070)**

———————————

| | |
|---|---|
| Robert W. McFarland | Jeffrey Wilson |
| V. Kathleen Dougherty | William A. Lascara |
| Jeanne E. Noonan | Thomas S. Berkley |
| McGuireWoods LLP | Pender & Coward, PC |
| 9000 World Trade Center | 222 Central Park Avenue |
| 101 West Main Street | Suite 400 |
| Norfolk, VA 23510 | Virginia Beach, VA 23462 |
| T: (757) 640-3716 | T: (757) 502-7341 |
| *Counsel for Appellant* | *Counsel for Appellee* |

*(additional counsel listed on inside cover)*

Sean A. McClelland
MᶜGᴜɪʀᴇWᴏᴏᴅꜱ LLP
888 16th Street, N.W.
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2838

*Counsel for Appellant*

# **TABLE OF CONTENTS**

**Page**

**Volume I (pp. 1-305)**

E.D. Va. Docket Sheet (Case No. 2:19-cv-00324-RCY-LRL) ...............................1

Dkt. 1:
      Complaint (June 20, 2019) ...........................................................40

      Dkt. 1-1: Civil Cover Sheet ......................................................118

      Dkt. 1-2: Exhibit 1 to Complaint, Apr. 3, 2019 Termination,
      Cease and Desist and Litigation Hold Notice Letter ..................119

      Dkt. 1-3: Exhibit 2 to Complaint, GMS Catalogue ....................133

      Dkt. 1-4: Exhibit 3 to Complaint, G&S Catalogue ....................219

      Dkt. 1-5: Exhibit 4 to Complaint, Comparison ..........................241

      Dkt. 1-6: Exhibit 5 to Complaint, Email Details ........................267

      Dkt. 1-7: Exhibit 6 to Complaint, Apr. 17, 2019 Supplemental
      Termination, Cease and Desist and Litigation Hold Notice Letter
      and Demand for Return of Property ...........................................270

      Dkt. 1-8: Exhibit 7 to Complaint, Report ..................................272

      Dkt. 1-9: Exhibit 8 to Complaint, GMS Trademark Use Examples ..........273

      Dkt. 1-10: Exhibit 9 to Complaint, G&S Designation Use Examples .......280

      Dkt. 1-11: Exhibit 10 to Complaint, May 24, 2019 Second
      Supplemental Termination, Cease and Desist and Litigation
      Hold Notice Letter and Demand for Return of Property ...........297

      Dkt. 1-12: Exhibit 11 to Complaint, Declaration of Garry A. Pate............298

Dkt. 1-13: Exhibit 12 to Complaint, Declaration of William A.
Lascara ...................................................................................................304

**Volume II (pp. 306-713)**

Dkt. 3-1:
    Exhibit 1 to Memorandum in Support of Motion for Temporary
    Restraining Order and Temporary Injunction – Contracts
    Between Plaintiffs and Defendants (June 21, 2019) ..................................306

Dkt. 156:
    Third Amended Verified Complaint (Dec. 1, 2020) ..................................346

Dkt. 193:
    Defendants' Motion for Sanctions Pursuant to Rule 11 (July 8, 2021) .....432

Dkt. 194:
    Memorandum in Support of Defendants' Motion for Sanctions
    Pursuant to Rule 11 (July 8, 2021) ...............................................................435

Dkt. 205:
    GMS Industrial Supply, Inc.'s Response to Defendants' Motion
    for Sanctions Pursuant to Rule 11 (July 22, 2021)....................................467

Dkt. 207:
    Reply in Support of Defendants' Motion for Sanctions Pursuant
    to Rule 11 (July 28, 2021) .........................................................................495

Dkt. 249:
    Order Denying Rule 11 Motion (Mar. 22, 2022) ......................................517

Dkt. 250:
    Memorandum Opinion re: Rule 11 Motion (Mar. 22, 2022) ....................518

Dkt. 266:
    Proposed Jury Instructions (May 9, 2022) ................................................539

## Volume III (pp. 714-1070)

Dkt. 271:
    Defendants' Objections To Plaintiff's Proposed Jury Instructions
    (May 12, 2022) ..........................................................................714

Dkt. 289:
    Defendants' Pretrial Bench Brief (May 26, 2022) ....................................723

Dkt. 291:
    Plaintiff's Bench Brief (May 26, 2022)....................................................738

Dkt. 323:
    Transcript of Jury Trial (Excerpt of Proceedings) (June 2, 2022) .............754

    Donna Grace Rupley, Direct Examination By Mr. Gordon ......................757

    Donna Grace Rupley, Cross-Examination By Mr. McFarland .................799

    Donna Grace Rupley, Redirect Examination By Mr. Gordon ..................807

    Danielle Renee Robichaux, Direct Examination By Mr. Berkley .............810

Dkt. 329:
    Transcript of Proceedings (Excerpt Testimony of Danielle Renee
    Robichaux) (June 3, 2022)........................................................................885

    Danielle Renee Robichaux, Direct Examination By Mr. Berkley .............887

    Danielle Renee Robichaux, Cross-Examination By Mr.
    McFarland..................................................................................................950

    Danielle Renee Robichaux, Redirect Examination By Mr.
    Berkley.......................................................................................................983

Dkt. 361:
    Transcript of Proceedings re: Initial Oral Rule 50 Motion
    (Motions Excerpt) (June 3, 2022).............................................................988

iii

## Volume IV (pp. 1071-1446)

Dkt. 340:
    Transcript of Proceedings (Excerpt of Proceedings – Westly
    Greer) (June 6, 2022) ...................................................................1071

    Westly Greer, Direct Examination By Mr. McFarland ...........................1074

    Westly Greer, Cross-Examination By Mr. Lascara.................................1126

Dkt. 341:
    Transcript of Proceedings (Excerpt Testimony of Westly Greer)
    (June 7, 2022) .........................................................................1170

    Westly Greer, Cross-Examination By Mr. Lascara.................................1174

    Westly Greer, Redirect Examination By Mr. McFarland .......................1196

Dkt. 342:
    Transcript of Proceedings (Excerpt Testimony of Sabrina Greer)
    (June 7, 2022) .........................................................................1199

    Sabrina Star Greer, Direct Examination By Mr. McFarland...................1202

    Sabrina Star Greer, Cross Examination By Mr. Gordon.........................1224

Dkt. 362:
    Transcript of Proceedings re: Renewed Oral Rule 50 Motion
    (June 7, 2022) .........................................................................1244

Dkt. 310:
    Order re: Defendants' Motion for Judgment As A Matter of Law
    Under Rule 50 (June 8, 2022)...................................................1281

Dkt. 311:
    Order re: Defendants' Renewed Motion for Judgment As A
    Matter of Law Under Rule 50 (June 8, 2022) ...........................1283

Dkt. 316-1:
    Exhibit and Witness List (June 10, 2022) ................................................1285

Dkt. 317:
    Jury Verdict (June 10, 2022) ....................................................1298

Dkt. 319:
    Jury Instructions (June 10, 2022) ...........................................1333

Dkt. 321:
    Clerk's Judgment (June 10, 2022)...........................................1406

Dkt. 331:
    Notice of Appeal (July 8, 2022) ..............................................1407

Dkt. 363-1:
    Trial Exhibit P3 – Independent Agent Agreement Between GMS
    Industrial Supply, Inc. and Westly Greer ...................................1409

Dkt. 363-2:
    Trial Exhibit P4 – GMS Industrial Supply, Inc. Zone Manager
    Addendum.............................................................................1413

Dkt. 363-3:
    Trial Exhibit P5 – GMS Document re: Westly Greer's New Title
    of Director of Sales................................................................1414

Dkt. 363-4:
    Trial Exhibit P6 – Employment Agreement for Westly Greer As
    District Manager ...................................................................1415

Dkt. 363-5:
    Trial Exhibit P8 – Independent Sales Agent Agreement for
    Sabrina Greer .......................................................................1417

Dkt. 363-6:
    Trial Exhibit P12 – Independent Sales Agent Agreement
    Between GMS & County Roads (Greg Spires).........................1421

Dkt. 363-7:
    Trial Exhibit P14 – Independent Sales Agent Agreement for
    Thomas Hayes ........................................................................1425

Dkt. 363-8:
    Trial Exhibit P16 – Independent Sales Agent Agreement for
    Michael Welton ......................................................................1429

Dkt. 363-9:
    Trial Exhibit P28 – Independent Sales Agent Agreement for
    Sabrina Greer ........................................................................1433

Dkt. 363-10:
    Trial Exhibit P32 – Independent Sales Agent Agreement for
    County Roads, LLC (Greg Spires) ..........................................1438

Dkt. 363-11:
    Trial Exhibit P49 – Employee Non-Compete Agreement for
    Westly Greer ..........................................................................1442

Dkt. 363-12:
    Trial Exhibit P52 – Sales Agent Agreement for Gregory Spires .............1444

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

GMS INDUSTRIAL SUPPLY, INC.,      )
                          )
        Plaintiff,          )
v.                        )      Case No. 2:19-cv-324-RCY-LRL
                          )
G&S SUPPLY, LLC, et al.,        )
                          )
        Defendants.      )

## <u>DEFENDANTS' OBJECTIONS TO PLAINTIFF'S PROPOSED JURY INSTRUCTIONS</u>

Defendants G&S Supply, LLC, WarTech Industries, LLC, HMC Supply, LLC, Defendants/Counterclaimants Westly Greer, Sabrina Greer, Greer Group, LLC, Gregory K. Spires, County Roads, LLC, Thomas Hayes, and Mike Welton (collectively "Defendants"), by counsel, submit the following objections to Plaintiff GMS Industrial Supply, Inc.'s ("GMS"), Proposed Jury Instructions (ECF No. 266 at 43-128):

1.     Defendants object to Plaintiff's Proposed Jury Instruction P-1 as it is misleading and improperly states only the standard for preponderance of the evidence when certain of Plaintiff's claims must be resolved by clear and convincing evidence.

2.     Defendants object to Plaintiff's Proposed Jury Instruction P-3 as it is an incomplete recitation of the issues the jury is to decide on witness creditability. Defendants assert their version of the witness credibility instruction, found at D-2, is a more complete and appropriate instruction.

3.     Defendants object to Plaintiff's Proposed Jury Instruction P-4 as irrelevant and unhelpful to the jury in deciding the issues in this case.

4.     Defendants object to Plaintiff's Proposed Jury Instruction P-5 as irrelevant and unhelpful to the jury in deciding the issues in this case.

**JA714**

5.     Defendants object to Plaintiff's Proposed Jury Instruction P-6 as unnecessary and confusing as the jury need not reach a finding on successor liability.  The Parties have stipulated that WarTech Industries, LLC, is the successor in interest to G&S Supply, LLC, and responsible for any award of damages against G&S Supply.

6.     Defendants object to Plaintiff's Proposed Jury Instruction P-7 because it misstates the Court's ruling, is argumentative and unnecessarily punitive.

7.     Defendants object to Plaintiff's Proposed Jury Instruction P-7[Alternative] as it appears to be an exact duplicate of Plaintiff's Proposed Jury Instruction P-7.

8.     Defendants object to Plaintiff's Proposed Jury Instruction P-8 as vague and incomplete as it fails to define the duty of loyalty.

9.     Defendants object to Plaintiff's Proposed Jury Instruction P-9 as the policy rationale and instructions about preparing to leave employment to compete are not relevant to the issues in this case.  Defendants also object because the instruction incorporates facts not in evidence and is argumentative.  Defendants further object to the extent this instruction may mislead the jury about the status of Defendant Westly Greer's employment and his transition to a non-exclusive sales agent role prior to his relationship with GMS being terminated.

10.     Defendants object to Plaintiff's Proposed Jury Instruction P-10 as irrelevant as there are no allegations or evidence in this case that Defendant Westly Greer ever attempted to solicit other GMS employees to leave GMS or to compete with GMS.

11.     Defendants object to Plaintiff's Proposed Jury Instruction P-11 as this instruction is misleading to the extent it is an incomplete recitation of the applicable law, vague and insufficiently tailored to the facts and issues in this case.

**JA715**

12.     Defendants object to Plaintiff's Proposed Jury Instruction P-12 on the grounds there cannot be future losses to GMS from Defendant Westly Greer's alleged breach and as presented certain of the measures are cumulative and would provide a double recovery.

13.     Defendants object to Plaintiff's Proposed Jury Instruction P-13 as it is an incomplete recitation of the law as it fails to include damages as an element of the claim.  Under Virginia contract law, damage to the plaintiff is an essential element of the claim, which, if unproven, requires dismissal of the claim.  *See Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 423 (Va. 2012).

14.     Defendants object to Plaintiff's Proposed Jury Instruction P-14 as it is unnecessary and irrelevant to the issues in the case.

15.     Defendants object to Plaintiff's Proposed Jury Instruction P-16 as it is vague and not tied to a specific Defendant.

16.     Defendants object to Plaintiff's Proposed Jury Instructions P-17 through P-26, related to its trade secret misappropriation claims under the Defend Trade Secrets Act in Count IV against Defendants HMC Supply LLC, County Roads LLC, Greer Group LLC, and G&S Supply LLC as those Defendants could not have misappropriated any trade secrets.

17.     Defendants object to Plaintiff's Proposed Jury Instruction P-17 as an incorrect and misleading paraphrasing of the applicable law.  Defendants assert their version of the law governing Federal Trade Secrets Misappropriation, found at D-12, is a more accurate instruction.

18.     Defendants object to Plaintiff's Proposed Jury Instruction P-18 as it is an incomplete recitation of the applicable standard for this case, as interpreted within the Fourth Circuit.

19.     Defendants object to Plaintiff's Proposed Jury Instruction P-19 as it is an incorrect recitation of the standard governing Federal Trade Secrets misappropriation, instead

**JA716**

inappropriately relying on the standard for South Carolina Trade Secrets Misappropriation law, which is not applicable to Plaintiff's claims. *See Woven Elecs. Corp v. Advance Grp. Inc.*, No:89-1580, 1991 U.S. App. LEXIS 6004, at *6 (4th Cir. Apr. 15, 1991) (noting that the matter is a diversity case and South Carolina law governs plaintiff's trade secrets claim); *Prysmian Cables & Sys., USA, LLC Prysmian v. Szymanski*, 2021 U.S. Dist. LEXIS 229102, at *2, 27 (D.S.C. Nov. 29, 2021) (noting the matter is a diversity case and plaintiff has claimed violation of the South Carolina's trade secrets act).

20.     Defendants object to Plaintiff's Proposed Jury Instruction P-20 as an inaccurate and incomplete statement of the law.  Defendants believe their version of the law governing Federal Trade Secrets Misappropriation, found at D-13, is a more accurate and appropriate instruction.

21.     Defendants object to Plaintiff's Proposed Jury Instruction P-21 as an inaccurate, incomplete and misleading statement of the law for this case.

22.     Defendants object to Plaintiff's Proposed Jury Instruction P-22 as vague, overbroad and because it fails to specify that the jury may award damages only against the specific Defendant or Defendants whom they have found violated the law.

23.     Defendants object to Plaintiff's Proposed Jury Instruction P-24 as the instruction is impermissibly vague and fails to specify that the jury may only award attorneys' fees related to this specific claim and only against the specific Defendant or Defendants whom they have found violated the law.

24.     Defendants object to Plaintiff's Proposed Jury Instruction P-25 as an erroneous statement of the law.  Further, the law Plaintiff cites in support of this instruction does not comport with Plaintiff's proffered definition of "willfully and maliciously."

**JA717**

25.    Defendants object to Plaintiff's Proposed Jury Instruction P-26 as it does not apply to this case.

26.    Defendants object to Plaintiff's Proposed Jury Instructions P-27 through P-34, related to its trade secret misappropriation claim under the Virginia Uniform Trade Secrets Act in Count V.  Virginia trade secret law does not apply to this case as there has been no allegation or evidence that any Defendant engaged in any tortious conduct falling within the statute in the Commonwealth of Virginia.  *See Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 855-56 (E.D. Va. 2013) (noting that Virginia applies the lex loci delicti doctrine, the law of the place of the wrong, to tort actions).

27.    Defendants object to Plaintiff's Proposed Jury Instructions P-35 through P-39, related to its claim under the Federal Fraud and Abuse Act in Count VII, as there exists no evidence to support this claim.  Further, claims under the Federal Fraud and Abuse Act may not be filed against allegedly disloyal employees who walk off the job with confidential information.  *NRT Mid-Atl., LLC v. D'Ambrosia*, DKC 2008-0166, 2008 U.S. Dist. LEXIS 132657, at *18 (D. Md. Dec. 22, 2008).  Without waiver of these objections, Defendants assert that to the extent any instructions are offered for Count VII, Defendants believe their Federal Fraud and Abuse Act instruction, D-14, should be included.

28.    Defendants object to Plaintiff's Proposed Jury Instructions P-40 through P-41, related to its claim under the Virginia Computer Crimes Act in Count VIII.  Virginia law does not apply to this case as there has been no allegation or evidence that any Defendant engaged in tortious conduct in the Commonwealth of Virginia.  *See Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 855-56 (E.D. Va. 2013) (noting that Virginia applies the lex loci delicti doctrine, the law of the place of the wrong, to tort actions).

JA718

29.     Defendants object to Plaintiff's Proposed Jury Instructions P-42 through P-46, related to its claim under Virginia Business Conspiracy law in Count X.  Virginia law does not apply to this case as there has been no allegation or evidence that any Defendant engaged in any tortious conduct in the Commonwealth of Virginia.  *See Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 855-56 (E.D. Va. 2013) (noting that Virginia applies the lex loci delicti doctrine, the law of the place of the wrong, to tort actions).

30.     In addition to their objections that the underlying claim cannot survive, Defendants object to Plaintiff's Proposed Jury Instruction P-45, as it misstates the applicable law as a jury "may," but is not required to, award treble damages under Va. Code § 18.500 as Plaintiff's instruction claims.

31.     In addition to their objections that the underlying claim cannot survive, Defendants object to Plaintiff's Proposed Jury Instruction P-46, as it misstates the applicable law: a jury "may," but is not required to, award attorneys' fees under Va. Code. § 18.1-500, as Plaintiff's instruction claims.  This instruction is also impermissibly vague and fails to specify that the jury may only award damages only against the specific Defendant or Defendants whom they have found violated the law.

32.     Defendants object to Plaintiff's Proposed Jury Instructions P-47 through P-48, related to its claim for Virginia common law conspiracy in Count XI.  Virginia law does not apply to this case as there has been no allegation or evidence that any Defendant engaged in any tortious conduct in the Commonwealth of Virginia.  *See Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 855-56 (E.D. Va. 2013) (noting that Virginia applies the lex loci delicti doctrine, the law of the place of the wrong, to tort actions).

33.     Defendants also object to Plaintiff's Proposed Jury Instruction P-47 as it is a vague and incomplete recitation of the law.  However, to the extent any instruction on Virginia

common law conspiracy is offered, Defendants assert their version of the instruction on Virginia common law conspiracy, found at D-15, is a more complete and appropriate instruction.

34.     Defendants object to Plaintiff's Proposed Jury Instruction P-48 as it is vague and fails to specify that the jury may only award damages against the specific Defendant or Defendants whom they have found violated the law.

35.     Defendants object to Plaintiff's Proposed Jury Instructions P-49 through P-54, related to its trademark infringement claims in Count XII against all Defendants except for G&S Supply, LLC, as none of the Defendants except G&S Supply could have infringed Plaintiff's trademark, as a matter of law.

36.     Defendants object to Plaintiff's Proposed Jury Instruction P-50 as this instruction refers to Plaintiff as "GMS Industrial Supply, *LLC*," which is incorrect and misleading as Plaintiff is a corporation.

37.     Defendants object to Plaintiff's Proposed Jury Instruction P-51 as this instruction refers to Plaintiff as "GMS Industrial Supply, *LLC*," which is incorrect and misleading as Plaintiff is a corporation.

38.     Defendants object to Plaintiff's Proposed Jury Instruction P-52 as this instruction refers to Plaintiff as "GMS Industrial Supply, *LLC*," which is incorrect and misleading as Plaintiff is a corporation.  Defendants further object as the proffered instruction is confusing.

39.     Defendants object to Plaintiff's Proposed Jury Instruction P-53 as this instruction refers to Plaintiff as "GMS Industrial Supply, *LLC*," which is incorrect and misleading as Plaintiff is a corporation.  Defendants further object on the grounds the instruction is over-inclusive and confusing.

40.     Defendants object to Plaintiff's Proposed Jury Instruction P-54 as it does not apply to this case.

7

**JA720**

41.     Defendants object to all Plaintiff's Proposed Jury Instructions P-55 through P-64, related to its claim for trade dress infringement in Count XIII as there have been no factual allegations or evidence supporting this claim and nothing that Defendants sold was distinctive.

Defendants respectfully request the Court reject Plaintiff's proposed jury instructions identified herein.

Respectfully submitted,

**G&S SUPPLY, LLC, WESTLY L. GREER, SABRINA GREER, GREER GROUP, LLC, GREGORY K. SPIRES, COUNTY ROADS, LLC, THOMAS HAYES, MIKE WELTON, WARTECH INDUSTRIES, LLC AND HMC SUPPLY, LLC**

By: */s/ Micaylee A. Noreen*
Robert W. McFarland (VSB # 24021)
V. Kathleen Dougherty (VSB # 77294)
Micaylee A. Noreen (VSB # 92433)
MᴄGᴜɪʀᴇWᴏᴏᴅꜱ LLP
World Trade Center
101 West Main Street, Ste. 9000
Norfolk, Virginia 23510
Phone:  (757) 640-3716
Fax:  (757) 640-3966
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*

8

**JA721**

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2022, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

By: */s/ Micaylee A. Noreen*
Robert W. McFarland (VSB # 24021)
V. Kathleen Dougherty (VSB # 77294)
Micaylee A. Noreen (VSB # 92433)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Ste. 9000
Norfolk, Virginia 23510
Phone: (757) 640-3716
Fax: (757) 640-3966
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*

**JA722**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | | |
|---|---|---|
| GMS INDUSTRIAL SUPPLY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:19-cv-324-RCY-LRL |
| | ) | |
| G&S SUPPLY, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**DEFENDANTS' PRETRIAL BENCH BRIEF**</u>

Defendants G&S Supply, LLC, WarTech Industries, LLC, HMC Supply, LLC, Defendants/Counterclaimants Westly Greer, Sabrina Greer, Greer Group, LLC, Gregory K. Spires, County Roads, LLC, Thomas Hayes, and Mike Welton (collectively "Defendants"), by and through counsel, hereby submit this Pretrial Bench Brief outlining material issues Defendants expect to arise at trial.

**I.      PROCEDURAL HISTORY**

Plaintiff initiated this case on June 20, 2019, and filed a Motion for Temporary Restraining Order and Preliminary Injunction.  ECF Nos. 1, 2.  The Court held a preliminary injunction hearing after which it denied Plaintiff's Motion in part and granted it in part, requiring Defendants to change their company name and return any documents identified by Plaintiff as confidential, proprietary, and/or trade secret documents.  ECF No. 70 at 14-15.

Importantly, the Court did *not* rule that Defendants possessed or misappropriated documents or information that constituted Plaintiff's "trade secrets."  Instead, because of the uncertainty from the hearing about what GMS averred were its trade secrets, the Court directed Plaintiff to provide the Court and Defendants' counsel "a list of confidential, proprietary, and/or trade secret documents" which had been stored on Plaintiff's customer service and data

**JA723**

management portal and which Plaintiff believed Defendants then possessed. *Id.* at 15. Without waiver of their position that none of the documents identified by Plaintiff were trade secrets in any respect, Defendants complied with the Court's direction to declare what documents on Plaintiff's list each Defendant possessed, and returned the same to Plaintiff's counsel. ECF Nos. 77, 79-87.

Following the preliminary injunction hearing, Defendants filed two successful motions to dismiss. The Court dismissed then-defendant Wayne Side from this case for lack of personal jurisdiction, and granted in part Defendants' Motion to Dismiss for Failure to State a Claim. ECF Nos. 68-69, 93, 98, 102. In doing so, the Court found unenforceable provisions in Westly Greer's 2012 Employment Agreement (Count II) that prohibited him from using or disclosing GMS's confidential information, recruiting GMS employees, holding a competing job, or violating any portion of GMS's Employee Handbook. ECF No. 102 at 30. The Court also found unenforceable the customer non-solicitation and supplier non-disclosure provisions of Westly Greer's 2019 Independent Sales Agent Agreement (Count II). *Id.* at 29. Several provisions in Defendants' Independent Sales Agent Agreements (Count III) were held to be unenforceable, including the customer non-solicitation and supplier non-disclosure clauses. *Id.* at 30. Lastly, the Court dismissed Plaintiff's tortious interference claim (Count IX). *Id.*

On March 23, 2020, GMS filed its First Amended Verified Complaint removing its prior claims under Count III and replacing them with the allegation that the Defendant sales agents failed to "aggressively promote" GMS's products. *See* ECF No. 108 ¶ 111. On April 6, 2020, Defendants filed their answers and counterclaims, for GMS's failure to pay commissions for sales made on GMS's behalf. ECF Nos. 111-117. On November 16, 2020, GMS filed its Second Amended Verified Complaint, adding HMC Supply, LLC as a Defendant. ECF No. 151.

Finally, on December 1, 2020, GMS filed the operative Third Amended Verified Complaint, adding WarTech Industries, LLC as a Defendant, as successor in interest to Defendant G&S Supply, LLC.  ECF No. 156.  On July 6, 2021, GMS voluntarily dismissed then-defendant Sky Spires.  ECF No. 187.

Defendants filed their motion for sanctions on July 8, 2021, and Plaintiff filed its spoliation sanctions motion on July 13, 2021.  ECF Nos. 193, 195.  On August 4, 2021, Plaintiff filed a Motion for Partial Summary Judgment.  ECF Nos. 212-13.  On March 22, 2022, the Court denied Defendants' Motion for Sanctions Pursuant to Rule 11 and granted Plaintiff's Motion for Sanctions against Defendants Westly Greer and G&S Supply, LLC.  ECF Nos. 249, 250.  That same day, the Court denied Plaintiff's Motion for Partial Summary Judgment and awarded, *sua sponte*, Defendants summary judgment on Count VI, for fraud in the inducement of continued performance.  ECF No. 252 at 11-12.

## II.    FACTUAL BACKGROUND

Gregory K. Spires, Westly Greer, Sabrina Greer, Mike Welton, and Thomas Hayes (the "Individual Defendants") were all former independent non-exclusive sales agents for GMS prior to their termination in early April 2019.[1]  In this capacity, Defendants sold standard industrial products, such as mechanical lubricants, paper towels, trash bags, and cleaning supplies at Army bases, through relationships they established and maintained with their military customers on base.  From 2015 on, GMS's sales focused on NSN "kits" – groups of products that the Defense Logistics Agency ("DLA") had pre-authorized for purchase by military customers.

---

[1] GMS paid Commissions to them or their companies, Defendants County Roads LLC (for Gregory K. Spires) and Greer Group, LLC (for Westly and Sabrina Greer).  As an employee for GMS from November 2012 until January 2019 Westly Greer received salary and commissions. He returned to his original position as an independent sales agent for three months in 2019, until his termination.

**JA725**

Indeed, despite its post-litigation assertions, from 2017-2019 GMS discouraged and, at times prohibited, its sales agents from selling customers individual products (that is, items not part of a kit), or customizing kits in order to meet customers' needs. After observing how GMS's inflexible sales policy resulted in customer dissatisfaction and lost sales to GMS's competitors, Defendants Spires and Greer formed G&S Supply, LLC ("G&S Supply" or "G&S"), in mid-2017, to provide customized orders to their military customers for products and quantities GMS declined to sell. Defendants' efforts for G&S Supply complemented their sales for GMS. G&S's efforts benefitted GMS because having G&S as an option permitted their mutual customers to purchase all their industrial products through one sales agent, as opposed to GMS losing sales to a competitor who offered both DLA-approved NSN kits and customized products (CCPNs). Notably, after G&S Supply began its operations, GMS's sales and profits *increased* significantly from 2017-2019, and Defendants remained GMS's top performing sales agents. Contrary to Plaintiff's unsubstantiated assertions, Defendants not only maintained their efforts for GMS, but they continued to perform at the highest level. After learning of G&S Supply, GMS terminated its relationships with the Individual Defendants on April 3, 2019, issued them cease and desist letters, and shortly thereafter filed suit.

## III.  ISSUES EXPECTED TO ARISE AT TRIAL

### A.  Pursuant to the Court's Rulings, Certain Issues and Claims of GMS are No Longer Viable.

As noted in Section I, *supra*, this Court has made several rulings on the viability of certain of Plaintiff's claims and/or portions of Plaintiff's claims. Notwithstanding those rulings, Plaintiff has repeatedly failed to conform its amended complaints and other pleadings to incorporate them, to the point of continuing to include dismissed claims and parties. *See* ECF

No. 240 at 10. From their recent pleadings and arguments, Defendants expect Plaintiff will continue at trial to assert claims and raise issues which this Court has already resolved.

Regarding Count II, the only remaining alleged breach by Greer of his 2012 Employment Agreement is for revealing the identities of GMS's suppliers to its competitors, namely G&S.[2] *See* ECF No. 156 ¶ 113. As to Count III, the Court has dismissed several provisions of the Sales Agent Agreements as unenforceable.[3] Equally important, Plaintiff withdrew all its original claims of breach in Count III in its operative Third Amended Complaint. The only claim now plead in Count III is Defendants' alleged failure to "aggressively promote" GMS's products. *Compare* ECF No. 1 ¶¶ 32, 109-112 *with* ECF No. 156 ¶¶ 118-120. Although those previously alleged breaches are no longer viable, Defendants expect Plaintiff will attempt to proffer argument and evidence about them as part of its newly asserted "duty of loyalty" claim. GMS should not be permitted to resurrect any previously resolved claims before the jury. Put differently, Plaintiff's evidence should be limited to only what is needed to support its remaining claims.

**B.    As None of Defendants' Alleged Actions Occurred Within Virginia, Counts V, VIII, X and XI Should Be Dismissed.**

Plaintiff has asserted a number of Virginia-based tort claims, including Misappropriation Under the Virginia Uniform Trade Secrets Act (Count V, ECF No. 156 ¶¶ 132-141), violation of the Virginia Computer Crimes Act (Count VIII, ECF No. 156 ¶¶ 164-171), Virginia Business Conspiracy (Count X, ECF No. 156 ¶¶ 180-186), and Virginia Common Law Conspiracy (Count

---

[2] As noted above, as to Count II, the Court found unenforceable the provisions in Westly Greer's 2012 Employment Agreement that prohibited him from using or disclosing GMS's confidential information, recruiting GMS employees, holding a competing job, or violating any portion of GMS's Employee Handbook. ECF No. 102 at 30.

[3] The Court found several provisions in Defendants' Independent Sales Agent Agreements (Count III) unenforceable, including the customer non-solicitation and supplier non-disclosure clauses. *Id.* at 30.

**JA727**

XI, ECF No. 156 ¶¶ 187-190).  When deciding which state's law is appropriately applied to these tort claims, courts sitting in Virginia employ the lex loci delicti doctrine, the law of the place of the wrong.  *See Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 855-56, 860-61 (E.D. Va. 2013) (granting defendant's motion for summary judgment on plaintiff's Virginia Business Conspiracy claim because the wrongful acts occurred in Michigan and "Michigan law does not encompass the Virginia Business Conspiracy Statute"); *accord Milton v. IIT Res. Inst.*, 138 F.3d 519, 521 (4th Cir. 1998) ("Virginia's choice of law rule selects the law of the state *in which the wrongful act took place*." (emphasis added)).  This inquiry looks at where the allegedly tortious conduct took place, not where the effects of that conduct may be felt.  *Milton*, 138 F.3d at 522. Despite GMS repeatedly pleading these Virginia tort claims, the evidence adduced through discovery, including deposition testimony, establishes Defendants never committed any acts – let alone any wrongful act – in the Commonwealth of Virginia.  Each of these claims thus fail as a matter of law and should not be sent to the jury for consideration.

### C.  Nearly Three Years After Bringing Suit, Plaintiff Still Cannot Establish What Trade Secrets Defendants Purportedly Misappropriated.

Plaintiff brings two misappropriation of trade secrets claims, under the federal Defend Trade Secrets Act (Count IV) and Virginia Uniform Trade Secrets Act (Count V).  *See* ECF No. 156 ¶¶ 122-141.[4]  To establish that a trade secret exists, the Plaintiff must prove that the information "(1) has independent economic value; (2) is not known or readily ascertainable by proper means; and (3) is subject to reasonable efforts to maintain secrecy.  *Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 778 (E.D. Va. 2012)*.

---

[4] As explained in Section IIIB., *supra*, Count V also cannot survive because none of the alleged tortious trade secret activity occurred in Virginia.

Throughout the nearly three years this litigation has been pending, GMS has consistently failed to identify what trade secrets Defendants have misappropriated.  From the preliminary injunction hearing through written discovery and depositions, GMS has never identified with clarity documents and information that qualify as trade secrets and which Defendant misappropriated.  In September 2019, GMS complied with the Court's order directing that it provide Defendants with a list of all documents it purported were "confidential, proprietary, and/or trade secrets," in compliance with the Court's preliminary injunction order.  *See* ECF Nos. 70 at 15.  Notably, the items on that list are not trade secrets.  ECF No. 76.  In response to Defendants' efforts in written discovery to determine what information Plaintiff claims are trade secrets, GMS directed Defendants to documents which included a collection of emails dated after this lawsuit was filed, a military rank abbreviation chart, photographs of GMS products, and Defendants' own customer lists.  *See* ECF No. 194, Ex. 10.  None of these legally qualify as trade secrets.  This Court must require Plaintiff to *specifically* identify what information it claims constitute trade secrets and what portion of that information was misappropriated by Defendants. Defendants submit that Plaintiff will be unable to establish that any information or documents it maintained meet the legal elements required for trade secrets protection, nor that Defendants undertook any misappropriation.

### 1.    *Defendants' "know-how" cannot constitute trade secrets.*

This Court has already ruled that Defendants "know-how" does not constitute trade secrets.  *See* ECF No. 70 at 9.  Specifically, this Court found that Defendants were "entitled to use the experience and 'know-how' they have gained through their work as salespersons and employees at GMS, and elsewhere in their careers."  *Id.*

### 2. Information provided to GMS by Defendants or by third parties is not trade secrets.

Several documents that GMS will attempt to proffer as its protected trade secrets are not trade secrets at all, because they were not created nor owned by GMS. *See* 18 U.S.C. §§ 1836, 1839(4) (noting only the trade secrets "owner" may bring an action for misappropriation). These include documents which GMS received from the Defense Logistics Agency, military personnel, and other sources. GMS has also identified information *supplied by Defendants to GMS* as trade secrets. As the evidence will show, several Individual Defendants are veterans with extensive experience in the procurement of industrial products for the military and concomitant knowledge of the many systems the military uses for procurement of the goods GMS and other contractors sell. Utilizing their backgrounds, Defendants developed their customer bases, built relationships, and shared their customer contacts with GMS. GMS cannot claim Defendants misappropriated customer contact information when, in fact, Defendants provided that information to GMS. GMS has admitted as much in a separate action. Indeed, in its Complaint against *Drummond American Corp.*, GMS vehemently disclaimed this customer data was a protectable trade secret. *See* ECF No. 194, Ex. 11 ¶¶ 124-125 ("Drummond similarly cannot demonstrate that Rachel Gorken or GMS learned 'trade secrets' or acquired 'other confidential information' through her affiliation with Drummond . . . this is partially due to the fact that customer identities do not amount to 'trade secrets'"). As this type of information is "known or readily ascertainable [to Defendants] by proper means," it cannot qualify as trade secrets. *Trident Prods. & Servs., LLC*, 859 F. Supp. 2d at 778.

### 3. Information GMS shared with its customers or competitors is not trade secrets.

A plaintiff must take reasonable steps to maintain the secrecy of its trade secrets in order for those alleged secrets to be legally protected. *Trident Prods. & Servs., LLC*, 859 F. Supp. 2d at 778. Often, this means sharing its trade secrets only with those who have signed non-disclosure agreements or otherwise agree to maintain its confidentiality. 1 MILGRIM ON TRADE SECRETS § 1.05. Information cannot qualify as trade secrets if disclosed to a third party without requiring that party's confidentiality. *Id.*; *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise discloses the secret, his property right is extinguished."). Much of the information GMS claims as trade secrets are things which GMS itself has disclosed to third parties without requiring their confidentiality, including information GMS provided to its customers through sales agents, employees, and marketing materials. Any information GMS freely shared with third parties is not protected trade secret material.

### D. GMS's Inconsistent Positions on Unfair Competition.

Evidence adduced during discovery shows that GMS has been wholly inconsistent in enforcing its rights against its competitors, and has behaved in a manner that waives its right to enforce unfair competition claims against Defendants.

First, Gary Gorken owns his own industrial supply sales company, G Cubed, Inc., which directly competes with GMS in military sales. Gary Gorken is an employee of GMS, serves as its Director of Regulatory Compliance, and oversees all its day-to-day operations of GMS. As such, he owes Plaintiff fiduciary duties as an officer and employee. But GMS has never even attempted to prevent Mr. Gorken from selling competing products through G Cubed and reaping

the profits from those sales – blatantly permitting Gorken and G Cubed, Inc. to usurp its sales opportunities.

Similarly, GMS has authorized, and at times *required*, its sales agents to sell products provided by its competitors. For example, during their time as sales agents, GMS directed the Individual Defendants to sell products of GMS competitors Grainger and Coastal Products. GMS's selective enforcement of its rights against unfair competition, and its endorsement of its agents and employees selling competing products for competing companies undermine, if not bar, its unfair competition claims against the Defendants.

### E.   GMS's Trademark and Trade Dress Claims.

#### 1.   *GMS's trademark and trade dress claims are only potentially viable against G&S Supply, LLC.*

GMS's trademark and trade dress claims focus on G&S Supply, yet are asserted against all the Defendants. *See* Counts XII and XIII. The Individual Defendants were acting as agents of G&S Supply in their promotion and sale of G&S products. Accordingly, alleged infringing uses of GMS's trademark or trade dress can only be attributed to the actual vendor, and GMS cannot maintain this claim against the Individual Defendants. Similarly, GMS has alleged no facts and offer no evidence in support of any purported trademark or trade dress claims against HMC Supply, LLC. The Court should limit GMS's presentation of these claims to Defendant G&S Supply.

#### 2.   *GMS's trade dress infringement claim fails as Defendants had no company identifiers on G&S Supply, LLC's products.*

GMS has even more problems with its trade dress infringement claim, even against G&S Supply. The essence of a trade dress claim is that the non-functional parts of a product's image or packaging are presented in a manner that is confusing and misleading to the customer. *See*

*CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 657 (4th Cir. 2020) (noting there is no prohibition under trade dress law for copying products; rather, the law protects those parts of a product that are primarily non-functional, inherently distinctive or have acquired a secondary meaning). Although GMS's products usually carry product labels with a stylized GMS symbol and often sport an image of GMS's mascot, the Green Oger, none of G&S Supply's products bore labels or other trade dress that identified them as G&S Supply products. GMS has not alleged, and cannot present evidence, that G&S packaged or labeled its products in a fashion constituting trade dress infringement.

### F.    GMS's Damages.

GMS will attempt to put forth damages claims which have no factual or legal foundation. GMS <u>may</u> be entitled to recover as damages:  (1) Westly Greer's salary, (2) G&S Supply's profits attributable to proven tortious conduct, namely sales from its misappropriation of trade secrets between 2018 and 2019, and (3) possibly, pursuant to the Court's ruling of May 19, 2022, the Independent Agents' sales commissions.  ECF No. 284.  However, whether GMS can meet the necessary evidentiary showing for even these items of damages is tenuous.

First, to recoup Westly Greer's salary, GMS must prove that while an employee, Greer breached his duty of loyalty.  Particularly given his performance for GMS from 2017 through March, 2019, Defendants anticipate that the evidence adduced at trial will fail to support any such breach.

In order to disgorge G&S Supply of the profits from its limited sales in 2018-2019, GMS must prove it would have made those sales but for G&S Supply's misappropriation.  GMS cannot carry its required evidentiary burden.  The evidence from discovery shows G&S's sales resulted not from misappropriation, but customer demand for products that GMS chose not to

offer.  Defendants were losing sales to GMS's competitors after GMS decided to restrict customized CCPN sales and instead focus almost exclusively on NSN and related fixed-kit sales. Indeed, GMS's own sales personnel have testified G&S's sales were not competitive because it sold different products in different combinations and/or different quantities than GMS.  Further, GMS has many competitors, including Drummond American, Grainger, and Coastal Products. GMS has previously averred in its pleadings that these products are generic and interchangeable, and military customers in the industrial supply space have no brand loyalty.  ECF No. 194, Ex. 11 ¶¶ 105, 108-109 (noting "all of the customers developed by Rachel Gorken and GMS . . . lacked any sort of product loyalty, brand loyalty or company loyalty" and the "[p]roducts distributed by Rachel Gorken and GMS . . . were common chemical products that are offered through many different distributors nation-wide under private label").

Finally, GMS's claims for recoupment of the Individual Sales Agent commissions and punitive damages cannot survive.  Virginia law strongly disfavors punitive damages.  *McLean v. Branch Banking & Trust Co.*, No. 1:19-cv-1413, 2020 U.S. Dist. LEXIS 140850, at *5 (E.D. Va. Aug. 5, 2020) (citing *Simbeck, Inc. v. Dodd Sisk Whitlock Corp.*, 257 Va. 53 (Va. 1999)).  To survive through trial, GMS must prove Defendants acted willfully and maliciously in their tortious conduct.  *See Green v. Ingram*, 269 Va. 281, 292 (Va. 2005) (noting willful and wanton conduct sufficient to support a claim of punitive damages requires proof of "actual or constructive consciousness that injury will result from the act done or omitted.")  No such evidence exists.  From 2017 through March, 2019, Defendants' actions not only complemented and boosted their sales for GMS, but prevented GMS's competitors from taking away NSN sales. Indeed, Defendants remained GMS's top sales agents during their tenure, even after they started and sold for G&S Supply.  There is no evidence of intentional, malicious conduct that will

support an award of punitive damages, and no evidence that justifies Defendants forfeiting their commissions for sales that profited GMS.

### G. GMS Admits it Owes Defendants Unpaid Sales Commissions.

In its Rule 30(b)(6) deposition, GMS's designated representative, D. Renee Robichaux, admitted that GMS owes the individual Defendants the commissions and bonuses alleged in their counterclaims. ECF No. 194, Ex. 5 at 30:18-32:20. Those counterclaims are for Plaintiff's failure to pay Westly Greer $13,087.99, Gregory Spires $14,231.32, Thomas Hayes $5,000.00, Sabrina Greer $10,000.00, and Mike Welton $7,500.00. GMS maintains, however, that it is not legally obligated to pay Defendants' those commissions because they "first breached" their Sales Agent Agreements which entitle them to these payments. GMS's first breach argument is not only circular, but disingenuous. The only claim GMS pleads against Defendants pursuant to the Sales Agent Agreements is that they failed to "aggressively promote" GMS's products. But GMS does not, and indeed cannot, dispute that the commissions Defendants seek in their counterclaims are owed because of their sales <u>for GMS</u>. Defendants could not, therefore, have "first breached" their sales agent agreements by making successful sales for GMS, from which GMS profited. ECF No. 194, Ex. 5 at 31:3-8 (admitting that GMS received payment from the Government for the sales underlying Defendants' counterclaims). GMS's first breach argument fails given the uncontroverted facts, and judgment should be awarded Defendants on their counterclaims.

## IV. CONCLUSION

After nearly three (3) years of extensive and needlessly expensive litigation, the parties will finally obtain a resolution on the merits of GMS's claims and Defendants' counterclaims. Defendants respectfully ask that the Court hold Plaintiff to its required burdens of proof on its

remaining claims, and exclude unsupported argument and assertions.

Respectfully submitted,

**G&S SUPPLY, LLC, WESTLY L. GREER,
SABRINA GREER, GREER GROUP, LLC,
GREGORY K. SPIRES, COUNTY ROADS,
LLC, THOMAS HAYES, MIKE WELTON,
WARTECH INDUSTRIES, LLC AND HMC
SUPPLY, LLC**

*By Counsel*

/s/ Robert W. McFarland
Robert W. McFarland (VSB # 24021)
V. Kathleen Dougherty (VSB # 77294)
Micaylee A. Noreen (VSB # 92433)
Jeanne E. Noonan (VSB # 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Ste. 9000
Norfolk, Virginia 23510
Phone: (757) 640-3716
Fax: (757) 640-3966
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com
jnoonan@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*

**JA736**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 26, 2022, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

By: */s/ Robert W. McFarland*
Robert W. McFarland (VSB # 24021)
V. Kathleen Dougherty (VSB # 77294)
Micaylee A. Noreen (VSB # 92433)
Jeanne E. Noonan (VSB # 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Ste. 9000
Norfolk, Virginia 23510
Phone: (757) 640-3716
Fax: (757) 640-3966
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com
jnoonan@mcguirewoods.com

*Counsel for Defendants and Counterclaim Plaintiffs*

159947551_7

JA737

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | | |
|---|---|---|
| **GMS INDUSTRIAL SUPPLY, INC.,** | : | |
| a Virginia Corporation, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Civil Action No. 2:19cv324** |
| | : | |
| **G&S SUPPLY, LLC, ET AL.,** | : | |
| | : | |
| Defendant. | : | |

## PLAINTIFF'S BENCH BRIEF

**NOW COMES** the Plaintiff, GMS Industrial Supply, Inc. ("GMS"), by counsel, and in accordance with the Court's Revised Scheduling Order, submits this Bench Brief providing information that GMS believes will assist the Court in deciding issues that arise at trial.

## ISSUES EXPECTED TO ARISE AT TRIAL

**1.     PLAINTIFF CAN SUPPLEMENT ANSWERS GIVEN IN A RULE 30(B)(6) DEPOSITION.**

GME designated Gary Gorken ("Gorken"), its director of regulatory compliance, as one of its witnesses to appear at its Rule 30(b)(6) depositions.  Prior to the deposition, Plaintiff provided Defendants with over 400 pages of documents it alleged constituted trade secrets.  During the deposition, Defendants counsel, aggressively questioned Mr. Gorken about trade secret documents without first allowing him to see any of the relevant documents.  In fact, counsel did not provide any of the trade secret documents into evidence.  Defendants' counsel also questioned Mr. Gorken about financial and case-related matters without providing him with any documentation for support.  When Mr. Gorken replied that he did not know the answer to questions that could have been answered if documents were referenced, Defendant's counsel berated him.

**JA738**

A Rule 30(b)(6) deponent "speaks for the corporation . . . and must testify about information known or reasonably available to the organization." *Dixon Lumber Co. v. Austinville Limestone Co.*, 256 F. Supp. 3d 658, 667-68 (W.D. Va. 2017) (quoting Fed. R. Civ. P. 30(b)(6)) (other citations omitted). However, a Rule 30(b)(6) deposition is not a memory contest. *Bank of New York v. Meridien Biao Bank Tanz.*, 171 F.R.D. 135, 150 (S.D.N.Y. 1997). Rule 30(b)(6) testimony "is not binding against the organization in the sense that the testimony can be **corrected, explained and supplemented**, and the entity is not 'irrevocably bound' to what the fairly prepared and candid designated deponent happens to remember during the testimony." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1104 (9th Cir. 2018) (quoting 7 Moore's Federal Practice – Civil § 30.25) (emphasis added).

It is often said that a corporation is "bound" by the 30(b)(6) deponent, but in relation to a 30(b)(6) deposition, bound "does not mean that the witness has made a judicial admission that formally and finally decides an issue." *W.R. Grace & Co. v. Viskase Corp.*, 1991 U.S. Dist. LEXIS 14651, at *5-8 (N.D. Ill. Oct. 11, 1991).[1][2] The notion that "a corporation *generally* cannot present

---

[1] "*See, e.g., Mays v. LaRose*, 951 F.3d 775, 790 (6th Cir. 2020) ("most courts don't treat concessions by Rule 30(b)(6) designees as binding"); *Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1260 (10th Cir. 2016) (the majority of courts to reach the issue treat the testimony of a Rule 30(b)(6) representative as merely an evidentiary admission, and do not give the testimony conclusive effect); *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34-35 (2d Cir. 2015) ("[The plaintiff] rightly notes that an organization's deposition testimony is 'binding' in the sense that whatever its deponent says can be used against the organization. But Rule 30(b)(6) testimony is not 'binding' in the sense that it precludes the deponent from correcting, explaining, or supplementing its statements." (footnote omitted)); *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001) ("[T]estimony given at a Rule 30(b)(6) deposition is evidence which, like any other deposition testimony, can be contradicted and used for impeachment purposes.")." *McBroom v. Ethicon, Inc.*, 2021 U.S. Dist. LEXIS 123510, at *43-44 (D. Ariz. July 1, 2021)

[2] *See Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) ("A judicial admission is a representation that is 'conclusive in the case' unless the court allows it to be withdrawn");

---

*GMS Industrial Supply, Inc. v. G&S Supply, LLC, et al.*
Civil Action No. 2:19cv324; Bench Brief

PENDER & COWARD, P.C.
www.pendercoward.com

Page 2 of 16

**JA739**

a theory of the facts that differs from that articulated by the designated Rule 30(b)(6) representative . . . is limited to the summary judgment context." *Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1259-60 (10th Cir. 2016) (citing Moore's Federal Practice § 30.25"; *accord Snapp*, 889 F.3d at 1104.

"Nothing in Rule 30(b)(6) suggests that a company that denies knowledge of a fact cannot produce evidence of that fact from another source." *Dixon Lumber Co. v. Austinville Limestone Co.*, 256 F. Supp. 3d 658, 668-69 (W.D. Va. 2017). Nor does allowing correction, explanation, or supplementation "prejudice the opposing party or subvert the discovery process." *Id.* at 689. Importantly, "just as in the deposition of individuals, it is only a statement of the corporate person, which, if altered, may be explained and explored through cross-examination as to why the opinion or statement was altered." *Taylor*, 166 F.R.D. at 362 n.6. Stated differently, "there is no rule in [this] circuit that a witness 'is bound by his initial deposition testimony.'" *Eclipse Packaging, Inc. v. Stewarts of Am., Inc.*, 731 F. App'x 168, 170 (4th Cir. 2018) (citations omitted).

When a 30(b)(6) deponent gives "I don't know" answers "the Court must make a ruling based in the context of trial whether any answer provided merely corrects, explains, or supplements the deposition testimony, or if it truly contradicts it." *Union Pac. R.R. Co. v. Winecup Ranch*, 2020 U.S. Dist. LEXIS 228006, at *46 (D. Nev. Dec. 4, 2020). However, "if a party states it has no knowledge or position as to a set of alleged facts or area of inquiry at a Rule 30(b)(6) deposition, it cannot argue for a contrary position at trial *without* introducing evidence explaining the reasons for the change." *Taylor*, 166 F.R.D. at 363 (emphasis added).

---

*Wallace v. Polk*, 2008 U.S. Dist. LEXIS 36679, at *82-84 (W.D.N.C. May 5, 2008) (defining judicial admission as "a formal concession made by a party (usually through counsel) in the course of litigation for the purpose of withdrawing a particular fact from the realm of dispute"); *Viskase Corp.*, 1991 U.S. Dist. LEXIS at *5-8 (explaining judicial admissions cannot be contradicted).

*GMS Industrial Supply, Inc. v. G&S Supply, LLC, et al.*          PENDER & COWARD, P.C.
Civil Action No. 2:19cv324; Bench Brief                          www.pendercoward.com

Page 3 of 16

**JA740**

If a party feels that it has not received adequate responses at 30(b)(6) deposition, its remedies "will often require the deposition of an additional 30(b)(6) representative to provide answers where the first designee fails to do so" <u>or</u> the court may order additional interrogatories. *Runnels v. Norcold, Inc.*, 2017 U.S. Dist. LEXIS 161474, at *3 (E.D. Va. Mar. 30, 2017); *see In re Brican Am. LLC Equip. Lease Litig.*, 2013 U.S. Dist. LEXIS 142841, at *64-66 (S.D. Fla. Oct. 1, 2013) (fashioning remedy as an additional 30(b)(6) deposition or additional interrogatories). When a party attempts to raise 30(b)(6) sanctions at trial, such attempts are seen as "strategic delay in not timely deposing" another 30(b)(6) deponent and the court is "not required to belatedly punish" the non-movant. *Groce v. Menard, Inc.*, 2017 U.S. Dist. LEXIS 17633, at *4 (S.D. Ind. Feb. 8, 2017); *Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 733 (7th Cir. 2004).

Here, to the extent Defendants attempt to preclude all GMS testimony ***at trial*** as a remedy to cure Mr. Gorken's "I don't know," "I don't recall," and "I'm not sure" answers from the 30(b)(6) deposition, Defendants strategic delay in not timely deposing another 30(b)(6) deponent must operate to prevent their desired remedy. From the outset, it must be noted that "Plaintiff offered to provide another corporate representative who could be more successful in answering Defendants' questions. Defendants declined the offer, again evidencing their preference for a "gotcha" scenario. ECF 205 at 2. Plaintiff should not be punished at trial for Defendants' failure to depose an additional 30(b)(6) deponent.

At this stage, the most appropriate remedy to cure the alleged defects of the 30(b)(6) deposition is to allow Plaintiff to correct, explain, or supplement such answers from another source, namely Plaintiff's discovery responses (including interrogatories), the TRO hearing transcript, or any other source. *See Snapp*, 889 F.3d at 1104; *Dixon Lumber Co.*, 256 F. Supp. at 668-69. Plaintiff's corrections, explanations, and supplementations would then be "subject to

*GMS Industrial Supply, Inc. v. G&S Supply, LLC, et al.*
Civil Action No. 2:19cv324; Bench Brief

PENDER & COWARD, P.C.
www.pendercoward.com

Page 4 of 16

JA741

cross-examination and impeachment." *Wellman v. Bobcat Oil & Gas, Inc.*, 2011 U.S. Dist. LEXIS 174810, at *6 (S.D. W. Va. Dec. 1, 2011).

Plaintiff expressly put Defendants on notice in its interrogatory responses that Mr. Gorken "has knowledge of anything he testified to during the Court's hearing or Plaintiff's motion for injunction." Plt.'s Resp. to First Set of Interrog. at 3. Therefore, corrections, explanations, and supplementations should from the TRO transcript should not come as a surprise to Defendants.

Specifically, the reason for changing "I don't know" responses from the 30(b)(6) deposition at trial is due to Mr. Gorken's chemotherapy at the time of the 30(b)(6) deposition and the side effects of "chemo brain," which involves difficulties with memory and concentration. ECF 205 at 7; *see Taylor*, 166 F.R.D. at 363. At the time of the TRO hearing, Mr. Gorken was not undergoing chemotherapy and therefore did not experience the side effects of chemo brain at that time. As such, the answers that Mr. Gorken provided at the TRO hearing do not come as a surprise to Defendants and should operate to allow Mr. Gorken to testify on behalf of GMS at trial.

### 2.    COURT SHOULD EXCLUDE TESTIMONY ANDY JURY INSTRUCTIONS REGARDING STALE CRIMINAL CONVICTIONS.

Federal Rule of Evidence 609 states,

[I]f more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later…[e]vidence of [a criminal] conviction is admissible only if: (1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

Rule 609(b) makes inadmissible for impeachment purposes any conviction more than ten years old unless the court determines, "in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances outweighs its prejudicial effect." *Salmons, Inc. v. First Citizens Bank & Tr. Co.*, Civil Action No. 2:10cv72, 2011 U.S. Dist. LEXIS

*GMS Industrial Supply, Inc.  v. G&S Supply, LLC, et al.*
Civil Action No. 2:19cv324; Bench Brief

PENDER & COWARD, P.C.
www.pendercoward.com

Page 5 of 16

**JA742**

117239, at *4 (E.D. Va. Oct. 10, 2011) (quoting Fed. R. Evid. 609). Rule 609(b) thus establishes a robust presumption against admitting stale convictions. *Id*. Indeed, "[d]eparture from [this] prohibition is permitted 'very rarely and only in exceptional circumstances.'" *Id. (*quoting *Bizmark, Inc. v. Kroger Co*., 994 F. Supp. 726, 728 (W.D. Va. 1988)). Impeachment using remote convictions is permitted "very rarely and only in exceptional circumstances." United States v. Cavender, 578 F.2d 528, 530 (4th Cir 1978). To overcome this strong presumption, the proponent of the conviction "bears the burden of establishing specific . . . facts and circumstances that support the probative value of the conviction such that it substantially outweighs its prejudicial impact." *United States v. Beahm*, 664 F.2d 414, 418 (4th Cir. 1981).

While Defendants have not provided the required written notice, in their proposed jury instructions they have indicated their intent to question witnesses about criminal convictions, and it is believed the convictions at issue will be over 25 years old. Any such conviction is extremely remote and would, therefore, of low probative value, which will be far less than its prejudicial effect and should be excluded for these reasons.

3.    **DEFENDANTS' COUNTERCLAIMS WILL BE BARRED AS A MATTER OF LAW BY THE FIRST MATERIAL BREACH DOCTRINE.**

Each of Defendants' counterclaims are based on the alleged failure to pay commissions by GMS to the Defendants. These allegedly occured after the disloyal sales agent Defendants committed material breaches of their contracts with the company. For this reason, GMS' duties under the contract, including paying commissions, were excused at the time the alleged counterclaims accrued.

The party who commits the first breach of a contract is not entitled to enforce the contract. *Countryside Orthopedics v. Peyton*, 261 Va. 142, 153, 541 S.E.2d 279-54 (2001); *Horton*

---

*GMS Industrial Supply, Inc.  v. G&S Supply, LLC, et al.*
Civil Action No. 2:19cv324; Bench Brief

Pender & Coward, P.C.
www.pendercoward.com

Page 6 of 16

**JA743**

*v. Horton*, 254 Va. 111, 115, 487 S.E.2d 200 (1997); *Federal Ins. Co. v. Starr Elec. Co.*, 242 Va. 459, 468, 410 S.E.2d 684 (1991); *Hurley v. Bennett*, 163 Va. 241, 253, 176 S.E. 171 (1934). If the first breaching party committed a material breach, however, that party cannot enforce the contract. *Neely v. White*, 177 Va. 358, 366-367, 14 S.E.2d 337 (1941). If the initial breach is material, the other party to the contract is excused from performing its contractual obligations. *Horton*, 254 Va. 111 at 115.

The facts will show that the Sales Agent Defendants committed material breaches of their contracts. The Sales Agent Defendants had contractual duties to aggressively promote GMS products and a duty of loyalty to GMS, which they understand meant they were to provide their best efforts. ECF 213 ¶¶ 16, 19, 23, 35, 38, 41, 42, The Sales Agent Defendants breached this duty when they sold competing G&S goods to existing GMS customers.

The Defendants have asserted counterclaims for commissions which, to the extent that they can quantify, relate to commissions owed for sales in 2019. ECF 115 p. 34 and ECF 117 p. 35. On the other hand, the competition by the Disloyal Sales Agent Defendants began with the founding of HMC in 2015 and the founding of G&S in June of 2017   ECF 213 ¶¶ 25, 43.

Any alleged breach related to failing to pay commissions at the end of the Disloyal Sales Agents tenure with GMS occurred after they materially breached their contractual obligations to be loyal and to aggressively promote by selling competitive G&S products. As a result, the Sales Agent Defendants counterclaims are barred as a matter of law.

## 4.    VIRGINIA LAW IS APPROPRIATE FOR ALL STATE LAW CLAIMS.

In this case, the use of Virginia law is appropriate and necessary due to the contractual choice of law provision between the parties. In their Bench Brief, Defendants ignore the choice of law provision in their contracts altogether. Instead, they argue that the doctrine of *lex loci* bars

---

*GMS Industrial Supply, Inc.  v. G&S Supply, LLC, et al.*                    PENDER & COWARD, P.C.
Civil Action No. 2:19cv324; Bench Brief                                      www.pendercoward.com

Page 7 of 16

**JA744**

the application of Virginia law completely ignoring the agreement between the parties concerning choice of law.

The Virginia Supreme Court has stated, "the rule in Virginia . . . [is] that where parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law of a particular jurisdiction, we will recognize such agreement and enforce it, applying the law of the stipulated jurisdiction." *Paul Business Systems, Inc. v. Canon U.S.A., Inc.*, 240 Va. 337, 342, 397 S.E.2d 804, 807 (1990). The scope of a contractual choice of law provision depends upon the specific language of the contract as well as the nature of the claim asserted.

In *Hitachi Credit Am. Corp. v. Signet Bank,* 166 F.3d 614 (1999), the Fourth Circuit recognized "[g]enerally, where a cause of action arises in tort, Virginia applies the law of the state where the tortious conduct or injury occurred." Nevertheless, the Court held that tort claim that arose elsewhere was nevertheless governed by Virginia law because of the contract between the parties.

In *Hitachi*, the "Agreements explicitly call[ed] for the application of Virginia law in the interpretation of 'this Agreement and the rights and obligations of the parties hereunder . . . including all matters of construction, validity and performance.'" *Id.* at 624. Given the contractual language, the Court found that "the choice of law language of . . . the . . . Agreements indicates that the parties intended to cover more than merely contract claims. Thus, pursuant to [the choice of law provision] and recognizing the close relationship of the tort claims to the contract," the Court applied Virginia law to the tort claim. *Id.* at 628; *see also White v. Potacska*, 589 F. Supp. 2d 631, 641 (E.D. Va. 2008) ("When a choice of law clause is broad enough to encompass contract-related tort claims…the Court of Appeals for the Fourth Circuit has honored the intent of the parties to choose the applicable law.")

---

*GMS Industrial Supply, Inc.  v. G&S Supply, LLC, et al.*          PENDER & COWARD, P.C.
Civil Action No. 2:19cv324; Bench Brief                                www.pendercoward.com

Page 8 of 16

**JA745**

Similarly, in *Paul Business Systems*, the Virginia Supreme Court addressed the scope of a choice of forum provision while recognizing that it was analogous to a choice of law agreement. In thatt case, there were several contracts, and there were two different choice of forum provisions within those contracts. The first choice of forum clause stated, "any and all causes of action hereunder by and between the parties hereto shall only have jurisdiction and venue in the local, state or federal courts in the State of New York." *Id.* at 341, 397 S.E.2d at 807. The second choice of forum clause stated, "any and all causes of action whether or not arising under this Agreement by and between the parties hereto shall only be brought in a local, state or federal court situated within the State of New York." *Id.*

The Virginia Supreme Court held that both choice of forum provisions were broad enough to encompass a claim under the Virginia Business Conspiracy statute (Va. Code § 18.2-499). *Id.* at 343, 397 S.E.2d at 808 ("we find that these tort claims are covered by the 'here-under' language of the four agreements and certainly by the 'whether or not arising' language of the other two.").[3]

---

[3] The Virginia Supreme Court's opinion in *Ward's Equip. v. New Holland N. Am.*, 254 Va. 379, 493 S.E.2d 516 (1997) is also instructive. In *Ward's Equipment*, the Virginia Supreme Court stated, "[w]hen a contract contains a choice of law provision, the chosen jurisdiction's statutory law, as opposed to its common law, will not control *when the statutes by their own terms do not apply*." *Id.* at 254 Va. at 386, 493 S.E.2d at 520-21. The Virginia Supreme Court explained what it meant by the italicized language: when a statute contains express restrictions or limitations, the statute's limitation applies, and the parties cannot contract around it via choice of law provisions. For example, in *Wards's Equipment*, the Virginia Supreme Court held that Michigan franchise law did not apply despite a Michigan choice of law provision, because the statute only applies to franchises "made" in Michigan. The franchise party was not "made" in Michigan under that statute's definition. In other words, the parties' choice of law provision did not magically make the franchise "made" in Michigan. However, if a statute *does not* contain an express restriction or limitation, it is subject to a choice of law agreement. Here, there are no terms in VUTSA, Virginia's Computer Crimes Act or Virginia Business Conspiracy Act that would make those statutes not apply.

---

*GMS Industrial Supply, Inc. v. G&S Supply, LLC, et al.*    PENDER & COWARD, P.C.
Civil Action No. 2:19cv324; Bench Brief    www.pendercoward.com

Page 9 of 16

**JA746**

This Court's opinion in *Corinthian Mortg. Corp v. Choicepoint Precision Mktg., LLC*, 2008 U.S. Dist. LEXIS 28129, at *13 (E.D. Va. Apr. 4, 2008) is also instructive. In *Corinthian*, the plaintiff filed suit in Virginia against a company with which it had a contract alleging, among other things, that the defendant violated Massachusetts's Unfair Trade Practices Act ("MUTPA"). The defendant filed a motion to dismiss that claim, and the Court granted the Motion. The plaintiff moved to reconsider, and on reconsideration reversed in part.

The issue on the motion for reconsideration was whether Massachusetts's statutory law applied. The contract between the parties had a Massachusetts choice of law provision. The Court held that Virginia's *lex loci* rule applied to tort claims, but that contractual claims are governed by the choice of law agreement between the parties. The Court then analyzed whether the MUTPA claim sounded in tort or contract.

This Court held that those claims under MUTPA that raised allegations of fraud or misrepresentation sound in tort, but that "'embroidered contract claims or [MUTPA] claims essentially sounding in contract fall within the purview of the choice-of-law provisions governing contracts. . . .'" Looking at the "source of the duty," the Court found that MUTPA claims regarding breach of the parties' confidentiality agreement and use of confidential data were based in contract and thus, those claims were subject to Massachusetts law and MUTPA applied.

In this case, the language in Plaintiff's agreements with Defendants contains similar language to *Hitachi* and *Paul Business Systems*. The agreements state:

> **This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly.** Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts

---

*GMS Industrial Supply, Inc. v. G&S Supply, LLC, et al.*
Civil Action No. 2:19cv324; Bench Brief

PENDER & COWARD, P.C.
www.pendercoward.com

located in Virginia Beach Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement."

*See* ECF No. 3-1, (1.2-1.8), ¶17 (emphasis added). It should also be noted that the agreements also include confidentiality provisions protecting GMS's "confidential business information."

The plain language of the agreements dictates that Plaintiff's claims are governed by Virginia law, which encompasses Plaintiff's claims under the Virginia Uniform Trade Secrets Act, Virginia Computer Crimes Act, Virginia Business Conspiracy Act, and Virginia common law conspiracy.

Curiously, in their bench brief Defendants fail to recognize the parties' choice of law provision or cite to any case law that would render the choice of law provision ineffective in this case. Defendants cite to only two cases: *Ford Motor Co. v. Nat'l Indem. Co.,* 972 F. Supp. 2d 850 (E.D.Va. 2013) and *Milton v. IIT Res. Inst.*, 138 F.3d 519 (4th Cir. 1998). While these cases correctly state that Virginia follows the doctrine of *lex loci* with respect to tort claims, neither of them have any bearing on this case, because they do not involve contracts containing choice of law provisions.

Moreover, even if this Court does apply *lex loci* and ignore the parties' agreement regarding choice of law, Virginia law may should still apply under the facts of this case. The Circuit Court for the Western District of Virginia recently held "that the Supreme Court of Virginia, if applying *lex loci delicti* in a multi-defendant, multi-state Internet tort case, would define 'the place of the wrong' as the state where the plaintiff is injured as a result of the allegedly tortious content, as opposed to the state where publication occurs." *Gilmore v. Jones*, 370 F. Supp. 3d 630, 666 (W.D. Va. 2019). In this case, Plaintiff is a Virginia company and the injury occurred here.

*GMS Industrial Supply, Inc.  v. G&S Supply, LLC, et al.*                    PENDER & COWARD, P.C.
Civil Action No. 2:19cv324; Bench Brief                                      www.pendercoward.com

Page 11 of 16

**JA748**

Finally, even if VUTSA did not apply, Defendants have stated all of the elements of a claim for trade secret misappropriation under the Uniform Trade Secret Act. The uniform Act has been adopted in the jurisdictions where Defendants undertook the acts that form the basis of the trade secret violations. See La. Stat. Ann. § 51:1431 (2021) et seq.; Tex. Civ. Prac. & Rem. Code § 134A.002 (2021) et seq.; Okla. Stat. Tit. 78 § 86 (2021) et seq.; Colo. Rev. Stat. § 7-74-102 et seq. If this Court finds that the laws of those jurisdictions applies, Plaintiffs should have an opportunity to amend to state claims under those states' statutes (which all fall under the same uniform act). the definition of "trade secrets" under the VUTSA is broad as to include "low tech" secrets and trade secrets need not be written.

### 5. RELEVANT LAW REGARDING MISAPPROPRIATION OF TRADE SECRETS.

"[I]n order for a plaintiff to establish that [its alleged trade secret] has been the subject of a trade secret violation, two statutory elements must be proved, namely, the existence of a 'trade secret' and its 'misappropriation' by the defendant." *Collelo v. Geographic Servs.*, 283 Va. 56, 68 2012) (quoting *MicroStrategy Inc. v. Li*, 268 Va. 249, 263 (2004) & Va. Code § 59.1-336).

As to the first element,

"'Trade secret' means information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:

1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Va. Code § 59.1-336. "The case law is clear that just about anything can constitute a trade secret under the right set of facts. Few classes of information are per se excluded from trade secret

*GMS Industrial Supply, Inc. v. G&S Supply, LLC, et al.*                    PENDER & COWARD, P.C.
Civil Action No. 2:19cv324; Bench Brief                                      www.pendercoward.com

Page 12 of 16

**JA749**

protection." *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004). "Nevertheless, an alleged trade secret must 'meet all the criteria listed in the statute: (1) independent economic value; (2) not known or readily ascertainable by proper means; and (3) subject to reasonable efforts to maintain secrecy.'" *Audio-Video Grp., LLC v. Green*, 2014 U.S. Dist. LEXIS 25413, at *11-12 (E.D. Va. Feb. 26, 2014) (citations omitted) (holding "Plaintiff will likely be able to show that at least some of its confidential information, including 'AVG's models and methods for pricing, its specifications, business means, marketing plans, [and] financial cost structure' constitutes trade secrets").

The VUTSA provides a broad definitions of "trade secrets" as "to include everything from 'high tech' secrets such as formulas or processes to 'low tech' information like 'business leads, financial information [marketing strategies, sales techniques] and methods of conducting business,' and even to 'an idea, theory or concept.'"). *Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 657 (E.D. Va. 2002) (quoting parenthically Milton E. Babirak, Jr., *The Virginia Uniform Trade Secrets Act: A Critical Summary of the Act and Case Law*, 5 Va. J.L. & Tech. 15, *30 (2000)).Accordingly, a trade secret may relate to "low tech" concepts like "the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of booking or other office management." 1 Milgrim on Trade Secrets § 1.01 (2022).

Importantly, the law does not assign trade secret status exclusively to written documents. Under the Uniform Trade Secrets Act, trade secrets can be ***either*** written or unwritten. *See Excellience Learning Corp. v. Oriental Trading Co.*, 2004 U.S. Dist. LEXIS 30370, at *7-8 (N.D. Cal. Dec. 20, 2004) ("[T]he UTSA does preclude former employees from using trade secrets during such competition, even secrets that have not been reduced to writing and are carried solely

*GMS Industrial Supply, Inc.  v. G&S Supply, LLC, et al.*          PENDER & COWARD, P.C.
Civil Action No. 2:19cv324; Bench Brief                        www.pendercoward.com

Page 13 of 16

**JA750**

in the employee's mind."); *see also Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618 624-25 (1957) (predating UTSA but stating "[w]hether this [customer data of the plaintiff company] information was embodied in written lists or committed to memory is, we believe, of no significance; in either case in the data are entitled to protection.")."The UTSA focuses on the nature of the information, not the form in which it exists. Thus, the distinction between written and memorized information is without legal significance." *Ed Nowogroski Ins., Inc. v. Rucker*, 88 Wash. App. 350, 358 (1997).

As to the second element, "'misappropriation' means", *inter alia*,

"2. Disclosure or use of a trade secret of another without express or implied consent by a person who
a. Used improper means to acquire knowledge of the trade secret; or
b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was
    (1) Derived from or through a person who had utilized improper means to acquire it;
    (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;
    (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
    (4) Acquired by accident or mistake.

Va. Code 59.1-336. Misappropriation, under this element, does not require "proof of competition." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655 (4th Cir. 1993) (explaining Maryland UTSA"); *see also Green*, 2014 U.S. Dist. LEXIS at *10 (explaining that under the UTSA, "the same analysis would apply under either Virginia or Maryland law as both states have adopted the trade secret statutes which closely track the Uniform Trade Secrets Act" (citation omitted)). "Once the employment relationship comes to an end, of course, the employee is at liberty to solicit his former employer's business and employees"; however, "prior to his termination an employee may not solicit for himself business which his position requires him to obtain for his employer." *Md.*

---

*GMS Industrial Supply, Inc.  v. G&S Supply, LLC, et al.*                    PENDER & COWARD, P.C.
Civil Action No. 2:19cv324; Bench Brief                                          www.pendercoward.com

Page 14 of 16

JA751

*Metals, Inc. v. Metzner*, 382 Md. 31, 38 (1978); *see* 1 Milgrim on Trade Secrets § 5.02 (explaining an employee may not compete with his employer through use of trade secrets pretermination but may do so after employment is terminated).

Dated:  May 26, 2022                          Respectfully Submitted,

                                              **GMS INDUSTRIAL SUPPLY, LLC**,
                                              a Virginia Corporation

                                              By____/s/Jeffrey D. Wilson_____
                                                      Of Counsel

William A. Lascara, Esq., VSB #23118
Thomas S. Berkley, Esq., VSB #40124
Jeffrey D. Wilson, Esq., VSB #75734
PENDER & COWARD, P.C.
222 Central Park Avenue #400
Virginia Beach, VA 23462
(757) 502-7326 Direct Dial
(757) 502-7372 Facsimile
*wlascara@pendercoward.com*
*tberkley@pendercoward.com*
*jwilson@pendercoward.com*

*GMS Industrial Supply, Inc.  v. G&S Supply, LLC, et al.*                          PENDER & COWARD, P.C.
Civil Action No. 2:19cv324; Bench Brief                                          www.pendercoward.com

Page 15 of 16

**JA752**

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of May 2022, the foregoing Bench Brief was emailed and mailed via First Class U.S. Mail to the following:

Robert W. McFarland, Esquire
V. Kathleen Dougherty, Esquire
Micaylee A. Noreen, Esquire
McGuireWoods, LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
*Counsel for Defendants and Counterclaim*
*Plaintiffs G&S Supply, LLC, et al.*

    **/s/**Jeffrey D. Wilson_____
William A. Lascara, Esq., VSB #23118
Thomas S. Berkley, Esq., VSB #40124
Jeffrey D. Wilson, Esq., VSB #75734
PENDER & COWARD, P.C.
222 Central Park Avenue #400
Virginia Beach, VA 23462
(757) 502-7326 Direct Dial
(757) 502-7372 Facsimile
*wlascara@pendercoward.com*
*tberkley@pendercoward.com*
*jwilson@pendercoward.com*

---

*GMS Industrial Supply, Inc.  v. G&S Supply, LLC, et al.*          PENDER & COWARD, P.C.
Civil Action No. 2:19cv324; Bench Brief                      www.pendercoward.com

Page 16 of 16

**JA753**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                       )
 5   GMS INDUSTRIAL SUPPLY, INC.        )
                                       )
 6          Plaintiff,                  )    CIVIL ACTION NO.
                                       )    2:19cv324
 7   v.                                 )
                                       )
 8   G&S SUPPLY, LLC, et al,            )
                                       )
 9          Defendants.                 )
                                       )
10                                      )
     - - - - - - - - - - - - - - - - - -
11

12

13               TRANSCRIPT OF JURY TRIAL
                   (EXCERPT OF PROCEEDINGS)
14                  Norfolk, Virginia

                     June 2, 2022
15

16

17   BEFORE:  THE HONORABLE RODERICK C. YOUNG
             United States District Judge

18

19   APPEARANCES:

20            PENDER & COWARD PC
              By:  William A. Lascara
21                 Jeffrey Dennis Wilson
                   Jesse Brian Gordon
22                 Thomas S. Berkley
                   Counsel for Plaintiff
23
              McGuireWoods LLP
24            By:  Robert William McFarland
                   Micaylee Alexa Noreen
25                 Jeanne E. Noonan
                   Counsel for Defendants
```

JILL H. TRAIL, Official Court Reporter

**JA754**

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 50 of 366

1                         I N D E X

2    PLAINTIFF'S
     WITNESSES                                            PAGE
3
       DONNA GRACE RUPLEY
4          Direct Examination By Mr. Gordon                  4
           Cross-Examination By Mr. McFarland               46
5          Redirect Examination By Mr. Gordon               54
       DANIELLE RENEE ROBICHAUX
6          Direct Examination By Mr. Berkley                57

7

     DEFENDANT'S
8    WITNESSES                                            PAGE

9

10

11

12                      E X H I B I T S

13
     PLAINTIFF'S
14   NO.            DESCRIPTION                           PAGE

15     115                                                   6
       119                                                  11
16     120                                                  13
       124                                                  14
17     117                                                  20
       258                                                  39
18     63                                                   65
       65                                                   69
19     62                                                   71
       64                                                   86
20     66                                                   88
       67                                                   91
21     68                                                   93
       89                                                   98
22     73                                                  103
       49                                                  114
23     48                                                  117
       6                                                   120
24     5                                                   122
       28                                                  124

25

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 51 of 366
Case 2:19-cv-00324-RCY-LRL   Document 323   Filed 06/14/22   Page 3 of 131 PageID# 10650

3

| DEFENDANT'S | | |
|---|---|---|
| NO. | DESCRIPTION | PAGE |

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 52 of 366
Case 2:19-cv-00324-RCY-LRL   Document 323   Filed 06/14/22   Page 4 of 131 PageID# 10651

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

4

```
 1              (Excerpt of proceedings.)

 2              THE COURT:  All right.  Ladies and gentlemen, I

 3    hope you had a nice lunch.

 4              So, Plaintiff's Counsel, you may continue with your

 5    examination.

 6              MR. GORDON:  Thank you.

 7              DONNA GRACE RUPLEY, called by the Plaintiff, having

 8    been first duly sworn, was examined and testified as

 9    follows:

10                        EXCERPT OF

11                     DIRECT EXAMINATION

12    BY MR. GORDON:

13    Q.  Ms. Rupley, we looked before we took our break at 128.

14    It was those plans.  Do you recall that?

15    A.  Yes.

16    Q.  All right.  And that was the plan for Mr. Hayes?

17    A.  Yes.

18    Q.  Okay.  And that would be saved in his portal in the

19    Google drive?

20    A.  His portal would be saved in the Google drive.

21    Q.  Okay.  And who else would have access to Mr. Hayes'

22    portal in the Google drive?

23    A.  Westly.

24    Q.  All right.  Anyone else?

25    A.  Renee, Chris, anybody from planning that would work to
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

5

1    support.

2    Q.  And why did Westly have access to the portal?

3    A.  Because he was part of our executive staff.

4    Q.  All right.  Thank you.

5        If I could have you turn to 115 now, which should be

6    another one of these oversized ones that you have on the

7    desk.  And are you with me on 115?

8    A.  I believe so.  The numbers are a little bit cut off here

9    on the end.  I think it's 115, yes.

10   Q.  And can you identify what this document is?

11   A.  This is the plan for -- with a variety of bases for

12   Westly Greer.

13   Q.  And so you should have a green sheet in there which

14   corresponds to the tab on the digital version.

15       What do you see behind the first green tab there?

16   A.  Is there a page number?

17   Q.  It's just one page.  It starts with base name in the

18   upper left-hand corner.

19   A.  Okay.  I'm not there.

20       So it's not the first page that you're referring to?

21   Q.  No.  So first, it starts with what you just identified as

22   the plan.

23   A.  Yes.

24   Q.  Oh, you know what?  I think I missed a divider.  I

25   apologize.

JILL H. TRAIL, Official Court Reporter

JA758

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

6

```
 1          All right.  And then behind the plan, what's behind
 2   the next green slip sheet there?
 3   A.   The next sheet would be the order sheet.
 4   Q.   Okay.  And, again, that's Mr. Greer's order sheet?
 5   A.   Yes.
 6   Q.   And if we keep going behind that, let's just skip all the
 7   way to the last -- last document in the back.  The tab is
 8   data in the digital version.
 9   A.   Uh-huh.
10   Q.   What is that?
11   A.   That would be the POC information.
12   Q.   All right.  And do you recognize this Exhibit 115 to be
13   Mr. Greer's portal?
14   A.   Yes.
15          MR. WILSON:  We would move for the admission of
16   115.
17          THE COURT:  Any objection?
18          MR. MCFARLAND:  No, Your Honor.
19          THE COURT:  All right.  It will be admitted.
20          MR. GORDON:  All right.  If we could publish that
21   to the jury, please?
22          THE COURT:  All right.  You may publish.
23          (Plaintiff's Exhibit 115 received in evidence.)
24   BY MR. GORDON:
25   Q.   All right.  And I would like to start with you talking
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

7

1    about that tab that we have got up on the screen, the data

2    tab.  Do you see that?

3    A.  Yes.

4    Q.  All right.  And it's named data on the digital version,

5    but what do we see present in this chart?

6    A.  We were working on the lookup table.  It's geek speak.

7    I'm sorry.  So you would have another spreadsheet with all of

8    the information that you're looking at right here with all of

9    the part numbers, the kit names.  The idea was -- is that the

10   account managers wouldn't have to go through the process of

11   typing things over and over and over again.  They would just

12   be able to put in a part name, and then the rest would

13   populate.

14   Q.  And how is it selected what part names would go into the

15   V lookup table?

16   A.  These, in particular, are for -- I see a couple of them

17   here for non-standards.  Most of these are -- about half of

18   them are NSNs.  Half of them are non-standards.

19   Q.  Were these items that were frequently sold?

20   A.  Some of them.  I believe it was more of a test sheet than

21   actual physical use, but that's my recollection.

22   Q.  All right.  And in the left-hand side, left-hand column,

23   you see a number of contacts; is that correct?

24   A.  Yes.

25   Q.  All right.  And if we could just scan down so that

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

8

```
 1    everyone could see how -- or just see the length of that
 2    list.
 3           All right.  It looks like there is approximately 162
 4    contacts there in Mr. Greer's portal?
 5    A.   161 plus the header, yes.
 6    Q.   Yes.  Okay.  And if we go to the first page, the plan,
 7    the left-hand column, we looked at this before, this is the
 8    same form that we looked at for Mr. Hayes, correct?
 9    A.   Correct.  And you will see the different base names
10    there, which is why we added that column.
11    Q.   All right.  And was Mr. Greer limited to Fort Carson?
12    A.   Oh, no.
13    Q.   And if we would scan down, are the other base names in A,
14    bases where he sold on behalf of GMS Industrial?
15    A.   Yeah.  He was basically -- being in his position, he was
16    there to break open territory, to assess places.  So he went
17    to multiple bases.
18    Q.   Okay.  And there is a final column that's off the
19    monitor; if we could take it all the way to the right edge.
20           So, we see 2016, and then when we skip -- we scan
21    down.  We get to a break where it jumps from 2016 to 2019.
22    Do you understand why there is that break in his plan between
23    2016 and 2019?
24    A.   Yes.  At some point in -- I don't know the exact date,
25    but he became a manager of people, and so the rest of the
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

9

1    account managers were handling the customers and the

2    territory.  He was managing them.  And then, in 2019, his

3    agreement changed, and he was back to the regular account

4    manager role.

5    Q.  All right.  If you could now take out 119, please.

6    A.  Is that another?

7    Q.  Yeah.  It should be.  If I organized them well, it would

8    be the next one in your pile.

9    A.  Okay.  And you did.

10   Q.  All right.  Do you have it in front of you?

11   A.  Yes, I do.

12   Q.  All right.  If you could just take a look at it quickly.

13   I know it's rather large.  Do you recognize this document?

14   A.  I have to get to -- because you started with the order

15   sheet, I don't have the base name on here.  This is Greg

16   Spires.

17   Q.  Greg Spires, okay.

18        And the first document behind the cover sheet, that

19   is the sales tracking that we've discussed?

20   A.  Yes.

21   Q.  All right.  And then behind the first sheet is some

22   contacts?

23   A.  Where am I looking at it now?

24   Q.  So, in the paper copy --

25   A.  Uh-huh.

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 58 of 366

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

1  Q.  -- so, we have these green sheets in here.  So, you just

2  identified that the first one was the sales tracking, and

3  then we've got a green sheet.  And I'm just asking you what

4  document you've got behind that.

5  A.  So, we went to the sale tracking.  Now we're at the POC

6  information.

7  Q.  Yes.  Exactly.  Thank you.

8          All right.  And then --

9  A.  This is actually -- no, no, no.  This is the plan because

10  we've got the notes to include the sale on here.

11  Q.  Okay.  And what -- the plan, what's the -- the top left,

12  what do you see?

13  A.  Fort Sill.

14  Q.  Fort Sill, okay.

15          And in that packet, do you also have a POC?

16  A.  Let me see.  I've never seen them printed out like this

17  before.  You'll have to bear with me.

18  Q.  Sure.  And we can look on the screen as well.

19  A.  They're huge.

20          I can look on the screen?

21  Q.  Yeah.

22  A.  Okay.  Wonderful.  Yes, that's the POC information.

23  Q.  Okay.  So, what you've just reviewed, is that the portal

24  for Mr. Spires?

25  A.  Yes, it is.

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 59 of 366

```
 1            MR. GORDON:  Your Honor, we move for the admission
 2    of Exhibit 119.
 3            THE COURT:  Any objection?
 4            MR. MCFARLAND:  No objection, Your Honor.
 5            THE COURT:  All right.  It will be admitted, and
 6    you may publish.
 7            (Plaintiff's Exhibit 119 received in evidence.)
 8            MR. GORDON:  All right.  Publish to the jury,
 9    please.
10    BY MR. GORDON:
11    Q.  I want you to go ahead and flip to the plan tab for me.
12    And if we could scan all the way to the right, to the notes
13    column.
14            All right.  As we look down in the third and fourth
15    boxes down, it says "no funding."  Why would that be helpful
16    to have that information for GMS?
17    A.  Because that particular unit didn't have funds available
18    to them to purchase materials.
19    Q.  All right.  And how could the sales agents use that
20    information?
21    A.  They would find out when the funding would be coming in.
22    They would continue to meet with the customer, build a needs
23    list, and they just know that they wouldn't be able to fund
24    an order.
25    Q.  And again, if we scan across, we can see that this
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

12

 1   information is also in a row that has the point of contact's

 2   name and their base?

 3   A.   Some of our account managers are not the best at filling

 4   out the data.

 5   Q.   Let's move on to 120.

 6        If you could take a look at 120 for me.

 7   A.   Yes.  Got it.

 8   Q.   And do you recognize Plaintiff's Exhibit 120?

 9   A.   Yes.  This is Fort Hood.  This is going to be Mike

10   Welton.

11   Q.   And was he good at keeping his records?

12   A.   He was unique at keeping his records.

13   Q.   And if you just look through here, does this include the

14   plan and his contact list --

15   A.   Yes.

16   Q.   -- and the sales tracking?

17   A.   Yeah.

18   Q.   All right.  And you recognize this?

19   A.   (Witness nodded.)

20        MR. GORDON:  All right.  Move for the admission of

21   Plaintiff's Exhibit 120.

22        THE COURT:  Any objection?

23        MR. MCFARLAND:  No objection, Your Honor.

24        THE COURT:  All right.  It will be entered.

25        You may publish.

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 61 of 366

```
 1              MR. GORDON:  All right.  If we could publish it.
 2          (Plaintiff's Exhibit 120 received in evidence.)
 3   BY MR. GORDON:
 4   Q.  And let's bring up -- we've got the first map up.  Let's
 5   scan all the way to the right.
 6          Did Mr. Welton track an area that not all of the
 7   other sales agents did?
 8   A.  Some of them do.  He kept track of what products were in
 9   use, and that's awesome.
10   Q.  All right.  And why is that information helpful to GMS?
11   A.  That's very helpful because not only do customers change,
12   they're deployed to other areas, but that unit itself uses
13   that same material whether that person is there or not.
14   Q.  And that information is contained here in GMS' Google
15   drive?
16   A.  Yes.  That's in our Google drive.
17   Q.  And what fort did Mr. Welton sell at?
18   A.  He was at Fort Hood.
19   Q.  All right.  If you could go to Exhibit 124.
20   A.  Okay.
21   Q.  And if you could just take a look through what you've got
22   there.  Do you recognize this to be another sales agent
23   portal?
24   A.  Yeah.  This is Sabrina Greer.
25   Q.  Okay.  Sabrina Greer?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 62 of 366

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

```
 1   A.  Uh-huh.

 2   Q.  All right.  It includes her plan, her contact list, and

 3   her sales history?

 4   A.  Yes.

 5           MR. GORDON:  Move for the admission of 124.

 6           THE COURT:  Any objection?

 7           MR. MCFARLAND:  No objection, Your Honor.

 8           THE COURT:  All right.  It will be admitted.

 9           You may publish.

10           (Plaintiff's Exhibit 124 received in evidence.)

11           MR. GORDON:  Thank you for publishing it, Madam

12   Clerk.

13   BY MR. GORDON:

14   Q.  What -- based on this, what fort did Ms. Greer mainly

15   sell at?

16   A.  Fort Carson, Colorado.

17   Q.  And if we could go to the sales tab SMS GCS Fort Carson.

18   And again, this lists the sales price of every sale that she

19   reported?

20   A.  Yes.

21   Q.  And if this information became public, the sales price of

22   every sale she made would be available?

23   A.  Yeah.

24   Q.  And this POC name, those were the chiefs that she sold

25   to?
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

15

1   A.   Excuse me?

2   Q.   The POC name, the column D, those were the contacts that

3   she sold to?

4   A.   Yes.

5   Q.   All right.  And do you see a Chief Oyola in that column?

6   A.   Yes.  Right there, uh-huh, 162.

7   Q.   If we go over to the POC tab, those would be her

8   contacts?

9   A.   Yes.

10  Q.   All right.  And if we go down about halfway -- actually,

11  I think we need the info tab.

12       Didn't we see the same on Mr. Greer's?  He had an

13  info tab that had names --

14  A.   He had a desktop.

15  Q.   -- and contacts, and then the POC that was largely empty?

16  A.   They always have the freedom to add another tab or so if

17  they want to.  I just need to have the ones that are standard

18  to stay.

19  Q.   And if we go scan down to the bottom of that, about how

20  many --

21       THE COURT:  We're going to have a hard time hearing

22  you over there.

23       MR. GORDON:  I'm sorry, Your Honor.

24  BY MR. GORDON:

25  Q.   Yes.  If we scan down to the bottom, about how many

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 64 of 366

 1  contacts do we see there for Ms. Greer?

 2  A.  So 146.

 3  Q.  Okay.  And can we identify a Chief Conant on there in the

 4  list?

 5  A.  Yes.

 6  Q.  It might take a little looking.

 7       You do see Chief Conant?

 8  A.  Uh-huh.

 9  Q.  Okay.  And in your role, did you follow up with the sales

10  agent defendants about their plans?

11  A.  Yes.

12  Q.  All right.  And after you followed up with the defendant

13  sales agents, what happened?

14  A.  It was new to have me working on this plan.  I read them

15  every day, and so I started contacting the account managers

16  to ask them questions about their plans; why an order was

17  sitting there so long and not having been received, those

18  sorts of things.  Not only learning, but holding them

19  accountable to keep their plans up-to-date, and there was

20  some that were particularly unfriendly about it.  They didn't

21  want to be questioned about it, and they would rather that I

22  would have spoken to Westly.  Westly would rather that I

23  spoke to him instead of his people.

24  Q.  All right.  Did you contact Mr. Spires directly?

25  A.  Yes.

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 65 of 366

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

```
 1    Q.  All right.  And after you did that, did you receive a
 2    call about that from anyone else?
 3    A.  Yes.  It was around when I first started doing this that
 4    there was a lot of questions about why I needed to be
 5    contacting the account managers when, you know, they were
 6    being managed.  Why do I need to contact them?
 7    Q.  All right.  And who asked you why you were contacting
 8    Mr. Spires?
 9    A.  Westly.
10    Q.  And did Mr. Greer confront you about contacting any other
11    sales agents directly?
12    A.  He said "agents" in plural.
13    Q.  Okay.  Does GMS utilize the data in the sales agent
14    portals in any other ways?
15    A.  So many ways.  We're able to track all of the customers
16    for a particular base, for a particular account manager.  We
17    know that they're getting visited regularly and that our --
18              THE COURT:  I'll get you to slow down just a little
19    bit.
20              THE WITNESS:  My apologies.
21              THE COURT:  That's okay.
22              THE WITNESS:  I get excited.
23              THE COURT:  That's okay.
24              THE WITNESS:  I can see that the quality of care is
25    there by knowing that they visited all of the customers and
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

18

```
 1    they're making those visits.  And they're just creating,

 2    it's really relationships, so that's what it signifies.  The

 3    order sheets are invaluable to me because they allow me to

 4    project materials coming in.  We're able to have our items

 5    ready to be shipped, and I also can tell when something is

 6    moving more slowly.  Or, I mean, it's a plethora of

 7    information.

 8    BY MR. GORDON:

 9    Q.  And do you take the sales information and aggregate it

10    into a larger document?

11    A.  Yes.

12    Q.  All right.  And who has access to that document?

13    A.  Very, very few people.  I don't like people playing with

14    my data.

15    Q.  Okay.  Did Mr. Greer have access to that --

16    A.  Yes, he did.

17    Q.  -- data prior to his termination?

18    A.  Yes.

19    Q.  All right.  After Mr. Greer was terminated, did he return

20    his desktop computer, notebook computer, and tablet to GMS?

21    A.  Yes.

22    Q.  All right.  I would like you to look at 113.  I believe

23    that's in binder 2.

24        Do you recognize -- do you recognize this document?

25    A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 67 of 366

1   Q.  All right.  And what is this?

2   A.  So, this is a material form.  It's a receipt of company

3   property that gets issued to any employee of the company that

4   we give any kind of technical material to.

5   Q.  Okay.  Great.

6        And if you could scan up so we can see the date on

7   the bottom.

8        What's the date on the bottom of this?

9   A.  11/30/2017.

10  Q.  All right.  And this was issued when the equipment was

11  given to Mr. Greer?

12  A.  Yes.

13  Q.  All right.  And it has tracking numbers on it?

14  A.  It has the serial numbers, yes.

15  Q.  All right.  And is this utilized by GMS in its business?

16  A.  Yes.

17  Q.  All right.  And you've seen this before?

18  A.  Uh-huh.  Yes, I have.

19  Q.  How did you utilize this document?

20  A.  Excuse me?

21  Q.  How did you utilize this document?

22  A.  We used it to track any material that left GMS offices

23  and was being utilized out in the field.

24  Q.  All right.  And is this a true and accurate copy?

25  A.  Excuse me?

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

20

```
 1   Q.  Is this a true and accurate copy?
 2   A.  Yes.
 3          MR. GORDON:  All right.  We'll move for the
 4   admission of 117.
 5          THE COURT:  Any objection?
 6          MR. MCFARLAND:  No objection, Your Honor.
 7          THE COURT:  All right.  It will be admitted.
 8          (Plaintiff's Exhibit 117 received in evidence.)
 9   BY MR. GORDON:
10   Q.  And when Mr. Greer's computers were returned, were they
11   put in your possession?
12   A.  Yes.
13   Q.  And what did you do after you received them?
14   A.  They were in my office where I could see them, physically
15   see them.
16   Q.  Okay.  And then did you send them on to someone else?
17   A.  We took out the account materials that were in there and
18   left the computers wrapped in paper like they came to me.  I
19   escorted them over to our operations, warehouse operations,
20   who is a specialist at packaging items, and he shipped them
21   to BDO.
22   Q.  Okay.  When you say you removed some materials, you mean
23   you removed some materials from the packaging, not from --
24          MR. MCFARLAND:  Objection, Your Honor.  Wait.
25   Whoa.  Objection.  I've let the leading go, but that is a
```

JILL H. TRAIL, Official Court Reporter

# JA773

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

21

```
 1   leading question.  I am going to object.  The witness ought

 2   to tell us what she did, not Mr. Gordon.

 3            THE COURT:  It's leading.  It's okay.  All right.

 4   It's leading.  So, I think it is leading.  The objection is

 5   sustained.

 6            I'll just ask you to rephrase.

 7            MR. GORDON:  All right.

 8   BY MR. GORDON:

 9   Q.  You stated you -- did you remove some items from a

10   package that you received from Mr. Greer?

11   A.  There were GMS polos and other sample materials that were

12   in the box with the computers, and I separated those out.

13   Q.  Did you remove any data from the computer?

14   A.  I did not unwrap the paper off of the computer.  I didn't

15   do anything with the computers.

16   Q.  All right.  As the marketing manager and with your

17   continuing IT duties, do you have access to GMS Industrial's

18   Google vault?

19   A.  Yes, I do.

20   Q.  All right.  And was a search of that Google vault

21   conducted after the existence of G&S Supply was discovered?

22   A.  Yes, hours and hours and hours of search in the vault.

23   Q.  Did you participate in that search?

24   A.  Yes.

25   Q.  All right.  And what did you do to carry out that search?
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

22

```
 1    A.  We, myself in particular, picked up keywords, you know,

 2    starting out with a G&S email address and then moving on from

 3    there.  Every one that I found, I found more keywords, and I

 4    was able to create a list of keywords to look through the

 5    hundreds, maybe hundreds of thousands of emails that we have

 6    in our vault.

 7    Q.  All right.  And did you discover emails that had GMS

 8    Industrial email addresses that were requests for G&S Supply

 9    products?

10    A.  Yes, I did.

11    Q.  I would like to ask you if you could look at Exhibit 107,

12    and that should be in binder 2.

13          Is this one of those documents that you identified in

14    your search?

15    A.  Yes, it is.

16          MR. MCFARLAND:  There is an objection to this

17    exhibit, Your Honor, that's still under advisement.

18          THE COURT:  All right.  Okay.

19          MR. GORDON:  Should we take it up?

20          THE COURT:  Sure.  Yes.  Headsets.  Headsets.

21          (Sidebar conference as follows.)

22          MR. GORDON:  Can you hear me, Your Honor?

23          THE COURT:  Okay.  Can everybody hear me?  Thumbs

24    up if you can.

25          All right, Mr. McFarland.  Your objection to this
```

JILL H. TRAIL, Official Court Reporter

**JA775**

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

```
 1   document?

 2           And can you state the document number again,

 3   Plaintiff, Plaintiff's Counsel?

 4           MR. GORDON:  Yeah.  I believe it's 107, Plaintiff's

 5   Exhibit 107.

 6           THE COURT:  107, okay.

 7           Yes, Mr. McFarland.  I'll hear you.

 8           MR. MCFARLAND:  Yes, Your Honor.  We object to this

 9   document on the grounds of hearsay.  In fact, it's double

10   hearsay.  It's not authored by anyone at GMS.  It's authored

11   -- well, the authors are William G. Long, who is apparently

12   a military officer, senior auto warrant officer.  And there

13   is communications between Mr. Long, a Miss Wagner at the

14   U.S. Army as well, and Mr. Spires.  And it appears to be --

15   I'm not exactly sure what it's being offered for, but it

16   appears to be offered for the truth of the matter of what's

17   in here.  It is not a business record, obviously, of GMS.

18   And the fact that they found it on their drive doesn't make

19   it admissible as an exhibit.

20           THE COURT:  All right.

21           Plaintiff.

22           MR. GORDON:  Thank you, Your Honor.

23           Factually, so we've got an email here from a

24   customer here with the military.  Mr. Spires is the

25   recipient of the top email and also a recipient at the top
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 72 of 366
Case 2:19-cv-00324-RCY-LRL   Document 323   Filed 06/14/22   Page 24 of 131 PageID# 10671

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

24

```
 1    of page 2.

 2            We discussed yesterday that there is admissibility

 3    for the limited purpose of confusion.  Here we have a G&S

 4    request for parts.  It's got a G&S part number that is sent

 5    to a GMS email address.  So it's evidence of confusion.

 6            And additionally, this is part of the response to

 7    the notice prior to filing the suit on April 3rd.  If you

 8    look, it has the April 3rd date in the top left-hand corner.

 9            But we did some research.  So the Fourth Circuit,

10    Benedi versus McNeil-P.P.C., Inc., this is a Fourth Circuit

11    1995, 66 F.3d 1378.

12            THE COURT:  All right.

13            MR. GORDON:  And in that case, they said, "We find

14    the district court did not abuse its discretion in admitting

15    the DERs and case summary, because the plaintiff offered the

16    evidence solely to prove notice.  In addition, the district

17    judge properly gave a limiting instruction to the jury that

18    it could only consider the DER and case summaries as

19    evidence of notice."

20            So, we're offering this as notice of G&S' dealings.

21    The DERs in this case were drug experience reports, and this

22    was a case about the interaction of Tylenol and alcohol, so

23    evidence of other interactions was admissible for the

24    purpose of notice.

25            So, we would move to admit this document on the
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 73 of 366

| | |
|---|---|
| 1 | grounds of notice and based on evidence of confusion.  And |
| 2 | we would move that this should be admitted on those bases. |
| 3 | And if the Court finds it appropriate to issue a limiting |
| 4 | instruction, certainly that would be agreeable. |
| 5 | THE COURT:  So, what is your evidence with respect |
| 6 | to this email about confusion?  Who in this email says |
| 7 | they're confused about whether it's GMS or G&S, or somebody |
| 8 | thinking that they're dealing with GMS, but they're actually |
| 9 | ordering a G&S product? |
| 10 | MR. GORDON:  Yes, Your Honor.  So, we've had |
| 11 | testimony already about the part numbers. |
| 12 | THE COURT:  Yes. |
| 13 | MR. GORDON:  And if we look about two-thirds of the |
| 14 | way down on page 1, it says, "I did another one."  And the |
| 15 | subject is "Order".  So, he is saying, "I did another order |
| 16 | with a G&S part number."  And that gets forwarded to Chief |
| 17 | William Long, and Chief William Long then sends it to |
| 18 | Mr. Spires.  So, we've got essentially a follow-up on a G&S |
| 19 | product to a GMS Industrial email address.  So that's the |
| 20 | evidence of confusion.  These people are coming to GMS email |
| 21 | addresses and saying, you know, Here is my order. |
| 22 | THE COURT:  Right.  So, with respect to the |
| 23 | confusion argument, I understand what you're saying, but I |
| 24 | think there needs to be some other evidence to kind of round |
| 25 | that out.  So, I'm not saying that you can't bring it in on |

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

26

 1    confusion.  I don't think you can bring it in now based on

 2    what I've heard.  So, on that ground, the objection is

 3    sustained.

 4          Did you have another ground that you were seeking

 5    to move it in on?

 6          MR. GORDON:  The other one was notice.  That was

 7    the Fourth Circuit case that I had just read.  And there is

 8    a companioning Western District of North Carolina that talks

 9    about evidence; hearsay evidence can be admitted for the

10    purpose of notice.

11          In that other case, Silicon Knights, Inc. versus

12    Epic Games, Inc., there was a purchase of some software by

13    one company, and it delayed the delivery of their products.

14    And they offered other complaints by other users of this

15    same software as evidence of notice that the software was

16    insufficient.

17          And the Court stated, "When evidence is offered for

18    the limited purpose of proving notice or state of mind, it

19    is not hearsay.  Thus, Silicon may offer evidence of

20    complaints that other licensees made before May 10th for the

21    limited purpose of showing Epic's notice and state of mind."

22          And this is the issue that was raised on

23    Mr. Gorken's cross.  What notice and what state of mind did

24    you have before you went terminating my clients?  That was

25    the argument that was posited.  And this is a direct

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 75 of 366

 1    response to that.  It shows what notice, what state of mind

 2    they had.  We put in the emails, and the witness would

 3    testify that they were provided to Mr. Gorken.

 4            THE COURT:  All right.

 5            Mr. McFarland, on the issue of notice.

 6            MR. MCFARLAND:  Yeah.  There is nothing in this

 7    document that pertains to notice whatsoever.  The email

 8    exchange is from January 2019.  There is not a dispute that

 9    as of April 3rd they had notice of my clients, or at least

10    two of my clients, Spires and Greer, with respect to G&S

11    Supply.  We've never questioned that.

12            My questioning yesterday of Mr. Gorken was what did

13    he have evidence of for Sabrina Greer, Thomas Hayes, Mike

14    Welton.  That's a different matter.

15            But this document is being offered for the truth of

16    the matter about -- through double hearsay of communications

17    with warrant officers in the Army.  The Court has already

18    ruled on the confusion, but, also, this document doesn't

19    provide any evidence of notice.

20            THE COURT:  Thank you, Mr. McFarland.

21            What is the evidence of notice in this document?

22    So show me what the notice portion of it is.

23            MR. GORDON:  The notice portion is the date, the

24    4/3/2019 date, in the upper left-hand corner.  So, she

25    testified about how they did this search once they found out

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

```
 1    about G&S.  Mr. Gorken testified about this as well.

 2              THE COURT:  All right.

 3              MR. GORDON:  So, they did the search, and then they

 4    got notice of these G&S sales by GMS account

 5    representatives, and I've got two that have got Sabrina

 6    Greer.

 7              MR. MCFARLAND:  But that's not at issue, Your

 8    Honor.  It's not at issue that they --

 9              THE COURT:  All right.  Just a minute.

10              So, Plaintiff, what is it that you want to -- if I

11    did allow you to introduce this, what is it that you want to

12    ask this witness?

13              MR. GORDON:  Yeah.  So, we laid the foundation for

14    the investigation.  We asked her if she found emails

15    requesting G&S supplies for -- sent to GMS asking for G&S

16    Supply materials.  Then I'm going to ask her:  Is this one

17    of the emails that you received?  What did you do with it

18    after you found it?  And she will testify, I forwarded it to

19    Mr. Greer.

20              THE COURT:  Okay.

21              MR. GORDON:  I mean, not Mr. Greer.  Mr. Gorken.

22              THE COURT:  So, I think I'm going to sustain the

23    objection in part and overrule it in part in this way.  I'm

24    going to allow you to ask her about it.  At this time, I'm

25    not going to allow you to introduce it, but I think there is
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 77 of 366

```
 1   a basis, based on what you've argued, for you to be able to
 2   introduce it.  I just think I need a little bit more either
 3   on the notice issue or on the confusion issue.  I think you
 4   have dual ways to introduce it, actually triple ways to
 5   introduce it.  Because although Mr. McFarland raised that
 6   there is hearsay within hearsay contained within the
 7   document, which is true -- which is why I was reading it --
 8   that doesn't necessarily keep it out.  There is a way to
 9   also get that in.  So there is three bases for you to be
10   able to get it in.  I just don't think you've gotten there
11   yet.  But I will allow you to show her the document and
12   question her in the way that you've just laid out.  All
13   right?
14            MR. GORDON:  Thank you.
15            MR. MCFARLAND:  Well, Your Honor, my concern is
16   that if he questions her about the contents of the document,
17   he is backdooring --
18            THE COURT:  I didn't say the contents of the
19   document.
20            MR. MCFARLAND:  Okay.
21            THE COURT:  I'm talking about what she did with the
22   document when she found the document, what she related --
23   exactly what he said.  He didn't say anything about the
24   contents of the document when I asked him what he was going
25   to ask her about.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 78 of 366

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

```
 1              All right.  Thank you.  Let's go.
 2              (End of sidebar conference.)
 3   BY MR. GORDON:
 4   Q.  All right.  When we left off, Ms. Rupley, I think we were
 5   discussing an investigation of GMS' Google vault that you
 6   participated in.
 7   A.  Yes.
 8   Q.  All right.  Do you still have Exhibit 107 in front of
 9   you?
10   A.  Yes.
11   Q.  All right.  And what date did you uncover this document?
12   A.  Very, very soon after everything started.  I don't know
13   if that 4/3 means anything on there, but it was very shortly
14   after the discovery of G&S.
15   Q.  And is this Exhibit 107 one of the documents that you
16   discovered in that investigation?
17   A.  Yes.
18   Q.  All right.  And after you located it, did you forward it
19   to Mr. Gorken?
20   A.  I downloaded it as a PDF, and I shared it with Chris
21   Morton, Gary Gorken, and Renee Robichaux, our team.
22   Q.  All right.  And who is the recipient of this email?
23   A.  The recipient was Greg Spires.
24   Q.  All right.  And why did you flag this email?
25   A.  Because GMS part numbers began with GMS or GM.  These
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 79 of 366

```
 1    part numbers began with GS, and it had the cage code for G&S
 2    on the orders.
 3    Q.  Thank you.
 4          If you could move to Plaintiff's Exhibit 103.  It
 5    should be in that same binder.  Are you with me at Exhibit
 6    103?
 7    A.  Now I am, yes.
 8    Q.  Okay.  Was this another email that you uncovered during
 9    your search?
10    A.  Yes, it is.
11    Q.  All right.  And it would have been in that same time
12    frame?
13    A.  Yes, it would.
14    Q.  All right.  And was this also forwarded to that same
15    group, or placed in a PDF and sent to that same group?
16          MR. MCFARLAND:  Objection to the leading, Your
17    Honor.
18          THE COURT:  All right.
19          MR. MCFARLAND:  Literally, Mr. Gordon is --
20          THE COURT:  You've made your objection.  I don't
21    need the rest of it.
22          Objection sustained.
23          Rephrase your question.
24    BY MR. GORDON:
25    Q.  What did you do with this email after you found it?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 80 of 366

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

```
 1   A.  I did like I did with all of them.  I printed it to PDF.
 2   I forwarded it to the group.  And by this time, we were
 3   getting a number of emails, so we started building a folder
 4   on our Google drive, and that folder is shared between the
 5   team of us that were doing the discovery.
 6   Q.  Who was the recipient of this email?
 7   A.  Sabrina Greer.
 8   Q.  All right.  And what's the email address?
 9   A.  Sabrina.Greer@gmsindustrialsupply.com.
10   Q.  So that's a GMS company email address?
11   A.  GMS, correct.
12   Q.  Yes.  And why did you include this email with those that
13   you brought to everyone else's attention?
14   A.  You would have to scroll down a little bit, but I believe
15   this is another one of the ones that had the part numbers
16   from -- yes, the GS2201 and that whole line of the part
17   numbers there.
18           MR. MCFARLAND:  Your Honor, this is what I was
19   concerned about.  We're now getting into the hearsay.
20           THE COURT:  We're not going to discuss the
21   particulars of the email.
22           MR. GORDON:  Okay.
23   BY MR. GORDON:
24   Q.  If you could flip to Plaintiff's Exhibit 104.  Is this
25   another email that you uncovered in your investigation?
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

33

```
1    A.  Yes, it is.

2    Q.  All right.  And what did you do with this email after you

3    discovered it?

4    A.  Printed it to PDF, shared it with my team, and put it in

5    our folder.

6    Q.  Okay.  All right.  Let's go on to Plaintiff's

7    Exhibit 105.

8            All right.  And did you uncover this document as part

9    of your investigation?

10   A.  Yes.

11   Q.  All right.  And who is the recipient email for

12   Exhibit 105?

13   A.  Mike.Welton@gmsindustrialsupply.com.

14   Q.  So if it ends in @gmsindustrialsupply.com, that's a GMS

15   company email address?

16   A.  That's my domain, yes.

17   Q.  All right.  And this was in GMS' Google vault?

18   A.  Yes, it was.

19   Q.  All right.  And what did you do after you discovered this

20   email?

21   A.  I printed it to PDF, shared it with my team, and put it

22   in the folder.

23   Q.  All right.  Ms. Rupley, if you could go ahead and look at

24   Plaintiff's 258.  It's going to be in binder 4.

25           All right.  Ms. Rupley, I think you testified earlier
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 82 of 366

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

34

| | |
|---|---|
| 1 | that you deal with these award forms in performance of your |
| 2 | job? |
| 3 | A.  Yes. |
| 4 | Q.  All right.  And are some of G&S Supply's awards on this |
| 5 | same document? |
| 6 | A.  Yes. |
| 7 | Q.  Okay.  Number 3, in the field at number 3, it says "Date |
| 8 | of Order" -- |
| 9 | MR. MCFARLAND:  I'm not able to see the document. |
| 10 | THE CLERK:  I don't have 258, Your Honor. |
| 11 | THE COURT:  We don't have 258. |
| 12 | MR. GORDON:  Okay. |
| 13 | MR. LASCARA:  258? |
| 14 | MR. GORDON:  Yeah.  This is -- |
| 15 | Your Honor, do you need our copy? |
| 16 | THE COURT:  I've got something in 258. |
| 17 | MR. GORDON:  All right.  Thank you, Your Honor.  I |
| 18 | apologize. |
| 19 | THE COURT:  Does it say "Order For Supplies or |
| 20 | Services" at the top? |
| 21 | MR. GORDON:  Correct.  And it has a Bates name Fort |
| 22 | Sill 116 in the top right-hand corner. |
| 23 | THE COURT:  Okay.  Yes.  I have that. |
| 24 | MR. GORDON:  Thank you. |
| 25 | THE COURT:  I have it.  The courtroom deputy |

JILL H. TRAIL, Official Court Reporter

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

```
 1   doesn't have it.
 2          All right.  Go ahead.
 3   BY MR. GORDON:
 4   Q.  So, in the top of that document in Box 3 is a Date of
 5   Order/Call.  What is the date that goes in that box?
 6   A.  That's the date the material was awarded by DLA.
 7   Q.  Okay.  And what do you mean by awarded?
 8   A.  There is a whole process to getting an award.  I don't
 9   want to drag it all out, but when the account manager is in
10   the field and is with a customer, and the customer decides
11   they need to procure material, they will put the order -- put
12   the material in their GCSS Army system.  This is for Army
13   customers.  And it will -- if it's not an NSN item, it is a
14   non-NSN item.  It will go to DLA for solicitation.  And when
15   they have done their due diligence on that solicitation, they
16   award the material to a company.
17   Q.  Okay.  If we go about a third of the way down, there is a
18   Box 16, Type of Order.  Are you with me?
19   A.  Yes.
20   Q.  And in the middle of that, it says "Reference Your
21   Offer/Quote," dated 2018 December 28.
22   A.  Yes.
23   Q.  What is that the date of?
24   A.  The solicitation that came out for that order.
25   Q.  All right.  And who issues the solicitation?
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

36

```
 1   A.  Excuse me?

 2   Q.  Who issues the solicitation?

 3   A.  DLA.

 4   Q.  DLA, okay.

 5        Now, there is another date if we go further back here

 6   on to page 5 of 5.  So there is a row that starts with M/F.

 7   Is there a date in that column?

 8   A.  Yes, there is.

 9   Q.  All right.  And can you explain it?

10   A.  The military uses a Julian date, and it counts the days

11   of the year.  And of course, that's going to change year by

12   year because of leap years and other such things.  And so the

13   first six digits in the document number that you're looking

14   at -- they also call it a TCN number.  We call it a doc

15   number -- is the DoDAAC, which is like the address for the

16   buyer of the material, and then the second four digits are

17   the Julian date.

18   Q.  What numbers are the Julian date on here?

19   A.  The Julian date would be 835 -- yes.  Thank you -- 8354.

20   Q.  What does the 8 signify?

21   A.  It would be '18 because you add a 1 to the front of it.

22   It would be 2018.

23   Q.  Yeah.  Okay.

24        And the 354, how does that correspond to a date?

25   A.  It would be the 354th day of the year.
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

```
 1   Q.  Okay.  And what happens on this date?
 2   A.  That's the date that they push the order to their SPO,
 3   their budgeting department, and it allows funds to be applied
 4   to the order, money.
 5   Q.  What happens after they allow the funds to be applied?
 6   A.  Once the funds are applied, then DLA can actually see the
 7   order.  Before it's just kind of like a vapor.  It's just a
 8   thought until the money goes behind it, and then it's an
 9   actual -- it becomes an order.
10   Q.  All right.  And so what happens between this date that we
11   just looked at and the first date that we looked at, at the
12   top in number 3, which in this document is 2019, April 5th?
13   A.  There is a lot in the process, but once this gets funding
14   behind it and it goes national --
15          MR. MCFARLAND:  Your Honor, I'm going to object.  I
16   understand that the witness has experience with DLA forms
17   and awards, but now she's testifying as to what DLA did, and
18   that's improper.  There is not a foundation for that that
19   has been laid.  The witness' testimony is the award date
20   was, I think -- I don't have it exactly memorized, but
21   something in April of 2019.  That's the award date.  She
22   says that's when it was awarded.
23          THE COURT:  Right.  But she's explaining the rest
24   of the document.
25          So, you answer the objection.  Go ahead.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 86 of 366

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

```
 1              MR. GORDON:  Yeah.  This is a part of her job.
 2   They deal with this in their job.  They get these awards.
 3   They understand the process.
 4              THE COURT:  Objection overruled.  Objection
 5   overruled.
 6              Go ahead.
 7   BY MR. GORDON:
 8   Q.  Does one of these dates correspond with when the sale
 9   gets pushed out to the DIBBS Board?
10   A.  So, when it gets pushed out to the DIBBS board, the DLA
11   team will push out a solicitation that there -- it's a
12   request for quote.  They want other companies.  They want
13   vendors to put in their bids on these items so that the
14   government gets the best possible price and the best possible
15   material to support the warfighter.
16   Q.  So the date that it goes out to the DIBBS Board would be
17   the number in 16 that you described as the solicitation?
18   A.  Yes.
19   Q.  All right.  And what do all of these dates tell us about
20   when the agent provided a quote to the customer?
21   A.  It doesn't, because that happens before all of this.
22   This is a result of that quote given to the customer.
23              MR. GORDON:  Your Honor, we're going to move for
24   the admission of 258.
25              THE COURT:  All right.  Any objection?
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

39

```
 1              MR. MCFARLAND:  Yes, Your Honor.

 2          The testimony is that the award date here was past

 3     April 3rd of 2019.  And the witness just said she doesn't

 4     know even when the solicitation was made by the sales agent.

 5     It's not on this document.  So the only evidence is --

 6              THE COURT:  Right.  But your objection is if it was

 7     after April of 2019, correct?

 8              MR. MCFARLAND:  Correct, and it was.

 9              THE COURT:  This is before April of 2019, isn't it?

10              MR. MCFARLAND:  No.  No.  The award date is after

11     April 3rd of 2019.

12              THE COURT:  The award date.  But her testimony was,

13     I believe, was that anything that the agent did preceded

14     April of 2019.  So once the agent has done his work, it goes

15     in.

16          So the objection is overruled.  It's coming in.

17          All right.  Let's go ahead.

18          (Plaintiff's Exhibit 258 received in evidence.)

19     BY MR. GORDON:

20     Q.  All right.  If you could come with me to 279.

21              THE CLERK:  I don't have this one either.

22              THE COURT:  You don't have 279?

23              MR. GORDON:  Yes.

24              THE COURT:  We don't have 279.  When I say we, I

25     mean my courtroom deputy, who is the important person
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

40

1    because she's putting your exhibits into evidence.

2    BY MR. GORDON:

3    Q.  All right.  Ms. Rupley, are you with me on Exhibit 279?

4    A.  Yes.

5    Q.  All right.  And what is the number 16 reference here,

6    Offer/Quote Date?

7    A.  That would be April 4th, 2019.

8    Q.  And what is the Julian date?

9          MR. MCFARLAND:  Your Honor, I'm going to object.

10   Even the offered date here is after April 2019.

11         THE COURT:  Yeah.  So, I'm going to have them blow

12   it up or something because I'm having trouble seeing it.

13   Let me look.

14         MR. LASCARA:  Could we put it on the document

15   camera?  Would that help?

16         THE COURT:  I'll just look at it.  Hold on.

17         So, Mr. McFarland, is your objection that the

18   information that's in Box 16 is prior to 2019?

19         MR. MCFARLAND:  It's --

20         THE COURT:  Or are you dealing with Box 3?

21         MR. MCFARLAND:  I think even Box 16, Your Honor.  I

22   understand the Court's ruling on Box 3, if you will.

23         THE COURT:  Right.

24         MR. MCFARLAND:  But Box 16 is post April 3rd, 2019,

25   as well.  In other words, my clients had already been

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 89 of 366

```
 1    terminated by the time this was even offered.

 2              THE COURT:  Which exhibit is this?

 3              MR. MCFARLAND:  279, I think is what the plaintiffs

 4    are offering, Your Honor.  It's their exhibit, but...

 5              THE COURT:  All right.  Okay.  This one is not

 6    going to come in.  All right.  So go to the next one.

 7              MR. GORDON:  Okay.

 8    BY MR. GORDON:

 9    Q.  281.

10         Are you with us, Ms. Rupley?

11    A.  Yeah.  Uh-huh.

12    Q.  Okay.  What is the Box 16 date on this DLA award?

13    A.  May 3rd, 2018.

14    Q.  Are you on 281?

15    A.  281?

16    Q.  Yeah.

17    A.  That's what I have for 281.  It's -- I don't know how

18    else to identify it for you.  I can give you the agreement

19    number.  It does not match what you have on your screen.

20              THE COURT:  Ladies and gentlemen of the jury, I'm

21    going to excuse you to the jury room for a minute.

22              (The jury exited the courtroom at 3:01 p.m.)

23              THE CLERK:  May I go grab something from the

24    printer real quick?

25              THE COURT:  Yes.  Just one second.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 90 of 366

1          So, I think part of the confusion is that when I

2   asked you-all to meet with the courtroom deputy, she pulled

3   the ones out that weren't coming in, and it seems now you're

4   trying to put those in; is that correct?

5          MR. GORDON:  That's correct, Your Honor, yes.

6          THE COURT:  All right.  So, why didn't you say that

7   when you had your meeting with her?

8          MR. GORDON:  My apologies, Your Honor.

9          THE COURT:  All right.

10         Ms. Jones, do you need to do something?  Do you

11  need me to take a break?

12         THE CLERK:  No, that's okay.

13         THE COURT:  Are you sure?

14         THE CLERK:  Yeah.

15         THE COURT:  All right.  So we don't have any of

16  these.  And just to make it, you know, go a little more

17  smoothly, if the date on that line 16, or like she explained

18  is before April 3rd of 2019, then I'm going to allow it

19  with, you know, the continuing objection I guess from

20  Mr. McFarland.  If it's not, I don't think we have to waste

21  time on that.

22         MR. GORDON:  Your Honor, I'm only doing this for

23  the purpose of getting them in the record.  So, if we can go

24  back and review those dates and then supply them.

25         THE COURT:  Do you object to that?  I know you had

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

43

```
 1   the objection originally, but do you object if he moves en
 2   masse these ones in that occurred, you know, based on my
 3   ruling on line 16, before April of 2019, preserving your
 4   objection?
 5          MR. MCFARLAND:  Right.  No, I don't.  Preserving,
 6   no, I don't.  Here is part of my problem though, Your
 7   Honor -- and I think I said this before the lunch break --
 8   is this witness has just said the document that she was
 9   looking at that they said is 281 wasn't what she's got at
10   281.  So, we've got two problems here.  We've got my concern
11   about anything post April 3rd, 2019.  And I appreciate, I
12   understand and appreciate the Court's ruling that if it's in
13   Box 3, I lost that one.
14          THE COURT:  Right.
15          MR. MCFARLAND:  On Box 16, I won.
16          THE COURT:  Right.
17          MR. MCFARLAND:  I get that.  But I've got another
18   concern, and I say this -- and I am not trying to be
19   disparaging.  Plaintiffs don't have a very good handle on
20   their own documents and exhibits.
21          THE COURT:  But that's why -- I understand that.
22          MR. MCFARLAND:  So there is real confusion.
23          THE COURT:  So, I understand that.  But I guess I
24   want to keep moving.  So, if you don't have an objection to
25   it, we can sort that out later.
```

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

44

```
 1              MR. MCFARLAND:  Okay.

 2              THE COURT:  We can sort that out.

 3              MR. MCFARLAND:  Okay.  Long before it goes back, I

 4  get a chance to look.

 5              THE COURT:  Yes.  Yes.

 6              MR. MCFARLAND:  Because the way they've numbered

 7  these and renumbered them --

 8              THE COURT:  Yes.  Yes.

 9              MR. MCFARLAND:  -- I'm concerned that what's going

10  to go back is even post April 3rd in Box 16.

11              THE COURT:  So, that's my ruling.  I'm going to

12  allow you-all to work that out at another time so we don't

13  keep the jury waiting, and then I will hear any objections,

14  if there is objections that it's not a correct document or

15  anything like that.

16              MR. MCFARLAND:  I appreciate that, Your Honor.

17              THE COURT:  Let's move along.  And let's bring the

18  jury back.  Thank you.

19              (The jury entered the courtroom at 3:04 p.m.)

20              THE COURT:  All right.  Please continue with your

21  examination.

22  BY MR. GORDON:

23  Q.  Ms. Rupley, if you could look at Plaintiff's 259 with me,

24  and that is in plaintiff's binder 4.

25  A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 93 of 366

DONNA GRACE RUPLEY,
Direct Examination By Mr. Gordon

1  Q.  All right.  And if we flip to the second page of this

2  award, is there an area that identifies the part number?

3  A.  Yes.

4  Q.  All right.  And what's the part number that's listed in

5  the award here?

6  A.  That would be GS1022.

7  Q.  All right.  And is there a description of what that part

8  is?

9  A.  It -- they rarely have a description for the item.

10  Q.  All right.  And in the sales histories that we looked at

11  with the sales agent portals, does GMS ask its sales agents

12  to track more than just the part number?

13  A.  Yes.

14  Q.  All right.  What other information does GMS Industrial

15  track in its internal records?

16  A.  We ask them to track the part number, the nomenclature,

17  the costing -- I mean the pricing on it, the customer, the --

18  I can go on.  It's, like, 26 boxes.

19  Q.  And that includes the product description?

20  A.  That includes the product description, yeah.  It's very

21  difficult to memorize a whole list of just part numbers.

22        MR. GORDON:  All right.  Thank you.

23        You can answer whatever questions Mr. McFarland

24  has.

25        THE COURT:  All right.  Mr. McFarland, any cross?

JILL H. TRAIL, Official Court Reporter

**JA798**

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/19/2023   Pg: 94 of 366
Case 2:19-cv-00324-RCY-LRL   Document 323   Filed 06/14/22   Page 46 of 131 PageID# 10693

46

DONNA GRACE RUPLEY, Cross-Examination By Mr. McFarland

```
 1              MR. MCFARLAND:  Yes, Your Honor.
 2                         CROSS-EXAMINATION
 3   BY MR. MCFARLAND:
 4   Q.  Good afternoon, ma'am.  I'm Robert McFarland.  I
 5   represent all of the defendants in this case.
 6              And do I understand, ma'am, that you are based in the
 7   San Diego office?
 8   A.  Yes, I am.
 9   Q.  And have you always worked in the San Diego office?
10   A.  Yes, I have.
11   Q.  Okay.  And I may have missed it, but did I follow that
12   you joined GMS approximately six and a half years ago?
13   A.  Yes.
14   Q.  All right.  Mr. Greer was already the director of sales
15   for GMS at the time that you joined, correct?
16   A.  Correct.
17   Q.  Okay.  And the charts that we've been looking at, do we
18   call them portals?  Is that the name for them?
19   A.  Data portals.
20   Q.  Data portals?
21   A.  Yes.
22   Q.  Okay.  Are you aware that he in effect created those
23   portals after he joined GMS?
24   A.  I don't have any knowledge of that.
25   Q.  And you would agree with me that the information that's
```

**JA799**

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 95 of 366
Case 2:19-cv-00324-RCY-LRL   Document 323   Filed 06/14/22   Page 47 of 131 PageID# 10694

47

DONNA GRACE RUPLEY, Cross-Examination By Mr. McFarland

```
 1    in the portals is information that the sales agents or their
 2    supervisor is inputting, correct?
 3    A.  The agents supply the information, correct.
 4    Q.  Mr. Greer went from being a director of sales through
 5    2018, to becoming an independent sales agent in January of
 6    2019, correct?
 7    A.  Yes.
 8    Q.  You're aware of that?
 9    A.  Yes.
10    Q.  Okay.  Did he retain authority to access the people that
11    he supervised, their portals?
12    A.  He retained authority over their portals.
13    Q.  During the rest of his tenure through April 3rd of 2019?
14    A.  Correct.
15    Q.  Okay.  And was it your understanding -- because I
16    understand you are involved in sales and marketing among the
17    many hats that you wear?
18    A.  Yes.
19    Q.  Okay.  And was it your understanding that his same sales
20    agents that he had been supervising for his territory
21    continued to report to him, and he continued to supervise
22    them during this period?
23    A.  Yes.
24    Q.  For a non-NSN or a -- what sometimes has been referred to
25    in this trial as CCPNs, is that a term you're familiar with,
```

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/19/2023   Pg: 96 of 366

DONNA GRACE RUPLEY, Cross-Examination By Mr. McFarland

```
 1   Cage Code Part Number?
 2   A.  Yes, Cage and Part Number, correct.
 3   Q.  Okay.  For the CCPN sales that are made on the DIBBS
 4   Board, the ultimate price is public knowledge, correct?
 5   A.  The awarded price.
 6   Q.  Public knowledge?
 7   A.  The quoted price, no.
 8   Q.  I didn't ask about the quoted price.
 9        The awarded price, that's public knowledge.  When the
10   award is actually awarded to the contractor, whoever it is,
11   that's public information?
12   A.  Correct.
13   Q.  Okay.  That can be obtained by anyone who goes to the
14   DIBBS Board, and they can go in and -- what?  Today is
15   June 2nd.  So, if someone wanted to find out what had been
16   awarded on the DIBBS Board on June 1st, they could go in,
17   access it, and see what was sold through the DIBBS Board on
18   June 1st and at what prices, correct?
19   A.  If it was not September, because they get rid of them.
20   Q.  Right.  My hypothetical was -- I'm trying to keep it easy
21   in my mind.  Today is June 2nd.  If someone wanted to see
22   what was awarded on the DIBBS Board yesterday, June 1st --
23   A.  Absolutely.
24   Q.  Absolutely.  Public information?
25   A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 97 of 366

```
 1  Q.  Okay.  And I also take it that a contractor may put in a
 2  bid for an item, but when it goes to the DIBBS Board, anyone
 3  who is eligible to bid through DIBBS can bid on that item,
 4  right?
 5  A.  Correct.
 6  Q.  Okay.  So it isn't always the case that whoever puts in
 7  the original bid necessarily --
 8          MR. GORDON:  Objection.  This is beyond the scope
 9  of her direct.
10          MR. MCFARLAND:  Oh, no.  This is directly --
11          THE COURT:  Okay.
12          MR. MCFARLAND:  -- related to --
13          THE COURT:  All right.  Hold on.  He says beyond
14  the scope.  Why is it not beyond the scope?
15          MR. MCFARLAND:  Ms. Rupley testified at length
16  about the DIBBS process, and the bidding process, and how
17  the award process went through, and I am completing that so
18  the jurors can have complete information about the process.
19          THE COURT:  All right.  Your objection.  I'll give
20  you the last word.
21          MR. GORDON:  Yeah.  Her testimony was just relating
22  to what happened between two dates relative to what happened
23  on the award.  It wasn't related to everything that goes on,
24  on the DIBBS Board.
25          THE COURT:  All right.  It's cross-examination.  He
```

DONNA GRACE RUPLEY, Cross-Examination By Mr. McFarland

```
 1   gets some latitude.  So, it's overruled.
 2   BY MR. MCFARLAND:
 3   Q.  So, it could be that whoever ends up actually winning the
 4   award is not the original contractor who put in the bid,
 5   correct?
 6   A.  Correct.
 7   Q.  And I take it, ma'am, that for the non-NSN sales, it's
 8   the government, whether it's the chief warrant officer or the
 9   government procurement officer, they're the ones who are
10   inputting both the seller, vendor number, and the part
11   number, correct?
12   A.  The person ordering --
13   Q.  Yes.
14   A.  -- the material puts in --
15   Q.  From the government.
16   A.  Yes.  Well, yeah, the Army customer or whoever orders the
17   material.
18   Q.  Right.  So, for example, at Fort Sill, let's say the
19   person ordering on behalf of the government, the chief
20   warrant officer, he's the one who is not only going to, but
21   has to input the vendor number and the Cage Code Part Number?
22   A.  Correct.
23   Q.  The agent, sales agent can't do that?
24   A.  No.
25   Q.  That would be a violation of government regulations,
```

51

DONNA GRACE RUPLEY, Cross-Examination By Mr. McFarland

```
 1   correct?
 2   A.  Correct.
 3   Q.  Okay.  And if I followed you on the agent portals, you're
 4   encouraging the agents to provide as much information as they
 5   can in terms of who they're dealing with, who they're
 6   speaking with, and what they're ordering?
 7   A.  Correct.
 8   Q.  Okay.  And that's agent input, sales agent input?
 9   A.  Correct.
10   Q.  And so, for example, with -- I think the first portal we
11   looked at was Thomas Hayes, that what we saw, those comments,
12   that's Thomas Hayes doing an excellent job for GMS on
13   inputting the information that he's getting from Fort Polk,
14   correct?
15   A.  I'm not going to agree that -- but Thomas was inputting
16   it, correct.
17   Q.  Right.  Thomas inputted a lot of information?
18   A.  He did.
19   Q.  Thomas, I'll -- since they're my clients, I can pick on
20   them.  Thomas was sure better about inputting information
21   than Greg Spires?
22   A.  Absolutely.
23   Q.  Okay.
24   A.  100 percent.
25            MR. MCFARLAND:  And if we could go to Plaintiff's
```

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/18/2023   Pg: 100 of 366

DONNA GRACE RUPLEY, Cross-Examination By Mr. McFarland

```
 1   Exhibit 99, please.
 2          THE COURT:  All right.
 3          MR. MCFARLAND:  And I think this is admitted, Your
 4   Honor, so I would ask that it be published.
 5          THE COURT:  All right.
 6          MR. MCFARLAND:  Ms. Jones, may we?
 7          THE CLERK:  Got it.
 8          MR. MCFARLAND:  Thank you.  Again, obviously way
 9   beyond my skill set.
10   BY MR. MCFARLAND:
11   Q.  So, ma'am, if we're looking -- do you have 99 in front of
12   you there?
13   A.  Yes.
14   Q.  Okay.  You were asked about this at the beginning of your
15   direct exam by Mr. Gordon?
16   A.  Correct.
17   Q.  And what I understand this to be, but please correct me
18   if I'm misstating, this seems to be a series of
19   communications.  Are they emails or texts?  I can't quite
20   tell.  Or is it a chat room?
21   A.  It's a chat.  It's a chat group.
22   Q.  I know a little bit about that, not much, but anyway.
23          So it's a chat.  And what Mr. Hayes is doing here is
24   he is -- first of all, the product that he's initially asking
25   for where there is pink towels in the kit, and his client
```

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/19/2023   Pg: 101 of 366
Case 2:19-cv-00324-RCY-LRL   Document 323   Filed 06/14/22   Page 53 of 131 PageID# 10700

53

DONNA GRACE RUPLEY, Cross-Examination By Mr. McFarland

```
 1    wants white towels, that I take it is a non-NSN, but it's a
 2    CCPN kit, if it had pink towels, that GMS offers?
 3    A.  Um --
 4            MR. GORDON:  Objection, ambiguous.  That was a long
 5    question.
 6            THE COURT:  It was.
 7            MR. MCFARLAND:  Let me see if I can rephrase.
 8            THE COURT:  Ask your question again.
 9    BY MR. MCFARLAND:
10    Q.  What Mr. Hayes is referring to, the first product here
11    that he's looking to sell would be a non-NSN, correct?
12    A.  Correct.
13    Q.  And it would be a CCPN kit that GMS has, but they have it
14    with pink towels and not white towels?
15    A.  Correct.
16    Q.  Okay.  So this is an inquiry from him about selling a GMS
17    product on August 9th of 2018?
18    A.  Correct.
19    Q.  Okay.  And then he even goes down below, and the second
20    thing he's asking is, "Do we sell" -- and the we is obviously
21    GMS --
22    A.  Uh-huh.
23    Q.  -- "shoes?"
24    A.  Correct.
25    Q.  And he's saying, "I know we sell boots."  But he wants to
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 102 of 366
Case 2:19-cv-00324-RCY-LRL   Document 323   Filed 06/14/22   Page 54 of 131 PageID# 10701

54

DONNA GRACE RUPLEY, Redirect Examination By Mr. Gordon

1    know, "Do we sell shoes?"  Because he has got a customer

2    interested in what I take has got to be a non-NSN.

3    A.  Correct.

4    Q.  And not even a CCPN kit, right?

5    A.  An item.

6    Q.  Yes.

7    A.  Correct.

8    Q.  So he's asking in August of 2018, can GMS do this?

9    A.  Correct.

10   Q.  Yeah.  This isn't some email you found when you looked

11   under G&S, right, when you did the search --

12   A.  No.

13   Q.  -- terms for G&S?

14   A.  No.

15   Q.  This is Mr. Hayes, in August of 2018, trying to make

16   sales for GMS?

17   A.  Correct.

18         MR. MCFARLAND:  Thank you very much, Ms. Rupley.

19   That's all of the questions I have.

20         THE WITNESS:  You are welcome.

21         THE COURT:  Any redirect?

22         MR. GORDON:  Just briefly, Your Honor.

23                   REDIRECT EXAMINATION

24   BY MR. GORDON:

25   Q.  Ms. Rupley, Mr. McFarland asked you about pricing on the

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/19/2023   Pg: 103 of 366
Case 2:19-cv-00324-RCY-LRL   Document 323   Filed 06/14/22   Page 55 of 131 PageID# 10702

55

DONNA GRACE RUPLEY, Redirect Examination By Mr. Gordon

```
1    DIBBS Board, correct?
2    A.  Correct.
3    Q.  Does the DIBBS Board include a final price of the sale?
4    A.  Yes.
5    Q.  All right.  Is that the same amount that GMS Industrial
6    gets paid for the sale?
7    A.  Yes.
8    Q.  Is there any markup by DLA?
9         MR. MCFARLAND:  Objection, Your Honor.  He didn't
10   like the answer, but it's been asked and answered.
11        THE COURT:  I'm sorry?
12        MR. GORDON:  I didn't even finish the next
13   question.
14        THE COURT:  Right.  I know --
15        MR. MCFARLAND:  I know what the next question is.
16   He didn't like that answer.
17        THE COURT:  You're telepathic?  Let's let him ask
18   the next question and then see if it's objectionable.
19        Go ahead.
20   BY MR. GORDON:
21   Q.  When GMS Industrial makes a sale through the GCSS portal,
22   does it include any markups?
23   A.  Yes.
24   Q.  All right.  And are any of those markups external to GMS
25   Industrial?
```

DONNA GRACE RUPLEY, Redirect Examination By Mr. Gordon

```
 1    A.   Yes.

 2    Q.   All right.  And whose markup is it?

 3    A.   It would be DLA's charges for freight and other such

 4    things on an order.

 5    Q.   All right.  And who is responsible for paying for that?

 6    A.   The customer pays for that.

 7    Q.   All right.  And does GMS Industrial get any of that

 8    portion of the DLA markup?

 9    A.   No, never, no.

10    Q.   And is that amount included in the price that's displayed

11    on the DIBBS Board?

12    A.   No.

13    Q.   Is it included in the total that's on the DIBBS Board?

14    A.   No.

15              MR. GORDON:  All right.  Thank you.

16              THE COURT:  All right.  May this witness be

17    excused?

18              MR. GORDON:  Yes.  Yes, Your Honor.

19              THE COURT:  All right, Mr. McFarland?

20              MR. MCFARLAND:  Yes, Your Honor.

21              THE COURT:  All right.  Ma'am, you may be excused.

22    You can remain in the courtroom, or you're free to leave.

23    Thank you very much.

24              THE WITNESS:  Thank you very much.

25              THE COURT:  All right.  This seems to be a perfect
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

57

```
 1   time for us to take our afternoon recess.
 2           So, ma'am, if you could just stay seated for just a
 3   second.  I'm sorry.
 4           THE WITNESS:  My apologies.
 5           THE COURT:  So, jury, I'm going to let you go back
 6   for your afternoon recess.  We'll reconvene at 3:35.
 7           (The jury exited the courtroom at 3:21 p.m.)
 8           THE COURT:  All right.  We'll be in recess until
 9   3:35.
10           And then, Plaintiffs, have your next witness in the
11   courtroom when we come back so we can go ahead and swear
12   them and get started.  Okay?
13           All right.  We'll stand in recess.
14           (Court stood in recess from 3:22 p.m. to 3:36 p.m.)
15           THE COURT:  All right.  Plaintiff, call your next
16   witness.
17           (The witness was duly sworn.)
18           DANIELLE RENEE ROBICHAUX, called by the Plaintiff,
19   having been first duly sworn, was examined and testified as
20   follows:
21                      DIRECT EXAMINATION
22   BY MR. BERKLEY:
23   Q.  Good afternoon, ma'am.  Can you tell us your name,
24   please?
25   A.  Danielle Renee Robichaux.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

58

```
 1   Q.   And where do you reside?

 2   A.   In Virginia Beach.

 3   Q.   And how long have you lived in Virginia Beach?

 4   A.   Twenty years.

 5   Q.   Do you currently have a job?

 6   A.   Yes, I do.

 7   Q.   And who do you work for?

 8   A.   GMS Industrial Supply.

 9   Q.   And where do you perform your work for this company?

10   A.   In Virginia Beach.

11   Q.   And how long have you worked at that location?

12   A.   Since 2011.

13   Q.   What was your job title when you began working for GMS

14   Industrial Supply, Inc.?

15   A.   Operations manager.

16   Q.   And as the operations manager, what were your

17   responsibilities?

18   A.   I would oversee our internal staff, monitor their duties

19   and responsibilities, delegate tasks, process sales quotes

20   and sales orders, establish sales prices for products, review

21   vendor quotes, shipping estimates, commission reports, and

22   administer sales agent agreements and documents.

23   Q.   Okay.  Were you the custodian of those sales agent

24   agreements?

25   A.   Yes, I was.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 107 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1    Q.   Okay.  Now, how are you involved in the product bidding
 2    process?
 3    A.   Processing quotes on GMS products for various purchasing
 4    avenues.
 5    Q.   And can you describe to us a few of those avenues to
 6    purchase products?
 7    A.   EMALL, GSA, the DIBBS Board, credit card.
 8    Q.   Okay.  In your role as the operations manager of GMS
 9    Industrial Supply, did you learn what a DDL -- I mean 1155
10    was?
11    A.   Yes.
12    Q.   Okay.  And how did you learn what that was?
13    A.   By reviewing documents.
14    Q.   Okay.  And what is a DDL -- I mean 1155?
15    A.   It's an order for supplies or services.
16    Q.   Okay.  And if I call a DD 1155 an award for purposes of
17    your work, would that be appropriate?
18    A.   Yes.
19    Q.   Okay.  And did you learn how to read these award
20    documents?
21    A.   Yes, I did.
22    Q.   Okay.  Can you explain to us how you were involved in the
23    product pricing and product cost processes?
24    A.   We would receive vendor quotes for products, determine
25    shipping estimates, determine packaging costs, as well as
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley
60

1    factor in commission payments to establish a sales price.

2    Q.  Okay.  Was competitor pricing involved in that pricing at

3    all?

4    A.  Yes, it was.

5    Q.  Okay.  How were you involved in the product sales

6    process?

7    A.  By processing sales quotes and processing sales orders.

8    Q.  Okay.  Would you process these sales orders and sales

9    quotes for DLA?

10   A.  Yes.

11   Q.  What is DLA?

12   A.  It's Defense Logistics Agency, one of our customers.

13   Q.  Okay.  Would you do the same for GSA?

14   A.  Yes.

15   Q.  And what is GSA?

16   A.  General Services Administration, also one of our

17   customers.

18   Q.  Okay.  Do you recognize EMALL?

19   A.  Yes.

20   Q.  What is EMALL?

21   A.  EMALL was a procurement avenue for government agencies to

22   purchase products.

23   Q.  Okay.  And were you involved in handling EMALL matters

24   for GMS?

25   A.  Yes.

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

61

```
 1   Q.  Okay.  How was GMS involved with EMALL?
 2   A.  We were awarded a contract to have our products available
 3   for purchase to government agencies.
 4   Q.  Okay.  Do you know when you secured that contract for
 5   EMALL?
 6   A.  In 2007.
 7   Q.  Okay.  Did GMS Industrial Supply have access to EMALL
 8   when you started working for GMS?
 9   A.  Yes.
10   Q.  Okay.  In your tenure with GMS Industrial Supply, did GMS
11   ever lose access to EMALL?
12   A.  No.
13   Q.  Okay.  Does EMALL still exist today?
14   A.  No.
15   Q.  Okay.  Has it become something else?
16   A.  Yes.  It's now known as FedMall.
17   Q.  Okay.  Did GMS Industrial Supply maintain its access to
18   offer products when EMALL became FedMall?
19   A.  Yes.
20   Q.  Okay.  How long has GMS Industrial Supply had access to
21   FedMall?
22   A.  Since 2017.
23   Q.  Okay.  How were you involved in the management of
24   internal employees?
25   A.  I would oversee their daily tasks, delegate tasks, review
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley                              62

```
 1   operating procedures and processes, administer employment
 2   agreements.
 3   Q.  Did you have any role in the establishment of pay?
 4   A.  Yes, I did.
 5   Q.  How were -- how were you involved in the custodial
 6   administrative processes for the sales agent agreements?
 7   A.  I would administer the sales agent agreements as well and
 8   maintain them, if there was any updates or additions.
 9   Q.  What do you mean when you say you "maintained additions"?
10   A.  If a sales agent wanted to add an additional territory to
11   their non-exclusive sales agent agreement, we would update
12   the agreement or have a new agreement.
13   Q.  Okay.  Now, you just used the word "non-exclusive."  What
14   did you understand non-exclusive to mean in those agreements?
15   A.  That GMS Industrial Supply had the right to appoint other
16   sales agents to territories.
17   Q.  Okay.  So that was a benefit that was provided to GMS and
18   not to the sales agent; is that correct?
19   A.  Correct.
20   Q.  Okay.  Were you also involved in sales agent support?
21   A.  Yes.
22   Q.  Okay.  How were you involved in that process?
23   A.  Providing them with access to training documents,
24   resource documents, new agent kits, which included, like,
25   catalogs, novelties, anytime we had updated catalogs, yeah.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 111 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

63

```
 1   Q.  Did you maintain price lists as well?

 2   A.  Yes.

 3   Q.  I would like to refer you to trial Exhibit 64, which is

 4   in binder.  1?

 5           MR. MCFARLAND:  I'm sorry.  Plaintiff's 26?

 6           MR. LASCARA:  64.

 7           MR. MCFARLAND:  Oh, 64.

 8           MR. BERKLEY:  In binder 1.

 9           THE CLERK:  I don't have it.

10           THE COURT:  Again, we don't have -- my courtroom

11   deputy doesn't have that exhibit.  We'll straighten it out

12   later.  Let's go.

13           MR. MCFARLAND:  This is a document, Your Honor,

14   that the defendants have objected to, and the Court has

15   under advisement.

16           THE COURT:  Okay.  All right.  Thank you.  Thank

17   you for alerting me to that, Mr. McFarland.

18           MR. BERKLEY:  I don't have that document in front

19   of me, Your Honor, and I'm not sure the witness is going to

20   remember.

21           MR. LASCARA:  Do you see the screen?

22           MR. BERKLEY:  That's not it.

23           MR. MCFARLAND:  Are you sure it's Plaintiff's

24   Exhibit 64?

25           MR. BERKLEY:  It's 2329 GMS.  63, I'm sorry.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

64

```
 1            MR. MCFARLAND:  I'm sorry.

 2            MR. BERKLEY:  My bad.  This is Exhibit 63.

 3            THE COURT:  Do you have that?

 4            THE CLERK:  Yes.

 5            THE COURT:  Yes, Mr. Lascara.

 6            MR. LASCARA:  I just wanted to make sure the Court

 7  had that one.

 8            THE COURT:  We have it.  Thank you.

 9            All right.  Go ahead.

10  BY MR. BERKLEY:

11  Q.  Okay.  Ma'am, do you recognize Exhibit 63?

12  A.  Yes, I do.

13  Q.  And how do you recognize this document?

14  A.  This is a document that GMS would use to teach sales

15  agents how to make sales to military customers and conduct

16  themselves in the sales field.

17  Q.  Okay.  As the operations manager, would you have control

18  over this document?

19  A.  Yes.

20            MR. BERKLEY:  Your Honor, I would like to offer

21  Exhibit 63 into evidence.

22            THE COURT:  All right.

23            Mr. McFarland, the basis for your objection?

24            MR. MCFARLAND:  Well, this one we don't object to,

25  Your Honor.
```

JILL H. TRAIL, Official Court Reporter

## JA817

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

65

```
 1            THE COURT:  Okay.

 2            MR. MCFARLAND:  It was the one that --

 3            THE COURT:  Okay.

 4            MR. MCFARLAND:  -- Mr. Berkley, I think, had a

 5   little confusion about.

 6            THE COURT:  Any objection to this?

 7            MR. MCFARLAND:  63 we're good with, Your Honor.

 8            THE COURT:  All right.  No objection.  It will be

 9   admitted.

10            You may publish.

11            MR. BERKLEY:  Yes, please publish, Your Honor.

12            (Plaintiff's Exhibit 63 received in evidence.)

13   BY MR. BERKLEY:

14   Q.  Ms. Robichaux, what is this document?

15   A.  This is a training document that shows -- that we would

16   use to teach our sales agents how to make sales to military

17   customers.

18   Q.  Okay.  And what did you, in your capacity as operations

19   manager, do in providing sales agents with support with this

20   document?

21   A.  I would share this document with them, new and existing

22   sales agents, through a folder on our Google drive.

23   Q.  Okay.  And do you know how this document was created?

24   A.  From Gary Gorken's sales experience.

25   Q.  Okay.  And where is this document kept?
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

66

1  A.  On the account manager Google drive folder.

2  Q.  Okay.  And who has access to the account manager Google

3  drive folder?

4  A.  Myself, our sales managers, our sales agents, and our

5  graphics team.

6  Q.  Okay.  Has access to this been expanded beyond those

7  people?

8  A.  Once we developed our marketing planning team, they

9  gained access to this as well.

10  Q.  Okay.  And do you know when that access was provided to

11  the marketing team?

12  A.  2017.

13  Q.  Okay.  Now, how would a sales agent gain access to the

14  account manger's Google drive folder?

15  A.  I would share a link to the account manager folder

16  through email.

17  Q.  Okay.  And was that email like an electronic key to get

18  into the system?

19  A.  Yes, it was.

20  Q.  Okay.  Now, is this document that we're looking at, 63,

21  is this document stagnant, or does it evolve over time?

22  A.  It evolves.

23  Q.  And how would it evolve?

24  A.  Based on information that we may receive from the sales

25  team, it may be information that's documented in their data

JILL H. TRAIL, Official Court Reporter

**JA819**

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

67

```
1    portals, or if it was relevant, we would add it and
2    incorporate it into the document.
3    Q.  Now, who would add it and incorporate it into the
4    document?
5    A.  Myself.
6    Q.  Okay.  Would you have any assistance in incorporating
7    information from the data portal into the document?
8    A.  From our marketing team.
9    Q.  Okay.  Now I would like to move on to trial Exhibit 65.
10        Okay.  Ma'am, do you recognize this document?
11   A.  Yes.
12   Q.  Okay.  And how do you recognize this document?
13   A.  This is an email where I'm sharing access to the account
14   manager documents folder to a sales agent.
15        MR. MCFARLAND:  Your Honor, this one the Court has
16   under advisement, and I will just note that it's a document
17   that apparently was created after, months after my clients
18   were terminated.
19        THE COURT:  All right.  Well, let me -- so --
20        MR. MCFARLAND:  Irrelevant, Your Honor.
21        THE COURT:  Okay.
22        All right, Plaintiff.
23        MR. BERKLEY:  Your Honor, the relevancy of this
24   document is an example of the electronic key that she was
25   talking about as how she would send it out to the sales
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

68

```
 1    agents and other people, and this is just a sample of how

 2    that is done.

 3              THE COURT:  All right.  So, I think it's definitely

 4    demonstrative, so it can come in as a demonstrative exhibit.

 5              So, the objection is overruled.

 6              MR. BERKLEY:  Okay.  Can we published this for the

 7    jury, Your Honor?

 8              MR. LASCARA:  Your Honor, just maybe housekeeping,

 9    we've called the first demonstrative exhibit as

10    Demonstrative Exhibit 1.  And in keeping with that, should

11    we call this Demonstrative 2?

12              THE COURT:  We can keep your current number.

13              MR. LASCARA:  Okay.

14              THE COURT:  But just note that.  We can take care

15    of that as a housekeeping matter.

16              MR. LASCARA:  Thank you.

17              MR. MCFARLAND:  I'm sorry, Your Honor.  Is the

18    Court saying it can be used, or is the Court admitting it as

19    an exhibit for publication to the jury?

20              THE COURT:  I'm admitting it.  It can be published

21    to the jury as a demonstrative exhibit to help explain her

22    testimony.

23              MR. MCFARLAND:  Okay.

24              THE COURT:  Thank you.

25              Go ahead.  You may publish.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 117 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1              (Plaintiff's Exhibit 65 received in evidence.)
 2    BY MR. BERKLEY:
 3    Q.  So, ma'am, did you draft this email?
 4    A.  Yes, I did.
 5    Q.  Okay.  And who did you send it to?
 6    A.  To our marketing team, Manuel Ortega and Cory Allen.
 7    Q.  Okay.  And the section to Manuel Ortega, is there a link
 8    that he would have to go to in order to get into the account
 9    manager Google drive folder?
10    A.  Yes.
11    Q.  Okay.  And so this is a sample of the electronic key that
12    you would have to send out; is that right?
13    A.  Yes.
14    Q.  Okay.  Now, if this key was given to anybody outside of
15    GMS Industrial Supply, would they be able to get into the
16    account manager Google drive folder?
17    A.  No.
18    Q.  Okay.  If, for instance, Mr. Manuel gave it to a
19    warehouse worker for GMS Industrial Supply, would that
20    warehouse worker working inside GMS Industrial Supply be able
21    to get into the system?
22    A.  No.
23    Q.  Okay.  And why is that?
24    A.  Because I would have to share it with the individuals in
25    order to gain access to it.
```

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/19/2023   Pg: 118 of 366

```
 1   Q.  So, your sharing of it, you control the access to any
 2   information --
 3   A.  Correct.
 4   Q.  -- you sent from the account manager Google drive folder?
 5   A.  Correct.
 6           MR. BERKLEY:  Your Honor, I would like to move on to
 7   trial Exhibit 62.
 8           THE COURT:  All right.
 9           MR. BERKLEY:  Which is in binder 1 as well.
10   BY MR. BERKLEY:
11   Q.  Ma'am, do you recognize this exhibit?
12   A.  I do.
13   Q.  Okay.  And how do you recognize it?
14   A.  This is a document used to teach sales agents how to
15   provide -- how to sell to military customers at the motor
16   pool.
17   Q.  Okay.  And was this an exhibit that was in the account
18   manager Google drive folder?
19   A.  Yes.
20   Q.  Okay.  And was this an exhibit that you would have to
21   provide access to individuals in order to see?
22   A.  Yes.
23           MR. BERKLEY:  Your Honor, I would like to offer
24   this into evidence.
25           THE COURT:  Any objection?
```

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/18/2023   Pg: 119 of 366

```
 1              MR. MCFARLAND:  Oh, no objection, Your Honor.
 2              THE COURT:  All right.  It will be admitted.
 3              (Plaintiff's Exhibit 62 received in evidence.)
 4    BY MR. BERKLEY:
 5    Q.  Can you explain to us what this document is?
 6    A.  It's a training that we use to teach the sales agents how
 7    they were to sell to the motor pools, the military customers
 8    at the motor pools, and how to conduct themselves in the
 9    field.
10    Q.  Okay.  And, again, this document was kept in the account
11    manager Google drive folder, right?
12    A.  Yes.
13    Q.  So, the information in this document, who developed the
14    information in this document?
15    A.  From Gary Gorken's sales experience, and then information
16    that we may have received from the account managers' data
17    portal or sales managers' information that was relevant.
18    Q.  So, who would go into the data portal and gather that
19    information to supplement Gary Gorken's sales experience?
20    A.  Our marketing team.
21    Q.  Okay.  And that would include you as well?
22    A.  Includes me, yes.
23    Q.  Okay.  Was all of the training materials for sales agents
24    sent by you using this electronic key process?
25    A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 120 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1              MR. BERKLEY:  Your Honor, I would like to move on
 2     to trial Exhibit 40.
 3              THE COURT:  All right.
 4     BY MR. BERKLEY:
 5     Q.  Do you have that before you, Ms. Robichaux?
 6     A.  Yes, I do.
 7     Q.  Okay.  Now, do you recognize this document?
 8     A.  Yes, I do.
 9     Q.  And how do you recognize it?
10     A.  This is also a training resource document that's kept in
11     the account manager Google drive.
12              MR. BERKLEY:  Your Honor, I would like to offer
13     this into evidence.
14              THE COURT:  Any objection?
15              MR. MCFARLAND:  I'm trying to keep up, Your Honor,
16     if I can.  Just one second.
17              THE COURT:  All right.
18              MR. MCFARLAND:  Your Honor, we do object to this
19     document as irrelevant.
20              I understood originally plaintiffs had withdrawn
21     the document.  I don't know that it was put forth on the
22     joint motion.  And then the Court has it under advisement.
23              THE COURT:  All right.  So what's the relevance of
24     this document?
25              MR. BERKLEY:  Your Honor, this is one --
```

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/18/2023   Pg: 121 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

73

```
 1              THE COURT:  Let's jump on the headsets for this.
 2              (Sidebar conference as follows.)
 3              THE COURT:  All right.  Thumbs up when everybody
 4      can hear.
 5              Okay, Plaintiff, what's the relevance of this
 6      document?
 7              MR. BERKLEY:  Your Honor, this is one of the many
 8      training guide documents that are kept in the Google drive
 9      folder that sales agents must review in order to go out and
10      make sales for GMS Industrial Supply.  It is a trade secret.
11      We believe it's a trade secret.  And as you know, Your Honor
12      had ruled that Mr. Greer had spoliated evidence and
13      documents that were in the laptop.  This, we have adverse
14      instructions hopefully coming with regards to trade secrets,
15      and we believe this is one of the documents that could have
16      been destroyed.  This teaches the sales agents how to
17      specifically sell to aircraft squadrons with aircraft parts
18      using NSNs, the National Stock Numbers.  Now, while that's
19      not something that GMS is saying that they were selling at
20      the time, the whole purpose of selling CCPNs or non-standard
21      NSNs is to eventually get to an NSN level, and if they did,
22      they would have this document that would allow them to
23      expand their business into aircraft squadrons and other
24      areas.  So, I think it's very relevant to the trade secret
25      analysis that's before the Court.
```

**JA826**

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 122 of 366

```
 1              THE COURT:  All right.

 2              Mr. McFarland.

 3              MR. MCFARLAND:  First off, Your Honor, I don't

 4    think this is in any way a trade secret.  It's a generic

 5    how-to document.

 6              But more important, number one, we don't know when

 7    this document was created so that it was even available to

 8    my clients before April 3rd of 2019, so that's first.

 9              Second, it's wholly irrelevant.  My clients didn't

10    sell anything to the Navy.  The top of this document is

11    Naval Aviation Logistics Command Management Information

12    System.  My clients never had anything to do with that,

13    never set foot on a naval base.

14              I mean, this is totally irrelevant to this case.

15    It's going to confuse this jury, and it's not adding -- it's

16    not probative.  It is not in any way going to make a fact

17    more or less probable.

18              THE COURT:  All right.

19              Plaintiff, I'll give you the last word.

20              MR. BERKLEY:  Your Honor, I think this is relevant,

21    and it goes to the growth of GMS and what they could do once

22    they established NSN sales and expanded beyond the CCPN

23    market that they were trying to say that that's all they

24    were involved in.  They were clearly heading towards the NSN

25    market, because that's why you sell the non-standard NSNs,
```

USCA4 Appeal: 22-2090  Doc: 20-3  Filed: 01/19/2023  Pg: 123 of 366
Case 2:19-cv-00324-RCY-LRL  Document 323  Filed 06/14/22  Page 75 of 131 PageID# 10722

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

75

```
 1   and this would be a means for them to grow their business
 2   which they didn't have.
 3          And you will hear testimony from this witness
 4   saying that GMS created this document.  This was not a copy
 5   and cut and paste job from some instruction manual.  They
 6   came up with this idea and this plan and how to make it work
 7   for aircraft carriers.  It's very important to their trade
 8   secrets.
 9          THE COURT:  All right.  Well, right now, based on
10   what the witness has testified, the objection is sustained.
11   But I will allow you to ask some more questions about it,
12   and then we'll see where we are.
13          MR. BERKLEY:  Thank you, Your Honor.
14          (End of sidebar conference.
15   BY MR. BERKLEY:
16   Q.  Ms. Robichaux, with regard to this document, how was this
17   document created?
18   A.  From information received from our sales team to develop
19   these steps.
20   Q.  Okay.  Did you cut and paste this document from
21   instructions, or did you come up -- or did GMS come up with
22   this document on its own?
23   A.  GMS came up with this document.
24   Q.  And they used their own experience in order to come up
25   with how to make sales to aircraft squadrons?
```

```
 1   A.  Yes.

 2           MR. BERKLEY:  Okay.  Again, Your Honor, we offer

 3   this into evidence.

 4           THE COURT:  All right.

 5           Mr. McFarland.

 6           MR. MCFARLAND:  The same objections, Your Honor.

 7   And there must be a reason, but it hasn't even been asked

 8   when this document was created.

 9           THE COURT:  All right.  The objection is sustained.

10           MR. BERKLEY:  Okay.

11   BY MR. BERKLEY:

12   Q.  Ma'am, how long did you hold the title of operations

13   manager for GMS Industrial Supply?

14   A.  Until March of 2016.

15   Q.  Okay.  And during that time, would price lists for

16   non-NSNs and NSNs be some of the type of documents that you

17   would pass to sales agents through the electronic key

18   process?

19   A.  Yes.

20   Q.  Okay.  And did you receive a new job title from GMS

21   Industrial Supply in March of 2016?

22   A.  Yes, I did.

23   Q.  And what was this title?

24   A.  It was director of marketing administration.

25   Q.  Okay.  Did this new title mean you no longer had the
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   responsibilities of the operations manager?
 2   A.  No.  I continued with those responsibilities.
 3   Q.  Okay.  And did you gain some new responsibilities?
 4   A.  Yes, I did.
 5   Q.  And what were these additional responsibilities?
 6   A.  I have spoken more with contracting officers for
 7   government agencies, negotiated contracts, also maintaining
 8   any sales agent agreements that were amended or updated or
 9   any new sales agent agreements.
10   Q.  Did you also support the sales managers?
11   A.  Yes, I did.
12   Q.  And was this an additional task added to your
13   responsibility to support the sales agents?
14   A.  Yes.
15   Q.  Okay.  And who were some of the sales managers?
16   A.  Westly Greer, Jeff Johnson, Howard Barlow.  I'm trying to
17   think back to that time.  Jennifer Allen.
18   Q.  Okay.  So how are you involved in providing support to
19   these sales managers?
20   A.  By reviewing information that's in the sales agents' data
21   portals to look at trends, gather information, compile sales
22   information that they could use to strategize or to gain more
23   sales in the field.
24   Q.  Okay.  So what is the account manager data portal?
25   A.  The account manager data portal is an individual data
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

78

```
 1   portal for each account manager that keeps information as far
 2   as customer preferences, customer contact information,
 3   customer lists, ordering information, order history and
 4   preferences from customers, as well as the account managers'
 5   daily activities.
 6   Q.  Okay.  And how is the account manager data portal
 7   different from the account manager Google drive folder?
 8   A.  The account manager data portal is an individual thing
 9   for each specific account manager.  The account manager
10   documents Google drive folder is compiled of resources that
11   are shared with all of the sales agents.
12   Q.  Okay.  And can you describe some of the information that
13   was placed into the account manager data portal?
14   A.  The customer lists for GMS, the ordering histories of the
15   customers, daily activities, trends, I think that...
16   Q.  Okay.  And what would GMS management do with this data
17   that was in the data portal?
18   A.  We would review the interactions of the account managers,
19   pass that information along to sales management if there was
20   any, you know, maybe challenges or any special occurrences,
21   things that they needed to be aware of.  We would use that
22   information, the ordering information for internal tracking
23   purposes for stocking, having material available, and looking
24   for other trends.  And the customer lists, we always needed
25   to keep our database updated with current customers.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

79

```
 1    Q.  Okay.  And so who would have access to the account

 2    manager data portal?

 3    A.  The specific account manager, their sales manager, the

 4    marketing team, the director of sales.

 5              MR. BERKLEY:  Your Honor, I would like to move on

 6    to trial Exhibit 86 in binder 1.

 7              THE COURT:  All right.

 8    BY MR. BERKLEY:

 9    Q.  Ma'am, do you recognize trial Exhibit 86?

10    A.  Yes, I do.

11    Q.  Okay.  And how do you recognize this document?

12    A.  This is a document that I was sharing to Westly regarding

13    Fort Leavenworth.

14    Q.  And what is the date of this document?

15    A.  September 12th, 2018.

16              MR. BERKLEY:  Your Honor, I would like to offer

17    this into evidence.

18              THE COURT:  Any objection?

19              MR. MCFARLAND:  Your Honor, this one was one the

20    Court has actually ruled on and says it can only be shown to

21    show knowledge, not for the truth of the matter asserted; in

22    other words, the contents.

23              THE COURT:  Okay.  All right.  You can use it for

24    that purpose.

25              MR. BERKLEY:  Okay.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 128 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   BY MR. BERKLEY:
 2   Q.  Ma'am, why did you send this document to Westly Greer?
 3   A.  Because he was planning a training trip to Fort
 4   Leavenworth, and we were providing previous GSA sales orders
 5   that GMS had received.
 6   Q.  And how did you send this message to Westly Greer?
 7   A.  Through the Google drive.  It was shared.
 8   Q.  Okay.  And was access to this Google drive restricted to
 9   the same electronic key process?
10   A.  Yes.
11   Q.  Okay.  And was this a sample of information that you were
12   sharing with an account manager to support them?
13          MR. MCFARLAND:  Objection, Your Honor.  Now we're
14   getting into what the document is.  The ruling was it can be
15   shown to show that Mr. Greer received it, notice, not the
16   contents, not the purpose.
17          THE COURT:  Plaintiff.
18          MR. BERKLEY:  Your Honor, I'm not getting into the
19   specific contents of this.  I'm just asking if it was a
20   sample of account manager support that she sent out through
21   the Google drive electronic key process.
22          THE COURT:  Overruled.
23          Go ahead.  She can answer that question.
24   BY MR. BERKLEY:
25   Q.  Ma'am, was this a document -- this is a sample of a
```

JILL H. TRAIL, Official Court Reporter

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

81

```
 1    document that you would send out to an account manager
 2    through the electronic key process?
 3    A.  Yes.
 4    Q.  Okay.  Ma'am, were you involved in government contract
 5    negotiations in your role as the director of marketing
 6    administration?
 7    A.  Yes, I was.
 8    Q.  Okay.  And how were you involved?
 9    A.  Communicating with government contracting officers,
10    attending industry day events or government contracting
11    events, submitting bids and proposals, compiling the
12    information for those bids and proposals.
13    Q.  Okay.  And this process, were you trying to secure
14    long-term contracts with the government?
15    A.  Yes.
16    Q.  And do you know when GMS Industrial Supply received its
17    first long-term contract with the government?
18    A.  In January of 2018.
19    Q.  And were you involved in securing that contract?
20    A.  Yes.
21    Q.  So, what did this long-term contract do for GMS
22    Industrial Supply?
23    A.  It meant that GMS did not have to bid on individual
24    solicitations for our NSN material.
25    Q.  Okay.  And what do you mean by not have to bid?
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

82

```
 1    A.  We didn't have to go to the DIBBS Board to bid on

 2    solicitations for that material, and the government would

 3    stock our items, stock our material in the government depots.

 4    Q.  Okay.  And was there a certain level of goods that had to

 5    be stocked in their depots?

 6    A.  Yes.

 7    Q.  Okay.  And what would happen if somebody used the GCSS

 8    system to purchase an item?  Would it come from that depot?

 9    A.  Yes, it would.

10    Q.  Okay.  If it was one of the items that was --

11    A.  If it was one of the items that was on the long-term

12    contract.

13    Q.  Okay.  And what would happen when the items in the depot,

14    the level of -- the number of the items in the depot would

15    shrink?

16    A.  DLA would issue GMS another order for supplies.

17    Q.  And that order did not have to go through the DIBBS order

18    process?

19    A.  Correct.

20          MR. BERKLEY:  Your Honor, I'm going to turn to

21    trial Exhibit 64.

22          THE COURT:  All right.

23          THE CLERK:  I don't have that one.

24          THE COURT:  For the record, the courtroom deputy

25    doesn't have that one.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

83

```
 1            MR. BERKLEY:  This is the one we started with,
 2   so...
 3   BY MR. BERKLEY:
 4   Q.  Ma'am, can you see trial Exhibit 64 on your screen?
 5   A.  I do.
 6   Q.  Okay.  And do you recognize this document?
 7   A.  Yes.
 8   Q.  Okay.  And how do you recognize this document?
 9   A.  This is one of the training resource documents that's on
10   the account manager Google drive.
11   Q.  Okay.  And is this one of the documents that you would
12   have access and control dissemination of with your electronic
13   key?
14   A.  Yes.
15            MR. BERKLEY:  Your Honor, I would like to offer
16   this into evidence.
17            THE COURT:  All right.
18            Mr. McFarland.
19            MR. MCFARLAND:  Yes, Your Honor.  This is a
20   document that the Court took under advisement our objections
21   to.  One, there is no date.  There is no foundation for this
22   document at this point in time.  We don't know if it was in
23   existence when my clients were still doing sales before they
24   were terminated.  And, two, it's irrelevant.
25            THE COURT:  Headsets.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 132 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1              (Sidebar conference as follows.)

 2              THE COURT:  Thumbs up when everybody can hear.

 3              All right, Plaintiff, relevance.

 4              MR. BERKLEY:  Your Honor, this is another one of

 5    the trade secrets that is kept in the account manager Google

 6    drive folder that Westly Greer would have had access to and

 7    could have disseminated among all of the other sales agents.

 8    It is instructions on how to load NSNs into the GCSS system,

 9    which the Army uses to purchase NSNs.  And, again, while

10    they are focussing on CCPN sales or non-standard sales,

11    this would obviously lead to the sale of NSN sales in the

12    future.  And this would be a way for them to teach their

13    oncoming sales agents how to do the process and share it

14    with them.

15              THE COURT:  All right.

16              All right, Mr. McFarland.

17              MR. MCFARLAND:  Thank you, Your Honor.

18              First off, we don't know that Mr. Greer ever had

19    access to this document because we don't know when it was

20    created.  There is no foundation for it.  Second, my clients

21    never sold an NSN.  They were terminated long before they

22    had anything to do with NSNs, and so it's irrelevant.

23              THE COURT:  All right.

24              MR. MCFARLAND:  And, third, I'll just note the idea

25    that this document is a trade secret, we wholly disagree
```

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/18/2023   Pg: 133 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1    with that.
 2              THE COURT:  All right.
 3              MR. MCFARLAND:  This is a --
 4              THE COURT:  That's a later argument, I think.
 5              MR. MCFARLAND:  Yes, I get you.
 6              THE COURT:  But he raised it.  It's fair for you to
 7    respond to that.
 8              MR. MCFARLAND:  Yes.
 9              THE COURT:  Yes.  Okay.  So, here is what I think.
10    Again, I do think this is a little different from the other
11    document because there has been a lot of discussion about
12    NSNs, CCPNs, et cetera.  And so I think instructions to do
13    that would be relevant, but you would need to ask some more
14    questions to lay the proper foundation for that to come in.
15    So, I am sustaining the objection right at this second, but
16    allowing you to ask some more questions.
17              MR. BERKLEY:  Sure, Your Honor.
18              (End of sidebar conference.)
19    BY MR. BERKLEY:
20    Q.  Ms. Robichaux, would this document have existed at the
21    time that Westly Greer was working for GMS Industrial Supply?
22    A.  Yes.
23    Q.  Would this document have existed at the time that
24    Mr. Spires was working for GMS Industrial Supply?
25    A.  Yes.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   Q.  What about Mr. Welton?
 2   A.  Yes.
 3   Q.  And what about Sabrina Greer?
 4   A.  Yes.
 5   Q.  And was this a document that you would have shared with
 6   new sales agents when they came onboard?
 7   A.  Yes.
 8   Q.  Okay.  And it would have been shared with -- and you
 9   started in that role of sharing training materials when?
10   A.  Sharing training materials, probably even back in my
11   operations manager days.
12   Q.  Okay.  And did you -- would this be a document that you
13   also would have shared with Thomas Hayes, when he came
14   onboard?
15   A.  Yes.
16         MR. BERKLEY:  Okay.  Your Honor, again we would
17   like to move this into evidence.
18         THE COURT:  All right.  Mr. McFarland, I note your
19   objection.  Overruled.  It will come in.  Thank you.
20         (Plaintiff's Exhibit 64 received in evidence.)
21   BY MR. BERKLEY:
22   Q.  Ma'am, can you explain to us what this document is?
23   A.  This is the document that has instructions on how to
24   input NSN items into the GCSS system to be available to
25   order.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

87

```
 1   Q.  And can you explain to us again what the GCSS system is?
 2   A.  It's the Global Combat Support System used by military
 3   for ordering material and tracking material, logistics.
 4   Q.  Okay.  And what could you order through the GCSS system?
 5   A.  You could order NSN items and non-NSN items.
 6   Q.  Okay.  And so what is the purpose of this document?
 7   A.  This document, the purpose is one of our established
 8   training methods was to teach our sales agents to learn the
 9   processes and the systems that the military customers used,
10   so that they could assist them with how to order our
11   material.
12   Q.  Okay.  And, again, where is this document kept?
13   A.  The account manager Google drive folder.
14   Q.  And that would have been kept under that electronic key
15   process that you had, right?
16   A.  Yes.
17   Q.  And did you control that access?
18   A.  Yes.
19        MR. BERKLEY:  Your Honor, moving on to trial
20   Exhibit 66.
21        THE COURT:  All right.
22   BY MR. BERKLEY:
23   Q.  Ma'am, do you have that before you?
24   A.  I do.
25   Q.  Okay.  Do you recognize this document?
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   A.  I do.

 2   Q.  Okay.  And how do you recognize this document?

 3   A.  I created it.

 4   Q.  Okay.  And when did you create this document?

 5   A.  Um, in 2018.

 6   Q.  Okay.  And were the defendants working for GMS Industrial

 7   Supply at that time?

 8   A.  Yes.

 9   Q.  Okay.  And where did you keep this document?

10   A.  In the account manager Google drive folder.

11          MR. BERKLEY:  Your Honor, I would like to offer

12   this into evidence.

13          THE COURT:  All right.

14          Any objection?

15          MR. MCFARLAND:  No objection to this one, Your

16   Honor.

17          THE COURT:  All right.  It will be entered.

18          (Plaintiff's Exhibit 66 received in evidence.)

19   BY MR. BERKLEY:

20   Q.  Ma'am, can you explain to us what this document is?

21   A.  This is a training guide or checklist that was provided

22   to new account managers and taught to them to ensure that

23   they had all of the basic training steps from GMS.

24   Q.  Okay.  And how did you develop this document?

25   A.  It was developed from sales experience from Gary Gorken
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 137 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

1   and different steps that we -- and the different manner that

2   we wanted to train the sales agents.

3   Q.  Okay.  And who was responsible for producing this

4   document to the new account managers or sales agents?

5   A.  Myself.

6   Q.  Okay.  And when I say account manager, that's also a

7   sales agent; is that correct?

8   A.  Yes, it is.

9   Q.  Okay.  Would this document be used to teach sales agents

10  how to make sales?

11  A.  Yes.

12  Q.  Okay.  Does this document refer to NSNs?

13  A.  Yes, it does.

14  Q.  Okay.  Does it also refer to CCPNs?

15  A.  Yes, it does.

16  Q.  Why did you decide to put CCPNs on this document?

17  A.  Because GMS was selling CCPNs and NSN items, and we

18  wanted to be sure that our sales agents knew the different

19  procurement avenues for those, for both of those things.

20  Q.  Okay.  So when a new sales agent would come to GMS, one

21  of the first documents they would see is this; is that

22  correct?

23  A.  Yes.

24  Q.  And they were put on notice at that time that their job

25  was to sell NSNs and CCPNs; is that right?

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   A.   Yes.

 2   Q.   And when I say CCPNs, that's also a non-NSN?

 3   A.   Correct.

 4        MR. BERKLEY:  Your Honor, I would like to move on to

 5   trial Exhibit 67.

 6        THE COURT:  All right.

 7   BY MR. BERKLEY:

 8   Q.   Ma'am, do you recognize trial Exhibit 67?

 9   A.   Yes, I do.

10   Q.   And who prepared this document?

11   A.   Our customer service manager.

12   Q.   Okay.  And who does the customer service manager work

13   with?

14   A.   Myself.

15   Q.   Okay.  And would you have any oversight on the

16   preparation of this document?

17   A.   Yes.  I provided information, and input, and a final

18   review and approval.

19   Q.   Okay.  And what is the date of this document?

20   A.   January 25th, 2016.

21   Q.   And were the defendants in this case working for GMS

22   Industrial Supply at that time?

23   A.   Yes.

24        MR. BERKLEY:  Your Honor, I would like to offer

25   this into evidence.
```

JILL H. TRAIL, Official Court Reporter

**JA843**

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

91

```
 1            THE COURT:  Mr. McFarland, any objection?
 2            MR. MCFARLAND:  No.  No objection to this one, Your
 3   Honor.
 4            THE COURT:  All right.  It will be admitted.  You
 5   may publish.
 6            (Plaintiff's Exhibit 67 received in evidence.)
 7   BY MR. BERKLEY:
 8   Q.  Ms. Robichaux, what is the purpose of this document?
 9   A.  It's a reminder to the sales agents on the proper
10   procedure to request a quote from our customer service team.
11   Q.  Okay.  And what do you mean request a quote?
12   A.  Request a quote for GMS items.
13   Q.  Okay.  And who would you be requesting the quote from or
14   to or given to?
15   A.  The sales agents would be requesting a quote from our
16   customer service team.
17   Q.  Okay.  And what would they do with that quote?
18   A.  The customer service team would send it to the sales
19   agent and/or GMS' customer.
20   Q.  Okay.  And when the sales agent received this quote, what
21   would they do with it?
22   A.  They would take this to their customer to review with
23   their customer.
24   Q.  Okay.  Was this one of the documents that was kept in the
25   account manager Google drive folder?
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

92

```
 1   A.  Yes.
 2   Q.  And this was under lock and key like we've talked about
 3   before with the electronic key process?
 4   A.  Yes.
 5   Q.  Okay.  So who would have issued this document out of the
 6   account manager Google drive folder?
 7   A.  Myself.
 8   Q.  Okay.  Ma'am, in the middle of this document, the "Info
 9   Below Needs" section, do you see that?
10   A.  Yes.
11   Q.  Okay.  What is the purpose of that section?
12   A.  Because we needed to maintain our customer lists and our
13   database, so we've always needed to get the customer's name,
14   the base they're at, their unit or their command, and their
15   point of contact information.
16   Q.  And why did you need all of that information?
17   A.  To maintain our customer lists.
18   Q.  Okay.  And what would you do with those customer lists?
19   A.  It was historical information that we would need.  It
20   would show us purchasing trends for customers.
21   Q.  Okay.  And so you were instructing with this document the
22   sales agents to provide information in the sales agent data
23   portal?
24   A.  Yes.  That information would be in their data portal as
25   well, yes.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1              MR. BERKLEY:  Your Honor, I'm moving on to trial
 2     Exhibit 68.
 3              THE COURT:  All right.
 4     BY MR. BERKLEY:
 5     Q.  Ms. Robichaux, do you recognize this document?
 6     A.  I do.
 7     Q.  And who prepared this document?
 8     A.  Myself.
 9     Q.  Okay.  And was this a document that you kept in your
10     account manager Google drive folder?
11     A.  It is.
12     Q.  Okay.  And do you know when you prepared this document?
13     A.  I believe it was 2016.
14     Q.  Okay.  And would the defendants have been working for GMS
15     at the time you prepared this document?
16     A.  Yes.
17              MR. BERKLEY:  Your Honor, I would like to offer
18     this into evidence.
19              THE COURT:  Any objection?
20              MR. MCFARLAND:  No objection, Your Honor.
21              THE COURT:  All right.  It will be admitted.
22              (Plaintiff's Exhibit 68 received in evidence.)
23     BY MR. BERKLEY:
24     Q.  Ma'am, could you explain to us what you were doing with
25     this document?
```

JILL H. TRAIL, Official Court Reporter

JA846

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/18/2023   Pg: 142 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   A.  Notifying our sales agents of the process and procedure

 2   on how to submit documentation or confirmation of sales

 3   orders, products received, so that they could receive credit

 4   for it to be paid commission.

 5   Q.  Okay.  So, why did you feel it was important for them to

 6   send confirmation of their sales orders?

 7   A.  So that they would get credit for it, so we could pay

 8   commissions.

 9   Q.  So, the idea was that you weren't going to pay

10   commissions until you received confirmation from the sales

11   agents?

12   A.  Correct.

13   Q.  Okay.  And this notice that you sent out to the agents in

14   2016, was to let them know that every time they made a sale

15   they needed to provide some type of confirmation?

16          MR. MCFARLAND:  Objection, Your Honor, leading and

17   testifying.

18          THE COURT:  All right.  Sustained.

19          MR. BERKLEY:  Okay.

20          THE COURT:  Rephrase.

21   BY MR. BERKLEY:

22   Q.  Again, ma'am, what was the purpose of sending this

23   document to sales agents?

24   A.   To notify the sales agents that they needed to provided

25   confirmation of material receipt to receive credit,
```

JILL H. TRAIL, Official Court Reporter

**JA847**

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 143 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1    commissions.
 2          MR. BERKLEY:  Your Honor, I'll move on.  Moving on
 3    to trial Exhibit 89 in binder 1.
 4    BY MR. BERKLEY:
 5    Q.  Ma'am, do you recognize this document?
 6          MR. MCFARLAND:  Your Honor, I am going to object.
 7    We have an agreement with plaintiff's counsel that this
 8    document would come in through another witness and not
 9    Ms. Robichaux.
10          THE COURT:  Yes.  Headsets.  Headsets.
11          (Sidebar conference as follows.)
12          THE COURT:  Thumbs up if you can hear me.
13          All right.  I'm looking at the list, and it says
14    89, to which the defendant objected, was an email regarding
15    GSA price lists.  It says withdrawn exhibit and withdrawn
16    objection.  Is that the basis of your objection,
17    Mr. McFarland?
18          MR. MCFARLAND:  I think what I understood was page
19    3 was withdrawn, and so we -- page 3 is withdrawn, and the
20    remainder is admissible if used with Mr. Greer, but not with
21    this witness.
22          THE COURT:  Okay.  All right.
23          MR. WILSON:  Well, Your Honor, our understanding of
24    this is we withdrew page 3 altogether, and that anybody
25    could bring it in as long as page 3 didn't get in.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

96

```
 1              THE COURT:  All right.

 2              So that's not your understanding, Mr. McFarland?

 3              MR. MCFARLAND:  No, Your Honor.  Our understanding

 4    is because it's a hearsay document, it can only come in

 5    through Greer as potentially a party admission.

 6              THE COURT:  All right.  So, what we'll do is this.

 7    Plaintiff, if you're still moving to admit it, I'll see if

 8    you can lay the proper foundation.  If you can't, then you

 9    can't.  If you can, then it will come in.

10              Mr. Wilson, is there something else you wanted to

11    say?

12              MR. WILSON:  No, Your Honor.

13              THE COURT:  All right.

14              (End of sidebar conference.)

15              THE COURT:  So, at any rate, page 3, which is in

16    the courtroom deputy's documents is being removed.

17              Go ahead with your examination.

18    BY MR. BERKLEY:

19    Q.  Ma'am, is this a document that you prepared?

20    A.  Yes.

21    Q.  And on what date did you prepare this document?

22    A.  August 11, 2015.

23    Q.  Okay.  And, again, were all of the defendants working for

24    GMS Industrial Supply at that time?

25    A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 145 of 366

```
 1    Q.  Okay.  And was this one of the documents that you would

 2    have kept in your account manager Google drive folder?

 3    A.  Some of the attachments would have been kept in there,

 4    but this looks like it's emailed out.

 5    Q.  Okay.  And why were you sending this document out?

 6    A.  Because we had added -- we were granted additions to our

 7    EMALL contract for additional GMS products.

 8    Q.  Okay.  And were you involved in that process of getting

 9    those additional products with EMALL?

10    A.  Yes.

11            MR. BERKLEY:  Your Honor, I would like to offer

12    this into evidence.

13            THE COURT:  All right, Mr. McFarland.

14            MR. MCFARLAND:  Your Honor, it is a hearsay

15    document.  It is an out-of-court statement being offered for

16    the truth of the matter.  And now we also know that it

17    wasn't kept in the Google drive folder under any secure

18    system or whatever the lock and key phrase I have heard, and

19    the attachments aren't being offered and are irrelevant.

20            THE COURT:  All right.

21            MR. MCFARLAND:  So the document is irrelevant and

22    it's hearsay.

23            THE COURT:  All right.

24            Mr. Wilson, you can consult with your lawyer up

25    here.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1              MR. WILSON:  I just wanted to make sure.
 2    BY MR. BERKLEY:
 3    Q.  Ma'am, again, did you draft this, the first page of this
 4    document?
 5    A.  I did.
 6    Q.  Okay.  And this is all your language and your words,
 7    right?
 8    A.  Yes.
 9              MR. BERKLEY:  So, Your Honor, again, we would like
10    to admit at least the first page of this document based on
11    the fact that she drafted it.
12              THE COURT:  Can you scroll down to the second page,
13    so I can see the second page?
14              All right.  Are the first page and the second page
15    the same thing?
16              MR. BERKLEY:  Well, the second page is a reminder
17    making sure that people received it.  But, again, that's her
18    words.  That is her writing this.
19              THE COURT:  All right.  The objection is overruled.
20              You may publish.
21              (Plaintiff's Exhibit 89 received in evidence.)
22    BY MR. BERKLEY:
23    Q.  Ma'am, again, you drafted the first page of this
24    document; is that correct?
25    A.  Yes.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

99

```
 1    Q.  And why did you do that?
 2    A.  To announce the new additional items that were added to
 3    our GMS EMALL contract.
 4    Q.  Okay.  And what was the importance of announcing these
 5    additional items?
 6    A.  It was many more items that were added for the sales
 7    agents to be able to just go out and sell.
 8    Q.  Okay.  And what type of items would have been added to
 9    the EMALL process?
10    A.  We added some containment system items.  We added some
11    consumable items.  It looks like we also added some
12    additional spill pallets.
13    Q.  Okay.  And were these NSN items?
14    A.  These were not.
15    Q.  Okay.  And would these be non-standard NSN or non-NSN?
16    A.  Non-NSNs.
17    Q.  Okay.  And were you informing the sales agents that they
18    had a lot more non-NSNs to sell?
19            MR. MCFARLAND:  Objection.  Now he's leading.
20            THE COURT:  Sustained.
21            MR. BERKLEY:  Okay.
22    BY MR. BERKLEY:
23    Q.  Again, why did you send this document out to the sales
24    agents?
25    A.  To let them know of the additional non-NSN items that we
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

1    had available.

2    Q.  Okay.  And was this a big deal for GMS?

3    A.  Yes.

4    Q.  Okay.  Had you been able to have a one-time event like

5    this happen in the past when you've had so many non-NSNs

6    added to EMALL?

7    A.  Not that I can recall, no.

8    Q.  Okay.  And, again, when did this occur?

9    A.  August 11th, 2016, is when I sent this out.

10   Q.  Okay.  And were all of the defendants working for GMS at

11   that time?

12   A.  Yes.

13   Q.  Okay.  If we could scroll down to the next page.

14           Okay.  Ma'am, is this also your writing on this

15   email?

16   A.  Yes, it is.

17   Q.  And what's the date of this email.

18   A.  August 12, 2016.

19   Q.  Okay.  And why were you sending out this email?

20   A.  Just an additional reminder to make sure that they saw

21   the new items that were added to our product offering on

22   EMALL.

23   Q.  Okay.  And who did you send this to?

24   A.  To our agents, sales management, and our internal

25   customer service team.

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   Q.  Okay.  And your sales management, who would -- who would
 2   that include?
 3   A.  That would have included the sales managers I mentioned
 4   before:  Westly Greer, Jeff Johnson, Greg Naschansky.  I
 5   can't recall all of them at the time.
 6   Q.  Okay.  And the sales agents that you sent it to, would
 7   that have been the defendants here today?
 8   A.  Yes.
 9           MR. BERKLEY:  That's all of the questions I have
10   for that, Your Honor.
11           THE COURT:  All right.  Thank you very much.
12           All right, Mr. McFarland, any cross?
13           MR. BERKLEY:  No.  I'm sorry.  That was just for
14   that exhibit, Your Honor.
15           THE COURT:  I misunderstood.  All right.
16           MR. BERKLEY:  I'm sorry.  I've got a ways to go.
17           THE COURT:  Okay.  Go ahead.
18           MR. BERKLEY:  Let's see.  Moving on to trial
19   Exhibit 73, Your Honor.
20           THE COURT:  All right.
21   BY MR. BERKLEY:
22   Q.  Ma'am, this is several pages that we're going to run
23   through on the screen until we get to the end, so you can
24   take a look at them.  If we could do that.
25           Ma'am, did you have the opportunity to review all of
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

1    those pages?

2    A.  Yes.

3    Q.  Okay.  And do you recognize this document?

4    A.  I do.

5    Q.  Okay.  And how do you recognize trial Exhibit 73?

6    A.  This is a document that shows the different procurement

7    avenues that customers can purchase GMS products.

8    Q.  Okay.  And did you prepare this document?

9    A.  I added input to prepare this document.

10   Q.  Okay.  And did you have to provide approval for the final

11   version of this document?

12   A.  Yes.

13   Q.  Okay.  And who helped you prepare this document?

14   A.  Our graphics team and marketing.

15   Q.  Okay.  And was this document in existence when all of the

16   defendants were working for GMS Industrial Supply?

17   A.  Yes.

18   Q.  Okay.  And was this a document that you would provide to

19   people through the account manager Google drive folder?

20   A.  Yes.

21   Q.  So that was under the same lock and key?

22   A.  Yes.

23        MR. BERKLEY:  Okay.  Your Honor, I would like to

24   offer this into evidence.

25        THE COURT:  All right.  Mr. McFarland, I know

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   you've objected, but I think I overruled this one, correct?
 2           MR. MCFARLAND:  You did, Your Honor, and I
 3   certainly don't need --
 4           THE COURT:  Okay.  Very good.  It will be admitted.
 5           (Plaintiff's Exhibit 73 received in evidence.)
 6           MR. BERKLEY:  So if we could publish that.
 7   BY MR. BERKLEY:
 8   Q.  Okay.  Ma'am, again, what is the purpose of this
 9   document?
10   A.  This is a document that shows the different avenues that
11   customers can procure GMS Industrial Supply products, and to
12   train our sales agents on those different processes so they
13   can assist customers.
14   Q.  Okay.  And is this something that you would give to new
15   sales agents?
16   A.  Yes.
17   Q.  Okay.  And was it also a resource for the existing sales
18   agents?
19   A.  Yes.
20   Q.  Okay.  So they could go back and refer to this if a
21   customer needed help?
22   A.  Correct, from the account manager Google drive.
23   Q.  Okay.  I want to turn to the third page of this document.
24           Okay.  What does it say across the top of that
25   screen?
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

104

1    A.  "Ways supply can process your orders."

2    Q.  Okay.  And why was this page placed into the document?

3    A.  To show the different procurement avenues that our GMS

4    material could be ordered.

5    Q.  Okay.  So, your new sales agents would learn, for

6    instance, that they could use credit card direct sales?

7              MR. MCFARLAND:  Objection, Your Honor, leading.

8              THE COURT:  Sustained.

9    BY MR. BERKLEY:

10   Q.  So, the first item on this, this first bullet point, what

11   is the purpose of that?

12   A.  To inform sales agents that credit card -- direct credit

13   card orders could be an avenue to order material.

14   Q.  And what about the second bullet point?

15   A.  That GSA via MILSTRIP was a procurement avenue available.

16   Q.  Can you explain MILSTRIP to us?

17   A.  MILSTRIP, I don't know what the acronym stands for off

18   the top of my head, but it's military funding.

19   Q.  Okay.  And GSA, again, what is that?

20   A.  General Services Administration, another one of our

21   customers.

22   Q.  Okay.  And the third bullet point, gsaadvantage.gov, what

23   is that?

24   A.  Gsaadvantage.gov is a website offering products, and you

25   could order by credit card.  Customers could order by credit

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

105

```
 1    card.
 2    Q.   Okay.  And then DOD EMALL, what is that?
 3    A.   Another procurement avenue for military customers to
 4    order material that GMS had an EMALL contract with.
 5    Q.   And BPA, what is BPA?
 6    A.   Blanket purchase agreement.
 7    Q.   Yeah.  But what is that process?
 8    A.   That's a process through GSA to have an open purchase
 9    agreement for certain materials, for specific materials.
10    Q.   And what is prime vendor, the bullet point for --
11             MR. MCFARLAND:  Your Honor, I understand the
12    document has been admitted, but this is all irrelevant.  My
13    clients didn't make a single sale through any of these
14    means.
15             THE COURT:  That's okay.  That's fine.  That's
16    fine.
17             So, Plaintiff, Mr. Berkley, why is this relevant?
18             MR. BERKLEY:  So, Your Honor, this is provided to
19    new sales agents about how to sell, and there is so many
20    different avenues of selling that a sales agent could go.
21    So it could be through credit cards, or it could be through
22    the GS or DOD EMALL, and it's all different products.
23             THE COURT:  So two things.  So the objection is
24    overruled.  So that's that.  But I also think it's starting
25    to get cumulative.  We've heard testimony about credit
```

JILL H. TRAIL, Official Court Reporter

**JA858**

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1    cards, about FedMall and EMALL and all of that, that's fine.
 2    And I'm going to let you do your case, but that portion is
 3    starting to get cumulative.  So I'm going to ask you to move
 4    on.
 5              MR. BERKLEY:  Sure, Your Honor.
 6              THE COURT:  And I understand I sustained his
 7    objection when you led her through it before, so I get it,
 8    but we're going to have to move on.  Okay?
 9              MR. BERKLEY:  Okay.  Sure, Your Honor.
10    BY MR. BERKLEY:
11    Q.  So, if we can look at the pages that are marked at the
12    bottom 2378 through 2386 on the side, and let me know when
13    you've read those or reviewed.
14    A.  You said through 2386?
15    Q.  2378 through 2386.
16    A.  Okay.
17    Q.  And can you tell us what those pages represent?
18    A.  These are training resources on how customers can order
19    through GSA, the steps to making, placing orders through GSA
20    avenues.
21    Q.  Okay.  So this is what the customers would need to do to
22    place your order through the system; is that right?
23    A.  Yes.
24    Q.  Okay.  And why were you showing this to your sales
25    agents?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 155 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

1   A.  So that they could be informed and knowledgeable of the

2   different processes and systems that the customers would use,

3   and they could teach them the system if they needed help.

4   Q.  So the sales agents would teach the customers if they had

5   any problem with entering --

6   A.  Right.

7   Q.  -- data; is that correct?

8   A.  That's correct.

9   Q.  Okay.  Was that an advantage that GMS had in the

10  marketplace?

11  A.  Yes.  It's one of the ways that we trained our sales

12  agents to learn these systems so that they could assist the

13  customers.

14  Q.  Okay.  Now, if we can look to pages 2387 through 2397.

15  A.  Okay.

16  Q.  Can you tell us what those pages represent?

17  A.  This represents the DOD EMALL platform and how to

18  navigate through the DOD EMALL system.

19  Q.  Okay.  And would this be something that the customers

20  would have to navigate through?

21  A.  The customers have to navigate through, yes.

22  Q.  So, again, why are you teaching your sales agents about

23  what the customers have to do with DOD EMALL?

24  A.  So they could be knowledgeable of the systems, and they

25  could train and assist the customers if they needed help with

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 156 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

1  ordering our materials.

2  Q.  So this is one of the training documents that you would

3  give to new sales agents; is that right?

4  A.  New and existing sales agents.

5  Q.  Okay.  Now, if we look at the last few pages, 2398

6  through 2400.

7  A.  Okay.

8  Q.  Can you tell us what those pages represent?

9  A.  This gives information on how blanket purchase

10  agreements -- things that the customer would need to get

11  blanket purchase agreements established, how to -- you said

12  just 238 and 239?

13  Q.  2398 just through 2400.

14  A.  Okay.  Okay.  Yes.  So the first couple is about the

15  blanket purchase agreements, what would be needed for

16  customers to establish that.

17  Q.  So, again, this was you -- why was this provided to the

18  sales agents?

19  A.  So that they could learn the systems and processes to

20  assist a military customer if they needed assistance

21  purchasing our materials through any of these avenues.

22  Q.  Okay.  All right.  Now, ma'am, how long did you hold the

23  title of director of marketing administration?

24  A.  Until August of 2020.

25  Q.  Okay.  And did you receive another change in your title

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

1    at that time?

2    A.  Yes.

3    Q.  And what was that new title?

4    A.  Marketing HR director.

5    Q.  Okay.  And did this new title mean you no longer had the

6    responsibilities from your previous positions with GMS?

7    A.  No.  I kept those.

8    Q.  Okay.  So did you get additional responsibilities?

9    A.  Yes, I did.

10   Q.  What were they?

11   A.  Data input of payroll and also increased responsibilities

12   with internal employee HR oversight.

13   Q.  Okay.  Now I want to move on to trial Exhibit 49.

14           THE CLERK:  I don't have this one.

15           THE COURT:  Okay.  You don't have that one?

16           THE CLERK:  No.

17           THE COURT:  All right.  She doesn't have that one.

18   Just keep a list of it.

19           All right.  Keep going, Counsel.

20           MR. BERKLEY:  Okay.

21   BY MR. BERKLEY:

22   Q.  Ma'am, can you see trial Exhibit 49 on your screen?

23   A.  Yes.

24   Q.  Okay.  And how do you recognize this document?

25   A.  It was one of the documents that I administered.

JILL H. TRAIL, Official Court Reporter

JA862

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   Q.  Okay.  Is this a contract?

 2   A.  Yes.

 3   Q.  Okay.  And what is the date of this contract at the top?

 4   A.  April 3rd, 2011.

 5   Q.  Okay.

 6          MR. MCFARLAND:  Your Honor, I'm going to object to

 7   this exhibit.  It's superceded by when Mr. Greer became an

 8   employee by his employment agreement, and then superceded by

 9   his independent sales agent agreement.  It's dated

10   April 3rd --

11          THE COURT:  What exhibit is this?

12          MR. BERKLEY:  This is 49.

13          MR. MCFARLAND:  49, Your Honor.

14          THE COURT:  It says objection withdrawn.

15          MR. MCFARLAND:  If admitted through Greer, not this

16   witness.  This is a hearsay document in any other context.

17          THE COURT:  Okay.  Well, so I understand your

18   objection now.  I will let him go ahead.

19          And you finish asking your questions, and we'll

20   decide if it comes in or not.

21          MR. BERKLEY:  Okay.

22   BY MR. BERKLEY:

23   Q.  Ma'am, was this one of the documents that you kept

24   custodial control over?

25   A.  Yes.
```

JILL H. TRAIL, Official Court Reporter

**JA863**

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 159 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1    Q.  Okay.  And this was in your position as HR director, and

 2    as operations manager, and as the marketing director for GMS?

 3    A.  Marketing HR director, yes.

 4    Q.  Okay.

 5    A.  All three positions.

 6    Q.  And what is the date of this document?

 7    A.  April 3rd, 2011.

 8    Q.  Okay.  And were you working for GMS at that time?

 9    A.  Yes.

10    Q.  Okay.  And did you have the responsibility of maintaining

11    the contract documents then?

12    A.  Yes.

13    Q.  Okay.  And who is this document for?

14    A.  Westly Greer.

15    Q.  Okay.  And do you understand this to be one of

16    Mr. Greer's first contracts with GMS Industrial Supply?

17    A.  Yes.

18         MR. BERKLEY:  Your Honor, I would offer this into

19    evidence.

20         MR. MCFARLAND:  Your Honor, this Court has already

21    ruled that there is no claim as to Mr. Greer about

22    non-competition.  So that's why I say this document is

23    irrelevant, in addition to the fact that it's been

24    superceded.

25         THE COURT:  All right.  Headsets.
```

USCA4 Appeal: 22-2090     Doc: 20-3     Filed: 01/19/2023     Pg: 160 of 366

```
 1              (Sidebar conference as follows.)

 2         THE COURT:  All right, Mr. McFarland, lay that out

 3    again for me, please.

 4         MR. MCFARLAND:  Sure, Your Honor.  This Court ruled

 5    in conjunction with the preliminary injunction hearing and

 6    the motion to dismiss that we filed that there is no

 7    non-competition claim as to Mr. Greer, so this document is

 8    irrelevant.  Moreover, it's dated April 3rd of 2011.  He

 9    later became an employee, and he had an employment

10    agreement, and that is what it is.  And then after that he

11    became an independent sales agent.  And both of those

12    documents we agree can be used because they cover the time

13    period at issue in this case.  But this document is wholly

14    irrelevant, and it's bringing up a claim that no longer is

15    in this case and has a real potential to prejudice this jury

16    about something that is not a valid claim.  They shouldn't

17    be hearing about non-competition.

18         THE COURT:  Okay.  So two things.  I'm not as

19    concerned about the timeline, but as it relates to the prior

20    rulings.

21         MR. WILSON:  Your Honor, may I address this

22    question?

23         THE COURT:  Yes.

24         MR. WILSON:  We dealt with this.  As we noted, the

25    objection had been removed, as far as I'm aware.  But
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

113

```
 1   anyway, in any event, the defendants in this, if you look at
 2   the final pretrial order --
 3           THE COURT:  Right.  Hold on one second.
 4           So, Mr. McFarland, it does say --
 5           What document is this again?
 6           MR. BERKLEY:  49.
 7           THE COURT:  49, objection withdrawn.  Now, why was
 8   your objection withdrawn, and what are you saying is
 9   different now?
10           MR. MCFARLAND:  I think it can be shown to Greer
11   for notice, but it can't be admitted through this witness on
12   the non-competition aspect.
13           THE COURT:  Okay.  All right.  So I understand your
14   argument.
15           Now, Mr. Wilson, go ahead.
16           MR. WILSON:  Your Honor, we're not presenting this
17   for the non-competition aspect.  The defendants, when they
18   put in their final pretrial order, added one of the issues
19   of triable fact or issues of law is whether we had trade
20   secrets and whether we protected our trade secrets.  As you
21   know, one of the elements to have a trade secret is to
22   protect it.  Part of that protection was we had contracts
23   with the defendants going back to the initiation of their
24   employment that have confidentiality clauses in them that
25   prevent them from disclosing the trade secrets.  So this
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

114

```
 1   goes to the element of trade secrets.  It goes to the
 2   question of whether we were -- that's been brought by the
 3   defendants, I might add -- whether we were defending our
 4   trade secrets.  And I believe this is a key aspect of that
 5   element, and I don't believe that we're bringing it in for
 6   any other reason.
 7           THE COURT:  All right.
 8           MR. BERKLEY:  Your Honor, if I may, we're going to
 9   be referring to section 1C of the first page of the
10   document, and we might also refer to Mr. Greer's signature
11   on the last, and that's it.
12           THE COURT:  Okay.  All right.  Objection is
13   overruled.  It will be entered.
14           (End of sidebar conference.)
15           THE COURT:  So the objection is overruled.  The
16   document will be entered.
17           You may publish.
18           (Plaintiff's Exhibit 49 received in evidence.)
19   BY MR. BERKLEY:
20   Q.  So, ma'am, on the first page in section 1C, do you see
21   that?
22   A.  Yes.
23   Q.  Okay.  Do you recognize the terms "confidential
24   information" in that section?
25   A.  Yes, I do.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

1   Q.  Okay.  And do you understand what the purpose of that

2   section was?

3   A.  Yes.

4   Q.  And what is that?

5   A.  To protect GMS's confidential --

6          MR. MCFARLAND:  I object, Your Honor.  It says what

7   it says.

8          THE COURT:  All right.

9          MR. MCFARLAND:  I don't think she's the author of

10  this document, and it hasn't been raised that there is an

11  ambiguity about that paragraph such that we need parole

12  evidence to define it.  It says what it says.  And now we're

13  trying to get a legal conclusion.  And Mr. Berkley --

14         THE COURT:  I understand your objection.

15         Mr. Berkley.

16         MR. BERKLEY:  Your Honor, I'm just having her point

17  out the confidential information section in the contract.  I

18  can ask her to read it and not interpret it.

19         THE COURT:  Right.  Let's ask her to read it.

20  BY MR. BERKLEY:

21  Q.  Ma'am, can you identify the confidential information

22  section of this contract by pointing out where it is in the

23  contract and reading that section for us?

24         THE COURT:  No.  Just reading it to herself.

25  BY MR. BERKLEY:

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 164 of 366

```
 1   Q.  Reading it to yourself.

 2   A.  Okay.  Okay.

 3   Q.  Ma'am, as the custodian administrator of the contracts,

 4   do you have an understanding that Westly Greer had an

 5   obligation to keep documents confidential when he was --

 6           MR. MCFARLAND:  Well --

 7           THE COURT:  Sustained.  Sustained.

 8           MR. BERKLEY:  Okay.

 9   BY MR. BERKLEY:

10   Q.  Okay.  Ma'am, could you find the confidential information

11   clause in the contract?

12   A.  Yes.

13           MR. BERKLEY:  Okay.  That's all of the questions I

14   have on that, Your Honor.

15           THE COURT:  All right.

16           MR. BERKLEY:  Moving on to trial Exhibit 48, Your

17   Honor.

18           THE COURT:  48?

19           MR. BERKLEY:  48.

20   BY MR. BERKLEY:

21   Q.  Ma'am, do you recognize this document?

22   A.  Yes, I do.

23   Q.  Was this one of the documents that you kept in your

24   custodial duties of holding contracts for GMS Industrial

25   Supply?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 165 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

1    A.  Yes.

2    Q.  Okay.  And was this document for one of the defendants in

3    this case?

4    A.  Yes.

5    Q.  Okay.  And do you know the date of this document?

6    A.  April 4th, 2011.

7            MR. BERKLEY:  Okay.  Your Honor, I would offer this

8    into evidence.

9            THE COURT:  All right.  Any objection?

10           MR. MCFARLAND:  No objection, Your Honor, but I

11   would ask if it's going to be put in the record, Mr. Greer's

12   Social Security number is in there, and it hasn't been

13   redacted.

14           THE COURT:  Then it's not going to be published, or

15   at least that page that it's on is not going to be

16   published, and it's going to be redacted.  Plaintiffs will

17   be responsible for redacting that before it goes back to the

18   jury room.

19           MR. BERKLEY:  Understood, Your Honor.

20           (Plaintiff's Exhibit 48 received in evidence.)

21   BY MR. BERKLEY:

22   Q.  Ms. Robichaux, do you recognize Westly Greer's signature

23   at the back of that document?

24   A.  Yes, I do.

25   Q.  Okay.  Do you recognize or can you find the term

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

118

1    "confidential information" -- the terms "confidential

2    information" in this document?

3    A.  Yes.

4    Q.  Okay.  Are they in this document on more than one

5    occasion?

6    A.  Yes.

7          MR. BERKLEY:  All right.  Your Honor, moving on to

8    trial Exhibit 48.

9          THE COURT:  I thought this was 48.

10         MR. BERKLEY:  Wait.  Excuse me.  6.

11         MR. MCFARLAND:  I'm sorry.  Which exhibit are we

12    moving to next?

13         MR. BERKLEY:  6.

14         THE COURT:  6.

15         MR. MCFARLAND:  Plaintiff's 6?

16         THE COURT:  Yes.

17         MR. MCFARLAND:  Okay.  Thank you.

18    BY MR. BERKLEY:

19    Q.  Ma'am, do you recognize this document?

20    A.  Yes.

21    Q.  And was this one of the documents that you also kept as a

22    custodian of the contracts for the sales agent employees of

23    GMS Industrial Supply?

24    A.  Yes.

25    Q.  And is Westly Greer the employee identified in this

JILL H. TRAIL, Official Court Reporter

**JA871**

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 167 of 366

1    document?

2    A.  Yes.

3    Q.  Okay.

4            MR. MCFARLAND:  Your Honor, I show this document as

5    being withdrawn, in part because if you look at the second

6    page, it's wholly illegible.

7            THE COURT:  No, I don't -- is this 6, 06?

8            MR. BERKLEY:  Yes.  Yes, Your Honor.

9            THE COURT:  I don't show that on my order.  Can you

10   show me where that is, where it says withdrawn?  I don't see

11   it on the order.

12           MR. MCFARLAND:  Well, when we met, as the Court

13   directed us to, I understood that because the second page,

14   at least in my volume, the second page is illegible --

15           THE COURT:  Is that in your joint submissions to

16   me?

17           MR. MCFARLAND:  I'm sorry.  I don't know.  I don't

18   think it is, Your Honor.

19           THE COURT:  Okay.  All right.

20           MR. LASCARA:  Your Honor, if I may?  They have a

21   version of it in their exhibits, I believe, that is clear,

22   and our thought was we would just use that and shift it over

23   to our list to address his concerns that it wasn't very

24   legible.  So, that was my understanding of how we were going

25   to try to handle it.

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 168 of 366
Case 2:19-cv-00324-RCY-ERL  Document 323  Filed 06/14/22  Page 120 of 131 PageID# 10767

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

120

```
 1              THE COURT:  All right.  Well, that's not what seems
 2   to be happening.  What seems to be happening right now is
 3   you're attempting to move this one in.  So, that's something
 4   you-all will have needed to work out.
 5              MR. BERKLEY:  But, Your Honor, my understanding is
 6   the objection is withdrawn.  There is no objection by
 7   Mr. McFarland on this one.
 8              THE COURT:  That's my understanding as well.
 9              MR. BERKLEY:  Okay.
10              THE COURT:  So anyway, go ahead.
11              MR. BERKLEY:  So, Your Honor, I would like to offer
12   this into evidence.
13              THE COURT:  All right.
14              Any objection, Mr. McFarland?
15              MR. MCFARLAND:  No, Your Honor.  It is what it is.
16              THE COURT:  All right.  It will be entered.
17              MR. LASCARA:  And may we, if they're in agreement,
18   may we substitute it with the clearer version, Your Honor?
19              THE COURT:  You-all can work that out this evening.
20              MR. LASCARA:  Yes, sir.  Thank you.
21              (Plaintiff's Exhibit 6 received in evidence.)
22   BY MR. BERKLEY:
23   Q.  Ma'am, do you see the terms "district manager" in this
24   document?
25   A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 169 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

1    Q.   Okay.  And is this a document for Westly Greer?

2    A.   Yes.

3    Q.   Can you explain to me what the duties of the district

4    manager are?

5    A.   District manager would oversee a region or team of sales

6    agents to assist them with making sales, and communicate with

7    the sales management team, marketing team.

8    Q.   Okay.  So it is the district managers who would oversee

9    the sales agents?

10   A.   Yes.

11   Q.   And what is the date of this document?

12   A.   November 5th, 2012.

13   Q.   And did Westly Greer become a district manager for GMS

14   Industrial Supply on November 5th, 2012?

15   A.   Yes.

16   Q.   Okay.  Ma'am, can you find the terms "confidential

17   information" in this document?

18   A.   Yes.

19   Q.   Okay.  Thank you, ma'am.

20         Moving on to trial Exhibit 5.

21         Ma'am, do you recognize trial Exhibit Number 5?

22   A.   Yes.

23   Q.   Okay.  Was this one of the documents that you also served

24   as custodian for GMS Industrial Supply?

25   A.   Yes.

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   Q.  Okay.  And what is the date of this document?

 2   A.  July 1st, 2015.

 3   Q.  Okay.  And was Mr. Greer working for GMS Industrial

 4   Supply at that time?

 5   A.  Yes, he was.

 6         MR. BERKLEY:  Your Honor, I would like to offer

 7   this into evidence.

 8            THE COURT:  All right.

 9            Mr. McFarland.

10            MR. MCFARLAND:  No objection to this, Your Honor.

11            THE COURT:  All right.  It will be entered.

12         (Plaintiff's Exhibit 5 received in evidence.)

13   BY MR. BERKLEY:

14   Q.  Ma'am, can you explain to us what this document is?

15   A.  This is a memo to Westly Greer that his new title would

16   be director of sales for GMS Industrial Supply --

17   Q.  Okay.

18   A.  -- and notating his salary amount.

19   Q.  Okay.  Is there an effective date for this document?

20   A.  Yes, July 1st, 2015.

21   Q.  Okay.  And at that time he began to oversee the other GMS

22   sales agents?

23   A.  Oversee the entire sales force, yes.

24   Q.  Okay.  Thank you, ma'am.

25         MR. BERKLEY:  Moving on to trial Exhibit 9.  Now, I
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 171 of 366

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1    believe there is a duplicate for this one, Your Honor, also

 2    at trial Exhibit 28.

 3              THE COURT:  Which one are you seeking to move in?

 4              MR. BERKLEY:  We're going to move in 28 because

 5    it's a little bit more legible, Your Honor.

 6              THE COURT:  All right.

 7    BY MR. BERKLEY:

 8    Q.  Ma'am, do you recognize this document?

 9    A.  Yes.

10    Q.  Is this one of the documents that you had custodial

11    control over for GMS Industrial Supply?

12    A.  Yes.

13    Q.  Okay.  And what is the date of this document?

14    A.  This one is dated January 10th, 2017.

15    Q.  Okay.  And was this document for Greer Group and Sabrina

16    Greer?

17    A.  Yes, it is.

18    Q.  And were they working for -- was Sabrina Greer working

19    for GMS Industrial Supply at the time, at the date of this

20    document?

21    A.  Yes.

22              MR. BERKLEY:  Your Honor, I would like to move this

23    in as an exhibit.

24              THE COURT:  Any objection?

25              MR. MCFARLAND:  No objection to the exhibit itself,
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   Your Honor.
 2            THE COURT:  All right.  It will be entered.
 3            (Plaintiff's Exhibit 28 received in evidence.)
 4            THE COURT:  You may publish.
 5   BY MR. BERKLEY:
 6   Q.  Okay.  Ma'am, does this document reference the term --
 7            MR. BERKLEY:  Are we publishing this, Your Honor?
 8            THE COURT:  You may, yes.
 9   BY MR. BERKLEY:
10   Q.  Does this document reference the term "territory"?
11   A.  Yes, it does.
12   Q.  Okay.  And where do you see "territory" in this document?
13   A.  In section B, also in section 1.
14   Q.  Okay.  Did sales agents have sales territories?
15   A.  Yes.
16   Q.  Okay.  And were the sales agents that were given those
17   territories, were those exclusive to those sales agents?
18   A.  No.
19   Q.  Okay.  Did GMS have the right to add additional people to
20   sales territories?
21   A.  Yes.
22   Q.  Was that the non-exclusive nature of the sales agent
23   agreements?
24   A.  Correct.
25   Q.  Okay.  Ma'am, does this document refer to the terms
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

125

```
 1   "aggressively promote"?
 2   A.  Yes, it does.
 3   Q.  And where do you see that in this document?
 4   A.  In section 1.
 5   Q.  Okay.  Does this document also reference the terms
 6   "confidential and proprietary"?
 7   A.  Yes.
 8   Q.  And can you tell us where that is found in the document?
 9   A.  Section 12.
10   Q.  Okay.  Ma'am, did GMS Industrial Supply place initial
11   lines on each page of this document?
12   A.  Yes.
13   Q.  Okay.  And why did it place the lines on each page of the
14   document?
15   A.  To ensure that the sales agent read and understood --
16   read each page.
17   Q.  Okay.  Did the document also have a signature page?
18   A.  Yes, it does.
19   Q.  Okay.  And do you know who initialed this document?
20   A.  Sabrina Greer.
21   Q.  And do you know who signed this document?
22   A.  Sabrina Greer.
23           MR. BERKLEY:  Your Honor, I would like to move on
24   to trial Exhibit 8.
25           THE COURT:  All right.  I would like for the
```

JILL H. TRAIL, Official Court Reporter

**JA878**

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

126

 1    lawyers to jump on the headsets.

 2              *(Sidebar conference as follows.)*

 3              THE COURT:  Thumbs up everybody.

 4              Plaintiff, how much more of this do you have today?

 5              MR. BERKLEY:  There are several contract documents

 6    that we have to get in, Your Honor.  I'm just scratching the

 7    surface at this point in time.

 8              THE COURT:  All right.  We're going to end that

 9    scratch for today.

10              MR. BERKLEY:  Okay.

11              THE COURT:  We're going to take up tomorrow.  Okay?

12              MR. BERKLEY:  Okay.

13              THE COURT:  All right.  Thank you.

14              MR. MCFARLAND:  Your Honor, before we get off, this

15    is another document that has got Sabrina Greer's personal

16    identifier.

17              THE COURT:  I'm going to raise that once I let the

18    jury go, and we'll talk about that.

19              MR. MCFARLAND:  Okay.  Thank you.

20              *(End of sidebar conference.)*

21              THE COURT:  All right, ladies and gentlemen, I

22    think this is as good a place as any to stop, given how much

23    more testimony we have.  So, I'm going to release you for

24    the day.

25              Again, I will admonish you not to discuss the case

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

127

```
 1    with anyone, even amongst yourselves overnight.  Do not do
 2    any independent research on the case.
 3             Enjoy your night.  We'll see you back here
 4    tomorrow, and we'll get going bright and early at 9:15.
 5    Have a great evening.
 6             (The jury exited the courtroom at 5:07 p.m.)
 7             THE COURT:  All right.  So, a couple of things.
 8             And, Mr. Berkley, you can return to the table or
 9    you can stay at the podium.
10             So, a couple of things.  So, one, with respect to
11    the exhibits, when I leave the bench, you will need to
12    confer with my courtroom deputy.  She's been nice enough to
13    make a list of the stuff that hasn't come in, but this is
14    your responsibility to make sure that she has these
15    documents, because if they -- at the end of the day, if they
16    don't get back to the jury, we're not going to hunt down to
17    make sure that document number 258 is there.  That's your
18    responsibility to make sure she has it, to make sure that it
19    got marked, so that it can get back to the jury.  All right?
20             MR. LASCARA:  Yes, Your Honor.  And I did speak
21    with her regarding the transgressions earlier today, and we
22    had them delivered, so I'm going to bring the first part of
23    what we're looking for, and we'll get the rest of it.
24             THE COURT:  Very good.
25             The next thing is you'll need to make sure that
```

JA880

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

128

```
 1   these documents are scrubbed for personal identifying
 2   information, so that needs to happen as well.  Because I'm
 3   not going to let anything go back to the jury that has that
 4   information in it.
 5           MR. WILSON:  I will personally make sure tonight
 6   that you have these documents tomorrow, Your Honor, and all
 7   personal information has been removed.
 8           THE COURT:  Very good.  All right.
 9           And by tomorrow at 9:00 a.m., you all are supposed
10   to have a joint verdict form, so we know that.
11           And then when I leave the bench, Plaintiffs, I want
12   you to give the case that you cited that stood for the
13   proposition that notice was an acceptable means by which to
14   have a hearsay exception.  I do want to read that case
15   overnight as it relates to those exhibits.
16           MR. WILSON:  Your Honor, I will check.  I may have
17   a copy of it, but I think Mr. Gordon may have taken it with
18   him.  I will make sure that you --
19           THE COURT:  You must get my law clerk's information
20   and make sure you get the cite to her, if you want me to
21   read it overnight.  If you don't want me to read it
22   overnight, I won't read it tonight.
23           MR. WILSON:  I'll make sure your law clerk gets
24   copies.
25           THE COURT:  All right.  That's all I have.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1              Plaintiff, anything else before we recess?
 2         MR. LASCARA:  No, Your Honor.
 3         THE COURT:  All right, Mr. McFarland.
 4         MR. MCFARLAND:  Two things, Your Honor.
 5         THE COURT:  Certainly.
 6         MR. MCFARLAND:  First is I understand the
 7    employment agreements or sales agent agreements for my
 8    clients for the pertinent time can come in, and we didn't
 9    object to those.  But there are these continuing references
10    to the confidential information section in them.  There is
11    no claim remaining in this case about confidential
12    information.  That was struck through both the preliminary
13    injunction, Judge Smith's rulings, and the ruling on the
14    motion to dismiss.  And I have grave concerns that the jury
15    is hearing repeatedly about confidential, confidential
16    information.  It's not part of this case.
17         THE COURT:  All right.  I'm going to take a look at
18    that overnight.
19         MR. MCFARLAND:  Okay.
20         THE COURT:  And if I need to do some type of
21    instruction on that, I will.
22         MR. MCFARLAND:  The second thing that I will say
23    that I am concerned about is -- and, look, I understand the
24    plaintiffs have to put on their case, and I was happy
25    because I thought that Mr. Berkley was done, and I was going
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

```
 1   to get to cross-examine Ms. Robichaux, and I promise I would

 2   have finished my cross by 5:00.  I'm really concerned though

 3   now, and I said this at the beginning of the trial, and I'm

 4   serious, I've got to defend my clients.  I've got five

 5   clients, individuals, putting aside the corporate entities.

 6   I am really concerned that I am going to have sufficient

 7   time to do that.  They're not going to finish tomorrow.  I

 8   mean, I think that's perfectly clear.  They've got two

 9   experts that they're going to put on.

10        THE COURT:  How many more witnesses do you have,

11   Plaintiff?

12        MR. LASCARA:  We have the two experts that will

13   follow Ms. Robichaux.  One is going to be fairly -- I think

14   both of them are going to be fairly short.

15        THE COURT:  Do you think you will finish tomorrow?

16        That sounds like a no.

17        MR. BERKLEY:  I think Monday morning we would

18   finish.  I think by noon on Monday we would finish.

19        THE COURT:  All right.  How many days of testimony

20   do you have?

21        MR. MCFARLAND:  I am going to streamline, Your

22   Honor.  I would think that we would have at least two.

23        THE COURT:  Look at it.  Look at it overnight.

24        MR. MCFARLAND:  I will.

25        THE COURT:  And then let's discuss in the morning.
```

DANIELLE RENEE ROBICHAUX
Direct Examination By Mr. Berkley

1          MR. MCFARLAND:  Again, I appreciate that plaintiffs
2   have to present their case and it's their burden.
3          THE COURT:  I understand.  I understand.
4          MR. MCFARLAND:  But I've got to defend my clients.
5          THE COURT:  The Court takes no offense to you
6   raising this, and it's proper given what we discussed at the
7   final pretrial conference, and it's been on my mind as well.
8   So that's well taken.
9          MR. MCFARLAND:  Thank you, Your Honor.
10          THE COURT:  Not a problem.  All right.  Thank you.
11          So let's definitely be here by 9:00 a.m. tomorrow
12   because we will have some things to discuss.  I will be
13   taking the bench at 9:00 for us to follow up on a few of
14   these things before the jury comes in.
15          Okay.  Let's close court.
16          (Proceedings adjourned at 5:13 p.m.)
17                     CERTIFICATION
18
19       I certify that the foregoing is a correct transcript
20   from the record of proceedings in the above-entitled matter.
21
22
23        _____/s/_____
24                    Jill H. Trail
25                    June 5, 2022

JILL H. TRAIL, Official Court Reporter

**JA884**

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5     GMS INDUSTRIAL SUPPLY, INC.,      )
                                        )
 6           Plaintiff,                  )   CIVIL ACTION NO.
                                        )   2:1cv324
 7     v.                                )
                                        )
 8     G&S SUPPLY, LLC, et al,           )
                                        )
 9           Defendants.                 )
     - - - - - - - - - - - - - - - - - -

10

11

12                  TRANSCRIPT OF PROCEEDINGS
             (EXCERPT TESTIMONY OF DANIELLE RENEE ROBICHAUX)

13                       Norfolk, Virginia

14                        June 3, 2022

15

16   BEFORE:  THE HONORABLE RODERICK C. YOUNG
                 United States District Judge

17

18

19   APPEARANCES:

20              PENDER & COWARD PC
                By:  William A. Lascara
21                   Jeffrey Dennis Wilson
                     Daniel Berger
22                   Thomas S. Berkley
                     Counsel for Plaintiff
23
                MCGUIRE WOODS LLP
24              By:  Robert William McFarland
                     Micaylee Alexa Noreen
25                   Jeanne E. Noonan
                     Counsel for the Defendants
```

JILL H. TRAIL, Official Court Reporter

**JA885**

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 181 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 2 of 103 PageID# 10935

2

```
 1                          I N D E X

 2   PLAINTIFF'S
     WITNESSES                                        PAGE
 3
       DANIELLE RENEE ROBICHAUX
 4          Direct Examination By Mr. Berkley            3
            Cross-Examination By Mr. McFarland          66
 5          Redirect Examination By Mr. Berkley         99

 6
     DEFENDANTS'
 7   WITNESSES                                        PAGE

 8

 9

10

11                        E X H I B I T S

12   PLAINTIFF'S
13   NO.                                              PAGE

14     8                                                 4
       52                                                6
15     32                                               11
       14                                               12
16     16                                               15
       44                                               26
17     91                                               29
       92                                               34
18     97                                               42
       95                                               43
19     96                                               44
       94                                               49
20     98                                               54
       78                                               65
21

22   DEFENDANTS'
     NO.                                              PAGE
23

24

25
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1              (Excerpt of proceedings.)
 2          THE COURT:  All right.  Good morning, ladies and
 3   gentlemen of our jury.  Thank you for coming back.  It's
 4   good to see everyone.  I trust everyone had a good evening.
 5   We'll continue with our examination.
 6          Ms. Robichaux, you are still under oath.
 7          All right, Mr. Berkley, go right ahead.
 8          MR. BERKLEY:  Thank you, Your Honor.
 9          DANIELLE RENEE ROBICHAUX, called by the Plaintiff,
10   having been previously duly sworn, was examined and
11   testified as follows:
12                    DIRECT EXAMINATION
13   BY MR. BERKLEY:
14   Q.  Ms. Robichaux, we left off with trial Exhibit 8.  Can you
15   find trial Exhibit 8 in binder 1, please.
16          THE COURT:  I don't think the computer is up; at
17   least my screen is not on.
18          MR. BERKLEY:  How do we turn this on?
19          MR. LASCARA:  We have a blank screen, too.
20          THE COURT:  Okay.
21          MR. LASCARA:  There we go.
22   BY MR. BERKLEY:
23   Q.  Okay.  Ms. Robichaux, in your duty as the custodian of
24   records and administrator of contracts was -- well, actually,
25   do you recognize this document?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 183 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 4 of 103 PageID# 10937

4

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   A.  Yes, I do.
 2   Q.  Okay.  Was this one of the documents that you served as
 3   custodian for in your role at GMS Industrial Supply?
 4   A.  Yes.
 5   Q.  Okay.
 6          MR. BERKLEY:  Your Honor, I would like to offer
 7   this into evidence.
 8          THE COURT:  Any objection?
 9          MR. MCFARLAND:  No objection, Your Honor.
10          THE COURT:  All right.  It will be admitted.  You
11   may publish.
12          (Plaintiff's Exhibit 8 received in evidence.)
13   BY MR. BERKLEY:
14   Q.  Ms. Robichaux, can you explain to us what this document
15   is?
16   A.  This is a Sales Agent Agreement.
17   Q.  Okay.  And who is the Sales Agent Agreement for?
18   A.  This is for Greer Group, Sabrina Greer.
19   Q.  Okay.  And is there a date of this agreement?
20   A.  Yes.
21   Q.  And what is the date?
22   A.  January 10th, 2017.
23   Q.  Okay.  Ms. Robichaux, do you -- do the terms
24   "aggressively promote" appear in this document?
25   A.  Yes, they do.
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1    Q.  Okay.  And can you tell us where they appear in the
 2    document?
 3    A.  In section 1.
 4    Q.  Okay.  And, ma'am, do the terms "confidential
 5    information" appear in this document?
 6    A.  Yes.
 7    Q.  Okay.  Now, ma'am, at the bottom of each page of this
 8    document is there a place for initials?
 9    A.  Yes, there is.
10    Q.  And what is the purpose of that?
11    A.  For the sales agent to acknowledge reading the change.
12    Q.  Okay.  And do you recognize the initials at the bottom of
13    each of these pages?
14    A.  Yes.
15    Q.  And whose initials are they?
16    A.  Sabrina Greer.
17    Q.  Okay.  Is there also a signature line at the back of this
18    document?
19    A.  Yes, there is.
20    Q.  And do you recognize the signature on that?
21    A.  Yes.
22    Q.  And whose signature is that?
23    A.  Sabrina Greer.
24    Q.  Okay.
25              MR. BERKLEY:  Your Honor, I would like to move to
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

 1   trial Exhibit 52.

 2           THE COURT:  All right.

 3   BY MR. BERKLEY:

 4   Q.  It's also in binder 1.

 5           Ms. Robichaux, do you recognize this document?

 6   A.  Yes.

 7   Q.  Okay.  And was this one of the documents that you served

 8   as a custodian for, for GMS Industrial Supply?

 9   A.  Yes.

10   Q.  Okay.

11           MR. BERKLEY:  Your Honor, I would like to offer

12   this into evidence.

13           THE COURT:  Any objection?  Mr. McFarland, any

14   objection?

15           MR. MCFARLAND:  The only objection, this is not the

16   Government Sales Agent for Mr. Spires, so I think it would

17   be cumulative and irrelevant.

18           THE COURT:  Well, we addressed this and you said

19   withdrawn objection.

20           So this is 52, right?

21           MR. BERKLEY:  That's correct, Your Honor.

22           MR. MCFARLAND:  That's fine, Your Honor.

23           THE COURT:  All right.  Thank you.

24           It will be admitted, and you may publish.

25           (Plaintiff's Exhibit 52 received in evidence.)

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 186 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 7 of 103 PageID# 10940

7

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1            MR. BERKLEY:  Thank you, Your Honor.
 2   BY MR. BERKLEY:
 3   Q.  Ma'am, do you know what this document is?
 4   A.  This is a Sales Agent Agreement.
 5   Q.  Okay.  And who is the Sales Agent Agreement for?
 6   A.  Gregory K. Spires.
 7   Q.  Okay.  And is there a date on this agreement?
 8   A.  Yes.
 9   Q.  And what is that date?
10   A.  January 22nd, 2013.
11   Q.  Okay.  Now, does this document reference territory?
12   A.  Yes, it does.
13   Q.  Okay.  Where does it reference territory?
14   A.  In Section C.
15   Q.  Okay.  And is there a state associated with that
16   territory?
17   A.  Yes.
18   Q.  And what is that state?
19   A.  Oklahoma.
20   Q.  All right.  Does this document also reference the terms
21   "aggressively promote"?
22   A.  Yes.
23   Q.  Okay.  And where do you find that section?
24   A.  Section 6.
25   Q.  Okay.  Does this document refer to the terms
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   "confidential and proprietary"?

 2   A.  Yes, it does.

 3   Q.  Okay.  And where do you find those terms?

 4   A.  In Section 13.

 5   Q.  Okay.  Now, ma'am, are there initial lines on each of

 6   these pages?

 7   A.  Yes.

 8   Q.  Okay.  And do you recognize the initials for those --

 9   A.  Yes.

10   Q.  -- lines?

11          And whose initials are those?

12   A.  Greg Spires.

13   Q.  Okay.  And is there a signature line also on this

14   document?

15   A.  Yes.

16   Q.  And do you recognize the signature on that?

17   A.  Yes.

18   Q.  And whose signature is that?

19   A.  Greg Spires.

20   Q.  Okay.

21          MR. BERKLEY:  Your Honor, I would like to move on

22   to trial Exhibit 56.

23          THE COURT:  All right.

24   BY MR. BERKLEY:

25   Q.  Do you have that one before you, Ms. Robichaux?
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   A.  Yes, I do.
 2   Q.  Do you recognize that document?
 3   A.  Yes.
 4   Q.  Okay.  Is this one of the documents that you also had in
 5   your custodial role for GMS Industrial Supply?
 6   A.  Yes.
 7        MR. BERKLEY:  Your Honor, I would like to offer
 8   this document into evidence.
 9        THE COURT:  All right.  Any objection?
10        MR. MCFARLAND:  Yes, Your Honor.  This is for
11   Gregory Sky Spires, a defendant who was originally sued in
12   this case, and who the plaintiff has dismissed after we
13   filed a motion.
14        THE COURT:  All right.
15        Mr. Berkley.
16        MR. BERKLEY:  Yes, sir.
17        Your Honor, we're just trying to show the
18   consistency of how we handled the contract documents for all
19   of the sales agents for GMS Industrial Supply.
20        THE COURT:  Right.  Well, I think you're going to
21   have enough to do that.  So, if Mr. Spires is no longer
22   before the Court, that motion will be granted.
23        MR. BERKLEY:  Okay.  Then, Your Honor, we will move
24   on to that trial Exhibit 56.
25        THE COURT:  That was 56.
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1            MR. LASCARA:  That was 56.

 2            MR. BERKLEY:  Yeah.  So, we're moving on to trial

 3    Exhibit 32.

 4    BY MR. BERKLEY:

 5    Q.  Ms. Robichaux, do you have that one before you?

 6    A.  I do.

 7    Q.  Okay.  Do you recognize that document?

 8    A.  Yes.

 9    Q.  Was this also a document over which you served as the

10    custodian for GMS Industrial Supply?

11    A.  Yes.

12    Q.  Okay.  And who is this document for?

13    A.  County Roads, Greg Spires.

14    Q.  Okay.  Is there a date for this document?

15    A.  January 6th, 2017.

16    Q.  Okay.  And is there a territory in this document?

17    A.  Yes.

18    Q.  Okay.  And can you tell us where that's located?

19    A.  Oklahoma and Texas.

20    Q.  Where in the contract would that be?

21    A.  Oh, I'm sorry.  Section B.

22            THE COURT:  Are you moving it into evidence?

23            MR. BERKLEY:  Yes.  I'm sorry, Your Honor.  Can we

24    move this into evidence?

25            THE COURT:  All right.  Any objection?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 190 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 11 of 103 PageID# 10944

11

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1              MR. MCFARLAND:  No objection to this.
 2              THE COURT:  All right.  It will be admitted.  It
 3   will be admitted.  You may publish.
 4              (Plaintiff's Exhibit 32 received in evidence.)
 5   BY MR. BERKLEY:
 6   Q.  Okay.  Why would this document have two states identified
 7   in the territory?
 8   A.  Because Greg Spires wanted to add an additional territory
 9   to his -- to his area.
10   Q.  Okay.  Was that done on January 6th of 2017?
11   A.  Yes.
12   Q.  Okay.  Does this document also reference the terms
13   "aggressively promote"?
14   A.  Yes, it does.
15   Q.  And where would they be found?
16   A.  In Section 1.
17   Q.  Okay.  And does this document also reference the terms
18   "confidential and proprietary"?
19   A.  Yes.
20   Q.  Okay.  And where is that found?
21   A.  Section 12.
22   Q.  Okay.  Now, does this document also have signature lines
23   at the bottom of each page?
24   A.  There is initials at the bottom of each page.
25   Q.  Initials, excuse me.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 191 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 12 of 103 PageID# 10945

12

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1          And do you recognize the initials at the bottom of
 2   each page?
 3   A.  Yes.
 4   Q.  And whose initials are they?
 5   A.  Greg K. Spires.
 6   Q.  Okay.  And does this document also have a signature line?
 7   A.  Yes, it does.
 8   Q.  And whose signature is that?
 9   A.  Greg K. Spires.
10          MR. BERKLEY:  Your Honor, we would like to move on
11   to trial Exhibit 14.
12          THE COURT:  All right.
13   BY MR. BERKLEY:
14   Q.  Ms. Robichaux, do you recognize this document?
15   A.  Yes.
16   Q.  Is this a document that you had custodial control over
17   for GMS Industrial Supply?
18   A.  Yes.
19          MR. BERKLEY:  Your Honor, we would like to move
20   this in.
21          THE COURT:  Any objection?
22          MR. MCFARLAND:  No, Your Honor.
23          THE COURT:  All right.  It will be admitted.
24          (Plaintiff's Exhibit 14 received in evidence.)
25          MR. BERKLEY:  Okay.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 192 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 13 of 103 PageID# 10946

13

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1            THE COURT:  You may publish.
 2    BY MR. BERKLEY:
 3    Q.  Ms. Robichaux, is this an Independent Sales Agent
 4    Agreement?
 5    A.  Yes, it is.
 6    Q.  And who is this for?
 7    A.  Thomas Hayes.
 8    Q.  And do you know the date of this document?
 9    A.  July 27th, 2016.
10    Q.  Okay.  And does this document have a territory section?
11    A.  Yes.
12    Q.  And where is that found?
13    A.  Section B.
14    Q.  Okay.  And what is the territory for this document?
15    A.  Louisiana.
16    Q.  Okay.  Does this document also have an "aggressively
17    promote" term?
18    A.  Yes, it does.
19    Q.  And where is that found?
20    A.  Section 1.
21    Q.  Okay.  Does this document also have "confidential and
22    proprietary" terms?
23    A.  Yes.
24    Q.  And where would that be found?
25    A.  Section 12.
```

14

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
1   Q.  Okay.  Are there initial lines at the bottom of each
2   page?
3   A.  Yes.
4   Q.  And do you recognize the initials on the bottom of each
5   page?
6   A.  Yes.
7   Q.  And whose are they?
8   A.  Thomas Hayes.
9   Q.  Okay.  Is there also a signature line at the back?
10  A.  Yes.
11  Q.  Do you recognize that signature?
12  A.  Yes.
13  Q.  And whose is that?
14  A.  Thomas Hayes.
15  Q.  All right.  Moving on to trial Exhibit 16.
16          Ms. Robichaux, do you recognize that document?
17  A.  Yes, I do.
18  Q.  And what is that document?
19  A.  An Independent Sales Agent Agreement.
20  Q.  Okay.  And was this a document that you had custodial
21  control over for GMS Industrial Supply?
22  A.  Yes.
23          MR. BERKLEY:  Your Honor, I would like to move this
24  in.
25          THE COURT:  Any objection?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 194 of 366

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1              MR. MCFARLAND:  No, Your Honor.
 2              THE COURT:  All right.  It will be admitted.
 3              MR. BERKLEY:  Okay.
 4              (Plaintiff's Exhibit 16 received in evidence.)
 5   BY MR. BERKLEY:
 6   Q.  Ma'am, is there a date to this document?
 7   A.  June 15th, 2016.
 8   Q.  Okay.  And is there a territory section for this
 9   document?
10   A.  Yes.
11   Q.  And where is that found?
12   A.  Section B.
13   Q.  And what would be the territory?
14   A.  Texas.
15   Q.  Okay.  Is there also "aggressively promote" terms in this
16   document?
17   A.  Yes.
18   Q.  And where would that be found?
19   A.  Section 1.
20   Q.  Okay.  Are there "confidential and proprietary" terms in
21   this document?
22   A.  Yes.
23   Q.  And where would those be found?
24   A.  Section 12.
25   Q.  Okay.  Now, Ms. Robichaux, like we've asked before, are
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 195 of 366

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
1    there initial lines at the bottom of each page?

2    A.  Yes.

3    Q.  Okay.  And do you recognize the initials at the bottom of

4    each page?

5    A.  Yes.

6    Q.  And whose are they?

7    A.  Mike Welton.

8    Q.  Okay.  Is there also a signature line on this document?

9    A.  Yes.

10   Q.  And do you recognize the signature on that line?

11   A.  Yes.

12   Q.  And whose is that?

13   A.  Mike Welton.

14   Q.  All right.

15        MR. BERKLEY:  Moving on to trial Exhibit 48, Your

16   Honor?

17        THE COURT:  All right.

18        MR. MCFARLAND:  Your Honor, I thought we had

19   already done 48.

20        MR. BERKLEY:  Excuse me.

21        MR. MCFARLAND:  Excuse me.  Plaintiff has already

22   presented 48.

23        THE COURT:  That's what my notes show.

24        MR. BERKLEY:  We'll move on, Your Honor, to trial

25   Exhibit 4.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 196 of 366

```
 1              THE COURT:  All right.
 2   BY MR. BERKLEY:
 3   Q.  Ms. Robichaux, do you recognize this document?
 4   A.  Yes.
 5   Q.  And was this a document that you had control over in your
 6   custodial role for GMS?
 7   A.  Yes.
 8              MR. BERKLEY:  I would like to offer this into
 9   evidence, Your Honor.
10              THE COURT:  All right.  Any objection?
11              THE CLERK:  It's already admitted.
12              MR. MCFARLAND:  It's already admitted.  That's what
13   I was going to say, Your Honor.
14              THE COURT:  All right.
15   BY MR. BERKLEY:
16   Q.  Okay.  And can you explain to us what this document is?
17   A.  This is a Zone Manager Addendum for Westly Greer.
18   Q.  Okay.  And what was the purpose of this document?
19   A.  To explain his duties and responsibilities as a zone
20   manager.
21   Q.  And when did he become a zone manager?
22   A.  In January of 2019.
23   Q.  Okay.  And what was his role in January of 2019?
24   A.  He was an independent sales agent and had zone manager
25   responsibilities.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 197 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 18 of 103 PageID# 10951

18

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1    Q.  Okay.  Did he have to sign an Independent Sales Agent

 2    Agreement in January of 2019?

 3    A.  Yes.

 4          MR. BERKLEY:  Your Honor, if I could take one

 5    minute, please.

 6          THE COURT:  Sure.

 7          MR. BERKLEY:  Your Honor, if we could move to trial

 8    Exhibit 3.

 9          THE COURT:  All right.

10          MR. MCFARLAND:  I'm sorry, 3?

11          MR. BERKLEY:  3.

12          MR. MCFARLAND:  Thank you.

13    BY MR. BERKLEY:

14    Q.  Ms. Robichaux, do you recognize this document?

15    A.  Yes.

16    Q.  Is this a document that you had custodial control over

17    while you worked for GMS Industrial Supply?

18    A.  Yes.

19          MR. BERKLEY:  Your Honor, I would like to move this

20    document in.

21          THE COURT:  Any objection?

22          THE CLERK:  It's already admitted.

23          THE COURT:  It's already admitted.

24          MR. BERKLEY:  Okay.

25          MR. MCFARLAND:  Yes.
```

JILL H. TRAIL, Official Court Reporter

JA902

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 198 of 366

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   BY MR. BERKLEY:
 2   Q.  Ms. Robichaux, can you explain to us what this document
 3   is?
 4   A.  It's an Independent Agent Agreement.
 5   Q.  Okay.  And who is the independent agent for this
 6   document?
 7   A.  Westly Greer.
 8   Q.  And is there a territory section for this document?
 9   A.  Yes.
10   Q.  And what are the territories?
11   A.  Colorado and Kansas.
12   Q.  Okay.  Do you know why Mr. Greer wanted to become a sales
13   agent in January of 2019?
14   A.  He relinquished his responsibilities as the director of
15   sales position and wanted to be an independent agent.
16   Q.  Okay.  And do you know why he relinquished his
17   responsibilities as the director of sales?
18           MR. MCFARLAND:  Your Honor, I don't mind if the
19   witness had a conversation with Mr. Greer in which he
20   expressed his decision, but otherwise --
21           THE COURT:  Objection sustained.  Objection
22   sustained.
23           Rephrase.
24   BY MR. BERKLEY:
25   Q.  Ms. Robichaux, did you have a conversation with Mr. Greer
```

JILL H. TRAIL, Official Court Reporter

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/18/2023   Pg: 199 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 20 of 103 PageID# 10953

20

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1  about the Sales Agent Agreement?

2  A.  Yes.

3  Q.  Okay.  And did Mr. Greer sign this Sales Agent Agreement

4  for you?

5  A.  Yes.

6  Q.  Okay.  And what did Mr. Greer tell you about why he

7  wanted to become a sales agent?

8  A.  I can't recall the details from that time frame.  He no

9  longer wanted the responsibilities that he had and just

10  wanted to be an independent sales agent.

11  Q.  Okay.  Does this document have "aggressively promote"

12  terms?

13  A.  Yes.

14  Q.  And where are those found?

15  A.  Section 1.

16  Q.  Okay.  Does this document also have "confidential and

17  proprietary" terms?

18  A.  Yes.

19  Q.  And where is that found?

20  A.  Section 12.

21       MR. BERKLEY:  Your Honor, has this been published

22  to the jury yet?  Yes.

23       THE COURT:  I know it's in evidence, but I don't

24  know if it's been published or not, but you may publish.

25       THE CLERK:  It has.

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/19/2023   Pg: 200 of 366
Case 2.19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 21 of 103 PageID# 10954

21

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1              THE COURT:  It has been published.
 2              MR. BERKLEY:  Okay.
 3    BY MR. BERKLEY:
 4    Q.  Are there initial lines on the bottom of each page?
 5    A.  Yes.
 6    Q.  Okay.  And do you recognize the initials at the bottom of
 7    each page?
 8    A.  Yes.
 9    Q.  Okay.  Is there a signature line on the bottom of each
10    page -- or, excuse me, a signature line at the back of the
11    document?
12    A.  Yes, it is.
13    Q.  Okay.  And do you recognize that signature?
14    A.  Yes.
15    Q.  Okay.  And whose signature is that?
16    A.  Westly Greer.
17    Q.  All right.
18              MR. BERKLEY:  Now, Your Honor, if we can go back to
19    trial Exhibit 4.
20              THE COURT:  All right.
21    BY MR. BERKLEY:
22    Q.  Now, Ms. Robichaux, you've already discussed this
23    document briefly, but this is an addendum.  Do you know what
24    it's an addendum to?
25    A.  An addendum to his Independent Sales Agent Agreement.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 201 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 22 of 103 PageID# 10955

22

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1  Q.  Okay.
 2          THE COURT:  Who is his?
 3          THE WITNESS:  Westly Greer.
 4          THE COURT:  All right.
 5  BY MR. BERKLEY:
 6  Q.  And, again, do you know why there was an addendum to a
 7  Sales Agent Agreement?
 8  A.  Because he, Westly, was going to have additional
 9  responsibilities as a sales manager in addition to his
10  Independent Sales Agent Agreement.
11  Q.  And what were his responsibilities as a zone manager?
12  A.  Providing support to a primary set of customers,
13  assisting account managers with sales, providing product
14  knowledge and training to customers and account managers,
15  reporting customer activity to the marketing team,
16  participating in weekly sales management calls.
17  Q.  Okay.  Was this a level that was higher than your regular
18  sales agent manager?
19  A.  Yes.
20  Q.  Okay.  Was this a level that was created for Westly
21  Greer?
22  A.  I believe we had zone manager positions before.
23  Q.  Okay.
24  A.  Other zone managers, but this position was for Westly
25  Greer.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 202 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 23 of 103 PageID# 10956

23

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1    Q.  Okay.  Thank you.
 2          Ma'am, did GMS Industrial Supply reimburse employees
 3    for work-related travel expenses?
 4    A.  Yes.
 5    Q.  Okay.  And --
 6          THE COURT:  One moment, Mr. Berkley.  We are going
 7    to need to take a brief recess.  I will have the jury go to
 8    the jury room.
 9          (The jury exited the courtroom at 9:40 a.m.)
10          THE COURT:  We have got a little bit of a technical
11    issue up here, so I'm going to step off the bench for just a
12    minute and let my court reporter fix it.
13          (Recess from 9:40 to 9:42 a.m.)
14          THE COURT:  All right.  Let's have our jury back.
15          (The jury entered the courtroom at 9:42 a.m.)
16          THE COURT:  All right, ladies and gentlemen, so
17    sometimes the tech issues I think are going to be quick take
18    an hour, and sometimes the ones I think are going to take an
19    hour take two seconds, so anyway I think we're good to go.
20          Mr. Berkley, you may continue.
21          MR. BERKLEY:  Thank you, Your Honor.
22          Your Honor, I would like to go back to trial
23    Exhibit Number 4.
24          THE COURT:  All right.
25    BY MR. BERKLEY:
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 203 of 366
Case 2:19-cv-00324-RCY-LRL    Document 329    Filed 07/06/22    Page 24 of 103 PageID# 10957

24

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1   Q.  If we could scroll down a little bit.

2       And, Ms. Robichaux, is there a date on this document?

3   A.  Yes.

4   Q.  And what is that date?

5   A.  January 12th, 2019.

6   Q.  Okay.  And if we could go back to trial Exhibit Number 3.

7       And, ma'am, is there a date on this document?

8   A.  Yes.

9   Q.  And what is that date?

10  A.  January 21st, 2019.

11  Q.  Okay.  And so did the Addendum Agreement for Westly Greer

12  occur before January 21st of 2019?

13  A.  I believe the documents were provided to him on or around

14  that date of January 12th.

15  Q.  Okay.  Thank you.

16      MR. BERKLEY:  Your Honor, I would like to move on

17  to --

18  BY MR. BERKLEY:

19  Q.  Well, let me ask you this, Ms. Robichaux, did GMS

20  Industrial Supply reimburse employees for work-related travel

21  expenses?

22  A.  Yes.

23  Q.  Okay.  Would GMS Industrial Supply knowingly reimburse

24  travel expenses to employees related to the selling of

25  industrial products for another company?

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1    A.   No.
 2    Q.   Okay.  Can we move on to trial Exhibit Number 44?
 3              MR. MCFARLAND:  I'm sorry.  I am having a really
 4    hard time hearing again.
 5              Reimburse for employees, correct?
 6              THE COURT:  Yes.
 7              MR. MCFARLAND:  Is that what the testimony was?  I
 8    just --
 9              THE COURT:  They'll reimburse for travel for GMS
10    not for other types of travel, not for travel related to
11    other businesses.
12    BY MR. BERKLEY:
13    Q.   Ma'am, do you recognize this document?
14    A.   Yes.
15    Q.   Is this a document that you would have control over in
16    your custodial role for GMS Industrial Supply?
17              MR. MCFARLAND:  I'm sorry.  Which exhibit are we
18    on?
19              MR. BERKLEY:  44.
20              THE WITNESS:  Yes.
21              MR. BERKLEY:  Okay.  Your Honor, we would like to
22    publish this document.
23              THE COURT:  All right.  Are you moving it into
24    evidence?
25              MR. BERKLEY:  Yes, Your Honor.
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1              THE COURT:  All right.  Any objection?
 2              MR. MCFARLAND:  One second, Your Honor.  I'm trying
 3    to keep up here.
 4              44, no, Your Honor.
 5              THE COURT:  All right.  It may be admitted.  All
 6    right.  You may publish.
 7              (Plaintiff's Exhibit 44 received in evidence.)
 8    BY MR. BERKLEY:
 9    Q.  Ms. Robichaux, what is this document?
10    A.  This is a mileage and expense reimbursement document.
11    Q.  Okay.  And what is the date of this document?
12    A.  August 31st, 2017.
13    Q.  And what was Westly Greer's role for GMS Industrial
14    Supply at that time?
15    A.  I believe at that time he was the director of sales.
16    Q.  Okay.  And is this a document that Mr. Greer prepared or
17    someone in your office would prepare?
18    A.  Mr. Greer.
19    Q.  Okay.  And would this be a document that he would submit
20    to you?
21    A.  Yes.
22    Q.  Okay.  And what is he submitting to you in this document?
23    A.  This first page is for mileage reimbursements, and then
24    the next page is expenses related to his travel for a sales
25    training trip, and then there was receipts to follow.
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   Q.  Okay.  And you mention this was for a sales training
 2   trip.  Do you know which training trip this was for?
 3   A.  Based on these receipts, it looks like a training trip to
 4   Fort Stewart.
 5   Q.  Okay.  Now, ma'am, did GMS Industrial Supply pay
 6   commissions pursuant to the sales agent contracts to its
 7   sales agents?
 8   A.  I'm sorry.  Can you repeat that?
 9   Q.  Did GMS Industrial Supply pay commissions to its sales
10   agents pursuant to its sales agent contracts with them?
11   A.  Yes.
12   Q.  Okay.  Were you involved in the payment of those
13   commissions?
14   A.  Yes.
15   Q.  Okay.  And how were you involved in the payment of those
16   commissions?
17   A.  I would receive documentation for material received by
18   our customers, and review that documentation, and input it
19   into our database for -- to provide credit for the sales
20   agents, review commission statements and approve them.  Any
21   questions or inquiries about the commission statements, I
22   would answer those questions.
23   Q.  Okay.  And did sales agents have to take certain steps in
24   order to get paid those commissions?
25   A.  Yes.
```

USCA4 Appeal: 22-2090     Doc: 20-3     Filed: 01/19/2023     Pg: 207 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 28 of 103 PageID# 10961

28

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   Q.  And what steps would those be?
 2   A.  They would have to document the orders into their data
 3   portal.  They would have to provide specific documentation
 4   that the customer received the goods, and provide that to
 5   myself or my team to review, and we would review it for
 6   accuracy and put it in the system.
 7   Q.  Okay.
 8           MR. BERKLEY:  Your Honor, I would like to move to
 9   Exhibit 91 --
10           THE COURT:  All right.
11           MR. BERKLEY:  -- which might be in binder 2, or
12   1-B, a new binder.
13           THE WITNESS:  You said 92?
14   BY MR. BERKLEY:
15   Q.  Exhibit 91.
16   A.  91.
17   Q.  And are there several pages with that exhibit?
18   A.  Yes.
19   Q.  And have you reviewed all of those pages?
20   A.  I have.
21   Q.  Can you tell us what those pages constitute?
22   A.  These are commission reports.
23   Q.  Okay.  And do you know whose commission reports these are
24   for?
25   A.  These are for Mike Welton.
```

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/19/2023   Pg: 208 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 29 of 103 PageID# 10962

29

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1   Q.  Okay.

2          MR. BERKLEY:  Your Honor, I would like to offer

3   Exhibit 91 into evidence.

4          THE COURT:  Any objection?

5          MR. MCFARLAND:  No objection, Your Honor.

6          THE COURT:  All right.  They will be admitted, and

7   you may publish.

8          (Plaintiff's Exhibit 91 received in evidence.)

9   BY MR. BERKLEY:

10  Q.  Ms. Robichaux, on the first page of Exhibit 91, do these

11  pages reference a military base?

12  A.  Yes, they do.

13  Q.  And what base is that?

14  A.  Fort Hood.

15  Q.  Okay.  And in processing Mr. Welton's commission reports,

16  did you come to understand where he sold his goods for GMS

17  Industrial Supply?

18  A.  Yes.

19  Q.  And where was that?

20  A.  Fort Hood.

21  Q.  Okay.  And did he sell at any other fort that you're

22  aware of?

23  A.  No.

24  Q.  Okay.  Ma'am, did you come to an understanding at some

25  point that Mike Welton had begun selling products for G&S

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

 1   Supply?

 2   A.  Yes.

 3   Q.  Okay.  And how did you come to understand when Mr. Welton

 4   began selling products for G&S Supply?

 5   A.  By reviewing the DLA awards for G&S Supply products.

 6   Q.  Okay.

 7          MR. BERKLEY:  And, Your Honor, I would like to

 8   refer to Exhibit 275.

 9          THE COURT:  All right.

10          MR. BERKLEY:  Which is in binder 4.

11          THE COURT:  Is that in evidence already?

12          MR. BERKLEY:  It should be, Your Honor.

13          THE COURT:  All right.

14   BY MR. BERKLEY:

15   Q.  Ma'am, we're not going to refer to that exhibit right

16   now, but did Mike Welton begin selling G&S Supply products on

17   March 22nd, 2018?

18   A.  Yes.

19   Q.  Okay.  And when you looked at the commission reports,

20   considering that date of March 22nd, 2018, did you -- did you

21   add up the commissions that GMS Industrial Supply paid him

22   from that date moving forward?

23   A.  Yes.

24   Q.  And would you have ended that addition period at his

25   point of termination from GMS Industrial Supply?

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   A.  Yes.
 2   Q.  Okay.  And did you come to a conclusion of how much GMS
 3   Industrial Supply had paid him from that -- in that period of
 4   time?
 5   A.  Yes.
 6   Q.  Okay.  Did GMS Industrial Supply pay Michael Welton
 7   $48,549.38 during that period of time?
 8   A.  Yes.
 9        MR. MCFARLAND:  I'm sorry, Your Honor.  That's
10   absolutely leading.  If the witness knows the answer, she
11   can give the answer, but Mr. Berkley literally, without even
12   a foundational document before her, said the figure, and she
13   simply said yes.
14        THE COURT:  That is leading.  Sustained.
15   BY MR. BERKLEY:
16   Q.  Okay.  Ms. Robichaux, did you prepare a computation for
17   the commissions paid to Mr. Welton during that period that we
18   just discussed?
19   A.  Yes, I did.
20        MR. BERKLEY:  Your Honor, if I may show the witness
21   a document?
22        THE COURT:  Sure.  Yes.
23        MR. MCFARLAND:  I'm sorry, Your Honor.  I haven't
24   seen the document.  Is it something that's been produced to
25   the defendants before today?
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1            THE COURT:  What is it?

 2            MR. BERKLEY:  Your Honor, I'm using this to refresh

 3   her memory.

 4            THE COURT:  That's fine, but you still have to show

 5   it to opposing counsel.

 6            MR. MCFARLAND:  Your Honor, this is the first time

 7   we've ever been presented with this document.

 8            THE COURT:  Okay.

 9   BY MR. BERKLEY:

10   Q.  Ms. Robichaux, did you prepare --

11            THE COURT:  He can still show it to her to refresh

12   her recollection.

13            MR. MCFARLAND:  I think it's being offered for the

14   truth of the matter, Your Honor.  We're not refreshing

15   recollection.  Supposedly she created this document, we

16   don't know when, and it's being offered for the truth.

17            THE COURT:  Well, he hasn't asked her any questions

18   yet.  So, a couple of things, your first thing was he hasn't

19   shown it to you.  He's shown it to you.  Now he's asked her

20   the question.  The figure is actually already out, but I

21   sustained your objection, so he's going back and asking her

22   the questions, so he can do that.

23            Go ahead, Mr. Berkley.

24            MR. BERKLEY:  Thank you, Your Honor.

25   BY MR. BERKLEY:
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 212 of 366

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   Q.  Ms. Robichaux, did you -- when you reviewed the
 2   commission reports that are already in evidence, did you add
 3   up the commissions that were paid to Mike Welton during that
 4   period that he was selling for G&S Supply and working for GMS
 5   Industrial Supply?
 6   A.  Yes.
 7   Q.  Okay.  And is the document before you what you used to
 8   add up those commissions?
 9   A.  Yes, it is.
10   Q.  Okay.  And did you come up with a total on that document
11   of what Mr. Welton was paid during that period of time?
12   A.  Yes.
13   Q.  And what is that total?
14   A.  $48,549.38.
15   Q.  Okay.  Thank you, ma'am.
16        MR. BERKLEY:  Your Honor, we would like to move on
17   to Exhibit 92.
18        THE COURT:  All right.
19   BY MR. BERKLEY:
20   Q.  Do you have that?
21   A.  Yes.
22   Q.  Okay.  Do you recognize those documents?
23   A.  Yes.
24   Q.  Okay.  And were those documents that you were involved
25   in, in the payment of commissions to sales agents?
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1    A.  Yes.
 2            MR. BERKLEY:  Your Honor, we would like to offer
 3    these into evidence.
 4            THE COURT:  Any objection?
 5            MR. MCFARLAND:  No, Your Honor.
 6            THE COURT:  All right.  They will be admitted.  You
 7    may publish.
 8            (Plaintiff's Exhibit 92 received in evidence.)
 9            MR. BERKLEY:  Okay.
10    BY MR. BERKLEY:
11    Q.  Ma'am, can you tell us what those documents are?
12    A.  Commission reports.
13    Q.  And who are the commission reports for?
14    A.  Thomas Hayes.
15    Q.  Okay.  And if you look at that first page, is there a
16    fort identified on that commission report?
17    A.  Yes.
18    Q.  And what is that fort?
19    A.  Fort Campbell.
20    Q.  Ma'am, I'm looking a couple of pages down from that.
21    It's dated 1/7/19 to 1/20/19.
22    A.  Yes.
23    Q.  Do you see that?
24    A.  I do.
25    Q.  Okay.  Is there a fort identified on that page?
```

35

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

 1   A.  Yes, Fort Benning.

 2   Q.  Okay.  Ma'am, I want to refer you to a page that's

 3   starting with 5/14/18 through 5/27/18.

 4   A.  Yes.

 5   Q.  Now, that's the period where commissions were paid at the

 6   top of each page; is that right?

 7   A.  Yes.

 8   Q.  Now, is there forts identified on this page?

 9   A.  Yes.

10   Q.  And what forts are those?

11   A.  Fort Campbell and Fort Polk.

12   Q.  Okay.  Thank you, ma'am.

13        Now, did you come to an understanding at some point

14   in time that Thomas Hayes began selling products for G&S

15   Supply?

16   A.  Yes.

17   Q.  And how did you come to that understanding?

18   A.  By reviewing G&S -- by reviewing DLA awards for G&S

19   products.

20   Q.  Okay.  And if we can refer to Exhibit 281.  It should be

21   in binder 4.

22        Ma'am, do you recognize this document?

23   A.  Yes.

24   Q.  Okay.  And what is this?

25   A.  This is an order, an award for G&S products.

JILL H. TRAIL, Official Court Reporter

**JA919**

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 215 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 36 of 103 PageID# 10969

36

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   Q.  Okay.  And is there a quote date on this document?
 2   A.  Yes, there is.
 3   Q.  And what is that quote date?
 4   A.  January 3rd, 2019.
 5   Q.  Okay.  And can you tell from this document and its pages
 6   where this product was sold?
 7   A.  Yes.
 8   Q.  And where would you find that?
 9   A.  It's on the fourth page, towards the bottom.  It shows
10   Fort Benning.
11   Q.  Excuse me.  Where?
12   A.  Fort Benning.
13   Q.  Okay.  Is Fort Benning one of the forts that Thomas Hayes
14   sold at for GMS Industrial Supply?
15   A.  Yes, it is.
16   Q.  Okay.  Did you come to an understanding that Thomas Hayes
17   began selling G&S Supply products on January 3rd, 2019?
18   A.  Yes.
19   Q.  Okay.  The same questions as you did before, ma'am.  When
20   you found that out, did you take the commission pages that
21   you had for Thomas Hayes while he was working for GMS
22   Industrial Supply and review them?
23   A.  Yes.
24   Q.  And did you review them from that date until the date he
25   was terminated with GMS Industrial Supply?
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1  A.  Yes.

2  Q.  Okay.  And did you come to a figure of how much GMS

3  Industrial Supply had paid him during that period of time?

4  A.  Yes.

5  Q.  Okay.

6          MR. BERKLEY:  May I approach, Your Honor?

7          THE COURT:  Approach her with what?

8          MR. BERKLEY:  Just her document.

9          THE COURT:  What document are you showing her?

10          MR. BERKLEY:  This is the document with the

11  computation of her damages for Mr. Hayes.  It's going to be

12  the same process for each defendant, if we're --

13          THE COURT:  Well, I don't think you've asked the --

14  so, a couple of things.  I don't think you've asked the

15  right question yet to be able to approach her to refresh her

16  recollection, if that's what you're trying to do.

17          MR. BERKLEY:  Okay.  I was just trying to short

18  circuit the process knowing what was coming, Your Honor.  I

19  apologize.

20          THE COURT:  I understand.  But I know there is

21  going to be an objection, so --

22          MR. BERKLEY:  Yeah.  Okay.

23          THE COURT:  -- so, you can't short circuit the

24  process.

25  BY MR. BERKLEY:

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   Q.  Ma'am, did GMS Industrial Supply pay Thomas Hayes $12,087

 2   and --

 3           THE COURT:  Objection sustained.

 4           MR. BERKLEY:  Okay.

 5   BY MR. BERKLEY:

 6   Q.  Ms. Robichaux, were you able to -- did you prepare a

 7   computation of the commission reports during that period of

 8   time that we discussed?

 9   A.  Yes.

10   Q.  Okay.  And did that computation add up all of those

11   commissions?

12   A.  Yes, it did.

13   Q.  Okay.

14           MR. BERKLEY:  And, Your Honor, I would like to show

15   Ms. Robichaux that computation to refresh her memory, if she

16   cannot remember.

17           THE COURT:  Did she say she couldn't remember what

18   the figure was?

19           MR. BERKLEY:  Yes.

20   BY MR. BERKLEY:

21   Q.  Ms. Robichaux, do you remember what the figure was?

22   A.  I don't remember.

23   Q.  Okay.

24           THE COURT:  All right.  Yes.  Show a copy to

25   counsel if you haven't provided it already.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 218 of 366

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1            MR. BERKLEY:  Sure.
 2            THE COURT:  And you can show it to Ms. Robichaux.
 3            MR. MCFARLAND:  Thank you.
 4   BY MR. BERKLEY:
 5   Q.  Ms. Robichaux, is that the document that you prepared for
 6   Thomas Hayes?
 7   A.  Yes, it is.
 8   Q.  Okay.  And those are the commissions that occurred during
 9   that period where he was selling for GMS Industrial Supply
10   and G&S Supply?
11   A.  Yes.
12   Q.  Okay.  And did you add up all of those commissions?
13   A.  Yes.
14   Q.  And what figure did you come to?
15   A.  $12,087.78.
16   Q.  Okay.  Thank you.
17            Moving on to Exhibit 97.
18            Ma'am, do you recognize those pages?
19   A.  Yes.
20   Q.  And what are those pages?
21   A.  Commission reports.
22   Q.  Okay.  And who are they commission reports for?
23   A.  Greg Spires.
24   Q.  Okay.  And on the first page of that document is there a
25   fort identified?
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   A.  Yes.

 2   Q.  And what is that fort?

 3   A.  Fort Bliss.

 4   Q.  Is there more than one fort on that page?

 5   A.  Yes, Fort Sill as well.

 6   Q.  Okay.  And in your work with Greg Spires and paying his

 7   commissions, did you come to understand what forts he worked

 8   at?

 9   A.  Yes.

10   Q.  And what were those forts?

11   A.  Fort Bliss and Fort Sill.

12   Q.  All right.  At some point in time did you come to know

13   the date that Gregory Spires began selling products for G&S

14   Supply?

15   A.  Yes.

16   Q.  Okay.  And how did you determine that date?

17   A.  By reviewing the DLA awards for G&S products.

18   Q.  Okay.  If we can go to Exhibit 274.

19           THE COURT:  Is this in evidence already?

20           THE CLERK:  Yes.

21           THE COURT:  All right.  You may publish.

22   BY MR. BERKLEY:

23   Q.  Do you have that document before you, ma'am?

24   A.  I do.

25   Q.  Okay.
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
1    A.  Yes.

2    Q.  And what is this document?

3    A.  This is a DLA award for G&S Supply.

4    Q.  Okay.  And is there a quote date on this document?

5    A.  Yes.  It's March 9th, 2018.

6    Q.  Okay.  And can you tell from this document where this

7    product was sold?

8    A.  Yes.

9    Q.  And where was that?

10   A.  Fort Bliss.

11   Q.  Okay.  Now, ma'am, after you referred to this document,

12   did you total the number of commissions paid to Gregory K.

13   Spires by GMS Industrial Supply from the time he began

14   selling GMS products until the date he stopped --

15   A.  Yes.

16   Q.  -- working for GMS Industrial Supply?

17   A.  Yes.

18   Q.  Okay.  Do you know what that total is?

19   A.  I don't recall.

20   Q.  Okay.  Ma'am, did you prepare a computation of the

21   commissions paid to Mr. Spires during that period of time?

22   A.  Yes.

23   Q.  And did you total up those commissions paid?

24   A.  I did.

25   Q.  Okay.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 221 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 42 of 103 PageID# 10975

42

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1              MR. BERKLEY:  Your Honor, if I may approach?
 2              THE COURT:  Yes.
 3              THE WITNESS:  Thank you.
 4   BY MR. BERKLEY:
 5   Q.  Ms. Robichaux, is that a copy of the computations that
 6   you prepared for Mr. Spires during that period of time?
 7   A.  It is.
 8   Q.  Okay.  And does that document add up all of the
 9   commissions during that period of time?
10   A.  Yes.
11   Q.  And what is the total of those commissions?
12   A.  $141,768.41.
13   Q.  Okay.  Thank you, ma'am.
14              THE COURT:  Mr. Berkley, I don't have that you
15   moved 97 into evidence.  Were you asking that that come into
16   evidence?
17              MR. BERKLEY:  Yes, Your Honor.  We would like to
18   have that into evidence.
19              THE COURT:  Any objection?
20              MR. MCFARLAND:  No, Your Honor.
21              THE COURT:  All right.  It will be admitted.
22              (Plaintiff's Exhibit 97 received in evidence.)
23   BY MR. BERKLEY:
24   Q.  Now we're referring to Exhibits 95 and 96.
25   A.  Okay.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 222 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 43 of 103 PageID# 10976

43

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1    Q.  Ms. Robichaux, do you recognize the pages that constitute

2    Exhibit 95?

3    A.  Yes.

4    Q.  And what are those pages?

5    A.  Commission reports.

6    Q.  Okay.  And whose commission reports are they?

7    A.  Sabrina Greer.

8    Q.  Okay.

9         MR. BERKLEY:  Your Honor, we would like to offer

10   Exhibit 95 into evidence.

11        THE COURT:  Any objection?

12        MR. MCFARLAND:  No objection, Your Honor.

13        THE COURT:  All right.  It will be admitted.  You

14   may publish.

15        (Plaintiff's Exhibit 95 received in evidence.)

16        MR. BERKLEY:  Your Honor, if we could go ahead and

17   refer to Exhibit 96 now.

18        THE COURT:  All right.

19   BY MR. BERKLEY:

20   Q.  Ms. Robichaux, do you recognize the pages that constitute

21   Exhibit 96?

22   A.  Yes.

23   Q.  And what are those pages?

24   A.  Commission reports.

25   Q.  And who are those commission reports for?

44

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1   A.   Sabrina Greer.

2   Q.   Okay.  Now, on these commission reports, do you recognize

3   a fort on the first page?

4   A.   Yes.

5   Q.   And what's that fort?

6   A.   Fort Carson.

7   Q.   Okay.  And did you come to understand where Sabrina Greer

8   worked when she --

9           THE COURT:  Are you asking that these be moved into

10  evidence, P96?

11          MR. BERKLEY:  Yes, Your Honor.

12          THE COURT:  All right.

13          Any objection, Mr. McFarland?

14          MR. MCFARLAND:  No objection, Your Honor.

15          THE COURT:  All right.  It will be admitted.  You

16  may publish.

17          (Plaintiff's Exhibit 96 received in evidence.)

18  BY MR. BERKLEY:

19  Q.   So, Ms. Robichaux, on the first page of these commission

20  reports is there a fort listed?

21  A.   Yes.

22  Q.   And what is that fort?

23  A.   Fort Carson.

24  Q.   And did you come to an understanding, working with

25  Sabrina Greer, where she worked for GMS Industrial Supply?

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1    A.  Yes.
 2    Q.  And where was that?
 3    A.  Fort Carson.
 4    Q.  Okay.  If we could go back to the previous Exhibit 95.
 5         Ms. Robichaux, on the page dated 5/28/18 through
 6    6/10/18, do you see that page?
 7    A.  Yes, I do.
 8    Q.  Okay.  And is there a fort identified on that page?
 9    A.  Yes.
10    Q.  Okay.  And what fort is that?
11    A.  Fort Carson.
12    Q.  Okay.  Thank you, ma'am.
13         Did you come to know a date that Sabrina Greer began
14    selling products for G&S Supply?
15    A.  Yes.
16    Q.  Okay.  And how did you come by that date?
17    A.  By reviewing the DLA awards for G&S products.
18    Q.  Okay.  If we could refer to Exhibit 247.
19         And do you recognize this document?
20    A.  Yes.
21    Q.  And what is this document?
22    A.  This is a DLA award for G&S Supply.
23    Q.  Okay.  Is there a quote date on this document?
24    A.  Yes.
25    Q.  And what is that date?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 225 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 46 of 103 PageID# 10979

46

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   A.  September 15th, 2017.
 2   Q.  Okay.  And can you tell from this document where the
 3   products were sold?
 4   A.  Yes.
 5   Q.  And where would that be?
 6   A.  At Fort Carson.
 7   Q.  Okay.  Did Sabrina Greer begin selling G&S products on
 8   September 15th, 2017?
 9   A.  Yes.
10   Q.  Now, after you determined that Ms. Greer had been selling
11   products, did you review her commissions?
12        MR. MCFARLAND:  I am going to note an objection
13   here, because the testimony is that not only Sabrina Greer
14   but her husband sold at Fort Carson during this time period,
15   so there has got to be a little better foundation as to how
16   we know this is a Sabrina Greer --
17        THE COURT:  You can explore that on cross.  You can
18   explore that on cross.
19        Go ahead, Mr. Berkley.
20        MR. BERKLEY:  Thank you, Your Honor.
21   BY MR. BERKLEY:
22   Q.  Did you total the number of commissions paid to Sabrina
23   Greer from -- from September 15th, 2017, until she was
24   terminated?
25   A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 226 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 47 of 103 PageID# 10980

47

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1    Q.  Okay.  And did you prepare -- well, and do you know what
 2    the total amount of those commissions are?
 3    A.  I don't recall.
 4    Q.  Okay.  And did you prepare a computation of those total
 5    amount of commissions?
 6    A.  I did.
 7    Q.  Okay.  And did that computation add up each of the
 8    commission pages that you've reviewed?
 9    A.  Yes.
10    Q.  Okay.
11            THE COURT:  Yes.  You may show the witness.
12            MR. BERKLEY:  Oh, I'm sorry, Your Honor.
13            THE COURT:  That's all right.
14            MR. BERKLEY:  I'm getting into a routine.
15    BY MR. BERKLEY:
16    Q.  Ms. Robichaux, is this the computation that you prepared
17    for Sabrina Greer?
18    A.  Yes, it is.
19    Q.  Okay.  And in this computation did you add up each of the
20    commission pages that we've talked about today?
21    A.  Yes.
22    Q.  Okay.  And what was the total amount of commissions paid
23    to Sabrina Greer during that period of time?
24    A.  $137,905.44.
25    Q.  Okay.  Thank you, ma'am.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 227 of 366
Case 2:19-cv-00324-RCY-LRL  Document 329  Filed 07/06/22  Page 48 of 103 PageID# 10981

48

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1              MR. BERKLEY:  Your Honor, if we could move on to

2      Exhibit 94.

3              THE COURT:  All right.

4      BY MR. BERKLEY:

5      Q.  Do you recognize those pages, ma'am?

6      A.  Yes.

7      Q.  And what are they?

8      A.  Commission reports.

9      Q.  Okay.  And whose commission reports are they?

10     A.  Westly Greer.

11     Q.  And what is the date of this payroll report, the first

12     page?

13     A.  This was the period of March 4th, 2019, through

14     March 17th, 2019.

15     Q.  And at this time had Westly Greer decided to become a

16     sales agent?

17     A.  Yes.

18     Q.  And he had relinquished his role as the director of sales

19     by this time?

20     A.  Correct.

21     Q.  Okay.  Did you come to an understanding of when Mr. Greer

22     began selling products for G&S Supply, Inc. in 2019, as a

23     sales agent?

24     A.  Yes.

25     Q.  Okay.  And how did you come by that determination?

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

49

```
 1   A.  By reviewing the DLA awards for G&S products.
 2   Q.  Okay.  And if we could refer to Exhibit 460 --
 3           THE CLERK:  Are you moving in that exhibit?
 4           MR. BERKLEY:  Yeah, I'm sorry.  Yes, we are moving
 5   in that exhibit.
 6           THE COURT:  You're asking to move in P94?
 7           MR. BERKLEY:  Yes.
 8           THE COURT:  All right.
 9           Mr. McFarland, any objection?
10           MR. MCFARLAND:  No objection, Your Honor.
11           THE COURT:  All right.  It will be admitted.
12           (Plaintiff's Exhibit 94 received in evidence.)
13           THE WITNESS:  Which exhibit number are you looking
14   at?
15   BY MR. BERKLEY:
16   Q.  It's Exhibit 460.
17   A.  416?
18   Q.  460.
19           Now, do you recognize this document?
20   A.  Yes.
21   Q.  And what is it?
22   A.  This is an award for G&S Supply.
23   Q.  Okay.  And is there a quote date on this document?
24   A.  Yes.
25   Q.  Okay.  And what is that quote date?
```

JILL H. TRAIL, Official Court Reporter

**JA933**

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/19/2023   Pg: 329 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 50 of 103 PageID# 10983

50

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1    A.  February 12th, 2019.

2    Q.  And can you tell from this document where the product was

3    sold?

4    A.  Can you scroll up on it?

5           Yes.

6    Q.  And where was that?

7    A.  Fort Riley.

8    Q.  Okay.

9           MR. BERKLEY:  And, Your Honor, if we can go back to

10   Exhibit 94.

11          THE COURT:  All right.

12   BY MR. BERKLEY:

13   Q.  Now, on the first page of Exhibit 94, is there a fort

14   identified?

15   A.  Yes.

16   Q.  And what is that fort?

17   A.  Fort Riley.

18   Q.  Did Westly Greer begin selling G&S Supply products on

19   February 12th of 2019, according to your analysis?

20   A.  Yes.

21   Q.  Okay.  And after you determined that, did you add up the

22   commission reports during the period of time when he began

23   selling for G&S Supply until the time he was terminated by

24   GMS Industrial Supply?

25   A.  Yes.

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/18/2023   Pg: 230 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 51 of 103 PageID# 10984

51

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   Q.  Okay.  And do you recall that total number of
 2   commissions?
 3   A.  I don't recall.
 4         MR. BERKLEY:  Your Honor, may I approach?
 5         THE COURT:  Yes.
 6   BY MR. BERKLEY:
 7   Q.  Ms. Robichaux, does that document represent your
 8   computations that you made for Westly Greer during that
 9   period of time?
10   A.  Yes.
11   Q.  And did you add up the commissions during that period of
12   time?
13   A.  Yes.
14   Q.  And did you come to a total figure?
15   A.  Yes.
16   Q.  And what is that total figure?
17   A.  $11,860.34.
18   Q.  Okay.  Thank you, ma'am.
19         Now, if we could refer back to Exhibit 460.
20         Ma'am, on this document, are you aware where there is
21   a Julian date on this document?
22   A.  Yes.
23   Q.  And where would that be found?
24   A.  Can you scroll down some?
25         Okay.  It's in Section B.  It's underneath the
```

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

 1   address.  It's -- it also has TCN.

 2   Q.  Okay.  And what are the letters and numbers in that

 3   Julian date?

 4   A.  So the first six characters are DoDAAC, which is -- which

 5   tells you who, what customer or what government entity

 6   purchased the material.  And then the next four digits is the

 7   Julian date, which tells you the date of the document.

 8   Q.  Okay.  And the -- so we can follow along, what are those

 9   first letters?

10   A.  The first letters, the W907FD, those are the DoDAAC which

11   identify the unit or government.

12   Q.  And then there is the numbers 8345, what do those

13   represent?

14   A.  So the 8 stands for 2018, and 345 is the 345th day of

15   2018.

16   Q.  So, what does that date represent on this document?

17   A.  It represents the date that the material was funded

18   by the customer -- funded to the customer for order.

19   Q.  Funded to the customer for order?

20   A.  Uh-huh.

21   Q.  Does there have to be -- is there something done before

22   the funding takes place by a sales agent?

23   A.  The sales agent would present products to the customer to

24   order and provide them with the information to order the

25   material.

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   Q.  So, the sales agents would have had to done something
 2   before that date in order to sell the products; is that
 3   correct?
 4   A.  Yes.
 5   Q.  And if we refer back up to the first page of this
 6   document, under or next to Box 16 under offer/quote --
 7   A.  Uh-huh.
 8   Q.  -- does that date of February 12th of 2019 match up with
 9   the -- is that the same date as the Julian date?
10   A.  No, it's not.
11   Q.  Okay.  So the Julian date event occurs before this date;
12   is that correct?
13   A.  Yes.
14   Q.  Thank you.
15           Ma'am, did you prepare a lost profit analysis for GMS
16   Industrial Supply?
17   A.  Yes.
18   Q.  Okay.  And if we could refer to trial Exhibit 98.
19   A.  Which binder would that be in?
20   Q.  It might be in 2.
21   A.  2, okay.
22   Q.  Okay.  Ma'am, do you recognize that document?
23   A.  I do.
24   Q.  Is that the document you prepared?
25   A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 233 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 54 of 103 PageID# 10987

54

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   Q.  Okay.
 2          MR. BERKLEY:  Your Honor, I would like to move this
 3   into evidence.
 4          THE COURT:  All right.  I believe we already dealt
 5   with the objection, which is noted, and so that's in.  It
 6   will be entered, and you may publish.
 7          MR. BERKLEY:  Thank you.  I'm sorry, Your Honor,
 8   did you say that was published?
 9          THE COURT:  You may publish it, yes.
10          MR. BERKLEY:  Thank you.
11          (Plaintiff's Exhibit 98 received in evidence.)
12   BY MR. BERKLEY:
13   Q.  Ms. Robichaux, does this document represent the lost
14   profit analysis that you prepared for GMS Industrial Supply?
15   A.  Yes.
16   Q.  Okay.  What does the first column on these pages
17   identify?
18   A.  This is the award number.
19   Q.  Okay.  And that's -- and if we go through all of those
20   pages and scroll through all of them, that's all of the
21   awards that who made?
22   A.  These are the awards for G&S Supply products.
23   Q.  Okay.  So these are not GMS Industrial Supply awards.
24   These are G&S Supply awards; is that right?
25   A.  Correct.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 234 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 55 of 103 PageID# 10988

55

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   Q.  Okay.  And your second column, going through those pages,
 2   what does that column represent?
 3   A.  This is the CAGE Code.
 4   Q.  And whose CAGE Code is represented in that column?
 5   A.  This is the CAGE Code for whom the award was awarded to.
 6   Q.  Okay.  And for who was the award awarded to?
 7   A.  There is G&S Supply.  There is a couple of other CAGE
 8   Codes that won awards for other G&S Supply products.
 9   Q.  Okay.  But this first CAGE Code, 7WPR4, is that G&S
10   Supply's CAGE Code?
11   A.  Yes.
12   Q.  Okay.  And if we scroll down a little bit, we see on that
13   first page -- you're on the second page, that's fine.  We see
14   a CAGE Code of 61125.  Do you see that?
15   A.  Yes.
16   Q.  Okay.  Why is that CAGE Code listed here?
17   A.  This is the CAGE Code for the company that was awarded
18   G&S Supply product.
19   Q.  Okay.  And that would be the same, if you go a little bit
20   lower, for 19151?
21   A.  Correct.
22   Q.  So if there is a different CAGE Code number than this
23   7WPR4, it would still be related to the sale of a G&S Supply
24   product; is that right?
25   A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 235 of 366
Case 2:19-cv-00324-RCY-LRL  Document 329  Filed 07/06/22  Page 56 of 103 PageID# 10989

56

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   Q.  Okay.  Now, what does the third column represent?

 2   A.  This is the award date.

 3   Q.  Okay.  And the award date is not the quote date, is it?

 4   A.  Correct.

 5   Q.  And the award date is not the Julian date?

 6           MR. MCFARLAND:  Objection, Your Honor.  Can the

 7   witness testify?  Leading.

 8           THE COURT:  All right.

 9           MR. BERKLEY:  Fine.

10           THE COURT:  Rephrase.  The objection is sustained.

11   You may rephrase.

12   BY MR. BERKLEY:

13   Q.  Ms. Robichaux, do you know the difference between the

14   award date and the solicitation date?

15   A.  Yes.

16   Q.  And do you know the difference between the award date and

17   the Julian date that we have talked about on award documents?

18   A.  Yes.

19   Q.  Okay.  Does this date represent the Julian date?

20   A.  No, it does not.

21   Q.  Does this column represent the quote date?

22   A.  No.

23   Q.  Okay.  Now, if we move forward to the G&S award total

24   column, do you see that?

25   A.  Yes.
```

USCA4 Appeal: 22-2090 Doc: 20-3 Filed: 01/19/2023 Pg: 236 of 366
Case 2:19-cv-00324-RCY-LRL Document 329 Filed 07/06/22 Page 57 of 103 PageID# 10990

57

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
1    Q.  What does that column represent?
2    A.  This is the total award amount for the G&S products.
3    Q.  Okay.  If we scroll down to the last page, did you total
4    up the G&S awards from -- that you listed on this document?
5    A.  Yes.
6    Q.  And what is that total?
7    A.  $961,397.18.
8    Q.  Okay.  Now, if we could go back up to the top.
9         What does the next column represent that you have,
10   QTY?
11   A.  That's for the quantity of how many items that were on
12   the award.
13   Q.  Okay.  So, in those first two rows, you have quantity
14   one.  So there was just one item for that award?
15   A.  Yes, one each.
16   Q.  And the next column or the next row, that would show
17   there was four for that award?
18   A.  Correct.
19   Q.  Okay.  All right.  And let's move on to the unit price
20   column.
21   A.  Okay.  This is the unit price for each item on the award.
22   Q.  Okay.  So, that was the price on the award documentation?
23   A.  Yes.
24   Q.  Okay.  Now, the next column represents GMS sale price.
25   Do you see that column?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 237 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 58 of 103 PageID# 10991

58

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1    A.   Yes.
 2    Q.   And does that run down along all of the awards as well?
 3    A.   Correct.
 4    Q.   Okay.  And what does that column represent?
 5    A.   This is the price that GMS Industrial Supply had for
 6    those items.
 7    Q.   Okay.  And how did you come by that sales price?
 8    A.   From our database.
 9    Q.   Okay.  And did you compare the products in your database
10    with what's in the award documentation?
11    A.   Yes.
12    Q.   Okay.  Now, the next column is lowest price, unit price.
13    What does that represent?
14    A.   It's the between, looking at the G&S product price and
15    the GMS sale price, we use the lowest sale price.
16    Q.   And so for each award, you would choose to set forth what
17    the lowest price --
18              MR. MCFARLAND:  Objection, Your Honor.  Can the
19    witness tell us what she did?
20              THE COURT:  Just what's your objection,
21    Mr. McFarland?
22              MR. MCFARLAND:  Absolutely leading, Your Honor.
23              MR. BERKLEY:  Okay.
24              THE COURT:  All right.  Thank you.  That's
25    sustained.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 238 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 59 of 103 PageID# 10992

59

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1           All right, Mr. Berkley, rephrase.

2           MR. BERKLEY:  Sure.

3    BY MR. BERKLEY:

4    Q.  Ms. Robichaux, so why did you use the lowest price, unit

5    price?

6    A.  Because that would have been the price that the

7    government paid for the product.

8    Q.  Okay.  So if the --

9           Okay.  So then we have a column, GMS cost.  What does

10   that represent?

11   A.   That's the GMS cost associated with the product.

12   Q.  Okay.  And how did you come by the GMS cost that you've

13   listed down these pages?

14   A.  It's the cost that's in our database, which is comprised

15   of the material costs, shipping costs, packaging, and

16   commissions paid.

17   Q.  Okay.  And then you have a profit lost column; is that

18   correct?

19   A.  Yes.

20   Q.  And how did you calculate the figure in the profit lost

21   column?

22   A.  Using the price that's in the lowest price, unit price,

23   subtracting out the GMS cost.

24   Q.  Okay.  And why did you subtract the GMS cost from the

25   lowest priced unit?

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1   A.  Those were the known costs that GMS would have had for

2   those items, so...

3   Q.  And this document represents GMS lost profits; is that

4   right?

5   A.  Correct.

6   Q.  Okay.  Then you have this column, extended profit loss.

7   Do you see that?

8   A.  Yes.

9   Q.  Why do you have that there?

10  A.  That was using the quantity column times the profit loss.

11  Q.  Okay.  So, we have to go to the column that says QTY, and

12  whatever that number was, multiply it by the profit loss,

13  right?

14  A.  Correct.

15  Q.  Okay.  Then if we scroll down to the last page, did you

16  come up with a total profit lost?

17  A.  Yes.

18  Q.  And what is that figure?

19  A.  $195,872.95.

20  Q.  Okay.  Now, again, Ms. Robichaux, the quote dates were

21  not the same as the award dates you have on here; is that

22  right?

23  A.  Correct.

24  Q.  And the Julian date is not the same as the award dates on

25  here, right?

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1    A.  Correct.

2    Q.  Now, when you came up with the GMS price, you said you

3    compared products, right?

4    A.  Yes.

5    Q.  Okay.  And you determined that you were able to -- that

6    GMS was able to sell the same product?

7    A.  Yes.

8         MR. MCFARLAND:  Objection, Your Honor, again

9    leading.

10        THE COURT:  Sustained.

11        MR. BERKLEY:  Okay.

12   BY MR. BERKLEY:

13   Q.  Ms. Robichaux, when you looked at the database, did you

14   compare it to the award documents?

15   A.  Yes.

16   Q.  Okay.  And did you find any inconsistencies between your

17   database and the award documents, so that you could not

18   determine the sales price?

19   A.  No.

20   Q.  Okay.  And that would be the same for the cost; is that

21   correct?

22   A.  Correct.

23   Q.  Okay.  Now, Ms. Robichaux, did you come to an

24   understanding of when G&S Supply first tried to sell a DLA

25   award or achieve a DLA award?

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   A.  Yes.
 2   Q.  Okay.  And how did you come by that date?
 3   A.  By reviewing the DLA award.
 4   Q.  Okay.  And do you remember what that date was?
 5   A.  September 15th, 2017.
 6   Q.  Okay.  And do you have an understanding of who created
 7   G&S Supply?
 8   A.  Yes.
 9   Q.  And who created it?
10   A.  Westly Greer and Greg Spires.
11   Q.  And have you come to an understanding of how much GMS
12   Industrial Supply paid Westly Greer from that date until the
13   time he became a sales agent for GMS Supply in 2019?
14   A.  Yes.
15   Q.  Okay.  And do you remember off the top of your head what
16   he was totally paid during that period of time?
17   A.  Not off the top of my head.
18   Q.  Okay.  And did you prepare a computation of what he was
19   paid during that period of time?
20   A.  Yes.
21   Q.  Okay.  And --
22          MR. BERKLEY:  May I approach, Your Honor?
23          THE COURT:  Yes.
24   BY MR. BERKLEY:
25   Q.  And, Ms. Robichaux, does that document represent your
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 242 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 63 of 103 PageID# 10996

63

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

1    computations?

2    A.  Yes, it does.

3    Q.  And so how much did Westly Greer make during that period

4    of time?

5    A.  $396,832.59.

6    Q.  Okay.

7            MR. BERKLEY:  Now, Your Honor, I would like to move

8    to trial Exhibit 78.

9            THE COURT:  All right.  Hold on a second.

10           Headsets everybody.

11           (Sidebar conference as follows:)

12           THE COURT:  All right.  Thumbs up if everybody can

13   hear me.

14           Can you hear me, Mr. Lascara?

15           All right.

16           So, in looking at my order, it says 78 was

17   withdrawn and the objection to it was withdrawn.

18           MR. BERKLEY:  Your Honor, I think this is where

19   there was some confusion with pulling exhibits out of the

20   binders when it was a withdrawn objection and not a

21   withdrawn exhibit, which we tried to correct last night, and

22   I'm not -- it looks like this one slipped through the

23   cracks.

24           THE COURT:  This is something different from last

25   night.  This has to do with the objections at the final

64

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1   pretrial conference that I asked you all to meet and confer
 2   about, and when you all met and conferred and filed your
 3   joint memorandum, it said with respect to Exhibit 78 that
 4   the the GMS contractor and payroll payments, that the
 5   exhibit was withdrawn and the objection was withdrawn.
 6            MR. BERKLEY:  Oh, so --
 7            THE COURT:  Am I incorrect?
 8            MR. BERKLEY:  So, in this document it had also Sky
 9   Spires' information.
10            THE COURT:  Okay.
11            MR. BERKLEY:  And it had Wayne Sides' information.
12            THE COURT:  Okay.
13            MR. BERKLEY:  And they were dismissed from the
14   case, so we withdrew those pages from this document and left
15   everything else in.
16            THE COURT:  Okay.
17            Is that your recollection, Mr. McFarland?
18            MR. MCFARLAND:  Yes, Your Honor.
19            THE COURT:  Okay.  Very good.  Let's proceed.
20            (End of sidebar conference.)
21            THE COURT:  All right, Mr. Berkley, go ahead.
22   BY MR. BERKLEY:
23   Q.  So, ma'am, do you have document or trial Exhibit 78 in
24   front of you?
25   A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 244 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 65 of 103 PageID# 10998

65

DANIELLE RENEE ROBICHAUX, Direct Examination By Mr. Berkley

```
 1    Q.   Okay.  And if we could flip through those pages.

 2          Ma'am, do you recognize this document?

 3    A.   Yes.

 4    Q.   Okay.  And is this a document you had custodial control

 5    of in your role at GMS Industrial Supply?

 6    A.   Yes.

 7    Q.   Okay.

 8          MR. BERKLEY:  Your Honor, I would like to admit

 9    this into evidence.

10          THE COURT:  All right.  Any objection?

11          MR. MCFARLAND:  No, not under the understanding,

12    Your Honor -- I don't think it's a business record.  It was

13    created for this litigation, so I think custodial control is

14    irrelevant, but we don't object with the --

15          THE COURT:  Okay.

16          MR. MCFARLAND:  -- withdrawn portions.

17          THE COURT:  All right.  No objection.  It will be

18    entered.  You may publish.

19          (Plaintiff's Exhibit 78 received in evidence.)

20    BY MR. BERKLEY:

21    Q.   So, if we can scroll through the document briefly.

22          Ma'am, if you could tell us what this document is.

23    A.   These are payroll records.

24    Q.   Okay.  So these are payroll records kept by GMS

25    Industrial Supply?
```

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1    A.  Yes.
 2            MR. BERKLEY:  That's all of the questions I have,
 3    Your Honor.
 4            THE COURT:  All right.
 5            Okay, Mr. McFarland, any cross?
 6            MR. MCFARLAND:  Yes, Your Honor.  Thank you.
 7            THE COURT:  All right.  And, Mr. McFarland, I'll
 8    ask you to pull the microphone over towards you --
 9            MR. MCFARLAND:  Okay.
10            THE COURT:  -- if you are going to be at that
11    podium, which is fine.
12            MR. MCFARLAND:  Thank you, Your Honor.
13            THE COURT:  Go ahead.
14                       CROSS-EXAMINATION
15    BY MR. MCFARLAND:
16    Q.  Good morning, Ms. Robichaux.
17    A.  Good morning.
18    Q.  Can we go to Plaintiff's 98, please?
19            THE COURT:  All right.  All right.  Is that it on
20    the screen?
21    BY MR. MCFARLAND:
22    Q.  Are you good with the screen?
23    A.  Yeah.
24    Q.  Okay.  All right.  If I followed you, ma'am, this is a
25    document that you created for this litigation, correct?
```

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

1   A.   Correct.

2   Q.   Okay.  And it's entitled GMS Lost Profit Final.

3        And if I understood your testimony on direct, this is

4   a listing of every sale my clients made during a period of

5   essentially 20- what, 2017 through 2019, correct, first

6   quarter of 2019?

7   A.   This is a listing of the DLA awards that we have for your

8   clients.

9   Q.   Right.  The DLA awards for my clients?

10  A.   Yes.

11  Q.   Okay.  First off, GMS never -- GMS, your employer, never

12  bid on a single one of these, did they?

13  A.   No.

14  Q.   These are all DIBBS board bids and sales to my client

15  that GMS never submitted a bid for, correct?

16  A.   Correct.

17  Q.   And the other assumption in this document is not only did

18  GMS not bid on any of these, but there is an assumption that

19  every sale my clients made would have gone to GMS?

20          MR. BERKLEY:  Your Honor, I object.

21          THE COURT:  All right.

22          MR. BERKLEY:  It's a mischaracterization calling it

23  an assumption.

24          THE COURT:  All right.

25          MR. MCFARLAND:  It's absolutely an assumption.

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/18/2023   Pg: 247 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 68 of 103 PageID# 11001

68

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1              MR. BERKLEY:  She just said what it is.  She just
 2    said what the awards were.
 3              THE WITNESS:  Correct.
 4              THE COURT:  Yes.  So, she said what the awards
 5    were.  I think it's proper cross-examination, and she can
 6    say if that's not the case.
 7              So go ahead, Mr. McFarland.
 8              So it's overruled at this time.
 9    BY MR. MCFARLAND:
10    Q.  Let's be clear, ma'am, what this document is purporting
11    to represent is that every non-NSN DIBBS board sale that my
12    client made would have somehow gone to GMS, notwithstanding
13    that they never even put in the first bid on any of these,
14    correct?  That's what this document is?
15    A.  Yes.  If your clients had sold GMS Industrial Supply
16    products to the customers, GMS Industrial Supply would have
17    gotten the awards.
18    Q.  But you're assuming that the customer would have wanted
19    GMS products, correct?
20    A.  If they were aggressively promoting GMS products to the
21    customers.
22    Q.  Except that we heard yesterday, and I don't want to
23    regurgitate but too much, but we saw that GMS in, for
24    example, Plaintiff's 110 put a moratorium on --
25              THE COURT:  What's your question, Mr. McFarland?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 248 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 69 of 103 PageID# 11002

69

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1              MR. MCFARLAND:  I'm getting to it.
 2   BY MR. MCFARLAND:
 3   Q.  GMS, as of January 10th, 2019, put a moratorium on these
 4   type of sales, correct, ma'am?
 5   A.  GMS put a moratorium on new non-NSN items.  We already
 6   had hundreds of non-NSN items.
 7   Q.  So, did you go through every one of my clients' sales
 8   through the DLA's DIBBS board and compare it to make sure
 9   that GMS actually had an existing CCPN kit for every one of
10   those items?
11   A.  Yes.  We researched -- I researched our database.
12   Q.  And you're telling me that every one of the items that my
13   clients sold, GMS had an existing CCPN kit at the time of the
14   sale?
15   A.  Not only kits or single items, we had those items
16   available.
17   Q.  Well, you would have to get those items, correct?
18   A.  There were already in our database.
19   Q.  Every one of these?
20   A.  Yes.
21   Q.  Was in your database?
22   A.  Yes.
23   Q.  Well, then why don't we see the GMS part or product
24   number on this document?
25   A.  There is no -- no product numbers listed on the document.
```

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   Q.  Well, wait a minute.  If we go to your catalog, ma'am,
 2   for your CCPN kits, there is a CAGE Code Number, right?
 3   A.  Yes.
 4   Q.  Okay.  And if you've got a part that you're selling for a
 5   customer, it's got to have a part number, correct?
 6   A.  That's correct.
 7   Q.  Yet on this, there is no part numbers here that show that
 8   GMS has these products available for sale, is there?
 9   A.  Not on this list, no.
10   Q.  This is the list that you're offering to the jury, right?
11   A.  Right.
12   Q.  Okay.  Ma'am, I notice --
13           So, we're operating on the assumption that every one
14   of these sales would have gone to GMS, correct?
15   A.  Yes.
16   Q.  Notwithstanding that GMS didn't want to do one-off sales,
17   as we've heard repeatedly from Mr. Gorken and Mr. Morton,
18   correct?
19   A.  Can you restate your question?
20   Q.  Sure.  We have heard --
21           THE COURT:  She wasn't in here for Mr. Gorken's
22   testimony or Mr. Morton's testimony.
23           MR. MCFARLAND:  I will rephrase, Your Honor.
24           THE COURT:  So you should rephrase that question.
25           MR. MCFARLAND:  I will definitely rephrase.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 250 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 71 of 103 PageID# 11004

71

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1            THE COURT:  Objection sustained.
 2   BY MR. MCFARLAND:
 3   Q.  You are familiar with the January 10th moratorium memo
 4   from Mr. Morton, correct?  You received a copy of that?
 5   A.  Yes.
 6   Q.  And you're familiar with even earlier the March 9th,
 7   2018, memorandum that said concentrate on existing CCPN
 8   existing kits if you're going to make non-standard sales,
 9   correct?
10   A.  Yes.
11   Q.  Okay.  But your testimony is this document is
12   representing things that GMS would have gotten,
13   notwithstanding the company's stated policy in its memorandum
14   to its sales agents, correct?
15   A.  Can you rephrase --
16   Q.  Sure.
17   A.  -- the question exactly?
18   Q.  Notwithstanding the company policy that you were well
19   aware of, right?
20   A.  Uh-huh.  Yes.
21   Q.  In fact, you helped formulate that policy --
22   A.  Yes.
23   Q.  -- right?
24            Concentrate on NSNs, and if you're going to bring us
25   CCPNs, they need to be existing CCPN kits, right?  That's the
```

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1    policy that is set forth in those memoranda?
 2    A.  To concentrate on the existing non-standard items.
 3    Q.  Okay.  And yet this is primarily a bunch of one-off
 4    sales.  The majority that I'm seeing here, for example, on
 5    the first page is quantity 1.  Non --
 6              MR. BERKLEY:  Your Honor.
 7              THE COURT:  Yes.
 8              MR. BERKLEY:  Your Honor, I object.  He's
 9    testifying to what they are.  The document speaks for
10    itself.
11              THE COURT:  Don't testify, Mr. McFarland.  Just ask
12    your question.
13              MR. MCFARLAND:  All right.
14    BY MR. MCFARLAND:
15    Q.  Let me also note, ma'am, the very first item here on
16    page 1, with a date of July 28, 2018, it says G&S Award Total
17    $25,000?
18    A.  Yes.
19    Q.  That means that's what DLA paid G&S?
20    A.  Correct.
21    Q.  For that price, for that item, correct?
22    A.  Yes.
23    Q.  Okay.  It then says -- keep going forward -- the GMS
24    sales price is $30,003.85.  And then you're -- continuing
25    forward -- you claim an extended profit loss and profit lost
```

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   of $9,959.22.
 2        The government isn't going to pay 30,000 -- at least
 3   I certainly hope the government isn't going to pay $30,003.85
 4   for GMS's sales price, when it could buy it from G&S and did
 5   buy it from G&S for 25,000, correct, ma'am?
 6   A.  If your clients promoted the GMS item, whatever this item
 7   is, if they promoted the GMS item, the customer would have
 8   entered the GMS price for that item, and that would have been
 9   what was awarded.
10   Q.  Well, the customer wouldn't have paid $30,000 on the
11   DIBBS board if they could get it for $25,000.
12   A.  If they would have submitted the GMS Industrial Supply
13   item, that would have been the item that would have been on
14   the DIBBS board.
15   Q.  So, you're saying my clients should have submitted a GMS
16   higher price to the government than what they sold it for?
17        THE COURT:  That's asked and answered twice,
18   Mr. McFarland, so go to your next question.
19        MR. MCFARLAND:  Very well.
20   BY MR. MCFARLAND:
21   Q.  I also note, ma'am, that on the third line down, the
22   award date is April 10th of 2019, correct?
23   A.  Yes.
24   Q.  My clients were terminated on April 3rd of 2019, correct?
25   A.  Correct.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 253 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 74 of 103 PageID# 11007

74

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   Q.  Can we go to Plaintiff's 92, please?
 2         You were asked a lot of questions, and I'm trying to
 3   make sure that I understand it and that the jurors understand
 4   all of this testimony about commissions paid to my clients.
 5         So, I'm looking at Plaintiff's 92, which I think is
 6   the payroll report for Thomas Hayes for the period -- the
 7   first page is February 18th, 2019 to March 3rd of 2019,
 8   correct?
 9   A.  Correct.
10   Q.  Okay.  So that's, give or take, a month before Mr. Hayes
11   is terminated?
12   A.  Yes.
13   Q.  Okay.  And if I follow, the two items on this page are
14   sales that he made for GMS, correct?
15   A.  Correct.
16   Q.  Not for G&S Supply?
17   A.  Correct.
18   Q.  For GMS?
19   A.  Yes.
20   Q.  That GMS was paid for by the government, correct?
21   A.  Correct.
22   Q.  Okay.  And, in fact, the first one of these is a DLA
23   sale, correct?
24   A.  Yes.
25   Q.  Okay.  And then the second one is FAS Southwest Supply
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 254 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 75 of 103 PageID# 11008

75

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   Center.
 2          And did I understand this was -- did we figure out
 3   which fort these were made at?
 4   A.  Fort Campbell for the first one.
 5   Q.  I'm sorry?
 6   A.  Fort Campbell for the first one.
 7   Q.  Okay.  That's in Kentucky, correct?
 8   A.  Yes.
 9   Q.  And we know that Mr. Hayes' Independent Sales Agent
10   Agreement, his stated territory was Louisiana, correct, in
11   his Independent Sales Agent Agreement?
12   A.  Yes.
13   Q.  Okay.  But obviously it was okay for GMS, they wanted him
14   to sell beyond that territory, and accepted the sales that he
15   made at Fort Campbell?
16   A.  We did.
17   Q.  Okay.  So -- and I think if we go through this, you said
18   that -- I'm just picking Mr. Hayes as an example -- his total
19   commissions from the time that he -- you think he began
20   selling for G&S Supply through his termination, which you
21   have on this document you created is 12/21/18 to March 3,
22   2019, is $12,087.78.  That's what you told us?
23   A.  Yes.
24   Q.  But those are commissions paid to him for sales for GMS
25   Industrial?
```

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1    A.   Yes.

 2    Q.   Successful sales?

 3    A.   Yes.

 4    Q.   Why does GMS think that it should take back commissions

 5    earned by my client on behalf of GMS sales?

 6    A.   Because he was also selling products for G&S Supply, and

 7    had he -- had we been aware of that, we would never have paid

 8    him sales or paid him commissions for sales for GMS.

 9    Q.   You think under his Independent Sales Agreement you have

10    the right to not pay him commissions for sales he made for

11    GMS?

12            MR. BERKLEY:  Your Honor, I object.  He's asking

13    for a legal opinion in a contract --

14            MR. MCFARLAND:  Well, I'm not asking for a legal

15    opinion.

16            THE COURT:  Let him finish, Mr. McFarland.

17            MR. BERKLEY:  He's asking for a legal opinion under

18    the contracts, and she's not up there to testify legally

19    about the contracts.

20            THE COURT:  All right.  So, I don't think it's a

21    legal opinion.  You asked her questions about various

22    provisions of each sale agreement, so I think he can pose a

23    question about the sale agreement as well.

24            You might want to rephrase it a little bit,

25    Mr. McFarland, but go ahead.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 256 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 77 of 103 PageID# 11010

77

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1              MR. MCFARLAND:  Sure.
 2   BY MR. MCFARLAND:
 3   Q.  You're trying to claw back, and by you, I mean GMS,
 4   ma'am, not you individually.
 5   A.  I understand.
 6   Q.  I know you wouldn't do that.
 7              You're trying to claw back commissions that my
 8   clients were paid at whatever percentage rate, what is it,
 9   18, 20 percent?
10   A.  It varies for the product.
11   Q.  For which your employer got the revenue fully paid by the
12   government, and they were GMS sales, correct?
13   A.  Yes.
14   Q.  Okay.  We're not talking about G&S Supply sales here?
15   A.  We're not.  We're talking about GMS Industrial.
16   Q.  Okay.  Can we go to -- I believe it's Plaintiff's
17   Exhibit 11.
18              MR. MCFARLAND:  I'm sorry.  What is Mr. Hayes'
19   contract?  I may have given you the wrong number.  I
20   apologize.
21              Plaintiff's 14, if we could publish Plaintiff's 14.
22              THE COURT:  All right.
23   BY MR. MCFARLAND:
24   Q.  And, Ms. Robichaux, you would agree with me this is the
25   Independent Sales Agreement for Thomas Hayes made as of
```

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   July 27th, 2016, correct?
 2   A.  Yes.
 3   Q.  And you testified that one of your duties is to keep
 4   track of these contracts, make sure they're executed.  You're
 5   essentially the custodian, I think is the word that was used
 6   for these agreements, correct?
 7   A.  Yes.
 8   Q.  Okay.  First off, ma'am -- and you're familiar with these
 9   documents?
10   A.  I am.
11   Q.  At this point in time, in 2016, essentially all of the
12   Independent Sales Agent Agreements are word for word the same
13   except for who, is, the independent sales agent or the
14   entity?
15   A.  Right.  Correct.
16   Q.  Some folks as we saw with Mr. Spires and the Greers, they
17   create an LLC company --
18   A.  Correct.
19   Q.  -- for tax purposes?
20        But Mr. Hayes -- so you would agree with me, word for
21   word these are pretty much the same?
22   A.  Identical, yes.  Uh-huh.
23   Q.  Okay.  First off, you would agree with me that Mr. Hayes
24   is an independent non-exclusive sales agent, correct?
25   A.  Non-exclusive sales agent for the territory.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 258 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 79 of 103 PageID# 11012

79

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1    Q.  Right.  Which means from the GMS perspective that you can
 2    put somebody else in his territory and -- for example, for
 3    him, his stated territory is Louisiana -- you can have
 4    another GMS either independent sales agent or employee sell
 5    in his territory, and he's stuck with that, right?
 6    A.  Right.
 7    Q.  But what it also means is that Mr. Hayes doesn't have to
 8    sell just for GMS Industrial, correct?  Yeah.
 9    A.  No.
10    Q.  Well, can you point me to a provision in this
11    agreement -- and you agree with me, this is the governing
12    document for GMS's relationship with Thomas Hayes?
13    A.  Yes.
14    Q.  Point me to a provision in here which says he can't sell
15    for another entity or for himself.
16    A.  I'm not seeing one, but that was never the understanding
17    of the document.
18    Q.  Well, ma'am, it may not be your understanding, but you
19    just agreed with me; it's the wording of this document, the
20    actual wording of this document that controls the
21    relationship between GMS, your employer, and Thomas Hayes, my
22    client, during the period that he was an independent sales
23    agent, correct?
24    A.  Yes.
25    Q.  Okay.  Now, I also would like you, and take whatever time
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 259 of 366

1    you need, to point out to me in this Independent Sales

2    Agreement where it says that when my client makes a

3    successful sale for GMS for which it receives revenue that it

4    can nonetheless withhold his commission.

5    A.  I'm reading in the commission Section 4, it's toward the

6    end.  "The company shall have the right -- shall have the

7    absolute right to" --

8            THE COURT:  I'm going to get you to slow down just

9    a hair.

10           THE WITNESS:  Okay.

11           THE COURT:  Thank you.

12           THE WITNESS:  "The company shall have the absolute

13   right in its discretion to refuse to accept any orders

14   procured through the agent and to refuse to ship any goods

15   described therein, or to make any allowance or adjustments

16   to orders and accept any returns of any shipments.  The

17   company shall notify the agent in writing of such refusal,

18   allowances or adjustments.

19   BY MR. MCFARLAND:

20   Q.  I'm sorry.  Can we scroll down?

21           Was that on the second page of the document?

22   A.  It goes into the second page, number 4 on the second page

23   at the top.

24   Q.  Okay.  But the commissions that GMS is trying to claw

25   back from Mr. Hayes were not for orders that the company

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 260 of 366

```
 1   refused.  They were for orders that the company sent the
 2   products and was paid in full by the government, correct?
 3   A.  Yes.
 4   Q.  Okay.  So this, what you just cited is of no
 5   consequences, it's not material to the issue with Mr. Hayes'
 6   commissions, is it?
 7   A.  What I was referring to is the "make allowances or
 8   adjustments to orders."
 9   Q.  But the company didn't make any allowances or
10   adjustments.  The company shipped and was paid for exactly
11   for the orders that Mr. Hayes placed, correct?
12   A.  Correct.
13   Q.  Okay.  And in fact, ma'am, if we go to paragraph 11 in
14   the Independent Sales Agent Agreement, this paragraph is
15   entitled Commission Payments After Termination.  "The agent
16   will be paid commissions on all orders from the territory
17   accepted by the company prior to the effective termination
18   date, even though such orders may be shipped after the
19   effective date of termination."
20        And yet putting aside that GMS wants to claw back the
21   commissions that my client earned on GMS's behalf --
22        THE COURT:  Question, Mr. McFarland.
23        MR. MCFARLAND:  Certainly, Your Honor.
24   BY MR. MCFARLAND:
25   Q.  -- the reality is that GMS still owes Mr. Hayes
```

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/18/2023   Pg: 261 of 366

```
 1   commissions for sales he made on GMS's behalf, but that they
 2   won't pay him; isn't that correct, ma'am?
 3   A.  No.  That's not correct.
 4   Q.  You are telling this Court and this jury that Mr. Hayes
 5   doesn't have unpaid commissions for sales that GMS made, he
 6   made on behalf of GMS, and GMS was paid in full by the
 7   government?
 8            MR. BERKLEY:  Objection to the mischaracterization,
 9   Your Honor.  That's not what she just testified to.
10            THE COURT:  Well --
11            MR. BERKLEY:  He asked her what the contract does,
12   and she explained what it does.  And now he's asking her
13   something else, and he mischaracterized her testimony.
14            THE COURT:  Mr. McFarland.
15            MR. MCFARLAND:  I don't want to mischaracterize her
16   testimony.  Let me take it this way --
17            THE COURT:  Rephrase your question.
18            MR. MCFARLAND:  I'll rephrase.
19   BY MR. MCFARLAND:
20   Q.  You would agree with me, ma'am, that Mr. Hayes still is
21   owed commissions for sales he made prior to his termination
22   on April 3rd, 2019.  There are sales that went through, for
23   which GMS received the revenue but has not paid Mr. Hayes'
24   commissions, correct?
25   A.  No.
```

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   Q.  You think GMS has paid Mr. Hayes everything he is
 2   entitled to for commissions, for all of the sales that he
 3   made on GMS's behalf prior to April 3rd, 2019?
 4   A.  Yes.  Because GMS has to accept the -- accept the sales.
 5   Q.  Well, GMS did accept the sales.  It accepted the revenue
 6   from the government, didn't it, ma'am?
 7   A.  There is documentation that the sales agents would have
 8   to provide for GMS to accept the sales --
 9   Q.  Did GMS get --
10   A.  -- in order to pay commission.
11   Q.  -- did GMS get paid from the government for the sales
12   that Mr. Hayes made, for every sale that Mr. Hayes made prior
13   to April 3rd, 2019?
14   A.  I would have to check accounting records to be sure that
15   we got paid everything from the government, but...
16   Q.  Well, do you have any indication that the government
17   didn't pay GMS for any sale that Mr. Hayes made prior to
18   April 3rd, 2019?
19   A.  No.  Not at this time, no.
20   Q.  So, is it your testimony that because he was terminated
21   and no longer had access to GMS records that somehow he
22   didn't do something, that he didn't fully earn those
23   commissions for the sales he made?
24   A.  If he didn't turn in the proper documentation for GMS to
25   accept the sales prior to his termination, he would not be
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 263 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 84 of 103 PageID# 11017

84

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1  owed the commission.
 2  Q.  Well, do you have any evidence that he didn't turn in the
 3  proper documentation prior to his termination?
 4  A.  I know that there was some documents that came in after
 5  his termination, not prior.
 6  Q.  So if he nonetheless, even though you terminated him, was
 7  fulfilling his duties and providing you the evidence, further
 8  confirmation of the sales, that's unacceptable; is that what
 9  GMS's position is?
10  A.  If GMS hadn't accepted the documentation, correct.
11  Q.  Notwithstanding that the sale was made, it received the
12  revenue, and it's not going to accept the documentation
13  because GMS terminated him; is that what you're saying?
14  A.  He did not turn the documentation in prior.
15  Q.  All right.  But you didn't say he didn't turn it in.  You
16  can't --
17          THE COURT:  Mr. McFarland, I think we're starting
18  to exhaust this line of questioning.
19          MR. MCFARLAND:  Well, I just want to make sure.
20          THE COURT:  I am going to give you one more on
21  this, and then let's move forward.
22          MR. MCFARLAND:  For my clients, Your Honor, we have
23  a counterclaim --
24          THE COURT:  I understand.
25          MR. MCFARLAND:  -- for monies they are owed.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 264 of 366
Case 2:19-cv-00324-RCY-LRL    Document 329    Filed 07/06/22    Page 85 of 103 PageID# 11018

85

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1          THE COURT:  I understand.  But it seems like we're
 2   asking the same question and getting the same answer, that's
 3   what I'm talking about.
 4          MR. MCFARLAND:  Okay.
 5          THE COURT:  So one more question on that particular
 6   thing and then let's go.
 7   BY MR. MCFARLAND:
 8   Q.  Can you name me a single sale for which Thomas Hayes was
 9   the sales agent prior to April 3rd, 2019, for which he did
10   not either turn in his documentation or attempt to turn it in
11   after April 3rd?
12   A.  Not off the top of my head, no.
13   Q.  By the way, ma'am, the document that was created for the
14   commissions that GMS wants to claw back from this gentleman,
15   you created this, correct?
16   A.  Yes.
17   Q.  Okay.  You would agree with me it's never been produced
18   to me or my clients prior to today?
19   A.  I don't...
20   Q.  Pardon?
21   A.  I don't know.
22   Q.  Well, when did you create it?
23   A.  Um, I created that several days ago from the commission
24   reports that have already been received.
25   Q.  You created this several days ago?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 265 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 86 of 103 PageID# 11019

86

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   A.   To total it up.

 2   Q.   This case has been going on how long, ma'am?

 3   A.   Three years.

 4   Q.   Okay.  Could we go to Plaintiff's 95.

 5        This is a document that you testified about on direct

 6   exam, ma'am.

 7   A.   Yes.

 8   Q.   Okay.  And this is the report of Sabrina Greer's sales

 9   for GMS, correct?

10   A.   Correct.

11   Q.   And I guess this is a several-page document?

12   A.   Uh-huh.

13   Q.   Okay.  And Ms. Greer sold exclusively at Fort Riley, do I

14   understand?

15   A.   Fort Carson.

16   Q.   Fort Carson, I'm sorry.

17        Fort Carson, correct?

18   A.   Fort Carson.

19   Q.   Am I correct that every one of Sabrina Greer's sales was

20   an NSN sale?

21   A.   Um, I would have to go back and look at all of the

22   specific sales.

23   Q.   Pardon?

24   A.   I would have to go back and look at all of the specific

25   sales to see.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 266 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 87 of 103 PageID# 11020

87

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
1    Q.   If we look at Plaintiff's 247, please.
2             Do you recognize this document, ma'am?
3    A.   Yes.
4    Q.   This is a DLA report for a sale for GS Supply LLC,
5    correct?
6    A.   Yes.
7    Q.   Okay.  And the date of order is November 30th of 2017?
8    A.   Correct.
9    Q.   And is this the document that you used as the starting
10   point for when Sabrina Greer began selling for G&S Supply?
11   A.   Yes.
12   Q.   Okay.  Where on this document do we find Mrs. Greer's
13   name?
14   A.   Her name is not on this document.
15   Q.   So how do we know that this is a Sabrina Greer sale?
16   A.   It was at Fort Carson.
17   Q.   Who else sold at Fort Carson?
18   A.   Westly Greer.
19   Q.   Okay.  Who else?
20   A.   For GMS Supply, GMS Industrial Supply?
21   Q.   Yes.
22   A.   At this time, it was only Sabrina and Westly.
23   Q.   When did Amber Wenrick begin selling at Fort Carson?
24   A.   I don't recall off the top of my head.  I would have to
25   see an agreement.  I don't have one.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 267 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 88 of 103 PageID# 11021

88

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

1   Q.  Well, isn't it possible then that this is either a Westly

2   Greer sale or an Amber Wenrick sale?

3   A.  For G&S?

4   Q.  Yeah.

5   A.  I don't recall when Amber Wenrick started selling for --

6   at Fort Carson, so I don't have that date.

7   Q.  Well, what you've done, ma'am, is you've just taken this

8   date for this G&S sale and assumed that from then on every

9   sale at Fort Carson was a Sabrina Greer sale, correct?

10  A.  Yes.

11  Q.  I don't dispute your math, I guess.  I'll assume that's

12  correct.

13        But whether or not it was for Sabrina Greer or Westly

14  Greer or Amber Wenrick, we can't tell, and you can't tell

15  from just looking at the DLA awards, correct?

16  A.  From this document, no.

17  Q.  Pardon me?

18  A.  No, not from this document.

19  Q.  And is it fair to say -- so I don't belabor this too

20  much -- that these totals that you came up with for sales or

21  the commissions, and I guess you did it for Sabrina, too,

22  right?

23  A.  Yes.

24  Q.  And that figure is for commissions that Sabrina sold for

25  products for GMS, correct?

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   A.  Correct.
 2   Q.  And, again, that's why I asked about NSNs, because
 3   Sabrina Greer sold nothing but NSNs for GMS, correct?
 4   A.  Again, I would have to look at every sale she ever made.
 5   I don't know specifically that they were only NSN items.
 6   Q.  Okay.  Well, you would agree with me if they were NSN
 7   items, those were not sales that my clients even could have
 8   made, correct?
 9   A.  G&S did not have any NSNs.
10   Q.  Exactly.
11        And I take it that these sheets that you made, they
12   were all made about the same time?
13   A.  Yes.
14   Q.  A few days ago?
15   A.  Yes.
16   Q.  I asked you about Mr. Hayes and his efforts on behalf of
17   GMS and the commissions that he's owed.
18        Who was the top sales agent for GMS in 2017,
19   independent sales agent?
20   A.  I don't have that total in my head.
21   Q.  Would you believe it might be Thomas Hayes?
22   A.  Quite possible.
23   Q.  And who was the top independent sales agent for GMS in
24   2018?
25   A.  Again, I don't have that information in my head.
```

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

1    Q.  Would you accept that it was Thomas Hayes?

2    A.  Possible.

3    Q.  And in fact, Hayes, Mr. Hayes and Mr. Spires were the two

4    top sales agents in 2018 for GMS, correct?

5    A.  They were quite successful, yes.

6    Q.  And they earned GMS as --

7            MR. BERKLEY:  Your Honor, I am going to object.

8    This is going way beyond direct.

9            MR. MCFARLAND:  Oh, no.

10           THE COURT:  How is it beyond direct, Mr. Berkley?

11           MR. BERKLEY:  We weren't talking about the sales

12   experience and what these gentlemen have done over a period

13   of time.

14           THE COURT:  Right.  But you did talk about sales

15   and commission and how much people made on commissions,

16   correct?

17           MR. BERKLEY:  Yeah.  During a set period of time,

18   Your Honor.

19           THE COURT:  Yeah.  I think it's proper

20   cross-examination.

21           MR. MCFARLAND:  I'm talking about the same period

22   of time, Your Honor.

23           THE COURT:  All right.  I think it's proper.

24           MR. MCFARLAND:  They want to claw back commissions.

25           THE COURT:  I have overruled the objection.  Go

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   ahead with your next question, Mr. McFarland.
 2          MR. MCFARLAND:  Thank you, Your Honor.
 3   BY MR. MCFARLAND:
 4   Q.  We've seen a figure for the commissions you want to claw
 5   back for Mr. Hayes for his successful sales, and the
 6   commissions you want to claw back from Sabrina for her
 7   successful sales, and from Greg Spires for his successful
 8   sales, and Mike Welton for his successful sales.
 9          Have you presented any figures about the actual
10   revenues that these gentlemen and Mrs. Greer brought in for
11   GMS?
12   A.  No.
13   Q.  Now, with respect to Mr. Greer, you testified that he
14   went from being the director of sales to an independent sales
15   agent in January of 2019, correct?
16   A.  Yes.
17   Q.  And I think we've seen the addendum to his Independent
18   Sales Agent Agreement that's dated 1/12/19, and the agreement
19   itself is dated 1/21/19?
20   A.  Uh-huh.
21   Q.  Is it possible that the addendum date, the middle date,
22   or that the day got transposed?
23   A.  There was a series of documents that I sent to him, had a
24   discussion about these are the documents that I am going to
25   send to you to make your Independent Sales Agent Agreement
```

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   effective, and the Zone Manager Addendum is one of the
 2   documents in that packet.  I don't know the specific date
 3   that I sent those things to him.
 4   Q.  But the documents are to be taken together, correct?
 5   A.  Yes.
 6   Q.  In other words, he's now an independent sales agent?
 7   A.  Yes.
 8   Q.  But what GMS is saying is we value you so much that we
 9   also still want you to be the supervisor of some other agents
10   in a certain zone?
11   A.  In a certain zone, yes.
12   Q.  And therefore, he still had access to certain materials
13   that other just plain independent sales agents wouldn't have
14   access to?
15   A.  Correct.
16   Q.  Now, you were asked about why Mr. Greer went from being
17   director of sales to an independent sales agent, correct?
18   A.  Yes.
19   Q.  Okay.  In fact, ma'am, you were on a phone call with
20   Mr. Gorken and Mr. Greer when he indicated that he wanted to
21   switch to being a sales agent because he wasn't getting paid
22   his proper bonus, correct?
23   A.  I remember being on phone calls.  I don't remember the
24   details of the conversation.
25   Q.  Well, do you remember that Mr. Greer's beef, or what he
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 272 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 93 of 103 PageID# 11026

93

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   was upset about and why he went from being director of sales
 2   to an independent sales agent was compensation, his
 3   compensation?
 4   A.   I know that he had concerns about it.  I don't remember
 5   the specifics of the conversation.
 6           THE COURT:  All right.  Mr. McFarland, we're going
 7   to take the morning recess at this time, so I'm going to
 8   excuse the jury and give them a break.
 9           Again, ladies and gentlemen, don't discuss your
10   testimony until the case is submitted to you.
11           (The jury exited the courtroom at 11:19 a.m.)
12           THE COURT:  All right.  We'll give the jury and the
13   court reporter about 15 minutes to rest her fingers, and
14   then we'll come back and resume with your cross-examination
15   at 11:35.
16           MR. MCFARLAND:  Thank you, Your Honor.
17           (Recess from 11:26 a.m. to 11:35 a.m.)
18           THE COURT:  All right, Mr. McFarland, you may
19   continue with your cross.
20           MR. MCFARLAND:  Thank you very much, Your Honor.
21           If we may publish Plaintiff's 98, please.
22           THE COURT:  All right.
23   BY MR. MCFARLAND:
24   Q.   Ma'am, again, this is the document that you created for
25   the lost profits?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 273 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 94 of 103 PageID# 11027

94

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
1   A.  Yes.

2   Q.  Okay.  And I notice that while the majority of the time

3   the G&S price is lower than the GMS price, that's not always

4   the case, right?

5   A.  Correct.

6   Q.  There are some times when GMS has a lower price, or at

7   least the lowest unit price than my client got for the

8   successful award, correct?

9   A.  Yes.

10  Q.  Okay.  Could we have Plaintiff's 97, please.

11          With respect to this document, ma'am, I don't know

12  that we discussed Mr. Spires' commission reports, but this is

13  again a document that you created?

14  A.  Yes.

15  Q.  Okay.  I notice highlighted in yellow it's plus 1,600

16  spifs; is that what it is?

17  A.  Yes, it is.

18  Q.  What are spifs?

19  A.  Spifs is if we were trying to promote specific items.  In

20  order to increase the sales on that specific item, we would

21  offer a spif or a dollar amount, $50, $100 to promote those

22  particular items, and if the sales agents sold them, they

23  would get the spif.

24  Q.  So in other words, Mr. Spires earned $1,600 in spifs, or

25  essentially it's a bonus, right?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 274 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 95 of 103 PageID# 11028

95

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   A.   Right.
 2   Q.   Okay.  And you're getting that because you've met or
 3   exceeded a sales quota for a product that GMS is pushing?
 4   A.   Not exactly.  If there was a product that we said, if you
 5   sell this product, you would get a spif, a dollar amount, so
 6   he would have sold that product during that time.
 7   Q.   For GMS?
 8   A.   For GMS.
 9   Q.   Okay.  So in other words, he's been pretty successful
10   because he's not only getting the regular commissions, but
11   he's sold the product that GMS is emphasizing at that time
12   and getting an extra payment for it?
13   A.   Yes.
14   Q.   Okay.  And I don't want to belabor it too much, but we're
15   going to see spifs on there for Thomas Hayes and Michael
16   Welton, correct?
17   A.   Yes.
18   Q.   You would agree with me, ma'am, putting aside the dispute
19   that brings us here together, one thing we can agree on is my
20   clients were darn good salespeople for GMS?
21   A.   They did well, yes.
22   Q.   And could we have Plaintiff's Exhibit 518, please.
23        This is a GMS catalog, ma'am, that you're familiar
24   with?
25   A.   GMS Industrial Supply catalog, yes.
```

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/19/2023   Pg: 275 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 96 of 103 PageID# 11029

96

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   Q.  Now, I note that the title is Department of Defense
 2   Supply Catalog, and underneath that is NSN.  And we've heard
 3   a lot about the NSN sales.  Those are the pre-approved
 4   contracts with the government, correct, DLA or GSA?
 5   A.  Yes.
 6   Q.  Okay.  Then there is FedMall, which is another, as I
 7   understand it, another manner that you can sell to the
 8   government?
 9   A.  Correct.
10   Q.  But which my clients never used, correct, for G&S Supply?
11   A.  Prior to it being called FedMall it was EMALL, and Greg
12   Spires had customers using EMALL.
13   Q.  For GMS?
14   A.  Yes.
15   Q.  Right.  But not for G&S Supply?
16   A.  Not that I'm aware.
17   Q.  All right.  And if we go, ma'am --
18        I guess maybe scroll down.  I think it's either at
19   the bottom of the page -- I'm sorry.  Maybe it's the very end
20   of the catalog.  Okay.  Yep.  Here we go.
21        On the very bottom at the right it says, "Need
22   tactical products?  GMS offers the Storm Tactical
23   international product line."
24        What is the Storm Tactical international product
25   line?
```

USCA4 Appeal: 22-2090   Doc: 20-3   Filed: 01/19/2023   Pg: 276 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 97 of 103 PageID# 11030

97

DANIELLE RENEE ROBICHAUX, Cross-Examination By Mr. McFarland

```
 1   A.  It would have been tactical products, protective gear,
 2   things like that.
 3   Q.  I'm sorry.  Protective gear?
 4   A.  Protective gear, equipment.
 5           MR. BERKLEY:  And, Your Honor, this seems to be way
 6   out of the scope of direct.
 7           THE COURT:  All right.
 8           Mr. McFarland, I don't remember him asking any
 9   questions to this witness about the catalog or anything
10   related to tactical gear.
11           MR. MCFARLAND:  No, Your Honor, but the witness
12   yesterday testified about getting price quotes, sometimes
13   the need to get three price quotes for certain items, I
14   think on the DIBBS board, and that's where this is going.
15           THE COURT:  Okay.  So, sustained for right now, but
16   let's go there.
17   BY MR. MCFARLAND:
18   Q.  Is Storm Tactical then, ma'am, an affiliate or subsidiary
19   company of GMS?
20   A.  It was our d/b/a.
21   Q.  I'm sorry?
22   A.  It was our d/b/a.
23   Q.  D/b/a?
24   A.  Yes.
25   Q.  So it's -- I'm not sure what that means.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 277 of 366

```
 1    A.   It's a doing business as.
 2    Q.   Is it GMS doing business as Storm Tactical, or Storm
 3    Tactical doing business as GMS?
 4    A.   Storm Tactical as GMS.
 5    Q.   Okay.  And who owns Storm Tactical?
 6    A.   It's GMS.
 7    Q.   It's not a separate corporate entity?
 8    A.   No.
 9    Q.   Well, did GMS regularly use Storm Tactical for quotes for
10    items when three price quotes were required?
11    A.   There may have been times.
12    Q.   And you're sure Storm Tactical isn't a company that's
13    owned by Gary Gorken?
14    A.   Correct.
15    Q.   What is G Cubed?
16    A.   G Cubed is a company owned by Gary Gorken.
17    Q.   And what does G Cubed sell?
18         MR. BERKLEY:  Your Honor, I think this is getting
19    way beyond where we were.
20         THE COURT:  Sustained.
21         Next question.
22         MR. MCFARLAND:  One moment, if I may, Your Honor.
23         THE COURT:  Certainly.
24         MR. MCFARLAND:  Thank you, ma'am, that's all of the
25    questions I have.
```

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/18/2023    Pg: 278 of 366
Case 2:19-cv-00324-RCY-LRL   Document 329   Filed 07/06/22   Page 99 of 103 PageID# 11032

99

DANIELLE RENEE ROBICHAUX, Redirect Examination By Mr. Berkley

```
 1              THE COURT:  All right.

 2              Mr. Berkley, any redirect?

 3              MR. BERKLEY:  Yes, Your Honor.

 4              THE COURT:  All right.

 5              MR. BERKLEY:  Your Honor, if I could refer to

 6   Exhibit 14.

 7              THE COURT:  All right.

 8                     REDIRECT EXAMINATION

 9   BY MR. BERKLEY:

10   Q.  Binder 1.

11              MR. BERKLEY:  Madam Clerk, I think you need to

12   switch it.

13              THE CLERK:  Sorry.

14              THE COURT:  All right.  Go ahead, Mr. Berkley.

15   BY MR. BERKLEY:

16   Q.  Ms. Robichaux, Mr. McFarland asked you about this

17   document and your understanding of this document.

18              Let me ask you this:  Did you ever go to law school?

19   A.  No.

20   Q.  Do you have a law degree?

21   A.  No.

22   Q.  Did you draft this document?

23   A.  No.

24   Q.  Okay.  And now let me ask you something.  In Section 1,

25   you were talking -- you identified "aggressively promote,"
```

DANIELLE RENEE ROBICHAUX, Redirect Examination By Mr. Berkley

```
 1    right?
 2    A.  Yes.
 3    Q.  And what is your understanding of aggressively promote?
 4             MR. MCFARLAND:  I am going to object, Your Honor,
 5    way beyond the scope of my cross; and B, now he's asking her
 6    for a legal conclusion, or at least an opinion about the
 7    wording of the document.  The document says what it says.
 8    It hasn't been claimed to be ambiguous.  You don't get to
 9    try and put in parol evidence on her understanding.
10             THE COURT:  The document does say --
11             Well, go ahead, Mr. Berkley.
12             MR. BERKLEY:  Okay.  Your Honor, he did ask her
13    about provisions of this document.  I do not believe it is
14    beyond the scope.
15             THE COURT:  He did.  It is not beyond the scope.
16             Overruled.
17             MR. BERKLEY:  He was asking her --
18             THE COURT:  I overruled his objection.  You won.
19    Go ahead and ask your next question.
20             MR. BERKLEY:  Okay.
21    BY MR. BERKLEY:
22    Q.  So, ma'am, the aggressively promote section in there,
23    were the agents required to aggressively promote --
24    A.  Yes.
25    Q.  -- for GMS?
```

USCA4 Appeal: 22-2090    Doc: 20-3    Document 329    Filed: 01/19/2023    Pg: 280 of 366
Case 2:19-cv-00324-RCY-ERL   Document 329   Filed 07/06/22   Page 101 of 103 PageID# 11034

101

DANIELLE RENEE ROBICHAUX, Redirect Examination By Mr. Berkley

1   A.  Yes.

2   Q.  And do you believe that aggressively promoting means they

3   could walk in and sell both GMS and G&S Supply products to

4   customers?

5          MR. MCFARLAND:  Objection.  Mr. Berkley is now

6   testifying, not asking a question.

7          THE COURT:  I think you mean leading.

8          MR. MCFARLAND:  Yes.

9          THE COURT:  And that objection is sustained.

10          MR. BERKLEY:  Okay.

11          THE COURT:  Go ahead, Mr. Berkley.  You may

12   rephrase.

13          MR. BERKLEY:  All right.

14   BY MR. BERKLEY:

15   Q.  If we can move on to Section 12 of this document.  Go to

16   13 and 14.

17          Now, Ms. Robichaux, when you were talking about these

18   pages that you prepared in order to, you know, have the

19   number more recently in front of you with these

20   commissions --

21   A.  Uh-huh.

22   Q.  -- how long had you had those commission reports before

23   you prepared those?

24   A.  Since the commission reports were created.

25   Q.  And you had reviewed those commission reports multiple

JILL H. TRAIL, Official Court Reporter

**JA985**

USCA4 Appeal: 22-2090    Doc: 20-3    Filed: 01/19/2023    Pg: 281 of 366
Case 2:19-cv-00324-RCY-ERL   Document 329   Filed 07/06/22   Page 102 of 103 PageID# 11035

102

DANIELLE RENEE ROBICHAUX, Redirect Examination By Mr. Berkley

```
 1   times in this case; is that right?
 2   A.  Yes.
 3   Q.  Okay.  Do you recollect when Amber Wenrick was hired by
 4   GMS Industrial?
 5   A.  I don't recall specifically.  I believe it might have
 6   been 2018.  I don't recall specifically.
 7   Q.  Okay.  So, if she was hired in 2018, that would be -- was
 8   she hired after Sabrina Greer?
 9   A.  Yes.
10   Q.  Okay.  And was she hired after Westly Greer?
11   A.  Yes.
12          MR. BERKLEY:  That's all of the questions I have,
13   Your Honor.
14          THE COURT:  Okay.  Thank you.
15          May Ms. Robichaux be excused, Mr. Berkley?
16          MR. BERKLEY:  Hold on one second, Your Honor.
17          THE COURT:  Yes.
18          MR. BERKLEY:  Excuse me, Your Honor.  No questions,
19   Your Honor.  She can be excused.
20          THE COURT:  Mr. McFarland?
21          MR. MCFARLAND:  Yes, Your Honor.
22          THE COURT:  All right.
23          All right, Ms. Robichaux, you may be excused.
24   You're free to either stay in the courtroom, or you may
25   leave the courthouse.  Thank you very much.
```

DANIELLE RENEE ROBICHAUX, Redirect Examination By Mr. Berkley

1              Plaintiffs, call your next witness.  Who is your

2      next witness?

3              (End of excerpt.)

4

5                         CERTIFICATION

6

7         I certify that the foregoing is a correct transcript

8      from the record of proceedings in the above-entitled matter.

9

10

11      _____/s/_____

12                    Jill H. Trail

13                    July 6, 2022

14

15

16

17

18

19

20

21

22

23

24

25

**JA987**

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    Norfolk Division

 3

 4    - - - - - - - - - - - - - - - - - -
                                       )
 5    GMS INDUSTRIAL SUPPLY, INC.,      )
                                       )
 6            Plaintiff,                )   CIVIL ACTION NO.
                                       )   2:19cv324
 7      v.                              )
                                       )
 8    G&S SUPPLY, LLC, et al,           )
                                       )
 9            Defendants.               )
      - - - - - - - - - - - - - - - - - -

10

11

12                TRANSCRIPT OF PROCEEDINGS
                    (MOTIONS EXCERPT)

13                  Norfolk, Virginia

14                    June 3, 2022

15

16    BEFORE:  THE HONORABLE RODERICK C. YOUNG
               United States District Judge

17

18

19    APPEARANCES:

20            PENDER & COWARD, P.C.
              By:  William Lascara
21                 Thomas Berkley
                   Jeffrey Wilson
22                 Daniel Berger
                   Counsel for the Plaintiff
23
              MCGUIRE WOODS LLP
24            By:  Robert W. McFarland
                   Micaylee A. Noreen
25                 Jeanne Noonan
                   Counsel for the Defendants
```

JILL H. TRAIL, Official Court Reporter

**JA988**

2

```
1              (Excerpt of Proceedings)
2          THE COURT:  All right.  So, we'll be in recess
3    until around 3:30, and then I'll come back and hear your
4    motion.  How we'll do it is this, since we have a number of
5    counts is that, Mr. McFarland, I'll ask you if you have a
6    motion on Count One.  I'll hear you.  I'll hear plaintiff's
7    response.  I'll hear your reply, if any, and then I'll
8    either rule and we'll move on to Count Two.  We'll do it
9    that way as opposed to saying everything as it relates to
10   every count and then having them do the same.  All right.
11         So, we'll take a brief recess.  We'll be back
12   around 3:30, and we'll get going with that motion.  All
13   right.
14             (Court stood in recess from 3:15 p.m. to 3:33 p.m.)
15         THE COURT:  All right, Mr. McFarland, do you have
16   any motion as it relates to Count One, breach of duty of
17   loyalty?
18         MR. MCFARLAND:  I do, Your Honor.
19         THE COURT:  All right.
20         MR. MCFARLAND:  If I can get my mask off.
21         Your Honor, the plaintiff having rested, the
22   defendant moves for judgment as a matter of law pursuant to
23   Rule 50(a) of the Federal Rules of Civil Procedure on all of
24   the counts, and I'll take them one by one as the Court has
25   directed.
```

JILL H. TRAIL, Official Court Reporter

# JA989

```
1              THE COURT:  Yes.
2              MR. MCFARLAND:  So, the first count is breach of
3    duty of loyalty against Defendant Westly Greer, and the
4    Court has held that this is governed by Colorado law.  And
5    the elements are that the defendant was acting as a
6    fiduciary of the plaintiff, that he breached a fiduciary
7    duty to the plaintiff, that the plaintiff incurred damages,
8    and that the defendant's breach of the fiduciary duty was a
9    cause of the plaintiff's damages.
10             THE COURT:  Yes.
11             MR. MCFARLAND:  We will accept, Your Honor, that as
12   an employee Mr. Greer owed a fiduciary duty.
13             THE COURT:  Okay.
14             MR. MCFARLAND:  What has not been proven by the
15   evidence is:  What is the breach of the fiduciary duty by
16   Mr. Greer, or particularly that the defendant's breach,
17   whatever it was, caused the plaintiff to suffer damages from
18   that breach.  There simply has not been evidence that links
19   damage to the plaintiff from an alleged breach of fiduciary
20   duty.  I think there has been evidence about -- we don't
21   accept it, obviously, but there has been evidence presented
22   on lost profits.  The expert accountant talks about unjust
23   enrichment, but no one has linked those alleged damages to a
24   breach of fiduciary duty by Greer.
25             THE COURT:  All right.  Okay.
```

4

```
 1            Plaintiff, your response.
 2            MR. LASCARA:  Your Honor, first, we note that the
 3     standard here is high, and that the presumption is in favor
 4     of the plaintiff when these motions are made.
 5            And so the issue of causation of damages, I think
 6     Westly Greer had a duty of loyalty.  He had a duty of full
 7     disclosure.  And lots of proof came in that he failed to
 8     inform his employer that he had gone off at a time where he
 9     was especially counted on, as was explained in the testimony
10     of Gary Gorken, to be needed within the company.
11            THE COURT:  Well, let me ask you this.
12     Mr. McFarland doesn't disagree that Mr. Greer as an employee
13     of GMS was acting as a fiduciary.  The second element is
14     that Mr. Greer breached a fiduciary duty to act with the
15     utmost loyalty on behalf of GMS.
16            So, what was his fiduciary duty, and what was the
17     breach of that duty?
18            MR. LASCARA:  Well, his fiduciary duty was of full
19     disclosure, and he did not fully disclose that he had
20     created what was a competing company.  He withheld that
21     information from the management, and he gathered together
22     those who were willing to participate with him, and he went
23     off and he competed.  And we showed in a number of catalog
24     comparisons that they're one-for-one comparisons, but that
25     these goods, all of the -- in the catalogs all of the goods
```

1  were of an industrial supply.

2       There is testimony out there that GMS could

3  prepare, could deliver any of those goods.  And they were

4  delivering not only exactly the same for G&S that they

5  should have been doing for GMS, he should have disclosed

6  that they were doing that.  They withheld it and they

7  competed.

8       So, I think Westly Greer has a great deal of

9  liability for failure to disclose and the duty of loyalty

10 and honesty.

11      And did that lead to damages?  Your Honor, there

12 has been lots of evidence that each one of those sales that

13 were done for G&S should have been sales for GMS, because it

14 was GMS's customers.  It was GMS's contact information.  It

15 was GMS's trade secret approach on how you find out what

16 that particular purchaser wants, and over a period of time

17 you find out what their favorites are.

18      And so, Your Honor, in that regard, this is

19 probably one of the most flagrant causes of action that we

20 have, and I think that we have the greatest deal of evidence

21 on it.  So, I definitely believe that we have met the

22 fiduciary duty, that it was breached, that the damages

23 occurred, and that the breach caused the damages.  Because

24 had they not been withholding the knowledge of this

25 competing entity, they wouldn't be making those sales.

1           And this is -- Your Honor, I think you said in the

2    motion for partial summary judgment we were about this

3    close.  I think we have put on the evidence, and there at

4    best is a dispute over those remaining issues that a jury

5    should address.  And so, Your Honor, on that basis we would

6    argue that we've met the very high standard and that this

7    should go to the jury.

8           THE COURT:  All right.

9           Mr. McFarland, I'll let you respond if you would

10    like.

11           MR. MCFARLAND:  Thank you, Your Honor.

12           For purposes of this motion, Your Honor, I accept

13    that the fiduciary duty is there, as I said in my opening

14    argument.  And if we take what I think I understand

15    plaintiff to say is that the breach of that duty is not

16    disclosing G&S; I don't agree that that's a breach, per se,

17    but I'll accept that for purposes just of this argument.

18           THE COURT:  All right.

19           MR. MCFARLAND:  If the Court will let me.

20           THE COURT:  Sure.

21           MR. MCFARLAND:  What I haven't heard, and this is a

22    required element is:  What is the link between the alleged

23    breach and specific damages?  So, I don't think that's been

24    proven, Your Honor, and that's the plaintiff's burden.

25           And I recognize we're here on a motion for judgment

```
 1   as a matter of law.
 2           THE COURT:  Right.
 3           MR. MCFARLAND:  It's different from a motion to
 4   dismiss, obviously.
 5           THE COURT:  It is.
 6           MR. MCFARLAND:  Because the Court now has evidence
 7   before it.
 8           THE COURT:  All right.  Thank you.
 9           Mr. Lascara.
10           MR. LASCARA:  I didn't want to jump in.  I thought
11   he was finished.
12           THE COURT:  He is finished, but we're now going to
13   move on to Count Two.
14           MR. LASCARA:  Okay.
15           THE COURT:  All right.  Okay.
16           MR. MCFARLAND:  That's why I remained, Your Honor.
17   And I didn't mean to be presumptuous.  I just thought if we
18   were going to go count by count, I think this is --
19           THE COURT:  That's all right.  Yes.
20           All right.  Count Two, breach of Westly Greer's
21   employment agreement.
22           Mr. McFarland, do you have a motion on Count Two?
23           MR. MCFARLAND:  I do, Your Honor.
24           THE COURT:  All right.
25           MR. MCFARLAND:  And this one I will say I think is
```

```
 1    much different than the first one, because the only claim
 2    that is remaining here pursuant to the Court's rulings is a
 3    claim for revealing the identities of GMS suppliers to its
 4    competitors.
 5            What we haven't heard today -- and I'm going to
 6    accept for purposes of this that Virginia law applies,
 7    because this is a claim under the employment agreement.
 8    What we haven't heard at all for the last four days is that
 9    Mr. Greer ever revealed the identity of GMS's suppliers to
10    anyone.  There has been just zero testimony on that point.
11    It hasn't been presented.
12            And I'm happy to answer any questions the Court may
13    have.
14            THE COURT:  Okay.
15            MR. MCFARLAND:  But there is just no, no evidence
16    on that point, Your Honor.
17            THE COURT:  Okay.
18            All right, Plaintiff, I'll hear your response.
19            MR. LASCARA:  Your Honor, there is evidence that
20    Westly Greer had agreed in that 2000 -- in the agreement not
21    to solicit or encourage any GMS employee to leave the employ
22    of GMS or an independent contract, or to serve an engagement
23    with G&S.
24            So, his recruitment of those others to join in with
25    him is a breach of that duty, and that's, I think, a
```

JILL H. TRAIL, Official Court Reporter

**JA995**

```
 1   fundamental part of what has been demonstrated through the
 2   evidence that's come in.  He had a group of them that were
 3   willing to work both sides of the street, in essence, and
 4   Your Honor, I think that is the key point.
 5              THE COURT:  Okay.
 6              Mr. McFarland, you get the last word.  It's your
 7   motion.
 8              MR. MCFARLAND:  Thank you, Your Honor.
 9              When I said that the only claim that was remaining
10   pursuant to the Court's prior rulings was the claim for
11   revealing the identities of suppliers, I was relying on this
12   Court's rulings found at ECF number 102 at 30, that the
13   claim for recruiting other employees was dismissed.  So, the
14   argument Mr. Lascara made is for a claim that has already
15   been dismissed.
16              The only claim that's remaining on this count of
17   breach of the employment agreement for Greer is that he
18   revealed the identities of GMS's suppliers to its
19   competitors, and there is simply -- I don't mean to repeat
20   myself, but there wasn't a shred of testimony about that in
21   four days.  That claim needs to be struck, Your Honor, Count
22   Two.
23              THE COURT:  Okay.  All right.  Hold on one moment.
24              Okay.  Mr. McFarland, do you have any motion on
25   Count Three?
```

1          MR. MCFARLAND:  I do, Your Honor.

2          THE COURT:  Breach of sales agreement, and tell me

3    who that is to.  I know it's not to every defendant.

4          MR. MCFARLAND:  Well, it's a little unclear, Your

5    Honor, but at least as alleged in the Third Amended

6    Complaint, it applies to:  Westly Greer, Greg Spires, County

7    Roads, which is Mr. Spires' corporate entity that he uses,

8    Thomas Hayes, Sabrina Greer, Greer Group, which is the

9    entity that the Greers as a married couple used, and Mike

10   Welton, so essentially the majority of the defendants.

11         THE COURT:  So, I have everyone but G&S Supply, HMC

12   Supply, and Westly Greer.

13         MR. MCFARLAND:  And WarTech, Your Honor.

14         THE COURT:  And WarTech, okay.

15         MR. MCFARLAND:  Those are not parties named in

16   Count Three, the breach of the sales agreement.

17         So, the only thing that remains as to this is that

18   pursuant to the independent sales agreements, plural, for

19   these defendants is a claim of failing to aggressively

20   promote the sale of GMS products in his, her, or its

21   territory.

22         The uncontradicted evidence is that Hayes and

23   Spires were the top two salesmen for GMS in the time frame

24   at issue.  There has been no indication, no evidence

25   whatsoever that Welton didn't aggressively promote GMS

```
 1    products.  There has been no testimony that Sabrina Greer
 2    didn't aggressively promote GMS products.  The only time
 3    this came up was on Ms. Robichaux's direct.  She was asked
 4    some questions about her legal interpretation of what that
 5    phrase meant, but even Ms. Robichaux admitted that they were
 6    darn good salespeople.
 7            So, again, Your Honor, I recognize plaintiff says,
 8    oh, huge burden here, but we're here now, the Court having
 9    heard the evidence.  And the Court, as Your Honor knows, has
10    a duty to strike claims for which there is no evidentiary
11    foundation, and there is no evidentiary foundation that my
12    clients did not aggressively promote the sale of GMS
13    products.  Now, they may also have sold G&S products, but
14    that's not what this claim is.  They had to show that my
15    clients didn't aggressively promote GMS products.  And we
16    even have in evidence Mr. Hayes asking for quotes and the
17    ability to sell CCPNs or non NSNs for GMS in 2018.  So, on
18    an evidentiary basis, this claim fails as a matter of law,
19    Your Honor.
20            THE COURT:  All right.
21            Mr. Lascara.
22            MR. LASCARA:  Your Honor, the fact that Thomas
23    Hayes and Mr. Spires were some of the top earners for GMS is
24    totally irrelevant when it comes to an evaluation of whether
25    they aggressively promoted on our behalf, because if there
```

1   was a competing item or even close to a competing item that

2   they sell through G&S, they could have sold it, every one of

3   them.  That's the evidence that's come out.  There is lots

4   of evidence indicating that every one of those products that

5   they sold as G&S they could have sold as GMS, and then they

6   didn't aggressively promote at that particular instance.

7          The fact that they were great, and they had lots of

8   contacts, and they generated lots of money doesn't evaporate

9   or ignore or, I guess, resolve the fact that there is lots

10  of evidence that they sold competing goods.  And in every

11  instance where they sold a competing good, they were not

12  aggressively promoting, and that's a breach.

13         I think the standard is a very high standard to

14  knock this out when there are those facts in the record.

15         THE COURT:  All right.  Very good.

16         Mr. McFarland, I'll give you the last word on this,

17  if any.

18         MR. MCFARLAND:  Thank you, Your Honor.

19         The place where, as the Court may recall,

20  "aggressively promote" is found is paragraph 1 of the

21  Independent Sales Agent Agreement, and it says simply this:

22  "The agent agrees to aggressively promote the sale of the

23  products in the territory and to service the customers of

24  the company in a manner consistent with good sales procedure

25  and customer relations and to make regular calls on its

```
1    customers at regular intervals."  There is zero evidence
2    that my clients didn't do that.  Whether or not they sold
3    G&S products does not factor into whether they are
4    aggressively promoting under this definition what their
5    contractual obligation -- and this Court has said as
6    independent sales agents the only duties my clients have is
7    what is expressed specifically in this Independent Sales
8    Agreement.  And the evidence is, what is before this jury is
9    what they did do to promote GMS and the sales that they
10   made, and no rational jury could return a verdict otherwise
11   that they didn't fulfill their duties as stated here in this
12   agreement, Your Honor.
13           THE COURT:  Okay.  All right.  Very good.
14           Count Four, misappropriation of trade secrets under
15   the Defend Trade Secrets Act, 18 U.S.C. 1836.
16           MR. MCFARLAND:  Yes, Your Honor.  And so, first,
17   there is I'll say two components --
18           THE COURT:  And this is to all defendants, I
19   believe.
20           MR. MCFARLAND:  It is, Your Honor, though I will
21   say -- let me maybe just knock out some things initially.
22           THE COURT:  Sure.
23           MR. MCFARLAND:  There is zero evidence of a
24   violation of the Federal Trade Secrets Act as to HMC.  In
25   fact, there is zero evidence about HMC other than the
```

```
 1   question that I asked Mr. Gorken of what he knew about HMC,
 2   and he said two of my clients formed it.  That's it.  There
 3   is no evidence that HMC ever did anything wrong.  Nothing is
 4   before this jury to that effect.
 5            Similarly, there is no evidence that WarTech
 6   Industries, who was named, and the parties have agreed is
 7   named only as a successor entity to pay any judgment that
 8   might be rendered against G&S Supply, but since they
 9   included them as a party and didn't exclude them from this
10   claim, I'm moving now to dismiss them from this claim
11   because there is zero evidence of anything about WarTech
12   whatsoever in this trial.
13            With respect to -- and there is certainly no
14   evidence that County Roads, Country Roads, excuse me, or
15   County Roads or Greer Group or McWelton violated any trade
16   secrets.  So, we would ask that all of the corporate
17   entities be dismissed from Count Four, Your Honor.
18            Turning to the individual defendants, in order for
19   there to be a violation for misappropriation of trade
20   secrets, first we have to establish what the trade secrets
21   are.  And while we've heard some evidence that certain
22   things could only be accessed if you had a password, that
23   doesn't mean that anything that's been proffered before this
24   Court is a trade secret.  In fact, I'll say to the Court,
25   and the Court will recall the evidence, I kept waiting for a
```

```
 1   witness that GMS put on to say, "Yes, this is our trade
 2   secret," for any of the documents presented.  Not one
 3   witness ever testified that a specific item was a trade
 4   secret.  And, of course, a trade secret is something defined
 5   as "The owner takes reasonable measures to keep the
 6   information secret and the information derives independent
 7   economic value from not being generally known or readily
 8   ascertainable."  Plaintiff hasn't met those requirements to
 9   show what is a trade secret.
10         The information that's been or the documents that
11   were primarily proffered were documents about -- I think
12   they're called the agent protocols or pools.  Those are what
13   the agents themselves provide the information for.  That
14   can't be a trade secret, and they certainly can't
15   misappropriate the information that they themselves
16   inputted.
17         The second failure here for the plaintiff's federal
18   trade secrets claim is we don't have any evidence of
19   misappropriation.  There is simply nothing before this jury
20   that any of the individual defendants took something that
21   was a trade secret and used it improperly.
22         The requirement is:  "Misappropriation is the
23   acquisition of a trade secret of another by a person who
24   knows or has reason to know that the trade secret was
25   acquired by improper means."  Well, there certainly is no
```

1    evidence of that, because to the extent -- let's just

2    assume, and I don't admit it, but let's just say there was

3    something that's a trade secret, to the extent the

4    defendants had it, they got it by lawful means.

5           So, then the plaintiff must prove "or disclosure or

6    use of a trade secret of another without express or implied

7    consent by a person who:  One, used improper means to

8    acquire knowledge of the trade secret."  Well, that sure as

9    heck hasn't been proven here because, again, to the extent

10   my clients had anything arguably confidential, proprietary,

11   or trade secret, they had the right to have it.  "Two, at

12   the time of disclosure or use knew or had reason to know

13   that the knowledge of the trade secret was:  A, derived

14   through improper means" -- well, that hasn't been shown and

15   can't be shown -- "or acquired under circumstances giving

16   rise to a duty to maintain secrecy."  And then the final

17   part is, "through persons who knew it was a trade secret and

18   knew it had been acquired by accident or mistake."

19          And then improper means are defined as including

20   theft, bribery, misrepresentation, breach, or inducement of

21   a breach of duty to maintain secrecy or espionage through

22   electronic means.  Does not include reverse engineering,

23   independent derivation or any other lawful means.

24          There is simply no evidence here of a

25   misappropriation by my clients.  My clients in the best case

```
 1    scenario for the plaintiff didn't disclose the existence of
 2    G&S Supply and sold products on behalf of G&S Supply.  There
 3    is no evidence they did that through misappropriation of
 4    trade secrets, Your Honor.
 5              THE COURT:  All right.
 6              All right, Mr. Lascara.
 7              MR. LASCARA:  Mr. Berkley will...
 8              THE COURT:  Mr. Berkley.
 9              MR. BERKLEY:  Thank you, Your Honor.
10              So, with regards to trade secrets, I think we need
11    to step back and consider what happened here and that
12    these --
13              THE COURT:  Before we do that, let me ask you this:
14    What was the trade secret?  Tell me what the trade secrets
15    were or are.
16              MR. BERKLEY:  Okay.
17              THE COURT:  So, the first element is that plaintiff
18    owns a trade secret.  What were the trade secrets?
19              MR. BERKLEY:  Okay.  The trade secrets can be
20    anything low tech as well as high tech, Your Honor.  I do
21    not have to have some computer program or anything to be a
22    trade secret.  I mean, under Virginia Supreme Court law and
23    other law, it can be a low tech.  It can be the concept of
24    packaging.  It could be the concept of how I approach
25    somebody and talk to them.  It can be the concept of how I
```

```
1    sell a good.
2            THE COURT:  I understand that.
3            So, what were the trade secrets in this case that
4    you put on evidence of?
5            MR. BERKLEY:  Okay.  So, these individuals walked
6    into the same customers, selling the same type of goods,
7    using the same type of procedures that we use, and they're
8    doing it simultaneously.  They're wearing two hats at the
9    same time.  They're using our trade secrets to do that.  Not
10   only that --
11           THE COURT:  So, one trade secret was the procedures
12   that they used to make the sales?
13           MR. BERKLEY:  Yes.  They were using our procedures
14   of how to make sales, simultaneously selling goods that are
15   nearly identical to the exact same customers, exact same
16   military bases.
17           THE COURT:  All right.
18           MR. BERKLEY:  And then you have -- in addition to
19   that, you have all of the information in the Google drive.
20           So, what we put on for evidence of that is how to
21   train the sales agents to go -- to teach them how to do the
22   job of the customer, so when they go up to the customer, and
23   the customer is putting in orders for their products, those
24   orders are going to get through.  There is not going to be a
25   hiccup in the customer not knowing how to do it because he's
```

1    a new guy in the military pool, because they switch out
2    people all of the time.  Our people are there, going
3    regularly, and they're teaching these people, these
4    customers how to do their own job to make sure our goods go
5    through.  We went through that PowerPoint presentation with
6    Ms. Robichaux.
7            THE COURT:  So, what is the trade secret?  So, what
8    is the trade secret that is being misappropriated?
9            MR. BERKLEY:  The teaching of the customers how to
10   do it while they're, again, simultaneously selling goods for
11   both entities at the same military bases, and customers at
12   the same military bases, too.
13           THE COURT:  All right.
14           MR. BERKLEY:  Okay.  So, then, Your Honor, we also
15   have within the documents that Ms. Rupley introduced to the
16   Court, we have the customer preferences, and we have all of
17   the data spreadsheets.  So, these sales agents, when they
18   would make a sale, they would have to put in data into their
19   data portal, which was also secured.  And then management
20   would use that sales data in order to formulate marketing
21   plans and teach them how to make better sales to the
22   customers, how to reach out to those customers better.
23           So, all of the sales preferences, customer
24   preferences, and sales data, the contact information for
25   those individuals was in those data portals while they're --

```
 1    and they have access to those data portals as our people,
 2    but then they're out there, again, same military bases, same
 3    military customers, same products, and using it
 4    simultaneously.  We certainly didn't give them permission to
 5    use our information to sell G&S products at the same exact
 6    time.
 7              THE COURT:  All right.  So, are there any other
 8    trade secrets or is that all?
 9              MR. BERKLEY:  So, we have the customer preferences.
10    We have all of the data about the sales.  We have the
11    teaching of how to add information into not only the GCSS
12    program but the FedMall program, which was eMALL earlier.
13              THE COURT:  That's all the information that was on
14    the Google drive?
15              MR. BERKLEY:  Yes.  That was on the Google drive.
16    That was in that PowerPoint presentation.
17              THE COURT:  All right.  So, the procedures that
18    were used to make the sales, how is that misappropriated?
19              MR. BERKLEY:  Um --
20              THE COURT:  What was your evidence that the
21    procedures used to make sales was misappropriated?
22              MR. BERKLEY:  They were making the sales for G&S
23    simultaneously, at the same time.  They are going to the
24    same military bases.
25              THE COURT:  So they're double dipping?
```

```
 1          MR. BERKLEY:  They're double dipping, and the DLA
 2     awards prove that.
 3          They're not making those sales when they're -- and
 4     they're going there on our dime.  We're paying.  We put in
 5     evidence of that of them, when they are traveling, we are
 6     paying for their travel expenses.  So, we're paying them to
 7     go to these places, do our job, and while they're there,
 8     they're secretly selling for G&S.
 9          THE COURT:  All right.  How did they misappropriate
10     the Google drive?  What was your evidence of that?
11          MR. BERKLEY:  So, they all had access to the Google
12     drive.  Ms. Robichaux explained that she would give access
13     to the sales agents by those electronic keys.  And once they
14     received one of those electronic keys, they were entitled to
15     go into the Google drive when they wanted to.
16          THE COURT:  Okay.
17          MR. BERKLEY:  And when they are on these sales
18     calls, they're allowed to go into the Google drive and get
19     the customer preferences, get all of that data while --
20          THE COURT:  Well, I guess I'm asking a more narrow
21     question.  What is the evidence you've presented that they
22     used the information in the Google drive that was GMS
23     information, misappropriated that in order to make a G&S
24     sale?  Because I think that would be the misappropriation,
25     right?
```

```
 1            MR. BERKLEY:  Well, it's not only just to use it to
 2    make the sale, it's disclosing that information.  So, if
 3    they shared it among each other, then they're disclosing
 4    that information to each other.
 5            THE COURT:  If who shared it among each other?
 6            MR. BERKLEY:  The sales agents.  If Westly Greer,
 7    who is overseeing this whole operation, is sharing this
 8    information -- now, he's at the top, and so he can share it
 9    with all of the other sales agents.  So, he had access to
10    it.
11            THE COURT:  But don't you have to delineate if he's
12    sharing it with Mr. Hayes in the context of doing GMS
13    business, as opposed to sharing it with Mr. Hayes in the
14    context of making a sale on behalf of G&S?
15            MR. BERKLEY:  Right.
16            THE COURT:  Right.  Okay.  Good.
17            So, now that I've said that, what is the evidence
18    that they used the Google drive to share information to make
19    a G&S sale?  That's what I'm asking.
20            MR. BERKLEY:  So, their meteoric rise -- I mean,
21    they were able to make these sales, $961,000 in sales in a
22    short period of time that no other startup could possibly
23    do.  The only way they could do that would be using the data
24    information that we put into the system.
25            Now, overriding all of this, too, Your Honor, is
```

JILL H. TRAIL, Official Court Reporter

**JA1009**

1  this spoliation issue which we haven't even addressed.

2       Now -- and we've got to keep in mind that trade

3  secrets is often proved by circumstantial evidence in the

4  case law.  It is, you know, difficult to prove what a low

5  tech secret is and how they used it.  But because low tech

6  secrets are allowed, and the method of making sales, and the

7  method of using the data, it's difficult to prove.  So,

8  oftentimes you are using circumstantial evidence.  So, we

9  have the DLA awards.

10       THE COURT:  Circumstantial evidence is fine.

11       MR. BERKLEY:  Yeah.

12       THE COURT:  How did they misappropriate the

13  teaching of the customers how to order the products?  How

14  was that misappropriated?

15       MR. BERKLEY:  Okay.  So, the teaching information

16  that was in there was also a resource, and Ms. Robichaux

17  spoke to this, was also a resource that the existing agents

18  could use because it's a lot of information about how to put

19  something into the GSA system in order to get that sale to

20  go through.  So, if you're making sales quickly for G&S, you

21  must be using our information in order to make that happen,

22  unless you've got all of that memorized in --

23       THE COURT:  But who testified that they taught a

24  customer how to input information to make a G&S sale?

25       MR. BERKLEY:  So, Ms. Robichaux said, I would send

```
1    these.  I was in charge of these documents, and it was my
2    job to send them to all of the sales agents.
3              THE COURT:  Right.  But she did that for GMS as
4    well, right?
5              MR. BERKLEY:  Which she did for GMS, but the sales
6    agents, again, are the same military bases, selling to the
7    same customers.
8              THE COURT:  I get that.  I'm just -- my questions
9    are more narrow than that, and so what I'm saying is she
10   would send them this information for GMS to make sales,
11   right?  For GMS sales agents to go to customers at military
12   bases to teach them how to input this information so that
13   GMS could sell them a product, right?
14             MR. BERKLEY:  Yes.
15             THE COURT:  Okay.
16             MR. BERKLEY:  To help the customer enter it.
17             THE COURT:  That's not a misappropriation of
18   anything, right?
19             MR. BERKLEY:  It is if they are using that
20   information --
21             THE COURT:  For GMS, just stay with me on GMS.
22             MR. BERKLEY:  Right.
23             THE COURT:  If they do that for a GMS sale, that is
24   not misappropriation of GMS products, correct?
25             MR. BERKLEY:  Correct.
```

```
1              THE COURT:  All right.  So, I'm asking you now --
2     let's put GMS to the side -- what is the evidence that one
3     of these defendants:  Mr. Greer, Ms. Greer, Mr. Hayes,
4     Mr. Spires, went to one of these bases and taught them how
5     to enter information so that they could buy a G&S product
6     before GMS even knew G&S existed?
7              MR. BERKLEY:  Okay.
8              THE COURT:  So, when they were double dipping.
9     What's the evidence of that?  That's what I'm asking.
10             MR. BERKLEY:  So, what we know --
11             THE COURT:  Because that would be the
12    misappropriation, right?
13             MR. BERKLEY:  So, what we know from the GMS
14    commission reports and other documents is where these sales
15    agents, defendants were working, what military bases they
16    were working at.  So, we can confirm where they're making
17    sales for GMS.  We also have the DLA awards for G&S, and
18    those awards are set by military base as well.  So, if you
19    matched the G&S awards with where they're selling for GMS,
20    and the dates when they're selling, then we know that
21    they're using our information.
22             THE COURT:  Okay.  What's the evidence that came in
23    that the customer data sheets and the customer preferences
24    was somehow misappropriated?
25             MR. BERKLEY:  Well, again, Your Honor, I think the
```

```
1    fact that they were able to sell $961,000 of goods in a
2    short period of time, and walking into these military bases,
3    you know, they were using that data.  They were using the
4    same data as they were walking in wearing two hats, and
5    they're doing it simultaneously.  And when you have them
6    walking in simultaneously, and you have the fact that they
7    were making these sales, a million dollars worth of sales in
8    a short period of time, I could not do that.  I couldn't
9    walk into a military base and figure out how to do all of
10   this.  This is complicated stuff.  I mean, I don't even know
11   how to get a security pass.  I wouldn't know who to talk to
12   when I get in there.  So, they're simultaneously using our
13   data to figure out how to make these sales.  In fact, they
14   used that data to create catalogs.
15             THE COURT:  Okay.
16             MR. BERKLEY:  And so these catalogs that are in
17   there is our information.  It's our products.  And they're
18   copying our ideas, maybe tweaking them a little bit, and
19   saying that they are CCPNs and not NSNs, and the reason they
20   have to say that is because they're starting out.  But we
21   all know that eventually that CCPN leads towards an NSN.
22   That's the whole nature of the business.
23             THE COURT:  All right.  So, with respect to the
24   double dipping, using the same procedures to make the sales,
25   how does that implicate interstate or foreign commerce?
```

```
 1          MR. BERKLEY:  What they're doing is, you know,
 2    Westly Greer is working in Colorado.  And we're issuing
 3    these trade secrets through this key access program, and the
 4    access is granted from Virginia.  And so the Google drive,
 5    being able to enter into it originates from here.
 6          THE COURT:  All right.
 7          MR. BERKLEY:  And Westly is in Colorado, and
 8    Mr. Hayes is in Louisiana, and --
 9          THE COURT:  That's enough.  It's de minimus.  So,
10    all it has to be is de minimus.
11          MR. BERKLEY:  Yeah.
12          THE COURT:  Okay.  All right.
13          MR. BERKLEY:  Okay.
14          THE COURT:  Very good.
15          Anything else you want to -- that's all of the
16    elements, but I'll listen to anything else you have to say
17    on this.
18          MR. BERKLEY:  You know, I'll just throw in there,
19    Your Honor, that there was testimony that they were walking
20    around saying that they were the sister company of us and,
21    you know, again, it's them wearing two hats, trying to
22    conceal what they were doing and getting away with
23    something.
24          THE COURT:  All right.  Okay.
25          Mr. McFarland, I'll give you the last word on this
```

1    one.

2            MR. MCFARLAND:  Thank you, Your Honor.

3            Plaintiff seems to be confusing the count that
4    we're here on right now.  It's a misappropriation of trade
5    secrets claim.  So, this reference to a sister company, that
6    has nothing to do with trade secrets.

7            We don't dispute that G&S Supply made sales.  The
8    issue is:  Did they make sales through the misappropriation
9    of trade secrets?

10           So, let's go back a second, because the law of the
11    case is, as established on the motion to dismiss, that my
12    clients' experience and know-how that they gained through
13    their work as sales persons and employees at GMS Industrial
14    and elsewhere in their careers is not trade secret.  And
15    that is found, Your Honor, at Judge Smith's ruling ECF 70 at
16    page 9.

17           What I just heard Mr. Berkley say is the basis for
18    how this must have been a misappropriation of trade secrets
19    is no one could come up with a whopping $961,000 in sales in
20    two years unless they did something wrong, unless they
21    misappropriated.

22           Let me first point out, there is not one shred of
23    evidence, and that's what we're here on now, and the
24    plaintiff also seems to be forgetting that.  We're not here
25    on a motion to dismiss on allegations.  We're here on

```
 1   evidence that has come in through the plaintiff's case.  And
 2   if I rested right now, there is no testimony about you
 3   couldn't do $961,000 in sales based on these gentlemen's
 4   experience.  In fact, what the evidence shows is that they
 5   used their know-how and their relationships to make these
 6   sales, which Judge Smith has specifically said is permitted.
 7            The hypothetical that Your Honor was talking about
 8   assumed that there was something that was a trade secret
 9   that they were using improperly.  It isn't there.  I mean,
10   the plaintiff doesn't meet either of the elements that are
11   required here.  I have yet to hear what the trade secret is.
12            THE COURT:  Interstate and foreign commerce.
13            MR. MCFARLAND:  I'll give you that one, Your Honor.
14            THE COURT:  They meet that.
15            MR. MCFARLAND:  I'll give you that one.
16            THE COURT:  I'm not saying they don't meet the
17   other ones, but I think they meet that one.
18            MR. MCFARLAND:  They meet the interstate and
19   foreign commerce.
20            What I'm saying is the key elements that I'm
21   disputing here are tell me what the trade secret is.  And
22   what's been referenced is the sales agents' sheets that they
23   use, that's their information that they're inputting.  It's
24   not a trade secret if it's my information that I am
25   providing to my employer, or in this case not even employer,
```

```
 1    the independent company that I happen to be selling for.  My
 2    input of information is not a trade secret.
 3          Then what we don't have is the misappropriation.
 4    It's not there.  It is absolutely fine.
 5          The Court has already ruled Thomas Hayes can go to
 6    Fort Polk, and he can sell whatever he wants to sell based
 7    on his know-how, his experience, and his relationships with
 8    these folks.  Same, so can Gregory Spires.  So can Mike
 9    Welton.  So can Sabrina Greer.  So can Westly Greer.
10          The plaintiff wants to build on speculation and
11    allegation.  We're not here on that now, Your Honor.  We're
12    here on an evidentiary motion, and if the defendant --
13    defendants, excuse me, plural, were to rest right now, there
14    is no evidence before this jury that would support a claim
15    for misappropriation of trade secrets.
16          THE COURT:  All right.
17          Count Five is misappropriation of trade secrets
18    under the Uniform Trade Secrets Act of Virginia.  Do you
19    have the same argument as it relates to Count Four, or is
20    there a different argument?
21          MR. MCFARLAND:  I have the same argument, but I
22    have an additional argument, Your Honor.
23          THE COURT:  All right.
24          MR. MCFARLAND:  There is no evidence of a
25    misappropriation that occurred in Virginia, as is required.
```

1    Virginia law applies to my clients' conduct only in terms of

2    either for Mr. Greer the period that he was an employee, or

3    the independent sales agents for the period that they were

4    independent sales agents, but it only applies to their

5    duties and obligations under those agreements.

6            Misappropriation is a tort claim and, as the Court

7    noted earlier in its ruling, that is governed by lex loci.

8    Virginia applies lex loci, the place of the wrong.  There is

9    no evidence that any of my clients committed a wrong in

10   Virginia.  Now, what I think plaintiff is going to try to

11   sell to this Court is, well, the language in the agreement

12   is broad enough to cover any conduct by these defendants,

13   and that's not correct.

14           If we look at -- if I can steal back -- do we have

15   the Independent Sales Agent Agreement handy?  Maybe I have

16   it.  Yeah.  I've got it.  Never mind.  Thank you.

17           Paragraph 17 for the independent sales agents is

18   the governing law venue and jurisdiction paragraph.  "This

19   agreement shall be governed by -- this agreement shall be

20   governed by and construed in accordance with the laws of the

21   State of Virginia without giving effect to any choice of law

22   provisions.  Any dispute that should arise will be handled

23   accordingly."

24           In other words, what my clients agreed to when they

25   signed this agreement that is if there was a contractual

```
 1   dispute, that would be governed by Virginia law, and they
 2   also agreed that the exclusive venue for such an action
 3   would be the state or federal courts in Virginia Beach,
 4   which is why they're all here.
 5           What they didn't agree is that any conduct or
 6   alleged conduct outside of this agreement is a basis to hail
 7   them into Virginia or subject them to a Virginia claim or
 8   statute, and that's what's attempting to be done here, Your
 9   Honor, and there is no evidence.
10           The only evidence, by the way, of anyone ever being
11   in Virginia is Mr. Greer, and the evidence is that he came
12   for training, not that it occurred -- not that his even
13   coming to Virginia occurred between June of 2017, when G&S
14   was established, and April 3rd of 2019, when he was
15   terminated.  There is simply no basis --
16           THE COURT:  Are you saying, as you raised in your
17   final pretrial memorandum, that this count has to go out
18   because nothing happened in Virginia?
19           MR. MCFARLAND:  That's one basis, yes.
20           THE COURT:  Okay.
21           MR. MCFARLAND:  And I'm also making the same
22   argument, and I don't want to --
23           THE COURT:  But what about the forum selection
24   clause?  Why isn't it a reasonable interpretation that no
25   matter where this takes place -- it could take place in
```

```
 1    Alaska -- we're agreeing that Virginia law is going to cover
 2    it?
 3              MR. MCFARLAND:  No.  No.  We're only agreeing that
 4    Virginia law applies to claims under the agreement.
 5              THE COURT:  Okay.
 6              MR. MCFARLAND:  Now, there are other agreements,
 7    not in this case, where parties can define that any dispute
 8    between them is governed by Virginia law.  That's not this
 9    agreement.  These agreements, by the way, have to be
10    construed narrowly, right?
11              THE COURT:  Why didn't you file for, like, a motion
12    to dismiss or a motion for summary judgment on this?
13              MR. MCFARLAND:  Well, we did, I think, maybe in the
14    motion to dismiss, Your Honor.  We filed a motion for
15    sanctions for lack of evidence that included this claim, I
16    believe.
17              THE COURT:  Okay.
18              MR. MCFARLAND:  And I understand the Court ruled,
19    and that is what it is.
20              THE COURT:  Right.  Okay.
21              MR. MCFARLAND:  And you know hindsight is 20/20,
22    but the point now is --
23              THE COURT:  And I'm not saying I would have granted
24    it.  I'm just saying this seems like a motion to dismiss for
25    summary judgment type of argument, but go ahead.
```

```
 1            MR. MCFARLAND:  Well, here is the other point.
 2    Right now we are at the stage -- we're even past the summary
 3    judgment stage, right?  Because summary judgment is:  Is
 4    there a material fact in dispute?
 5            There is no facts about my client, any of my
 6    clients coming to Virginia and committing a tortious act in
 7    the Commonwealth of Virginia, and that is required here.
 8    This is governed by lex loci and the principles there, and
 9    there simply is not a basis.
10            And this agreement, when it's construed, it's
11    construed against the drafter, who is obviously the
12    plaintiff.  It's read narrowly, not broadly to include all
13    disputes between these parties, because that's not what my
14    clients agreed to.  And if you think about it practically,
15    Mr. Spires resides in Oklahoma, Mr. and Mrs. Greer now in
16    Missouri, and Mr. Hayes in Louisiana.  If somehow there were
17    a claim to be brought against them long after they stopped
18    doing anything with GMS that wasn't specific to their
19    obligations as independent sales agents, they would
20    challenge it for personal jurisdiction because nothing ever
21    happened in Virginia, so -- and I'm not in any way, by the
22    way -- they still, the same principles essentially apply for
23    the Virginia Trade Secrets Act as the federal.
24            THE COURT:  Right.
25            MR. MCFARLAND:  Virginia code sections.
```

1          THE COURT:  You're talking about the state?

2          MR. MCFARLAND:  Right.

3          THE COURT:  I understand.

4          MR. MCFARLAND:  I mean, there is a fundamental

5   problem about the lack of evidence of trade secret and even

6   more so about trade secret misappropriation.  That was a

7   primary basis for our motion.  And the Court will recall we

8   took Mr. Gorken's deposition and gave it to Your Honor as

9   part of our motion to show we've been looking for that

10  evidence for three years.  It has not come forward.

11         THE COURT:  All right.

12         All right, Plaintiff.

13         MR. LASCARA:  Mr. Berger will make this argument.

14         THE COURT:  All right, Mr. Berger.  All right,

15  Mr. Berger, I would imagine that for the trade secrets part

16  of this, you-all adopt the same argument that Mr. Berkley

17  gave me as far as what the trade secrets were and how they

18  were misappropriated, correct?

19         MR. BERGER:  Yeah.  I think since we do have a

20  second bite at the apple, there may be a couple of things we

21  want to add.

22         THE COURT:  Sure.

23         MR. BERGER:  First of all, I think it seems to me

24  that their argument is, you know, what we're using is our

25  know-how.  And I think the rule regarding know-how is you

 1   can only use know-how after the employment is ended, after
 2   the agency relationship has ended.  It can't be used during
 3   to compete with, the dual-hat argument.
 4        I think one thing that was also referenced but that
 5   probably was not given enough discussion is the fact that
 6   this Court has already found that defendants Westly Greer
 7   and G&S Supply spoliated evidence.  And, Your Honor, that
 8   right there, I mean, how can you -- if there is an inference
 9   out there, whether it's mandatory or permissive, how can you
10   find as a matter of law that there was no misappropriation
11   of trade secrets?  That's exactly the information that was
12   deleted from their information, from their computer.
13        We have access from BDO.  We saw from Shirk's
14   report, from his testimony that they accessed, that Westly
15   Greer accessed the Google drive on April 19th.  That right
16   there should be enough to get us past the low hurdle of a
17   motion to strike.
18        THE COURT:  Okay.
19        MR. BERGER:  With respect to the lex loci argument,
20   Your Honor, we have briefed this, I think in no less than
21   three places at this point.  Jury instructions.  We have got
22   a bench brief on it.  I think it was also addressed a little
23   bit during the motion for sanctions raised by plaintiff.
24        We have cited several cases.  I am happy to go
25   through them again, unless Your Honor has gone through them

1     and wants to ask me questions, but generally it's *Hitachi*.

2     This is a Fourth Circuit case.  The cite is 166 F.3rd 614.

3     It was a 1999 case, and it acknowledges, "Where a cause of

4     action arises in tort" -- and this is the exact argument of

5     defendant, that it's a tort claim, not a contract claim --

6     "That where a cause of action arises in tort, Virginia" --

7          THE REPORTER:  I'm sorry.  Could you please slow

8     down?

9          MR. BERGER:  I'm sorry.

10          THE REPORTER:  Thank you.

11          MR. BERGER:  Ms. Trail, you know me too well, and

12     you know that I always speak too fast.

13          THE COURT:  That's all right.  Try to slow down.

14     Go ahead.

15          MR. BERGER:  "Where a cause of action arises in

16     tort, Virginia applies the law of the state where the

17     tortious conduct or injury occurred."  In that case, it held

18     a choice of law provision covered tort claims that were

19     closely related to contract.  This is the exact situation we

20     have here, Your Honor.

21          *Paul Business Systems, Inc. versus Canon USA*, this

22     is a Virginia Supreme Court case, 240 Va. 337, 1990.  That

23     case actually involves a choice of forum argument, but

24     nevertheless it's significant because that one actually

25     addresses a business conspiracy claim, one of the exact

```
 1    claims we're raising here.  And in that case the choice of
 2    law provision, I would like to read it for Your Honor,
 3    because it's pretty close to what we have here.  I believe
 4    there were a series of, I think, eight contracts, but they
 5    had two separate forums in the forum selection clause.  The
 6    first one says, in pertinent part, "Any and all causes of
 7    action hereunder by and between the parties hereto shall
 8    only" --
 9              THE COURT:  Slow down so she can keep up.
10              MR. BERGER:  Yes, Your Honor.
11              THE COURT:  Go ahead.
12              MR. BERGER:  "Any and all causes of action
13    hereunder by and between the parties hereto shall only have
14    jurisdiction and venue in the local, state or federal courts
15    in the State of New York."
16              The second set of agreements had a choice of forum
17    clause.  "Any and all causes of action whether or not
18    arising under this agreement by and between the parties
19    hereto shall only be brought in a local, state or federal
20    court situated within the State of New York."
21              And the Virginia Supreme Court, Your Honor, found
22    that that language was sufficient to cover the business
23    conspiracy claim.  In doing so, it overcame an argument by
24    the plaintiff which argued, quote, "The case has nothing to
25    do with any contract existing between the plaintiff and
```

1    defendant, Canon.  It argues that the case would exist if
2    there were no contract because the charge is that defendants
3    conspired to damage and destroy plaintiff's business in
4    violation of the business conspiracy statute."  The Court
5    concludes, "We find that these tort claims are covered under
6    the" -- quote, unquote -- "'hereunder' language of the four
7    agreements and certainly by the 'whether or not arising'
8    language of the other two."
9            In our case, Your Honor, we've got the language in
10   evidence.  "This agreement shall be governed by and
11   construed in accordance with the laws of the State of
12   Virginia without giving effect to any choice of law
13   provision.  Any dispute that should arise" -- this doesn't
14   even say hereunder.  It says, "Any dispute that should arise
15   will be handled accordingly."
16           So, under this choice of law provision, which is in
17   all of the agreements, all of the Virginia claims -- and I
18   expect that this lex loci argument would be raised with
19   respect to multiple claims.  I'm happy to address the same
20   with respect to each different claim, but it should cover
21   all of the statutory claims.
22           THE COURT:  Right.
23           MR. BERGER:  One other case that's instructive,
24   Your Honor, and this is helpful for the trade secret claim,
25   *Corinthian Mortgage Corporation versus Choicepoint Precision*

```
 1    Marketing.  It's a 2008 U.S. District Court Lexis 28129.
 2    It's an Eastern District of Virginia case from 2008.  In
 3    this case, it is analogizing a Massachusetts trade secret
 4    law and whether those claims could be covered under a choice
 5    of law provision.  And in that case the Court held that
 6    under that Massachusetts Uniform Trade -- the Massachusetts
 7    Unfair Trade Practices Act, I'm sorry, Your Honor, that
 8    those claims under that act that were so closely related to
 9    the contract, even though they're in statute, were still
10    covered by the choice of law provision.
11          In this case, Your Honor, we've got trade secret
12    claims.  Those are directly analogous to the confidentiality
13    provisions in the agreement.  That's why we have it in the
14    agreement is to protect those trade secrets from being
15    disclosed.
16          Finally, the last case, Your Honor, is Ward's
17    Equipment versus New Holland.  It's another Virginia Supreme
18    Court case.  We have cited it again in our brief.  I don't
19    need to recite it here but, again, it's another case that we
20    rely on.
21          THE COURT:  Okay.  Very good.
22          All right, Mr. McFarland.  You get the last word on
23    this one, if anything.
24          MR. MCFARLAND:  Thank you, Your Honor.
25          First off, Your Honor, the expert witness,
```

1    Mr. Shirk, in no way testified that there were any trade
2    secrets destroyed.  His testimony was he could only say that
3    there were certain things that were deleted, weren't
4    available.  What they were, other than by file name, he
5    could not say.  There is no evidence before this Court that
6    trade secrets were destroyed.  That is improper.  And
7    perhaps Mr. Berger wasn't here for the expert witness's
8    actual testimony, but that's not what he testified to.
9          Let's get to the real issue about Virginia law,
10   which I think Mr. Berger, I hear him conceding that lex loci
11   applies.  With respect to this agreement, which is what
12   governs my clients and their duties, it says, "This
13   agreement shall be governed by and construed in accordance
14   with the laws of the State of Virginia without giving effect
15   to any choice of law provisions.  Any dispute that shall
16   arise will be handled accordingly."  A dispute under this
17   agreement.  So, the breach of failure to promote
18   aggressively, I agree that's Virginia law.  But what we have
19   got here is a tort claim.
20         And here is what the case that plaintiff relies on
21   so heavily, *Hitachi Credit America Corporation*, found at
22   166 F.3rd 416, at page 628 the Court says, "Where a choice
23   of law clause in the contract is sufficiently broad to
24   encompass contract related tort claims such as fraudulent
25   inducement, other courts have honored the intent of the

42

parties to choose the applicable law."  That is not the
situation here.  In fact, Your Honor sua sponte dismissed
the fraud claim here, Count Six.

There is nothing about fraudulent inducement.
These are separate tort claims that are in no way governed
by this agreement's choice of law provision.

And the case that plaintiffs also rely heavily on,
*White versus Potocska*, P-O-T-O-C-S-K-A, found at
589 F.Supp.2nd 631, Eastern District of Virginia, 2008,
finds that where the fraudulent acts occurred in Virginia,
Virginia law applies in addition to Virginia choice of law
provisions in a contract, and then they cite that Fourth
Circuit decision about where the choice of law clause is
broad enough.

That case involved tort claims actually occurring
in Virginia.  We don't have that here, Your Honor, because,
again, I don't want to belabor it, my clients haven't even
been in Virginia.  They can't be subject to -- and this
really, Your Honor, implicates notions of due process.  It
gets to essentially, in a sense, the minimum contacts
analysis, because the contract doesn't provide for it, and
the idea of hailing my clients into court for tort claims
that didn't occur in Virginia violates their due process.
We were waiting to see if there was any evidence whatsoever
that something they did tortiously, allegedly, occurred in

**JA1029**

```
 1    Virginia.  There isn't a shred of it, Your Honor.
 2            THE COURT:  All right.  Count Seven, Federal
 3    Computer Fraud and Abuse Act.
 4            MR. MCFARLAND:  I think my colleague is going to
 5    argue that one.
 6            THE COURT:  All right, Colleague.
 7            MR. MCFARLAND:  No?
 8            THE COURT:  I think you were overruled.
 9            MR. MCFARLAND:  In my household, Your Honor, I am
10    regularly overruled by the female members, my wife and my
11    dog.
12            THE COURT:  That's all right.
13            MR. MCFARLAND:  All right.  If you will give me
14    just a second, Your Honor.
15            So, the claim in Count Seven is for violation of
16    the Federal Computer Fraud Abuse Act, and this applies only
17    to Mr. Greer and G&S Supply.
18            THE COURT:  Okay.
19            MR. MCFARLAND:  And the statute is 18 U.S.C.
20    Section 1030, Your Honor.  And I think the allegations are
21    that Greer violated section 1030(a)(4) through (5), at least
22    that's what's alleged in the Third Amended Complaint at
23    paragraph 153.
24            THE COURT:  Okay.
25            MR. MCFARLAND:  So, the requirement is that the
```

1    defendant "knowingly and with intent to defraud accesses a
2    protected computer without authorization" -- of course,
3    there is no evidence that anything was done without
4    authorization -- "or exceeds authorized access, and by means
5    of such conduct furthers the intended fraud and obtains
6    anything of value, unless the object of the fraud and thing
7    obtained consists only of the use of the computer itself and
8    the value of such use is not more than $5,000."

9         What the Fourth Circuit has said is, "This statute
10   must be narrowly interpreted in terms of without
11   authorization and exceeding authorized access," and that's
12   found in *WEC Carolina Energy Solutions, LLC versus Miller*,
13   687 Fed.3rd at page 206, a Fourth Circuit decision from
14   2012.

15        And then the other aspect of this, Your Honor, is
16   courts have further held, "The statute was not meant to
17   cover the disloyal employee who walks off with confidential
18   information.  Rather, the statutory purpose is to punish
19   trespassers and hackers."  That is from *NRT Mid-Atlantic,*
20   *LLC versus D'Ambrosia*, a decision out of our sister to the
21   north, District Court, District of Maryland, December 22nd,
22   2008, found at Lexis 132657, and it's quoting from another
23   district court decision, *American Family Mutual Insurance*
24   *Company versus Rickman*, 554 F.Supp. 766 and 771 out of the
25   Northern District of Ohio, going back to 2008.

```
 1              This statute is designed to prevent the
 2     unauthorized access of a computer and information taken in
 3     that regard.  It is not designed for an employee who
 4     allegedly, as is the allegation against Greer, somehow took
 5     something improperly and used it.  Now, we dispute that
 6     anything was done by Mr. Greer in that nature, and obviously
 7     he had access.  In fact, the evidence is that even after --
 8              THE COURT:  For the sake of argument, if your
 9     client did delete those files with File Shredder, would this
10     statute still apply?
11              MR. MCFARLAND:  No, it would not.
12              THE COURT:  Okay.  Why not?
13              MR. MCFARLAND:  Because what the statute is
14     designed for is someone who didn't have access to take it
15     and use it.  Deleting is deleting.  That may be a separate
16     issue that the Court has ruled on as to spoliation, but it
17     doesn't establish -- I mean, this is basically a criminal
18     statute with a small civil component, Your Honor.  What it
19     doesn't do, and the courts have so held, is if you had
20     access originally, the statute just doesn't apply to you.
21              THE COURT:  Okay.  All right.  Thank you.
22              All right, Plaintiff, Mr. Wilson.  You aren't
23     related to Jeffrey Wilson of the Portsmouth project fame,
24     are you?
25              MR. WILSON:  You know, the horror of this, Your
```

1   Honor, is that I actually live in Portsmouth.

2            THE COURT:  Oh, boy.

3            MR. WILSON:  And I am known affectionately by a

4   number of people throughout that don't know me that well as

5   J-Dub.

6            THE COURT:  J-Dub.

7            MR. WILSON:  Which apparently that was -- I will go

8   into stores and people will just yell J-Dub across the

9   store.

10           THE COURT:  Exactly.  Exactly.

11           MR. WILSON:  Unfortunately, I don't know.  There is

12  quite a lot of us out there, a lot of Jeffreys and Wilsons,

13  Your Honor.

14           THE COURT:  So, let me get to this.  I think with

15  respect to the elements, knowingly with the intent to

16  defraud, without authorization, by means of such conduct

17  where there is an intended fraud, obtain something of value,

18  let's just say for the sake of argument that you could meet

19  those elements.  Is this the type of statute, the federal

20  statute that governs this type of activity?

21           MR. WILSON:  Yes, Your Honor, I believe that it

22  actually is, and I'll tell you why is because Mr. McFarland

23  has stated a fact pattern, and he is I guess what we call a

24  strawman.  He said a fact pattern that we are not arguing,

25  and he's arguing against it trying to take it down.

```
 1          The actual facts here as have been testified to, to
 2   the jury in here, is that at some time the night of April
 3   the 3rd, after he was terminated, not employee leaving with
 4   documents, but employee who has been fired, and who even
 5   Mr. McFarland asked other witnesses here, Well, wasn't his
 6   access removed to these documents by then?  I mean, how did
 7   he get in?  So, he's saying, gosh, he must have known after
 8   he was fired he didn't have access to the Google drive of
 9   his former employer.
10          So, what did he do?  We have testimony that someone
11   using Mr. Greer's password and Mr. Greer's account tried to
12   access or accessed -- well, did access the Google drive
13   improperly.  We have got testimony from Mr. Morton on that.
14   We've seen documentary evidence that it happened.  And the
15   key here, Your Honor, is another word that Mr. McFarland
16   used, and that is trespass.  It is in essence as simple as
17   that.  When you without authorization or even exceeds
18   authorization -- and I would point out the case law out
19   there shows that exceeds authorization means you can have
20   authorization even then, it's just if you go beyond what
21   you're allowed to do you're violating this law.  So, it's
22   kind of a broad standard in that sense.
23          Well, without a doubt there was no -- the testimony
24   that the jury heard here is that on April 3rd, Mr. Greer
25   accessed that information, downloaded it without
```

```
1   authorization, and it must have been something of value
2   because he got on there to get it.  But even if, you know,
3   even if we take that away and look at it --
4           THE COURT:  The fourth element is obtain something
5   of value.
6           MR. WILSON:  Exactly.
7           THE COURT:  What did he obtain of value?
8           MR. WILSON:  Exactly.
9           We won't know, Your Honor, because three weeks
10  later on his computer system, he deleted everything.
11          Now, Mr. McFarland would have the Court look at
12  this spoliation issue as, Well, what did Mr. Shirk testify
13  to?
14          THE COURT:  Well, I think what your argument would
15  be, if I were you, is that there is circumstantial evidence
16  from your expert that jump drives were used around the time
17  of this deletion, so that circumstantially items were
18  obtained of value, right?
19          MR. WILSON:  Your Honor, you're better at it than I
20  am.  That's exactly the argument I would make.  And I can't
21  prove it because as the -- and it's not because of actions
22  that my clients have taken.  It's because of actions that
23  Mr. Greer took.  As Mr. Shirk testified, we can't know what
24  was taken.  All we know is somebody hooked a storage device
25  up to that computer prior to shredding all of those files.
```

1    They then, who knows, did something, presumably took stuff

2    off, maybe, and certainly the jury has a right to that

3    presumption under the spoliation inference, whether it's may

4    or must, that there was something that he didn't want us to

5    know about and presuming it's on there.  We have no access

6    to it.  We now don't know --

7         THE COURT:  But I think the real nub of this issue

8    is the Fourth Circuit case law.  So, I could give you that.

9    You could make the elements.  I think there can be a case

10   made that you can make the elements.  But the case law seems

11   to indicate that this is really a criminal statute that has

12   a civil component, almost like for somebody like Snowden,

13   for example, like a hacker.

14        So, do you have a case that has a similar fact

15   pattern to this where an employee I'll just say steals a

16   computer from their prior employer and then is civilly

17   tried, is held civilly responsible under this statute?

18        MR. WILSON:  Your Honor, today in front of you, I

19   don't have a case, but that's not because I haven't been

20   able to find a case.  It's because I haven't had access to

21   look for that specific case.  I haven't had a chance to

22   brief that.  And if the Court has questions on that and sees

23   it as dispositive, I would ask that we be given an

24   opportunity to brief it, if we're going to move forward,

25   even if it's just between today and tomorrow, or Monday

1    rather.

2          But that aside, I would point out that -- let's

3    assume just for a second, Your Honor, that we're not talking

4    about an employee or a former employee.  Let's assume that

5    it was me who did this, or anybody else in here that's not

6    employed by GMS, that we somehow used the password that we

7    didn't have authorization to use to get onto a computer

8    network that we don't have permission to access to take

9    information that we agree inferentially could be of value.

10   I mean, I don't know what the standard definition of hacking

11   is, but that sounds like hacking to me.

12         I mean, if Snowden was doing it with the Department

13   of Defense, what's to prevent Snowden's brother from doing

14   the exact same thing with GMS?  Now, admittedly, we're not

15   talking of the same level, I mean, of the Department of

16   Defense and security and all of that.  But, still, we do

17   have a civil component here.  We do have a private cause of

18   action under the act.  And I believe, Your Honor, that since

19   we meet the elements here that we have established at least

20   enough for the jury to issue a verdict on this.

21         THE COURT:  Thank you.

22         Mr. McFarland, I'll give you the last, a brief last

23   word on this.

24         MR. MCFARLAND:  Thank you, Your Honor.

25         The Court has hit on that this is a criminal

```
 1    statute with a small civil component that isn't meant to
 2    engulf or swallow the criminal aspect.  And in this case,
 3    Your Honor, not only do I think that that's what's being
 4    attempted here, but there is no proof.  There is a
 5    requirement of damage or loss, and there is no proof of
 6    actual damage or loss.  And simply to say, well, he went in
 7    and he deleted things, there is no evidence that what was
 8    deleted somehow has affected this company in its business
 9    operations.  In fact, what we know is that after Mr. Greer
10    was terminated on April 3rd, 2019, the company continued to
11    have record years in 2019 and 2020.  There is no showing of
12    a damage and loss.
13             And, as the Court has pointed out, this is a
14    criminal statute, and it's not designed -- I mean, what we
15    have is other courts who have interpreted this have said
16    this is not a statute designed for the actions of employees
17    or former employees.
18             The hypothetical that Mr. Wilson is talking about
19    with Mr. Snowden and his brother, his brother is not a GMS
20    employee in that hypothetical, nor was Mr. Snowden.  So,
21    we've got a different situation here.  And lord knows, Your
22    Honor, we've got enough claims and theories in this case as
23    it is and counts.  We don't need one that is legally
24    invalid.
25             THE COURT:  Count Eight, Virginia Computer Crimes
```

JILL H. TRAIL, Official Court Reporter

**JA1038**

1    Act.

2          MR. MCFARLAND:  They've got the same problems, Your

3    Honor, in terms of proving what is a criminal statute and

4    trying to apply it in a civil context.  Moreover, we've got

5    the issue again of nothing occurred in Virginia.  There is

6    no -- there is no allegations that anything was done as to

7    Virginia.

8          THE COURT:  All right.

9          MR. MCFARLAND:  There is no evidence, even if you

10   want to accept the server in the cloud, no evidence they're

11   in Virginia before this Court at this point in time.

12         THE COURT:  All right.

13         All right, Plaintiffs.

14         MR. WILSON:  Your Honor, if I may incorporate

15   Mr. Berger's argument on the lex loci.  I believe --

16         THE COURT:  Let just me go through these elements

17   first.  Use a computer or a computer network without

18   authority.

19         MR. WILSON:  I think we're back to where we were

20   during the last one.  I would argue, Your Honor, this is a

21   broader statute.  It doesn't have the elements that you were

22   concerned about with the Fourth Circuit in the sense that

23   this, you're right, it is authorizing, again, improperly

24   authorizing the computer network, which we have evidence

25   that the jury has heard that someone using Mr. Greer's

1    password -- they can infer that it was him using his

2    password and his login information -- I'll try to slow down

3    a little bit -- his login information, so there is your

4    access, Your Honor.  And we also have testimony from

5    Mr. Morton that the person who accessed was copying their

6    files, the files of Mr. Greer.  And so there you have

7    "copying in any form computer data."  I mean, I think that's

8    plainly there.  "Residing in, communicated by, produced by a

9    computer or computer network."  And so I think the elements

10   are pretty clearly met here, like, directly, and we have

11   evidence on every single one of these.

12           And so, Your Honor, we would ask that this cause of

13   action go forward.

14           THE COURT:  Okay.  And the lex loci portion of

15   this, you adopt Mr. Berger's argument?

16           MR. WILSON:  I do, Your Honor.

17           THE COURT:  I don't need to hear the whole thing

18   again.

19           All right, Mr. McFarland.  I'll give you the last

20   word if there is anything else you want to add on this one.

21           MR. MCFARLAND:  The evidence from Mr. Morton was

22   that apparently someone may have tried to copy something on

23   April 3rd.  There is no evidence that anything was lost,

24   deleted or destroyed, which is the requirement here under

25   the statute.  Moreover, and here is where we have a

```
 1    fundamental foundational problem here, Your Honor, if we
 2    accept that someone using Mr. Greer's GMS account tried to
 3    access the Google drive -- and let's assume for purposes of
 4    this argument, although it's not established, but let's
 5    assume that there is enough there that because it's his
 6    email address that Google sent back to that it was
 7    Mr. Greer.  What we don't have is that that was done after
 8    he received notice of termination.  There is zero evidence
 9    linking when that was done versus when he was terminated.
10    What we do know is that the termination notice was sent by
11    email to him at approximately 7:00 p.m.  There is no
12    evidence that whenever this was done on April 3rd was post
13    7:00 p.m. eastern time.  That's a foundational requirement
14    that if you're going to hold someone to what is, again,
15    essentially a criminal statute, you've got to meet the
16    elements.  It's not there.
17            THE COURT:  All right.  Business conspiracy, Count
18    Nine.
19            MR. MCFARLAND:  Yes, Your Honor.
20            Another claim brought under the Virginia Code which
21    fails because there is no evidence of any conspiracy
22    occurring in the Commonwealth of Virginia.  My clients,
23    again, never set foot in Virginia.  Moreover, under the
24    Virginia Code what is required is a combination of two or
25    more persons for the purpose of willfully and maliciously
```

```
1    injuring the plaintiff in his business.
2              THE COURT:  Do they have two or more persons?
3              MR. MCFARLAND:  They have two or more persons, but
4    they don't have two or more persons willfully and
5    maliciously injuring the plaintiff.
6              THE COURT:  All right.
7              MR. MCFARLAND:  The best evidence for the plaintiff
8    is --
9              THE COURT:  So, you get that they have two or more
10   persons.
11             What about, is there any evidence of legal malice
12   towards GMS?
13             MR. MCFARLAND:  Not at all, Your Honor.  The
14   evidence is, if you take the best evidence for the
15   plaintiff, they went out and sold products and didn't
16   disclose that to GMS.  Now, whether or not that's a breach
17   of their duty of loyalty in the case of Mr. Greer, and we
18   have argued about that, and whether it's -- and I don't
19   think it can be a breach of the aggressively promote, but
20   let's put that aside.  What it isn't is this statute
21   requires -- and by the way, this is not a preponderance of
22   the evidence statute.  This is a clear and convincing burden
23   of proof here.  It requires legal malice; i.e., the element
24   of legal malice requires the plaintiff to prove that the
25   concerted action was undertaken to injure the plaintiff
```

JILL H. TRAIL, Official Court Reporter

**JA1042**

```
 1    intentionally, purposefully, and without lawful
 2    justification.
 3           The only evidence before this jury is -- if you
 4    accept it in the best light for the plaintiff -- is that
 5    Spires and Greer formed G&S to sell products and they didn't
 6    tell GMS about it.  That is not an intent to intentionally,
 7    purposefully, and without lawful justification injure the
 8    plaintiff.  In fact, what we know is, and this is in
 9    evidence, for 2017, 2018, and 2019, what did the plaintiff
10    have?  Record revenues, record profits, and my clients were
11    their top sales agents.  There is simply no evidence of
12    intentional action to injure purposefully and without lawful
13    justification the plaintiff.
14           THE COURT:  What about the element that the
15    conspiratorial actions caused GMS damage?
16           MR. MCFARLAND:  There is no --
17           THE COURT:  That the fact that your clients formed
18    G&S and under the plaintiff's theory double dipped, that
19    caused damage to GMS?
20           MR. MCFARLAND:  Well, what they still -- what's
21    still required though for a business conspiracy is that that
22    action was done with the intent to injure the plaintiff.
23    It's not that they formed G&S, they sold some products --
24    and I'm just accepting the plaintiff's theory --
25           THE COURT:  I understand.
```

JILL H. TRAIL, Official Court Reporter

**JA1043**

```
 1              MR. MCFARLAND:  -- which I think is hogwash -- but
 2    that they formed G&S and they sold products that GMS would
 3    have sold.  They have to show under this statute -- again,
 4    this is a limited statute.  I mean, again, it is found in
 5    the criminal code section.  There is a civil component to
 6    it, but you've got to prove it by clear and convincing
 7    evidence, number one.  Not even close here.  Number two, you
 8    have to show that there was more than just the action of
 9    selling in this case.  You have to show that it was done
10    intentionally to injure the plaintiff purposefully and
11    without lawful justification.  Evidentiary wise that is not
12    met here, Your Honor.
13              THE COURT:  All right.
14              Plaintiff.
15              MR. WILSON:  Your Honor, I think it's established
16    that we have one or more people here, individuals here under
17    the conspiracy element.  I think it was agreed to at this
18    point in time.
19              So, the question is the malice --
20              THE COURT:  The legal, right.
21              MR. WILSON:  -- the malice issue.
22              THE COURT:  Was there legal malice towards GMS?
23              MR. WILSON:  And I will point out, Your Honor, that
24    it's legal malice here.
25              THE COURT:  Yes.
```

```
 1              MR. WILSON:  This is not actual malice.
 2              Your Honor, the question then arises is what did
 3    the jury hear?  The jury heard Mr. Naschansky come in here,
 4    and he testified that when he was being recruited by
 5    Mr. Greer and Mr. Spires on the telephone together, two
 6    people who were involved in this together, that when they
 7    called him up, they were talking bad about Mr. Gorken.  They
 8    were talking bad about GMS.  They were saying, you can do
 9    better.  They're going to hurt you in the future.  They were
10    saying things, bad things about GMS to get Mr. Naschansky to
11    violate his employee duty of loyalty and start selling items
12    that he knew were competitive that were being sold by G&S.
13              And the concept that GMS was doing better
14    financially during these years, or improved financially
15    during these years, or that Mr. Greer or Mr. Hayes and
16    Mr. Spires were selling a lot of items doesn't mean that
17    they weren't scraping stuff off the bottom to try to hurt
18    the company.  That is in essence saying that a little theft
19    is okay.  That's what we've got here.  They did better.  I
20    mean, yeah, we took 10 percent off the top, but they did
21    better on the whole.  So, they got commissions that they
22    didn't deserve.
23              As we've said, we've got testimony to the jury that
24    the jury can infer from the testimony, the limited testimony
25    from Mr. Naschansky that they were -- that they were
```

```
 1    badmouthing GMS, and they were clearly upset at GMS, the
 2    reason for selling their items.  They can definitely infer
 3    that.
 4          And I would also note that getting beyond the
 5    regular spoliation, when found out, or when it looked like
 6    he was getting found out, Mr. Greer -- we also have
 7    testimony from Amber Wenrick that she was told to delete her
 8    G&S information and other stuff.  So, they were trying to
 9    avoid the company finding -- GMS finding out about them
10    through that route and what they were up to.
11          This whole thing is about them sneaking behind the
12    back of GMS for years and selling items in the attempt to
13    injure GMS.  And I think there is testimony here, Your
14    Honor, that the jury could infer that, and the jury could
15    rule in our favor on that element.
16          THE COURT:  What about, what was the damage caused
17    by the conspiratorial actions of the --
18          MR. WILSON:  Well, that's the little theft, Your
19    Honor.  That was the -- you've seen the damage numbers that
20    have been put up by our experts.  You have seen
21    Ms. Robichaux testify as to lost profits.  You have seen
22    Ms. Van Tassel testify as to unjust enrichment on their
23    behalf, all of those damages.  Every sale, Your Honor, that
24    the defendants made that should have been a GMS sale is a
25    violation.  It is a violation of their duty of loyalty, of
```

```
 1   their duty under the contract to aggressively promote.  Each
 2   one of these was a violation.  And we would state that it
 3   becomes an intent issue on the illegal malice, and that
 4   intent issue could be backed by the evidence that has been
 5   presented that I have just discussed.  I won't go through it
 6   again for you, unless you want me to.  And I think we meet
 7   that standard.
 8              THE COURT:  Okay.  The same lex loci argument --
 9              MR. WILSON:  Yes, Your Honor.
10              THE COURT:  -- as Mr. Berger presented?
11              MR. WILSON:  Yes, Your Honor.  He did such a good
12   job, I can't...
13              THE COURT:  All right.
14              Mr. McFarland.
15              MR. MCFARLAND:  Yes, Your Honor.
16              THE COURT:  Last word on this, if you want to add
17   anything.  You don't have to.
18              MR. MCFARLAND:  Two points, Your Honor.  Unjust
19   enrichment is not a damage for a business conspiracy.  You
20   have to prove a direct loss as a result of the alleged
21   conspiratorial actions, which now have to be established by
22   clear and convincing evidence.  So, there is no damage
23   established from the alleged conspiratorial actions.
24   Moreover, what I heard was, well, they were talking bad
25   about Mr. Gorken with Mr. Naschansky.  Okay.  That's not an
```

1    intent to intentionally injure GMS.  Moreover, what the

2    evidence is, is that Naschansky didn't do anything.  He

3    didn't make any sales.  So, there is no injury from talking

4    to Naschansky and trying to recruit him, which by the way,

5    the Court has already ruled is not -- solicitation is not a

6    factor in this case anymore.  That cannot be the tortious

7    action, trying to recruit Naschansky.

8            So, there is -- I think the Court asked the

9    question, what is the damage?  And the Court is directly

10   right.  There is no proven damage.  Moreover, there is no

11   evidence of an intent to injure, willfully, maliciously GMS.

12   There is definitely intent to make some sales, and we'll

13   argue at closing about whether or not that's certain

14   violations or not, and I get that.  But business conspiracy,

15   again, Your Honor, is a very limited cause of action on the

16   civil side, not met here.

17           THE COURT:  All right.  One moment.

18           Okay.  Count Eleven, common law conspiracy.

19           MR. MCFARLAND:  So --

20           THE COURT:  You've got two or more people, so

21   you're not arguing that that element is not met, right?

22           MR. MCFARLAND:  Correct, Your Honor.

23           THE COURT:  All right.

24           MR. MCFARLAND:  Although, I will say that I don't

25   see how in the conspiracy claim, although they're named --

```
 1              THE COURT:  I'm not saying that they've got it, but
 2      under the best case there is two or more.
 3              MR. MCFARLAND:  No.  I'm with you on that, Your
 4      Honor.  What I was about to say is in this count they also
 5      included HMC Supply.
 6              THE COURT:  Okay.
 7              MR. MCFARLAND:  They included County Roads.  They
 8      included Greer Group.  They included Mike Welton.  And they
 9      included Sabrina Greer.
10              There is zero evidence about the corporate
11      defendants conspiring or participating in a conspiracy.  And
12      there is actually no evidence about Sabrina Greer and Mike
13      Welton participating in a conspiracy, particularly since
14      they're independent sales agents.
15              THE COURT:  All right.
16              MR. MCFARLAND:  So, the only actors that can be the
17      conspiratorial actors, if you will, are Greer and Spires.
18              THE COURT:  What about the element of accomplishing
19      an unlawful purpose or accomplishing a lawful purpose by
20      unlawful means?
21              MR. MCFARLAND:  There is no evidence of the
22      unlawful means.  Now, it may be that we've got a dispute
23      over whether -- and I think it's not met, but whether Greer
24      breached his duty of loyalty, but that's not unlawful means,
25      Your Honor.  This is -- even Virginia's common law
```

conspiracy claim, which I think also requires proof by clear

and convincing evidence, is a limited cause of action.

You've got to show, again -- the elements are an agreement

between two or more persons to participate in an unlawful

act or a lawful act in an unlawful manner.  That's not met

here.  Third, an injury caused by the unlawful overt act

performed by one of the parties; also not met here.  And

that the overt act was done pursuant to and in furtherance

of a common scheme.  I don't think that's met either here,

Your Honor.  And, of course, we also have the fact that

whatever this was my clients did or didn't do, they sure

didn't do it in the Commonwealth of Virginia.

       THE COURT:  All right.  And I presume your position

is no damage to the plaintiff?

       MR. MCFARLAND:  Exactly, Your Honor.

       THE COURT:  Same argument you've made with the

other damage components?

       MR. MCFARLAND:  Right.  They have to prove that the

alleged conspiratorial actions caused damage.  Whether or

not they made sales in and of itself, whether or not G&S had

sales is not shown to be linked to the conspiratorial

actions.  That's just general damages.

       THE COURT:  All right.  Very good.

       All right, Plaintiff.

       So, Mr. Wilson, there is definitely more than two

64

1    people, but I'm going to ask you about the corporate
2    defendants as it relates to this count, and there was
3    another count I wanted to ask you all about the corporate
4    defendants on, but I forgot, but I'll try to find it after
5    this argument.
6         MR. WILSON:  All right.  Your Honor, as you know
7    from the evidence that has been shown, the corporate
8    defendants here were parties to the contracts with GMS, at
9    least the ones that are issued in 2019, the sales agent
10   agreements.  Their names were on the contracts along with
11   the individual defendants.  The individual defendants were
12   using these companies for their purposes of payment and
13   otherwise as their own vehicles, and I think it's probably
14   an alter ego argument here, but that is for the future to
15   decide.
16        But, Your Honor, I would say that they were using
17   -- they entered into these agreements with us.  They
18   together, the corporate defendants and the individuals I
19   think are inseparable here, but in any event the question
20   arises then:  Then what is the unlawful act or the lawful
21   act done unlawfully?  Well, I would argue that competing
22   against your employer could be an unlawful act, but
23   certainly misappropriation, trademark misappropriation is an
24   unlawful act, which we've alleged in here.  And we've
25   alleged that all of these groups got together and they

JILL H. TRAIL, Official Court Reporter

**JA1051**

1    formed -- or a number of these individuals got together, and
2    they formed a company G&S.  Some were members.  Some were
3    salespeople for the company of the defendants, but they
4    formed a company called G&S, and that they did so with the
5    intent -- with the intent to misappropriate our trademarks.
6           We have in the -- and, obviously, this is not
7    evidence of today but what has happened in the TRO hearings.
8    The Court at the time ruled that there was a likelihood of
9    success on the merits, and they made the defendants take
10   certain actions to change their name, and certainly we can
11   use that here.  The evidence has come out that we have a
12   mark that -- and I won't argue the entire trademark thing,
13   but we have alleged it.
14          THE COURT:  That's coming next.
15          MR. WILSON:  I know.  I know.  It's also going to
16   be me, so I might as well do it.
17          But in any event, we've alleged trademark
18   infringement among other things here, Your Honor, and so I
19   do think we have an unlawful act here that is arising.  We
20   have damages that have been alleged across the board, again.
21   We could go into the damages, the lex loci argument, but
22   these individuals set up a competing company to be competing
23   against us, right underneath us.
24          THE COURT:  Is this a Virginia count as well?
25          MR. WILSON:  I think so.

JILL H. TRAIL, Official Court Reporter

**JA1052**

```
 1              MR. MCFARLAND:  Yes, Your Honor.

 2              MR. WILSON:  Yes, statutory.

 3              MR. MCFARLAND:  Virginia common law.

 4              MR. WILSON:  Common law, yeah, yeah.  So, I

 5    think we're also going to stand on our lex loci argument as

 6    we go forward.

 7              Do you have any other questions, Your Honor?

 8              THE COURT:  No.  Your damages are, of course, your

 9    lost sales and all of the things we've talked about before,

10    right?

11              MR. WILSON:  Sure.

12              THE COURT:  Okay.

13              MR. WILSON:  And unjust enrichment, Your Honor.

14              THE COURT:  Yes.

15              Mr. McFarland, last word on this before we move on

16    to the next one.

17              MR. MCFARLAND:  Thank you, Your Honor.

18              Unjust enrichment is not -- that's an equitable

19    remedy.  It is not a basis for the injury for a conspiracy

20    claim.  You've got to show a direct injury, and that is not

21    shown here.

22              First off let me say, initially I heard plaintiff's

23    counsel argue that the breach of the employment agreement or

24    the breach of the independent sales agreement can be the

25    wrongful act.  That is absolutely not true under Virginia
```

JILL H. TRAIL, Official Court Reporter

**JA1053**

1    law.  It is required that there be a separate tortious

2    conduct that rises to the level of intentional, willful, et

3    cetera.  So, the breach of an agreement absolutely cannot be

4    a basis for a conspiracy, and that's -- the Court has noted

5    that while some states let you turn every breach of contract

6    into a tort, Virginia has held the line very firmly on that,

7    and it is not permitted.  So, that can't be the tortious

8    conduct.

9         What I think I heard then is that the alleged

10   trademark infringement is the tortious conduct that would

11   give them the hook for the conspiracy.  I don't think that

12   is true.  But moreover, what is not established is that

13   there is any damage from the alleged trademark infringement,

14   particularly since the Court directed us to change our name

15   and we did.  There is no evidence that between June of 2017

16   and, let's see -- it was April 3rd of 2019, that any

17   trademark infringement alleged caused damage.  And, again,

18   that's why the law, even the common law claim is very

19   specific.  You've got to have a proximate relationship

20   showing conspiratorial conduct with the elements that are

21   required for that, and it's not simply breach of contract or

22   even tortious conduct.  It's got to be enough to meet the

23   requirements for a conspiracy, but then there is damage that

24   flows from the conspiracy.  Their damages, there is no

25   evidence that they flow from any conspiratorial conduct,

```
 1   Your Honor.
 2           THE COURT:  Okay.  Count Twelve, trademark
 3   infringement.
 4           MR. MCFARLAND:  Yes, Your Honor.  The plaintiff
 5   must prove that it possesses a mark.
 6           THE COURT:  All right.  Any evidence that the
 7   plaintiff had a mark, a valid mark?
 8           MR. MCFARLAND:  I haven't heard it in this case.
 9   They used GMS, maybe that's what they're alleging or they're
10   going to say.  There is nothing that says that we developed
11   this, we put it out there, we used it.
12           Then there has got to be evidence that the
13   defendant used the mark.  I don't think there is any
14   evidence of that.  That the defendants' use of the mark
15   occurred in commerce, and that the defendant used the mark
16   in connection with the sale, offering for sale,
17   distribution, or advertising of goods and services, and that
18   the defendant used this mark in a manner likely to confuse
19   customers.
20           I guess what they're going -- what the contention
21   here is there is the GMS name, and that while it was in
22   existence G&S Supply violated that trademark.  The Court did
23   order us to change our name, but what we don't have is a
24   damage that results from that.  We're not at the point of
25   injunctive relief of changing the name.  Now we're at the
```

JILL H. TRAIL, Official Court Reporter

**JA1055**

```
 1    point of show what the alleged infringement caused in terms
 2    of a monetary harm, and there just isn't any evidence of
 3    that, Your Honor.
 4            THE COURT:  All right.
 5            All right, Mr. Wilson.  All right, Mr. Wilson, what
 6    was the evidence elicited of a valid mark?
 7            MR. WILSON:  Well, Your Honor, a valid mark is just
 8    a mark that the business uses in commerce.  There is no
 9    requirement under the federal trademark statute Lanham Act
10    that the trademark be registered in any way with the
11    state --
12            THE COURT:  Either a mark with a certificate of
13    registration or a mark that is used in commerce and is
14    distinctive.
15            MR. WILSON:  Yes, Your Honor.  And we've made the
16    argument that we've used GMS in commerce.  I think we've
17    provided copious amounts of evidence on that issue.  We've
18    had catalogs with our mark on it.  We've had products that
19    had -- contained products with our mark on it.  We have
20    evidence that we were sending sales people out across the
21    country and even internationally with those catalogs.  So, I
22    don't think there is any doubt that we had a mark and we
23    were using it in commerce on that.
24            So, the question then arises, the second element,
25    whether the defendants used the mark, improperly used our
```

```
1   mark.  And I think it's been established in the TRO, and I
2   think that that hasn't changed here today, that the
3   defendants used a mark, GMS -- G&S, that was close together.
4   And the law shows that just because something is a few
5   initials doesn't mean -- and there is a difference in the
6   initials doesn't mean that they're not using our mark.  It
7   can be close enough to cause likelihood of confusion in the
8   marketplace, which is the third element here.
9           And, Your Honor, again, the law is pretty clear on
10  this, when it comes to likelihood of confusion the best
11  evidence is actual confusion on this.  And we've had
12  testimony from a Mr. Naschansky that he experienced
13  customers in the field that expressed actual confusion about
14  the relationship between GMS and G&S.
15          And I would note, Your Honor, that I'm having
16  difficulty even saying -- and it's not evidence, but I'm
17  having difficulty saying the two clearly enough so that you
18  don't get confused by it on here.  And as a matter of fact,
19  you have noticed throughout my thing, I usually say GMS
20  Industrial, G&S Supply.
21          But I think there is no doubt that we have evidence
22  that we used it in commerce.  We have evidence that they
23  used our mark.  And we have evidence that it was likelihood
24  of confusion in the marketplace.
25          Now, Your Honor, we in our jury instructions, I'll
```

JILL H. TRAIL, Official Court Reporter

**JA1057**

```
 1    just note that we have not asked for any damages on this.
 2    In our proposed jury instructions, we've removed the
 3    damages.  We are asking for the continuation of injunctive
 4    relief in this case, so I don't think the damages are
 5    necessary.  I think we can still maintain injunctive relief
 6    as the way to forego injury.
 7            And, Your Honor, do you have an argument for trade
 8    dress, or are you ready to go ahead?
 9            THE COURT:  Yes.
10            MR. WILSON:  I think they are both tied together.
11            THE COURT:  All right.  Anything else you want to
12    say on Count Twelve, Mr. McFarland?
13            MR. MCFARLAND:  Well, I do, Your Honor.
14            I think what I heard the plaintiff say is they
15    agree they don't have any damages from this, so the count
16    ought to be dismissed.
17            The Court has already said we can't use the name
18    G&S Supply.  We have no intention of ever using that name,
19    so let's clean the case up a little bit if they're not
20    seeking damages on this claim.  And we certainly are not
21    going to violate a court order and finish this trial and go
22    out and rename our company G&S Supply, it's just not -- this
23    claim is not an issue anymore.  This count is not an issue.
24            The other thing I did want to point out, Your
25    Honor, is it's pled against all of the defendants.  If there
```

```
 1   was a trademark infringement, it could only have been
 2   undertaken by G&S Supply.  Individual defendants can't
 3   commit a trademark infringement.  Greg Spires didn't
 4   represent himself as GMS Industrial.  Thomas Hayes didn't
 5   represent himself.  That's a claim against a corporate
 6   entity in this case, since GMS Industrial is a corporation.
 7   And the claim as I understand it is you called yourself too
 8   close.  You called yourself G&S Supply.  That's who, if
 9   there were to be a proper corporate defendant or, excuse me,
10   a proper defendant, it's got to be G&S Supply.  It can't be
11   all of the defendants.
12             THE COURT:  All right.
13             Mr. Wilson, what do you have to say about that as
14   it relates to the other defendants other than G&S?
15             MR. WILSON:  Well, Your Honor, again, we're seeking
16   injunctive relief at this stage.  I want to be very clear
17   also.  I never said that we don't have damages.  I said that
18   we have not requested damages as part of our jury
19   instruction.  Clearly, I think there is evidence of damages
20   when you look at the testimony that Mr. Naschansky --
21             THE COURT:  I understand the difference.
22             MR. WILSON:  But I believe here, as with the
23   conspiracy statute, these defendants got together and they
24   conspired together.  Part of that conspiracy was to create a
25   company that competed with us.  And part of that conspiracy
```

JILL H. TRAIL, Official Court Reporter

**JA1059**

```
 1    was to name it -- to use our mark in the marketplace as part
 2    of that company.
 3            And, again, if we're talking injunctive relief, to
 4    throw the argument back, what's the problem here?  If there
 5    is not damages at issue, we still have a right to request
 6    this Court continue to enjoin the defendants from -- I mean,
 7    tomorrow they could go start this -- or, you know, after the
 8    verdict goes out, they could go start their company back up.
 9    We want to maintain that injunction against all of them from
10    using our mark.
11            THE COURT:  All right.
12            MR. MCFARLAND:  But that's different, Your Honor.
13    The claim, the claim that is pled is trademark infringement,
14    and that can only -- the infringement can only be through
15    G&S Supply.  The individual defendants can't infringe a
16    trademark.
17            Now, I understand he's asking for an order,
18    basically, don't go rename yourselves G&S Supply, which
19    would be in violation of this Court's already existing
20    order.  So, I don't -- it's not necessary.  But moreover,
21    we're dealing with specific claims.  And what I'm partially
22    trying to do here is to clean the case up and take out that
23    which quite simply doesn't belong, and you can't have a
24    trademark infringement against an individual defendant in
25    this context.
```

```
 1              THE COURT:  Let's move on.
 2              MR. MCFARLAND:  If somebody goes and pawns himself
 3    off as Prince, and they're not the late Prince, that's
 4    different.  That's an individual.
 5              THE COURT:  All right.
 6              MR. MCFARLAND:  But that isn't what this claim is
 7    about.
 8              THE COURT:  All right.  Let's move on to last, but
 9    by no means of least importance, trade dress infringement.
10              MR. MCFARLAND:  Yes, Your Honor.
11              And really the same principles apply here.  Number
12    one, it can't be raised against all of the defendants.  And,
13    two, I have to say trade dress infringement is a little
14    different.  I don't know how the plaintiff has met the
15    elements for a trade dress infringement claim here.  I just
16    don't.
17              THE COURT:  The work at issue originated with the
18    plaintiff.  They have an argument, plausibly, on that.  But
19    if you don't think so, tell me why not.  Tell me why they
20    don't meet that element.
21              MR. MCFARLAND:  The name is the name, Your Honor,
22    but that's not what I understand this claim to be.  There
23    has got to be something more than just the name for a trade
24    dress infringement, and I don't think there is any evidence.
25    We haven't heard any testimony about that.  Confusion as to
```

```
 1    the name, which by the way the Court, I think, admitted for
 2    a very limited purpose since it was hearsay, but in any
 3    event, that's not the same as trade dress.  I just don't
 4    think it's been met, Your Honor.
 5              THE COURT:  All right.
 6              Mr. Wilson.
 7              MR. WILSON:  Your Honor, as I stated earlier, I
 8    think these two claims are tied together.  The trade dress
 9    is for the same reason.  We're just seeking injunctive
10    relief on this matter.
11              THE COURT:  All right.
12              MR. WILSON:  Again, we're not stating that we don't
13    believe we have damages on it.
14              THE COURT:  All right.
15              MR. WILSON:  But with regard to the dress issue of
16    the trade dress, we have presented evidence of two catalogs
17    that --
18              THE COURT:  And you're saying those catalogs
19    originated with you?
20              MR. WILSON:  Our catalog originated with us, and
21    they used -- we have a logo on the front of the catalog, and
22    we have certain things that are in that catalog and that
23    have been used on products, which you can see in the catalog
24    as well.  We believe that violation is there.  But part of
25    that is the G&S logo, and if they're enjoined from being G&S
```

1   and using the G&S logo, then I believe, Your Honor, that

2   that satisfies what we've asked for in the jury

3   instructions.  So, again, we're not asking for damages, we

4   believe.

5           THE COURT:  I understand that.  I'm just making

6   sure you've got all of the elements to go forward.

7           Origin of the work was falsely designated by the

8   defendant.

9           MR. WILSON:  Well, we've got them taking their --

10  again, we've got them taking their catalog out into the

11  marketplace.  We have evidence that they have been walking

12  in with their catalog.  We've got evidence that they've been

13  referring -- that people have thought of them as sister

14  companies, if not referred to them as sister companies.  So,

15  they're trying to make it look like their catalog and their

16  goods that are coming from us, GMS, and I believe that meets

17  that standard.

18          THE COURT:  Okay.  Hold on one second.

19          All right.  The false designation of origin was

20  likely to cause consumer confusion.

21          MR. WILSON:  Again, Your Honor, this tracks back to

22  the argument that we've seen confusion in the marketplace.

23  People were given catalogs.  People came.  We sent our guy

24  out in the field.  They came to him and expressed that.

25          Obviously, as trademark law will say, likelihood of

JILL H. TRAIL, Official Court Reporter

**JA1063**

1    confusion is very difficult to prove at times, and part of
2    that, like I said, the best evidence is actual confusion,
3    evidence of actual confusion.  We believe that there has at
4    least been evidence presented where a reasonable juror could
5    infer that there was actual confusion within the terms of
6    the trade dress and of the origin of G&S goods.
7            THE COURT:  And the harm, of course, would be the
8    same harm that you've alleged before, unjust enrichment,
9    et cetera, right?
10           MR. WILSON:  Yes, Your Honor.
11           THE COURT:  Stay at the podium for a moment.
12           Well, Mr. McFarland, you've got the last word.
13           MR. MCFARLAND:  Your Honor, I'll just note
14   plaintiff says they're not pursuing damages.  They can't
15   pursue damages under these two claims.  They're not
16   registered.
17           THE COURT:  Okay.
18           MR. MCFARLAND:  There is no registered mark here.
19   GMS isn't registered.  The green oger isn't registered.  We
20   didn't use the green oger, by the way, in no way.
21           And what I think I'm hearing is something about the
22   catalog.  Other than the name on the catalog, the catalogs
23   themselves cannot be a trade dress infringement.  They're
24   showing generic products.  There is pictures of generic
25   products in both catalogs.  That's not a trade dress

1    infringement.  Plaintiff doesn't own the rights to show

2    pictures of creepers or crimpers or batteries or cloths.

3    That's simply not trade dress infringement.

4            THE COURT:  Okay.

5            Before I take a recess I'll ask one of the

6    plaintiff's counsel -- I'm going to pick on you, Mr. Wilson,

7    you can come back to the podium.

8            You stay at the podium, Mr. McFarland.

9            MR. MCFARLAND:  Okay.

10           THE COURT:  So, for Count One, do the parties agree

11    that the standard for breach of duty of loyalty is

12    preponderance of the evidence?

13           MR. WILSON:  We do, Your Honor.

14           THE COURT:  All right.

15           Mr. McFarland?

16           MR. MCFARLAND:  Yes, Your Honor.

17           THE COURT:  All right.  Count Two, breach of Westly

18    Greer agreement, standard is preponderance of the evidence?

19           MR. WILSON:  We agree, Your Honor.

20           MR. MCFARLAND:  I do, Your Honor.

21           THE COURT:  All right.  Breach of sales agreement,

22    preponderance of the evidence?

23           MR. WILSON:  We agree, Your Honor.

24           MR. MCFARLAND:  Agreed, Your Honor.

25           THE COURT:  All right.  Count Four,

```
 1    misappropriation of trade secrets.  I have preponderance of
 2    the evidence.
 3              MR. WILSON:  I agree, Your Honor.  We agree.
 4              MR. MCFARLAND:  Yes.
 5              THE COURT:  Okay.  Count Five, misappropriation of
 6    trade secrets under Virginia statute.  I have, I believe,
 7    preponderance of the evidence.  Is that what you all have?
 8              MR. WILSON:  Plaintiffs agree, Your Honor.
 9              THE COURT:  Mr. McFarland?
10              MR. MCFARLAND:  Yes, Your Honor.
11              THE COURT:  All right.
12              Federal Computer Fraud and Abuse Act, I don't have
13    a burden of proof.  I think it's preponderance of the
14    evidence.
15              But, Mr. Wilson, what do you say?
16              MR. WILSON:  We will concur, Your Honor.
17              THE COURT:  All right.
18              MR. MCFARLAND:  I think that's correct with the
19    caveat that it's a criminal statute with...
20              THE COURT:  It's not beyond a reasonable doubt.
21              MR. MCFARLAND:  No, it's not, Your Honor.  I
22    couldn't get that legislation changed in time, Your Honor.
23              THE COURT:  Okay.  Count Eight, Virginia Computer
24    Crimes Act, preponderance of the evidence?
25              MR. WILSON:  We agree, Your Honor.
```

```
 1              THE COURT:  Mr. McFarland?

 2              MR. MCFARLAND:  Yes.

 3              THE COURT:  All right.

 4              Okay.  Business conspiracy, clear and convincing

 5     evidence?

 6              MR. WILSON:  Plaintiffs agree, Your Honor.

 7              MR. MCFARLAND:  Yes, Your Honor.

 8              THE COURT:  Count Eleven, common law conspiracy,

 9     preponderance of the evidence?

10              MR. WILSON:  Plaintiffs agree, Your Honor.

11              MR. MCFARLAND:  I think that's correct, Your Honor.

12              THE COURT:  Count Twelve, which is your trademark

13     infringement, preponderance of the evidence?

14              MR. WILSON:  Yes, Your Honor, we agree.

15              MR. MCFARLAND:  Defendants agree, Your Honor.

16              THE COURT:  And Count Thirteen, the trade dress,

17     preponderance of the evidence?

18              MR. WILSON:  Yes, Your Honor.

19              MR. MCFARLAND:  Agreed, Your Honor.

20              THE COURT:  Very good.

21              All right.  You all can take a break.  I'm going to

22     take a recess, and I'll be back.

23              MR. MCFARLAND:  Thank you, Your Honor.

24              THE COURT:  All right.  Thank you.

25              (Court stood in recess from 5:20 p.m. to 6:21 p.m.)
```

```
1              THE COURT:  All right.  So, I've entertained
2    argument on this motion for judgment as a matter of law and
3    the defense's motion for judgment as a matter of law
4    pursuant to Rule 50 of the Federal Rules of Civil Procedure,
5    and as it relates to these counts the Court has the
6    following rulings:
7              The defense's motion for judgment as a matter of
8    law on Count One is overruled.
9              The defense's motion for judgment as a matter of
10   law on Count Two is granted.
11             The defense's motion for judgment as a matter of
12   law on Count Three is overruled.
13             The defense's motion on Count Four, which is
14   misappropriation of trade secrets, is overruled as to all
15   defendants except HMC.
16             Defendants' motion on Count Five is overruled as to
17   all defendants except HMC.
18             Defendants' motion for judgment as a matter of law
19   on Count Seven is granted.
20             The defense's motion on Count Eight, which is the
21   Virginia Computer Crimes Act, the motion for judgment as a
22   matter of law is granted to everyone except for Westly
23   Greer; as to Westly Greer the motion is overruled.
24             On Count Ten, which is the business conspiracy, the
25   defendants' motion for judgment as a matter of law is
```

1    overruled, but it's granted as to HMC.

2            On Count Eleven, the defense's motion for judgment

3    as a matter of law is overruled except as to defendant HMC.

4            On Count Twelve, the defendants' motion for

5    judgment as a matter of law is overruled except as to HMC.

6            On Count Thirteen, the defendants' motion for

7    judgment as a matter of law is overruled as it relates to

8    false designation.  That's what's alleged in the complaint,

9    and there is no other Lanham Act violations alleged in the

10   complaint.  The motion is granted as to HMC.

11           I think that addresses every claim that was raised.

12           Mr. McFarland, how long is it going to take you to

13   put on your case starting on Monday morning at 9:15?

14           MR. MCFARLAND:  I actually think, Your Honor, in

15   light of the Court's rulings and where we are now, I think

16   we can get done with our case in two days or less.

17           THE COURT:  Okay.  All right.  Very good.  All

18   right.  So --

19           MR. MCFARLAND:  Can I get a quick clarification if

20   I may, Your Honor?

21           THE COURT:  You may.

22           MR. MCFARLAND:  On WarTech --

23           THE COURT:  Yes.

24           MR. MCFARLAND:  -- are they in still or out or?

25           THE COURT:  WarTech is still in for right now.

JILL H. TRAIL, Official Court Reporter

```
1              MR. MCFARLAND:  Okay.

2              THE COURT:  For right now.

3              MR. MCFARLAND:  Okay.

4              THE COURT:  Okay.  All right.

5         All right, Plaintiff.  Is there anything else that

6    we need to address before we recess for the weekend?

7              MR. LASCARA:  No, sir, Your Honor.

8              THE COURT:  All right.

9              Mr. McFarland, anything else we need to address?

10             MR. MCFARLAND:  No, Your Honor.  We appreciate the

11   Court's patience and its endurance during a long week.

12             THE COURT:  Not a problem.  Not a problem.  I know

13   everyone is working really hard.

14        Okay.  Let's, finally, close court.

15        (Proceedings adjourned at 6:25 p.m.)

16                      CERTIFICATION

17

18        I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20

21

22        _____/s/_____

23                     Jill H. Trail

24                   November 8, 2022

25
```

JILL H. TRAIL, Official Court Reporter

**JA1070**

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2023, I filed the foregoing with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Robert W. McFarland*
Robert W. McFarland

*Counsel for Defendant-Appellant*