No. 22-2090

In the

# United States Court of Appeals

## For the Fourth Circuit

———————————

GMS Industrial Supply, Inc.,

*Plaintiff-Appellee,*

v.

Westly L. Greer,

*Defendant-Appellant,*

and

G&S Supply, LLC; Sabrina Greer; Greer Group, LLC; Gregory K. Spires; Country Roads, LLC; Thomas Hayes; Mike Welton; WarTech Industries, LLC; HMC Supply, LLC,

*Defendants.*

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia at Norfolk
Case No. 2:19-cv-00324
The Honorable Roderick C. Young, District Judge
The Honorable Lawrence R. Leonard, Magistrate Judge

———————————

**JOINT APPENDIX – VOLUME IV OF IV (pp. 1071-1446)**

———————————

Robert W. McFarland
V. Kathleen Dougherty
Jeanne E. Noonan
McGuireWoods LLP
9000 World Trade Center
101 West Main Street
Norfolk, VA 23510
T: (757) 640-3716

*Counsel for Appellant*

Jeffrey Wilson
William A. Lascara
Thomas S. Berkley
Pender & Coward, PC
222 Central Park Avenue
Suite 400
Virginia Beach, VA 23462
T: (757) 502-7341

*Counsel for Appellee*

*(additional counsel listed on inside cover)*

Sean A. McClelland
MCGUIREWOODS LLP
888 16th Street, N.W.
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2838

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

**Volume I (pp. 1-305)**

E.D. Va. Docket Sheet (Case No. 2:19-cv-00324-RCY-LRL) ...............................1

Dkt. 1:
   Complaint (June 20, 2019) .............................................................40

   Dkt. 1-1: Civil Cover Sheet .......................................................118

   Dkt. 1-2: Exhibit 1 to Complaint, Apr. 3, 2019 Termination,
   Cease and Desist and Litigation Hold Notice Letter .................................119

   Dkt. 1-3: Exhibit 2 to Complaint, GMS Catalogue ....................................133

   Dkt. 1-4: Exhibit 3 to Complaint, G&S Catalogue ....................................219

   Dkt. 1-5: Exhibit 4 to Complaint, Comparison .........................................241

   Dkt. 1-6: Exhibit 5 to Complaint, Email Details .......................................267

   Dkt. 1-7: Exhibit 6 to Complaint, Apr. 17, 2019 Supplemental
   Termination, Cease and Desist and Litigation Hold Notice Letter
   and Demand for Return of Property ..........................................................270

   Dkt. 1-8: Exhibit 7 to Complaint, Report ...................................................272

   Dkt. 1-9: Exhibit 8 to Complaint, GMS Trademark Use Examples ..........273

   Dkt. 1-10: Exhibit 9 to Complaint, G&S Designation Use Examples .......280

   Dkt. 1-11: Exhibit 10 to Complaint, May 24, 2019 Second
   Supplemental Termination, Cease and Desist and Litigation
   Hold Notice Letter and Demand for Return of Property ...........................297

   Dkt. 1-12: Exhibit 11 to Complaint, Declaration of Garry A. Pate............298

Dkt. 1-13: Exhibit 12 to Complaint, Declaration of William A. Lascara ....................................................................................304

**Volume II (pp. 306-713)**

Dkt. 3-1:
   Exhibit 1 to Memorandum in Support of Motion for Temporary Restraining Order and Temporary Injunction – Contracts Between Plaintiffs and Defendants (June 21, 2019) ...................................306

Dkt. 156:
   Third Amended Verified Complaint (Dec. 1, 2020) ...................................346

Dkt. 193:
   Defendants' Motion for Sanctions Pursuant to Rule 11 (July 8, 2021) .....432

Dkt. 194:
   Memorandum in Support of Defendants' Motion for Sanctions Pursuant to Rule 11 (July 8, 2021) ...............................................................435

Dkt. 205:
   GMS Industrial Supply, Inc.'s Response to Defendants' Motion for Sanctions Pursuant to Rule 11 (July 22, 2021)....................................467

Dkt. 207:
   Reply in Support of Defendants' Motion for Sanctions Pursuant to Rule 11 (July 28, 2021) .........................................................................495

Dkt. 249:
   Order Denying Rule 11 Motion (Mar. 22, 2022) .......................................517

Dkt. 250:
   Memorandum Opinion re: Rule 11 Motion (Mar. 22, 2022) ....................518

Dkt. 266:
   Proposed Jury Instructions (May 9, 2022) .................................................539

## Volume III (pp. 714-1070)

Dkt. 271:
Defendants' Objections To Plaintiff's Proposed Jury Instructions
(May 12, 2022) ..........................................................................714

Dkt. 289:
Defendants' Pretrial Bench Brief (May 26, 2022) ....................723

Dkt. 291:
Plaintiff's Bench Brief (May 26, 2022)......................................738

Dkt. 323:
Transcript of Jury Trial (Excerpt of Proceedings) (June 2, 2022) .............754

Donna Grace Rupley, Direct Examination By Mr. Gordon .......................757

Donna Grace Rupley, Cross-Examination By Mr. McFarland .................799

Donna Grace Rupley, Redirect Examination By Mr. Gordon ..................807

Danielle Renee Robichaux, Direct Examination By Mr. Berkley .............810

Dkt. 329:
Transcript of Proceedings (Excerpt Testimony of Danielle Renee
Robichaux) (June 3, 2022)..........................................................885

Danielle Renee Robichaux, Direct Examination By Mr. Berkley ............887

Danielle Renee Robichaux, Cross-Examination By Mr.
McFarland.....................................................................................950

Danielle Renee Robichaux, Redirect Examination By Mr.
Berkley..........................................................................................983

Dkt. 361:
Transcript of Proceedings re: Initial Oral Rule 50 Motion
(Motions Excerpt) (June 3, 2022)..............................................988

## Volume IV (pp. 1071-1446)

Dkt. 340:
Transcript of Proceedings (Excerpt of Proceedings – Westly
Greer) (June 6, 2022)................................................................1071

Westly Greer, Direct Examination By Mr. McFarland............................1074

Westly Greer, Cross-Examination By Mr. Lascara..................................1126

Dkt. 341:
Transcript of Proceedings (Excerpt Testimony of Westly Greer)
(June 7, 2022) .........................................................................1170

Westly Greer, Cross-Examination By Mr. Lascara..................................1174

Westly Greer, Redirect Examination By Mr. McFarland .......................1196

Dkt. 342:
Transcript of Proceedings (Excerpt Testimony of Sabrina Greer)
(June 7, 2022) .........................................................................1199

Sabrina Star Greer, Direct Examination By Mr. McFarland...................1202

Sabrina Star Greer, Cross Examination By Mr. Gordon.........................1224

Dkt. 362:
Transcript of Proceedings re: Renewed Oral Rule 50 Motion
(June 7, 2022) .........................................................................1244

Dkt. 310:
Order re: Defendants' Motion for Judgment As A Matter of Law
Under Rule 50 (June 8, 2022)................................................1281

Dkt. 311:
Order re: Defendants' Renewed Motion for Judgment As A
Matter of Law Under Rule 50 (June 8, 2022) ........................1283

Dkt. 316-1:
Exhibit and Witness List (June 10, 2022) .................................................1285

Dkt. 317:
Jury Verdict (June 10, 2022) ....................................................1298

Dkt. 319:
Jury Instructions (June 10, 2022) .........................................................1333

Dkt. 321:
Clerk's Judgment (June 10, 2022)............................................................1406

Dkt. 331:
Notice of Appeal (July 8, 2022) .............................................................1407

Dkt. 363-1:
Trial Exhibit P3 – Independent Agent Agreement Between GMS
Industrial Supply, Inc. and Westly Greer ...................................................1409

Dkt. 363-2:
Trial Exhibit P4 – GMS Industrial Supply, Inc. Zone Manager
Addendum.................................................................................................1413

Dkt. 363-3:
Trial Exhibit P5 – GMS Document re: Westly Greer's New Title
of Director of Sales...................................................................................1414

Dkt. 363-4:
Trial Exhibit P6 – Employment Agreement for Westly Greer As
District Manager .......................................................................................1415

Dkt. 363-5:
Trial Exhibit P8 – Independent Sales Agent Agreement for
Sabrina Greer ...........................................................................................1417

Dkt. 363-6:
Trial Exhibit P12 – Independent Sales Agent Agreement
Between GMS & County Roads (Greg Spires).........................................1421

Dkt. 363-7:
　　Trial Exhibit P14 – Independent Sales Agent Agreement for
　　Thomas Hayes ............................................................1425

Dkt. 363-8:
　　Trial Exhibit P16 – Independent Sales Agent Agreement for
　　Michael Welton ...........................................................1429

Dkt. 363-9:
　　Trial Exhibit P28 – Independent Sales Agent Agreement for
　　Sabrina Greer ..............................................................1433

Dkt. 363-10:
　　Trial Exhibit P32 – Independent Sales Agent Agreement for
　　County Roads, LLC (Greg Spires) ............................................1438

Dkt. 363-11:
　　Trial Exhibit P49 – Employee Non-Compete Agreement for
　　Westly Greer ...............................................................1442

Dkt. 363-12:
　　Trial Exhibit P52 – Sales Agent Agreement for Gregory Spires .............1444

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 9 of 385
Case 2:19-cv-00324-RCY-LRL   Document 340   Filed 07/27/22   Page 1 of 99 PageID# 11244

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF VIRGINIA
 2                              Norfolk Division

 3

 4     - - - - - - - - - - - - - - - - - -
                                          )
 5     GMS INDUSTRIAL SUPPLY, INC.,        )
                                           )
 6            Plaintiff,                   )   CIVIL ACTION NO.
                                           )   2:19cv324
 7     v.                                  )
                                           )
 8     G&S SUPPLY, LLC, et al,             )
                                           )
 9            Defendants.                  )
                                           )
10     - - - - - - - - - - - - - - - - - -

11

12

13                       TRANSCRIPT OF PROCEEDINGS
                   (Excerpt of proceedings - Westly Greer)
14                          Norfolk, Virginia

                              June 6, 2022
15

16

17     BEFORE:  THE HONORABLE RODERICK C. YOUNG
                United States District Judge, and jury
18

19

20     APPEARANCES:

21              PENDER & COWARD
                By:  By:  William A. Lascara
22                   Jeffrey Dennis Wilson
                     Jesse Brian Gordon
23                   Thomas Saunders Berkley
                     Daniel T. Berger
24                   Counsel for Plaintiff

25
```

```
1              MCGUIREWOODS LLP
          By:  Robert William McFarland
2              Micaylee Alexa Noreen
               Jeanne E. Noonan
3              Counsel for the defendants

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JILL H. TRAIL, Official Court Reporter

```
 1                        I N D E X

 2   PLAINTIFF'S
     WITNESSES                                       PAGE
 3

 4

 5

 6   DEFENDANTS'
     WITNESSES                                       PAGE
 7    WESTLY GREER
           Direct Examination By Mr. McFarland          4
 8         Cross-Examination By Mr. Lascara              56

 9

10

11                      E X H I B I T S

12   PLAINTIFF'S
     NO.              DESCRIPTION                    PAGE
13

14

15   DEFENDANTS'
     NO.              DESCRIPTION                    PAGE
16
      19                                                51
17    29                                                52
      21                                                54
18

19

20

21

22

23

24

25
```

JILL H. TRAIL, Official Court Reporter

**JA1073**

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 12 of 385
Case 2:19-cv-00324-RCY-LRL   Document 340   Filed 07/27/22   Page 4 of 99 PageID# 11247

4

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1              (Excerpt of proceedings - testimony of Westly
 2     Greer.)
 3              MR. MCFARLAND:  Your Honor, our next witness will
 4     be Westly Greer.
 5              THE COURT:  All right.
 6              Mr. Greer, please come forward.
 7              (The witness was duly sworn.)
 8              THE COURT:  All right, Mr. McFarland, you may
 9     proceed.
10              MR. MCFARLAND:  Thank you, Your Honor.
11              WESTLY GREER, called by the Defendants, having been
12     first duly sworn, was examined and testified as follows:
13                        DIRECT EXAMINATION
14     BY MR. MCFARLAND:
15     Q.  Good afternoon.  Would you state your full name, please.
16     A.  Westly Greer.
17     Q.  And where do you reside, Mr. Greer?
18     A.  Wentzville, Missouri.
19     Q.  In the state of Missouri?
20     A.  Yes.
21     Q.  And who lives there with you in Missouri?
22     A.  My wife, Sabrina Greer, and Donovan Greer, my son.
23     Q.  And you've lived there since?
24     A.  2019.
25     Q.  And do we understand from some things we've heard
```

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1    earlier, were you born or at least grew up in Missouri?
 2    A.   Yes.
 3    Q.   What do you do at the present time?
 4    A.   I sell for Fastenal.  I work for Fastenal in Wentzville,
 5    Missouri.
 6    Q.   And what do you sell for Fastenal?
 7    A.   Just a lot of commodities, stuff like hardware,
 8    janitorial supplies, safety.
 9    Q.   And where did you work before joining Fastenal?
10    A.   I worked for GMS Industrial Supply.
11    Q.   Let's go back a little bit, Mr. Greer.  Your educational
12    background?
13    A.   I went to high school in Wright City, Missouri.  I
14    attended college at UMSL University in St. Louis, Missouri.
15              THE COURT:  I'll ask you to slow down just a
16    smidge.  Thank you.
17              THE WITNESS:  I attended UMSL in St. Louis,
18    Missouri.  I did one year there.
19    BY MR. MCFARLAND:
20    Q.   And what did you do after leaving college, Westly?
21    A.   I worked at Denny's.  I worked at Denny's during the time
22    of college and after, yeah.
23    Q.   And what has your career path been since then?
24    A.   I worked at Lowe's.  I worked for State Industrial and
25    State Chemical, UZ Engineering, and then GMS Industrial
```

USCA4 Appeal: 22-2090   Doc: 20-4   Filed: 01/19/2023   Pg: 14 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

1   Supply.

2   Q.  And for State -- is it State Industrial?

3   A.  Yes.

4   Q.  What did you do?

5   A.  I installed dilution systems on Fort Sill, Oklahoma.

6   Q.  And how about for -- what was the other, State Chemical?

7   A.  Yeah.  They branched off into two different companies, UZ

8   Engineering and State Chemical, and I worked for both

9   companies at the same time.

10  Q.  Did you do any selling of products for either of those

11  companies?

12  A.  For UZ Engineering, I was in training with my brother,

13  Gary Hodges.

14  Q.  And in training for, to do?

15  A.  Sales.  And then for State Chemical, I was doing

16  installs.

17  Q.  And Fort Sill is located where?

18  A.  Oklahoma, Lawton, Oklahoma.

19  Q.  Did you from your work for UZ or Industrial have any --

20  come to any knowledge about how the Army purchased products

21  at Fort Sill?

22  A.  Yes.  I would walk around with my brother as he sold

23  through their supply system.

24  Q.  And what was your brother's position?

25  A.  He was the account manager for Fort Sill, Oklahoma.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 15 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

1   Q.   And did there come a time when you joined GMS Industrial?

2   A.   Yeah.  It would be April 3rd of 2011.

3   Q.   At the time, what were you doing prior to becoming a -- I

4   guess you became an agent for GMS Industrial Supply

5   initially?

6   A.   A sales agent, yes.

7   Q.   What were you doing before that?

8   A.   I was doing installs for State Chemical Solutions, and I

9   was training with UZ Engineering, and I was also working at

10  Lowe's, and then I was also installing countertops for a side

11  business.

12  Q.   Did you, at the time you came to be an independent sales

13  agent for GMS, have an idea of the Army procurement system?

14  A.   Yes, through the same system, which was the supply system

15  at the time.  My brother taught me a lot of ways to order

16  hardware through that system.

17  Q.   And how did you hear about GMS Industrial?

18  A.   I think that GMS was trying to partner with UZ at the

19  time, because they were a hardware company, and GMS was a

20  chemical company, and my brother would just happen to be the

21  agent at Fort Sill.

22  Q.   And how did it come that you came to be an independent

23  sales agent for GMS Industrial?

24  A.   Like, six months after I started as being an employee for

25  them I became an independent agent, because the sales volume

JILL H. TRAIL, Official Court Reporter

**JA1077**

USCA4 Appeal: 22-2090   Doc: 20-4   Filed: 01/19/2023   Pg: 16 of 385
Case 2:19-cv-00324-RCY-LRL   Document 340   Filed 07/27/22   Page 8 of 99 PageID# 11251

8

WESTLY GREER, Direct Examination By Mr. McFarland

 1   was so high that it was more practical for me to be
 2   independent.
 3   Q.  So, I'm sorry.  Maybe I mis- -- you started as what at
 4   GMS Industrial?
 5   A.  I was a sales agent, but as an employee.
 6   Q.  Gotcha.  Okay.
 7        And what were you selling for GMS Industrial as an
 8   employee sales agent?
 9   A.  Just a lot of janitorial supplies.
10   Q.  Did you receive any training to sell janitorial supplies
11   for GMS Industrial?
12   A.  No training.  I think Gary Gorken and my brother, we all
13   tag-teamed at the beginning when we first met up and were
14   just seeing -- I don't think Gary Gorken had ever been on a
15   military base or an Army base before, and it was kind of new
16   to him.  And then we were just going around.  Just he had a
17   knowledge of what products they had, so we sold whatever we
18   could.
19   Q.  Just so we can keep it clear, your brother was not
20   employed or an independent sales agent for GMS Industrial,
21   correct?
22   A.  Correct.
23   Q.  And did you come to learn during the time that you were
24   first hired as an employee for GMS Industrial, were they
25   doing much business at Army bases?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 17 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

1   A.  From what I was told by Gary Gorken, no.

2   Q.  Did that change during your tenure with GMS Industrial?

3   A.  Yes.

4   Q.  Tell us about your career progression.  I guess you start

5   in your employee sales agent for about six months, correct?

6   A.  Yes.

7   Q.  Selling janitorial supplies?

8   A.  Yes, sir.

9   Q.  And then what happens after six months?

10  A.  After six months -- well, at the beginning, I was the

11  first agent to actually make a sale through that supply

12  system for the company.  I had continual sales.  No one else

13  could figure out how to do it, and --

14  Q.  I'm going to stop you for just a second.

15  A.  Yeah.

16  Q.  You said you were the first agent to make a sale at that

17  base through that system?

18  A.  Yes.

19  Q.  What's the system?

20  A.  It was called SAMS-E at the time, SAMS-E, Standard Army

21  Maintenance System.

22  Q.  To your knowledge, had anyone at GMS Industrial used the

23  SAMS-E system to make sales to the Army prior to you?

24  A.  No, there weren't.

25  Q.  Did anyone at GMS Industrial even know how to use that

USCA4 Appeal: 22-2090   Doc: 20-4   Filed: 01/19/2023   Pg: 18 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

1  system?

2  A.  No, they did not.

3  Q.  Just if we go forward, does that system evolve into

4  something else?

5  A.  Yes.

6  Q.  And what does it evolve into?

7  A.  It evolved into GCSS, the Global Combat Support System.

8  Q.  Well, it sounds like -- and I don't want you to toot your

9  own horn, but it sounds like things go pretty well for you

10  once you join GMS Industrial as a sales agent?

11          MR. LASCARA:  Objection, Your Honor, leading.

12          THE COURT:  Sustained.

13          MR. MCFARLAND:  I'll rephrase.

14  BY MR. MCFARLAND:

15  Q.  How did you do as a sales agent during your, let's say --

16  you started in 2011, right, as an employee.

17          When do you become an independent sales agent?

18  A.  I think it was about six months later that I became an

19  independent.

20  Q.  The first year or two, how do you do as an independent

21  sales agent?

22  A.  Well, in 2012, I became a district manager so I could

23  train everyone around the country how to actually do what I

24  did, so I would say I did pretty good.

25  Q.  Did you receive any commendations or awards during the

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 19 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 11 of 99 PageID# 11254

11

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1   first 18 months of your tenure at GMS Industrial?
 2   A.  I won a trip, I think in 2012, the Mexico trip that they
 3   had frequently.
 4   Q.  When you became either an -- initially an employee, or as
 5   an independent sales agent, did you receive any type of
 6   documents or pamphlets or materials?
 7   A.  I think catalogs, some samples for customers, some
 8   aerosols.
 9   Q.  Did you receive any document that was stamped
10   "confidential"?
11   A.  No.  No.
12   Q.  Or "proprietary"?
13   A.  No.
14   Q.  Or "trade secret"?
15   A.  No.
16   Q.  Did you, during the first two years of your work for GMS,
17   ever receive anything that you were told was confidential,
18   proprietary, or trade secret?
19   A.  No.
20   Q.  Did you have access to any kind of a computer system
21   during your first couple of years at GMS?
22   A.  No.  We just had a Google account with a Google drive.
23   Q.  How would you access that?
24   A.  With a password for your email.
25   Q.  Did you have access during this period to any of GMS
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 20 of 385

```
 1    Industrial's pricing?
 2    A.   Their costs?
 3    Q.   Yes.
 4    A.   No.
 5    Q.   Did you have access to anything regarding who were their
 6    suppliers, their vendors?
 7    A.   No.  I knew of a few, like -- I can't disclose them, but
 8    there were competitors on the base that they bought from.
 9    Q.   But in terms of -- did you ever get a list of GMS
10    Industrial vendors?
11    A.   No.
12    Q.   You said Fort Sill was where you were at least initially
13    primarily working or selling; is that correct?
14    A.   Yes.
15    Q.   Did you get any contact information for who to sell to at
16    Fort Sill?
17    A.   No.  We created that.
18    Q.   When you say we, you mean you created it?
19    A.   I created a spreadsheet to track all of my sales and who
20    I talked to.  And GMS liked the spreadsheet that I created.
21    I think they made it mandatory for everyone to use after I
22    created it.
23    Q.   So, you came up with the form?
24    A.   Yes.
25    Q.   Okay.  Can we -- I apologize.  My memory is not as good
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 21 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

1   on this one.

2           Can we publish P115, please?

3           THE COURT:  All right.

4           MR. MCFARLAND:  I believe it's already been

5   admitted and published.

6           THE COURT:  P115, all right.  You may publish if

7   it's been admitted.

8           MR. MCFARLAND:  Thank you, Your Honor.

9   BY MR. MCFARLAND:

10  Q.  Is this the document you're referring to, Mr. Greer?

11  A.  Yes.  This has evolved over time.  It used to be called

12  "What's in the SAMS."  It used to be called "What's in the

13  SAMS," and it's changed to whatever this is called now.

14  Q.  When you first came to be selling for GMS Industrial, did

15  this document exist?

16  A.  No.

17  Q.  Is this a template then that you created?

18  A.  Yes.

19  Q.  And I guess what I -- has it evolved some over time?

20  A.  Yes.

21  Q.  Okay.  Just -- I don't know that we need to do the column

22  by column by column, but how has it evolved over time,

23  Mr. Greer?

24  A.  Everything was all in one tab at one time, and now it's

25  kind of spread out.  It made it a little bit more organized.

JILL H. TRAIL, Official Court Reporter

**JA1083**

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 22 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1   Q.  And when you created this, what was your purpose?
 2          MR. LASCARA:  Your Honor, I'm going to object,
 3   because I think it's confusing.  He says, "When you created
 4   this."  And I don't believe the testimony is that he created
 5   this Exhibit 115.  He testified that at some time in the
 6   past he created something that became this, and I think it's
 7   confusing to the jury --
 8          THE COURT:  Mr. McFarland.
 9          MR. LASCARA:  -- to misconstrue these items,
10   because he didn't draft this.
11          THE COURT:  Mr. McFarland.
12          MR. MCFARLAND:  I believe his testimony is that he
13   created this document, the original template, and he said
14   it's a --
15          THE COURT:  I think that's the key question.
16          MR. MCFARLAND:  Sure.
17          THE COURT:  Template.
18          Go ahead.
19          So, objection sustained.
20          MR. LASCARA:  Thank you, Your Honor.
21          THE COURT:  You can rephrase.
22   BY MR. MCFARLAND:
23   Q.  Did you create the template for this document?
24   A.  Yes.
25   Q.  Okay.  Did it evolve over time?
```

WESTLY GREER, Direct Examination By Mr. McFarland

1   A.   Yes.

2   Q.   And I take it that the information that we see on this

3   version of the document is -- particularly on the far right,

4   the notes section, that's information that the sales agent

5   inputs, correct?

6   A.   Yes.  I inputted this information.

7   Q.   Or in your case, when you were the director of sales, you

8   may have inputted some information?

9   A.   Yes.

10  Q.   Through your tenure with GMS Industrial, Westly, do you

11  have a sense of what percentage of the company's revenues

12  were derived from Army sales versus Navy or other military

13  branch sales?

14  A.   When I started, it was the majority of Navy.  And then as

15  I progressed in the company, it had flipped to Army.

16  Q.   Before you joined the company, had there been any sales,

17  to your knowledge, by GMS Industrial at Fort Sill?

18  A.   No.

19  Q.   Had there been any sales by GMS Industrial at Fort Bliss?

20  A.   No.

21  Q.   And how did it come that GMS Industrial started to have

22  sales success at Fort Bliss?

23  A.   I think Greg started down there, Greg Spires.  He sold a

24  lot of kits down there.

25  Q.   And were you responsible for bringing Mr. Spires onboard?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 24 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

1    A.  Yes.

2    Q.  All right.  How about Fort Carson, any GMS sales there

3    prior to you beginning at GMS Industrial?

4    A.  No.

5    Q.  Fort Riley?

6    A.  No.

7    Q.  Fort Benning?

8    A.  No.

9    Q.  Fort Polk?

10   A.  No.

11   Q.  Fort Campbell?

12   A.  No.

13   Q.  You mentioned that you became the director of sales for

14   GMS Industrial?

15   A.  Yes.

16   Q.  When did that happen?

17   A.  I believe it was 2015.

18   Q.  And at the time you became director of sales for GMS

19   Industrial, did you then have a team of sales agents under

20   you?

21   A.  Yes.

22   Q.  How many reported to you?

23   A.  Off the top of my head, I think seven.

24   Q.  Was yours the largest of the divisions?

25   A.  Yes.

USCA4 Appeal: 22-2090     Doc: 20-4      Filed: 01/19/2023     Pg: 25 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1   Q.  Was it the most successful in terms of revenues?
 2   A.  Yes, it was.
 3   Q.  Was it the most successful in terms of profits?
 4   A.  Profits, I'm not sure.  For the company?
 5   Q.  Yes.
 6   A.  I don't know what their profits were.
 7   Q.  Oh, I'm sorry.  That was not something that you had
 8   access to?
 9   A.  No.
10   Q.  Okay.  Were your sales agents among the very top
11   producers for the company throughout your tenure up through
12   April 3rd of 2019?
13   A.  Yes.
14   Q.  And how do you know that?
15   A.  They were recognized on trips, vacation trips.
16   Q.  Were you the most productive in terms of revenue of the
17   directors of sales for GMS Industrial?
18   A.  Yes.
19   Q.  And how about yourself, did you receive any awards or
20   recognitions from the company through your tenure?
21   A.  I won a lot of trips, yes.
22   Q.  Okay.  What was your compensation based upon once you
23   became an employee for GMS Industrial?
24   A.  As a director?
25   Q.  Yes, sir.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 26 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 18 of 99 PageID# 11261

18

WESTLY GREER, Direct Examination By Mr. McFarland

```
1    A.  I had a required sales amount of 75,000 per quarter to
2    keep my job, and then anything that exceeded that would be
3    bonusable.
4    Q.  Was there ever a quarter from when you became the
5    director of sales that you didn't meet that -- I guess it's a
6    quotient, right, or quota of 75,000?
7    A.  Yes.  No.
8    Q.  And did you exceed that number for all of those quarters?
9    A.  Yes.
10   Q.  Were there bonuses paid to sales agents for NSN sales?
11   A.  Yeah.  There were spifs to increase sales of certain
12   kits, yes.
13   Q.  During your tenure at GMS Industrial, did the
14   company's -- well, let me ask it this way first.
15        When did GMS first get an NSN?
16   A.  I can't recall the date.  I want to say 2014, maybe.
17   Q.  And after the company started getting NSNs, did the
18   company focus switch in any way?
19   A.  Yeah.  The focus was to sell the NSNs, yeah.
20   Q.  And we kind of heard this, but from a director of sales
21   standpoint, what is the difference between an NSN and a CCPN?
22   A.  NSNs are National Stock Numbers, so they could be stocked
23   in DLA warehouses, and they can get to the customer a lot
24   quicker.
25   Q.  And how about the payment to GMS for an NSN?
```

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1   A.  If they were stocked, they would get paid for the amount
 2   that DLA ordered for the stock.  So, it would be essentially
 3   a prepay.
 4   Q.  I'm sorry?
 5   A.  Essentially like a prepay.
 6   Q.  How about a CCPN?
 7   A.  I don't know how -- what GMS' contract was with DLA, how
 8   they got paid, but I would say net 30, net 90, somewhere in
 9   that range.
10   Q.  Am I correct that the CCPN first has to be ordered by the
11   customer?
12   A.  Yes.
13   Q.  Okay.  And then there is a bid process?
14   A.  Yes.
15   Q.  If it's even approved by the financier for the
16   government, correct?
17   A.  Yes.
18   Q.  Okay.  Then it's put out to bid?
19   A.  Yes.
20   Q.  And that's what the DIBBS Board is that we've heard
21   about, correct?
22   A.  Yes.
23   Q.  And it is possible for the ultimate recipient of a CCPN
24   sale to be someone who just simply saw it on the DIBBS Board,
25   but wasn't the original contact, if you will, with the
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 28 of 385
Case 2:19-cv-00324-RCY-LRL    Document 340    Filed 07/27/22    Page 20 of 99 PageID# 11263

20

WESTLY GREER, Direct Examination By Mr. McFarland

1    customer at the base?

2    A.   Correct.

3    Q.   Is there a type of sale in which an agent needs to

4    provide the government more than just one price quote?

5    A.   Yes.

6    Q.   What type of sale?

7    A.   A GPC sale, a Government Purchase Card sale.

8    Q.   And was GMS involved in any GPC sales?

9    A.   Yes.

10   Q.   And so if you, as the director of sales, if it's a GPC

11   sale, how do you get quotes?  How do your agents get quotes?

12   A.   GMS had two other companies that they would use as the

13   competitors to quote those out.

14   Q.   And who were those companies?

15   A.   G Cubed and Storm Tactical.

16   Q.   And who owns G Cubed?

17   A.   Gary Gorken.

18   Q.   And what about Storm Tactical?

19   A.   It's either Gary or Rachel.  I'm not sure.

20   Q.   So, if I'm following, if the procurement process required

21   three quotes --

22   A.   Yeah, three competitive quotes.

23   Q.   -- what GMS was doing was providing quotes from companies

24   that its owner or director of regulatory compliance owned?

25   A.   Correct.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 29 of 385

| | |
|---|---|
| 1 | MR. LASCARA:  Your Honor, he's leading, and he's |
| 2 | testifying. |
| 3 | THE COURT:  It is leading.  So, that objection is |
| 4 | sustained. |
| 5 | MR. MCFARLAND:  I'll rephrase, Your Honor. |
| 6 | THE COURT:  Sure. |
| 7 | BY MR. MCFARLAND: |
| 8 | Q.  Would you consider G Cubed to be an independent company |
| 9 | of GMS Industrial? |
| 10 | A.  No. |
| 11 | Q.  Would you consider Storm Tactical to be an independent |
| 12 | company of GMS Industrial? |
| 13 | A.  No. |
| 14 | Q.  Do you know, was the government advised of who the owners |
| 15 | were of G Cubed and Storm Tactical? |
| 16 | A.  Not to my knowledge, no. |
| 17 | Q.  What -- by the way, what do you know about G Cubed? |
| 18 | A.  It was -- as far as I know, it was just used for bidding |
| 19 | to help win the bid for the credit card purchase. |
| 20 | Q.  And do you know what -- did G Cubed ever sell any |
| 21 | industrial products? |
| 22 | A.  Not that I've seen. |
| 23 | MR. LASCARA:  Your Honor, I'm going to raise an |
| 24 | objection regarding the relevance of this as it relates to |
| 25 | the claims at issue.  He's talking about some other alleged |

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1   conduct.  It has -- it has no relation to what the issues
 2   are in this case.
 3              THE COURT:  Mr. McFarland.
 4              MR. MCFARLAND:  Oh, it has a direct relation, Your
 5   Honor.  My clients are being sued for selling products or
 6   offering products for sale, and there is apparently two
 7   companies owned by the owners of GMS Industrial that are
 8   also offering products for sale, and are providing quotes
 9   when needed.
10              THE COURT:  It's relevant, and the objection is
11   overruled.
12              Go ahead, Mr. McFarland.
13              MR. MCFARLAND:  Thank you, Your Honor.
14   BY MR. MCFARLAND:
15   Q.  Were there, to your knowledge, sales agents of GMS
16   Industrial that were selling for other companies besides GMS
17   Industrial?
18   A.  Yes.
19   Q.  Who?
20   A.  Mike Welton.
21   Q.  And who else was Mr. Welton selling for besides GMS
22   Industrial?
23   A.  I think the company is called Schaffer Products.
24   Q.  Was he doing that with the approval of Gary Gorken?
25   A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 31 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

```
1    Q.   Why do you think, Westly, that your sales team was so
2    successful for GMS?
3    A.   They got up every day.  They worked.  They had grit.
4    Q.   And what did you see your role in being the team leader?
5    A.   Just keeping them happy, do what they needed, try to
6    answer anything they asked of me.
7    Q.   Would you yourself go to the bases where they were making
8    sales calls?
9    A.   Yes.
10   Q.   How often?
11   A.   I think quarterly trips.
12   Q.   Were you often called away from your family to do work
13   for GMS Industrial in your position as director of sales?
14   A.   Yes.
15   Q.   You were dealing with your agents on what, a daily basis?
16   A.   Yes.
17   Q.   From your dealings with your agents, was there anything
18   that you could see of a confidential, trade secret,
19   proprietary nature that they were using to be so successful?
20   A.   No.
21   Q.   What were they using to be so successful?
22   A.   Their common knowledge just from their past and
23   friendships.
24   Q.   By the way, did you receive any electronic devices from
25   GMS Industrial?
```

JILL H. TRAIL, Official Court Reporter

**JA1093**

WESTLY GREER, Direct Examination By Mr. McFarland

1    A.  Yes.

2    Q.  What did you get and when?

3    A.  I got a tablet in 2018, after the Mexico trip.  That was

4    a gift I received.

5    Q.  You say it was a gift?

6    A.  Yeah.

7    Q.  Is it something you earned?

8    A.  Yeah, it was.  I was recognized.  We were recognized, and

9    I received that, yes.

10   Q.  All right.  Prior to that, did you get any type of

11   electronic devices from GMS Industrial?

12   A.  I got a laptop and a PC in 2017.

13   Q.  And what did you use that for?

14   A.  Work stuff, personal stuff, just anything.

15   Q.  Was there any prohibition that came from GMS about using

16   the -- I'm sorry, you said a laptop?

17   A.  Laptop, yes.

18   Q.  -- about using the laptop for personal matters?

19   A.  No.

20   Q.  Did, at some point, you also receive a desktop?

21   A.  Yes.

22   Q.  And when did you get that?

23   A.  Um, I believe I signed for it in 2017.

24   Q.  And did you receive any prohibition about using the

25   desktop for personal use?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 33 of 385

| | |
|---|---|
| 1 | A.   No.   My personal computer quit working, and I told Gary |
| 2 | that I was going to buy me another computer.   And he said, |
| 3 | "I'll just send you one." |
| 4 | Q.   As the director of sales, were you encouraged from -- I |
| 5 | guess who did you -- well, let me rephrase first. |
| 6 | Who did you report to? |
| 7 | A.   Gary Gorken. |
| 8 | Q.   Were you encouraged by Mr. Gorken at some point in time |
| 9 | to focus on NSNs? |
| 10 | A.   Yes, NSNs, off and on sometimes, not just NSNs that were |
| 11 | already created, part number kits, goes back and forth. |
| 12 | Q.   What's the difference between -- I guess there is NSNs |
| 13 | and non-NSNs, right? |
| 14 | A.   Uh-huh. |
| 15 | Q.   Two broad categories. |
| 16 | But then am I correct there is CCPNs, but also CCPN |
| 17 | kits that GMS Industrial had? |
| 18 | A.   Yeah.   The non-standard kits, yes. |
| 19 | Q.   And what were the non-standard kits? |
| 20 | A.   They were just prepackaged kits that were in the catalog. |
| 21 | Q.   And what's the difference between a prepackaged kit in a |
| 22 | catalog and just simply a CCPN item? |
| 23 | A.   An item was just a one-off.   And the prepackaged kits, it |
| 24 | was a set.   You had to buy the whole thing. |
| 25 | Q.   Did there come a time when you, as director of sales, |

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 34 of 385

```
 1   received mandates to stop essentially the sale of one-off

 2   CCPNs?

 3   A.  Yes.

 4   Q.  And when did that begin?

 5   A.  I don't remember dates.  There was -- there was a

 6   stoppage in 2018, and another one in 2019.

 7   Q.  And could we have -- I think it's 110 is the March 9th,

 8   2018.

 9        MR. MCFARLAND:  This has already been admitted, Your

10   Honor, and used.

11        THE COURT:  You may publish.

12        MR. MCFARLAND:  Thank you.

13   BY MR. MCFARLAND:

14   Q.  Do you remember this, well, this memo coming by email,

15   Westly?

16   A.  Yes.

17   Q.  Okay.  And as a director of sales, what did you

18   understand the purpose of this company memorandum to be?

19   A.  It was a focus on selling NSN kits.

20   Q.  All right.  And by the way, one of the headings in this

21   memorandum is "Long-Term Contract."  What is a long-term

22   contract?

23   A.  The company announced a long-term contract with NSNs

24   where they were, like, guaranteed sales of NSNs for a period

25   of time.  I think it was like five years.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 35 of 385
Case 2:19-cv-00324-RCY-LRL   Document 340   Filed 07/27/22   Page 27 of 99 PageID# 11270

27

WESTLY GREER, Direct Examination By Mr. McFarland

1   Q.  And do you know, was the company successful in fulfilling
2   that long-term contract?
3   A.  Yes.
4   Q.  And what happened when the company met the sales?  I
5   guess there is a sales maximum, right?
6   A.  Yes.  I don't know the details of the contract.  I just
7   know there is a long-term contract.
8   Q.  As the director of sales, what did you understand when
9   Mr. Morton is writing, "No more bid board process causing
10  additional delays"?
11  A.  So, these would skip the bidding process.  They just
12  automatically had awards.  So, you just skipped the initial
13  process of bidding on the item.
14  Q.  Then there is a section entitled "CCPNs."  As the
15  director of sales, what did you understand the policy
16  directed to be coming down from Mr. Morton here?
17  A.  It -- it was a lot of work to build new kits, and they
18  were really busy, so try to focus on what we already have.
19  Q.  All right.  Thank you.
20          And in fact, did there come a time when the company
21  was even more direct, and put a moratorium on new CCPNs?
22  A.  Yes.
23  Q.  Could we have -- I think it's 111.
24          Did you receive this memo, Mr. Greer, as the director
25  of sales?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 36 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 28 of 99 PageID# 11271

28

WESTLY GREER, Direct Examination By Mr. McFarland

1   A.  Yes.

2   Q.  Okay.  And I guess I want to keep our dates straight, but

3   as of January 9th, 2019, I think you were still director of

4   sales?

5   A.  Yes.

6   Q.  Okay.  What did you understand this memorandum to be?

7   What was the policy being instituted here?

8   A.  Basically stop requesting new one-off kits, and sell the

9   kits that we already have.

10  Q.  Now, at some point you and Greg Spires create G&S Supply;

11  is that correct?

12  A.  Yes.

13  Q.  And when was that?

14  A.  June of 2017.

15  Q.  And why did the two of you create G&S Supply?

16  A.  My brother was a manufacturer for electric motors for the

17  Navy, and he was giving me an opportunity to bid on those

18  electric motors.

19  Q.  And electric motors being what?

20  A.  He said they were electric motors that they build for the

21  ships.  I didn't really know much about it.

22  Q.  I take it that was not something you were doing at the

23  time for GMS Industrial, or overseeing as the director of

24  sales for GMS Industrial?

25  A.  Correct.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 37 of 385

```
 1   Q.  All right.  And had you had any experience previously in
 2   forming an LLC, a limited liability company?
 3   A.  Yes.  We created Greer Group.
 4   Q.  And why did you create Greer Group, and what was it for?
 5   A.  Gary Gorken and his brother Greg Gorken told me it will
 6   save us a lot of money on taxes and expenses if we get paid
 7   through an LLC instead of direct.
 8   Q.  And did you use Greer Group not only for compensation and
 9   payments from GMS Industrial, but anything else in the
10   family?
11   A.  Yes.
12   Q.  What was that?
13   A.  I think my wife was doing a lot of things like
14   DoorDashing, Facebook gaming, Twitch.  It's just a lot of
15   little things.
16   Q.  Okay.  I have some familiarity with DoorDash, and maybe
17   some of the jurors do, but just in case, what is DoorDash?
18   A.  It's like Uber for food.
19   Q.  Delivery basically?
20   A.  Yes.
21   Q.  Okay.  So, your wife is doing the arrangements, I guess,
22   for DoorDash?
23   A.  Yes.
24   Q.  She's like an agent?
25   A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 38 of 385
Case 2:19-cv-00324-RCY-LRL Document 340 Filed 07/27/22 Page 30 of 99 PageID# 11273

30

WESTLY GREER, Direct Examination By Mr. McFarland

1   Q.  Okay.  So, in other words, Greer Group that you created
2   was not just for GMS Industrial --
3   A.  Correct.
4   Q.  -- compensation for GMS Industrial?
5           Tell us about the evolution of G&S Supply, because it
6   sounds like we're first talking about in terms of your
7   brother and motors.  And I can confidently say that's not why
8   we're here and the nine people in the jury box are here.
9   A.  Yeah.  We had customers that wanted stuff other than what
10  was in the GMS catalog, and they wanted, like, single items
11  or certain packaged items that didn't involve, like, shop
12  towels and soaps that GMS would throw in every one of their
13  kits.  And we had a customer that bought from a different
14  company because of that.
15  Q.  Were you then hearing the customers', is it fair to say,
16  frustrations?
17  A.  Yes.
18  Q.  As the director of sales?
19  A.  Yes.
20  Q.  Okay.  Did you think when you formed G&S Supply and it
21  began selling -- I mean, I take it these are strictly
22  non-NSNs?
23  A.  Yes.
24  Q.  When G&S Supply began selling non-NSNs, did you think you
25  were competing with GMS Industrial?

USCA4 Appeal: 22-2090   Doc: 20-4   Filed: 01/19/2023   Pg: 39 of 385
Case 2:19-cv-00324-RCY-LRL   Document 340   Filed 07/27/22   Page 31 of 99 PageID# 11274

31

WESTLY GREER, Direct Examination By Mr. McFarland

1    A.  No.  Because they weren't getting the sales anyways.

2    Q.  Did you see any benefits as the director of sales for

3    being able to supply customers NSNs and CCPNs, the one-offs

4    that I take GMS Industrial didn't want to sell?

5    A.  Yeah.  We were able to satisfy the customer in all

6    different aspects.

7         MR. LASCARA:  Your Honor, that was a leading

8    question.  Again, he testified, and he asked him --

9         MR. MCFARLAND:  I'll rephrase, Your Honor.

10        THE COURT:  Sustained.

11        MR. MCFARLAND:  The witness is telling the story.

12   BY MR. MCFARLAND:

13   Q.  As director of sales for GMS Industrial, what did you see

14   were the benefits for GMS customers in having also G&S

15   Supply?

16   A.  We were able to fulfill the customer's needs, even if GMS

17   couldn't.

18   Q.  Did Mr. Gorken from, say, the time you became director of

19   sales, did he ever accompany you to any Army bases?

20   A.  I think maybe once or twice.

21   Q.  Was he, to your knowledge -- I take it you spoke with him

22   on a regular basis?

23   A.  Yes.

24   Q.  How often?

25   A.  Once a week I think, at least.

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1   Q.  Was he having any direct communications with the bases in
 2   terms of what they were requesting and needing?
 3   A.  No.
 4   Q.  What would happen when you or one of your sales agents
 5   said, Hey -- I'm just going to pick -- Fort Bliss needs one
 6   crimper?
 7   A.  Yeah.
 8   Q.  And obviously there is not a kit, there is not a GMS
 9   Industrial kit for one crimper, is there?
10   A.  No.
11   Q.  So, what would happen when there was a request for that?
12        MR. LASCARA:  Your Honor, again, he's telling him
13   there is not one crimper.  He's not asking him the question.
14   And he's incorporating his statement into the follow-on
15   question.  So, it's compound and it's leading, Your Honor.
16        MR. MCFARLAND:  I don't think -- I don't think it
17   is leading, Your Honor, but I don't mind --
18        THE COURT:  I don't think your end question was
19   leading, but I think the lead-up is what he was saying.  So,
20   you can ask him the questions, just be tight and rephrase a
21   little.
22        MR. MCFARLAND:  Okay.
23   BY MR. MCFARLAND:
24   Q.  Is there a CCPN kit, or was there a CCPN kit by GMS that
25   sold just -- by which you could buy just one crimper?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 41 of 385
Case 2:19-cv-00324-RCY-LRL    Document 340    Filed 07/27/22    Page 33 of 99 PageID# 11276

33

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1   A.  No.
 2   Q.  Okay.  So, to use my hypothetical, when a customer would
 3   say, I don't want the kit.  I don't need the paper towels,
 4   the pink ones that are in there.  I just want the crimper.
 5   What were you hearing from your sales agents, and what was
 6   happening when you were conveying that to GMS?
 7   A.  They were losing sales because of it, and the
 8   conversations I had with Gary was, They need to sell what we
 9   have.  If they can't sell it, we'll find someone else to sell
10   it.
11   Q.  When GMS -- excuse me -- when G&S Supply started and
12   began selling its products, did you use any kind of pricing
13   information from GMS Industrial?
14   A.  No.
15   Q.  Did you possess any pricing information from GMS
16   Industrial?
17   A.  Only the end price of NSN kits.
18   Q.  And by the way, is that public knowledge?
19   A.  Yes.
20   Q.  Did you use any confidential or proprietary information
21   to set up G&S Supply?
22   A.  No.
23   Q.  Did you use any confidential or proprietary information
24   to help G&S Supply make sales?
25   A.  No.
```

WESTLY GREER, Direct Examination By Mr. McFarland

1  Q.  How was the G&S catalog created?

2  A.  Just by simply figuring out what the customer wanted, and

3  searching Google for pictures, and having my friend, Mike,

4  put it into a catalog for us.

5  Q.  Did you, as the director of sales for GMS Industrial,

6  ever tell anyone who was selling G&S Supply as well not to

7  sell for GMS?

8  A.  No, never.

9  Q.  Did you ever tell them to even emphasize G&S over GMS?

10  A.  No.

11  Q.  In -- let's see.  I think you said you formed G&S Supply

12  in June of 2017?

13  A.  Yes.

14  Q.  Did it have any sales in 2017?

15  A.  No.  I don't think it was until 2018.

16  Q.  Okay.  In 2018, who were the company's, by that I mean

17  GMS Industrial, who were their top salespeople?

18  A.  In 2018, Greg and Thomas, and I think Ken Reynolds were

19  the top three.

20  Q.  To whom did they report?

21  A.  Two of them reported to me.

22  Q.  And did you, as a director of sales in 2018, meet your

23  requirements and quotas?

24  A.  Yes.

25  Q.  Did you receive a bonus for 2018?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 43 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 35 of 99 PageID# 11278

35

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1   A.  Yes.
 2   Q.  Did you get to go on a trip at the end of 2018, because
 3   of your performance as the director of sales?
 4   A.  Yes.
 5   Q.  Is that the trip to Mexico?
 6   A.  Yes.
 7   Q.  Did you ever pressure any of your team members at GMS
 8   Industrial to sell for G&S Supply?
 9   A.  No.
10   Q.  Did anyone ever come to you and say, I've heard about
11   G&S, or what is this?
12   A.  Did anybody come to me and ask me that?
13   Q.  About G&S?
14   A.  No.
15   Q.  Okay.  Who else sold for G&S Supply during the remainder
16   of your tenure there?
17   A.  Other than the defendants, Amber.  I'm not sure if Abe
18   Salfiti did.  I can't think of anyone else.
19   Q.  Did you pressure Ms. Wenrick to sell for G&S Supply?
20   A.  No.
21   Q.  How did it come about that she made some sales for G&S
22   Supply?
23   A.  Just a similar situation.  A customer wanted something
24   that GMS couldn't provide, and then the opportunity came to
25   Amber through me.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 44 of 385
Case 2:19-cv-00324-RCY-LRL   Document 340   Filed 07/27/22   Page 36 of 99 PageID# 11279

36

WESTLY GREER, Direct Examination By Mr. McFarland

1   Q.  For GMS Industrial, what was Ms. Wenrick selling in terms
2   of NSNs versus non-NSNs?
3   A.  It was almost a hundred percent NSN items.
4   Q.  Now, you didn't tell Mr. Gorken about G&S Supply during
5   your tenure there, correct?
6   A.  No.
7   Q.  Why not?
8   A.  Because he wouldn't -- he's not out in the field.  He
9   wouldn't understand the needs of the customer.  He thinks
10  that you can just sell them what we already have, and they
11  would buy it.  You've just got to be a better salesman.  But
12  it just wasn't true.
13  Q.  Did you think that in offering customers non-NSNs through
14  G&S Supply that you were somehow in derogation of your duties
15  or obligations to GMS Industrial?
16  A.  No.
17  Q.  Why not?
18  A.  Because I think it helped increase the sales of GMS
19  Industrial Supply.
20  Q.  Okay.  From your position as director of sales, and when
21  you went to the bases, did you ever see firsthand any
22  confusion by anyone at the base about GMS Industrial versus
23  G&S Supply?
24  A.  No.
25  Q.  Did your agents ever report to you about any confusion

JILL H. TRAIL, Official Court Reporter

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 45 of 385
Case 2:19-cv-00324-RCY-LRL    Document 340    Filed 07/27/22    Page 37 of 99 PageID# 11280

37

WESTLY GREER, Direct Examination By Mr. McFarland

1    among their customers?

2    A.  No.

3    Q.  Did you ever say to anyone at any of the bases who were

4    customers of GMS Industrial that G&S Supply was a sister

5    company?

6    A.  No.

7    Q.  Were you ever present when any of your sales agents said

8    that G&S Supply was a sister company?

9    A.  No.

10   Q.  For you and your agents, how did you keep the two

11   companies different for your sales calls?

12   A.  We had separate catalogs.  We always showed the GMS

13   products first.  If there was stuff in there they didn't

14   want, then we would move on to the next catalog.

15   Q.  Did there come a time at the end of 2018 or early 2019,

16   when you learned that GMS Industrial was going to do away

17   with having independent sales agents?

18   A.  I want to say it was in 2019.

19   Q.  And how did you learn of that?

20   A.  Gary was proposing a statutory agreement.

21   Q.  When you say that, what do you mean specifically, Westly?

22   A.  He said the California law is changing, and it's going to

23   be required across the country, and everyone is going to have

24   to sign this agreement.

25   Q.  At the time were any of your independent sales agents

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 46 of 385
Case 2:19-cv-00324-RCY-LRL Document 340 Filed 07/27/22 Page 38 of 99 PageID# 11281

38

WESTLY GREER, Direct Examination By Mr. McFarland

1   selling in California?

2   A.   No.

3   Q.   And where were you based?

4   A.   Colorado Springs.

5   Q.   And do you happen to know where the company GMS

6   Industrial is incorporated?

7   A.   Virginia Beach or Virginia.

8   Q.   So, when you learned of this, what was the -- what did

9   you do, and what was the response of your sales agents?

10  A.   All of the sales agents were opposed of it.  They asked

11  their CPAs about it, and they said it would hurt you

12  financially with all of your write-offs.

13  Q.   And from a personal standpoint at this point in time, did

14  you have any issues with your compensation for what you were

15  paid in 2018?

16  A.   Yes.

17  Q.   And what were those issues?

18  A.   It's just not getting paid the bonus I deserved.

19  Q.   Had you had prior compensation issues with GMS

20  Industrial?

21  A.   Yes.

22  Q.   And when did they date back to?

23  A.   It's almost every quarter.  Almost every quarter there

24  was an issue with the bonus, it wasn't paid fully.

25  Q.   And did you raise that with Mr. Gorken?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 47 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 39 of 99 PageID# 11282

39

WESTLY GREER, Direct Examination By Mr. McFarland

1   A.  Yes.

2   Q.  What was the response?

3   A.  Lost profits, I guess.  One time he said paper clips in

4   Virginia are expensive, so...

5   Q.  All right.  So, when it comes beginning of the year 2019,

6   from a personal standpoint, where are you in terms of your

7   relationship with GMS Industrial?

8   A.  In 2019, I was wanting to be an independent sales agent.

9   Q.  Why was that?

10  A.  I just wasn't getting paid what I deserved, and I would

11  have made more money staying at home and selling than

12  traveling across the world.

13  Q.  So, how much did you travel, say, in 2017, 2018?

14  A.  It would be two, sometimes two weeks, three weeks a

15  month.

16  Q.  And where were you going?

17  A.  Just all over the U.S. really.

18  Q.  Bases?

19  A.  Yes, military bases.

20  Q.  You weren't going to New York City or Miami?

21  A.  Yeah.

22  Q.  This is all work related?

23  A.  Right.

24  Q.  Okay.  So, do you make the decision in January of 2019,

25  to switch over and just become an independent sales agent?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 48 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1    A.  Yes.
 2    Q.  Okay.  I forget the exact number, but it's a lower
 3    Plaintiff's Exhibit, I think.  Could we have P3, please?
 4              THE COURT:  All right.
 5              MR. MCFARLAND:  And, Your Honor, this is admitted
 6    previously.
 7              THE COURT:  All right.  You may publish.
 8              MR. MCFARLAND:  Thank you.
 9    BY MR. MCFARLAND:
10    Q.  Do you recognize this document, Mr. Greer?
11    A.  Yes.
12    Q.  And does it bear your signature?
13    A.  Yes.
14    Q.  And when you went from being the director of sales --
15              At that point you're an employee, right?
16    A.  Yes.
17    Q.  Okay.
18              -- to being an independent agent, what did you
19    understand the differences and your responsibilities now as
20    an independent sales agent?
21    A.  I would just -- I would be independent, and I can sell at
22    Fort Carson or -- I don't know.  I think Fort Riley was on
23    here.
24    Q.  Did you give up your -- well, let me ask this.
25              Did you receive any benefits when you were an
```

WESTLY GREER, Direct Examination By Mr. McFarland

1   employee of GMS Industrial?

2   A.  I think they started giving out health insurance in 2018.

3   Q.  And did you give that up when you became an independent

4   sales agent?

5   A.  Yes.

6   Q.  Okay.  Notwithstanding that you became an independent

7   sales agent, did you remain a supervisor of agents to an

8   extent?

9   A.  I think I was a supervisor over Amber, I think.

10  Q.  All right.  And if we could have Plaintiff's Exhibit, I

11  think it's 4, the addendum.

12          Do you recognize this document, Mr. Greer?

13  A.  Yes.

14  Q.  Okay.  And what did you understand it to be?

15  A.  It was a Zone Manager Addendum.

16  Q.  Did you understand this to be in tandem or in conjunction

17  with the Independent Sales Agent Agreement?

18  A.  Yes.  I received them at the same time, yes.

19  Q.  Did you get paid any additional compensation for agreeing

20  to be a zone manager?

21  A.  No.

22  Q.  Same commissions?

23  A.  Yes.

24  Q.  But you had more responsibilities than your typical

25  independent sales agent, correct?

USCA4 Appeal: 22-2090   Doc: 20-4   Filed: 01/19/2023   Pg: 50 of 385
Case 2:19-cv-00324-RCY-LRL Document 340 Filed 07/27/22 Page 42 of 99 PageID# 11285

42

WESTLY GREER, Direct Examination By Mr. McFarland

1   A.  Yes.

2   Q.  Okay.  When you became an independent sales agent, was

3   your access to the Google share restricted in any way?

4   A.  I don't think so.

5   Q.  Did you receive any new access?

6   A.  No.

7   Q.  By the way, for you as director of sales, what did you

8   have access to on Google?

9   A.  I think the agents below me, their data sheets.  I can't

10  think of anything else.  Just standard documents that they

11  send out.

12  Q.  Did you have access through Google to any pricing

13  information of the company in terms of costs that they paid?

14  A.  Costs, no.

15  Q.  Did you have access to any vendors of the company --

16  A.  No.

17  Q.  -- who were supplying products?

18  A.  No.

19  Q.  When you as a director of sales would go into the Google

20  drive, do you remember seeing anything that was marked

21  confidential and proprietary?

22  A.  No.  I don't remember anything confidential or

23  proprietary.

24  Q.  So, this is -- I think there is a little -- and we can

25  scroll down just a little bit.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 51 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1          The date on this is January 12th, and the date on
 2   your Independent Sales Agreement is January 21st.  But do you
 3   recall them essentially being in tandem?
 4   A.  I think they both were supposed to be on the 12th.  I
 5   think the numbers got mixed up.
 6   Q.  All right.  From the time that you became an independent
 7   sales agent in January of 2019, through the rest of your
 8   tenure, what did you do?
 9   A.  I sold products to Fort Carson and Fort Riley.
10   Q.  Were you successful?
11   A.  Yes.
12   Q.  Did you at any time during that time period not
13   aggressively promote GMS Industrial products --
14   A.  No.
15   Q.  -- for GMS at Fort Carson and Fort Riley?
16   A.  No.
17   Q.  I guess you didn't -- you weren't even an independent
18   sales agent for a whole quarter, were you?
19   A.  No, I wasn't.
20   Q.  So, you don't know whether you qualified for the
21   quarterly bonus or whatnot?
22   A.  No.
23   Q.  How did you come to be terminated as an independent sales
24   agent, Mr. Greer?
25   A.  By not signing the statutory agreement that was sent out
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 52 of 385
Case 2:19-cv-00324-RCY-LRL   Document 340   Filed 07/27/22   Page 44 of 99 PageID# 11287

44

WESTLY GREER, Direct Examination By Mr. McFarland

1   in, I think it was April.

2   Q.  And how did you receive notice that you were being

3   terminated?

4   A.  I think it was through my personal email.  I got

5   something from Pender and Coward.

6   Q.  And did you also receive any kind of notification from

7   the company about G&S Supply?

8   A.  Through -- I think through the emails from Pender and

9   Coward.

10  Q.  Did Mr. Gorken call you up to discuss the issue before

11  you were terminated?

12  A.  Nothing with the G&S Supply, no.

13  Q.  Did he call you up about the independent contractor or

14  independent sales agent statutory employment issue before

15  April 3rd of 2019?

16  A.  Yes.

17  Q.  And what did you all discuss?

18  A.  Just wanting me to sign it, and how it's going to make me

19  more money, and it's the same as the last agreement, just a

20  few, few things had changed.

21  Q.  Did you think it was the same as the last agreement?

22  A.  No.

23  Q.  Was it ever expressed to you why you were permitted to

24  become an independent sales agent in January of 2019, and

25  then approximately 60 days later they're terminating you

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 53 of 385

```
 1    because you want to stay an independent sales agent and not
 2    become a statutory employee?
 3    A.  Right.  He said that the agreement is going to expire,
 4    and this is going to supercede it.
 5    Q.  Can we go back to, I think it's P3, the independent sales
 6    agent agreement?
 7         Does it have any kind of an expiration date in here,
 8    to your knowledge?
 9    A.  No.
10    Q.  Just keep scrolling.  I haven't seen anything in there.
11    Thank you.
12         When then, Westly, did you find out that you had been
13    terminated from GMS Industrial?
14    A.  I think it was the morning of April 3rd, my phone -- I
15    had a notification on my phone that says you need to log into
16    your email account, which means my access was removed.
17    Q.  And when you say you got a notice to log in --
18    A.  Yes.
19    Q.  -- why, what was your understanding of why you were
20    getting that notice?
21    A.  The password was changed.  And typically when someone
22    gets let go or terminated from the company, they would remove
23    their password and put whatever password they would assign to
24    it so they couldn't get access.
25    Q.  What did you do from that point forward?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 54 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

1    A.  I think I called Greg and Thomas and let them know that I

2    don't have access to my email anymore.

3    Q.  How about did you speak with Mr. Gorken that day?

4    A.  April 3rd, I don't think so.  It would have been a couple

5    of days before.

6    Q.  Did you do anything on your computer that day to try and

7    access your files on your GMS desktop?

8    A.  GMS desktop, no.

9    Q.  Did you at some point get a notification to return the

10   desktop and the laptop?

11   A.  Yes.

12   Q.  And what did you do upon receiving that notification?

13   A.  I just read it and realized that the terms that I had

14   before was if you don't return it, there is a small fee.  I

15   was going to keep it because I used it for personal use.

16   Q.  So, is it in your -- was it in your Employment Agreement

17   and perhaps in your Independent Sales Agent Agreement that

18   you could keep the desktop and the laptop if you reimbursed

19   the company for them?

20   A.  It was somewhere.  I don't remember what we talked about,

21   but yeah.

22   Q.  Was that your plan then?

23   A.  Yes.

24   Q.  Okay.  But obviously you didn't, that isn't what ended up

25   happening, correct?

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1   A.  Correct.
 2   Q.  All right.  So what happened?  Take us through it,
 3   please.
 4   A.  There were several notices that they really wanted it
 5   back.  So, I cleaned it.  I wiped it clean and gave it back
 6   the way I received it.
 7   Q.  And when you say you wiped it clean, what did you do?
 8   A.  I downloaded a file shredder to shred everything.  I had
 9   tax information, personal stuff on there.  I wanted to make
10   sure they couldn't see all of my personal information on the
11   laptop.
12   Q.  And when you say you downloaded a file shredder, had you
13   ever used a file shredder before?
14   A.  No.
15   Q.  So, how did you learn about it, and what did you do?
16   A.  I've heard about it in the past.  It, like, makes it
17   where they can't go and recover and pull my files back, and
18   look through all of my personal information.
19   Q.  And what kind of personal information did you have on
20   your desktop?
21   A.  Tax information, pictures, personal messages to my wife,
22   friends, just a lot of different personal information.
23   Q.  Did your wife also use the desktop?
24   A.  Yes.
25   Q.  Did she have some of her information on there?
```

WESTLY GREER, Direct Examination By Mr. McFarland

1    A.  Yes.

2    Q.  Wholly unrelated to GMS?

3    A.  Correct.

4    Q.  Did you have concerns about GMS recovering your personal

5    information?

6    A.  Yes.

7    Q.  Why?

8    A.  Because there was -- me and Sabrina had conversations in

9    confidence about, like, how I was treated and stuff, and

10   that's personal information I don't think they should have

11   looked at.

12   Q.  Did you have any knowledge of experience with other

13   former GMS employees or agents who were terminated and what

14   happened with their computers?

15   A.  Yes.  For instance, Howard Barlow was fired, and he told

16   me that he just removed his hard drive from the computer and

17   just sent it back.

18   Q.  To your knowledge, when you used file shredder, were you

19   deleting anything of GMS' that it didn't already possess?

20   A.  No.  I only had access to copies of information, not -- I

21   can't -- I can't take their information.  It's just I have a

22   copy.

23   Q.  And was it your understanding you also couldn't delete or

24   destroy anything if it was on the GMS Google drive?

25   A.  Correct.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 57 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1   Q.  Or the cloud?
 2   A.  Correct.
 3   Q.  After you sent -- well, how did you send back the desktop
 4   and the laptop, and did you even send back the tablet?
 5   A.  Yes.  I sent back all three.  I boxed it all in a big
 6   package with some polo shirts and a letter to them for my
 7   bonus that I was owed.
 8   Q.  I'm sorry, a letter that was?
 9   A.  Addressed to Gary for the bonuses that was owed to me.
10   Q.  So, there were still moneys that you should receive?
11   A.  Yes.
12   Q.  And before this lawsuit was filed, did you ever hear
13   anything further from GMS about what you returned?
14   A.  No.
15   Q.  How soon after you sent back these electronic devices did
16   you learn that you would become a defendant in a lawsuit,
17   Westly?
18   A.  I think it was the next month, May, yeah.
19   Q.  And after you were terminated, were you still owed
20   commissions for sales that you had made on behalf of GMS
21   Industrial for which it was paid?
22   A.  Yes.
23   Q.  And did you have an opportunity to calculate how much you
24   were still owed?
25   A.  Yes.
```

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1   Q.  And what's the amount?

 2   A.  It was about 13,000.

 3   Q.  $13,000?

 4   A.  Yes.

 5   Q.  Have you ever received that payment?

 6   A.  No.

 7   Q.  Are you certain that GMS Industrial has in fact been paid

 8   by the government for those sales?

 9   A.  Correct.

10   Q.  And how do you know that?

11   A.  Because they would have been NSN sales that they were

12   prepaid when they delivered them to DLA.

13   Q.  When you were terminated by GMS Industrial in early April

14   of 2019, did you take any of its trade secrets or proprietary

15   information?

16   A.  No.

17   Q.  Did you download them?

18   A.  No.

19   Q.  Were you even aware if you possessed anything that was a

20   trade secret or proprietary information?

21   A.  No.  I had nothing marked, no.

22          MR. MCFARLAND:  One moment if I may, Your Honor.

23          THE COURT:  Yes.

24   BY MR. MCFARLAND:

25   Q.  Let me go back just a little bit, Mr. Greer.  We talked
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 59 of 385

WESTLY GREER, Direct Examination By Mr. McFarland

```
 1    about the moratorium on CCPNs from January of 2019, and I
 2    think we also looked at an email from Mr. Morton in March of
 3    2018.
 4            Could we have Defendants' 19, please?
 5            Do you remember receiving this memo from
 6    Ms. Robichaux in April of 2017, Westly?
 7    A.  Yes.
 8    Q.  Okay.  And what was Ms. Robichaux's position at the time,
 9    and what was her professional GMS relationship to you?
10    A.  She was the director of marketing.  She kind of answered
11    any -- I guess she was -- she answered any questions that
12    anyone had.
13            MR. MCFARLAND:  Your Honor, we would move in
14    Defendants' 19.
15            THE COURT:  Any objection?
16            MR. LASCARA:  No, Your Honor.
17            THE COURT:  All right.  It will be admitted.
18            MR. MCFARLAND:  Thank you.  We would ask that it be
19    published.
20            (Defendants' Exhibit No. 19 received in evidence.)
21            THE COURT:  All right.  You may publish.
22    BY MR. MCFARLAND:
23    Q.  Westly, what did you understand Ms. Robichaux to be doing
24    in terms of her directions to the agents in April of 2017?
25    A.  Try to sell what we already have, and not try to request
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 60 of 385
Case 2:19-cv-00324-RCY-LRL    Document 340    Filed 07/27/22    Page 52 of 99 PageID# 11295

52

WESTLY GREER, Direct Examination By Mr. McFarland

1   other items that we don't have.

2   Q.  Did that become a company theme from the time that the

3   company got its NSNs?

4   A.  Yeah.  It was back and forth a lot with this information.

5   Q.  Thank you.

6          And could we go to Defendants' 29, please?

7          Did you receive this memorandum from the company on

8   or about January 11th of 2019?

9   A.  Yes.

10  Q.  Okay.

11          MR. MCFARLAND:  We would move this in, Your Honor,

12  as Defendants' Exhibit 29.

13          THE COURT:  Any objection?

14          MR. LASCARA:  If I could have just a moment, Your

15  Honor.

16          THE COURT:  Sure.

17          MR. LASCARA:  I haven't had a chance to completely

18  review it.

19          Can I see the date of this?

20          MR. MCFARLAND:  Sure.  Do you want to scroll up?

21          MR. LASCARA:  No objection, Your Honor.

22          THE COURT:  It will be admitted.  You may publish.

23          MR. MCFARLAND:  Thank you.

24          (Defendants' Exhibit No. 29 received in evidence.)

25  BY MR. MCFARLAND:

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 61 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 53 of 99 PageID# 11296

53

WESTLY GREER, Direct Examination By Mr. McFarland

1   Q.  This is the same day as the moratorium email we looked at

2   earlier, correct?

3   A.  I believe so.

4   Q.  Okay.  And if we scroll down, the last paragraph is what?

5   A.  It's another paragraph just trying to push the kits they

6   already have created in the catalog.

7   Q.  And it's using the term "moratorium," correct?

8   A.  Correct.

9   Q.  Okay.  Thank you.

10          After you were sued by GMS Industrial, Westly, did

11  Mr. Gorken continue to contact you?

12  A.  Yeah, through texts.  Through texts, yeah.

13  Q.  Did you encourage or ask for those contacts?

14  A.  No.

15  Q.  All right.  If we could have D21, please.

16          Do you recognize this printout, Westly?

17  A.  Yes.

18  Q.  And what is it?

19  A.  It's the Punisher.

20  Q.  From whom did you receive this?

21  A.  Gary Gorken.

22  Q.  And when did you receive it?

23  A.  July 5th of 2020.

24  Q.  So, that's over a year after the lawsuit was filed,

25  correct?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 62 of 385
Case 2:19-cv-00324-RCY-LRL    Document 340    Filed 07/27/22    Page 54 of 99 PageID# 11297

54

WESTLY GREER, Direct Examination By Mr. McFarland

1    A.  Correct.

2          MR. MCFARLAND:  We would ask that this be admitted

3    Your Honor, and published.

4          THE COURT:  All right.  Any objection?

5          MR. LASCARA:  No objection, Your Honor.

6          THE COURT:  All right.  It will be entered.  You

7    may publish.

8          (Defendants' Exhibit No. 21 received in evidence.)

9          MR. MCFARLAND:  Thank you.

10   BY MR. MCFARLAND:

11   Q.  And I guess in terms of texts, we go from the bottom up

12   in terms of when things are said, right?  So if we go to the

13   bottom --

14   A.  I think it would be the top down.

15   Q.  Top down, okay.  Technology, here I am showing again, but

16   okay.

17          What did you as the recipient interpret this to be,

18   Westly?

19   A.  The Punisher?

20   Q.  Yes.

21   A.  Yeah.  It's -- it's someone that takes the law in their

22   own hands.  I've seen the movie, so relevant to that.

23   Q.  Is the Punisher then, is that a cartoon character or

24   super-type hero, something?

25   A.  Yeah, like a super villain, I guess.  Super hero, yeah,

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 63 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 55 of 99 PageID# 11298

55

WESTLY GREER, Direct Examination By Mr. McFarland

1    whatever.

2    Q.  And from a personal standpoint, how did you interpret

3    that Mr. Gorken is sending you a picture of the Punisher and

4    saying, "Tick tock.  And ready to talk yet?"

5    A.  So the Punisher would, you know, I guess they would kill

6    their enemies, but the way I took it is that he would come

7    after me financially.

8            MR. MCFARLAND:  Thank you, Westly.  That's all of

9    the questions I have.  Please answer any questions from

10   Mr. Lascara.

11           THE WITNESS:  Thank you.

12           THE COURT:  All right.  We're going to take our

13   afternoon recess at this time.  So, again, I'll ask you not

14   to talk about the case until it's been submitted to you.

15           (The jury exited the courtroom at 3:38 p.m.)

16           THE COURT:  All right.  We'll reconvene at 3:55 and

17   begin with cross.

18           Mr. Greer, I'll just ask you -- you can talk to

19   your lawyers, but please don't discuss your testimony.  All

20   right?

21           THE WITNESS:  Yes, Your Honor.

22           THE COURT:  Okay.  We'll be in recess.

23           (Recess from 3:39 p.m. to 3:55 p.m.)

24           THE COURT:  All right.  Let's have the jury.

25           (The jury entered the courtroom at 3:55 p.m.)

JILL H. TRAIL, Official Court Reporter

**JA1125**

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 64 of 385

```
 1              THE COURT:  All right, Mr. Lascara, any
 2   cross-examination?
 3              MR. LASCARA:  Yes, Your Honor.
 4              THE COURT:  All right.
 5                       CROSS-EXAMINATION
 6   BY MR. LASCARA:
 7   Q.  Good afternoon, Mr. Greer.
 8   A.  Good afternoon.
 9   Q.  What experience did you have in Army sales before you
10   started to work for GMS in 2011?
11   A.  With State Chemical Solutions, State Industrial, and UZ
12   Engineering.
13   Q.  Okay.  So, I understand that's who you were employed
14   with --
15   A.  Yes.
16   Q.  -- but what was your experience in making sales?
17   A.  I was -- I tagged along with my brother when he sold to
18   lots of motor pools on Fort Sill.
19   Q.  Okay.  So, you weren't making sales, you were tagging
20   along --
21   A.  Correct.
22   Q.  -- with somebody who was making sales?
23   A.  Yes.
24   Q.  So, your experience in making sales was zero before you
25   came to GMS?
```

USCA4 Appeal: 22-2090    Doc: 20-4      Filed: 01/19/2023    Pg: 65 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 57 of 99 PageID# 11300

57

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1    A.  I went through the process with my brother, so I --
 2    Q.  I understand that, but you never made any sales, did you?
 3            MR. MCFARLAND:  I object.  He gets to finish his
 4    answer, Your Honor.  Literally, the witness was still trying
 5    to answer when Mr. Lascara --
 6            THE COURT:  All right.
 7            MR. LASCARA:  I'm sorry I cut him off.  I didn't
 8    realize.
 9    BY MR. LASCARA:
10    Q.  Please answer the question.
11    A.  From my opinion, I think that's experience.
12    Q.  Okay.  But you hadn't made any sales?
13    A.  No.  They were in my brother's name.
14    Q.  Okay.  You were asked a question whether you received any
15    documents stamped confidential or trade secret when you came
16    to GMS.
17            Isn't it true that you had access to the computer
18    system through the Google account?
19    A.  I had Google drive access.
20    Q.  Okay.  It was a Google drive that was owned and operated
21    by GMS, correct?
22    A.  Yes.
23    Q.  And you said you had to log in, so there was a password
24    requirement, right?
25    A.  Yeah, for my email, yes.
```

JILL H. TRAIL, Official Court Reporter

**JA1127**

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 66 of 385

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1   Q.  Okay.  So, it was protected from people who didn't have
 2   access, right?
 3   A.  Correct.
 4   Q.  So, that means it was kept private to those people who
 5   were granted access, right?
 6   A.  Yes.
 7   Q.  All right.  And there is information in that Google drive
 8   relating to each of the points of contact at each of the
 9   locations where GMS sells products, correct?
10   A.  If the agents put it in the system, then yes.
11   Q.  Okay.  Well, the agents put it in the system, didn't
12   they?
13   A.  I wouldn't say all of them did, but some of them did,
14   yes.
15   Q.  Well, wasn't there a policy that you wouldn't get paid a
16   commission if you didn't put it in there?
17   A.  Yes.
18   Q.  So, they were pretty well incentivized to put it in
19   there, right?
20   A.  Yes.
21   Q.  So, that information included the names, correct?
22   A.  Yes.
23   Q.  The addresses, correct?
24   A.  I don't think that was required.
25   Q.  Well, the addresses were in there, weren't they?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 67 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 59 of 99 PageID# 11302

59

WESTLY GREER, Cross-Examination By Mr. Lascara

1    A.  In some of them, yes.

2    Q.  All right.  Emails?

3    A.  Yes.  And some were required and some weren't.

4    Q.  Phone numbers?

5    A.  Yeah.  For the most part there was phone numbers.

6    Q.  I mean, the whole point was it was a gathering of the

7    contact information for people that GMS sold to, correct?

8    A.  Yes.

9    Q.  Okay.  And so in addition to that point of contact

10   information, the sales agents were required to put in what

11   the customers were looking to purchase, correct?

12   A.  Yeah.  If they purchased, yes.

13   Q.  Not only if they purchased, but also what they were

14   asking to purchase; that was put in there, too, wasn't it?

15   A.  I think some agents did that, yes.

16   Q.  So, they made sales reports, right?

17        So, in some cases they didn't make a sale every time

18   they went there?

19   A.  Correct.

20   Q.  So, they talked with the people, the purchasing agents

21   for the government, and they found out what they wanted, what

22   they would like to have, and in some cases they were able to

23   sell, and they listed what they were going to sell, correct?

24   A.  Yeah.  They put the orders in the spreadsheet, yeah.

25   Q.  So, this gathering of information in this

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 68 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 60 of 99 PageID# 11303

60

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1   password-protected Google drive contained confidential
 2   information of GMS, didn't it?
 3   A.  I wouldn't think so, no.
 4   Q.  Okay.  So, how many points of contact did you put in
 5   there?
 6   A.  I'm unsure.
 7   Q.  A lot?
 8   A.  Yes.
 9   Q.  Okay.  Well, you couldn't just remember every one of
10   them, could you?
11   A.  Every one that I wrote down, no.
12   Q.  Right.  And you couldn't remember their email address,
13   could you?
14   A.  No.
15   Q.  So, you couldn't remember their telephone number, could
16   you?
17   A.  No.
18   Q.  So, all of that information that was essential to market
19   and sell the products was contained in a -- required by GMS
20   to be contained in a protected environment, and it would be
21   accessed when it was needed for use by the agents, correct?
22   A.  Yes, for input.
23            MR. MCFARLAND:  I am going to object to the
24   compound question, Your Honor, and the characterization.
25   There has been no testimony that the information in that
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 69 of 385
Case 2:19-cv-00324-RCY-LRL   Document 340   Filed 07/27/22   Page 61 of 99 PageID# 11304

61

WESTLY GREER, Cross-Examination By Mr. Lascara

1   chart that Mr. Greer created is essential.  That's a

2   characterization.  There hasn't been the first bit of

3   testimony that it's, quote, essential.

4           THE COURT:  I think it's okay for cross.  But I

5   will sustain the objection as to a compound question.

6           MR. LASCARA:  Yes.  Thank you, Your Honor.

7           THE COURT:  All right.

8   BY MR. LASCARA:

9   Q.  So, there was some testimony you gave about Plaintiff's

10  Exhibit 115.

11          I would like to, if we can, bring that up.  I believe

12  it's been admitted.  If you could publish it.

13          So, is it -- isn't it true that you didn't create

14  this document; is that right?

15  A.  This document?

16  Q.  Yes.

17  A.  I think I -- the original document was "What's in the

18  SAMS?"  And the titles were changed, and they added columns

19  to it.

20  Q.  Okay.  So, you had received that.

21          You came up with a template, I think the word was.

22  Is that -- is that what your testimony was?

23  A.  It was for myself to track orders, yeah.

24  Q.  Okay.  Well, you were an employee of GMS when you did

25  that, right?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 70 of 385

WESTLY GREER, Cross-Examination By Mr. Lascara

```
1   A.  I was an independent sales agent.
2   Q.  Okay.  So --
3   A.  Yeah.
4   Q.  -- when was that?
5   A.  It would have to have been sometime in 2011.
6   Q.  And at what date did you become an employee?
7   A.  It was six months after April.
8   Q.  Okay.  So, from six months after that April date you were
9   an employee?
10  A.  No.  I was an independent six months later, yes.
11  Q.  I'm sorry?
12  A.  I was independent six months after my hire date.
13  Q.  You were an independent sales agent?
14  A.  Yes.
15  Q.  Okay.  And then when did you become an employee?
16  A.  Sometime in, I think it was 2012 --
17  Q.  Okay.
18  A.  -- or '13.
19  Q.  All right.  So, this process of the requirement by GMS
20  for its sales agents and its employees who were selling to
21  its customers to record this type of information regarding
22  contact, points of contact, customer preferences, and minutes
23  or explanations about each visit with them, that started and
24  continued while you were there both as an agent and an
25  employee, correct?
```

USCA4 Appeal: 22-2090     Doc: 20-4     Filed: 01/19/2023     Pg: 71 of 385

1   A.  I am not sure what -- we originally started with just
2   emails, with a plan email.  I'm not sure what was required to
3   actually fill out the spreadsheets.
4   Q.  Okay.  But it was required by GMS of agents and employees
5   who were sales agents, correct?
6   A.  Yeah.  I think the requirement was just for the SAMS GCSS
7   tab.
8   Q.  So, you testified early in your direct examination about
9   your involvement at Fort Bliss and Fort Carson.  Were those
10  the first two bases that you were assigned to, to sell?
11  A.  Fort Sill was the first base, and then the second base
12  would have been Fort Hood.
13  Q.  Okay.  You testified, did you not, that there were no
14  sales at Fort Bliss or Fort Carson before you made sales
15  there; is that correct?
16  A.  Correct.
17  Q.  Okay.  But those aren't the first sales that GMS ever
18  made to the Army, are they?
19  A.  I think they had a few sales at Fort Eustis, which is
20  somewhere around here.
21  Q.  So, are you aware of all of the sales that were made by
22  GMS to the Army before you became involved?
23  A.  Not all sales.  But the territory that I went to, I was
24  literally the first person there.
25  Q.  I understand in the territory that you went to --

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 72 of 385
Case 2:19-cv-00324-RCY-LRL Document 340 Filed 07/27/22 Page 64 of 99 PageID# 11307

64

WESTLY GREER, Cross-Examination By Mr. Lascara

1    A.   Yeah.

2    Q.   -- it might have been the first sale that GMS made to the

3    Army on those particular locations, correct?

4    A.   Correct.

5    Q.   Okay.  But you don't know what sales GMS made to the Army

6    on other bases that you didn't go to before you arrived?

7    A.   From what I heard from Gary, they had only sold to Fort

8    Eustis by credit card before I started.

9    Q.   I see.

10        Do you know how many sales?

11   A.   No.

12   Q.   All right.  You were the director of sales commencing in

13   2015; is that correct?

14   A.   Yes.

15   Q.   All right.  And can you state which sales agents came

16   under your direction?

17   A.   Greg Spires, Thomas Hayes, Sabrina Greer, Abe Salfiti,

18   Mike Welton, Amber Wenrick, and I think Wayne Side.  I think

19   that's it.

20   Q.   Okay.  You've mentioned that there was a bonus for sales

21   on NSNs, correct?

22   A.   Yes.

23   Q.   There was also a bonus for sales on total sales volume,

24   right?

25   A.   Correct.

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1   Q.  So, therefore, there was a bonus on sales of NSNs and
 2   non-NSNs, correct?
 3   A.  Correct.
 4   Q.  All right.  So, would you agree that there are lots of
 5   other ways to sell non-NSNs, which sometimes we've referred
 6   to as CCPNs and non-NSN kits, other than the DIBBS Board?
 7   A.  For the motor pools, it would be a rare occasion where a
 8   motor pool is able to even actually use a credit card.  Other
 9   than that, I would say no.
10   Q.  Okay.  So, a credit card is not the only way to sell CCPN
11   items or non-NSNs, is it?
12   A.  The DIBBS Board was the other option.
13   Q.  Okay.  Well, what about -- so you're saying only credit
14   cards and DIBBS Board?
15   A.  I guess FedMall, but that's frowned upon.  GSA, they
16   would use their credit card, so it would still be a credit
17   card.
18   Q.  So, what's your understanding of the FedMall contract
19   that -- GMS had a FedMall contract, correct?
20   A.  Yes.
21   Q.  Okay.  So those CCPNs, the non-NSNs could be sold through
22   FedMall, right?
23   A.  You could, but it would skip checks and balances.
24   Q.  So, it would skip checks and balances?
25   A.  Yeah.  So, if you go into a motor pool and order a
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 74 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 66 of 99 PageID# 11309

66

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1   FedMall item with their DoDAAC, it would skip purchasing,
 2   like, the checks and balances above them, and it would
 3   automatically become an order, and I think they made a stop
 4   on that, the government.
 5   Q.  So it was an avenue for a while?
 6   A.  When I was with GMS, I think the credit card purchasing
 7   capability of FedMall was an avenue, but not using their
 8   DoDAAC.
 9   Q.  Okay.  So, again, there were credit card sales, and then
10   there were FedMall credit card sales; is that right?
11   A.  And there was also a FedMall DoDAAC.
12   Q.  Okay.  So, those were all available means to sell CCPNs
13   or non-NSNs other than just the DIBBS Board, correct?
14   A.  Not to the motor pools.  It would have to be a special
15   occasion where it's, like, an emergency buy.
16   Q.  Okay.  So, they could buy?
17   A.  Yeah, in emergencies, yes, sir.
18   Q.  When you became director of sales, it was your job to
19   teach the sales force of these various other methods of sale,
20   correct?
21   A.  No.
22   Q.  So, you were director of sales, but you're saying you
23   didn't have any obligation to tell those sales agents that
24   were working for you that there were other avenues to sell
25   GMS products?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 75 of 385

```
 1   A.  We were to sell through GCSS Army through the motor
 2   pools.  The credit card was really of no option for us,
 3   because it was a rare occasion on emergency buys.
 4   Q.  What about the GSA contract?
 5   A.  You have to use your credit card to purchase through GSA.
 6   Q.  Okay.  But it was another avenue, in addition to just
 7   credit cards?  It was through the GSA contract?
 8   A.  Yeah, with the credit card.
 9   Q.  Okay.  So, are you saying that you didn't teach any of
10   the seven people that you were overseeing about those
11   different methods?
12   A.  No.  I have not.
13   Q.  Okay.  Why not?
14   A.  Like I explained, it was for emergencies.  The only way
15   they could use a credit card was in rare occasions on
16   emergency buys, like if someone was deploying and they need a
17   one-off special item, and that just didn't happen.
18   Q.  Okay.  You mentioned that Mike Welton was permitted to
19   sell Schaffer products with Gary's approval.  Do you know
20   under what circumstances and what products?
21   A.  I just know they were lubricants.
22   Q.  Okay.  So, do you understand what the arrangement there
23   was?
24   A.  Just that he can sell both.  I don't know anything other
25   than that.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 76 of 385
Case 2:19-cv-00324-RCY-LRL   Document 340   Filed 07/27/22   Page 68 of 99 PageID# 11311

68

WESTLY GREER, Cross-Examination By Mr. Lascara

1  Q.  Okay.  And so you don't know any of the details of that?

2  A.  No.

3  Q.  Or what was sold?

4  A.  No.

5  Q.  Who would know that?  Would Gary Gorken know that?

6  A.  He should know that, yes.

7  Q.  Okay.  So, you mentioned something about electronic

8  devices.  And apparently you were given by GMS a laptop

9  computer, correct?

10  A.  Yes.

11  Q.  And you were given a desktop computer, correct?

12  A.  Yes.

13  Q.  And you were given a tablet, correct?

14  A.  Yes.

15  Q.  All right.  And sometime after you were requested to do

16  so, I believe on April 3rd, 2019, sometime around April 19th,

17  2019, you turned back or turned over all three of those

18  computer devices, correct?

19  A.  Yes.

20  Q.  And that's after you encoded an access code to the

21  tablet, correct?

22  A.  Yes.

23  Q.  All right.  And you used the file shredder on the laptop

24  and the desktop, correct?

25  A.  I'm not sure if I used it on the laptop.  From what the

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 77 of 385

WESTLY GREER, Cross-Examination By Mr. Lascara

1   BDO said, it looked like I just used it on the desktop.

2   Q.  Were you here during the BDO testimony?

3   A.  Yes.

4   Q.  And you're not familiar with the fact that he did an

5   evaluation of both your desktop and your laptop?

6   A.  Yes.

7   Q.  And he testified that the file shredder was used on both?

8   A.  I thought he just said desktop, but I think so.

9   Q.  All right.  We'll come back to that.

10          I would like to get rid of one or two of these.

11          If you would turn to Exhibit 110.

12          All right.  And if that could be published?  Thank

13  you.

14          THE COURT:  It can be published.

15  BY MR. LASCARA:

16  Q.  So, this was reviewed.  It's a March 9th, 2018, email

17  from Chris Morton.

18          And were you involved in the meetings that occurred

19  prior to Chris Morton issuing this?

20  A.  I don't know if this is a reference to a meeting or not.

21  I'm not sure.

22  Q.  Well, did you hear Chris Morton's testimony with regard

23  to this email and who was involved in preparing it and

24  presenting it?

25  A.  I think he said him and Gary and Renee.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 78 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 70 of 99 PageID# 11313

70

WESTLY GREER, Cross-Examination By Mr. Lascara

1    Q.  Okay.  Are you saying you have no recollection of being
2    involved in the discussions that led to this email being
3    issued?
4    A.  I may have heard meetings about this.
5    Q.  Did you attend meetings about it?
6    A.  If it was a Friday meeting, then yes.
7    Q.  Okay.  But you have no independent recollection of
8    whether you did or not?
9    A.  No.
10   Q.  So, this doesn't prevent or encourage any sales agent at
11   GMS to not sell CCPNs or non-NSNs, does it?
12   A.  No.
13           MR. MCFARLAND:  I am going to object, Your Honor.
14   The document says what it says.  I don't mind him
15   questioning on the document.
16           THE COURT:  He can ask him.  It's overruled.  He
17   can ask him.  He can ask his question and put his spin on
18   it.  He can answer the question.  He's got the document in
19   front of him.
20           THE WITNESS:  No.
21   BY MR. LASCARA:
22   Q.  I'm sorry.  Did you understand the question?
23   A.  Yeah.
24   Q.  And your answer was no, it did not request or require any
25   stoppage of sales of non-NSNs or CCPNs, correct?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 79 of 385

WESTLY GREER, Cross-Examination By Mr. Lascara

1   A.  Right.  Under the current one, yes.

2   Q.  And it didn't curtail the issuance of new CCPNs or

3   non-NSNs, did it?

4   A.  Come again, sir.

5   Q.  It did not dictate that new non-NSNs or CCPNs would not

6   be issued, did it?

7   A.  No.

8   Q.  Okay.  And then if you go to 112 --

9        If we could go to 112 and publish it to the jury.

10  Thank you.

11       -- this is June 14th, 2018.  Were you involved in the

12  meetings and conversations which led to Chris Morton issuing

13  this email?

14  A.  If it was on a Friday and I wasn't traveling, I would say

15  yes.

16  Q.  All right.  Well, do you have any independent

17  recollection of whether you actually were there and

18  participated?

19  A.  No.

20  Q.  Okay.  Are you familiar with the issue that is being

21  attempted to be addressed in this email?

22  A.  Yeah.  It looks like there was an overload on part number

23  requests, and they want you to try to sell the ones that they

24  already have first.

25  Q.  So, were you aware that there was an overload or a lot of

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1    requests for special one-off items and/or kits of CCPNs?
 2    A.   What was the date on this again?
 3    Q.   January 14th, 2018.
 4    A.   I would say yes.
 5    Q.   You would say yes?
 6    A.   Yes.
 7    Q.   Well, what do you recall the problem being?
 8    A.   I think that was around the time where Thomas was
 9    requesting a lot of non-standards, in the June time frame.
10    Q.   Okay.  And this was dealt with in the prior memo and in
11    this memo not by saying, We're not going to consider more
12    CCPNs or CCPN kits, correct?
13    A.   It's, yeah, to limit.
14    Q.   Well, it says for process -- for there to be a process so
15    that they could be evaluated as to whether it was financially
16    feasible or worthwhile.  Would you agree with that?
17    A.   I would say, yeah, worthwhile.  I don't know about the
18    financial aspect.
19    Q.   You had no involvement in the financial aspects?
20    A.   No, sir.
21    Q.   So, you didn't know if this was good for the company or
22    bad for the company?
23    A.   I had no idea on the profits of what they purchase stuff
24    at, no.
25    Q.   Do you have any knowledge as to how many new CCPN kits or
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 81 of 385

```
 1   new CCPN items, if they were individual items, were created
 2   after this June 14th, 2018, memorandum?
 3   A.  No.  I have no idea how many were.
 4   Q.  Okay.  And then let's go to 111, Exhibit 111.
 5           Do you see this is dated January the 9th, 2019,
 6   correct?
 7   A.  Yes.
 8   Q.  And this is the first time in any of the paperwork we've
 9   seen here or the testimony that the word "moratorium" was
10   used.
11           Do you see that?
12   A.  Yes.
13   Q.  Again, this date is January 9, 2019.  But you had already
14   started a competing company back in June of 2017, correct?
15   A.  I started another company in June of 2017, yes.
16   Q.  2017, excuse me.
17           So, when you started this competing company in 2017,
18   you focused on CCPN or non-NSN items; is that correct?
19   A.  When I started G&S in 2017, we focused on bidding on
20   electric motors for the Navy.
21   Q.  Well, how many proposals or bids did you submit for
22   boats?
23   A.  It was electric motors.  My brother --
24   Q.  Electric motors for boats?
25   A.  Yeah.  My brother was a manufacturer.  He was -- he was a
```

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1    manufacturer, so he was letting people bid on their motors
 2    that they created.
 3    Q.  How many bids on those motors did you submit?
 4    A.  I'm not sure.
 5    Q.  Did you submit any?
 6    A.  Yes.
 7    Q.  You personally?
 8    A.  Yes.
 9    Q.  Okay.  How long after that was it that G&S started
10    submitting bids to the government for non-NSN items?
11    A.  I think it was late 2018 -- or late 2017.
12    Q.  Late 2017.  So, that would be still a year and a couple
13    of months before that January 9th email that you all claim
14    was a moratorium on CCPN items, correct?
15    A.  Yes.
16    Q.  And this January 9th memorandum -- you heard
17    Mr. Naschansky here in court testifying under oath, did you
18    not?
19          MR. MCFARLAND:  Your Honor, I'm going to object.
20    This witness is here to answer questions on cross-exam, but
21    Mr. Lascara keeps asking about other witnesses' testimony.
22    He's not here to validate other witnesses' testimony.
23          THE COURT:  He's not asking him to validate.  So,
24    it's overruled right now.
25          Go ahead and ask your questions, Mr. Lascara.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 83 of 385

WESTLY GREER, Cross-Examination By Mr. Lascara

1   BY MR. LASCARA:

2   Q.  You were here in the courtroom when Mr. Naschansky

3   testified, were you not?

4   A.  Correct.  Correct.

5   Q.  He testified about this document, Exhibit 111, that says

6   "Moratorium on new CCPN kits."

7          Do you remember his testimony?

8   A.  I don't remember what he said about it.  I remember that

9   he testified about it, yes.

10  Q.  Okay.  Well, let me see if this refreshes your

11  recollection.  He testified that the moratorium --

12          MR. MCFARLAND:  Your Honor --

13          THE COURT:  You can't refresh his recollection like

14  that, Mr. Lascara.

15          MR. LASCARA:  Yes, Your Honor.

16          THE COURT:  So, the objection is sustained.

17          MR. LASCARA:  I understand.

18  BY MR. LASCARA:

19  Q.  Do you have any recollection as to whether or not

20  Mr. Naschansky stated the moratorium ended, or was not in

21  effect at some point after this?

22          MR. MCFARLAND:  I renew my objection, Your Honor.

23  Now we're asking him to validate or disagree with another

24  witness' testimony.

25          THE COURT:  Overruled.  He can be asked if he

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 84 of 385

```
 1   remembers that.
 2           THE WITNESS:  Um, I think he said he had no
 3   recollection of it being lifted.  Is that correct?  I don't
 4   know.
 5           THE COURT:  All right.  He doesn't know,
 6   Mr. Lascara.
 7           MR. LASCARA:  Yes, Your Honor.
 8           THE COURT:  Next question.
 9   BY MR. LASCARA:
10   Q.  So, you had testified about crimps, I think, at some
11   point in your testimony on direct, you know, a pair -- a tool
12   called a crimp.  And could that type of item be purchased by
13   the government under the GSA contract that GMS had?
14   A.  Through the GSA contract?
15   Q.  GSA contract, right, that GMS had?
16   A.  If it was on the contract.  I didn't -- I don't recall it
17   being on the contract.
18   Q.  You're not sure if it was on the contract?
19   A.  It wouldn't have been by itself on the contract, if they
20   had it.
21   Q.  Okay.  Why would you say it wouldn't have been on the
22   contract?
23   A.  Because they package items with it.
24   Q.  All right.  How about through FedMall, could a crimp be
25   purchased through FedMall?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 85 of 385
Case 2:19-cv-00324-RCY-LRL Document 340 Filed 07/27/22 Page 77 of 99 PageID# 11320

77

WESTLY GREER, Cross-Examination By Mr. Lascara

1  A.  I think FedMall is just a copy of GSA.  I don't know.
2  Q.  You don't know the answer to that question?
3  A.  It wouldn't have been on there, because it would have
4  been packaged.
5  Q.  Well, if you don't know, how can you testify that it
6  wouldn't have been on there?
7  A.  Because they package everything when it comes to kits.
8  Q.  Well, this wouldn't be a kit.  It would be an item, a
9  crimp.
10 A.  Yeah.  A crimper wasn't a core item of GMS.
11 Q.  So, how about credit cards, could you purchase it under a
12 credit card purchase?
13 A.  A crimper would be used for a motor pool, so I don't
14 think it would fall under emergency.
15 Q.  Okay.  So, are you saying the only way the United States
16 Government could buy a crimper is through the DIBBS Board?
17 A.  The only way the motor pools can buy it, I would say
18 that.
19 Q.  You don't know about anything other than the motor pool;
20 is that correct?
21 A.  Yeah.  I don't see anybody else needing a crimper other
22 than at the motor pool.
23 Q.  You were the sales manager for Amber Wenrick; is that
24 correct?
25 A.  Correct.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 86 of 385

WESTLY GREER, Cross-Examination By Mr. Lascara

| | |
|---|---|
| 1 | Q.  And you were the only one who trained her, correct? |
| 2 | A.  Yeah, until April of 2019. |
| 3 | Q.  Right.  Until you left the employer as a sales agent for |
| 4 | GMS.  You're the only one who trained Amber from the |
| 5 | beginning of the time she got there until the time you left? |
| 6 | A.  Correct. |
| 7 | Q.  You never taught her to sell at FedMall, into the FedMall |
| 8 | contract, did you? |
| 9 | A.  No. |
| 10 | Q.  And you never taught her to sell credit card sales, did |
| 11 | you? |
| 12 | A.  No. |
| 13 | Q.  So, if you thought creating this competing company and |
| 14 | selling CCPN items, that was not a problem, why didn't you |
| 15 | tell Gary that's what you were doing? |
| 16 | A.  He would flip out about anything, so I didn't tell him. |
| 17 | He would say, You're not a good salesman if you can't sell |
| 18 | what we have. |
| 19 | Q.  And so you weren't afraid that he was going to say you're |
| 20 | competing against me? |
| 21 | A.  I don't know what he would have said. |
| 22 | Q.  Again, going back to the Google drive, were you aware of |
| 23 | the existence of training memoranda on the Google drive? |
| 24 | A.  Training memorandum? |
| 25 | Q.  Yes. |

JILL H. TRAIL, Official Court Reporter

**JA1148**

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 87 of 385
Case 2:19-cv-00324-RCY-LRL Document 340 Filed 07/27/22 Page 79 of 99 PageID# 11322

79

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1    A.   Not to my knowledge.
 2    Q.   You're not aware of any sales agent training information
 3    that was resident on the GMS Google drive?
 4    A.   I think they had a checklist or something that they
 5    emailed to us, a new agent checklist to make sure they knew
 6    how to log into their email, fill out their sheets, and I
 7    think that was about it.
 8    Q.   So, do you recall whether that was on -- in the Google
 9    drive?
10    A.   I don't.  I think it was emailed.  I'm not sure.
11    Q.   All right.  Let's go to Exhibit 2 in binder one.
12         Did you receive that document on or about April 3rd,
13    2019, by email?
14    A.   Yes.
15    Q.   And what did you do when you received it?
16    A.   Just looked at it, and called Greg or Thomas and asked
17    them if they received the same thing.
18    Q.   Had they received the same thing?
19    A.   I think Greg did.  I'm not sure if Thomas did.
20    Q.   What was the first action you took, if any, after
21    reviewing this correspondence, other than you said you called
22    Greg, I think you mentioned, and some others of the sales
23    agents?
24    A.   I just thought this was something that was part of
25    termination, because it was sent out to previous people that
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 88 of 385
Case 2:19-cv-00324-RCY-LRL  Document 340  Filed 07/27/22  Page 80 of 99 PageID# 11323

80

WESTLY GREER, Cross-Examination By Mr. Lascara

1   were terminated.

2   Q.  All right.  You were directed in the end of the first

3   paragraph to cease all activities on behalf of GMS and to

4   return all GMS property and materials, including

5   documentation, the new agent kit.

6           What was the new agent kit?

7   A.  I know usually a new agent kit was just like a bunch of

8   aerosols and some polos.  But I was a new agent in 2011, so I

9   wouldn't even have all of that stuff.

10  Q.  All right.  Were you also requested to return -- to

11  preserve all sources of data within your possession, custody,

12  and control?  Do you see at the top of page 2?

13  A.  Yes.

14  Q.  Did you do that?

15  A.  I mean, I guess so.

16  Q.  What do you mean by "I guess so"?

17  A.  Everything was preserved to its normal state, the polos,

18  the laptop, and the desktop.

19  Q.  Well, did you hear the testimony by the BDO expert, Eric

20  Shirk --

21  A.  Yes.

22  Q.  -- about the affect of the file shredder?

23  A.  Yes.

24  Q.  You knew when you put that file shredder on the desktop

25  and the laptop that it was going to destroy the files,

WESTLY GREER, Cross-Examination By Mr. Lascara

1   correct?

2   A.  Yeah.  It would erase all files.

3   Q.  Okay.  And that included files on there related to G&S,

4   correct?

5   A.  Yes.  It erased everything that was on there.

6   Q.  Okay.  So, it included files related G&S, correct?

7   A.  Yeah.  There would have been some awards on there.

8   Q.  Is that all you think that was on there about GMS is

9   awards?

10  A.  Awards, probably a copy of my spreadsheet when I was --

11  when I would be on the plane, I would make sure to download

12  it before I got on the plane so I could fill out my report,

13  because we didn't have internet on the plane, and I would

14  re-upload it whenever I landed.

15  Q.  So, there was a great deal of GMS financial data, sales

16  data, marketing data on that desktop that the file shredder

17  shredded; isn't that true?

18  A.  No.  You said marketing data?  No.

19  Q.  So, you sent those computers back because you knew you

20  didn't have the right to keep them, right?

21  A.  I sent them back because I was -- I kept getting these

22  letters, and I thought they would stop sending letters if I

23  send them back.

24  Q.  How many letters did it take you before you decided to

25  send it back?

WESTLY GREER, Cross-Examination By Mr. Lascara

1    A.  I think it was three.

2    Q.  So, you testified that you didn't want them, meaning GMS,

3    to see all of your personal information, right?

4    A.  Right.

5    Q.  But it wasn't just personal information you didn't want

6    them to see.  You didn't want them to see the information

7    regarding the sales activity of G&S, correct?

8    A.  That's not true, because they could have seen that on

9    DIBBS.

10   Q.  Well, you had been able to keep it away from them for

11   over a year on DIBBS, right?

12   A.  Uh-huh.

13          THE COURT:  Is that yes?  Is that a yes, Mr. Greer?

14          THE WITNESS:  Yeah.  I mean, I didn't tell them

15   about DIBBS, yes.

16          THE COURT:  Okay.  Go ahead.

17   BY MR. LASCARA:

18   Q.  So, when you testified here under oath just earlier that

19   to your knowledge you weren't deleting anything -- that you

20   were not deleting anything that they did not already have --

21   A.  Right.

22   Q.  -- that's not true, is it?

23   A.  That is true.

24   Q.  Well, they didn't have your G&S information, because you

25   kept it from them, correct?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 91 of 385

1   A.  That's not true, because this letter states G&S Supply,

2   which means they would have looked up our cage code, and they

3   had already seen all of the data.

4   Q.  Well, are you saying that everything related to G&S that

5   was on that computer could be found on some government

6   website?

7   A.  Yes, sir.

8   Q.  Well, I understand that perhaps sales could be found on

9   that website, but could your financial records be found there

10  of G&S?

11  A.  No.

12  Q.  Okay.  Well, there were G&S financial records that you

13  shredded from your computer with the file shredder, weren't

14  there?

15  A.  I didn't save financial records to my computer.

16  Q.  I'm sorry.  I didn't quite understand.

17  A.  I didn't save financial records to my computer.

18  Q.  You didn't save any on your computer?

19  A.  No.

20  Q.  So, you stated on direct that after you sent back all

21  three of the computers, it was the next month that you

22  learned that you were involved in a lawsuit, correct?

23  A.  I think so.  I don't know all of the dates, but whenever

24  we got served, yeah.

25  Q.  Had you ever used that file shredder program before?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 92 of 385

1  A.  No, sir.

2  Q.  So, you thought you had gotten rid of it all, right?

3  A.  Gotten rid of all of?

4  Q.  Everything that was on the computer?

5  A.  Yeah.  I wiped it clean.

6  Q.  Okay.  Well, if your intent was to simply protect your

7  personal information that was on that computer -- which, by

8  the way, the computers belonged, did they not, to GMS?

9  A.  Yeah, two of them did.  Yes, sir.

10  Q.  So, if your concern was that you didn't want your

11  personal stuff on there, why did you delete everything?

12  A.  I just wiped it clean because you couldn't -- when you

13  delete something, it's like using an eraser.  You can even go

14  to recovery and recover files that were deleted and pull

15  everything back.

16  Q.  So, are you trying to tell this jury that you didn't

17  destroy all of that data because you wanted to hide it?

18  A.  Correct.

19  Q.  Yet, you knew when you got the file shredder program and

20  read what it was about, you knew it was going to destroy all

21  of it, right?

22  A.  I knew it would wipe it clean, yes, sir.

23  Q.  And that was your intent when you downloaded it on those

24  two mechanisms, those two computers, that was your intent to

25  destroy all of it, right?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 93 of 385

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1    A.  I meant to wipe both of them, but I guess I only wiped
 2    one.
 3    Q.  So, you heard the testimony of Mr. Eric Shirk of BDO
 4    regarding the USB timeline?
 5    A.  Correct.
 6    Q.  The timeline, event timeline and the list of USBs, excuse
 7    me, two separate documents, you saw them up on the screen,
 8    correct?
 9    A.  Yes.
10    Q.  All right.  And so one of those exhibits, which was
11    diagram 3.1, showed a number of USB drives that were
12    connected to that computer over time.
13         You didn't produce any of those USB drives in this
14    case, did you?
15    A.  I produced one.
16    Q.  Well, I may be --
17         MR. LASCARA:  If I may, Your Honor -- if I remember
18    how to do this -- show this?
19         THE COURT:  Does it take a minute, Julie?
20         THE CLERK:  Yes, it does.
21         THE COURT:  Okay.
22    BY MR. LASCARA:
23    Q.  So, there are two diagrams related to USB drives.  So,
24    the first one I was referring to is this USB drive diagram
25    3.1 as part of the expert report of Eric Shirk.
```

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1              MR. MCFARLAND:  I'm sorry.  Is this being published
 2     to the jury?
 3              THE CLERK:  Yes.  It came in, didn't it?
 4              THE COURT:  Is it the same demonstrative that came
 5     in earlier?
 6              MR. MCFARLAND:  It's not the same as the
 7     demonstrative.  The demonstrative exhibit is the chart that
 8     was used previously.  Now we've got the report itself that's
 9     being published.
10              MR. LASCARA:  Well, I can find the chart.
11              THE COURT:  Okay.  So take that down if it's not
12     the same report -- the same chart, excuse me.
13              MR. LASCARA:  It is the same chart, Your Honor.
14              THE COURT:  All right.  Well, did the same chart
15     have that paragraph of writing on it?
16              MR. LASCARA:  I don't believe --
17              MR. MCFARLAND:  I don't mind the chart.
18              THE COURT:  Just a minute.  Just a minute.
19              Did that same chart have that paragraph of writing
20     on it, Mr. Lascara?  I don't believe it did.
21              MR. LASCARA:  No, Your Honor.  The writing was not
22     on the first one I used.  I grabbed the actual --
23              THE COURT:  So, you either need to crop it so it's
24     just the chart or use the same chart.
25              MR. LASCARA:  Okay.  I understand, Your Honor.
```

WESTLY GREER, Cross-Examination By Mr. Lascara

1          THE COURT:  So, the objection is sustained.

2          MR. LASCARA:  And I'm sorry, Your Honor.  I'm

3    trying to get through this.

4          Your Honor, I want to make sure that I -- this

5    diagram 3.1 shows USBs that he testified to.  I'm not sure

6    this chart was actually put up as a demonstrative.

7          This chart, diagram 3.2, was put up.

8          THE COURT:  Okay.

9          MR. LASCARA:  And so I just want to make sure

10   everyone understands that, and I'll fold this under.  It was

11   a part of the report, but I don't believe that I used it as

12   a demonstrative when Mr. Shirk was here, and I want everyone

13   to understand that.

14         THE COURT:  Okay.

15         MR. MCFARLAND:  Your Honor, if this wasn't used by

16   Mr. Shirk, you can't use it with this witness.

17         THE COURT:  He can use it as a demonstrative

18   exhibit if he's talking about USBs, and he wants to show him

19   what USBs he's talking about.

20         MR. MCFARLAND:  There is no foundation with this

21   witness, Your Honor.  You're going to show him something

22   that he's never seen before.

23         THE COURT:  He just asked him three or four

24   questions about USBs.

25         MR. MCFARLAND:  Right.  That's fine.  I don't mind

WESTLY GREER, Cross-Examination By Mr. Lascara

 1   him asking questions about USBs, but what we're now asking

 2   the witness to do is comment on a hearsay chart that he did

 3   not prepare, and there is no evidence that he's even seen it

 4   before.

 5             THE COURT:  It's a demonstrative.

 6             Are you seeking to admit it, Mr. Lascara, or are

 7   you seeking it to have it as an aid to the testimony?

 8             MR. LASCARA:  An aid to the testimony, Your Honor.

 9             THE COURT:  Right.  That's the definition of

10   demonstrative, so you can use that.  Go ahead.  But not with

11   the writing, just with the chart.

12             MR. MCFARLAND:  I'm just going to note, Your Honor,

13   this is way beyond the scope of my direct.  We didn't talk

14   about USBs one iota in my direct.

15             THE COURT:  Right.  You talked about computers,

16   didn't you?

17             MR. MCFARLAND:  Yes, and that's something

18   different, Your Honor.

19             THE COURT:  USBs are inextricably intertwined with

20   the computers, right?  Because the testimony from the expert

21   was that -- well, I'm not going to rehash it all.  But it's

22   inextricably intertwined with the computers.  So, I think

23   it's proper cross-examination.

24   BY MR. LASCARA:

25   Q.  So, this is diagram 3.1.  And do you recall utilizing

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 97 of 385

```
 1   these USB devices on your desktop computer?
 2   A.   No.  Also, didn't I sign for this computer in November of
 3   2017?  I might be wrong.
 4             THE COURT:  All right.  Hold on a second.
 5             All right.  Take that down, and I want to get on
 6   the headsets.
 7             (Sidebar conference as follows:)
 8             THE COURT:  Hello, can everybody hear me?
 9             All right.  So, Mr. Lascara, I mean, maybe I'm
10   misremembering this, but the chart that dealt with the USBs
11   I remember, and somebody correct me if I am wrong, because I
12   could be wrong, but it started with dates in 2017 and all
13   the way to 2019, about the time that this witness no longer
14   was employed with GMS.
15             What you just put up just deals with 2017, so
16   that's not, at least to me, a replica of one of the charts
17   that was used, but please disabuse me of that notion if I'm
18   wrong, because I could be.
19             MR. LASCARA:  No, Your Honor.  I think you are
20   correct.  And I mentioned that this one was not shown, but
21   it does list USBs that were attached.  And we asked for all
22   of the USBs that were attached to this equipment in
23   discovery, and that's why I found it relevant to add this
24   list of USBs.  This chart that I have in my hand is the one
25   that I had put up, and I'm not trying to over complicate,
```

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1    and if you would like me to simply put that away and go back
 2    to the one I used, I will do that, I don't want to cause
 3    confusion.
 4           THE COURT:  I think you're right.  You need to use
 5    the one you used before if you want to ask him questions
 6    about it based on the foundation that you laid, specifically
 7    asking him a series of questions about did he hear the
 8    testimony from the BDO expert.
 9           MR. LASCARA:  Yes, sir.
10           THE COURT:  Okay.  All right.
11           MR. LASCARA:  Yes, sir.  Thank you.
12           (End of sidebar conference.)
13    BY MR. LASCARA:
14    Q.  All right.  We're going to put a different chart up, and
15    it's diagram 3.2 from the Eric Shirk BDO report.
16           So, do you recall testimony given in this courtroom
17    last week by Mr. Shirk related to this diagram?
18    A.  Yes, sir.
19    Q.  Okay.  And included in his testimony was a reference to
20    this top USB storage device that was last seen and first seen
21    on April 19th, 2019, at 8:42 p.m.
22           Do you recall that?
23    A.  Yes.
24    Q.  All right.  And did you in fact attach that USB drive to
25    your desktop computer immediately before you executed the
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 99 of 385

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1   file shredder program?
 2   A.  Yeah.  It would have been before.
 3   Q.  Okay.  And did that USB storage device get produced?
 4   A.  I believe so.
 5   Q.  Is that the only USB drive that you produced?
 6   A.  Yes.
 7   Q.  Okay.  So, what about the USB drive, Epson storage USB
 8   device on April 2nd, 2019, at 7:39 a.m., was that produced?
 9   A.  That was a printer, so no.
10   Q.  I'm sorry?
11   A.  That was a printer, so no.
12   Q.  The Epson storage USB device?
13   A.  Yes, sir.
14   Q.  Is a printer?
15   A.  Yes, sir.
16   Q.  Well, what type of printer is?
17   A.  Epson.
18   Q.  Why does it say "storage USB device" as opposed to
19   printer?
20         MR. MCFARLAND:  Your Honor, I'm going to object.
21   He didn't create this document.  I don't mind him being
22   asked about it, but to go after this witness for wording
23   that --
24         THE COURT:  He can ask him about it.  I mean, your
25   client seems to know what an Epson printer is, so he can
```

JILL H. TRAIL, Official Court Reporter

WESTLY GREER, Cross-Examination By Mr. Lascara

| | |
|---|---|
| 1 | certainly ask him about it. |
| 2 | MR. MCFARLAND: Right. But the last question, |
| 3 | though, asked him why that wording was used in this diagram |
| 4 | document that my client certainly didn't create. |
| 5 | THE COURT: That question is sustained. |
| 6 | MR. MCFARLAND: Thank you, Your Honor. |
| 7 | THE COURT: You can reword, Mr. Lascara. |
| 8 | BY MR. LASCARA: |
| 9 | Q. So, do you know why this diagram indicates that a storage |
| 10 | USB device was attached to the computer on April 2nd, 2019, |
| 11 | at 7:39 a.m., but you believe that it was a printer? |
| 12 | A. I believe it was a printer, yes, sir. |
| 13 | Q. Do you know why? |
| 14 | A. Because it says Epson, and the only Epson USB I recall |
| 15 | using was an Epson printer. |
| 16 | Q. Okay. Is the Epson printer a USB drive? |
| 17 | A. It's attached by USB. |
| 18 | Q. Okay. Now, as it relates to the contents, I would like |
| 19 | to show you, just as an example, page 42 of 72 of Exhibit 11. |
| 20 | This was presented at trial, if you recall, while Mr. Shirk |
| 21 | was testifying. |
| 22 | MR. MCFARLAND: This is another demonstrative, Your |
| 23 | Honor. I don't mind him trying to answer the best he can on |
| 24 | a demonstrative, but I want it to be clear this isn't an |
| 25 | exhibit. Plaintiff didn't offer this as an exhibit on their |

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 101 of 385

WESTLY GREER, Cross-Examination By Mr. Lascara

 1   exhibit list.

 2           THE COURT:  This is demonstrative, Mr. Lascara?

 3           MR. LASCARA:  Yes, Your Honor.

 4           THE COURT:  Okay.  Very well.

 5   BY MR. LASCARA:

 6   Q.  So, this is page 43 -- I can't quite fit it all on -- 42,

 7   excuse me, of 72.  I don't think I can make it any smaller.

 8           So, you see that at the bottom of this page and

 9   starting at the top these item numbers, they appear to be

10   item numbers, are item numbers for G&S Supply products; is

11   that correct?

12   A.  You said at the top, sir?

13   Q.  Yes.  Right here.

14   A.  I have no idea.  They look like solicitation from DIBBS.

15   I have no idea what they were for.

16   Q.  Okay.  But do you know that they relate to G&S Supply

17   because of the cage code?

18   A.  It just looks like a solicitation number, sir.

19   Q.  A solicitation number, you said?

20   A.  Yes, sir.

21   Q.  All right.  Going down to Greer Group 2018, W-2, W-3, W-2

22   forms 1/29/19, that's a G&S document, correct?

23   A.  No, sir.

24   Q.  What document is that?

25   A.  I don't know exactly what it was, but it says Greer Group

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 102 of 385

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1   on it.
 2   Q.  Well, Greer Group was involved in G&S Supply, correct?
 3   A.  Greer Group was me and my wife's company that we received
 4   payments from all sorts of things.
 5   Q.  Okay.  These are specifically W-2s and W-3s for 2018.
 6   So, wouldn't that relate to compensation that you received?
 7   A.  Yeah, compensation we received from Greer Group.
 8   Q.  And is it your testimony that that doesn't have -- in any
 9   way relate to GMS?
10   A.  It's just payments from Greer Group.  We received money
11   from GMS Industrial Supply as well.
12   Q.  So, are you saying that that doesn't relate in any way to
13   G&S?
14   A.  No.  This is Greer Group.  It's a separate entity.
15   Q.  Looking at page 1, these items that are listed here all
16   the way down to this point before the license, what are
17   those?
18   A.  These look like pictures, pings, and gifs.
19   Q.  And GS indicates it's a G&S Supply photograph, correct?
20   A.  It probably is a photo off of Google, yeah.
21   Q.  And this list right here, is that the same?
22   A.  Without seeing it, just the name, probably so.
23   Q.  Well, we can't -- we can't see the documents because
24   they're destroyed, correct?
25   A.  Yeah.  They're erased.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 103 of 385

WESTLY GREER, Cross-Examination By Mr. Lascara

```
1    Q.  How many of the items on this page are personal?
2    A.  I don't know.  I don't know what a read me is.  I don't
3    know what those programs are.
4    Q.  All right.  Let's go to page 3.  It's another sampling
5    of -- do you understand that this is a listing of file names
6    that were recovered after they were changed by the file
7    shredder, correct?
8    A.  Correct.
9    Q.  All right.  Which of this list of files is personal?
10   A.  I would say W-2.
11   Q.  Well, who is the W-2 from?
12   A.  It likely would be from Greer Group or GMS.
13   Q.  It could be from G&S, correct?
14   A.  No.
15   Q.  No?
16   A.  No.  They paid dividends.  There was no W-2.
17   Q.  Okay.
18   A.  Export final, ODS, I think it's just -- I think this is a
19   lot to do with the G-Army.
20   Q.  All right.  This one right here, G&S tax, is that a tax
21   return?
22   A.  It could be.  I'm not sure.
23   Q.  For G&S Supply?
24   A.  Yes.
25   Q.  I'm going to show you another group of items.  These G&S
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 104 of 385
Case 2:19-cv-00324-RCY-LRL Document 340 Filed 07/27/22 Page 96 of 99 PageID# 11339

96

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1   items below the document that is G&S items description.XLS.
 2   Do you see that?
 3   A.  Yes.
 4   Q.  And the list of XLS files below them, what are those?
 5   A.  I would think that would be inside of that spreadsheet.
 6   I don't know why they are listed like this, because I don't
 7   see a spreadsheet being one part number or one PR number.
 8   Q.  What is a PR number?
 9   A.  It's just a purchase request number.
10   Q.  All right.  The G&S item descriptions, what is that
11   document?
12   A.  It's probably just descriptions of kits which would be
13   put in the catalog.
14   Q.  Now, there are also GMS items listed in this recovered
15   file name.  What are these items referring to GMS here at the
16   bottom of the page?
17   A.  It's probably some of the part numbers that are in their
18   catalog.
19   Q.  All right.  And this document here, the file shredder
20   setup, is that when you actually executed the file shredder
21   at around 8:53 p.m.?
22   A.  I think this would be the deletion of the file shredder.
23   I don't really know.
24   Q.  Okay.  Well, this is a recovery of a file name.
25   A.  Uh-huh.
```

97

WESTLY GREER, Cross-Examination By Mr. Lascara

```
 1   Q.  Right?
 2   A.  Yeah.
 3        MR. LASCARA:  Let me just beg the Court's
 4   indulgence.  I'm not going to keep doing this.  I just want
 5   to find one or two others, and then we'll move on.
 6        THE COURT:  I think we've almost exhausted this
 7   line of questioning, Mr. Lascara.
 8        MR. LASCARA:  Yes, sir, Your Honor.
 9   BY MR. LASCARA:
10   Q.  So, is it your testimony that you didn't download
11   anything other than personal items on the USB drive before
12   you ran the file shredder?
13   A.  On the USB drive?
14   Q.  Uh-huh.
15   A.  From the report, it showed that I only had the
16   spreadsheet on there which showed the bonus that was owed to
17   me.
18   Q.  Well, my question is:  Is it your testimony that you only
19   downloaded personal files onto the USB drive before you
20   executed the file shredder?
21   A.  Yeah.  I guess so.
22   Q.  Okay.  Well, you sent back your tablet that had a code on
23   it?
24   A.  Uh-huh.
25   Q.  You understand that the code that you provided didn't
```

JILL H. TRAIL, Official Court Reporter

# JA1167

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 106 of 385
Case 2:19-cv-00324-RCY-LRL Document 340 Filed 07/27/22 Page 98 of 99 PageID# 11341

98

WESTLY GREER, Cross-Examination By Mr. Lascara

1    open it?

2    A.  The code I provided did open it.  Someone must have

3    changed it after I sent it.

4    Q.  Okay.  And then the desktop and the laptop were both

5    devoid of any readable files because of the file shredder,

6    correct?

7    A.  I think the BDO said just the desktop.

8    Q.  Okay.  So, did you just destroy every bit of data that

9    you owned that was stored on all three of those computer

10   devices and didn't keep any of it?

11   A.  Yeah.  I just wiped it clean.

12   Q.  Poof?

13   A.  The desktop.  I meant to do it to the laptop, but I

14   forgot to do it, I guess.

15   Q.  So, were none of those documents important to you to be

16   maintained for personal purposes or tax purposes?

17   A.  No.  I don't really like to keep anything.

18   Q.  I just want to review Defendants' Exhibit 21.

19          THE COURT:  Can we jump on the headsets before you

20   do that, Mr. Lascara?

21          (Sidebar conference as follows:)

22          THE COURT:  Mr. Lascara, I'm not rushing you, but

23   how much more do you think you have?

24          MR. LASCARA:  Your Honor, I could have 20 to 25

25   more minutes.

WESTLY GREER, Cross-Examination By Mr. Lascara

```
1              THE COURT:  All right.  We're going to stop there
2    and pick up tomorrow.
3              MR. LASCARA:  All right.  Thank you.
4              (End of sidebar conference.)
5              (End of excerpt.)
6
7                         CERTIFICATION
8
9         I certify that the foregoing is a correct transcript
10   from the record of proceedings in the above-entitled matter.
11
12
13         _____/s/_____
14                    Jill H. Trail
15                    July 27, 2022
16
17
18
19
20
21
22
23
24
25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5   GMS INDUSTRIAL SUPPLY, INC.,        )
                                        )
 6          Plaintiff,                   )   CIVIL ACTION NO.
                                        )   2:19cr324
 7    v.                                 )
                                        )
 8   G&S SUPPLY LLC, et al,              )
                                        )
 9          Defendants.                  )
                                        )
10   - - - - - - - - - - - - - - - - - -

11

12                TRANSCRIPT OF PROCEEDINGS
              (Excerpt Testimony of Westly Greer)
13                   Norfolk, Virginia

14                    June 7, 2022

15

16

17   BEFORE:  THE HONORABLE RODERICK C. YOUNG
              United States District Judge, and jury

18

19

20   APPEARANCES:

21           PENDER & COWARD
             By:  William A. Lascara
22                Jeffrey Dennis Wilson
                  Jesse Brian Gordon
23                Thomas Saunders Berkley
                  Daniel T. Berger
                  Counsel for Plaintiff
24

25
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 109 of 385
Case 2:19-cv-00324-RCY-LRL   Document 341   Filed 07/27/22   Page 2 of 29 PageID# 11344

2

1              MCGUIREWOODS LLP
         By:  Robert William McFarland
2              Micaylee Alexa Noreen
               Jeanne E. Noonan
3              Counsel for the Defendants

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 110 of 385
Case 2:19-cv-00324-RCY-LRL    Document 341    Filed 07/27/22    Page 3 of 29 PageID# 11345

3

```
 1                      I N D E X

 2    PLAINTIFF'S
      WITNESSES                                        PAGE
 3

 4

 5
      DEFENDANTS'
 6    WITNESSES                                        PAGE

 7     WESTLY GREER
            Cross Examination by Mr. Lascara            5
 8          Redirect Examination by Mr. McFarland      27

 9

10

11                    E X H I B I T S

12    PLAINTIFF'S
      NO.                                              PAGE
13
       53                                              13
14     183                                             14
       87                                              15
15     90                                              26

16
      DEFENDANTS'
17    NO.                                              PAGE

18

19

20

21

22

23

24

25
```

 1              (Excerpt of proceedings - testimony of Westly

 2   Greer.)

 3              THE CLERK:  In the matter of civil case number

 4   2:19cv324, GMS Industrial Supply, Inc. versus G&S Supply,

 5   LLC, et al.  The plaintiff is represented by William

 6   Lascara, Jeffrey Wilson, Daniel Berger, Thomas Berkley, and

 7   Jesse Gordon.  The defendants are represented by Robert

 8   McFarland, Micaylee Noreen, and Jeanne Noonan.

 9              Mr. Lascara, is plaintiff ready to proceed?

10              MR. LASCARA:  Yes.  Good morning.

11              THE COURT:  Good morning.

12              MR. LASCARA:  The plaintiff is ready to proceed.

13              THE COURT:  Good morning.

14              THE CLERK:  And, Mr. McFarland, are defendants

15   ready to proceed?

16              MR. MCFARLAND:  Yes.  Good morning, Your Honor.

17   Defendants are ready.

18              THE COURT:  Good morning.

19              All right.  So, let's go ahead and get Mr. Greer

20   back to the stand, and once he gets there, we'll bring the

21   jury in.

22              MR. MCFARLAND:  Can we take up one housekeeping

23   matter, Your Honor?

24              THE COURT:  Sure.  He can still come to the stand.

25              MR. MCFARLAND:  Good morning, Your Honor.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 112 of 385
Case 2:19-cv-00324-RCY-LRL   Document 341   Filed 07/27/22   Page 5 of 29 PageID# 11347

5

WESTLY GREER, Cross Examination by Mr. Lascara

```
 1           THE COURT:  Good morning.
 2           MR. MCFARLAND:  In light of the Court's rulings and
 3  the way the evidence has progressed, we do have a few
 4  additional instructions that we would like to present to the
 5  Court.  Would the Court like us to do that by filing them as
 6  we did before or?
 7           THE COURT:  You should file them, but if you have
 8  copies of them, give them to my law clerk at one of the
 9  breaks.
10           MR. MCFARLAND:  Will do, Your Honor, and we'll
11  present Word copies as well.
12           THE COURT:  Fantastic.
13           Let's have the jury.
14           (The jury entered the courtroom at 9:17 a.m.)
15           THE COURT:  All right.  Good morning, everyone.  I
16  hope you all had a nice evening.  So, we will now continue
17  with our trial.
18           Mr. Lascara, you can continue with your cross.
19           MR. LASCARA:  Thank you, Your Honor.
20           WESTLY GREER, having been first duly sworn, was
21  examined and testified as follows:
22                    CONTINUED CROSS-EXAMINATION
23  BY MR. LASCARA:
24  Q.  Good morning, Mr. Greer.
25  A.  Good morning, sir.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 113 of 385

WESTLY GREER, Cross Examination by Mr. Lascara

1  Q.  Isn't it true that yesterday you testified on the witness

2  stand in response to my question that G&S was created because

3  your brother wanted to sell electric motors for boats?

4  A.  No, sir.

5  Q.  Okay.  Why was -- what do you recall was your testimony

6  then regarding why G&S was created?

7  A.  He was a -- he worked for a manufacturer that created

8  electric motors, and it was a bidding opportunity for us just

9  to make bids on the DIBBS.

10 Q.  Okay.  So, are you saying you did not testify yesterday

11 that the reason G&S was created was because your brother

12 wanted to sell electric motors for boats?

13 A.  He was already selling electric motors.  It was a chance

14 for us to bid on those solicitations.

15 Q.  Okay.  And that's why G&S was formed?

16 A.  Yes.

17 Q.  Okay.  This is not the first time that you've given a

18 statement about the reasons for forming G&S Supply, is it?

19 A.  I'm not sure.

20 Q.  Okay.  Well, you sat and testified for two depositions in

21 this case before this trial, didn't you?

22 A.  I think it was one deposition.  It might have been two.

23 Q.  Okay.  You had what we call a 30(b)(6) corporate

24 deposition taken.  Do you recall that?

25 A.  Yes.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 114 of 385
Case 2:19-cv-00324-RCY-LRL   Document 341   Filed 07/27/22   Page 7 of 29 PageID# 11349

7

WESTLY GREER, Cross Examination by Mr. Lascara

1    Q.  And then you had your individual deposition taken.  Do
2    you recall that?
3    A.  Oh, yes.
4    Q.  All right.  So your first deposition was conducted on
5    April 13th, 2021, last year, correct?
6    A.  That was -- I'm sure it was.
7    Q.  Okay.  And before you took the witness stand today, you
8    took an oath to give true testimony, correct?
9    A.  Correct.
10   Q.  Before you answered questions in your April 13th
11   deposition, you also gave an oath to give truthful testimony,
12   didn't you?
13   A.  Yes.
14   Q.  All right.  Even though the deposition wasn't in the
15   courtroom, you understood that you were sworn to give
16   truthful testimony in the deposition, right?
17   A.  Yes.
18   Q.  And you reviewed the deposition transcript prepared by
19   the court reporter and completed a -- the court reporter
20   after the deposition was completed -- in other words, you
21   were given the ability to review that deposition transcript
22   for accuracy, correct?
23   A.  Yes.
24   Q.  And you had the opportunity to make corrections if you
25   found anything that wasn't correct in that deposition

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 115 of 385

```
 1   transcript, didn't you?
 2   A.  Yes.
 3   Q.  And you, in fact, took the opportunity to make a couple
 4   of corrections on what we call an errata sheet that you
 5   signed.  Do you recall that?
 6   A.  I believe so, yes.
 7   Q.  All right.  I'm going to ask that you be provided a copy
 8   of the April 13th, 2021, deposition.
 9           MR. LASCARA:  And I've provided a copy to
10   Mr. McFarland.
11           THE COURT:  All right.
12           THE WITNESS:  Thank you.
13   BY MR. LASCARA:
14   Q.  So, we're in the April 13th transcript.  Please refer to
15   page 88, line 11 and then to line 23.
16   A.  I've read that, sir.
17   Q.  All right.  And in line 11, I asked you the question:
18   "When did you start G&S Supply, and who did you start it
19   with?"
20           And your answer was:  "I believe it was June of 2017,
21   with Gregory Spires."
22           Correct?
23   A.  Yes.
24   Q.  The next question I asked was:  "Was anyone other than
25   Gregory Spires involved?"
```

WESTLY GREER, Cross Examination by Mr. Lascara

```
 1              And your answer was:  "No, sir."
 2              Correct?
 3   A.  Yes.
 4   Q.  All right.  I then asked you:  "And why did you start
 5   that business?"
 6              And your answer was at lines 19 and 20:  "The
 7   original thought of G&S Supply was to bid on solicitations on
 8   DIBBS."
 9              Correct?
10   A.  Correct.
11   Q.  All right.  And is that the true reason that you started
12   G&S?
13   A.  Yes.  It's the same answer, yes.
14   Q.  All right.  "And when you say DIBBS" -- I asked the next
15   question -- "what are you referring to?"
16              And your answer was:  "The DLA International" --
17              MR. MCFARLAND:  Your Honor, I'm going to object.
18   There hasn't been any impeachment.  The purpose of pulling
19   out this deposition is that the witness has said something
20   different at trial than he said in the deposition, and
21   what's been read is consistent with the witness' testimony.
22   It's not proper impeachment.  You don't just pull out a
23   deposition and start reading it.  I mean, I'm happy for the
24   jury to see the consistency, but I don't think it's
25   necessarily appropriate.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 117 of 385
Case 2:19-cv-00324-RCY-LRL  Document 341  Filed 07/27/22  Page 10 of 29 PageID# 11352

10

WESTLY GREER, Cross Examination by Mr. Lascara

1          MR. LASCARA:  Your Honor --

2          THE COURT:  Mr. Lascara.

3          MR. LASCARA:  Yes, Your Honor.

4          THE COURT:  I haven't heard any impeachment yet.  I

5   was waiting.

6          MR. LASCARA:  Your Honor, his testimony during the

7   hearing earlier was that it was formed because his brother

8   wanted to sell electric motors for boats, and they were

9   going to be able to bid on them through this --

10         THE COURT:  What hearing are you talking about?

11         MR. LASCARA:  Pardon me?  Today -- yesterday's --

12         THE COURT:  The trial?

13         MR. LASCARA:  -- trial.

14         THE COURT:  Okay.  Right.  I understand that's what

15  you're saying, but to me you can -- you're free to use a

16  deposition to impeach someone, that's fine under the rules,

17  both the Rules of Evidence and the Rules of Civil Procedure,

18  but it seems that your impeachment is consistent with the

19  answer that he gave today, like ten minutes ago, when he

20  said, "No.  I created G&S to bid on DIBBS."  And what you

21  just read in the deposition was consistent with that.  So, I

22  don't know if there is another question after that, that

23  leads to this creation for the purpose of selling electric

24  motors to the military, but so far I haven't heard that it's

25  impeachment.

JILL H. TRAIL, Official Court Reporter

**JA1179**

USCA4 Appeal: 22-2090 Doc: 20-4 Filed: 01/19/2023 Pg: 118 of 385

WESTLY GREER, Cross Examination by Mr. Lascara

```
 1          So, unless you have another question from that same
 2   line that you asked him to read, the objection is sustained.
 3   But I'll give you leave if that material is in the
 4   deposition to follow-up on that question.
 5          MR. LASCARA:  No, Your Honor.  I've read all that I
 6   had intended to read.  My -- the impeachment was his
 7   testimony yesterday related to forming the corporation
 8   because his brother wanted to sell these motors, and he --
 9          THE COURT:  Right.
10          MR. LASCARA:  -- he was going to use the company to
11   bid on it.
12          THE COURT:  Right.  So, right.  But the thing is
13   that you can't use the -- the deposition is not impeaching
14   him, because he has stated that same thing.  He's stated
15   something consistent with the deposition.
16          Now, you've pointed out what you believe to be an
17   inconsistency, and if you have other documents that he has
18   read or signed, or reports that he's done, or emails that
19   he's done that says, you know, "I created G&S to be able to
20   sell electric motors," then you can use that, but that's not
21   -- that's not impeachment, what I just heard.
22          So, the objection is sustained.
23          MR. LASCARA:  I understand, Your Honor.
24          THE COURT:  All right.
25   BY MR. LASCARA:
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 119 of 385

WESTLY GREER, Cross Examination by Mr. Lascara

1   Q.  Okay.  So, the reason you formed G&S was to bid on

2   products on the DIBBS Board?

3   A.  Yes.  The original thought was my brother was a

4   manufacturer for electric motors and to bid on their motors

5   that they created.

6   Q.  All right.  And is that through the DIBBS Board?

7   A.  Yes, sir.

8   Q.  Okay.  I understand.

9          I would like to show you Exhibit 53, and that should

10  be in volume one of the binder in front of you.  It's in one

11  of these binders, Exhibit 53.

12         Do you recognize Exhibit 53 as the Articles of

13  Organization of G&S Supply?

14  A.  Yes.

15  Q.  And if you go over to page 3 of that document, is that

16  your name and address information?

17  A.  Yes.  At the time that was my address.

18  Q.  All right.  Did you prepare and file this document with

19  the Colorado Secretary of State?

20  A.  I'm not sure if it was me or a CPA.  It was one of the

21  two.

22  Q.  Okay.  So, it was done at your request?

23  A.  Yes.

24         MR. LASCARA:  I would move for admission of this

25  Articles of Organization, Exhibit 53.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 120 of 385

 1           THE COURT:  Any objection?

 2           MR. MCFARLAND:  No objection, Your Honor.

 3           THE COURT:  It will be entered.  You may publish.

 4           (Plaintiff's Exhibit 53 received in evidence.)

 5  BY MR. LASCARA:

 6  Q.  And can you identify the date in the receipt up at the

 7  top right corner?

 8  A.  June the 22nd, 2017.

 9  Q.  All right.  And in binder two, I believe that should also

10  be -- you're in binder one.  I believe you have binder two

11  also at the stand.

12           Is that binder two?

13  A.  Yes.  Yes, sir.

14  Q.  Okay.  If you could turn to 183.

15  A.  This one goes to 150.

16  Q.  Oh, 150.  So, it must be binder three.  I apologize.

17  A.  Thank you.

18  Q.  All right.  Do you recognize that document?

19  A.  Yes, sir.

20  Q.  What is that document?

21  A.  It's the Operating Agreement for G&S Supply.

22  Q.  All right.  And does your signature appear at page 15 of

23  that Operating Agreement?

24  A.  Yes, sir.

25  Q.  And did you sign that agreement on behalf of yourself as

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 121 of 385
Case 2:19-cv-00324-RCY-LRL  Document 341  Filed 07/27/22  Page 14 of 29 PageID# 11356

14

WESTLY GREER, Cross Examination by Mr. Lascara

```
 1   a member?
 2   A.  Yes, sir.
 3   Q.  All right.
 4           MR. LASCARA:  I move for admission of this
 5   Exhibit 183.
 6           THE COURT:  Any objection?
 7           MR. MCFARLAND:  No objection, Your Honor.
 8           THE COURT:  All right.  It will be entered.
 9           (Plaintiff's Exhibit 183 received in evidence.)
10   BY MR. LASCARA:
11   Q.  And with respect to the effective date of the Operating
12   Agreement, if you could refer to the first line on the first
13   page, when was it made effective?
14   A.  Effective June 22nd, 2017.
15   Q.  All right.  Thank you.
16           Now, if you could turn to Exhibit 87.  It should be
17   in binder one.
18   A.  There is nothing in the binder, but I can see this.
19   Q.  Okay.  It's up on the screen here.
20           Can you identify what that document is?
21   A.  It's an email from myself to Mike Welton.
22   Q.  Okay.  And what is the date?
23   A.  September 16, 2016.
24   Q.  And who was copied on the document?
25   A.  Renee Robichaux.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 122 of 385

WESTLY GREER, Cross Examination by Mr. Lascara

```
 1   Q.  All right.
 2   A.  And Gary Gorken, I'm sorry.
 3   Q.  And was this in relation to communications on behalf of
 4   GMS Industrial?
 5   A.  Yes, sir.
 6          MR. LASCARA:  I would move for admission of
 7   Exhibit 87.
 8          THE COURT:  Any objection?
 9          MR. MCFARLAND:  No objection, Your Honor.
10          THE COURT:  It will be entered.  You may publish.
11          (Plaintiff's Exhibit 87 received in evidence.)
12          MR. LASCARA:  Thank you, Your Honor.
13   BY MR. LASCARA:
14   Q.  This appears to have a picture.  Can you identify what
15   that picture is of?  It's a little, small box.
16   A.  I can't, sir.
17   Q.  Well, it says right below it a little PDF symbol.  And
18   then to the right of that do you see "Battle Damage
19   Assessment List"?
20   A.  I see that, sir.
21   Q.  That's a CCPN or a non-NSN item, correct?
22   A.  I have no idea what that is, sir.  I don't know if this
23   was a soldier's lunch bag.  I don't know what this is.
24   Q.  Well, in this communication, you were sending an email to
25   Mike Welton, correct?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 123 of 385

WESTLY GREER, Cross Examination by Mr. Lascara

```
 1    A.  Yes, sir.
 2    Q.  And your statement was:  "Before doing this, does your
 3    customer have the option of ordering through credit card?"
 4          Do you see that?
 5    A.  Yes.
 6    Q.  "DOD EMALL" --
 7    A.  Yeah.
 8    Q.  -- "or only ordering through the stock system GCSS?"
 9          Do you see that?
10    A.  Yes.
11    Q.  All right.  So, you were aware that customers or some
12    customers of GMS had the opportunity or option to order
13    through credit card, right?
14    A.  Yes.  There was very few customers that could.
15    Q.  So, how about through the DOD EMALL?
16    A.  Yeah.  That would have been another credit card request.
17    Q.  So, there is a separate credit card option that can be
18    done, what, at the -- at the entity or organization that's
19    buying it, and a separate credit card opportunity through the
20    DOD EMALL?
21    A.  Correct.  Yeah.
22    Q.  All right.  And then what is meant "or only ordering
23    through the stock system?"  What did you mean there?
24    A.  Just the Army supply system, whatever they had at the
25    time, one of those three.
```

WESTLY GREER, Cross Examination by Mr. Lascara

1   Q.  Okay.  Were you familiar with all of the avenues as to

2   how the government could purchase supplies from GMS, such as

3   credit cards, the FedMall, the GCSS, those various types of

4   contract vehicles?

5   A.  For the most part, yes.

6   Q.  When you gave your testimony in the 30(b)(6) deposition,

7   isn't it true that you were asked about what contracts --

8   what government contracts GMS sales agents could sell

9   through, and you said you didn't know?

10          THE COURT:  Objection?

11          MR. MCFARLAND:  Your Honor, I am going to object.

12          THE COURT:  Okay.

13          MR. MCFARLAND:  If he's going to impeach the

14  witness with his prior deposition testimony, as the Court

15  knows, there is a procedure that you follow.

16          THE COURT:  Sustained.  Sustained.

17          MR. MCFARLAND:  Thank you.

18  BY MR. LASCARA:

19  Q.  I'm going to ask you to look at the deposition transcript

20  in front of you over on page 8 -- excuse me -- page 9.

21          MR. MCFARLAND:  I'm sorry.  Which transcript?  I've

22  got two.

23          MR. LASCARA:  Yeah, 30(b)(6).

24  BY MR. LASCARA:

25  Q.  It's the 30(b)(6) deposition transcript that's been

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 125 of 385

WESTLY GREER, Cross Examination by Mr. Lascara

```
 1   handed up.

 2   A.  I have it pulled up, sir.

 3   Q.  All right.  So, if you go to line 15, you see my

 4   question:  "Okay.  What avenues of sale -- let me rephrase

 5   that.  Through what contracts, government contracts, could

 6   GMS sales agents, including yourself, sell to?"

 7           THE COURT:  I'll just ask you to slow down a little

 8   bit, Mr. Lascara.

 9           THE WITNESS:  What page was that again?

10   BY MR. LASCARA:

11   Q.  Page 9.

12   A.  And what number, sir?

13   Q.  Line 17 --

14   A.  Okay.

15   Q.  -- through line 19.

16   A.  I think I have the wrong document.

17   Q.  This is the 30(b)(6).

18   A.  Thank you.

19           I see that, sir.

20   Q.  Okay.  So -- and your answer was:  "I don't know the

21   specifics of the contracts."

22           MR. MCFARLAND:  And, Your Honor, I'm going to

23   object.  This is improper impeachment.  The question is --

24   which wasn't read very clearly, but I'll read it clearly:

25   "Through what contracts, government contracts, could GMS
```

USCA4 Appeal: 22-2090   Doc: 20-4   Filed: 01/19/2023   Pg: 126 of 385
Case 2:19-cv-00324-RCY-LRL   Document 341   Filed 07/27/22   Page 19 of 29 PageID# 11361

19

WESTLY GREER, Cross Examination by Mr. Lascara

```
 1   sales agents, including yourself, sell to?"
 2          And the answer is:  "I don't know the specifics of
 3   the contracts."
 4          That's not what was asked of him on
 5   cross-examination here.
 6          THE COURT:  All right.  Your objection is improper
 7   impeachment.
 8          MR. MCFARLAND:  Absolutely, Your Honor.
 9          THE COURT:  Mr. Lascara.
10          MR. LASCARA:  Your Honor, he testified that he did
11   know about the availability of these contracts in connection
12   with 87.  Yet, in his deposition transcript on behalf of the
13   company, which occurred on April 20th, 2021, he gave an
14   exactly opposite answer.
15          THE COURT:  All right.  It's overruled, and he can
16   explore it on redirect.
17          Go ahead, Mr. Lascara.
18          MR. LASCARA:  All right.
19   BY MR. LASCARA:
20   Q.  Would you agree that we've talked about catalogs, and
21   catalogs of GMS as well as G&S?
22          With respect to GMS catalogs, do you agree that there
23   were plenty of other products, including non-NSN products,
24   that GMS could sell and did sell that were not in the
25   catalog?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 127 of 385

```
 1   A.  There were pending kits that sometimes needed to be added
 2   to the catalog that weren't in there yet, yes.
 3   Q.  So the answer is yes, not everything that could be sold
 4   was in the catalog, correct?
 5   A.  Correct.
 6   Q.  All right.  So, you recall times where there were items
 7   that the government wanted that weren't in the GMS contract,
 8   yet they were sold to the government, correct?
 9   A.  In the contract, sir?
10   Q.  Excuse me.  In the catalog?
11   A.  I believe so, sir.
12   Q.  So, what is your understanding of the FedMall contract
13   that GMS Industrial had with DLA?  What did it entail?
14   A.  I have no idea, sir.  I don't know much about their
15   contract.
16   Q.  Wasn't it a contract vehicle that you, as the director of
17   sales, would alert other sales agents that it was an avenue
18   for their sales?
19   A.  We used GCSS to sell through DLA.  We didn't -- we didn't
20   push the FedMall contract.
21   Q.  Well, you say, "We didn't push the FedMall contract."
22   A.  As in GMS.
23   Q.  Are you saying you didn't press?
24   A.  Not anybody that dealt with the Army at the time.
25   Q.  Okay.  Well, the Army materials could be purchased
```

USCA4 Appeal: 22-2090   Doc: 20-4   Filed: 01/19/2023   Pg: 128 of 385

 1   through the FedMall contract, couldn't they?

 2   A.  I believe so.

 3   Q.  And so it was an avenue to sell to the Army on behalf of

 4   GMS, correct?

 5   A.  Yes.

 6   Q.  And you could sell non-NSNs through the FedMall contract,

 7   couldn't you?

 8   A.  You could, but I wouldn't do that.

 9   Q.  Okay.  You had an obligation and the other agents had an

10   obligation to aggressively promote the sale of GMS' products,

11   whether they were in the catalog or not, correct?

12   A.  In the catalog, yes.

13   Q.  So, are you saying they didn't have an obligation to

14   aggressively promote the sales of GMS' products that were not

15   in the catalog?

16   A.  We sold what we can sell.

17   Q.  I'm sorry?

18   A.  We sold what we can sell.  You cannot just sell random

19   stuff that wasn't in the catalog.  You had to get approval.

20   Q.  So, did you ever teach any of the agents that you

21   oversaw, as the sales director, how to sell through the

22   FedMall contract?

23   A.  I don't believe so.

24   Q.  Okay.  Are you familiar with the ability that GMS

25   Industrial Supply had to sell industrial supply products to

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 129 of 385
Case 2:19-cv-00324-RCY-LRL   Document 341   Filed 07/27/22   Page 22 of 29 PageID# 11364

22

WESTLY GREER, Cross Examination by Mr. Lascara

1    the federal government through credit card purchases?

2    A.  I'm sorry.  You said "had to sell," sir?

3    Q.  Yes, had to sell industrial.  So, are you familiar with

4    the ability that GMS Industrial Supply had to sell industrial

5    supply products to the federal government through credit card

6    purchases?

7    A.  Yes, sir.

8    Q.  Explain to me what you know about credit card purchases

9    by the federal government for products from GMS Industrial

10   Supply.

11   A.  So, on the rare occasion that you can get a customer that

12   has a credit card, there had to be -- they had to get three

13   quotes from three different vendors that were competitive,

14   and only then could they choose the lowest price to purchase

15   from that vendor.  So, GMS would use G Cubed, their own

16   quotes, and also Storm Tactical.

17   Q.  Well, at the same time you indicated that it was

18   difficult for GMS to sell credit card sales.

19        Isn't it true that G&S was using credit card sales

20   starting back in late 2017, all through the end of March of

21   2019, to sell its products?

22   A.  If a third-party vendor had bidded on DIBBS and won the

23   award, that's how they paid us.  So, it wasn't us using the

24   card to the military.  It was a vendor paying us.

25   Q.  Okay.  So, credit card sales were available to --

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 130 of 385

| | |
|---|---|
| 1 | MR. MCFARLAND:  Goodness gracious, Your Honor, |
| 2 | asked and answered at least a half dozen times between |
| 3 | yesterday and today. |
| 4 | THE COURT:  Overruled at this point. |
| 5 | Go ahead, Mr. Lascara. |
| 6 | BY MR. LASCARA: |
| 7 | Q.  So, credit card sales were available for GMS Industrial |
| 8 | sales agents, correct? |
| 9 | A.  Yes, sir. |
| 10 | Q.  Are you aware of any limit that related to use of credit |
| 11 | sales?  Like, was there a dollar limit? |
| 12 | A.  Yes, and they changed all of the time, so I'm not sure. |
| 13 | Q.  So, you would have to keep up with what the government |
| 14 | requirements for purchasing through credit card sales were if |
| 15 | you wanted to use it? |
| 16 | A.  It was 3,000 at one time, and then it switched to, like, |
| 17 | $3,500 as their limit. |
| 18 | Q.  So, do you recall a point in time in 2016, August of |
| 19 | 2016, when GMS Industrial obtained a new DOD EMALL contract? |
| 20 | A.  If there was an email sent, then yes. |
| 21 | Q.  Pardon me? |
| 22 | A.  If it was through email, then yes. |
| 23 | Q.  I'm sorry.  I did not understand your answer. |
| 24 | A.  If it was through an email, then yes. |
| 25 | Q.  So, do you recall it being? |

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 131 of 385

```
 1   A.  I don't know the date, no.

 2   Q.  Okay.  But you recall that they, in that time period, won

 3   a new contract through DOD EMALL?

 4   A.  I think it switched to FedMall or something.

 5   Q.  Okay.  Is that the same thing?  EMALL and FedMall were

 6   the same contract?

 7   A.  It evolved to FedMall.

 8   Q.  Okay.  So, that vehicle, that contract could be used to

 9   sell non-NSNs, correct?

10   A.  The contract?

11   Q.  Yes.

12   A.  I don't know what the contract was, but if they had items

13   on FedMall, you can sell it, yes.

14   Q.  So, you're not -- as sales director, you were not

15   familiar with what that new DOD EMALL or FedMall contract

16   permitted?

17   A.  I just know you can sell whatever was on FedMall.

18   Q.  Do you recall that there was a point in time where

19   Mr. Spires objected to his receipt of commissions, claiming

20   that he was underpaid?

21   A.  Yes.  What he testified, yes.

22   Q.  No.  I'm talking about on specific transactions.

23   A.  Yeah.  I think at one time any motor pool sale you would

24   get deducted 5 or 10 percent commission for a certain period

25   of time because they said they were losing money on the sales
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 132 of 385
Case 2:19-cv-00324-RCY-LRL  Document 341  Filed 07/27/22  Page 25 of 29 PageID# 11367

25

WESTLY GREER, Cross Examination by Mr. Lascara

```
 1   through the motor pools.
 2   Q.  And that was by GMS?
 3   A.  Yes.
 4   Q.  Okay.  Well, let me have you turn to Exhibit 90 in the
 5   binder in front of you, and that should be in exhibit binder
 6   one.
 7           Do you have that up in front of you on the screen?
 8   A.  Yes.
 9   Q.  Okay.  So, do you recognize what this document is?
10   A.  It was an email to Greg Spires and copying Renee and
11   Rachel.
12   Q.  All right.  And are you the author of the email?
13   A.  Yes.
14   Q.  And what is the date of the email?
15   A.  What does it say?  Do you want me to just read it?
16   Q.  Yeah.
17   A.  "Greg, we are currently" --
18   Q.  No.  I said the date.
19           THE COURT:  The date.
20   BY MR. LASCARA:
21   Q.  The date.
22   A.  January 12th, 2016.
23   Q.  All right.  And did this relate to a request or for
24   information or a --
25           THE COURT:  Are you asking to move this into
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 133 of 385
Case 2:19-cv-00324-RCY-LRL  Document 341  Filed 07/27/22  Page 26 of 29 PageID# 11368

26

WESTLY GREER, Cross Examination by Mr. Lascara

```
 1   evidence?
 2          MR. LASCARA:  Yes.  I am asking to move it into
 3   evidence.
 4          THE COURT:  Any objection, Mr. McFarland?
 5          MR. MCFARLAND:  No objection, Your Honor.
 6          THE COURT:  All right.  It will be entered.
 7          (Plaintiff's Exhibit 90 received in evidence.)
 8   BY MR. LASCARA:
 9   Q.  So, with regard to the specifics of the document,
10   Mr. Spires had emailed -- sent an email and wrote, "My
11   commission report shows I'm getting paid for less than the
12   kit sales and the paperwork I turned in.  My commission check
13   was $243.82 less because of the difference on the price I was
14   paid for.  See below.  Thank you."
15          And did you --
16          MR. MCFARLAND:  Your Honor, I don't object to the
17   exhibit to the extent it is an email from Mr. Greer.  This
18   is way beyond the scope of my direct examination.  I didn't
19   go into anything with Mr. Spires' commissions with this
20   witness.  It seems to me the time for this subject was with
21   Mr. Spires.
22          THE COURT:  All right.
23          Mr. Lascara.  Mr. Lascara.
24          MR. LASCARA:  Your Honor, I do think that it is
25   referring back to Mr. Spires' testimony that he was shorted,
```

WESTLY GREER, Redirect Examination by Mr. McFarland

```
 1   and what I'm trying to get into --
 2          THE COURT:  It does refer back to that, but his
 3   specific objection is that it's beyond the scope of the
 4   direct of this witness.
 5          MR. LASCARA:  I don't recall him testifying about
 6   this specific issue, but I do recall there was some
 7   testimony regarding markup by DLA, and that's what I'm
 8   trying to address.
 9          THE COURT:  All right.  Well, I think the objection
10   is proper, and so I'm going to sustain it.
11          MR. LASCARA:  All right.  Thank you, Your Honor.
12          Your Honor, I think those are all of the questions
13   I have.
14          THE COURT:  All right.
15          Mr. McFarland, do you have any redirect?
16          MR. MCFARLAND:  Very briefly, Your Honor.
17          THE COURT:  All right.
18                      REDIRECT EXAMINATION
19   BY MR. MCFARLAND:
20   Q.  Westly, what branch of the military did you and your
21   sales agents sell to?
22   A.  We sold to the Army.
23   Q.  And with respect to the Army, I take it, it was mostly at
24   Army bases?
25   A.  Yes.
```

USCA4 Appeal: 22-2090     Doc: 20-4     Filed: 01/19/2023     Pg: 135 of 385

WESTLY GREER, Redirect Examination by Mr. McFarland

```
 1   Q.  Was it even exclusively at Army bases?

 2   A.  Yes.

 3   Q.  And was there a focus on motor pools?

 4   A.  Yes.  It was mainly motor pools.

 5   Q.  And do most Army motor pools have the ability to make

 6   purchases with a credit card?

 7   A.  It would be very rare, sir.

 8   Q.  You were asked some questions about FedMall.  Was FedMall

 9   a method of sale that GMS wanted you to use with the Army

10   bases?

11   A.  It was never really pushed.  It was more of the GCSS,

12   just the standard, non-standard ordering through GCSS.

13   Q.  And if we could have Plaintiff's Exhibit 87.

14         By the way, Westly, when I asked you about FedMall --

15   A.  That's the one that's not in here.

16   Q.  Okay.  Well, I think it's going to go up on the screen

17   for you in a minute.

18         But was FedMall an option that was used much, if at

19   all, with the motor pools?

20   A.  Oh, no.  No.

21   Q.  This email, Plaintiff's 87, do I follow that what you're

22   asking --

23         Mike Welton, by the way, is an independent sales

24   agent who reported to you, correct?

25   A.  Correct.
```

JILL H. TRAIL, Official Court Reporter

**JA1197**

WESTLY GREER, Redirect Examination by Mr. McFarland

1  Q.  Okay.  And you're asking him what options the customer or
2  his customer might have for payment?
3  A.  Correct.
4  Q.  Because you don't know what the customer's contract is in
5  terms of purchase options, correct?
6  A.  Correct.
7          MR. MCFARLAND:  Okay.  Thank you.  That's all I
8  have.
9          THE COURT:  Thank you.
10         All right, Mr. Greer, you may return to your seat.
11 Thank you very much.
12         THE WITNESS:  Thank you, Your Honor.
13         (End of excerpt.)
14
15                       CERTIFICATION
16
17    I certify that the foregoing is a correct transcript
18 from the record of proceedings in the above-entitled matter.
19
20
21      _____/s/_____
22                  Jill H. Trail
23                  July 27, 2022
24
25

JILL H. TRAIL, Official Court Reporter

**JA1198**

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 137 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 1 of 45 PageID# 11372

1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                      )
 5   GMS INDUSTRIAL SUPPLY, INC.,     )
                                      )
 6          Plaintiff,                )   CIVIL ACTION NO.
                                      )   2:19cv324
 7   v.                               )
                                      )
 8   G&S SUPPLY, LLC, et al,          )
                                      )
 9          Defendants.               )
                                      )
10                                    )
     - - - - - - - - - - - - - - - - - -
11

12

13                TRANSCRIPT OF PROCEEDINGS
              (Excerpt Testimony of Sabrina Greer)
14                    Norfolk, Virginia

                      June 7, 2022
15

16

17   BEFORE:  THE HONORABLE RODERICK C. YOUNG
              United States District Judge, and jury
18

19

20   APPEARANCES:

              PENDER & COWARD
21            By:  William A. Lascara
                   Jeffrey Dennis Wilson
22                 Jesse Brian Gordon
                   Thomas Saunders Berkley
23                 Daniel T. Berger
                   Counsel for Plaintiff
24

25
```

JILL H. TRAIL, Official Court Reporter

**JA1199**

USCA4 Appeal: 22-2090   Doc: 20-4   Filed: 01/19/2023   Pg: 138 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 2 of 45 PageID# 11373

2

```
 1              MCGUIREWOODS LLP
                By:  Robert William McFarland
 2                   Micaylee Alexa Noreen
                     Jeanne E. Noonan
 3                   Counsel for Defendants

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2    PLAINTIFF'S
     WITNESSES                                            PAGE
3

4


5
     DEFENDANTS'
6    WITNESSES                                            PAGE

7     SABRINA STAR GREER
           Direct Examination By Mr. McFarland              4
8          Cross-Examination By Mr. Gordon                 26

9

10

11                     E X H I B I T S

12   PLAINTIFF'S
     NO.                                                  PAGE
13

14


15   DEFENDANTS'
     NO.                                                  PAGE
16
      23                                                   24
17

18

19

20

21

22

23

24

25

USCA4 Appeal: 22-2090   Doc: 20-4   Filed: 01/19/2023   Pg: 140 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 4 of 45 PageID# 11375

4

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
 1              (Excerpt of proceedings - testimony of Sabrina
 2    Greer.)
 3              MR. MCFARLAND:  Thank you, Your Honor.  Our next
 4    witness is Sabrina Greer, Your Honor.
 5              THE COURT:  All right.
 6              Ms. Greer, please come forward.
 7              (The witness was duly sworn.)
 8              THE COURT:  All right.  Go ahead, Mr. McFarland.
 9              MR. MCFARLAND:  Thank you, Your Honor.
10              SABRINA STAR GREER, called by the Defendants,
11    having been first duly sworn, was examined and testified as
12    follows:
13                        DIRECT EXAMINATION
14    BY MR. MCFARLAND:
15    Q.  Good morning, ma'am.  Would you state your full name,
16    please.
17    A.  Sabrina Star Greer.
18    Q.  And, Sabrina, where do you live?
19    A.  Wentzville, Missouri.
20    Q.  And with whom do you live?
21    A.  My husband, Westly Greer, and my son, Donovan Greer, and
22    my two dogs.
23    Q.  And can you tell us a little bit about your background?
24    Where did you go to high school, and what have you done since
25    graduating from high school?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 141 of 385

```
 1    A.  I went to high school at Fort Zumwalt West in O'Fallon,
 2    Missouri.  Fast-forward, I was pregnant with my son when I
 3    was 21.  Started my associate's degree; that's in business.
 4    Finished that.  Didn't really do anything for a little period
 5    of time, well, for school wise.  And then I started my
 6    nutrition therapy school for a few years in Colorado.
 7    Finished that last year.  And now I'm working on NASM
 8    certification for youth exercise.
 9              THE COURT:  How do you spell NASM?
10              THE WITNESS:  It's abbreviated.  It's N-A-S-M, but
11    it stands for the National Academy of Sports Medicine, I
12    believe.
13              THE COURT:  All right.
14              THE WITNESS:  So, that's for my education.
15    BY MR. MCFARLAND:
16    Q.  All right.  And in addition to being a full-time mother,
17    what else, if anything, do you do outside the home, or I
18    guess in today's pandemic it may be partially in the home,
19    but in other words for occupation wise?
20    A.  Currently I do a lot of DoorDashing because it's very --
21    you get to pick your hours.  And then I do have a little bit
22    of income from Twitch and Facebook gaming, because I play
23    Call of Duty.
24    Q.  Okay.  And how did you meet your husband?
25    A.  We met at Denny's when I was 16.  I believe he was 17,
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 142 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 6 of 45 PageID# 11377

6

SABRINA STAR GREER, Direct Examination By Mr. McFarland

1    yeah.  I was a cook.  He was a cook at a different one, but
2    got transferred to my Denny's, and that's how we met.
3    Q.  And have you been, I guess, dating and married since
4    then?
5    A.  Yes.
6    Q.  Okay.  Fast-forward, at some point we've heard a little
7    bit that you came to be an independent sales agent for GMS
8    Industrial Supply?
9    A.  Yes.
10   Q.  Okay.  How did that occur, Sabrina?
11   A.  I believe after my husband started in Oklahoma, when he
12   became a manager, we moved back to Missouri because that's
13   where our family is, and we have a baby, and trying to be
14   around family.  But then we got the opportunity to move to
15   Colorado, where we would be right next to a military base.
16   And since he traveled, it was like an opportunity for me to
17   be a sales rep there because we lived right there.
18   Q.  All right.  And I guess I probably should have maybe done
19   a little better in the time frame.
20        When you mention that you moved from Oklahoma, what
21   did you do, go back to Missouri, and then to --
22   A.  And then to Colorado.
23   Q.  And during that period, Westly had already started with
24   GMS Industrial, correct?
25   A.  Yes.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 143 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 7 of 45 PageID# 11378

7

SABRINA STAR GREER, Direct Examination By Mr. McFarland

1    Q.   Okay.

2    A.   He was a manager, like, traveling around.

3    Q.   All right.  But you were not at that time?

4    A.   No.

5    Q.   Okay.  So, did you become an independent sales agent with

6    the move to Colorado?

7    A.   Yes.  I do think sometime when I lived in Missouri, there

8    was -- we were trying, I think, for me to call people to set

9    up appointments for GMS.  I didn't get anywhere with that,

10   so, like, it wasn't -- it just didn't benefit, so yeah.  So

11   yeah.

12   Q.   So, for you, what was the process of actually becoming an

13   independent sales agent for GMS?

14   A.   I think I just walked around Fort Carson with my husband,

15   signed the document that said I was an agent.

16   Q.   The agreement?

17   A.   Yeah.

18   Q.   Okay.  Did you yourself -- prior to becoming an

19   independent sales agent for GMS, had you ever been an

20   independent sales agent for anyone else?

21   A.   No.

22   Q.   Had you ever had any experience selling industrial

23   products?

24   A.   No.

25   Q.   When you became an independent sales agent, did you

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 144 of 385

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
 1   receive any documents from GMS?
 2   A.  I don't think so.
 3   Q.  Well, your recollection.
 4   A.  Yeah.  Not that I remember.
 5   Q.  Okay.  Well, did you get anything, either by email or in
 6   the mail, that came in sort of a packet that said these are
 7   confidential, these are proprietary?
 8   A.  No.
 9   Q.  So, you become an independent sales agent.  And as I
10   gather, you go to -- this is Fort Carson?
11   A.  Yes.
12   Q.  Okay.
13   A.  In Colorado.
14   Q.  And you first go to the base with Westly?
15   A.  Uh-huh.
16         MR. GORDON:  Objection, leading.
17         MR. MCFARLAND:  I'll rephrase.
18         THE COURT:  Sustained.
19   BY MR. MCFARLAND:
20   Q.  What if any training did you receive, ma'am, in order to
21   be an independent sales agent for GMS?
22   A.  I guess you could say I just shadowed my husband, like
23   walked around with him on Fort Carson when he talked to
24   people.
25   Q.  And after that, anything further that you got in terms of
```

JILL H. TRAIL, Official Court Reporter

**JA1206**

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 145 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 9 of 45 PageID# 11380

9

SABRINA STAR GREER, Direct Examination By Mr. McFarland

1  training or how to do this?

2  A.  No.

3  Q.  And then did you yourself then start to go to Fort

4  Carson?

5  A.  Yes.

6  Q.  Well, let me ask you this.  When you and Westly -- when

7  you shadowed Westly at Fort Carson, were you given any kind

8  of a list of people to talk to, or these are the chief

9  warrant officers, or anything like that?

10  A.  I don't think so.  I don't have a memory of that, but I

11  do know there was one chief there that someone from GMS knew

12  from somewhere else.  His name was Chief Hoskins.  Somebody

13  in GMS knew him, so...  I think it was Jeff Johnson.  He was

14  a manager at GMS.  So, that was the only name that -- like,

15  they're friends, so...

16  Q.  So, how did you then, ma'am, figure out who you were

17  going to make calls to?

18  A.  You just walk in the building and ask who is in charge of

19  ordering supplies for the building, and then a soldier will

20  just take you to that person.

21  Q.  And so did you yourself then start to come to understand

22  who were the folks that were potential customers for GMS

23  Industrial?

24  A.  Yes.

25  Q.  And how did it go from there?

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 146 of 385

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
 1   A.  Like how do I?
 2   Q.  I guess let me see.  How do you make a sale?
 3   A.  For me personally, I make friends, and then, like --
 4   well, like, NSNs are very, very easy to order.  So, I just
 5   make friends with people, and if they need something, they'll
 6   just order it.
 7   Q.  Do you bring anything with you when you make a call on a
 8   potential Army purchaser?
 9   A.  Yes.
10   Q.  And what would you bring with you?
11   A.  An NSN catalog.
12   Q.  Of GMS?
13   A.  GMS, yeah.
14   Q.  Okay.  And did you have any success in selling GMS NSNs?
15   A.  Yes.
16   Q.  All right.  And I think you're an Independent Sales Agent
17   Agreement.  Best recollection when you signed that?
18   A.  Well, I moved to Colorado in 2015, so I think it was
19   right after that I started working on Fort Carson, so...
20   Q.  Okay.  Well, let me help you.
21        Do we have Sabrina's Independent Sales Agent
22   Agreement, please?
23        MR. MCFARLAND:  And I believe, Your Honor, this has
24   been admitted, so we ask that it be published.
25        THE COURT:  All right.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 147 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 11 of 45 PageID# 11382

11

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
 1          Any objection, Plaintiff?

 2          MR. GORDON:  We have no objection.

 3          THE COURT:  Okay.  I can't hear you when you're

 4   sitting down talking to me.

 5          MR. GORDON:  No objection, Your Honor.

 6          THE COURT:  Very good.

 7          THE CLERK:  What exhibit number was this?

 8          THE COURT:  What's the exhibit number,

 9   Mr. McFarland?

10          MR. MCFARLAND:  This would be Plaintiff's 8, Your

11   Honor.

12          THE COURT:  Okay.

13          MR. MCFARLAND:  And I thought it had been admitted.

14          THE COURT:  Do we have it admitted, Ms. Jones?

15          THE CLERK:  I'm trying to find it.  Yes.

16          THE COURT:  Yes.

17          MR. MCFARLAND:  Okay.

18          THE COURT:  Yes.  Go ahead.

19          MR. MCFARLAND:  Thank you.

20          THE COURT:  You may publish.

21          MR. MCFARLAND:  Thank you, Your Honor.

22   BY MR. MCFARLAND:

23   Q.  Ma'am, do you recognize this document, ma'am?

24   A.  Yes.

25   Q.  This would be your Independent Sales Agent Agreement with
```

SABRINA STAR GREER, Direct Examination By Mr. McFarland

1   a date of January 10th, 2017?

2   A.  Yes.

3   Q.  Okay.  Fair to say it's about this time that you start

4   selling for GMS Industrial?

5   A.  I believe it was a little earlier, but I was in 2017.

6   Q.  Okay.

7   A.  Yes.

8   Q.  How much time would you devote as an independent sales

9   agent for GMS, GMS?

10  A.  It would vary week by week, but I tried to do at least

11  three days a week.

12  Q.  And I take it as a new -- well, your son was born when?

13  A.  2011.

14  Q.  So, he's, I guess, kindergarten age --

15  A.  Yes.

16  Q.  -- at this point in time?

17  A.  Yes.

18  Q.  Okay.  So, as a mother, I take it the advantage of being

19  able to pick your own hours as an independent sales agent is

20  quite a bonus or benefit for you?

21  A.  Yes.

22  Q.  All right.

23  A.  I go to all of the field trips.

24  Q.  Did you sell at any other bases other than Fort Carson?

25  A.  No.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 149 of 385

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
 1   Q.  And during your tenure as an independent sales agent for
 2   GMS Industrial, did you sell anything but NSNs?
 3   A.  I do not believe so.
 4           THE COURT:  Meaning?  So, I'm a little confused by
 5   that answer.
 6           Can you ask that question again?
 7           MR. MCFARLAND:  Sure.
 8   BY MR. MCFARLAND:
 9   Q.  During your tenure as an independent sales agent for GMS
10   Industrial, do you recall selling anything but NSNs?
11   A.  No.
12   Q.  Can you get information about potential purchasers of GMS
13   Industrial products at Fort Carson through public means?
14   A.  Like the unit information?  Yes.
15   Q.  And how can you get it, ma'am?
16   A.  For me, I would go to their Facebook page where their
17   directories are.  Like, every base I think has -- well, I
18   know Fort Carson for sure has a directory on their Facebook
19   page with the units and their phone numbers.
20   Q.  And I take it you didn't have to have a password or pass
21   code to access something on Facebook?
22   A.  No.
23   Q.  For the NSN sales that you made, ma'am, how were you
24   paid?
25   A.  Commissions.
```

JILL H. TRAIL, Official Court Reporter

**JA1211**

SABRINA STAR GREER, Direct Examination By Mr. McFarland

1   Q.  You didn't receive any salary or a set salary?

2   A.  No.

3   Q.  Or any type of benefits?

4   A.  No.

5   Q.  And how was Westly paid during the period when he was a

6   director of sales?

7   A.  He was salary.

8   Q.  Was he your supervisor, I guess?

9   A.  Yes.

10  Q.  Did you ever have any customers discuss with you wanting

11  to buy something other than the NSNs pre-approved contracts?

12  A.  Yes.

13  Q.  And how did you handle that?

14  A.  Chief Oyola was a close customer of mine.  He wanted an

15  item that was in an NSN kit, just the item, a case of it.  He

16  tried to order it, but it never went through.

17  Q.  And when you say he tried to order it, did you try and

18  satisfy his need through GMS?

19  A.  Yes.  That was a GMS product.

20  Q.  But it didn't work out?

21  A.  No.

22  Q.  How did you come to learn about G&S Supply?

23  A.  I don't remember how I learned about G&S Supply,

24  honestly.

25  Q.  Well, did there come a time when it became a topic that

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 151 of 385
Case 2:19-cv-00324-RCY-LRL  Document 342  Filed 07/27/22  Page 15 of 45 PageID# 11386

15

SABRINA STAR GREER, Direct Examination By Mr. McFarland

1   you learned about in the Greer household?

2   A.  It had to have been conversations, like, me

3   eavesdropping, but I don't really recall learning about it or

4   talking about it really.

5   Q.  Well, is it fair to say then that Mr. Greer didn't come

6   to you and discuss the formation initially of G&S Supply with

7   you?

8           MR. GORDON:  Objection, leading.

9           THE COURT:  Sustained.

10  BY MR. MCFARLAND:

11  Q.  Do you recall any discussions with your husband about

12  forming G&S Supply?

13  A.  No.

14  Q.  In the Greer household, is there any kind of division

15  between business and financial and majority of childcare and

16  family things?

17  A.  Yes.

18  Q.  And how does that division in the Greer household break

19  down?

20  A.  Um, he's more of the businessy numbers person, and I'm

21  more the family person.

22  Q.  Who pays the bills in the Greer household?

23  A.  He does.

24  Q.  Well, at some time, ma'am, you do come to learn about G&S

25  Supply?

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
 1   A.  Yes.
 2   Q.  And did you become a sales agent for G&S Supply?
 3   A.  No.
 4   Q.  Did you ever offer any of your customers at Fort Carson
 5   G&S products or the opportunity to purchase G&S products?
 6   A.  There is two customers that I have memory of having some
 7   sort of G&S, like, ordering.  I don't know how it was
 8   initiated, like, how it started really.
 9   Q.  Well, what did you do when these two instances came up?
10   A.  I believe my husband was with me.  I have a hard time
11   remembering because I'm usually talking about things with the
12   soldiers unrelated to ordering.  I do have memory of Chief
13   Oyola ordering shelving, and me looking on the GMS catalog
14   from their website to see if it was in there, and it was not.
15   Q.  So Chief Oyola wants some shelving not available through
16   GMS?
17   A.  Correct.
18   Q.  How does it go from there?
19   A.  I believe I pawn it off on my husband to handle.
20           MR. GORDON:  Objection, foundation.  She believes.
21           THE COURT:  Excuse me?
22           MR. GORDON:  Objection, foundation.  She believes.
23           THE COURT:  All right.
24           MR. GORDON:  We're getting into a lot of I don't
25   knows and she believes.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 153 of 385

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
 1              THE COURT:  Mr. McFarland.
 2              MR. MCFARLAND:  She's giving the best recollection
 3    she can about something that happened years ago.  If she
 4    says she believes, I think that is a very honest, candid
 5    answer.  I mean --
 6              THE COURT:  Does she know?
 7              So, the objection is sustained, and you can
 8    rephrase.
 9              MR. MCFARLAND:  Thank you.
10    BY MR. MCFARLAND:
11    Q.  What's your best recollection, ma'am, of when Chief Oyola
12    wanted some shelving, from what you did?  What did you do?
13    A.  I don't recall what I did other than I know I looked at
14    the GMS catalog from the website, and I knew there wasn't a
15    shelf there.
16    Q.  Very well.
17              And I think you said there was another instance where
18    a non-NSN item came up through one of your customers?
19    A.  Yes.
20    Q.  Do you recall what that was?
21    A.  The item?  Socks and maybe something else, a couple of
22    other items.  I don't remember exactly what they were.
23    Q.  Do you remember who it came up through?
24    A.  Yes.  Brandon, Chief Conant.
25    Q.  And what did you do with the chief's request for socks or
```

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
1    whatever it was?

2    A.  I believe my husband assisted him.

3    Q.  Well, let me ask this, ma'am.  When you would go to visit

4    your customers at Fort Carson --

5    A.  Yes.

6    Q.  -- did you ever bring any G&S materials with you?

7    A.  I started to after my termination with GMS.

8    Q.  Okay.  Well, I'm sorry --

9    A.  So, not before.

10   Q.  -- let's keep it all right.

11   A.  Okay.

12   Q.  I think everyone has agreed that the letters that came to

13   you for termination were April 3rd of 2019.

14        Prior to April 3rd of 2019, were you bringing your

15   customers at Fort Carson G&S catalogs?

16   A.  No.

17   Q.  You've been here for the trial, ma'am, and there was

18   testimony that somehow you earned commissions totalling about

19   $138,000 for G&S.  Is that accurate?

20   A.  G&S?  Oh, no.  No.

21   Q.  Did you yourself ever make any sales for G&S at Fort

22   Carson?

23   A.  No.

24   Q.  When you became an independent sales agent for GMS

25   Industrial, had you had any dealings with Mr. Gorken?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 155 of 385
Case 2:19-cv-00324-RCY-LRL  Document 342  Filed 07/27/22  Page 19 of 45 PageID# 11390

19

SABRINA STAR GREER, Direct Examination By Mr. McFarland

1    A.   Prior to GMS?  No.

2    Q.   Okay.  Had you had any dealings with Mrs. Gorken?

3    A.   No.

4    Q.   Did you have a close relationship with them outside of

5    GMS in some way?

6    A.   Uh, we didn't talk a lot, but together, like, on trips

7    and stuff, it felt that way.

8    Q.   And did there come a time when they learned of your and

9    Westly's engagement?

10   A.   Yes.

11   Q.   And was there a wedding ceremony held with

12   Mr. and Mrs. Gorken, and I believe his brother and the

13   brother's wife?

14   A.   Yes.

15   Q.   And where was that, ma'am?

16   A.   The Dominican Republic.

17   Q.   And why were y'all in the Dominican Republic?

18   A.   I'm not really sure of the reason for that.  I was the

19   wife of a manager.  So, that's -- I think that's why I was

20   there.

21   Q.   Okay.  It was GMS related though, I take it?

22   A.   Yes.

23   Q.   Okay.  In keeping with Westly's position at GMS?

24   A.   Yes.

25   Q.   Did you request that the Gorkens help you with the

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 156 of 385
Case 2:19-cv-00324-RCY-LRL    Document 342    Filed 07/27/22    Page 20 of 45 PageID# 11391

20

SABRINA STAR GREER, Direct Examination By Mr. McFarland

1    wedding ceremony?

2    A.   No.

3    Q.   Anyone else attend besides you, your husband,

4    Mr. and Mrs. Gorken, and his brother and his wife?

5    A.   No.

6    Q.   From your sales calls at Fort Carson, did any of your

7    customers ever indicate to you that they were confused about

8    GMS versus G&S Supply?

9    A.   No.

10   Q.   Did you ever hear anyone during your visits to Fort

11   Carson use the term "sister companies"?

12   A.   No.

13   Q.   And I take it that you are not doing at the present time

14   any sales for G&S's successor, WarTech Industries?

15   A.   Correct.

16   Q.   Did you ever use anything on the Google drive of GMS?

17   A.   I filled out my spreadsheets that we've all seen.

18   Q.   And why did you do that?

19   A.   So I could get paid.

20   Q.   Other than that, did you ever go to the Google drive for

21   anything?

22   A.   No.

23   Q.   Was there anything that GMS ever provided you that you

24   considered to be a trade secret or proprietary information?

25   A.   No.

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
1    Q.  Did GMS give you some specific confidential information
2    to help you make sales for it?
3    A.  No.
4    Q.  What did -- I mean, all of the witnesses here have kind
5    of different background on -- you know, of the defendants.
6            What did you use to make sales, Sabrina?
7    A.  I make friends.  I believe that that's how you get
8    long-term customers.  People buy from who they like.  So, I
9    talk about everything, and yeah.  Usually I bring donuts or
10   cookies and we talk for a long time, if they're not busy, and
11   we become friends.
12   Q.  And I'm -- this is in no way intended to be sexist, but I
13   take it you don't really know the intricacies of the products
14   that GMS Industrial was selling?
15   A.  Yeah.  I know about the bathroom stuff pretty good.
16   Q.  All right.
17   A.  But, like, RTV and all of that, I don't really know much,
18   too much.
19   Q.  Okay.  And I take it the same would be true for G&S
20   Supply's products?
21   A.  True.  Yes.
22   Q.  Now, ma'am, you indicated that you yourself didn't make
23   any sales for G&S, but you did make successful sales for GMS
24   Industrial, correct?
25   A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 158 of 385
Case 2:19-cv-00324-RCY-LRL  Document 342  Filed 07/27/22  Page 22 of 45 PageID# 11393

22

SABRINA STAR GREER, Direct Examination By Mr. McFarland

1  Q.  And are there still commissions that are owed to you for

2  sales that you made for GMS Industrial prior to your

3  termination on April 3rd, that you haven't been paid for?

4  A.  Yes.

5  Q.  And did you have the opportunity to confirm that those

6  were sales for which GMS Industrial was paid by the

7  government?

8  A.  Yes.

9  Q.  And did you have an opportunity to confirm how much

10  you're still owed?

11  A.  Yes.

12  Q.  And what is that amount, ma'am?

13  A.  $9,760.50.

14  Q.  Before being named as a defendant in this lawsuit, ma'am,

15  had you ever come to our fair state, the Commonwealth of

16  Virginia?

17  A.  No.

18  Q.  Did you ever come here to do any work for GMS Industrial?

19  A.  No.

20  Q.  Did you ever come here for any reason for G&S Supply?

21  A.  No.

22       MR. MCFARLAND:  One moment, if I may, Your Honor.

23       THE COURT:  Certainly.

24  BY MR. MCFARLAND:

25  Q.  Ma'am, after you were terminated by GMS Industrial, did

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 159 of 385
Case 2:19-cv-00324-RCY-LRL  Document 342  Filed 07/27/22  Page 23 of 45 PageID# 11394

23

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
 1   you receive an email from Gary Gorken?

 2   A.  Yes.

 3   Q.  And if we could have Defendants' 23.

 4          It should be on the screen before you, ma'am.  Do you

 5   see it?

 6   A.  Yes.

 7   Q.  Do you remember receiving this email on or about May 3rd

 8   of 2019?

 9   A.  Yes.

10   Q.  Okay.  And what is it, ma'am?

11   A.  It's a letter from Gary Gorken.

12   Q.  And how did you interpret this letter?

13          THE COURT:  Well, first, are you trying to move it

14   into evidence?

15          MR. MCFARLAND:  Yes.  I'm going to move it in, Your

16   Honor.  I was just laying a little foundation.

17          THE COURT:  Okay.

18          MR. MCFARLAND:  But if the Court is satisfied...

19   BY MR. MCFARLAND:

20   Q.  You received --

21          THE COURT:  Well, no.  No.  No.  Lay your

22   foundation.

23          MR. MCFARLAND:  Okay.

24          THE COURT:  And then we'll talk about this email,

25   if it comes in.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 160 of 385

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
 1    BY MR. MCFARLAND:
 2    Q.  Is this an email that you and Mr. Greer received from
 3    Gary Gorken?
 4    A.  Yes.
 5    Q.  Okay.  And you have read it?
 6    A.  Yes.
 7              MR. MCFARLAND:  Okay.  We would move it in, Your
 8    Honor, as a party admission.
 9              THE COURT:  Any objection?
10              MR. GORDON:  I guess I object to the relevance.  I
11    mean, what fact does it make more or less likely?
12              THE COURT:  Well, there is a --
13              Go ahead, Mr. McFarland.
14              MR. MCFARLAND:  Your Honor, it goes to the
15    motivation for this lawsuit as opposed to my clients
16    admitting anything for which they're legally responsible,
17    and it is a party admission.
18              THE COURT:  Well, there is a very low bar under,
19    you know, 401 and 402 for relevance.  So, as I scan it, I
20    believe it's relevant, and the objection is overruled.
21              You can go ahead.
22              MR. MCFARLAND:  Thank you.
23              We would ask that this be published, Your Honor.
24              (Defendants' Exhibit No. 23 received in evidence.)
25              THE COURT:  You may publish.
```

SABRINA STAR GREER, Direct Examination By Mr. McFarland

```
 1   BY MR. MCFARLAND:
 2   Q.  Had Mr. Gorken called you, ma'am, before May 3rd of 2019?
 3   A.  No.
 4   Q.  How did you interpret personally -- as the recipient,
 5   what did this email message mean to you?
 6   A.  I was very upset over it, and I just assumed he was,
 7   like, angry.
 8   Q.  If we could scroll down, please.
 9         Did you believe, ma'am, that you and your husband had
10   in any way stolen anything from GMS Industrial?
11   A.  No.
12   Q.  Did you watch your husband work hard for GMS Industrial?
13   A.  Yes.
14   Q.  Were there occasions when he had to leave the home and
15   miss out on activities with your son because of demands by
16   Mr. Gorken for GMS Industrial?
17   A.  Yes.
18   Q.  Can you just give us one example?
19   A.  Well, my son is in basketball since, like, kindergarten.
20   So, he's missed a lot of those games.  I'm pretty sure --
21   hold on.  I don't want to speculate.
22   Q.  Okay.
23   A.  I believe he was gone for a birthday as well.
24   Q.  Did you ever see your husband do anything but perform to
25   the utmost for GMS Industrial during the period from 20 -- I
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 162 of 385

```
 1   guess he was hired in 2011, to when he was terminated in
 2   2019?
 3   A.  No.  He was very dedicated.
 4   Q.  Even after he started G&S Supply in June of 2017, did you
 5   ever see him or hear anything by him in which he was giving
 6   less than 110 percent for GMS Industrial?
 7             MR. GORDON:  Objection, leading, compound.
 8             THE COURT:  Sustained.
 9             MR. MCFARLAND:  I'll rephrase, Your Honor.
10   BY MR. MCFARLAND:
11   Q.  From being with your husband, did you ever see him do
12   anything but be dedicated to GMS Industrial?
13             THE COURT:  Asked and answered.
14             MR. MCFARLAND:  That's all of the questions I have,
15   ma'am.  If you would answer any questions that counsel,
16   Mr. Gordon, may have for you.
17             THE WITNESS:  Okay.
18             THE COURT:  All right.  Any cross?
19             MR. GORDON:  Yes, Your Honor.
20                       CROSS-EXAMINATION
21   BY MR. GORDON:
22   Q.  Good afternoon, Ms. Greer.
23   A.  Good afternoon.
24   Q.  All right.  The first exhibit that you looked at with
25   Mr. McFarland, or maybe it wasn't the first exhibit, but you
```

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

 1    looked at your Sales Agent Agreement with Mr. McFarland.

 2         Do you remember that?

 3    A.  Yes.

 4    Q.  All right.  And that was dated in 2016?

 5    A.  I believe it was '17.

 6    Q.  '17?

 7    A.  Yeah.

 8    Q.  All right.  Can we bring it up?  It's 8, Plaintiff's 8.

 9         Okay.  Yes, 2017.  And you have testified that you

10    started to work for GMS Industrial prior to 2017, correct?

11    A.  Yes.

12    Q.  All right.  And you actually started in 2013?

13    A.  I don't think I was a sales agent in 2013.  I was a -- I

14    think they were, like, doing a trial to see if they could

15    make appointments with customers through the phone, and I was

16    testing that, and that did not work and go anywhere, so...

17    So, no, I didn't start being a sales agent until we moved to

18    Colorado in 2015.

19    Q.  And you first learned about GMS Industrial through your

20    husband, Westly Greer?

21    A.  Yes.

22    Q.  All right.  And you began selling products on behalf of

23    G&S Supply, Inc. shortly after its creation?

24    A.  No.

25    Q.  All right.  Do you recall in this matter that you

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 164 of 385
Case 2:19-cv-00324-RCY-LRL  Document 342  Filed 07/27/22  Page 28 of 45 PageID# 11399

28

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1   answered written questions that we call interrogatories?
 2   A.  Yes.
 3         MR. GORDON:  Ms. Jones, if you could switch to the
 4   document camera, and make sure that we have the witness and
 5   the parties only.
 6         MR. MCFARLAND:  Your Honor, before he undertakes
 7   any questions, is this an exhibit that the plaintiff has
 8   identified to us or?
 9         MR. GORDON:  It will be used for impeachment.
10         THE COURT:  I think he's using it for impeachment.
11         MR. MCFARLAND:  Okay.
12   BY MR. GORDON:
13   Q.  The heading there, it says "Defendant Sabrina Greer's
14   Objections and Responses to Plaintiff's First Set of
15   Interrogatories and Requests for Production."
16         Do you see that?
17   A.  Yes.
18   Q.  And if we flip here to number 1, it says "Sabrina Greer
19   and her counsel participated in the preparation of these
20   discovery responses."
21         Do you see that?
22   A.  Yes.
23   Q.  If we flip here to the final page here, is that your
24   signature?
25   A.  Yes.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 165 of 385

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1    Q.  Where it says, "Under penalty of perjury, the undersigned
 2    states that to the best of his information and belief the
 3    foregoing responses to the plaintiff's interrogatories are
 4    true and correct."
 5    A.  Yes.
 6    Q.  And interrogatory 16 says, "Identify, as defined above,
 7    when you first began selling products on behalf of G&S."
 8          And then there is -- it states -- the answer is
 9    "Sabrina Greer states that she began selling products on
10    behalf of" --
11          MR. MCFARLAND:  I'm sorry.  I can't see the answer.
12    We can't see.
13          THE COURT:  I can't see it.
14          MR. GORDON:  I apologize, Mr. McFarland.
15          All right.  There we go.
16    BY MR. GORDON:
17    Q.  So the answer, "Sabrina Greer states that she began
18    selling products on behalf of G&S Supply, Inc. shortly after
19    its creation."
20          Do you see that?
21    A.  Yes.
22    Q.  All right.  That was your sworn answer to your
23    interrogatory?
24    A.  It appears to be.
25    Q.  And is that statement correct?
```

USCA4 Appeal: 22-2090   Doc: 20-4      Filed: 01/19/2023   Pg: 166 of 385
Case 2:19-cv-00324-RCY-LRL  Document 342  Filed 07/27/22  Page 30 of 45 PageID# 11401

30

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

 1   A.   That is not correct.

 2   Q.   So, you gave a sworn statement in this case that's

 3   incorrect?

 4   A.   Yes.

 5   Q.   You had numerous sales at Fort Carson for GMS?

 6   A.   GMS?

 7   Q.   GMS Industrial?

 8   A.   Yes.

 9   Q.   All right.  And you had customers of yours on Fort Carson

10   place orders for products that you marketed of G&S Supply?

11   A.   I wouldn't say marketed.  I didn't go around presenting

12   G&S.

13   Q.   All right.  Ms. Greer, do you recall that I took your

14   deposition?

15   A.   Yes.

16   Q.   All right.  And if you could flip to page 116.

17   A.   Okay.

18   Q.   All right.  So on line 13 of 116, you were asked:  "Did

19   you have customers on Fort Carson place orders for products

20   that you marketed of G&S Supply?"

21        Do you see that?

22   A.   Yes.

23   Q.   And your answer there was "yes"?

24   A.   Uh-huh.  Yes.

25   Q.   So, you did in fact have customers on Fort Carson place

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 167 of 385
Case 2:19-cv-00324-RCY-LRL  Document 342  Filed 07/27/22  Page 31 of 45 PageID# 11402

31

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1   orders for products that you marketed for G&S Supply?
 2   A.  Was this in reference to a specific time?
 3   Q.  The question is as it reads.
 4   A.  Because I did start marketing --
 5           MR. GORDON:  Move to strike as nonresponsive.
 6           MR. MCFARLAND:  No.  Wait a minute, Your Honor.
 7   She gets to explain her answer.  Now, that's improper.
 8   Mr. Gordon --
 9           THE COURT:  Mr. McFarland, I've heard your
10   objection.
11           All right.  She can explain her answer.
12           THE WITNESS:  Okay.  I didn't market G&S until
13   after I was terminated by GMS.
14   BY MR. GORDON:
15   Q.  And what did you do to market G&S?
16   A.  I just had a catalog with me.
17   Q.  You just walked around and handed out catalogs?
18   A.  Showed the catalog, maybe left some with some, but...
19   Q.  Well, when you and Mr. Greer made joint sales trips to
20   Fort Carson selling GMS Industrial products, you also
21   marketed G&S materials.
22   A.  I did not market G&S Supply.
23   Q.  All right.  Mr. Greer was a part owner of G&S Supply?
24   A.  Yes.
25   Q.  All right.  Mr. Greer is your husband?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 168 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 32 of 45 PageID# 11403

32

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

1    A.  Yes.

2    Q.  All right.  And amounts paid to Mr. Greer by G&S Supply

3    were paid into the Greer Group bank account?

4    A.  Yes.

5    Q.  All right.  And you're a principal of the Greer Group?

6    A.  Yes.

7    Q.  All right.  And you had an interest in seeing G&S Supply

8    succeed?

9    A.  Yes.

10   Q.  All right.  You stood to benefit financially if G&S

11   succeeded?

12   A.  Yes.

13   Q.  And your understanding of why G&S Supply was formed is

14   because there were some customers outside of Fort Carson that

15   wanted something that they couldn't get from GMS, but they

16   wanted to order from somebody in this group?

17   A.  That was my guess at the time, yes.

18   Q.  All right.  All right.  And that answer is not based on

19   some bidding on electric motors?

20   A.  No.

21   Q.  All right.  Let's go back to the Independent Sales

22   Agreement, Plaintiff's 8.

23        All right.  And by letter A, it says here, "The

24   company is a supplier of certain industrial products, the

25   products."

USCA4 Appeal: 22-2090     Doc: 20-4     Filed: 01/19/2023     Pg: 169 of 385

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1          Do you see that in all caps -- well, not all caps,
 2    but the first letter is capped?
 3    A.  Yes.
 4    Q.  All right.  And your understanding of the word "products"
 5    is that it could mean anything that a customer wants?
 6    A.  Products in that statement, that would be referring to
 7    GMS' products.
 8    Q.  You would agree with me that you believe that it could
 9    mean anything that the customer wants?
10          THE COURT:  Asked and answered.  She answered your
11    question, Mr. Gordon.  So, ask your next question.
12    BY MR. GORDON:
13    Q.  All right.  The second sentence there, it says, "The
14    agent agrees to aggressively promote the sale of products in
15    the territory."
16          Do you see that?
17    A.  Yes.
18    Q.  And where it says "to aggressively promote the sale of
19    products," that means to you to sell GMS products, and
20    advertise them, and to use your best efforts?
21    A.  Yes.
22    Q.  And that language means not to sell competing products?
23    A.  I did not sell competing products.
24    Q.  A little different question.  Is your understanding of
25    the contract, that that language that we just reviewed means
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 170 of 385

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1   to not sell competing products?
 2   A.  To -- can you repeat the question?
 3   Q.  Sure.  Sure.
 4          So you signed this contract?
 5   A.  Yes.
 6   Q.  All right.  So you have an understanding of what the
 7   things mean in it?  You reviewed it before you signed it?
 8   A.  Yes.
 9   Q.  All right.  And there is a section that requires you to
10   aggressively promote GMS Industrial?
11   A.  Yes.
12   Q.  All right.  And that language "to aggressively promote,"
13   you understand that to mean not to sell competing products?
14          MR. MCFARLAND:  Well, Your Honor, the language says
15   what it says.
16          THE COURT:  He can ask her how she interprets it.
17   Overruled.
18          MR. MCFARLAND:  That's not what he's asking her.
19   He's asking her about words that aren't in the contract.
20          THE COURT:  He can ask her how she took that.  So,
21   overruled.
22          Go ahead and ask your question again, Mr. Gordon.
23          MR. GORDON:  Yes.
24   BY MR. GORDON:
25   Q.  So, the language requiring you to "aggressively promote,"
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 171 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 35 of 45 PageID# 11406

35

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1   did you understand that to mean not to sell competing
 2   products?
 3   A.  No.  To me the "aggressively promote" means to do
 4   whatever you can to get the sale.
 5   Q.  Okay.  If you could look in your transcript here.
 6   A.  Oh.
 7           THE COURT:  Is this the deposition transcript?
 8           MR. GORDON:  Yes, it is.
 9           THE COURT:  All right.
10           THE WITNESS:  What page?
11   BY MR. GORDON:
12   Q.  Sure.  Page 29.  We're going to start on 21, so the first
13   question, line 21:  "Does it mean not to sell competing
14   products?"
15        Your first answer was:  "I did not.  Those were not
16   competitive products, G&S."
17        Then there was a follow up, similar to what we've
18   just done here.  "I just said does that language mean not to
19   sell competing products?"
20        And your answer was:  "I mean, I could see that,
21   yes."
22        Did I --
23   A.  Yes.
24   Q.  Did I read that correctly?
25   A.  Yes.
```

JILL H. TRAIL, Official Court Reporter

**JA1233**

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 172 of 385
Case 2:19-cv-00324-RCY-LRL  Document 342  Filed 07/27/22  Page 36 of 45 PageID# 11407

36

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1    Q.  So this is how you testified under oath?
 2    A.  Yes.
 3    Q.  All right.  This was in the deposition?
 4    A.  Yes.
 5            MR. MCFARLAND:  I mean, she's testified, Your
 6    Honor, but this isn't impeachment.  At some point they're
 7    going to --
 8            THE COURT:  That is impeaching.  Overruled.
 9    BY MR. GORDON:
10    Q.  You did nothing to prepare for your sales calls on behalf
11    of GMS Industrial?
12    A.  No.
13    Q.  Could you go to page 57?
14            Again, this is in your deposition transcript.
15    A.  Okay.
16    Q.  All right.  And you were asked, if you're there with me,
17    on line 17:  "What did you do to prepare yourself for your
18    sales calls on behalf of GMS Industrial?"
19            The answer says:  "Nothing.  I would just show up at
20    buildings and show a catalog.  If they want something, they'd
21    say, and I want this one or not."
22            Was that your answer?
23    A.  Yes.
24    Q.  All right.  So, you did nothing to prepare for your sales
25    trips on behalf of GMS?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 173 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 37 of 45 PageID# 11408

37

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1   A.  No.
 2          THE COURT:  What was impeaching about that,
 3   Mr. Gordon?  Why were you referencing her transcript for
 4   that?
 5          MR. GORDON:  I asked her what she did to prepare
 6   for her sales trips, and she said that she took some actions
 7   to prepare.
 8          THE COURT:  Well, I read your question to say:  Did
 9   you do anything to prepare for your sales calls?  And she
10   said no.
11          MR. GORDON:  Your Honor, then I withdraw that.
12          THE COURT:  So, I'm striking that.
13          MR. GORDON:  Okay.
14   BY MR. GORDON:
15   Q.  All right.  You are asserting a counterclaim against GMS
16   Industrial?
17   A.  Yes.
18   Q.  All right.  And what was the exact amount of that?
19   A.  9,000 -- well, on there it said 10,000, because I didn't
20   have it.  It's, like, rounded on there.  But $9,760.50 would
21   be the exact number.
22   Q.  All right.  And have you or your counsel presented any
23   exhibits that identify the calculation of that number?
24   A.  I'm not sure.
25   Q.  All right.  Have you reviewed the exhibit list on behalf
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 174 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 38 of 45 PageID# 11409

38

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1   of you and the other defendants?
 2   A.  I don't think so.
 3   Q.  All right.  So how did you calculate the $9,760.50?
 4   A.  Yes.  So, my last orders with GMS were with Sergeant
 5   Volora, and he ordered three of each of the hardware kits and
 6   one of the bathroom refill kits, and I know that.  I have the
 7   information that you submit to get paid for that.
 8   Q.  And did you do that calculation on a piece of paper?
 9   A.  Yes.
10   Q.  All right.  And have you brought it to court to explain
11   to the jury what you're owed?
12   A.  No.
13   Q.  And that calculation, did you provide it to GMS
14   Industrial in the box with other materials that you returned?
15   A.  Yes.
16   Q.  And that box, you returned that after termination?
17   A.  Yes.
18   Q.  All right.  And those unpaid commissions, you calculated
19   those after termination?
20   A.  I would have had it all written down, but I'm pretty sure
21   my husband submitted the actual paper with the information on
22   it.  I think he put that in the box.
23   Q.  Were you surprised when you were terminated from GMS
24   Industrial on April 3rd?
25   A.  No.
```

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

1  Q.  Did you use your GMS sales tracking sheet to calculate
2  the commissions that you claim are owed?
3  A.  Originally, before I lost access to it.
4  Q.  All right.  Prior to working for GMS Industrial, you did
5  not have any sales contacts at Fort Carson?
6  A.  I don't think so.
7  Q.  So, all of the contacts that you had on Fort Carson were
8  generated during the time when you were working for GMS
9  Industrial?
10 A.  Yes.
11 Q.  All right.  And you sourced materials for G&S Supply,
12 correct?
13 A.  No.
14 Q.  Well, you have an Amazon account, correct?
15 A.  I have an Amazon account?
16 Q.  Do you?
17 A.  Yes.
18 Q.  All right.  And was that account used to order products
19 on behalf of G&S Supply?
20 A.  I'm not sure.
21 Q.  Okay.
22      THE COURT:  I think the more proper question is:
23 Did you use your Amazon account to order products on behalf
24 of G&S Supply?
25      THE WITNESS:  No, I did not.

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 176 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 40 of 45 PageID# 11411

40

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1              THE COURT:  All right.  Next question.
 2    BY MR. GORDON:
 3    Q.  Did Mr. Greer use your Amazon account to order products
 4    for G&S Supply?
 5    A.  I'm not sure.
 6    Q.  In December of 2018, did you request that G&S Supply give
 7    you a quote for 18 fire extinguishers?
 8    A.  I do have a memory of fire extinguishers.
 9    Q.  Okay.
10    A.  I think I asked my husband if he knew how to get fire
11    extinguishers.
12    Q.  And that would have been in December of 2018?
13    A.  Possibly.
14    Q.  All right.  And you made that inquiry to your husband by
15    emailing his G&S Supply email address?
16    A.  Possibly.
17    Q.  All right.  And so December of 2018 is while you are
18    still employed by GMS Industrial?
19    A.  Yes.
20    Q.  All right.  And during that time frame you asked your
21    husband if G&S Supply could provide 18 fire extinguishers to
22    a customer?
23    A.  I'm not sure how it was worded.
24    Q.  All right.  Did you request that GMS Industrial provide
25    the 18 fire extinguishers?
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 177 of 385
Case 2:19-cv-00324-RCY-LRL  Document 342  Filed 07/27/22  Page 41 of 45 PageID# 11412

41

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1   A.  No.
 2   Q.  Instead, you went to your husband and asked if G&S Supply
 3   could provide the 18 fire extinguishers?
 4   A.  I asked him.  I don't know if I said G&S or not, I don't.
 5   Q.  Well, you testified that you weren't going to get it from
 6   GMS.  Where else was he going to procure the fire
 7   extinguishers?
 8   A.  Well, G&S for him, so yeah.
 9   Q.  You've not discussed your involvement with G&S Supply
10   with Gary Gorken?
11   A.  Did I discuss it with Gary Gorken?
12   Q.  Yes.
13   A.  No.
14   Q.  All right.  And you've not discussed it with Rachel
15   Gorken?
16   A.  No.
17   Q.  All right.  And other than perhaps your GMS Industrial
18   fellow defendants, you've not had a conversation with anyone
19   about your involvement with G&S Supply?
20   A.  No.
21   Q.  G&S Supply maintained a Google drive of their own?
22   A.  I'm not sure.
23   Q.  Did you do some office work for G&S Supply?
24   A.  No.
25   Q.  You never made phone calls on its behalf?
```

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1   A.   None that I can remember.
 2   Q.   Did Mr. Greer ask you if you could call and ask about
 3   companies that are competitors of ours getting awards?
 4   A.   I may have called somebody about asking about orders
 5   being canceled.  I don't remember who I called, though.
 6   Q.   And you were calling to check on the status of 283
 7   orders?
 8   A.   I don't remember.
 9   Q.   Did you make calls to find out why orders were going
10   through to State Chemical Solutions?
11           MR. MCFARLAND:  Your Honor, I will just note we are
12   way beyond the scope of my direct here.
13           THE COURT:  Mr. Gordon.
14           MR. GORDON:  She testified on direct that she
15   essentially did nothing for G&S, and now we're establishing
16   that she did take affirmative actions on their behalf.
17           THE COURT:  All right.  Overruled.
18           THE WITNESS:  Did you have a question that I didn't
19   answer?
20           THE COURT:  Just hold on a second.  He'll ask you,
21   give him a second.
22           THE WITNESS:  Okay.
23           THE COURT:  Just give him a second.
24   BY MR. GORDON:
25   Q.   The question was:  Did Mr. Greer ask you to make calls
```

JILL H. TRAIL, Official Court Reporter

**JA1240**

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1   about whether State Chemical Solutions was getting awards?
 2   A.  I'm not sure.  I don't remember.
 3   Q.  All right.  I believe you testified that you had no sales
 4   on behalf of G&S Supply; is that correct?
 5   A.  Correct.
 6   Q.  All right.  Well, in fact you did have one sale at Fort
 7   Carson, correct?
 8   A.  That was my sale?  No.
 9   Q.  So, whose sale would it have been?
10          THE COURT:  What sale are you talking about?
11          So, objection sustained to vagueness.
12   BY MR. GORDON:
13   Q.  All right.  The final document in your testimony was an
14   email from Mr. Gorken, 5/3/2019?
15   A.  Yes.
16   Q.  All right.  And I believe your testimony is that you felt
17   Mr. Gorken was angry when he sent that email?
18   A.  Yes.
19   Q.  All right.  Do you believe that Mr. Gorken was angry
20   because two of his trusted sales agents formed a company to
21   sell industrial products to the military?
22   A.  Um, I can't really --
23          MR. MCFARLAND:  I'm going to object to the extent
24   it calls for speculation unless a better foundation than
25   that is laid.  She can only say what's in the email.
```

USCA4 Appeal: 22-2090    Doc: 20-4    Filed: 01/19/2023    Pg: 180 of 385
Case 2:19-cv-00324-RCY-LRL   Document 342   Filed 07/27/22   Page 44 of 45 PageID# 11415

44

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

```
 1              THE COURT:  Mr. Gordon.  Mr. Gordon.

 2              MR. GORDON:  Yes.

 3              THE COURT:  Response.

 4              MR. GORDON:  Response?  Oh, it was her testimony.

 5    She said he was angry.  I can follow up on that.

 6              THE COURT:  She said she believed that at the time

 7    he was angry.  So, I think you can ask another question

 8    about that.  So, I'm going to take his objection under

 9    advisement.

10    BY MR. GORDON:

11    Q.  Did you believe that Mr. Gorken was angry because five of

12    his trusted sales agents marketed G&S products on GMS sales

13    calls?

14    A.  I don't know exactly why he was angry.

15    Q.  Do you believe that Mr. Gorken was angry because for

16    two years five sales agents kept the existence of G&S secret

17    from him?

18    A.  Possibly.

19    Q.  Do you believe that Mr. Gorken was angry because G&S

20    Supply stole sales from GMS Industrial?

21    A.  No.

22              MR. GORDON:  That's all of the questions I have.

23              THE COURT:  All right.

24              Any redirect?

25              MR. MCFARLAND:  No, Your Honor, no redirect of
```

JILL H. TRAIL, Official Court Reporter

SABRINA STAR GREER, Cross-Examination By Mr. Gordon

1   Sabrina Greer.

2           THE COURT:  All right.  Thank you very much.

3           All right, Ms. Greer, you may return to your seat.

4           THE WITNESS:  Thank you.

5           THE COURT:  Thank you.

6           THE WITNESS:  I just leave this?

7           THE COURT:  Leave it up there, yes, ma'am.

8           (End of excerpt.)

9

10                      CERTIFICATION

11

12      I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14

15

16          _____/s/_____

17                      Jill H. Trail

18                      July 27, 2022

19

20

21

22

23

24

25

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5   GMS INDUSTRIAL SUPPLY, INC.,       )
                                        )
 6          Plaintiff,                  )   CIVIL ACTION NO.
                                        )   2:19cv324
 7   v.                                 )
                                        )
 8   G&S SUPPLY, LLC, et al,            )
                                        )
 9          Defendants.                 )
     - - - - - - - - - - - - - - - - - -

10

11

12              TRANSCRIPT OF PROCEEDINGS
                    (MOTIONS EXCERPT)

13              Norfolk, Virginia

14              June 7, 2022

15

16   BEFORE:  THE HONORABLE RODERICK C. YOUNG
              United States District Judge

17

18
     APPEARANCES:
19
                 PENDER & COWARD, P.C.
20               By:  William Lascara
                      Thomas Berkley
21                    Jeffrey Wilson
                      Daniel Berger
22                    Jesse Gordon
                      Counsel for Plaintiff
23
                 MCGUIRE WOODS LLP
24               By:  Robert W. McFarland
                      Micaylee A. Noreen
25                    Jeanne Noonan
                      Counsel for Defendants
```

```
 1              (Excerpt of Proceedings)
 2          THE COURT:  All right.  We'll be in recess until
 3     3:15.  I'll come back and entertain arguments on any Rule 50
 4     motions.
 5              (Recess from 3:00 p.m. to 3:19 p.m.)
 6          THE COURT:  Okay.  How we'll do this is as follows.
 7     I will first hear any renewed motion by the defendant for a
 8     judgment of acquittal pursuant to Federal Rule of Civil
 9     Procedure 50.  Then I will listen, I will hear the plaintiff
10     rebut that.  Mr. McFarland will get the last word on that.
11              And then if the plaintiff has a Rule 50 motion to
12     the counterclaims, I will hear that.  I'll hear your motion.
13     Mr. McFarland will have the chance to rebut it, and then you
14     will get the last word.  So, that's how we will proceed.
15              So, Mr. McFarland, do you have a Rule 50 motion on
16     the remaining counts?
17          MR. MCFARLAND:  I do indeed, Your Honor.
18          THE COURT:  All right.
19          MR. MCFARLAND:  If I may approach?
20          THE COURT:  You may.
21              And just to make it simple on the remaining counts,
22     you don't have to rehash all of your arguments before, but
23     if there is anything new you have, I will listen to it.
24          MR. MCFARLAND:  Thank you very much, Your Honor.
25              And I want to make sure at the outset and state
```

1    what I most want to do is to the extent the Court has any

2    questions or concerns, I want to emphasize I'm here to

3    address those.

4           THE COURT:  Sure.

5           MR. MCFARLAND:  So, on Count One -- and I take it,

6    what I understand the Court to be saying is to go count by

7    count first for me, and we're not going to go back and forth

8    as we did on the original.

9           THE COURT:  That's fine.  You can just go --

10           MR. MCFARLAND:  Or I can do it however the Court --

11           THE COURT:  No.  No.  We can just deal with the

12    counts that we have, and everything you've got to say, say

13    it, but I'm more interested in stuff that was not raised at

14    the first Rule 50.

15           MR. MCFARLAND:  Very well, Your Honor.

16           So, we will renew our motion on Count One as to the

17    breach of duty of loyalty for Mr. Greer.

18           We will renew our motion for judgment as a matter

19    of law under Rule 50(a) also for Count Three, the breach of

20    the sales agent agreements.  And let me say there, Your

21    Honor, I do think there is something the Court can do here

22    to help clean up the case, if you will, and the instructions

23    and the verdict forms.

24           The Independent Sales Agent Agreements, even where

25    they list the entity that a sales agent may have set up for

payment purposes, they defined the agent, and so I don't think that there is any evidence nor any reason to keep County Roads in as a defendant in Count Three. Mr. Spires is the agent defined as that in the independent sales agent.

And I'm happy to address if the Court wants me to get into the breach of duty of loyalty again, but we addressed that pretty fully, and I'm recognizing given the Court's rulings where we are now at the conclusion of all of the evidence.

THE COURT: Sure.

MR. MCFARLAND: I understand the Court's position, so...

THE COURT: Certainly.

MR. MCFARLAND: But I do think, Your Honor, County Roads and Greer Group should come out, because what this claim is, is it's a breach of the independent sales agents' alleged duty of loyalty in the sense of the duty to aggressively promote sales for GMS. It's not a County Roads duty. It's not a Greer Group duty. It's the agent's duty. And I think, frankly, it can eliminate potential confusion by the jury as to why they're still in for that instruction and that part of the verdict form.

Let me turn, Your Honor, next to Count Four, the Federal Trade Secrets Misappropriations Act. I continue to struggle, and I think perhaps to say it more importantly in

```
 1    terms of where we are on an evidentiary basis, what the
 2    trade secrets are that the plaintiff claims.  What we've
 3    heard is that to get access to certain documents, you've got
 4    to have a password.  That doesn't establish that what you're
 5    getting to is a trade secret.  That's the real key.
 6            And so far, listening to all of the evidence that
 7    is in the case, not just from the plaintiff, but from my
 8    clients and from the rebuttal, I don't think it's been
 9    established what are trade secrets in this case.
10            And with respect to -- I think what I kind of
11    understand the plaintiff to be claiming is maybe these
12    spreadsheets that are created with customer data, the
13    problem with that, Your Honor, is -- if the Court will
14    indulge me for just a second -- our Fourth Circuit has
15    indicated that if it's customer data that is publicly
16    available it's not a trade secret.  And this is, what is
17    available is the names and contact information for people on
18    the base.  And as Mrs. Greer, Sabrina Greer, testified, she
19    got that by going to Facebook.  There is no indication that
20    anything about the customers, i.e., the people on the base,
21    is protected information.
22            And so if I understand what the plaintiff is saying
23    is, oh, the spreadsheet that we create that has got the
24    customer information and the points of contact is somehow
25    secret or confidential, it's not.  It's publicly available.
```

6

1          And here is the other critical thing.  The sales
2   are also publicly available, whether it's a DIBBS Board sale
3   or an NSN, that information, everyone has admitted that
4   information is publicly available.
5          So, I don't think, Your Honor -- and the Court can
6   find when we look at some of the exhibits that have been
7   presented how to sell, that's not a trade secret.  The Court
8   can look at those documents and see no rational finder of
9   fact could look at those memos and say -- for example, they
10  say, show up, be on time, be courteous, dress appropriately.
11  That's not a trade secret.  You could substitute out GMS and
12  Industrial Sales and do it for a seller of dental hygiene
13  products, a seller of shoes.  It's the same thing.
14         So, I've got a -- I think, Your Honor, on the
15  federal misappropriation claim, there is a real problem
16  with:  What is the trade secret here?  Moreover, there is an
17  even equally large problem:  What is the misappropriation?
18         At the best for the plaintiff that I can figure,
19  it's Mr. Greer deleting information.  For purposes of this
20  argument only, if that's what their theory is, okay, that's
21  Mr. Greer deleting information.  There is zero evidence that
22  any of the other defendants, be it Mr. Welton, Sabrina
23  Greer, Greg Spires, or Thomas Hayes misappropriated trade
24  secrets.  And I think they have to be dismissed as a matter
25  of law, Your Honor, as to this count.

7

```
 1           Then we get to Count Five, the Virginia Trade
 2    Secrets Misappropriation Act.  And I know the Court has
 3    heard it, but let me say, I think now, the Court having
 4    heard all of the evidence, definitely there is no indication
 5    of a misappropriation occurring inside the Commonwealth of
 6    Virginia.
 7           So, we're now down to how does this statute apply
 8    to my clients for actions committed outside the Commonwealth
 9    of Virginia?  Now, the only basis it could be -- this is a
10    tort claim, so we're lex loci, the place of the wrong.  And,
11    again, I renew that none of my clients there is evidence of
12    misappropriation, but there certainly is no evidence of
13    misappropriation in Virginia, and if they -- just following
14    the allegations, if you will, you still have to apply the
15    doctrine of lex loci.  And our case law says, "When" -- and
16    I'm quoting now, Your Honor, from Milton versus IIT
17    Research, 138 F.3d F19, Fourth Circuit, 1998.  "Virginia's
18    choice of law rule selects the law of the state which the
19    wrongful act took place at."
20           So -- and, again, in no way am I saying that they
21    did any misappropriation, but for Spires it would be
22    Oklahoma, for Hayes it would be Louisiana, and for Sabrina
23    Greer and Westly Greer it would be Colorado, and for Welton
24    it would be Texas.
25           That case goes on to say --
```

1              THE COURT:  Read that first line again, please.

2              MR. MCFARLAND:  Sure.

3              THE COURT:  Virginia choice of law.

4              MR. MCFARLAND:  "Virginia's choice of law rule

5    selects the law of the state in which the wrongful act took

6    place."  And that is 138 F.3rd at 522.  It goes on to say at

7    that same page, "When Virginia residents are victims of out

8    of state torts," which is what's alleged here, "the Virginia

9    courts routinely apply the law of other states, even though

10   the physical pain or economic impact caused by the tort

11   injury may be experienced by the Virginia plaintiffs within

12   the boundaries of the Commonwealth."

13             In other words, given that GMS is incorporated in

14   Virginia, putting aside that they're mostly in San Diego,

15   California, and that they want to use California law as the

16   basis for making their people become employees, but

17   accepting that they are a Virginia registered corporation,

18   what *Milton* and its progeny teaches, and it's based on *the*

19   *McMillan versus McMillan* Virginia Supreme Court decision in

20   219 Virginia 1127, from 1979, is lex loci, you go to the

21   place of the wrong, and that isn't Virginia, Your Honor.

22             And what plaintiff is going to argue is that

23   somehow these independent sales agents' agreements are broad

24   enough to encompass tort claims, and they're not.

25             They have relied on *Hitachi*, which we discussed a

JILL H. TRAIL, Official Court Reporter

**JA1251**

```
 1    little bit before, which I believe is a Fourth Circuit
 2    decision.  But in Hitachi, it was based on the language in
 3    the agreement being broad enough to encompass more than just
 4    alleged breaches of the agreement, and it was a fraudulent
 5    inducement claim.  In other words, you were fraudulently
 6    induced to enter into that agreement and so Virginia law
 7    should apply.
 8              This Court has already dismissed the fraudulent
 9    inducement claim.  And the language that governs here as to
10    choice of law is applying to this agreement only, Your
11    Honor.
12              So, I would submit to the Court, and I won't repeat
13    it, this aspect of my argument, because it applies to Count
14    Five and also Counts Eight -- let me make sure I'm saying
15    them correctly, yeah -- Count Eight, the Virginia Computer
16    Crimes Act, in which Mr. Greer is the only remaining
17    defendant, and there is no evidence he did anything in the
18    Commonwealth.  Count Ten, the Business Conspiracy Act, and
19    Count Eleven, the Common Law Conspiracy Act, both of those
20    are Virginia causes of action, so that same principle
21    applies.
22              Let me turn next then, Your Honor, to the Business
23    Conspiracy Act.  In addition to the problem plaintiff has,
24    and I don't think they can overcome it --
25              THE COURT:  What count is that?
```

```
 1              MR. MCFARLAND:  That is Count Ten, Your Honor.
 2              THE COURT:  All right.
 3              MR. MCFARLAND:  Business conspiracy.  I don't think
 4    they can overcome the fact that it didn't occur in Virginia,
 5    and so the statute does not apply here.
 6              But in addition there is this problem.  Under the
 7    definition of business conspiracy, you've got to have a
 8    combination of two or more persons for the purpose of
 9    willfully and maliciously injuring plaintiff in his business
10    and resulting damage to the plaintiff.
11              I'm going to, for purposes only of this argument,
12    let's assume that Mr. Greer's deletion of materials from his
13    computer is an act, a tortious act.  What you don't have is:
14    Who is the second person?
15              Now, in the formation of G&S Supply, admittedly
16    it's Greer and Spires, but the fact that they formed a
17    company -- and even if you accept that they, for purposes of
18    this argument that they formed a company to compete, that is
19    not for the purpose of willfully and maliciously injuring
20    the plaintiff.  You've got to show that two or more people
21    conspired for the purpose of willfully and maliciously
22    injuring the plaintiff.  You don't have that.
23              Now, whether or not Spires and Greer combining
24    together to form G&S Supply is a breach of their respective
25    -- for Greer it would be his employment agreement, for
```

```
 1    Spires it would be the failure to promote under his
 2    Independent Sales Agent Agreement, whether those are
 3    breaches of contract, for purposes, I agree, is a matter for
 4    this jury to decide at this point in time based on the
 5    Court's prior rulings.
 6              THE COURT:  Okay.
 7              MR. MCFARLAND:  But what it isn't, as a matter of
 8    law, is a business conspiracy.  There is no evidence that
 9    the two of them conspired with the purpose of maliciously
10    and willfully injuring the plaintiff.  And what there also
11    isn't is any damage shown from their actions.
12              We've got an unjust enrichment claim.  I get that.
13    That's what the young lady who came in and testified to,
14    Ms. Van Tassel, took the tax return, deducted the cost of
15    the sales from the sales for G&S and came up with a number,
16    so be it.  But that's not resulting from a business
17    conspiracy.  That's resulting from G&S simply making sales
18    and being in business.  And there is no direct evidence of
19    an actual compensatory damage that flows from or is
20    proximately caused by the injury.
21              And the same holds true, Your Honor, for the common
22    law conspiracy claim.  We don't have the combination
23    element, which is required, of two or more persons
24    conspiring to participate in an unlawful act or a lawful act
25    in an unlawful manner.  And, again, we don't have the
```

1  damages.

2        And I would also say in the common law conspiracy

3  and the business conspiracy, there certainly is no evidence

4  that the entities did anything.  They're just the who

5  receives the funds.  I mean, when you get into a conspiracy,

6  you got to have the actors doing something.  County Roads

7  sure didn't do anything.  Greer Group sure didn't do

8  anything.  And I think it's confusing to the jurors to keep

9  them in for purposes of instructions and the verdict form.

10        Let me just check one thing, if I might, Your

11  Honor.  I just want to make sure I covered the counts.  I

12  think we did Count Eight, the business, the Virginia --

13        THE COURT:  Yes.  The same argument?

14        MR. MCFARLAND:  Yes.

15        THE COURT:  The lex loci argument?

16        MR. MCFARLAND:  Exactly.

17        And then finally, Your Honor, and I think this is

18  additional to what we brought before.  With respect to Count

19  Twelve, the trademark infringement, what has not been

20  presented for trademark infringement is:  What is the

21  plaintiff's distinct mark, and how was there some confusion

22  about it?  Now, there is no evidence of certainly in the

23  beginning of registration, right?  So, they've admitted they

24  can't get damages.  But even to carry on at this point in

25  time for permanent injunctive relief, you've got to have

```
 1   established that there was some distinctive mark, something
 2   unique about GMS Industrial Supply, and that has not been
 3   done.  You've got catalogs with names on them, but that
 4   doesn't qualify just because there is two catalogs; one has
 5   GMS Industrial Supply and one has G&S Supply.  That doesn't
 6   establish a distinctive mark necessary for a trademark.
 7           And it's even more so with respect to the trade
 8   dress.  Plaintiff has presented no evidence of something
 9   unique about its trade dress.  In fact, I think it's fair to
10   say we're not sure at this point in time what the trade
11   dress is.  There is nothing unique.  When a product goes
12   out, there is nothing unique that's been presented about you
13   could tell it's a GMS Industrial product because of its
14   mark, or there is something unique on it.  The only way you
15   could tell it is because it has got GMS Industrial on it.
16   When you look at their catalog, the only thing you can tell
17   is it's got GMS Industrial on it.  It's not like, for
18   example, trade dress would be -- I was actually drinking a
19   Diet Coke earlier today in a can.  And in addition to the
20   fact that it's registered, the way they put Diet Coke on
21   that can is distinctive.  They have a logo, if you will, or
22   a marking that is distinctive that if someone came along and
23   put Diet Croke, and added an R in front of the O-K-E, but
24   used the same exact manner, that would be a trade dress
25   infringement.  We don't have that in this case, Your Honor.
```

```
 1          And to the extent the plaintiff is concerned that,
 2    well, I need a permanent injunctive relief so they don't go
 3    the day after this case is decided and go back and change
 4    their name, we've already stipulated we won't do that, and
 5    we would be in violation of a court order.
 6          We're at the point where I hear the Court.  The
 7    Court is concerned that we've got a somewhat unwieldy set of
 8    jury instructions and an unwieldy verdict form.  Let's
 9    simplify it and take out counts that aren't relevant or
10    needed anymore.  So, I would say that -- and plaintiffs
11    admitted all they're looking for is injunctive relief.  I'll
12    stipulate on the record right now, although it's already in
13    the order, my clients will never use again the term G&S
14    Supply.  Candidly, if they come to me and --
15          THE COURT:  And are you also stipulating on the
16    record that if the jury finds that G&S Supply is somehow
17    liable in something that WarTech is on the hook for those
18    damages?
19          MR. MCFARLAND:  It may be.  I would say that they
20    are the successor company.  I stipulate that they are the
21    successor company.
22          THE COURT:  And so what does that mean about
23    damages, if the jury were to decide?
24          MR. MCFARLAND:  I was going to do that one later,
25    but I'll address the Court's inquiry.
```

JILL H. TRAIL, Official Court Reporter

**JA1257**

```
 1              THE COURT:  Okay.  Right.
 2              MR. MCFARLAND:  Because I think that one is a
 3    little different.  If the jury were to decide and give a
 4    judgment --
 5              THE COURT:  Yes.
 6              MR. MCFARLAND:  -- a monetary judgment against G&S
 7    Supply, then I would fully expect the plaintiff to come to
 8    us and say, okay, WarTech you need to pay this.
 9              THE COURT:  Right.
10              MR. MCFARLAND:  And then what happens happens, and
11    if they don't pay it, then they take the appropriate legal
12    action.
13              THE COURT:  Right.
14              MR. MCFARLAND:  But you don't keep -- on this
15    point, Your Honor, which was going to be my last point, you
16    don't keep a party in a case.
17              THE COURT:  And you wouldn't have an objection to
18    that being in the judgment, would you?  That if G&S is found
19    liable for $3, that the jury has concluded that the
20    defendant G&S is liable for $3, and WarTech the successor
21    company in interest is the individual to satisfy that
22    judgment?
23              MR. MCFARLAND:  I would not -- I would like to talk
24    to my clients for just a second.
25              THE COURT:  Yeah.
```

```
 1              MR. MCFARLAND:  But I think I would agree to that,
 2    Your Honor.  What I don't think is that WarTech needs to
 3    keep remaining in this case as a party in this case where it
 4    is actually named in counts where there isn't, first off,
 5    the first allegation about them.  I mean, there is no
 6    allegation in here that WarTech committed a
 7    misappropriation, or WarTech violated the Virginia Computer
 8    Crimes Act, or that WarTech participated in a conspiracy.
 9    In fact, obviously it can't since it wasn't even formed
10    until October of 2019.
11              THE COURT:  Right.
12              MR. MCFARLAND:  And also in that same vein, not
13    only is there no allegations, there is no evidence.  And so
14    what concerns me is when the jury is being instructed on
15    counts, and WarTech keeps getting named, I think there is
16    all of the potential in the world for jury confusion.
17              And this jury, this jury could not return a verdict
18    for, for example, misappropriation of trade secrets against
19    WarTech.  I think the Court recognizes that.  There is zero
20    evidence.  I mean, they weren't even in existence, right?
21    Nor any of the other counts.
22              So, if the Court wants to clarify who WarTech is,
23    that WarTech, G&S Supply -- and there has been testimony to
24    this effect, and I think it's uncontradicted.
25              THE COURT:  And you all stipulated to it.
```

```
1              MR. MCFARLAND:  Right.
2              THE COURT:  And I think that as I review, and you
3    tell me if I'm wrong about this, but typically when I've had
4    a case with stipulations, I go ahead and introduce -- when I
5    was a trial lawyer, I would go ahead and introduce those
6    stipulations as an exhibit.  But as I reviewed your
7    stipulations, I believe that everything in your stipulations
8    has already come into evidence.  Do you disagree with that?
9              MR. MCFARLAND:  I don't, Your Honor.
10             THE COURT:  Including this issue about WarTech
11   being a successor company starting in 2019, in October of
12   2019 --
13             MR. MCFARLAND:  And I'm fine with that.
14             THE COURT:  -- as a successor company to G&S?
15             MR. MCFARLAND:  Yes.
16             THE COURT:  Okay.
17             MR. MCFARLAND:  And I'm fine with that, Your Honor.
18             THE COURT:  All right.
19             MR. MCFARLAND:  Yeah.  What I don't think, though,
20   is we need to keep including them in the jury instructions
21   and the verdict form in that regard, and so I was --
22             THE COURT:  Well, neither of you included them in
23   the verdict form, but I'm not there yet.  That's a
24   discussion for tomorrow.
25             MR. MCFARLAND:  Okay.
```

```
 1              THE COURT:  Go ahead.
 2              MR. MCFARLAND:  And so I think that they should
 3    come out, Your Honor, as a party in this case as a
 4    defendant.  If there is a verdict and they are the entity
 5    that is required to pay it, we understand that.
 6              THE COURT:  Okay.  All right.
 7              MR. MCFARLAND:  Anything I can help the Court with
 8    on our end?
 9              THE COURT:  No.  I'm good.  You addressed every one
10    of the remaining counts, so that's good.
11              Let me hear from Plaintiff.
12              MR. WILSON:  Good afternoon, Your Honor.
13              THE COURT:  Good afternoon.
14              So, Mr. Wilson --
15              MR. WILSON:  Yes, sir.
16              THE COURT:  -- the defendant says with respect to
17    Count Three that we don't need the Greer Group or County
18    Roads.
19              MR. WILSON:  Your Honor, I would point out from
20    each of these contracts that Greer Group and County Roads
21    are in the contracts themselves.  They are listed as parties
22    in the four corners of the document.  I don't see any
23    ambiguity here.  I think that they're parties in the
24    documents.  This is a breach of contract claim.  And as I
25    remember, I think you have to look at the contract.  And so
```

```
 1   if there is -- there is also issues of alter ego and things
 2   of that nature that we could get into, but they are parties
 3   to the contract in the four corners of the document.
 4           THE COURT:  Okay.  Anything else on that count?
 5           MR. WILSON:  No, Your Honor.
 6           THE COURT:  All right.
 7           MR. WILSON:  Oh, one other thing, Your Honor.
 8           THE COURT:  Yes.
 9           MR. WILSON:  I will point out that they did have
10   benefits from this, from the contract as well.  We had
11   testimony on the record that these groups were the groups
12   that got paid for their commissions, and so therefore they
13   had responsibilities.  They got benefits.  So, we paid these
14   groups, so I believe that's just a natural part of the
15   contract.
16           THE COURT:  All right.  Count Four, trade secrets.
17   He says there is no trade secrets in this case.
18           MR. WILSON:  Your Honor, I think let me address the
19   two trade secrets he discussed here.  The first is the
20   customer preference data.  Mr. McFarland addressed
21   specifically names.  I think his argument was that they were
22   publicly available and the sales were publicly available.
23           I would call your attention, Your Honor, to *Woven*
24   *Electronics Corp versus The Advance Group, Inc.*, and that's
25   -- excuse me, Your Honor -- that was 1991 U.S. App. Lexis
```

20

1    6004, and it is at page 7 I'm citing from to pinpoint on

2    this.  And that court stated that a trade secret can -- and

3    I'm paraphrasing --

4              THE COURT:  Yes.

5              MR. WILSON:  -- can exist in the unique combination

6    of otherwise known components; although each of its parts,

7    by itself, may be in the public domain, the unified process,

8    design and operation of the combination may be the essence

9    of the secret.

10             And, Your Honor, if you will look at the Trade

11   Secret Act, actually if you will look at both the Defend

12   Trade Secrets Act and the Virginia Trade Secrets Act, you

13   will see that what is protected, among the list of things

14   that are protected in the statute, are compilations.

15             And in this case the data -- we've had copious, if

16   you will, Your Honor, amounts of evidence submitted from

17   each of the defendants in here about how they went and they

18   put information in.  They had names.

19             We asked, I think it was Mr. Welton, could you

20   remember the names that you have on here if you didn't have

21   a list?  No, he couldn't remember the names.

22             We asked Mr. Naschansky, if you will recall, is

23   this information public?  And he told us, no, it's not.  I

24   had to go on the base.  I had to go talk to these people.

25             Certain information is public, Your Honor.  If you

1  go look on the orders that Mr. McFarland referenced, you
2  will see that we can see the shipping location of where an
3  order went, but that doesn't indicate who actually received
4  the order.  It certainly doesn't indicate their phone number
5  or their email address, and that's just the contact
6  information.
7          Your Honor, there was other information in these
8  data preference sheets that included specifically, I think
9  of importance here, as each of them testified, I think each
10 defendant and Mr. Naschansky testified, and I think some
11 other plaintiff witnesses, that the preferences were -- you
12 remember that one row at the end that said, you know, went
13 and saw him, he wants such and such, or he wasn't available.
14 We had plenty of testimony in this.
15         Mr. Naschansky said he looked at this to review
16 every time he went back.  This was important information
17 that had been compiled, and part of what made it a trade
18 secret is it took time and effort to compile this.  It took
19 money.  It took money that GMS had to pay its people to go
20 out and do this, to maintain this.  So, you know, we put a
21 lot of time and effort, obviously, into these huge documents
22 that were of value to the company.
23         To insinuate that even if they were, which they
24 aren't, obviously, all public information, that they would
25 not be a trade secret is not in line with the law on that,

```
1    and I say that applies both to the Defend Trade Secrets Act
2    and the Virginia Trade Secrets Act as well.
3              THE COURT:  All right.
4              MR. WILSON:  And as to the question of what is
5    misappropriation, again, Your Honor, we've had testimony for
6    both, I think it was Mr. Welton and Mr. Naschansky, that
7    this was information that they reviewed.  It's information
8    that they kept in the course of doing their business to do
9    their job, and so when they were out there visiting the
10   area -- we've had -- pardon me.  We've also had testimony
11   from all of the other defendants that they sold to the same
12   clients; that they came in with a GMS and a G&S catalog or
13   maybe one or maybe the other, but it was the same clients,
14   Your Honor, in motor pools and other places on these bases.
15   They used this contact information, this location
16   information, this customer preference information.  They
17   used it equally.
18             I mean, you can't say they used an email address
19   when they sent an email to a specific client and say they --
20   there has been no -- certainly their testimony can certainly
21   be inferred by the jury that they could take a GMS list and
22   they were using that email contact to send an email for G&S.
23   As a matter of fact, we have a bunch of information that
24   shows they were using their GMS emails.  There has been no
25   evidence that these emails themselves are publicly
```

1   available, for example.  I'm just using this as an example,

2   Your Honor.

3          So, I think the factual, considering the factual

4   bar that happens at this stage in the proceedings, there is

5   plenty of evidence that allows the jury to infer that every

6   time any one of these defendants made a sale that they were

7   using that data that they got out of the customer data

8   preference list that they kept and it was assisting them in

9   that sale.  And every time they made a sale for G&S they

10  were doing it, and every one of those sales was competitive

11  in violations of breach of contact, breach of duty of

12  loyalty, trademark, any of the rest of those.

13         So, I think we've got evidence, and I'm not going

14  to spend too much time with it.  The Court is very well

15  aware of the spoliation issues in this trial as well.  So,

16  we also have issues of adverse inference.  You know, I

17  get -- I understand it doesn't go as to all of the

18  individual or even corporate defendants in this matter, but

19  we've had a lot of evidence in here that Mr. Greer was the

20  sales director, that he was the trainer, that he was the

21  owner of the company, and that he was the guy that was in

22  charge.  I would -- you know, I think we could say ring

23  leader, although it never came up in the testimony, that

24  specific word.  He was there from the beginning.  I believe

25  these people were following him through this, and so it

1   would be logical that he would have the information.  In

2   fact, I think we also heard from Ms. Greer that he was the

3   keeper of the money and the numbers in their relationship.

4   So, if he had that information on his computer and we lost

5   it, we'll never know.  We'll never be able to determine what

6   the rest of these people were doing.

7           THE COURT:  All right.

8           The lex loci argument.

9           MR. WILSON:  The lex loci issue, Your Honor, if you

10  would like us to reargue this issue, certainly we will.

11          THE COURT:  That's okay, if you don't have anything

12  different than what you've already argued.

13          MR. WILSON:  I mean, we have done this a lot, I

14  would assume, but we're happy to give it, Your Honor.

15          THE COURT:  That's all right.

16          Business conspiracy.

17          MR. WILSON:  Two or more persons with an

18  intentional act.  And he says, Mr. McFarland argues that

19  they didn't conspire to willfully or maliciously injure the

20  business.  Well, the question is:  Have sufficient facts

21  been presented during these proceedings to allow the jury to

22  assume that they have taken -- that each and any of these

23  individuals have taken actions to conspire to willfully or

24  maliciously injure GMS?

25          And I would posit that, first of all, I don't think

1    anything has changed in between the previous motion to

2    strike and now, fact wise.  The Court ruled that we had

3    placed sufficient facts on the record at least to get over

4    this hump, I believe, after the plaintiff's case in chief.

5           But I will point out that we also have testimony of

6    certain defendants making -- attempting to, I would say,

7    cajole Mr. Naschansky into coming to work for them.  And in

8    that language that he presented, made it seem like they were

9    mad at Gary, or that Gary would somehow hurt him, Gary being

10   Mr. Gorken, the husband of the owner, and that they seem to

11   be taking the evidence -- it could be seen by the jury to be

12   taking malicious acts and to be taking their actions and

13   competing against the plaintiff maliciously.

14          And I will point out, Your Honor, citing to

15   *Commercial Business Systems v Bell South Services*, and this

16   is 249 Virginia 39, and I'm citing to page 47, Your Honor,

17   on that.  And that case stands for the proposition that in

18   order to establish a business conspiracy, the plaintiffs

19   don't need to prove that the conspirators' primary and

20   overriding purpose is to injure another in his trade or

21   business.  We don't have to say that's the whole reason, in

22   other words, or even the primary reason that they got

23   involved in doing this.  If this was a reason or if the jury

24   could infer from the facts presented by the witnesses in

25   this that there was a purpose to injure, then I believe,

1    Your Honor, we have met the bar for that standard.

2           Damages, Your Honor, I mean, there has been, again,

3    a lot of evidence, both expert witness testimony, lay

4    witness testimony about the damages that have accrued to GMS

5    by the actions taken by the defendants in this case.  I

6    mean, you go down through the unjust enrichment, the lost

7    profit analysis.  If the jury is able to infer that these

8    individuals joined together to conspire to maliciously

9    injure the plaintiff in this, they certainly can then have

10   plenty of evidence of damages which they can apply to this

11   count.

12          THE COURT:  Trademark infringement.

13          MR. WILSON:  Your Honor --

14          THE COURT:  Mr. McFarland says, what is the

15   distinctive mark?

16          MR. WILSON:  Well, the distinctive mark, Your

17   Honor, is --

18          Do we have a copy of the catalog?

19          We've seen the catalog out here.  We've seen this

20   is the logo mark, Your Honor, that sits here, and obviously

21   that's a different matter than a word mark, but we have a

22   word mark.  We made extensive argument on this at the TRO,

23   Your Honor, and we presented a case -- and I apologize to

24   Your Honor, I don't have the case here in front of me.  I

25   believe it had to do with Regent or Liberty.  I remember a

1  religious institution.  But there was a situation where a

2  company was identified by its three letter name, say IBM,

3  for example.

4          And in this case, GMS was very distinctively

5  identified by its logo and by the GMS phrasing as being a

6  unique provider of services, and it provided distinctiveness

7  to its products in the marketplace.  So, I would argue, Your

8  Honor, that GMS, it's a low bar I believe when it comes to

9  trademarks, and I think that we've established that GMS was

10  recognized in the community, because I think even all of the

11  defendants in here have expressed that everybody knew the

12  difference between GMS and G&S.  Well, if they knew the

13  difference between G&S and GMS, it stands to reason they

14  know what GMS is, and therefore we had a distinct

15  reputation, even according to the defendants' testimony on

16  this.  I am sure, again, that the jury can infer from those

17  facts and others presented that GMS was distinctive in the

18  marketplace.

19          THE COURT:  All right.

20          MR. WILSON:  And as to -- I think it was also

21  touched on that there was evidence of a question of

22  confusion.  Again, Your Honor, I don't want to rehash it too

23  much, but we've seen from Mr. Naschansky that he experienced

24  confusion in the marketplace from individuals at Fort Sill

25  at the very least.  I think there was another fort, but at

JILL H. TRAIL, Official Court Reporter

**JA1270**

```
1   least at Fort Sill.

2           THE COURT:  All right.

3           Trade dress.

4           MR. WILSON:  Again, Your Honor, we've got the logo.

5   It's on products.  They had their logo as well that went on

6   catalogs.  I just rely on the previous statements, Your

7   Honor, that was made in the previous hearing.  I don't think

8   there was any new facts that were added to the argument

9   here, and so I'm just going to stand on that argument.

10          THE COURT:  WarTech.

11          MR. WILSON:  Ah, WarTech.  Again, Your Honor, we've

12  had extensive discussion of this party, and we are

13  concerned, as Mr. Berkley I believe brought to your

14  attention during the last hearing, a hearing on the previous

15  motion to strike.  WarTech was brought in, and Judge Krask

16  brought them in as a way to ensure that we would get, you

17  know, the money out of them, if there were a judgment.

18          And I'm not bringing anything new to the table.

19  You had a discussion with Mr. McFarland about this.  We

20  believe, and we are willing to agree, absolutely, that if

21  the Court is willing to issue a judgment that states that

22  WarTech is responsible for any damages that accrue to G&S in

23  this case, and that the parties, as Mr. McFarland kind of

24  stipulated, if you will, or said he would stipulate, that

25  the defendants will never ever use G&S in any manner or logo
```

JILL H. TRAIL, Official Court Reporter

**JA1271**

```
 1    or anything close to it in the future for business purposes,
 2    I think we could agree to judgments on both of those things
 3    together.
 4            THE COURT:  All right.  Thank you very much.
 5            Mr. McFarland, I don't have to have it, but
 6    anything you want to add?  You don't have to.  I think I am
 7    well versed in these counts.
 8            MR. MCFARLAND:  I appreciate that, Your Honor.
 9            THE COURT:  But it's your right, and I will let
10    you.
11            MR. MCFARLAND:  Although my wife will sometimes say
12    I'm obtuse, I think even I can get that.
13            Let me just be very specific.  What we're here for
14    now on the trademark and trade dress claims are not damages.
15    It's the plaintiff saying, I want permanent injunctive
16    relief.  So, the issue of G&S is gone.  My clients have
17    changed their name.  They did it back in October of 2019.
18            I heard mention of the logos.  We never used the
19    logos, and there is no evidence that we used the logos.  If
20    that's the basis for maintaining those counts --
21            THE COURT:  So, if the Court were to enter an order
22    that says that the parties stipulate that WarTech is not
23    going to or any of these clients are not going to revert to
24    using the name G&S, and they're barred from it, and all of
25    that?
```

```
 1              MR. MCFARLAND:  We're good.
 2              THE COURT:  Okay.
 3              MR. MCFARLAND:  I mean, the Court has already
 4   entered that order.
 5              THE COURT:  Right.
 6              MR. MCFARLAND:  And we haven't violated that order
 7   in any fashion, and we're happy to adhere to that, Your
 8   Honor.
 9              THE COURT:  Because you are asking for injunctive
10   relief on Twelve and Thirteen, right?
11              MR. WILSON:  We are, Your Honor.
12              THE COURT:  And so if the Court can do that by
13   order, these could be gone, right?
14              MR. WILSON:  Yes, Your Honor.
15              THE COURT:  Okay.  Thank you.
16              Go ahead, Mr. McFarland.
17              MR. MCFARLAND:  Thank you, Your Honor.  I'm going
18   to go kind of in reverse order, if I may.
19              On the business conspiracy, Your Honor, what I
20   didn't hear addressed is:  Who is the second actor who
21   participated in the conspiracy?  We've heard about what
22   Mr. Greer did, the testimony of Mr. Naschansky that he was
23   cajoled to try and join or even that there was an implied --
24   he was vaguely threatened by Mr. Greer, that's Mr. Greer.
25   That's not two actors.
```

1          And I will note to the Court, we're at the stage
2    where a business conspiracy claim has to be proved by clear
3    and convincing evidence.  So now all of the evidence is
4    before that Court, and we don't have two actors.
5          Moreover, let me note this, Your Honor, again from
6    our Fourth Circuit.  "Although plaintiff need not prove
7    personal spite, the alleged conduct must at least be aimed
8    at damaging another's business."  That's from *Peterson*
9    *versus Cooley*, 142 F.3rd 181 at page 188, noting "Plaintiff
10   must show defendants acted with some desire to injure
11   plaintiff's business in order to show purpose to willfully
12   injure."  We just don't have that.  We don't have two actors
13   doing that, Your Honor, in addition to -- and I'm not going
14   to go near the lex loci.
15         And finally I'll note that when it comes to damages
16   under this count, you don't get unjust enrichment.  As a
17   matter of law, you can't get unjust enrichment for a
18   business conspiracy.  It's got to be a proximately caused
19   damage.  So, I think that count, Your Honor, should be
20   dismissed.
21         And then just on the corporate actors, I heard the
22   argument was, well, Greer Group and County Roads are parties
23   to the agreements; that's true.  But they're not the agents
24   under the agreements.  And we're at the stage where for a
25   defendant to remain in this case, you have to have evidence

```
 1    that it breached the agreement, not simply that it's a party
 2    to the agreement, that it breached the agreement.  And there
 3    is zero evidence that County Roads or Greer Group committed
 4    any breaches.  Whether or not Spires for County Roads or
 5    Westly Greer for Greer Group did, I recognize where we are
 6    in this case, that's separate, but let's clean the case up
 7    and remove parties where there is zero evidence of a breach,
 8    which is what's needed to keep them in.
 9              THE COURT:  All right.  Thank you.
10              All right.  So, let me ask the plaintiff this.  In
11    Twelve and Thirteen, which are your trademark infringement
12    and trade dress, it seems like we have talked around
13    basically a stipulation that we may be able to remove these
14    counts by, you know, the orders that have been issued in the
15    past and the Court entering an order in this case.
16              But let me ask you this.  In those counts in your
17    Third Amended Complaint did you ask for damages?  Did you
18    ask for some type of damages --
19              MR. WILSON:  Yes, Your Honor.
20              THE COURT:  -- in the complaint?  But you're not
21    asking for damages now?
22              MR. WILSON:  Correct, Your Honor.
23              THE COURT:  Okay.  All right.
24              MR. WILSON:  And as I understand it, we didn't make
25    a jury instruction for damages, so we can't get them at this
```

```
 1    point anyway.
 2              THE COURT:  You're right about that.  Okay.
 3              All right.  Okay.  So, with respect to the counts,
 4    the remaining counts, the motion for judgment of acquittal
 5    pursuant to Rule 50 is overruled, because I believe that on,
 6    you know, almost all of these, all of these really that a
 7    reasonable jury could have a legally sufficient evidentiary
 8    basis to find for the plaintiff.
 9              I am going to take under advisement Count Twelve,
10    the trademark infringement, Count Thirteen, and the WarTech
11    counts.  I'm going to take all of that under advisement as
12    the Court may be able to do something overnight to deal with
13    that.
14              All right.  Now, Plaintiff, do you have a motion
15    for judgment on the defendants' counterclaims?
16              MR. WILSON:  No, Your Honor.
17              THE COURT:  Okay.  All right.  Very good.  So, no
18    judgment, no argument on that.
19              All right.  So, we're going to adjourn for the day.
20    I'm going to work with these jury instructions.  If we get
21    them, if I get a readable set at some time that's not too
22    late, I'm going to email them to you all so that you can
23    look at them overnight, but if it's too late, I'll just give
24    them to you in the morning.
25              All right.  Plaintiff, anything else we need to
```

```
 1   discuss?
 2           MR. LASCARA:  No, Your Honor, unless there is
 3   something we can do with regard to the instructions to
 4   assist.
 5           MR. WILSON:  I have to say, Your Honor, too late is
 6   not an issue.
 7           THE COURT:  Okay.  All right.  Well, you might get
 8   them late then.
 9           All right, Mr. McFarland, anything else we need to
10   discuss?
11           MR. MCFARLAND:  No.  I was going to ask the Court,
12   Your Honor, if there was something that the Court felt
13   needed to be submitted in terms of an instruction or?
14           THE COURT:  I don't think so at this point.  If I
15   do, we'll discuss it tomorrow.
16           MR. MCFARLAND:  Okay.
17           THE COURT:  We'll discuss it tomorrow, okay.
18           And, look, I know everybody has been working hard,
19   so I don't mean to be too disparaging when I sometimes
20   launch like a missile, like I say you do, Mr. McFarland,
21   when you're jumping up out of your chair.  I don't mean to
22   launch like a missile sometimes on some of this, but anyway
23   it has been a challenge getting our arms around with so many
24   that you haven't agreed to.  So I'm going to --
25           Go ahead.
```

```
1              MR. WILSON:  Just briefly, Your Honor.  I don't
2     know if this is a matter of housekeeping as well.  I know
3     Your Honor has made a statement in his opinion with regards
4     to spoliation.  You've indicated that there is a may or a
5     must standard in there.  Has Your Honor made a decision, or
6     do you need anything from us to help determine?
7              THE COURT:  No.  I'm going to deal with that this
8     evening.
9              MR. WILSON:  Okay.
10             THE COURT:  All right.  Also, when I leave the
11    bench, I'll need the parties to remain to discuss with
12    Ms. Jones the evidence and to make sure that everything that
13    she has as an exhibit that was entered into evidence is
14    actually what's there.  So, you all will need to remain and
15    discuss that with her before you leave.  All right.
16             MR. MCFARLAND:  Your Honor, for purposes, I
17    understand the Court is going to give the instructions.  We
18    will do closings, plaintiff obviously going first -- it has
19    the burden of proof -- then myself, and then the plaintiff
20    has the right to rebuttal if they so desire.
21             THE COURT:  Yes.
22             MR. MCFARLAND:  The same attorney does both,
23    correct?
24             THE COURT:  Yes.
25             MR. MCFARLAND:  Okay.
```

```
 1          THE COURT:  Well, it doesn't matter to me.  It
 2  doesn't matter to me.  They can, for them, one of them can
 3  do their opening closing, and the other one can do their
 4  rebuttal.  That's fine with me.
 5          MR. MCFARLAND:  Can we ask at least beforehand if
 6  that's going to happen that we be advised of that?  It's a
 7  little different when you're on my side of the fence and you
 8  only get one crack.
 9          THE COURT:  I mean, I don't know that it has to be
10  a secret.
11          Do you know right now who is closing for you?
12          MR. WILSON:  We know who is closing.  I don't think
13  we have discussed who is doing the --
14          THE COURT:  Don't let me forget.  I'll ask in the
15  morning.
16          MR. MCFARLAND:  All right.  And in the closing, for
17  those exhibits that have been admitted, we can reference
18  them and publish them, correct?
19          THE COURT:  Yes.
20          MR. MCFARLAND:  Okay.
21          THE COURT:  Yes.  Yes.
22          MR. MCFARLAND:  Thank you.
23          THE COURT:  Okay.
24          All right, Miss Fadahunsi, anything else?
25          THE CLERK:  No.
```

```
1              THE COURT:  Let's close court.
2              (Proceedings adjourned at 4:08 p.m.)
3                         CERTIFICATION
4
5         I certify that the foregoing is a correct transcript
6    from the record of proceedings in the above-entitled matter.
7
8
9              _____/s/_____
10                       Jill H. Trail
11                     November 8, 2022
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

JILL H. TRAIL, Official Court Reporter

**JA1280**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| GMS INDUSTRIAL SUPPLY, INC.. | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 2:19-cv-324 (RCY) |
| | ) | |
| G&S SUPPLY, LLC, *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER**

This matter is before the Court on Defendants' Motion for Judgment as a Matter of Law pursuant to Rule 50 of the Federal Rules of Civil Procedure made orally before the Court during the jury trial on June 3, 2022. Defendant moved for judgment as a matter of law as to all pending claims following the conclusion of Plaintiff's case.[1]

Under Rule 50 of the Federal Rules of Civil Procedure, a court "may grant judgment as a matter of law only if, viewing the evidence in a light most favorable to the non-moving party and drawing every legitimate inference in that party's favor, . . . the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Huskey v. Ethicon, Inc.*, 848 F.3d 151, 156 (4th Cir. 2017) (quoting *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 147 (4th Cir. 2008)). "If, upon the conclusion of a party's case, 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue,' a court may grant a motion from the opposing party for judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 50(a)).

Upon consideration of the parties' oral arguments and for the reasons stated on the record, the Court rules as follows:

- Defendants' Motion as to Count I is DENIED;

- Defendants' Motion as to Count II is GRANTED;

---

[1] The Court notes that Counts VI and IX of the Third Amended Complaint were dismissed previously. (*See* ECF Nos. 102 & 252.)

**JA1281**

- Defendants' Motion as to Count III is DENIED;

- Defendants' Motion as to Count IV is GRANTED as to Defendant HMC Supply, LLC ("HMC") and DENIED as to all remaining Defendants;

- Defendants' Motion as to Count V is GRANTED as to Defendant HMC and DENIED as to all remaining Defendants;

- Defendants' Motion as to Count VII is GRANTED;

- Defendants' Motion as to Count VIII DENIED as to Defendant Westly Greer and GRANTED as to all remaining Defendants;

- Defendants' Motion as to Count X is GRANTED as to Defendant HMC and DENIED as to all remaining Defendants;

- Defendants' Motion as to Count XI is GRANTED as to Defendant HMC and DENIED as to all remaining Defendants;

- Defendants' Motion as to Count XII is GRANTED as to Defendant HMC and DENIED as to all remaining Defendants; and,

- Defendants' Motion as to Count XIII is GRANTED in its entirety as to Defendant HMC, GRANTED to the extent it seeks relief based on Trade Dress Infringement or Unfair Competition under Section 43(a) of the Lanham Act, and DENIED as to all Defendants other than Defendant HMC to the extent it seeks relief based on False Designation of Origin under Section 43(a) of the Lanham Act.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

_____ /s/

Norfolk, Virginia
Date: June 8, 2022

Roderick C. Young
United States District Judge

**JA1282**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

GMS INDUSTRIAL SUPPLY, INC..  )
    Plaintiff,  )
             v.  )          Civil Action No. 2:19-cv-324 (RCY)
                  )
G&S SUPPLY, LLC, *et al*.,  )
    Defendants.  )
_____  )

## ORDER

This matter is before the Court on Defendants' Renewed Motion for Judgment as a Matter of Law pursuant to Rule 50 of the Federal Rules of Civil Procedure made orally before the Court during the jury trial on June 7, 2022.  On June 3, 2022, this Court granted in part and denied in part Defendants' oral Motion for Judgement as a Matter of Law. [1] Defendants renewed their Motion for Judgment as a Matter of Law as to all remaining pending claims following the conclusion of Defendants' case.

Under Rule 50 of the Federal Rules of Civil Procedure, a court "may grant judgment as a matter of law only if, viewing the evidence in a light most favorable to the non-moving party and drawing every legitimate inference in that party's favor, . . . the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Huskey v. Ethicon, Inc.*, 848 F.3d 151, 156 (4th Cir. 2017) (quoting *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 147 (4th Cir. 2008)). "If, upon the conclusion of a party's case, 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue,' a court may grant a motion from the opposing party for judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 50(a)).

---

[1] Pursuant to Defendants' Motion for Judgment as a Matter of Law, the Court dismissed the following Counts: II; IV as to Defendant HMC Supply, LLC ("HMC"); V as to Defendant HMC; VII; VIII as to all Defendants with the exception of Defendant Westly Greer; X as to Defendant HMC; XI as to Defendant HMC; XII as to Defendant HMC; and XIII in its entirety as to Defendant HMC and to the extent it seeks relief based on Trade Dress Infringement or Unfair Competition under Section 43(a) of the Lanham Act. The Court also notes that Counts VI and IX, of the Third Amended Complaint were dismissed previously. (*See* ECF Nos. 102 & 252.)

Upon consideration of the parties' oral arguments and for the reasons stated on the record, the Court rules as follows:

- Defendants' Motion as to Count I is DENIED;

- Defendants' Motion as to Count III is DENIED;

- Defendants' Motion as to Count IV is DENIED;

- Defendants' Motion as to Count V is DENIED;

- Defendants' Motion as to Count VIII DENIED;

- Defendants' Motion as to Count X is DENIED; and,

- Defendants' Motion as to Count XI is DENIED.

- Counts XII and XIII are DISMISSED pursuant to an agreement between the parties wherein Defendants stipulate that they shall permanently refrain from doing business as or otherwise using the name G&S Supply, LLC.[2]

- Defendant Wartech Industries, LLC ("Wartech") is hereby DISMISSED as a defendant from this litigation. Pursuant to the parties' stipulation, Wartech is the successor in interest to G&S Supply, LLC. (ECF No. 265 ¶ 13.) As such, Defendant Wartech is liable for all judgments against G&S Supply, LLC, in this action, since Wartech is merely a continuation of G&S Supply, LLC.

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Norfolk, Virginia                                    /s/
Date: June 8, 2022                          Roderick C. Young
                                            United States District Judge

---

[2] As stated on the record, Plaintiff does not seek damages on Counts XII and XIII. Instead, Plaintiff seeks permanent injunctive relief.

**JA1284**

✎AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA - NORFOLK DIVISION |
|---|---|---|

GMS INDUSTRIAL SUPPLY, INC.

v.

G&S SUPPLY, LLC, *et al.*

## EXHIBIT AND WITNESS LIST

Case Number:  2:19cv324

| PRESIDING JUDGE **Roderick C. Young** | PLAINTIFF'S ATTORNEYS William Lascara Jeffrey Wilson Jesse Gordon Thomas Berkley Daniel Berger | DEFENDANTS' ATTORNEYS Robert McFarland Micaylee Noreen Katie Dougherty Jeanne Noonan |
|---|---|---|
| | COURT REPORTER Jill Trail, OCR | COURTROOM DEPUTY J. Jones |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| x | | 5/31/22 | | | **Gary Gorken, Director of Regulatory Compliance at GMS Industrial Supply, Inc.** |
| x | | 5/31/22 | P102 | ADM | Interoffice summary of a video call (Email from Gorken to whole team – dated 2/15/18) |
| x | | 5/31/22 | P112 | N/A | Procedure for CCPN Kit Creation (Email from Chris Morton – dated 6/14/18) |
| x | | 5/31/22 | P110 | ADM | Green Oger Call Highlights 2/16/18 (Email from Chris Morton – dated 3/9/18) |
| | | | | | |
| | | | | | **Gary Gorken (continued)** |
| x | | 6/1/22 | P110 | AA | Green Oger Call Highlights 2/16/18 (Email from Chris Morton – dated 3/9/18) |
| x | | 6/1/22 | P112 | ADM | Procedure for CCPN Kit Creation (Email from Chris Morton – dated 6/14/18) |
| x | | 6/1/22 | P111 | ADM | Moratorium on New CCPN Kits (Email from Chris Morton – dated 1/9/19) |
| x | | 6/1/22 | P35 | ADM | Incorporation Document for G&S Supply, LLC – date of incorporation 6/22/17 |
| x | | 6/1/22 | P3 | ADM | Independent Agent Agreement between GMS Industrial Supply, Inc. & Westly Greer |
| x | | 6/1/22 | P2 | ADM | Cease & desist letter from Pender Coward to Westly Greer (dated 4/3/19) |
| x | | 6/1/22 | P7 | ADM | Termination, Cease & Desist and Litigation Hold Notice Letter from Pender Coward to Sabrina Greer (dated 4/3/19) |
| x | | 6/1/22 | P11 | ADM | Termination, Cease & Desist and Litigation Hold Notice Letter from Pender Coward to Greg Spires (dated 4/3/19) |
| x | | 6/1/22 | P13 | ADM | Termination, Cease & Desist and Litigation Hold Notice Letter from Pender Coward to Thomas Hayes (dated 4/3/19) |
| x | | 6/1/22 | P24 | N/A | Second Supplemental Termination, Cease & Desist & Litigation Hold Notice Letter and Demand for Return of Property from Pender Coward to Westly Greer (dated 5/24/19) |
| | | | | | **Cross-examination** |
| | x | 6/1/22 | P110 | AA | Green Oger Call Highlights 2/16/18 (Email from Chris Morton – dated 3/9/18) |

1

# JA1285

✎AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA - NORFOLK DIVISION |
|---|---|---|

GMS INDUSTRIAL SUPPLY, INC.

v.

G&S SUPPLY, LLC, *et al.*

## EXHIBIT AND WITNESS LIST

Case Number:  2:19cv324

| PRESIDING JUDGE **Roderick C. Young** | PLAINTIFF'S ATTORNEYS William Lascara Jeffrey Wilson Jesse Gordon Thomas Berkley Daniel Berger | DEFENDANTS' ATTORNEYS Robert McFarland Micaylee Noreen Katie Dougherty Jeanne Noonan |
|---|---|---|
| | COURT REPORTER Jill Trail, OCR | COURTROOM DEPUTY J. Jones |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | | | | **Gary Gorken ( cross-examination continued)** |
| | x | 6/1/22 | P111 | AA | Moratorium on New CCPN Kits (Email from Chris Morton – dated 1/9/19) |
| | x | 6/1/22 | D6 | ADM | GMS Gross Revenue and Profit from 2015 to 2019 |
| | x | 6/1/22 | D7 | N/A | 2015 S-Corporation Return for GMS Industrial Supply, Inc. |
| | x | 6/1/22 | P3 | AA | Independent Agent Agreement between GMS Industrial Supply, Inc. & Westly Greer |
| | x | 6/1/22 | P2 | AA | Cease & desist letter from Pender Coward to Westly Greer (dated 4/3/19) |
| | x | 6/1/22 | P7 | AA | Termination, Cease & Desist and Litigation Hold Notice Letter from Pender Coward to Sabrina Greer (dated 4/3/19) |
| | x | 6/1/22 | P11 | AA | Termination, Cease & Desist and Litigation Hold Notice Letter from Pender Coward to Greg Spires (dated 4/3/19) |
| | x | 6/1/22 | P13 | AA | Termination, Cease & Desist and Litigation Hold Notice Letter from Pender Coward to Thomas Hayes (dated 4/3/19) |
| | x | 6/1/22 | P4 | ADM | GMS Industrial Supply, Inc. Zone Manager Addendum & Bonus/Override document (dated 1/12/19) |
| | | | | | **Redirect** |
| x | | 6/1/22 | P3 | AA | Independent Agent Agreement between GMS Industrial Supply, Inc. & Westly Greer |
| x | | 6/1/22 | P4 | AA | GMS Industrial Supply, Inc. Zone Manager Addendum & Bonus/Override document (dated 1/12/19) |
| x | | 6/1/22 | P77 | N/A | Recap of independent investigation done by GMS |
| x | | 6/1/22 | P103 | N/A | Email re Non Standard Orders – Motor Pool Equipment PR's (dated 1/30/19) |
| x | | 6/1/22 | P104 | N/A | Email from Conant to Sabrina Greer re PR 1040102918 (dated 1/30/19) |
| x | | 6/1/22 | P105 | N/A | Email from Rieger to Mike Welton re GMS Rep on base tomorrow (dated 2/26/19) |
| x | | 6/1/22 | P106 | N/A | Email from Rieger to Mike Welton re Order Doc Numbers (dated 2/27/19) |
| x | | 6/1/22 | P107 | N/A | Email from Long to Anita Wagner and Greg Spires re Order (dated 1/17/19) |

2

**JA1286**

✎ AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA - NORFOLK DIVISION |
|---|---|---|

| GMS INDUSTRIAL SUPPLY, INC. | **EXHIBIT AND WITNESS LIST** |
|---|---|
| v. | |
| G&S SUPPLY, LLC, *et al.* | Case Number:   2:19cv324 |

| PRESIDING JUDGE<br><br>**Roderick C. Young** | PLAINTIFF'S ATTORNEYS<br>William Lascara<br>Jeffrey Wilson<br>Jesse Gordon<br>Thomas Berkley<br>Daniel Berger | DEFENDANTS' ATTORNEYS<br>Robert McFarland<br>Micaylee Noreen<br>Katie Dougherty<br>Jeanne Noonan |
|---|---|---|
| | COURT REPORTER<br>Jill Trail, OCR | COURTROOM DEPUTY<br>J. Jones |

| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | | | | **Gary Gorken (Redirect continued)** |
| x | | 6/1/22 | P108 | N/A | Email from Brookman to Greg Spires re Questions (dated 1/7/19) |
| x | | 6/1/22 | | | **Greg Naschansky, Regional Account Manager at GMS Industrial Supply, Inc.** |
| x | | 6/1/22 | P75 | ADM | Picture of GMS Creeper |
| | | | | | **Cross-examination** |
| | x | 6/1/22 | P111 | AA | Moratorium on New CCPN Kits (Email from Chris Morton – dated 1/9/19) |
| | | | | | **Redirect** |
| x | | 6/1/22 | | | **Amber Wenrick (Video Deposition)** |
| | | | | | |
| x | | 6/2/22 | | | **Amber Wenrick (Video Deposition - continued)** |
| x | | 6/2/22 | | | **Christopher Morton, Chief of Operations at GMS Industrial Supply, Inc.** |
| x | | 6/2/22 | P268 | | Order for Supplies or Services (dated 4/27/18) |
| x | | 6/2/22 | P0 & P235 – 248, 250 – 257, 259 – 272, 274 - 278, 280, 282 – 285, 287 - 302, 304 – 356, 358 -365, 367 - 376, 377 - 388, 390 – 393, 395 – 432, 434 – 449, 451 – 456, 458 – 460, 462 - 463, 465 – 474, 476 – 493, 495 – 497, 499 – 500, 505, 509, 513 - 516 | ADM | Orders for Supplies or Services (all dated prior to 4/3/19) |

3

**JA1287**

✎ AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

EASTERN _____ DISTRICT OF _____ VIRGINIA - NORFOLK DIVISION

GMS INDUSTRIAL SUPPLY, INC.

v.

G&S SUPPLY, LLC, *et al.*

**EXHIBIT AND WITNESS LIST**

Case Number:  2:19cv324

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEYS | DEFENDANTS' ATTORNEYS |
|---|---|---|
| **Roderick C. Young** | William Lascara<br>Jeffrey Wilson<br>Jesse Gordon<br>Thomas Berkley<br>Daniel Berger | Robert McFarland<br>Micaylee Noreen<br>Katie Dougherty<br>Jeanne Noonan |
| | COURT REPORTER<br>Jill Trail, OCR | COURTROOM DEPUTY<br>J. Jones |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | 6/2/22 | | | **Christopher Morton (continued)** |
| x | | 6/2/22 | P110 | AA | Green Oger Call Highlights 2/16/18 (Email from Chris Morton – dated 3/9/18) |
| x | | 6/2/22 | P111 | AA | Moratorium on New CCPN Kits (Email from Chris Morton – dated 1/9/19) |
| x | | 6/2/22 | P112 | AA | Procedure for CCPN Kit Creation (Email from Chris Morton – dated 6/14/18) |
| x | | 6/2/22 | P23 | ADM | Email re Archive of Google Data Requested through Vault (dated 4/3/19) |
| x | | 6/2/22 | P518 | ADM | DOD Supply Catalog NSN-FedMall-GCSS Maintenance Products |
| x | | 6/2/22 | P25 | ADM | G&S Supply Catalog |
| x | | 6/2/22 | P DEMO 1 | N/A | Demonstrative Exhibit Showing GMS & G&S product supply catalogs side by side |
| x | | 6/2/22 | P269 | AA | Order for Supplies or Services – Agreement No. SPE7L1-18-P-3068 (dated 4/27/18) |
| x | | 6/2/22 | P517 | ADM | Department of Defense Supply Catalog NSN Maintenance Products Catalog |
| | | | | | **Cross-examination** |
| x | | 6/2/22 | P269 | AA | Order for Supplies or Services – Agreement No. SPE7L1-18-P-3068 (dated 4/27/18) |
| x | | 6/2/22 | P110 | AA | Green Oger Call Highlights 2/16/18 (Email from Chris Morton – dated 3/9/18) |
| x | | 6/2/22 | P111 | AA | Moratorium on New CCPN Kits (Email from Chris Morton – dated 1/9/19) |
| x | | 6/2/22 | P23 | AA | Email re Archive of Google Data Requested through Vault (dated 4/3/19) |
| | | | | | **Redirect** |
| x | | 6/2/22 | | | **Donna Kline (a/k/a/ Donna Rupley), Marketing & Regulatory Manager at GMS** |
| x | | 6/2/22 | P99 | ADM | Email chat from Donna Kline re Thomas Support Team (dated 8/9/19) |
| x | | 6/2/22 | P128 | ADM | Spreadsheet with Base, POC and sales data |
| x | | 6/2/22 | P235 | AA | Order for Supplies or Services – Agreement No. SPE7L1-19-P-0075 |

4

**JA1288**

✎AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

EASTERN     DISTRICT OF     VIRGINIA - NORFOLK DIVISION

GMS INDUSTRIAL SUPPLY, INC.

v.

G&S SUPPLY, LLC, *et al.*

## EXHIBIT AND WITNESS LIST

Case Number: 2:19cv324

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEYS | DEFENDANTS' ATTORNEYS |
|---|---|---|
| **Roderick C. Young** | William Lascara<br>Jeffrey Wilson<br>Jesse Gordon<br>Thomas Berkley<br>Daniel Berger | Robert McFarland<br>Micaylee Noreen<br>Katie Dougherty<br>Jeanne Noonan |
| | COURT REPORTER<br>Jill Trail, OCR | COURTROOM DEPUTY<br>J. Jones |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | 6/2/22 | | | **Donna Kline a/k/a/ Donna Rupley (continued)** |
| x | | 6/2/22 | P115 | ADM | Spreadsheet with Base, POC and Data for GMS Industrial |
| x | | 6/2/22 | P119 | ADM | Spreadsheet for Fort Sill and Fort Bliss for GMS Industrial |
| x | | 6/2/22 | P120 | ADM | Spreadsheet for Fort Hood for GMS Industrial |
| x | | 6/2/22 | P124 | ADM | Spreadsheet for Fort Carson for GMS Industrial |
| x | | 6/2/22 | P113 | ADM | Receipt of Company Property for GMS Industrial as to Westly Greer (dated 11/30/17) |
| x | | 6/2/22 | P107 | N/A | Email from Long to Anita Wagner and Greg Spires re Order (dated 1/17/19) |
| x | | 6/2/22 | P103 | N/A | Email re Non Standard Orders – Motor Pool Equipment PR's (dated 1/30/19) |
| x | | 6/2/22 | P104 | N/A | Email from Conant to Sabrina Greer re PR 1040102918 (dated 1/30/19) |
| x | | 6/2/22 | P105 | N/A | Email from Rieger to Mike Welton re GMS Rep on base tomorrow (dated 2/26/19) |
| x | | 6/2/22 | P258 | ADM | Order for Supplies or Services Agreement |
| x | | 6/2/22 | P279 | N/A | Order for Supplies or Services |
| x | | 6/2/22 | P281 | ADM | Order for Supplies or Services (dated 1/3/19) |
| x | | 6/2/22 | P259 | AA | Order for Supplies or Services |
| | | | | | **Cross-examination** |
| x | | 6/2/22 | P99 | AA | Email chat from Donna Kline re Thomas Support Team (dated 8/9/19) |
| | | | | | **Redirect** |
| x | | 6/2/22 | | | **Danielle Renee Robichaux, Operations Manager at GMS Industrial Supply, Inc.** |
| x | | 6/2/22 | P63 | ADM | Green Oger Steps to the Sale |
| x | | 6/2/22 | P65 | ADM | Email re Account Manager Documents – Invitation to Collaborate (dated 7/24/19) |

5

**JA1289**

✎ AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA - NORFOLK DIVISION |
|---|---|---|

| GMS INDUSTRIAL SUPPLY, INC. | **EXHIBIT AND WITNESS LIST** |
|---|---|
| v. | |
| G&S SUPPLY, LLC, *et al.* | Case Number:  2:19cv324 |

| PRESIDING JUDGE<br>**Roderick C. Young** | PLAINTIFF'S ATTORNEYS<br>William Lascara<br>Jeffrey Wilson<br>Jesse Gordon<br>Thomas Berkley<br>Daniel Berger | DEFENDANTS' ATTORNEYS<br>Robert McFarland<br>Micaylee Noreen<br>Katie Dougherty<br>Jeanne Noonan |
|---|---|---|
| | COURT REPORTER<br>Jill Trail, OCR | COURTROOM DEPUTY<br>J. Jones |

| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | | | | **Danielle Renee Robichaux (continued)** |
| x | | 6/2/22 | P62 | ADM | Green Oger Steps to Providing Excellent Customer Service at the Motorpool |
| x | | 6/2/22 | P40 | N/A | GMS NALCOMIS Ordering Instruction Guide - ID only |
| x | | 6/2/22 | P86 | N/A | Email from Robichaux to Westly Greer re Fort Leavenworth (dated 9/12/18) - ID only |
| x | | 6/2/22 | P64 | ADM | GMS document - Standard GCSS Input Instructions to Load NSNs |
| x | | 6/2/22 | P66 | ADM | GMS document – NEW Account Manager Training Guide |
| x | | 6/2/22 | P67 | ADM | GMS Document – Proper Procedures Document (dated 1/25/16) |
| x | | 6/2/22 | P68 | ADM | GMS Document – Internal Document to Agents re Process and Procedure on Sales Orders |
| x | | 6/2/22 | P89 | ADM | Email re Announcement – New Emall Milstrip Items Added (dated 8/11/16) |
| x | | 6/2/22 | P73 | ADM | Green Oger – Learning Supply: Customer Oriented Sales Document |
| x | | 6/2/22 | P49 | ADM | Employee Non-Compete Agreement for Westly Greer (dated 4/3/11) |
| x | | 6/2/22 | P4 | ADM | Employment Agreement for Westly Greer (dated 4/4/11) |
| x | | 6/2/22 | P6 | ADM | Employment Agreement for Westly Greer as District Manager |
| x | | 6/2/22 | P5 | ADM | GMS document re Westly Greer's new title of Director of Sales (dated 7/1/15) |
| x | | 6/2/22 | P28 | ADM | Independent Sales Agent Agreement for Sabrina Greer (dated 1/10/17) |
| | | | | | |
| | | 6/3/22 | | | **Danielle Renee Robichaux (continued)** |
| x | | 6/3/22 | P8 | ADM | Independent Sales Agent Agreement for Sabrina Greer (dated 1/10/17) |
| x | | 6/3/22 | P52 | ADM | Sales Agent Agreement for Gregory Spires (dated 1/2/13) |
| x | | 6/3/22 | P56 | N/A | Independent Sales Agent Agreement for Gregory Sky Spires (dated 1/3/16) |

6

✏AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA - NORFOLK DIVISION |
|---|---|---|

GMS INDUSTRIAL SUPPLY, INC.

**EXHIBIT AND WITNESS LIST**

v.

G&S SUPPLY, LLC, *et al.*

Case Number:  2:19cv324

| PRESIDING JUDGE **Roderick C. Young** | PLAINTIFF'S ATTORNEYS William Lascara Jeffrey Wilson Jesse Gordon Thomas Berkley Daniel Berger | DEFENDANTS' ATTORNEYS Robert McFarland Micaylee Noreen Katie Dougherty Jeanne Noonan |
|---|---|---|
| | COURT REPORTER Jill Trail, OCR | COURTROOM DEPUTY J. Jones |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | 6/3/22 | | | **Danielle Renee Robichaux (continued)** |
| x | | 6/3/22 | P32 | ADM | Independent Sales Agent Agreement for County Roads, LLC (Greg Spires) (dated 1/6/17) |
| x | | 6/3/22 | P14 | ADM | Independent Sales Agent Agreement for Thomas Hayes (dated 7/27/16) |
| x | | 6/3/22 | P16 | ADM | Independent Sales Agent Agreement for Michael Welton (6/15/16) |
| x | | 6/3/22 | P4 | AA | GMS Industrial Supply, Inc. Zone Manager Addendum & Bonus/Override document (dated 1/12/19) |
| x | | 6/3/22 | P3 | AA | Independent Agent Agreement between GMS Industrial Supply, Inc. & Westly Greer |
| x | | 6/3/22 | P44 | ADM | Mileage Log and Reimbursement Form for Westly Greer (8/31/17) |
| x | | 6/3/22 | P91 | ADM | GMS Industrial Supply, Inc. Payroll Reports for Mike Welton |
| x | | 6/3/22 | P92 | ADM | GMS Industrial Supply, Inc. Payroll Reports for Thomas Hayes |
| x | | 6/3/22 | P281 | AA | Order for Supplies or Services (dated 1/3/19) |
| x | | 6/3/22 | P97 | ADM | GMS Industrial Supply, Inc. Payroll Reports for Greg Spires |
| x | | 6/3/22 | P274 | AA | Order for Supplies or Services (dated 4/26/18) |
| x | | 6/3/22 | P95 | ADM | GMS Industrial Supply, Inc. Payroll Reports for Sabrina Greer |
| x | | 6/3/22 | P96 | ADM | GMS Industrial Supply, Inc. Payroll Reports for Sabrina Greer for Fort Carson |
| x | | 6/3/22 | P247 | AA | Order for Supplies or Services (dated 11/30/17) |
| x | | 6/3/22 | P94 | ADM | GMS Industrial Supply, Inc. Payroll Reports for Westly Greer (dated 3/4/19 – 3/17/19) |
| x | | 6/3/22 | P460 | AA | Order for Supplies or Services (quote date 2/12/19) |
| x | | 6/3/22 | P98 | ADM | GMS Industrial Supply, Inc. Loss Profit Analysis |
| x | | 6/3/22 | P78 | ADM | GMS Industrial Supply, Inc. Contractor Payments |
| | | | | | **Cross-examination** |
| | | 6/3/22 | P98 | AA | GMS Industrial Supply, Inc. Loss Profit Analysis |

7

**JA1291**

✎ AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

EASTERN      DISTRICT OF      VIRGINIA - NORFOLK DIVISION

GMS INDUSTRIAL SUPPLY, INC.

v.

G&S SUPPLY, LLC, *et al.*

## EXHIBIT AND WITNESS LIST

Case Number:  2:19cv324

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEYS | DEFENDANTS' ATTORNEYS |
|---|---|---|
| **Roderick C. Young** | William Lascara<br>Jeffrey Wilson<br>Jesse Gordon<br>Thomas Berkley<br>Daniel Berger | Robert McFarland<br>Micaylee Noreen<br>Katie Dougherty<br>Jeanne Noonan |
| | COURT REPORTER<br>Jill Trail, OCR | COURTROOM DEPUTY<br>J. Jones |

| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | 6/3/22 | | | **Danielle Renee Robichaux (continued)** |
| | x | 6/3/22 | P92 | AA | GMS Industrial Supply, Inc. Payroll Reports for Thomas Hayes |
| | x | 6/3/22 | P14 | AA | Independent Sales Agent Agreement for Thomas Hayes (dated 7/27/16) |
| | x | 6/3/22 | P95 | AA | GMS Industrial Supply, Inc. Payroll Reports for Sabrina Greer |
| | x | 6/3/22 | P247 | AA | Order for Supplies or Services (dated 11/30/17) |
| | x | 6/3/22 | P98 | AA | GMS Industrial Supply, Inc. Loss Profit Analysis |
| | x | 6/3/22 | P97 | AA | GMS Industrial Supply, Inc. Payroll Reports for Greg Spires |
| | x | 6/3/22 | P518 | AA | DOD Supply Catalog NSN-FedMall-GCSS Maintenance Products |
| | | | | | **Redirect** |
| x | | 6/3/22 | P14 | AA | Independent Sales Agent Agreement for Thomas Hayes (dated 7/27/16) |
| x | | 6/3/22 | | | **Karyl Van Tassel, CPA (designated as expert)** |
| | | | | | **Cross-examination** |
| x | | 6/3/22 | | | **Eric Shirk, Partner with BDO, USA (designated as expert)** |
| x | | 6/3/22 | P DEMO 2 | N/A | Diagram 3.6 – 4/19/19 Event Timeline |
| x | | 6/3/22 | P DEMO 3 | N/A | Diagram 3.2 – USB Event Log |
| x | | 6/3/22 | P DEMO 4 | N/A | BDO Log Analysis Report |
| | | | | | **Cross-examination** |
| | x | 6/3/22 | P DEMO 3 | N/A | Diagram 3.2 – USB Event Log |

8

# JA1292

✎AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA - NORFOLK DIVISION |
|---|---|---|

| GMS INDUSTRIAL SUPPLY, INC. | **EXHIBIT AND WITNESS LIST** |
|---|---|
| v. | |
| G&S SUPPLY, LLC, *et al.* | Case Number:  2:19cv324 |

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEYS | DEFENDANTS' ATTORNEYS |
|---|---|---|
| **Roderick C. Young** | William Lascara<br>Jeffrey Wilson<br>Jesse Gordon<br>Thomas Berkley<br>Daniel Berger | Robert McFarland<br>Micaylee Noreen<br>Katie Dougherty<br>Jeanne Noonan |
| | COURT REPORTER<br>Jill Trail, OCR | COURTROOM DEPUTY<br>J. Jones |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | 6/3/22 | | | **Eric Shirk (Continued)** |
| | x | 6/3/22 | P DEMO 2 | N/A | Diagram 3.6 – 4/19/19 Event Timeline |
| | | | | | **Redirect** |
| | | | | | |
| | x | 6/6/22 | | | **Thomas Hayes** |
| | x | 6/6/22 | D40 | N/A | GCSS-Army Transaction Guide |
| | x | 6/6/22 | P14 | AA | Independent Sales Agent Agreement for Thomas Hayes (dated 7/27/16) |
| | x | 6/6/22 | P99 | AA | Email chat from Donna Kline re Thomas Support Team (dated 8/9/19) |
| | | | | | **Cross-examination** |
| x | | 6/6/22 | P143 | ADM | Email from Thomas Hayes re Situational Awareness (dated 5/7/19) |
| x | | 6/6/22 | P14 | AA | Independent Sales Agent Agreement for Thomas Hayes (dated 7/27/16) |
| x | | 6/6/22 | P128 | AA | Spreadsheet with Base, POC and sales data |
| x | | 6/6/22 | P110 | AA | Green Oger Call Highlights 2/16/18 (Email from Chris Morton – dated 3/9/18) |
| x | | 6/6/22 | P112 | AA | Procedure for CCPN Kit Creation (Email from Chris Morton – dated 6/14/18) |
| x | | 6/6/22 | P25 | AA | G&S Supply Catalog |
| x | | 6/6/22 | P518 | AA | DOD Supply Catalog NSN-FedMall-GCSS Maintenance Products |
| x | | 6/6/22 | P517 | AA | Department of Defense Supply Catalog NSN Maintenance Products Catalog |
| | | | | | **Redirect** |
| | x | 6/6/22 | P111 | AA | Moratorium on New CCPN Kits (Email from Chris Morton – dated 1/9/19) |
| | x | 6/6/22 | | | **Gregory Spires** |
| | x | 6/6/22 | P32 | AA | Independent Sales Agent Agreement for County Roads, LLC (Greg Spires) (dated 1/6/17) |

9

**JA1293**

✎ AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

EASTERN      DISTRICT OF      VIRGINIA - NORFOLK DIVISION

GMS INDUSTRIAL SUPPLY, INC.

v.

G&S SUPPLY, LLC, *et al.*

## EXHIBIT AND WITNESS LIST

Case Number:  2:19cv324

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEYS | DEFENDANTS' ATTORNEYS |
|---|---|---|
| **Roderick C. Young** | William Lascara<br>Jeffrey Wilson<br>Jesse Gordon<br>Thomas Berkley<br>Daniel Berger | Robert McFarland<br>Micaylee Noreen<br>Katie Dougherty<br>Jeanne Noonan |
| | COURT REPORTER<br>Jill Trail, OCR | COURTROOM DEPUTY<br>J. Jones |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | 6/6/22 | | | **Gregory Spires (Continued)** |
| | x | 6/6/22 | P62 | AA | Green Oger Steps to Providing Excellent Customer Service at the Motorpool |
| | | 6/6/22 | P63 | AA | Green Oger Steps to the Sale |
| | | 6/6/22 | P64 | AA | GMS document - Standard GCSS Input Instructions to Load NSNs |
| | | 6/6/22 | P66 | AA | GMS document – NEW Account Manager Training Guide |
| | | 6/6/22 | P73 | AA | Green Oger – Learning Supply: Customer Oriented Sales Document |
| | x | 6/6/22 | D34 | ADM | G&S Supply LLC Profit & Loss Document – January through December 2018 |
| | x | 6/6/22 | P204 | ADM | G&S Supply LLC Profit & Loss Document – January through December 2019 |
| | | | | | **Cross-examination** |
| x | | 6/6/22 | P12 | ADM | Independent Sales Agent Agreement between GMS & County Roads (Greg Spires) |
| x | | 6/6/22 | P184 | ADM | Email from G&S re NSN Catalog (dated 3/5/18) |
| x | | 6/6/22 | P189 | ADM | Email from G&S re Non Standard Catalog (dated 3/5/18) |
| x | | 6/6/22 | P171 | ADM | Email from G&S re G&S Catalog (dated 8/28/18) |
| x | | 6/6/22 | P62 | AA | Green Oger Steps to Providing Excellent Customer Service at the Motorpool |
| x | | 6/6/22 | P63 | AA | Green Oger Steps to the Sale |
| x | | 6/6/22 | P64 | AA | GMS document - Standard GCSS Input Instructions to Load NSNs |
| x | | 6/6/22 | P66 | AA | GMS document – NEW Account Manager Training Guide |
| | x | 6/6/22 | | | **Westly Greer** |
| | x | 6/6/22 | P115 | AA | Spreadsheet with Base, POC and Data for GMS Industrial |
| | x | 6/6/22 | P110 | AA | Green Oger Call Highlights 2/16/18 (Email from Chris Morton – dated 3/9/18) |
| | x | 6/6/22 | P111 | AA | Moratorium on New CCPN Kits (Email from Chris Morton – dated 1/9/19) |

10

**JA1294**

✎ AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA - NORFOLK DIVISION |

| | |
|---|---|
| GMS INDUSTRIAL SUPPLY, INC. | **EXHIBIT AND WITNESS LIST** |
| v. | |
| G&S SUPPLY, LLC, *et al.* | Case Number:  2:19cv324 |

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEYS | DEFENDANTS' ATTORNEYS |
|---|---|---|
| **Roderick C. Young** | William Lascara<br>Jeffrey Wilson<br>Jesse Gordon<br>Thomas Berkley<br>Daniel Berger | Robert McFarland<br>Micaylee Noreen<br>Katie Dougherty<br>Jeanne Noonan |
| | COURT REPORTER<br>Jill Trail, OCR | COURTROOM DEPUTY<br>J. Jones |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | 6/6/22 | | | **Westly Greer (Continued)** |
| | x | 6/6/22 | P3 | AA | Independent Agent Agreement between GMS Industrial Supply, Inc. & Westly Greer |
| | x | 6/6/22 | P4 | AA | GMS Industrial Supply, Inc. Zone Manager Addendum & Bonus/Override document (dated 1/12/19) |
| | x | 6/6/22 | D19 | ADM | Email from Renee Robichaux re Non-Core/Sourced Items (dated 4/13/17) |
| | x | 6/6/22 | D29 | ADM | From the Desk of the Green Oger document (dated 1/11/19) |
| | x | 6/6/22 | D21 | ADM | Tick Tock of Gary Gorken GMS (dated 7/5/20) |
| | | | | | **Cross-examination** |
| | x | 6/6/22 | P115 | AA | Spreadsheet with Base, POC and Data for GMS Industrial |
| | x | 6/6/22 | P110 | AA | Green Oger Call Highlights 2/16/18 (Email from Chris Morton – dated 3/9/18) |
| | x | 6/6/22 | P112 | AA | Procedure for CCPN Kit Creation (Email from Chris Morton – dated 6/14/18) |
| | x | 6/6/22 | P111 | AA | Moratorium on New CCPN Kits (Email from Chris Morton – dated 1/9/19) |
| | x | 6/6/22 | P2 | AA | Cease & desist letter from Pender Coward to Westly Greer (dated 4/3/19) |
| x | | 6/6/22 | P Demo 3 | N/A | Diagram 3.2 -  USB Event Log |
| x | | 6/6/22 | P Demo 4 | N/A | BDO Log Analysis Report |
| | | | | | |
| | | 6/7/22 | | | **Westly Greer (Continued)** |
| x | | 6/7/22 | P53 | ADM | Articles of Organization of G&S Supply, LLC w/ Colorado Secretary of State (dated 6/22/17) |
| x | | 6/7/22 | P183 | ADM | Operating Agreement of G&S Supply, LLC |
| x | | 6/7/22 | P87 | ADM | Email from Westly Greer re Battle Damage Assessment List (dated 9/16/16) |

11

**JA1295**

✎AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | VIRGINIA - NORFOLK DIVISION |
|---|---|---|

GMS INDUSTRIAL SUPPLY, INC.

v.

G&S SUPPLY, LLC, *et al.*

## EXHIBIT AND WITNESS LIST

Case Number:  2:19cv324

| PRESIDING JUDGE **Roderick C. Young** | PLAINTIFF'S ATTORNEYS William Lascara Jeffrey Wilson Jesse Gordon Thomas Berkley Daniel Berger | DEFENDANTS' ATTORNEYS Robert McFarland Micaylee Noreen Katie Dougherty Jeanne Noonan |
|---|---|---|
| | COURT REPORTER Jill Trail, OCR | COURTROOM DEPUTY J. Jones |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | 6/7/22 | | | **Westly Greer (Continued)** |
| x | | 6/7/22 | P90 | ADM | Email from Westly Greer re Kits on Commission Report (dated 1/12/16) |
| | | | | | **Redirect** |
| | x | 6/7/22 | P87 | AA | Email from Westly Greer re Battle Damage Assessment List (dated 9/16/16) |
| | x | 6/7/22 | | | **Mike Welton** |
| | x | 6/7/22 | P16 | AA | Independent Sales Agent Agreement for Michael Welton (dated 6/15/16) |
| | x | 6/7/22 | D22 | ADM | Email from Mike Welton with screen shot of text conversation between Mr. Welton and Gary Gorken (dated 7/21/19) |
| | | | | | **Cross-examination** |
| | x | 6/7/22 | P16 | AA | Independent Sales Agent Agreement for Michael Welton (6/15/16) |
| x | | 6/7/22 | P227 | ADM | Declaration of Michael Welton (dated 7/18/19) |
| x | | 6/7/22 | P105 | ADM | Email from Rieger to Mike Welton re GMS Rep on base tomorrow (dated 2/26/19) |
| | | | | | **Redirect** |
| | x | 6/7/22 | P227 | AA | Declaration of Michael Welton (dated 7/18/19) |
| | x | 6/7/22 | | | **Sabrina Greer** |
| | x | 6/7/22 | P8 | AA | Independent Sales Agent Agreement for Sabrina Greer (dated 1/10/17) |
| | x | 6/7/22 | D23 | ADM | Email from Gary Gorken re "next time you are looking through your wedding album, try not to cry" (dated 5/3/19) |
| | | | | | **Cross-examination** |
| | x | 6/7/22 | P8 | AA | Independent Sales Agent Agreement for Sabrina Greer (dated 1/10/17) |
| x | | 6/7/22 | N/A | N/A | Interrogatories of Sabrina Greer - ID only |
| x | | 6/7/22 | N/A | N/A | Sabrina Greer's Deposition Transcript - ID only |

# JA1296

◈AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

| EASTERN | | DISTRICT OF | | VIRGINIA - NORFOLK DIVISION |

| | | |
|---|---|---|
| GMS INDUSTRIAL SUPPLY, INC. | | **EXHIBIT AND WITNESS LIST** |
| v. | | |
| G&S SUPPLY, LLC, *et al.* | | Case Number:  2:19cv324 |

| PRESIDING JUDGE **Roderick C. Young** | PLAINTIFF'S ATTORNEYS William Lascara Jeffrey Wilson Jesse Gordon Thomas Berkley Daniel Berger | DEFENDANTS' ATTORNEYS Robert McFarland Micaylee Noreen Katie Dougherty Jeanne Noonan |
|---|---|---|
| | COURT REPORTER Jill Trail, OCR | COURTROOM DEPUTY J. Jones |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| x | | 6/7/22 | | | **Donna Kline (a/k/a/ Donna Rupley) – Rebuttal** |
| x | | 6/7/22 | P520 | ADM | GMS Industrial Supply, Inc. Sales Order re SDS Binder (dated 5/10/18) |
| x | | 6/7/22 | P521 | N/A | Order for Supplies or Services – SPE7L-1-18-V-5329 (dated 5/10/18) |
| x | | 6/7/22 | P522 | ADM | GMS Industrial Supply, Inc. Sales Order re SDS Binder Holder (dated 5/10/18) |
| x | | 6/7/22 | P523 | ADM | GMS Industrial Supply, Inc. Sales Order re 55 Gallon Drum Dolly  (dated 5/10/18) |
| x | | 6/7/22 | P524 | N/A | DOD Emall Order: M00011217576 |
| | | | | | **Cross-examination** |
| | x | 6/7/22 | P520 | AA | GMS Industrial Supply, Inc. Sales Order re SDS Binder (dated 5/10/18) |
| | x | 6/7/22 | P522 | AA | GMS Industrial Supply, Inc. Sales Order re SDS Binder Holder (dated 5/10/18) |
| | x | 6/7/22 | P523 | AA | GMS Industrial Supply, Inc. Sales Order re 55 Gallon Drum Dolly  (dated 5/10/18) |
| | x | 6/7/22 | D6 | AA | GMS Gross Revenue and Profit from 2015 to 2019 |
| | x | 6/7/22 | D9 | N/A | GMS Industrial 2018 S-Corp Tax Return |
| | | | | | **Redirect** |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

13

**JA1297**

FILED
IN OPEN COURT

JUN 1 0 2022

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

GMS INDUSTRIAL SUPPLY, INC.,      )
                                  )
    Plaintiff,                    )
                                  )
v.                                )    Civil Action No. 2:19-cv-324-RCY
                                  )
G&S SUPPLY, LLC, *et al.*,        )
                                  )
    Defendants.                   )

**SPECIAL VERDICT FORM**

**MEMBERS OF THE JURY:**

Please answer the questions on this form in the order listed – that is, please start with

Question 1, and answer each question in order before moving on to the next question. Please

follow the instructions after each question to determine which question to answer next.

We, the jury, unanimously answer the questions to us as follows:

**JA1298**

## BREACH OF DUTY OF LOYALTY CLAIM

Question No. 1

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Westly Greer** breached the fiduciary duty of loyalty he owed to GMS Industrial Supply, Inc.?

Yes  ___✓___                    No  _____

If you answered "Yes" to Question No. 1, then please proceed to Question No. 2. If you answered "No" to Question No. 1, then please proceed to Question No. 3.

Question No. 2

What is the amount of GMS Industrial Supply, Inc.'s damages from Westly Greer's breach of his fiduciary duty of loyalty?

$ ___59,000.00___

**JA1299**

## BREACH OF SALES AGENT AGREEMENTS CLAIMS

Question No. 3

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Westly Greer** breached his 2019 Independent Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____          No ___✓___

If you answered "Yes" to Question No. 3, then please proceed to Question No. 4. If you answered "No" to Question No. 3, then please proceed to Question No. 5.

Question No. 4

What is the amount of GMS Industrial Supply, Inc.'s damages from Westly Greer's breach of his 2019 Independent Agent Agreement with GMS Industrial Supply, Inc.?

$____N|A_____

Question No. 5

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Greg Spires** breached his 2013 Sales Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____          No ___✓___

Question No. 6

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Greg Spires** breached his 2017 Independent Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____          No ___✓___

**JA1300**

If you previously answered "Yes" to Question No. 5, then please proceed to Question No. 7. If you answered "No" to Question No. 5 and "Yes" to Question No. 6, then please proceed to Question No. 8. If you answered "No" to Question Nos. 5 and 6, then please proceed to Question No. 9.

Question No. 7

What is the amount of GMS Industrial Supply, Inc.'s damages from Greg Spires's breach of his 2013 Sales Agent Agreement with GMS Industrial Supply, Inc.?

$ 

If you previously answered "Yes" to Question No. 6, then please proceed to Question No. 8. If you previously answered "No" to Question No. 6, then please proceed to Question No. 9.

Question No. 8

What is the amount of GMS Industrial Supply, Inc.'s damages from Greg Spires's breach of his 2017 Independent Agent Agreement with GMS Industrial Supply, Inc.?

$ 

Question No. 9

Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **County Roads, LLC** breached its 2017 Independent Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____          No _____✓_____

If you answered "Yes" to Question No. 9, then please proceed to Question No. 10. If you answered "No" to Question No. 9, then please proceed to Question No. 11.

**JA1301**

Question No. 10

What is the amount of GMS Industrial Supply, Inc.'s damages from County Roads,

LLC's breach of its 2017 Independent Agent Agreement with GMS Industrial Supply, Inc.?

$_____ N|A _____

Question No. 11

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Sabrina**

**Greer** breached her 2017 Independent Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____          No ___✓___

If you answered "Yes" to Question No. 11, then please proceed to Question No. 12. If you

answered "No" to Question No. 11, then please proceed to Question No. 13.

Question No. 12

What is the amount of GMS Industrial Supply, Inc.'s damages from Sabrina Greer's

breach of her 2017 Independent Agent Agreement with GMS Industrial Supply, Inc.?

$_____ N|A _____

Question No. 13

Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **Greer**

**Group, LLC** breached its 2017 Independent Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____          No ___✓___

**JA1302**

If you answered "Yes" to Question No. 13, then please proceed to Question No. 14. If you

answered "No" to Question No. 13, then please proceed to Question No. 15.

Question No. 14

What is the amount of GMS Industrial Supply, Inc.'s damages from Greer Group LLC's

breach of its 2017 Independent Agent Agreement with GMS Industrial Supply, Inc.?

$  N|A

Question No. 15

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Mike Welton** breached his 2016 Independent Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____          No ___✓___

Question No. 16

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Mike Welton** breached his 2019 Statutory Employment Agreement with GMS Industrial Supply, Inc.?

Yes _____          No ___✓___

If you answered "Yes" to Question No. 15, then please proceed to Question No. 17. If you

answered "No" to Question No. 15 and "Yes" to Question No. 16, then please proceed to Question

No. 18. If you answered "No" to Question Nos. 15 and 16, then please proceed to Question No.

19.

**JA1303**

Question No. 17

What is the amount of GMS Industrial Supply, Inc.'s damages from Mike Welton's breach of his 2016 Independent Agent Agreement with GMS Industrial Supply, Inc.?

$ _____ N|A _____

If you previously answered "Yes" to Question No. 16, then please proceed to Question No. 18. If you previously answered "No" to Question No. 16, then please proceed to Question No. 19.

Question No. 18

What is the amount of GMS Industrial Supply, Inc.'s damages from Mike Welton's breach of his 2019 Statutory Employment Agreement with GMS Industrial Supply, Inc.?

$ _____ N/A _____

Question No. 19

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Thomas Hayes** breached his 2016 Independent Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____        No ___✓___

If you answered "Yes" to Question No. 19, then please proceed to Question No. 20. If you answered "No" to Question No. 19, then please proceed to Question No. 21.

**JA1304**

Question No. 20

What is the amount of GMS Industrial Supply, Inc.'s damages from Thomas Hayes'

breach of his 2016 Independent Agent Agreement with GMS Industrial Supply, Inc.?

$ _____N/A_____

## DEFEND TRADE SECRETS ACT CLAIMS

Question No. 21

      Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that it owned and possessed trade secret information, as defined in the Defend Trade Secrets Act?

Yes   ✓                    No  _____

      If you answered "Yes" to Question No. 21, then please proceed to Question No. 22.  If you answered "No" to Question No. 21, then please proceed to Question No. 33.

Question No. 22

      Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **G&S Supply, LLC** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes  _____          No   ✓   

Question No. 23

      Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Westly Greer** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes  _____          No   ✓   

**JA1306**

Question No. 24

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Sabrina Greer** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____          No ____✓____


Question No. 25

Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **Greer Group, LLC** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____          No ____✓____


Question No. 26

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Greg Spires** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____          No ____✓____


Question No. 27

Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **County Roads, LLC** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____          No ____✓____


**JA1307**

Question No. 28

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Thomas Hayes** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____          No ____✓____

Question No. 29

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Mike Welton** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____          No ____✓____

If you answered "Yes" to any of Question Nos. 22 through 29, then please proceed to Question No. 30. If you answered "No" to all of Question Nos. 22 through 29, then please proceed to Question No. 33.

**JA1308**

Question No. 30

For each Defendant that you find misappropriated GMS Industrial Supply, Inc.'s trade secret information, what is the amount of GMS Industrial Supply, Inc.'s damages from the misappropriation of each Defendant?



1. G&S Supply, LLC             $_____

2. Westly Greer                $_____

3. Sabrina Greer               $_____

4. Greer Group, LLC            $_____

5. Greg Spires                 $_____

6. County Roads, LLC           $_____

7. Thomas Hayes                $_____

8. Mike Welton                 $_____

<u>Question No. 31</u>

For each Defendant that you find misappropriated GMS Industrial Supply, Inc.'s trade secret information, do you find that the Defendant's misappropriation was willful and malicious?



G&S Supply, LLC
        Yes  _____          No  _____          N/A

Westly Greer
        Yes  _____          No  _____

Sabrina Greer
        Yes  _____          No  _____

Greer Group, LLC
        Yes  _____          No  _____

Greg Spires
        Yes  _____          No  _____

County Roads, LLC
        Yes  _____          No  _____

Thomas Hayes
        Yes  _____          No  _____

Mike Welton
        Yes  _____          No  _____

**JA1310**

If you answered "Yes" to Question No. 31 for any of the Defendants, then please proceed to Question No. 32. If you answered "No" to Question No. 31 for all of the Defendants, then please proceed to Question No. 33.

Question No. 32

For each Defendant that you find willfully and maliciously misappropriated GMS Industrial Supply, Inc.'s trade secret information, what amount of exemplary damages, if any, do you award GMS Industrial Supply, Inc.?



1. G&S Supply, LLC          $_____

2. Westly Greer             $_____

3. Sabrina Greer            $_____

4. Greer Group, LLC         $_____

5. Greg Spires              $_____

6. County Roads, LLC        $_____

7. Thomas Hayes             $_____

8. Mike Welton              $_____

## VIRGINIA UNIFORM TRADE SECRETS ACT CLAIMS

Question No. 33

     Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that it owned and possessed trade secret information, as defined in the Virginia Uniform Trade Secrets Act?

Yes ____✓____            No _____

     If you answered "Yes" to Question No. 33, then please proceed to Question No. 34.  If you answered "No" to Question No. 33, then please proceed to Question No. 45.

Question No. 34

     Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **G&S Supply, LLC** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____            No ____✓____

Question No. 35

     Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Westly Greer** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes ____✓____            No _____

Question No. 36

     Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Sabrina Greer** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____            No ____✓____

**JA1312**

Question No. 37

Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **Greer Group, LLC** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____        No ___✓_____


Question No. 38

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Greg Spires** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____        No ___✓_____


Question No. 39

Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **County Roads, LLC** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____        No ___✓_____


Question No. 40

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Thomas Hayes** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____        No ___✓_____


**JA1313**

Question No. 41

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Mike Welton** misappropriated GMS Industrial Supply, Inc.'s trade secret information?

Yes _____          No __✓__

If you answered "Yes" to any of Question Nos. 34 through 41, then please proceed to Question No. 42. If you answered "No" to all of Question Nos. 34 through 41, then please proceed to Question No. 45.

Question No. 42

For each Defendant that you find misappropriated GMS Industrial Supply, Inc.'s trade secret information, what is the amount of GMS Industrial Supply, Inc.'s damages from the misappropriation of each Defendant?

1. G&S Supply, LLC          $_____
2. Westly Greer             $_____ Ø _____
3. Sabrina Greer            $_____
4. Greer Group, LLC         $_____
5. Greg Spires              $_____
6. County Roads, LLC        $_____
7. Thomas Hayes             $_____
8. Mike Welton              $_____

**JA1314**

Question No. 43

For each Defendant that you find misappropriated GMS Industrial Supply, Inc.'s trade
secret information, do you find that the Defendant's misappropriation was willful and malicious?

G&S Supply, LLC

Yes _____      No _____

Westly Greer

Yes _____      No ___✓_____

Sabrina Greer

Yes _____      No _____

Greer Group, LLC

Yes _____      No _____

Greg Spires

Yes _____      No _____

County Roads, LLC

Yes _____      No _____

Thomas Hayes

Yes _____      No _____

Mike Welton

Yes _____      No _____

**JA1315**

If you answered "Yes" to Question No. 43 for any of the Defendants, then please proceed to Question No. 44.  If you answered "No" to Question No. 43 for all of the Defendants, then please proceed to Question No. 45.

Question No. 44

For each Defendant that you find willfully and maliciously misappropriated GMS Industrial Supply, Inc.'s trade secret information, what amount of punitive damages, if any, do you award GMS Industrial Supply, Inc.?



1.  G&S Supply, LLC              $_____

2.  Westly Greer                 $_____

3.  Sabrina Greer                $_____

4.  Greer Group, LLC             $_____

5.  Greg Spires                  $_____

6.  County Roads, LLC            $_____

7.  Thomas Hayes                 $_____

8.  Mike Welton                  $_____

**JA1316**

## VIRGINIA COMPUTER CRIMES ACT CLAIMS

Question No. 45

Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **Westly Greer** with a malicious intent OR through intentionally deceptive means and without authority did one or more of the following:

A)  Temporarily or permanently removed, halted, or otherwise disabled any of GMS Industrial Supply, Inc.'s computer data, computer programs, or computer software?

Yes  __✓__          No  _____

B)  Altered, disabled, or erased any of GMS Industrial Supply, Inc.'s computer data, computer programs, or computer software?

Yes  __✓__          No  _____

C)  Used a computer or computer network to cause physical injury to GMS Industrial Supply, Inc.'s property?

Yes  _____          No  __✓__

D)  Used a computer or computer network to make or cause to be made an unauthorized copy, in any form (including but not limited to, any printed or electronic form), of computer data, computer programs, or computer software residing in, communicated by, or produced by a computer or computer network?

Yes  __✓__          No  _____

If you answered "Yes" to any of Question Nos. 45 A through D, then please proceed to Question No. 46. If you answered "No" to all of Question Nos. 45 A through D, then please proceed to Question No. 47.

Question No. 46

What is the amount of GMS Industrial Supply, Inc.'s damages from the violation of the

Virginia Computer Crimes Act by Defendant Westly Greer?

1. Westly Greer                    $ _____50,000.00_____

## VIRGINIA STATUTORY BUSINESS CONSPIRACY CLAIMS

<u>Question No. 47</u>

Did GMS Industrial Supply, Inc., prove by clear and convincing evidence that **Westly Greer** conspired with one or more other persons to willfully and maliciously injure GMS Industrial Supply, Inc. in its reputation, trade, business, or profession?

Yes _____          No ___✓____


<u>Question No. 48</u>

Did GMS Industrial Supply, Inc., prove by clear and convincing evidence that **Sabrina Greer** conspired with one or more other persons to willfully and maliciously injure GMS Industrial Supply, Inc. in its reputation, trade, business, or profession?

Yes _____          No ___✓____


<u>Question No. 49</u>

Did GMS Industrial Supply, Inc., prove by clear and convincing evidence that **Greer Group, LLC** conspired with one or more other persons to willfully and maliciously injure GMS Industrial Supply, Inc. in its reputation, trade, business, or profession?

Yes _____          No ___✓____


<u>Question No. 50</u>

Did GMS Industrial Supply, Inc., prove by clear and convincing evidence that **Greg Spires** conspired with one or more other persons to willfully and maliciously injure GMS Industrial Supply, Inc. in its reputation, trade, business, or profession?

Yes _____          No ___✓____


**JA1319**

Question No. 51

Did GMS Industrial Supply, Inc., prove by clear and convincing evidence that **County Roads, LLC** conspired with one or more other persons to willfully and maliciously injure GMS Industrial Supply, Inc. in its reputation, trade, business, or profession?

Yes _____          No ___✓___


Question No. 52

Did GMS Industrial Supply, Inc., prove by clear and convincing evidence that **Thomas Hayes** conspired with one or more other persons to willfully and maliciously injure GMS Industrial Supply, Inc. in its reputation, trade, business, or profession?

Yes _____          No ___✓___


Question No. 53

Did GMS Industrial Supply, Inc., prove by clear and convincing evidence that **Mike Welton** conspired with one or more other persons to willfully and maliciously injure GMS Industrial Supply, Inc. in its reputation, trade, business, or profession?

Yes _____          No ___✓___


If you answered "Yes" to any of Question Nos. 47 through 53, then please proceed to Question No. 54. If you answered "No" to all of Question Nos. 47 through 53, then please proceed to Question No. 55.

**JA1320**

Question No. 54

What is the amount of GMS Industrial Supply, Inc.'s damages from the conspiracy?

$ _____ N/A _____

Question No. 55

The amount of damages provided for in Question No. 54 should be multiplied by (select one):



One _____

Two _____

Three _____

## VIRGINIA COMMON LAW BUSINESS CONSPIRACY CLAIMS

Question No. 56

Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **Westly Greer** conspired with one or more other persons to intentionally, maliciously, and without lawful justification injure GMS Industrial Supply, Inc.'s business?

Yes _____          No ___✓___

Question No. 57

Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **Sabrina Greer** conspired with one or more other persons to intentionally, maliciously, and without lawful justification injure GMS Industrial Supply, Inc.'s business?

Yes _____          No ___✓___

Question No. 58

Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **Greer Group, LLC** conspired with one or more other persons to intentionally, maliciously, and without lawful justification injure GMS Industrial Supply, Inc.'s business?

Yes _____          No ___✓___

Question No. 59

Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **Greg Spires** conspired with one or more other persons to intentionally, maliciously, and without lawful justification injure GMS Industrial Supply, Inc.'s business?

Yes _____          No ___✓___

Question No. 60

      Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **County Roads, LLC** conspired with one or more other persons to intentionally, maliciously, and without lawful justification injure GMS Industrial Supply, Inc.'s business?

      Yes _____              No  ✓\_\_\_\_\_

Question No. 61

      Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **Thomas Hayes** conspired with one or more other persons to intentionally, maliciously, and without lawful justification injure GMS Industrial Supply, Inc.'s business?

      Yes _____              No  ✓\_\_\_\_\_

Question No. 62

      Did GMS Industrial Supply, Inc., prove by a preponderance of the evidence that **Mike Welton** conspired with one or more other persons to intentionally, maliciously, and without lawful justification injure GMS Industrial Supply, Inc.'s business?

      Yes _____              No  ✓\_\_\_\_\_

      If you answered "Yes" to any of Question Nos. 56 through 62, then please proceed to Question No. 63. If you answered "No" to all of Question Nos. 56 through 62, then please proceed to Question No. 64.

Question No. 63

What is the amount of GMS Industrial Supply, Inc.'s damages resulting from the business conspiracy?

$_____N/A_____

## BREACH OF CONTRACT COUNTERCLAIMS

Question No. 64

Did **Westly Greer** prove by a preponderance of the evidence that GMS Industrial Supply, Inc. breached the 2019 Sales Agent Agreement with him?

Yes  ✓ _____    No _____

If you answered "Yes" to Question No. 64, then please proceed to Question No. 65.  If you answered "No" to Question No. 64, then please proceed to Question No. 68.

Question No. 65

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that Westly Greer is barred from recovery under his contracts with GMS Industrial Supply, Inc. due to unclean hands?

Yes _____    No ✓ _____

Question No. 66

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that Westly Greer committed the first material breach of his contracts with GMS Industrial Supply, Inc.?

Yes _____    No ✓ _____

If you answered "Yes" to either Question Nos. 65 or 66, then please proceed to Question No. 68.  If you answered "No" to both Question Nos. 65 and 66, then please proceed to Question No. 67.

**JA1325**

Question No. 67

What is the amount of **Westly Greer**'s damages?

$ _____ $13,087.99 _____

Question No. 68

Did **Sabrina Greer and Greer Group, LCC (collectively "Greer")** prove by a preponderance of the evidence that GMS Industrial Supply, Inc. breached its 2017 Sales Agent Agreement with her?

Yes ___✓___               No _____

If you answered "Yes" to Question No. 68, then please proceed to Question No. 69.  If you answered "No" to Question No. 68, then please proceed to Question No. 72.

**JA1326**

Question No. 69

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that Greer is barred from recovery under her 2017 Sales Agent Agreement with GMS Industrial Supply, Inc. due to unclean hands?

Yes _____          No __✓_____

Question No. 70

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that Greer committed the first material breach of her 2017 Sales Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____          No __✓_____

If you answered "Yes" to either Question Nos. 69 or 70, then please proceed to Question No. 72. If you answered "No" to both Question Nos. 69 and 70, then please proceed to Question No. 71.

Question No. 71

What is the amount of **Greer**'s damages?

$_____9760,50_____

Question No. 72

Did **Greg Spires and County Roads, LLC (collectively "Spires")** prove by a preponderance of the evidence that GMS Industrial Supply, Inc. breached its 2017 Sales Agent Agreement with him?

Yes __✓_____          No _____

**JA1327**

If you answered "Yes" to Question No. 72, then please proceed to Question No. 73. If you answered "No" to Question No. 72, then please proceed to Question No. 76.

Question No. 73

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Spires** is barred from recovery under his 2017 Sales Agent Agreement with GMS Industrial Supply, Inc. due to unclean hands?

Yes _____          No  _____

Question No. 74

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Spires** committed the first material breach of his 2017 Sales Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____          No ✓_____

If you answered "Yes" to either Question Nos. 73 or 74, then please proceed to Question No. 76. If you answered "No" to both Question Nos. 73 through 74, then please proceed to Question No. 75.

Question No. 75

What is the amount of **Spires'** damages?

$ ___14,231.32___

**JA1328**

Question No. 76

Did **Thomas Hayes** prove by a preponderance of the evidence that GMS Industrial Supply, Inc. breached its 2016 Sales Agent Agreement with him?

Yes __✓__                    No _____

If you answered "Yes" to Question No. 76, then please proceed to Question No. 77. If you answered "No" to Question No. 76, then please proceed to Question No. 80.

Question No. 77

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Thomas Hayes** is barred from recovery under his 2016 Sales Agent Agreement with GMS Industrial Supply, Inc. due to unclean hands?

Yes _____                    No __✓__

Question No. 78

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Thomas Hayes** committed the first material breach of his 2016 Sales Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____                    No __✓__

If you answered "Yes" to either Question Nos. 77 or 78, then please proceed to Question No. 80. If you answered "No" to both Question Nos. 77 and 78, then please proceed to Question No. 79.

**JA1329**

Question No. 79

What is the amount of **Thomas Hayes**' damages?

$_____5000.00_____

Question No. 80

Did **Mike Welton** prove by a preponderance of the evidence that GMS Industrial Supply, Inc. breached its 2016 Sales Agent Agreement with him?

Yes __✓__                    No _____

If you answered "Yes" to Question No. 80, then please proceed to Question No. 81. If you answered "No" to Question No. 80, then please proceed to the Closing Instruction on the last page.

Question No. 81

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Mike Welton** is barred from recovery under his 2016 Sales Agent Agreement with GMS Industrial Supply, Inc. due to unclean hands?

Yes _____                    No __✓__

Question No. 82

Did GMS Industrial Supply, Inc. prove by a preponderance of the evidence that **Mike Welton** committed the first material breach of his 2017 Sales Agent Agreement with GMS Industrial Supply, Inc.?

Yes _____                    No __✓__

**JA1330**

If you answered "Yes" to either Question Nos. 81 or 82, then please proceed to the Closing Instruction on the following page.  If you answered "No" to both Question Nos. 81 through 82, then please proceed to Question No. 83.

Question No. 83

What is the amount of **Mike Welton**'s damages?

$_____7500.00_____

## CLOSING INSTRUCTION

After answering the questions above as instructed, the jury has completed this Special

Verdict Form.  The jury foreperson should sign and date the document for return to the Court.

REDACTED COPY

_____
JURY FOREPERSON SIGNATURE

REDACTED COPY

_____
JURY FOREPERSON PRINTED NAME

SO SAY WE ALL

Dated this __10__ day of June, 2022.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**


GMS INDUSTRIAL SUPPLY, INC.,

      Plaintiff,

v.                                    Civil Action No.: 2:19CV324-RCY-LRL

G&S SUPPLY, LLC, et al.,

      Defendants.


## <u>JURY INSTRUCTIONS</u>

JURY INSTRUCTION NO. 1

Members of the jury:

Now that you have heard the evidence and the argument, it is my duty to instruct you about the applicable law.

It is your duty to follow the law as I will state it. You must apply the law to the facts as you find them from the evidence in the case. Do not single out one instruction as stating the law, but consider the instructions as a whole. Do not be concerned about the wisdom of any rule of law stated by me. You must follow and apply the law.

The lawyers may refer to some of the governing rules of law in their arguments. If there is any difference between the law stated by the lawyers and these instructions, you must follow my instructions.

Nothing I say in these instructions indicates I have any opinion about the facts. You, not I, have the duty to determine the facts.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

JURY INSTRUCTION NO. 2

In deciding the facts, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, part of it, or none of it. In considering the testimony of any witness, you may take into account many factors, including the witness' opportunity and ability to see or hear or know the things the witness testified about; the quality of the witness' memory; the witness' appearance and manner while testifying; the witness' interest in the outcome of the case; any bias or prejudice the witness may have; other evidence that may have contradicted the witness' testimony; and the reasonableness of the witness' testimony in light of all the evidence. The weight of the evidence does not necessarily depend upon the number of witnesses who testify.

JURY INSTRUCTION NO. 3

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. A corporation or other business entity is entitled to the same fair trial as a private individual. All persons, including corporations and other business entities, stand equal before the law, and are to be treated as equals.

JURY INSTRUCTION NO. 4

Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses regardless of who called the witness, all exhibits received in evidence regardless of who may have produced them, and all facts and events that may have been admitted or stipulated to.

Statements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you understand the evidence, but it is not evidence. However, when the lawyers on both sides stipulate or agree on the existence of a fact, unless otherwise instructed, you must accept the stipulation and regard that fact as proved.

Any evidence to which I have sustained an objection and evidence that I have ordered stricken must be entirely disregarded.

JURY INSTRUCTION NO. 5

The weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or nonexistence of any fact. You may find the testimony of a small number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

You are not bound to decide any issue of fact in accordance with the testimony of any number of witnesses that does not produce in your minds belief in the likelihood of truth, as against the testimony of a lesser number of witnesses or other evidence producing such belief in your minds.

The test is not which side brings the greater number of witnesses or takes the most time to present its evidence, but which witnesses and which evidence appeal to your minds as being most accurate and otherwise trustworthy.

JURY INSTRUCTION NO. 6

You are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You may be guided by the appearance and conduct of a witness, or by the manner in which a witness testifies, or by the character of the testimony given, or by evidence contrary to the testimony. You should carefully examine all the testimony given, the circumstances under which each witness has testified, and every matter in evidence tending to show whether a witness is worthy of belief. Consider each witness' intelligence, motive and state of mind, and demeanor or manner while testifying.

Consider the witness' ability to observe the matters as to which the witness has testified, and whether the witness impresses you as having an accurate recollection of these matters. Also, consider any relation each witness may have with either side of the case, the manner in which each witness might be affected by the verdict, and the extent to which the testimony of each witness is either supported or contradicted by other evidence in the case. Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses may or may not cause you to discredit such testimony. Two or more persons seeing an event may see or hear it differently.

In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood. After making your own judgment, you will give the testimony of each witness such weight, if any, that you may think it deserves. In short, you may accept or reject the testimony of any witness, in whole or in part.

JURY INSTRUCTION NO. 7

The rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions. There is an exception to this rule for expert witnesses.  An expert witness is a person who by education and experience has become expert in some art, science, profession, or calling. Expert witnesses give their opinions as to matters in which they profess to be expert, and may also state their reasons for their opinions.

You should consider each expert opinion received in evidence in this case, and give it such weight as you think it deserves.  If you should decide the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude the reasons given in support of the opinion are not sound, or if you feel the expert is outweighed by other evidence, you may disregard the opinion entirely.

JURY INSTRUCTION NO. 8

"Direct evidence" is a direct proof of a fact, such as testimony by a witness about what the witness said or heard or did. "Circumstantial evidence" is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You are to decide how much weight to give any evidence.

JURY INSTRUCTION NO. 9

You are to consider only the evidence in the case.  However, you are not limited to the statements of the witnesses.  You may draw from the facts you find have been proved such reasonable inferences as seem justified in light of your experience.

"Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

JURY INSTRUCTION NO. 10

The parties have stipulated that certain facts are true.  You must therefore treat these facts as having been proved for the purposes of this case.

JURY INSTRUCTION NO. 11

If any reference by the court or by counsel to matters of testimony or exhibits does not coincide with your own recollection of that evidence, it is your recollection which should control during your deliberations and not the statements of the court or of counsel. You are the sole judges of the evidence received in this case.

JURY INSTRUCTION NO. 12

Testimony and exhibits can be admitted into evidence during a trial only if it meets certain criteria or standards. It is the sworn duty of the attorney on each side of a case to object when the other side offers testimony or an exhibit which that attorney believes is not properly admissible under the rules of law. Only by raising an objection can a lawyer request and then obtain a ruling from the court on the admissibility of the evidence being offered by the other side. You should not be influenced against an attorney or his client because the attorney has made objections.

Do not attempt, moreover, to interpret my rulings on objections as somehow indicating how I think you should decide this case. I am simply making a ruling on a legal question regarding that particular piece of testimony or exhibit.

JURY INSTRUCTION NO. 13

During the course of a trial, I may have asked questions of a witness. Do not assume that I hold any opinion on the matters to which my questions may have related.  The court may ask a question simply to clarify a matter–not to help one side of the case or hurt another side.

Remember at all times that you, as jurors, are the sole judges of the facts of this case.

JURY INSTRUCTION NO. 14

The law of the United States permits a federal judge to comment to the jury on the evidence in a case. Such comments are, however, only expressions of my opinion as to the facts and the jury may disregard them entirely. You, as jurors, are the sole judges of the facts in this case. It is your recollection and evaluation of the evidence that is important to the verdict in this case.

Although you must follow the court's instructions concerning the law applicable to this case, you are totally free to accept or reject my observations concerning the evidence received in the case.

JURY INSTRUCTION NO. 15

Charts or summaries have been admitted into evidence, and have been shown to you during the trial for the purpose of explaining facts that are allegedly contained in books, records, and other documents or exhibits which are in evidence in this case. You may consider the charts and summaries as you would any other evidence admitted during the trial and give it such weight or importance, if any, as you feel it deserves.

JURY INSTRUCTION NO. 16

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by attorneys for the parties to the case. The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented in writing under oath or on a videotape. Such testimony is entitled to the same consideration and is to be judged as to credibility, and weighed, and otherwise considered by you, insofar as possible, in the same way as if the witness had been present and had testified from the witness stand.

JURY INSTRUCTION NO. 17

Video recordings of deposition testimony have been received in evidence and have been played for you. Transcripts of some of these video recordings of deposition testimony were furnished to you. These transcripts were given to you solely for your convenience to assist you in following the testimony or in identifying the speakers on the video recordings.

The video recording of deposition testimony itself is evidence in the case and the transcripts are not evidence. What you saw and heard on the video recording of deposition testimony is evidence. What you read on the transcript is not. If you perceive any variation between the two, you will be guided solely by the video recordings of deposition testimony and not by the transcripts.

If you cannot, for example, determine from the video recordings of deposition testimony that particular words were spoken or if you cannot determine from the video recordings of deposition testimony who said a particular word or words, you must disregard the transcripts insofar as those words or that speaker are concerned.

JURY INSTRUCTION NO. 18

A witness may be discredited or impeached by contradictory evidence or by evidence that at some other time the witness has said or done something, or has failed to say or do something that is inconsistent with the witness' present testimony.  If you believe any witness has been impeached and thus discredited, you may give the testimony of that witness such credibility, if any, you think it deserves.

If a witness is shown to have knowingly testified falsely about any material matter, you have a right to distrust such witness' other testimony and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.  An act or omission is "knowingly" done, if the act is done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

JURY INSTRUCTION NO. 19

Plaintiff GMS Industrial Supply, Inc., has the burden of proof in a civil action, such as this, to prove every essential element of plaintiff's claims by the applicable standard of proof as I will explain for each claim.  If plaintiff should fail to establish any essential element of any of its claims by the applicable standard of proof, you should find for defendants as to that claim.

As to the counterclaims, the defendants are in the position of a plaintiff, and the defendants have the burden of proving the essential elements of their counterclaims. If defendants should fail to establish any essential element of any of their counterclaims by the applicable standard of proof, you should find for plaintiff as to that counterclaim.

JURY INSTRUCTION NO. 20

To "establish by a preponderance of the evidence" means to show that the fact sought to be proved is more probable than not.  In other words, a preponderance of the evidence means such evidence, as when considered and compared with the evidence opposed to it, has more convincing force, and produced in your minds belief that what is sought to be proved is more likely true than not true. This standard does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case.

In determining whether any fact in issue has been proved by a preponderance of the evidence, unless otherwise instructed, you may consider the testimony of all witnesses, including all deposition testimony, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

JURY INSTRUCTION NO. 21

One of the plaintiff's claims must be proved by "clear and convincing evidence."  "Clear and convincing evidence" is evidence that produces in your mind a firm belief or conviction as to the matter at issue.  Clear and convincing evidence involves a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard.  This standard does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case.

JURY INSTRUCTION NO. 22

I have two preliminary instructions regarding damages, if you find that the plaintiff prevails on any of its claims.

First, you should not award compensatory damages more than once for the same injury or loss. For example, if a plaintiff were to prevail on two claims and establish a one-dollar injury or loss, you could not award it one dollar compensatory damages on each claim—it is only entitled to be made whole again, not to recover more than it lost. Of course, if different injuries or losses are attributed to the separate claims, then you must compensate it fully for all of the injuries or losses.

With respect to punitive damages, you may make separate awards on each claim that is established.

Second, you must be careful to impose any damages that you may award on a claim solely upon the defendant or defendants who you find to be liable on that claim. Although there is more than one defendant in this action, it does not follow from that fact alone that if one defendant is liable to the plaintiff, all defendants are liable. Each defendant is entitled to fair consideration of the evidence. No defendant is to be prejudiced should you find against another. Unless otherwise stated, all instructions I give you govern the case as to each defendant.

JURY INSTRUCTION NO. 23

The purpose of the law of damages is to award just and fair monetary compensation for the loss, if any, that resulted from a defendant's violation of plaintiff's rights. Compensatory damages are meant to compensate a party for the actual injury or loss caused. These damages are called "compensatory damages" and are meant to make a party whole – that is, to compensate the plaintiff for the damage suffered through the payment of money.

An award of compensatory damages must be fair and reasonable and be neither inadequate nor excessive. You should not award compensatory damages for speculative injuries and should only award damages for those injuries plaintiff has actually suffered.

In awarding compensatory damages, you must be guided by dispassionate common sense. Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork. Plaintiff GMS Industrial Supply, Inc., is not required to prove the exact amount of damages, but must show sufficient facts to permit you to make an accurate estimate of them.

You should not interpret the fact that I am giving instructions about damages as an indication in any way that I believe a party seeking damages in this case – Plaintiff on its claims and Defendants on their counterclaims – should prevail. I am instructing you on damages only so that you will have guidance in the event you decide they should be awarded.

JURY INSTRUCTION NO. 24


As a general rule, the knowledge of an agent is imputed to his principal.

JURY INSTRUCTION NO. 25


A principal is bound by the acts of his agent within the scope of the agent's ostensible or apparent authority.

JURY INSTRUCTION NO. 26

You are permitted, but not required, to infer that information existed on Westly Greer's laptop and desktop computers that would have been unfavorable to Westly Greer's theory of the case, and favorable to GMS's theory of the case. You may conclude this based on Westly Greer's use of FILESHREDDER on those computers after he had received evidence preservation letters from GMS Industrial Supply's attorneys. If you draw an adverse inference against Westly Greer from his conduct, then you may consider that inference with the other evidence to decide the questions in this case.

JURY INSTRUCTION NO. 27

In this case, the plaintiff, GMS Industrial Supply, Inc. alleges that the defendant, Westly

Greer, violated his fiduciary duty of loyalty as an employee of the company.  Westly Greer

denies violating his fiduciary duty of loyalty to GMS.

For GMS to recover from Westly Greer on its claim of breach of fiduciary duty, you must

find that all the following have been proved by a preponderance of the evidence:

1.  Defendant Westly Greer, breached his fiduciary duty to the plaintiff, GMS;

2.  The plaintiff had damages; and

3.  Westly Greer's breach of fiduciary duty was a cause of the plaintiff's damages.

If you find that any one or more of these three statements has not been proved, then your

verdict must be for the defendant.

On the other hand, if you find that all these three statements have been proved, then your

verdict must be for the plaintiff.

**JA1360**

JURY INSTRUCTION NO. 28

As an employee, Westly Greer owed GMS a fiduciary duty of loyalty to his employer during his employment.

JURY INSTRUCTION NO. 29

The fiduciary duty of loyalty dictates that, during his employment with GMS, Westly

Greer not exploit GMS's trust so as to obtain an unfair advantage in competing with GMS in a

matter concerning GMS's business.

JURY INSTRUCTION NO. 30

The termination of Westly Greer's employment with GMS did not automatically free him from his fiduciary obligations to the company.  If you find that Westly Greer engaged in transactions that had their inception before his termination from GMS or that were based on information obtained during his employment with GMS, then you must find that Westly Greer breached his fiduciary duty of loyalty to GMS.

JURY INSTRUCTION NO. 31

GMS has the burden of proving, by a preponderance of the evidence, the nature and extent of its damages. If you find in favor of GMS, you must determine the total dollar amount of GMS's damages, if any, that were caused by the breach of fiduciary duty by the defendant, Westly Greer.

In determining such damages, you shall consider any economic losses which plaintiff has had or will probably have in the future, including:

A. Anything of value or any profit the defendant, Westly Greer, received as a result of the breach of fiduciary duty;

B. Any loss of profits which GMS could reasonably have expected to earn had the fiduciary duty not been breached; and

C. Any compensation defendant Westly Greer received from GMS for services performed during the period in which he engaged in activities constituting a breach of his duty of loyalty, even if part of those services may have been properly performed.

JURY INSTRUCTION NO. 32

Plaintiff GMS Industrial Supply, Inc., alleges claims for breach of contract.  To prevail, plaintiff GMS Industrial Supply, Inc., must prove its breach of contract claims by a preponderance of the evidence.  Specifically, GMS Industrial Supply, Inc., alleges: Defendants Westly Greer, Gregory K. Spires, County Roads LLC, Thomas Hayes, Sabrina Greer, Greer Group LLC, and Mike Welton each breached their independent sales agent agreements with plaintiff GMS Industrial Supply, Inc.  On these claims, plaintiff bears the burden of proof.

In their counterclaims, defendants Westly Greer, Gregory K. Spires, County Roads LLC, Thomas Hayes, Sabrina Greer, Greer Group LLC, and Mike Welton allege plaintiff GMS Industrial Supply, Inc. breached its independent sales agreements with defendants Westly Greer, Gregory K. Spires, County Roads LLC, Thomas Hayes, Sabrina Greer, Greer Group LLC, and Mike Welton by failing to pay them commission and bonuses earned for sales each of them made for plaintiff.

On this issue, defendants Westly Greer, Gregory K. Spires, County Roads LLC, Thomas Hayes, Sabrina Greer, Greer Group LLC, and Mike Welton bear the burden of proof.

The sales agent agreements are contracts.   A contract is an agreement, for consideration, between two or more parties.  To breach a contract:

1.    There must be a legally enforceable obligation of one party to the other party;

2.    The party must have violated or breached that obligation; and

3.    Injury or damage to the other party was caused by the breach of the obligation.

I will give you further instructions on the counterclaims later on.

JURY INSTRUCTION NO. 33

As to each of the defendants listed here, you shall find your verdict for plaintiff GMS Industrial Supply, Inc., on its breach of contract claim against defendants Westly Greer, Gregory K. Spires, County Roads LLC, Thomas Hayes, Sabrina Greer, Greer Group LLC, or Mike Welton for their alleged violation of their sales agent agreements if plaintiff GMS Industrial Supply, Inc., has proven by a preponderance of the evidence that each of the aforementioned defendants:

1. Had a legally enforceable obligation to the plaintiff under their sales agent agreement; and

2. Violated or breached their obligation under their sales agent agreement; and

3. There was injury or damage to plaintiff GMS Industrial Supply, Inc., caused by the breach of the obligation.

You shall find your verdict for any one or all of the aforementioned defendants if plaintiff failed to prove any one or more of the elements above as to that particular defendant.

**JA1366**

JURY INSTRUCTION NO. 34

A contract must be both complete and reasonably certain.  It is complete if it incudes all the essential terms.  It is reasonably certain if all the essential terms are expressed in a clear and definite way.

JURY INSTRUCTION NO. 35

Interpretation of a contract is primarily a determination of what the parties intended.  In determining their intent, you should first consider the words they used.  The words should be given their plain and ordinary meaning unless an obvious different meaning is apparent.  You may also consider the subject matter of the contract, the situation of the parties, the purpose of the parties in making the contract, and the surrounding circumstances.

JURY INSTRUCTION NO. 36

In interpreting a contract, you should resolve any doubts about the meaning of a word or phrase against the party who prepared the contract.

JURY INSTRUCTION NO. 37

When interpreting contracts, words used by the parties should be given their ordinary, usual, and popular meaning, unless you find that the parties clearly intended such words to have another meaning.

JURY INSTRUCTION NO. 38

If you decide in favor of plaintiff GMS Industrial Supply, Inc., on its breach of contract claims, you should then decide how much the defendant or defendants who you believe breached the contract should pay in compensatory damages.

JURY INSTRUCTION NO. 39

The term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if

(a) the owner thereof has taken reasonable measures to keep such information secret; and

(b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

JURY INSTRUCTION NO. 40

In order for GMS to prevail on its claim for misappropriation of a trade secret under the Defend Trade Secrets Act, GMS must establish each element of the offense by a preponderance of the evidence.

JURY INSTRUCTION NO. 41

In this case, GMS alleges that each of the defendants misappropriated trade secrets under the Defend Trade Secrets Act.  Each of the defendants denies misappropriating any trade secrets from GMS.

With respect to each defendant, you shall find your verdict for GMS if it has proved that

1.  The defendant acted with intent to convert GMS 's trade secret (or trade secrets) that is/are related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than GMS; and

2.  The defendant did so intending or knowing that the offense would injure GMS; and

3.  The defendant knowingly did any **one or more** of the following:

    A.  Steal, or without authorization appropriate, take, carry away, or conceal, or by fraud, artifice, or deception obtain such information;

    B.  Without authorization copy, duplicate, sketch, draw, photograph, download, upload, alter, destroy, photocopy, replicate, transmit, deliver, send, mail, communicate, or convey such information;

    C.  Receive, buy, or possess such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

    D.  Attempt to commit any offense described in (A) through (C); or

    E.  Conspire with one or more other persons to commit any offense described in (A) through (C), and one or more of such persons do any act to effect the object of the conspiracy.

You shall find your verdict for the defendant if the plaintiff failed to prove any of the elements above.

**JA1374**

Although this instruction is applicable to claims by GMS against all of the defendants, you must consider for each defendant whether they misappropriated a trade secret under the Defend Trade Secrets Act.

JURY INSTRUCTION NO. 42

To satisfy the reasonable efforts requirement, GMS is not required to show that it utilized the full range of potentially protective measures that might have been available. GMS only has to show that the efforts it took were reasonable under the circumstances to maintain its secrecy. Extreme and unduly expensive procedures need not be taken.

JURY INSTRUCTION NO. 43

A trade secret can exist in the unique combination of otherwise known components; although each of its parts, by itself, may be in the public domain, the unified process, design and operation of the combination may be the essence of the secret.

A unique combination of generally known elements or steps can qualify as a trade secret if it represents a valuable contribution attributable to the independent efforts of the one claiming to have conceived it. The combination must differ materially from other methods revealed by the prior art.

JURY INSTRUCTION NO. 44

While it's true that an item can be a trade secret even if it's publicly available — for instance, if it appears in an unsealed court filing — it still must be relatively secret. A trade secret must not be of public knowledge or of a general knowledge in the trade or business.

However, information may lose its trade secret status by disclosure of the trade secret, including to a third party without requiring that party's confidentiality, through advertising, trade circulars, or in an analogous manner.

JURY INSTRUCTION NO. 45

Misappropriation under the Defend Trade Secrets Act occurs when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, or (2) uses or discloses the trade secret after acquiring it through improper means.  The phrase "improper means," when used in the context of acquiring a trade secret includes . . . a breach of a duty to maintain secrecy, . . . or other means.

JURY INSTRUCTION NO.  46

If you find your verdict for plaintiff, GMS, then it is entitled to recover damages for

actual loss caused by the misappropriation of the trade secret, and damages for any unjust

enrichment caused by the misappropriation of the trade secret that is not addressed in computing

damages for actual loss.

JURY INSTRUCTION NO. 47

If you find that the defendants willfully and maliciously misappropriated plaintiff's trade secret, you may award GMS exemplary damages in an amount not more than two times the amount of the actual loss and unjust enrichment damages.

JURY INSTRUCTION NO. 48


For the purpose of the Defend Trade Secrets Act, willfully and maliciously means acting with an intent to cause injury or harm.

JURY INSTRUCTION NO. 49

In this case, GMS alleges that each of the defendants misappropriated trade secrets under the Virginia Uniform Trade Secrets Act. Each of the defendants denies misappropriating any trade secrets from GMS.

With respect to each defendant, you shall find your verdict for GMS if it has proved two elements: (1) the existence of a "trade secret"; and (2) the "misappropriation" of that trade secret by the defendant.

You shall find your verdict for the defendant if the plaintiff failed to prove any of the elements above.

Although this instruction is applicable to claims by GMS against all of the defendants, you must consider for each defendant whether they misappropriated a trade secret under the Virginia Uniform Trade Secrets Act.

**JA1383**

JURY INSTRUCTION NO. 50

The Virginia Uniform Trade Secrets Act defines a "trade secret" as information that:

    (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and,

    (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Nearly any type of information can be subject to trade secret protections under the Virginia Uniform Trade Secrets Act, and it can include, but is not limited to, formulas, patterns, compilations, programs, devices, methods, techniques, or processes.

JURY INSTRUCTION NO. 51

To establish "misappropriation," GMS must establish two elements:

(1) that the defendant acquired, disclosed, or used a trade secret developed by GMS through improper means (namely, without express or implied consent); and

(2) that the defendant knew or had reason to know that its knowledge of the trade secret was either acquired under circumstances giving rise to a duty to maintain its secrecy or derived through a person owing such a duty to GMS.

Where the defendant did not utilize "improper means" to acquire a trade secret, misappropriation can still exist if the defendant disclosed or used that secret. Misappropriation does not require outright theft; it can occur when an employee formerly entrusted with trade secret information uses or discloses that information after the agency or fiduciary relationship between him or her and the employer has ended.

JURY INSTRUCTION NO. 52

Under the Virginia Uniform Trade Secrets Act, GMS bears the burden of proving by a

preponderance of the evidence that the defendants misappropriated GMS's trade secrets.

JURY INSTRUCTION NO. 53

If you find that any or all of the defendants misappropriated GMS's trade secrets, GMS is entitled to damages that can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

**JA1387**

JURY INSTRUCTION NO. 54

If you find that the defendants misappropriated GMS's trade secrets and that, in doing so, they acted willfully and maliciously, you may award GMS punitive damages in an amount not exceeding twice GMS's damages or $350,000, whichever amount is less.

**JA1388**

JURY INSTRUCTION NO. 55

In this case, GMS claims that defendant Westly Greer violated the Virginia Computer Crimes Act.

With respect to Westly Greer, you shall find your verdict for GMS if it has proved Westly Greer with a malicious intent, or through intentionally deceptive means and without authority, did one or more of the following:

1. Temporarily or permanently removed, halted, or otherwise disabled any computer data, computer programs, or computer software from a computer or computer network;

2. Altered, disabled, or erased any computer data, computer programs, or computer software, or

3. Used a computer or computer network to cause physical injury to the property of another, or

4. Used a computer or computer network to make or cause to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs, or computer software residing in, communicated by, or produced by a computer or computer network.

You shall find your verdict for defendant Westly Greer if the plaintiff failed to prove any of the above violations.

JURY INSTRUCTION NO. 56

If you find that defendant Westly Greer violated the Virginia Computer Crimes Act, then you may award GMS all of its damages, including lost profits.

JURY INSTRUCTION NO. 57

In this case, GMS claims that Westly Greer, Sabrina Greer, Greer Group, LLC, County Roads, LLC, Thomas Hayes, Gregory K. Spires, and Mike Welton conspired with each other to injure GMS in its reputation, trade, business, or profession in violation of Virginia's Business Conspiracy statute.

You shall find your verdict for GMS if it has proven by clear and convincing evidence:

(1) that at least two of the following: Westly Greer, Sabrina Greer, Greer Group, LLC, County Roads, LLC, Thomas Hayes, Gregory K. Spires, and Mike Welton acted in concert, agreed, associated, mutually undertook or combined together;

(2) that they intentionally, purposefully, and without lawful justification injured GMS's reputation, trade, business, and/or profession; and

(3) GMS suffered damages as a result of these acts.

You shall find your verdict for the defendants if the plaintiff failed to prove any one or more of these elements.

If you find in favor of GMS, your verdict should be limited to only those defendants that you find to have participated in the conspiracy.

**JA1391**

JURY INSTRUCTION NO. 58

In order to establish a business conspiracy, GMS does not need to prove that the

conspirators' primary and overriding purpose is to injure another in his trade or business.

JURY INSTRUCTION NO. 59

GMS has the burden of proving its business conspiracy claim by clear and convincing evidence. This means that GMS must produce evidence that creates in your minds a firm belief or conviction that it has proved elements of the claim.

JURY INSTRUCTION NO. 60

If you find that any of the defendants conspired to injure GMS in its reputation, trade, business, or profession in violation of Virginia's business conspiracy statute, then you may award GMS three times its damages, including lost profits.

JURY INSTRUCTION NO. 61

"Willfully and maliciously" means that the conspirators acted intentionally, purposefully, without lawful justification, and for the purpose of harming plaintiff GMS Industrial Supply, Inc.

JURY INSTRUCTION NO. 62

Without lawful justification means the defendants intended to accomplish some criminal

or unlawful purpose or to accomplish some lawful purpose through criminal or unlawful means.

JURY INSTRUCTION NO. 63

In this case, GMS claims that Westly Greer, Sabrina Greer, Greer Group, LLC, County Roads, LLC, Thomas Hayes, Gregory K. Spires, and Mike Welton engaged in a conspiracy. These defendants deny they engaged in a conspiracy.

You shall find your verdict for GMS if it has proven by a preponderance of the evidence that

(1) Two or more of Westly Greer, Sabrina Greer, Greer Group, LLC, County Roads, LLC, Thomas Hayes, Mike Welton, and Gregory K. Spires combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means; and

(2) Damage caused by the acts committed in furtherance of the conspiracy.

You shall find your verdict for the defendants if the plaintiff failed to prove either of these elements.

If you find in favor of GMS, your verdict should be limited to only those defendants that you find to have participated in the conspiracy.

JURY INSTRUCTION NO. 64

If you find that some or all of the defendants engaged in a conspiracy, then you shall award GMS all damages caused by the criminal or unlawful acts taken in furtherance of the conspiracy, regardless of which of the conspirators performed the criminal or unlawful acts.

JURY INSTRUCTION NO. 65

You shall find your verdict for defendants Westly Greer, Gregory K. Spires, County Roads LLC, Thomas Hayes, Sabrina Greer, Greer Group LLC, and Mike Welton on their breach of contract claims against plaintiff GMS Industrial Supply, Inc., for its alleged violation of each of their sales agent agreements if defendants have proven by a preponderance of the evidence that:

1.        Plaintiff GMS Industrial Supply, Inc., had a legally enforceable obligation to the defendant under the sales agent agreement; and

2.        Plaintiff GMS Industrial Supply, Inc., violated or breached its obligation under the sales agent agreement to pay commissions and/or bonuses earned by defendant; and

3.        There was injury or damage to defendant caused by the breach of the obligation.

You shall find your verdict for Plaintiff GMS Industrial Supply, Inc., on any one or all of the aforementioned defendants' claims if they failed to prove any one or more of the elements above.

JURY INSTRUCTION NO. 66

Generally speaking, an affirmative defense is a defense to a claim that, if proven, constitutes an absolute bar to recovery on the claim. GMS Industrial Supply has asserted several affirmative defenses to the counterclaims filed by Westly Greer, Gregory K. Spires, County Roads, LLC, Thomas Hayes, Sabrina Greer, Greer Group, LLC, and Mike Welton.

JURY INSTRUCTION NO. 69

GMS Industrial Supply, Inc. has asserted the doctrine of unclean hands as an affirmative defense to the counterclaims filed by Westly Greer, Gregory K. Spires, County Roads, LLC, Thomas Hayes, Sabrina Greer, Greer Group, LLC, and Mike Welton.  Under the doctrine of unclean hands, a party is denied relief because of his own inequitable conduct. However, the purpose of the unclean hands doctrine is to secure justice and equity, not to aid one in acquiring property to which he has no right.

If you find that any of these individuals has met his, her, or its burden of establishing his, her, or its counterclaim against GMS, you shall nevertheless find your verdict for GMS if you find that GMS has proven by a preponderance of the evidence that, for each defendant, the defendant, through his, her or its own inequitable conduct, has unclean hands in asserting that GMS breached its contract with the defendant.

If you find in favor of GMS, your verdict should be limited to only those defendants with counterclaims for which GMS has proven its affirmative defense by a preponderance of the evidence.

**JA1401**

JURY INSTRUCTION NO. 70

GMS Industrial Supply, Inc. has asserted the doctrine of first material breach as an affirmative defense to the counterclaims filed by Westly Greer, Gregory K. Spires, County Roads, LLC, Thomas Hayes, Sabrina Greer, Greer Group, LLC, and Mike Welton. Under the first material breach doctrine, a party who commits the first breach of a contract is not entitled to enforce the contract.

If you find that any of these individuals has met his, her, or its burden of establishing his, her, or its counterclaim against GMS for breach of contract, you shall nevertheless find your verdict for GMS if you find that GMS has proven by a preponderance of the evidence that, for each defendant, the defendant committed the first material breach of his, her, or its respective contract with GMS. A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract.

If you find in favor of GMS, your verdict should be limited to only those defendants with counterclaims for which GMS has proven its affirmative defense by a preponderance of the evidence.

JURY INSTRUCTION NO. 71

If you decide in favor of any (or all) of the defendants, Westly Greer, Gregory K. Spires, County Roads LLC, Thomas Hayes, Sabrina Greer, Greer Group LLC, and Mike Welton, on any or all of their counterclaims against plaintiff GMS Industrial Supply, Inc., you should then decide how much plaintiff should pay each of these defendants in compensatory damages.

JURY INSTRUCTION NO. 72

Upon retiring to the jury room to begin your deliberations, you will elect one of your members to act as your foreperson.  The foreperson will preside over your deliberations and will be your spokesperson here in court.

You will have a copy of these instructions.  You are not to concern yourself with the fact that some of the numbers are not sequential.

Your verdict must represent the collective judgment of the jury. In order to return a verdict, it is necessary that each juror agree to it.  Your verdict, in other words, must be unanimous.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for himself and herself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and to change your opinion if convinced it is erroneous.  Do not surrender your honest conviction, however, solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times that you are not partisans.  You are judges--judges of the facts of this case.  Your sole interest is to seek the truth from the evidence received during the trial.  You must not base your verdict in any way upon sympathy, bias, guesswork, or speculation.

Your verdict must be based solely upon the evidence received in the case and these instructions.  Nothing you have seen or read outside of court may be considered.  Nothing that I have said or done during the course of this trial is intended, in any way, to somehow suggest to you what I think your verdict should be.  Nothing said in these instructions and nothing in any form of verdict prepared for your convenience is to suggest or convey to you in any way or manner

any intimation as to what verdict I think you should return.  What the verdict shall be is the exclusive duty and responsibility of the jury.  As I have told you many times, you are the sole judges of the facts.

A verdict form has been prepared for your convenience.

You will take this verdict form to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson write your verdict, date and sign the form, and then return with your verdict to the courtroom.

If it becomes necessary during your deliberations to communicate with the court, you may send a note, signed by your foreperson or by one or more members of the jury, through the bailiff. No member of the jury should ever attempt to communicate with the court by any means other than a signed writing, and the court will never communicate with any member of the jury on any subject touching the merits of the case other than in writing or orally here in open court.

Bear in mind also that you are never to reveal to any person--not even to the court--how the jury stands, numerically or otherwise, on the issues in this case until after you have reached a unanimous verdict.

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF VIRGINIA

Norfolk Division

GMS INDUSTRIAL SUPPLY, INC.,

        Plaintiff,

v.

G&S SUPPLY, LLC, *et al.*,

        Defendants.

**JUDGMENT IN A CIVIL CASE**

CASE NUMBER:  2:19cv324

[X]  **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[ ]  **Decision by Court.** This action came for determination before the Court. The issues have been considered and a decision has been rendered.

   **IT IS ORDERED AND ADJUDGED** that GMS Industrial Supply, Inc. recover of Westly Greer, the sum of One Hundred Nine Thousand and 00/100 Dollars ($109,000.00).

   **IT IS FURTHER ORDERED AND ADJUDGED** that Westly Greer recover of GMS Industrial Supply, Inc., the sum of Thirteen Thousand Eighty-Seven and 99/100 Dollars ($13,087.99).

   **IT IS FURTHER ORDERED AND ADJUDGED** that Sabrina Greer and Greer Group, LLC (collectively "Greer") recover of GMS Industrial Supply, Inc., the sum of Nine Thousand Seven Hundred Sixty and 50/100 Dollars ($9,760.50).

   **IT IS FURTHER ORDERED AND ADJUDGED** that Greg Spires and County Roads, LLC (collectively "Spires") recover of GMS Industrial Supply, Inc., the sum of Fourteen Thousand Two Hundred Thirty-One and 32/100 Dollars ($14,231.32).

   **IT IS FURTHER ORDERED AND ADJUDGED** that Thomas Hayes recover of GMS Industrial Supply, Inc., the sum of Five Thousand Dollars ($5,000.00).

   **IT IS FURTHER ORDERED AND ADJUDGED** that Mike Welton recover of GMS Industrial Supply, Inc., the sum of Seventy-Five Hundred Dollars ($7,500.00).

Date: June 10, 2022

FERNANDO GALINDO, CLERK
   By: _____ /s/ _____
        Deputy Clerk

_____ /s/ _____
Roderick C. Young, U.S. District Judge

Form of judgment approved in accordance
with Rule 58, FRCivP

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| GMS INDUSTRIAL SUPPLY, INC., | ) |
| | ) |
|       Plaintiff, | ) |
| v. | )     Case No. 2:19-cv-324-RCY-LRL |
| | ) |
| G&S SUPPLY, LLC, et al., | ) |
| | ) |
|       Defendants. | ) |

**NOTICE OF APPEAL**

NOW COMES Defendant Westly Greer ("Greer"), by counsel, and pursuant to Rule 4 of the Federal Rules of Appellate Procedure, hereby notes his appeal from the Court's Judgment Order of June 10, 2022 (ECF No. 321), entering judgment against Greer for $109,000, based on the jury's verdict of that same date.

Respectfully submitted,

**WESTLY L. GREER**

*By Counsel*

*/s/ Robert W. McFarland*
Robert W. McFarland (VSB No. 24021)
V. Kathleen Dougherty (VSB No. 77294)
Micaylee A. Noreen (VSB No. 92433)
Jeanne E. Noonan (VSB No. 87863)
McGuireWoods LLP
101 West Main Street, Suite 9000
Norfolk, VA 23510
Tel:  (757) 640-3716
Fax: (757) 640-3730
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com
jnoonan@mcguirewoods.com

*Counsel for Defendant and Counterclaim Plaintiff*
*Westly L. Greer*

1

**JA1407**

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2022, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

By: */s/ Robert W. McFarland*
Robert W. McFarland (VSB No. 24021)
V. Kathleen Dougherty (VSB No. 77294)
Micaylee A. Noreen (VSB No. 92433)
Jeanne E. Noonan (VSB No. 87863)
McGuireWoods LLP
101 West Main Street, Suite 9000
Norfolk, VA 23510
Tel:  (757) 640-3716
Fax: (757) 640-3730
rmcfarland@mcguirewoods.com
vkdougherty@mcguirewoods.com
mnoreen@mcguirewoods.com
jnoonan@mcguirewoods.com

*Counsel for Defendant and Counterclaim Plaintiff Westly L. Greer*

**JA1408**

# Independent Agent Agreement

**THIS INDEPENDENT AGENT AGREEMENT** ("Agreement") is made as of January 21, 2019 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and Westly Greer (the "Agent") of 8102 Hardwood Circle, Colorado Springs, CO 80908 [Agent Address]

**WHEREAS**:

(A)    The Company is a supplier of certain industrial maintenance products (the "Products").

(B)    The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Colorado and Kansas (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    <u>Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory</u>.  Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory.  The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals.  The Agent shall be free to set its own hours and appointments.  The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products.  Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable.  If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.    <u>Training Assistance</u>.  The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee").  The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company.

3.    <u>Independent Contractor</u>.  The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.    <u>Commission</u>.  As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion.  Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date.  Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns.  Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of non-payment by customer.  As a straight commission paid Agent, the Company will issue Agent a 1099

Agent Initials __WG_____                                               Rev 6.2016

GMS 0007

at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5. **Bonus/Annual Sales Agent Trip.** Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6. **Agent Expenses – Product Samples.** The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7. **Customer Default.** Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8. **No Sale outside of Territory.** The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9. **Term and Termination.** This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10. **Return of New Agent Kit.** In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11. **Commission Payments after Termination.** The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12. **Confidentiality.** Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or

Agent Initials __WG___                                    Rev 6.2016

in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13.    <u>Authority of Agent – Indemnity of Company</u>. The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement. Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement. In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14.    <u>Non-Solicitation</u>. During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15.    <u>Notices</u>. Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

Agent Initials _WG____                                    Rev 6.2016

16.   Severability.  If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17.   Governing Law/Venue & Jurisdiction.  This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions.  Any dispute that should arise will be handled accordingly.  Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18.   Assignment by Agent.  Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19.   Entire Agreement.  This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof.  No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20.   Counterparts.  This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.

COMPANY:                                    AGENT:

GMS INDUSTRIAL SUPPLY, INC.                 Sign: _____

Rachel Gorken, President                    Name: ___ Westly Greer _____

Agent Initials __WG____                                      Rev 6.2016

**JA1412**



# GMS INDUSTRIAL SUPPLY, INC
## *Great Material, Superior Service*

2702 Southport Way, Suite F
National City, CA
91950-8400

212 Denn Lane
Virginia Beach, VA
23462-2506

PHONE   (757) 473-1467
FAX     (757) 337-3734
E-MAIL  sales@gmsindustrialsupply.com
WEB SITE http://www.gmsindustrialsupply.com

**SBA**
SBA-WOSB

### Zone Manager Addendum:
This addendum does not supersede the Independent Account Manager Agreement
Sales support to primary customer accounts.
Assist Account Managers with customer accounts
Provide product knowledge training to customers and Account Managers
Report customer activity to Marketing Team.
Participation in weekly Sales calls
All responsibilities also listed on the "Account Manager Expectations" document.

### Bonus/Override:
Accounts in which he relinquishes responsibilities of daily account maintenance to other
Account Managers of GMS, but continues to assist and advise the Agent on a regular and
consistent basis, with appropriate documentation and planning, he will receive a bonus
override on a quarterly basis. An override of 4% will be received on sales of core items.
Bonus override on non-core items will be scaled down according to sales commission
code.

Westly Greer
**Agent Print**

Rachel Gorken, President
GMS Industrial Supply, Inc.

*Westly Greer (signature)*
**Agent Signature**

01/12/19
**Date**

# JA1413

GMS 0011

USCA4 Appeal: 22-2090  Doc: 20-4  Filed: 01/19/2023  Pg: 352 of 385



# GMS INDUSTRIAL SUPPLY, INC

## *Great Material, Superior Service*

212 Denn Lane
Virginia Beach, VA
23462-2506

PHONE (757) 473-1467
FAX (757) 337-3734
E-MAIL sales@gmsindustrialsupply.com
WEB SITE http://www.gmsindustrialsupply.com

July 1, 2015

RE: Westly Greer

Effective July 1, 2015, Westly Greer's new title will be Director Sales for GMS Industrial Supply, Inc. His salary will be $75,000.12 yearly, to be paid on a bi-weekly basis $2,884.62. Bonus structure details will be in a separate addendum.

His responsibilities will include all overseeing GMS sales and operations with assistance of the Management team. The position will still require travel, training, and reporting.

Sincerely,

Rachel Gorken, President
GMS Industrial Supply, Inc.

Proudly Serving Government and Military Accounts with Over 50 Years Combined Experience
GSA Advantage Schedules GS-07F-0369V & GS-21F-0060X ; DOD EMALL Contract SPM7W107DE023

JA1414

GMS 0015



**GMS Industrial Supply Inc.**

# Employment Agreement

**Employee Statement**

In accepting employment with GMS Industrial Supply (EMPLOYER), as an exempt employee, I, Westly Greer, (EMPLOYEE) agree:

(1)  my yearly salary is $60,000.00 to be paid **biweekly** at a rate of $2,307.70.

(2)  (2) my job title as District Manager will begin on November 5, 2012. I have received the GMS Industrial Supply employee handbook, and agree to comply with its provisions and any other rules. Neither the handbook, practices, nor any communications create an employment contract or term. I understand that the policies and benefits communicated to me are subject to change, interpretation, and review by GMS Industrial Supply at any time.

(3)  Bonus structure will be based on the following things:

- For territories/accounts where that I consistently and regularly work, I will receive the difference of the commission of an independent sales agent and my regular salary if the difference is greater to be paid out on a quarterly basis.

- 3% quarterly bonus override based on total sales from any Sales Agent that I directly and consistently work with.

- A company credit card will be provided for the following expenses; gas, lodging, and meals when traveling outside of my regular customer base.  Expenses beyond a monthly total $1,500.00.  Should expenses exceed this amount or deemed not fit by GMS that amount will be deducted from my salary on a quarterly basis. Expenses will be monitored consistently on a monthly basis. Complete and accurate reporting of expenses (to include receipts) is to be turned in to the corporate office on a monthly basis.

- If the criteria for bonus is met, expenses related to training will be deducted from salary at a rate of 50% of total expenses.  If criteria for bonus is not met, expenses could be carried over to the following quarter.

GMS Industrial Supply may impart, to me, confidential information, including, without limitation, designs, pricing, financial information, personnel information, real estate information, marketing strategies, customer profiles, and the like (collectively "confidential information"). I hereby acknowledge GMS Industrial Supply's exclusive ownership of such confidential information.

I agree (1) only to use the confidential business information to provide services or goods to GMS Industrial Supply, (2) only to communicate the confidential information to fellow employees on a need-to-know basis; and (3) not to otherwise disclose or use, at any time, any confidential information. As an example, and not as a limitation, I understand that I am not to use or provide confidential information for the purpose of trading any securities of GMS Industrial Supply. Upon demand of GMS Industrial Supply or termination of my employment, I will deliver to GMS Industrial Supply all blueprints, manuals, designs, photographs, recordings, and any other medium by which, through which, or on which confidential information has been recorded or stored, which are in my possession, custody, or control.

I further agree that the disclosure or use of any confidential information, in breach of this understanding, would cause irreparable harm to GMS Industrial Supply and, accordingly, not only can GMS Industrial Supply seek damages, but I agree to the issuance of a permanent injunction against me restraining such disclosure and use, and I agree that any court of competent jurisdiction, selected by GMS Industrial Supply, shall have personal jurisdiction over me.

I agree that neither this document nor any other communication shall bind GMS Industrial Supply, to employ me now or in the future, that no consideration has been furnished to GMS Industrial Supply for my employment, other than my services, and that my employment may be terminated by GMS Industrial Supply or me, with or without notice, at any time. I further agree that if my employment is terminated by GMS Industrial Supply, it can be done without liability to me for wages or salary, except such as may have been earned or which may be due by

GMS 0016

terms of applicable employee handbooks and that such terms, conditions of and including the plan document, the authority of the CMS Industrial Supply arrangement for any specific background information and other matters are confidential. In making any agreement concerning this subject, I also understand and agree that this agreement also may be modified only upon individual written documentation and that it must be in writing and signed by the President of CMS Industrial Supply.

I agree that I will not, individually or on behalf of any other entity or including any other employee who worked for CMS Industrial Supply, during the last two or (2) years in which I worked for CMS Industrial Supply, contact I will not reveal the identity of any agreement or any arrangement of CMS Industrial Supply. These conditions will apply during my employment and for the rest of (2) months subsequent to my leaving employment. I understand that in establishing the restrictive covenant limitation for breach of this provision, for compensation accrued those who will have provided information. In consideration of this provision, liquidated damages for such violation due to the interest of current representation of any revision of CMS Industrial Supply.

Employee Signature _____    Date _____

Employee Printed Name _____    Social Security # _____

GMS 0017

# Independent Sales Agent Agreement

**THIS INDEPENDENT SALES AGENT AGREEMENT** ("Agreement") is made as of January 10, 2017 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln, Virginia Beach, VA 23462 and Greer Group LLC. (Sabrina Greer) (the "Agent") of 8102 Hardwood Circle, Colorado, CO 80908 [Agent Address]

**WHEREAS:**

(A)     The Company is a supplier of certain industrial maintenance products (the "Products").

(B)     The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Colorado (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory.  Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory.  The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals.  The Agent shall be free to set its own hours and appointments.  The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products.  Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable.  If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.      Training Assistance.  The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee").  The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company.

3.      Independent Contractor.  The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.      Commission.  As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion.  Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date.  Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns.  Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of

Agent Initials _____                                Rev 6 2016

GMS 0031

non-payment by customer. As a straight commission paid Agent, the Company will issue Agent a 1099 at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5. **Bonus/Annual Sales Agent Trip.** Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6. **Agent Expenses – Product Samples.** The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7. **Customer Default.** Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8. **No Sale outside of Territory.** The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9. **Term and Termination.** This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10. **Return of New Agent Kit.** In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11. **Commission Payments after Termination.** The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12. **Confidentiality.** Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other

Agent Initials _____                                          Rev 6 2016

**JA1418**

GMS 0032

person or entity, any Confidential Information of the Company (except as required by applicable law or in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13.   <u>Authority of Agent – Indemnity of Company.</u>  The Agent shall perform its services under this Agreement as an independent contractor.  Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party.  Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement.  Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement.  In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14.   <u>Non-Solicitation.</u>  During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company.  Agent will not reveal the identity of any supplier to any competitor of Company.  Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach.  In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available.  The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15    <u>Notices.</u>  Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying

Agent Initials _____                                          Rev 6.2016

GMS 0033

with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

16. **Severability.** If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17. **Governing Law/Venue & Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18. **Assignment by Agent.** Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19. **Entire Agreement.** This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20. **Counterparts.** This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**                        **AGENT:**

GMS INDUSTRIAL SUPPLY, INC.         Sign: _____

Rachel Gorken, President            Name: _____

Agent Initials _____              Rev 6.2016

JA1420

GMS 0034

# Independent Sales Agent Agreement

**THIS INDEPENDENT SALES AGENT AGREEMENT** ("Agreement") is made as of January 6, 2017 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and Country Roads LLC, (Greg Spires) (the "Agent") of 13476 SW Tinney Rd, Faxon, OK 73540[Agent Address]

**WHEREAS:**

(A)     The Company is a supplier of certain industrial maintenance products (the "Products").

(B)     The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Oklahoma and Texas (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.     <u>Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory</u>.  Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory.  The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals.  The Agent shall be free to set its own hours and appointments.  The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products.  Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable.  If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.     <u>Training Assistance</u>.  The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee").  The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company.

3.     <u>Independent Contractor</u>.  The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.     <u>Commission</u>.  As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion.  Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date.  Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns.  Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of non-payment by customer.  As a straight commission paid Agent, the Company will issue Agent a 1099

Agent Initials _G(S_                                                      Rev 6.2016

GMS 0049

at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5.     <u>Bonus/Annual Sales Agent Trip</u>. Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6.     <u>Agent Expenses – Product Samples</u>. The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7.     <u>Customer Default</u>. Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8.     <u>No Sale outside of Territory</u>. The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9.     <u>Term and Termination</u>. This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10.    <u>Return of New Agent Kit</u>. In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11.    <u>Commission Payments after Termination</u>. The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12.    <u>Confidentiality</u>. Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or

Agent Initials _G kS_                            Rev 6.2016

**JA1422**

GMS 0050

in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13.  Authority of Agent – Indemnity of Company.  The Agent shall perform its services under this Agreement as an independent contractor.  Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party.  Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement.  Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement.  In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14.  Non-Solicitation.  During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company.  Agent will not reveal the identity of any supplier to any competitor of Company.  Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach.  In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available.  The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15.  Notices.  Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above.  Any party may change its notice address by complying with the provisions herein.  Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

Agent Initials _CK_                                    Rev 6.2016

GMS 0051

16. **Severability.** If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17. **Governing Law/Venue & Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18. **Assignment by Agent.** Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19. **Entire Agreement.** This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent, and except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20. **Counterparts.** This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

GMS INDUSTRIAL SUPPLY, INC.

Rachel Gorken, President

AGENT:

Sign:_____

Name:_____

Agent Initials _G|Cs_

Rev 6.2016

# Independent Sales Agent Agreement

**THIS INDEPENDENT SALES AGENT AGREEMENT** ("Agreement") is made as of July 27. 2016 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and Thomas Hayes (the "Agent") of 826 Briarwood Circle, Leesville. LA, 71446 [Agent Address]

**WHEREAS**:

(A)     The Company is a supplier of certain industrial maintenance products (the "Products").

(B)     The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Louisiana (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.     <u>Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory</u>.  Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory.  The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals.  The Agent shall be free to set its own hours and appointments. The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products.  Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable.  If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.     <u>Training Assistance</u>.  The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee").  The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months. all in form and substance reasonably acceptable to Company.

3.     <u>Independent Contractor</u>.  The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.     <u>Commission</u>.  As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion.  Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date.  Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns.  Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of non-payment by customer. As a straight commission paid Agent, the Company will issue Agent a 1099

Agent Initials  _THJ_                                           Rev 6.2016

GMS 0066

at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5.   <u>Bonus/Annual Sales Agent Trip</u>. Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6.   <u>Agent Expenses - Product Samples</u>. The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7.   <u>Customer Default</u>. Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8.   <u>No Sale outside of Territory</u>. The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9.   <u>Term and Termination</u>. This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10.  <u>Return of New Agent Kit</u>. In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11.  <u>Commission Payments after Termination</u>. The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12.  <u>Confidentiality</u>. Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or

Agent Initials __THJ__                                    Rev 6.2016

**JA1426**

GMS 0067

in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13. <u>Authority of Agent – Indemnity of Company</u>. The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement. Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement. In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14. <u>Non-Solicitation</u>. During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15. <u>Notices</u>. Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

Agent Initials _THJ_                                     Rev 6.2016

GMS 0068

16. <u>Severability</u>. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17. <u>Governing Law/Venue & Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18. <u>Assignment by Agent</u>. Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19. <u>Entire Agreement</u>. This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.


**COMPANY:**

GMS INDUSTRIAL SUPPLY, INC.


Rachel Gorken, President

**AGENT:**

Sign: _____

Name: _Thomas Hayes Jr_____


Agent Initials _THJ_

Rev 6.2016

**JA1428**

GMS 0069

# Independent Sales Agent Agreement

**THIS INDEPENDENT SALES AGENT AGREEMENT** ("Agreement") is made as of June 15, 2016 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and Michael Welton (the "Agent") of 12112 Gallery St., Denton, TX, 76207. [Agent Address]

**WHEREAS:**

(A)     The Company is a supplier of certain industrial maintenance products (the "Products").

(B)     The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Texas – See attached addendum (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.     <u>Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory.</u>  Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory.  The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals.  The Agent shall be free to set its own hours and appointments. The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products.  Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable.  If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.     <u>Training Assistance.</u>  The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee").  The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company

3.     <u>Independent Contractor.</u>  The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.     <u>Commission.</u>  As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion.  Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date.  Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns.  Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of non-payment by customer.  As a straight commission paid Agent, the Company will issue Agent a 1099

Agent Initials _____

Rev 6.2016

GMS 0092

at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5.   Bonus/Annual Sales Agent Trip.  Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter.  Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6.   Agent Expenses   Product Samples.  The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit".  Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials.  Deductions for novelty/sample costs will be taken from commission payments.

7.   Customer Default.  Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8.   No Sale outside of Territory.  The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9.   Term and Termination.  This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice.  Either party may terminate this Agreement immediately in the event of a material breach by the other.

10.   Return of New Agent Kit.  In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11.   Commission Payments after Termination.  The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination.  Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12.   Confidentiality.   Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships.  Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or

Agent Initials _BL bb_                                                    Rev 6.2016

**JA1430**

GMS 0093

in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13. <u>Authority of Agent – Indemnity of Company</u>. The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement. Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement. In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14. <u>Non-Solicitation</u>. During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15. <u>Notices</u>. Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party

Agent Initials _M CC_                                           Rev 6.2016

16. Severability. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17. Governing Law/Venue & Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18. Assignment by Agent. Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19. Entire Agreement. This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20. Counterparts. This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.

COMPANY:                                    AGENT:

GMS INDUSTRIAL SUPPLY, INC.        Sign:_____


Rachel Gorken, President              Name:_____


Agent Initials _____                    Rev 6.2016

**JA1432**

GMS 0095

# Independent Sales Agent Agreement

**THIS INDEPENDENT SALES AGENT AGREEMENT** ("Agreement") is made as of January 10, 2017 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and Greer Group LLC. (Sabrina Greer) (the "Agent") of 8102 Hardwood Circle, Colorado, CO 80908 [Agent Address]

**WHEREAS**:

(A)     The Company is a supplier of certain industrial maintenance products (the "Products").

(B)     The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Colorado (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.     <u>Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory</u>.  Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory.  The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals.  The Agent shall be free to set its own hours and appointments.  The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products.  Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable.  If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.     <u>Training Assistance</u>.  The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee").  The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company.

3.     <u>Independent Contractor</u>.  The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.     <u>Commission</u>.  As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion.  Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date.  Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns.  Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of

Agent Initials _SG_                                    Rev 6.2016

GMS 000390

non-payment by customer. As a straight commission paid Agent, the Company will issue Agent a 1099 at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5.  Bonus/Annual Sales Agent Trip. Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6.  Agent Expenses – Product Samples. The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7.  Customer Default. Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8.  No Sale outside of Territory. The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9.  Term and Termination. This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10. Return of New Agent Kit. In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty) days from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11. Commission Payments after Termination. The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12. Confidentiality. Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent will not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other

Agent Initials_____                                    Rev 6.2016

GMS 000391

**JA1434**

person or entity, any Confidential Information of the Company (except as required by applicable law or in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13. <u>Authority of Agent – Indemnity of Company</u>. The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement. Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement. In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14. <u>Non-Solicitation</u>. During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15. <u>Notices</u>. Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying

Agent Initials _____    Rev 6.2016

GMS 000392

**JA1435**

with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

16. **Severability**. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17. **Governing Law/Venue & Jurisdiction**. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18. **Assignment by Agent**. Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19. **Entire Agreement**. This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20. **Counterparts**. This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.

COMPANY:                          AGENT:

GMS INDUSTRIAL SUPPLY, INC.        Sign: _Sabrina Greer_

Rachel Gorken, President           Name: _Sabrina Greer_

Agent Initials _SG_                          Rev 6.2016

GMS 000393

**JA1436**

**Direct Deposit Authorization Form**

Employee Name: Greer Group LLC
Department:
Social Security #: 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

Name, address, and phone number of bank to which funds will be sent:

Bank name: Bank of America
Bank address: 1311 NW Sheridan Rd
Lawton OK 73505
Phone number: 580-531-0279

Account number(s)* to which funds will be deposited:

| Checking or Savings? | Routing Number | Amount ($) |
|---|---|---|
| | 123103716 | All |
| | Account Number | |
| | 138102551319 | |

*If depositing to a checking account, please provide a voided blank check below.

Employee authorization:

I authorize GMS Industrial Supply to deposit my paycheck to the institution specified in the manner
            Company Name
and amounts stated above.  This authorization will remain in effect unless canceled by me in writing.

Antron Greer                    1-10-17
Employee Signature              Date

ATTACH CHECK HERE IF APPLICABLE

GMS 000394

JA1437

# Independent Sales Agent Agreement

**THIS INDEPENDENT SALES AGENT AGREEMENT** ("Agreement") is made as of January 6, 2017 [Date] between **GMS Industrial Supply, Inc.** (the "Company") of 212 Denn Ln. Virginia Beach, VA 23462 and Country Roads LLC, (Greg Spires) (the "Agent") of 13476 SW Tinney Rd, Faxon, OK 73540[Agent Address]

**WHEREAS**:

(A)     The Company is a supplier of certain industrial maintenance products (the "Products").

(B)     The Agent wishes to become the non-exclusive sales agent of Company for the Products in the state(s) of Oklahoma and Texas (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.     <u>Designation as Non-exclusive Sales Agent of the Products for the Company in the Territory</u>.  Company hereby appoints Agent as its non-exclusive Sales Agent for the Products in the Territory.  The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Company in a manner consistent with good sales procedure and customer relations, and to make regular calls on its customers at regular intervals.  The Agent shall be free to set its own hours and appointments.  The Agent acknowledges and agrees that the Company shall have the right to appoint one or more other agents within the Territory to sell the Products.  Agent acknowledges that in certain territories, the use of a "Consultant Program" may be applicable.  If Agent chooses to participate in the Consultant Program, a supplemental document detailing the program will be provided.

2.     <u>Training Assistance</u>.  The Agent can request extended training assistance from Company at a rate of $750.00/day ("Training Assistance Fee").  The Company may wave the Training Assistance Fee if the Agent agrees to and does submit weekly Agent Contact Reports ("ACR") detailing both Agent's customer contacts with respect to sales of the Products and Agent's weekly sales plan for the Products to the Company for no less than twelve (12) months, all in form and substance reasonably acceptable to Company.

3.     <u>Independent Contractor</u>.  The Agent expressly acknowledges that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of Social Security withholding tax and all other federal, state and local taxes.

4.     <u>Commission</u>.  As its sole compensation under this Agreement, Agent will be entitled to receive a commission of 5% - 25% on the net paid invoice for Products according to the Company's Commission Schedule as amended from time to time in the exercise of Company's sole discretion.  Company shall provide a copy of its current Commission Schedule to Agent and shall provide Agent notice of any changes at least two weeks prior to their effective date.   Commission is based upon the type of Products sold as well as service related to those Products and excludes applicable taxes, shipping, discounts, allowances and other expenses and any returns.   Commissions due to the Agent will be payable no later than two weeks after an order is delivered to a customer, subject to adjustment as provided below in the event of non-payment by customer.  As a straight commission paid Agent, the Company will issue Agent a 1099

Agent Initials _GLS_                                                                 Rev 6.2016

GMS 000549

at the end of the year for tax purposes. The Company shall have the absolute right, in its discretion: (a) to refuse to accept any orders procured through the Agent and to refuse to ship the goods described therein; or (b) to make any allowances or adjustments to orders and accept any returns of any shipments. The Company shall notify the Agent in writing of such refusals, allowances or adjustments.

5.  Bonus/Annual Sales Agent Trip.  Agent shall be paid a bonus of $300 for each calendar quarter that it files complete ACRs for each workweek in such quarter. Company, in the exercise of its sole and absolute discretion, may provide for an "Annual Sales Agent Trip" to reward high performing Agents for Company. The exact terms and conditions to qualify for any Annual Sales Agent Trip shall be established by the Company in the exercise of its sole and absolute discretion from time to time. However, notwithstanding the foregoing, Agent shall not be eligible for any Annual Sales Agent Trip unless Agent has provided weekly ACRs for the year being evaluated.

6.  Agent Expenses – Product Samples.  The Agent will be responsible for all of its expenses in operating its business. Initial shipments of new Product samples and novelties will be sent to the Agent at no additional cost as part of a "New Agent Kit". Agent will be responsible for 40% of the actual Company cost for any additional novelties or samples of the Products. Once a $300.00 Company subsidy has been reached for any calendar year, Agent will be responsible for 100% of the actual Company cost for novelty/sample materials. Deductions for novelty/sample costs will be taken from commission payments.

7.  Customer Default.  Commissions paid to the Agent on billings on which a customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more or when Company agrees to accept a return and refund the customer. If such customer pays at a future date, such commission will be repaid to the Agent less a 10% collection charge (e.g. if a commission was $1,000 on a sale for which the customer failed to pay, and the commission was charged back to the Agent, and then the customer made a late payment, the commission paid to the Agent would be the $1,000 original commission amount less a 10% collection charge of $100 for a net commission of $900).

8.  No Sale outside of Territory.  The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Company in the exercise of its sole discretion.

9.  Term and Termination.  This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party on two weeks' notice. Either party may terminate this Agreement immediately in the event of a material breach by the other.

10.  Return of New Agent Kit.  In the event this Agreement is terminated by either party for any reason, if the "New Agent Kit" is not returned within 30 (thirty days) from such termination date, Agent shall pay Company $1,500 for the value of such New Agent Kit.

11.  Commission Payments after Termination.  The Agent will be paid commissions on all orders from the Territory accepted by the Company prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Agent's commission checks after termination of this Agreement will be held for 60 days to ensure all customer accounts have paid in full.

12.  Confidentiality.  Agent recognizes and acknowledges that Agent will have access to Confidential Information (as defined below) relating to the business or interests of the Company or of persons with whom the Company may have business relationships. Except as permitted herein, Agent may not during the term of this Agreement, or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or

Agent Initials _G k S_                                    Rev 6.2016

GMS 000550

**JA1439**

16. **Severability.** If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

17. **Governing Law/Venue & Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without giving effect to any choice of law provisions. Any dispute that should arise will be handled accordingly. Both parties agree that the exclusive venue for any action, demand, claim or counterclaim relating to or arising from this Agreement, shall be in the state or federal courts located in Virginia Beach, Virginia and that such courts shall have personal jurisdiction over the parties to this Agreement.

18. **Assignment by Agent.** Agent may not assign or subcontract any rights or delegate any of its duties under this Agreement without Company's prior written approval, which shall not be unreasonably withheld.

19. **Entire Agreement.** This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, supersedes any previous agreement between Company and the Agent and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contains all the understandings, representations and warranties of the respective parties relating to the subject matter hereof. No waiver or modification of this Agreement shall be valid unless it is in writing and signed by the Company and the Agent.

20. **Counterparts.** This Agreement may be executed in one or more counterparts each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement

---

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.

COMPANY:                                    AGENT:

GMS INDUSTRIAL SUPPLY, INC.        Sign:_____

Rachel Gorken, President                  Name:_____

Agent Initials _GCS_                          Rev 6.2016

GMS 000551

**JA1440**

in connection with the performance of Agent's duties and responsibilities hereunder). The term "Confidential Information" means information relating to the Company's business affairs, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). This obligation shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section by Agent, regardless of whether Agent continues to be employed by the Company.

13. <u>Authority of Agent – Indemnity of Company</u>. The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or employer and employee relationship between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. Agent's sole authority shall be to solicit orders for the Products in the Territory in accordance with the terms of this Agreement. Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Company by reason of the Agreement. In the event that the Company is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Company from and against any and all claims for loss, liability or damages arising therefrom.

14. <u>Non-Solicitation</u>. During the term of this Agreement, and for a period of one year thereafter, Agent may not (i) entice, solicit or encourage any Company employee to leave the employ of the Company or any independent contractor to sever its engagement with the Company; and may not (ii) directly or indirectly, entice, solicit or encourage any client or customer or known prospective client or customer of the Company to cease doing business with the Company, reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company. Agent will not reveal the identity of any supplier to any competitor of Company. Agent understands and agrees that establishing the precise amount of damages for breach of Section 14(i) would be difficult and that a reasonable measure of liquidated damages to Company for each employee or contractor recruited in violation of Section 14(i) shall be the amount of the then current annual compensation of that employee or contractor by Company and such sum shall not be a penalty.

In the event of any breach of any of the covenants set forth in this Section, Agent acknowledges and agrees that the Company would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Employee agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the Company may have at law, without posting any bond or security, the Company shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available. The seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

15. <u>Notices</u>. Any notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered by private messenger, private overnight mail service, or facsimile as to the address first set forth above. Any party may change its notice address by complying with the provisions herein. Notwithstanding the foregoing, in all events, the actual timely receipt by a party of a writing directed to it containing the required information shall constitute notice to such party.

Agent Initials _Ḽ(Ḻ_____                                          Rev 6.2016

GMS 000552

## Employee Non-Compete Agreement

THIS EMPLOYEE NON-COMPETE AGREEMENT ("Agreement") is made as of _04-03-2011_ by and between

<span style="font-size:small">Date</span>

GMS Industrial Supply ("Employer") and _Westly Greer_ ("Employee").

<span style="font-size:small">Employee Name</span>

Employee desires to give, and Employer desires to receive from Employee, a covenant not to engage, either directly or indirectly, in competition with, or to solicit any customer, client, or account of Employer.

Employer and Employee desire to set forth, in writing, the terms and conditions of their agreements and understandings.

THEREFORE, in consideration of the foregoing, of the mutual promises herein contained, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree to the following:

1. **Covenants Against Competition**.
Employee acknowledges that the services to be rendered to Employer have a significant and material value to Employer, the loss of which cannot adequately be compensated by damages alone. In view of the significant and material value, to Employer, of the services of Employee for which Employer has employed Employee; and the confidential information obtained by or disclosed to Employee as an employee of Employer; and as a material inducement to Employer to employ Employee and to pay to Employee compensation for such services to be rendered for Employer by Employee (it being understood and agreed by the parties hereto that such non-competition shall also be paid for and received in consideration hereof), Employee covenants and agrees to the following:

    **A.** During Employee's employment by Employer and for a period of **1 Year** after

      Employee ceases to be employed by Employer, Employee shall not within 1 Year directly or

      indirectly, either for Employee's own account or as a partner, shareholder (other than shares regularly traded in a recognized market), officer, employee, agent or otherwise, be employed by, connected with, participate in, consult or otherwise associate with any other business, Enterprise or venture that is the same as, similar to, or competitive with Employer. By way of example, and not as a limitation, the foregoing shall preclude Employee from soliciting business or sales from, or attempting to convert to other sellers or providers of the same or similar products or services as provided by Employer, any customer, client or account of Employer with which Employee has had any contact during the term of employment.

    **B.** During employment and for a period of 1 Year thereafter, Employee shall not,

      directly or indirectly, solicit for employment or employ any employee of Employer.

    **C.** During employment, and for a period of 3 Years thereafter, Employee shall not disclose to

      anyone any Confidential Information. For the purposes of this Agreement, "Confidential Information" shall include any of Employer's confidential, proprietary or trade secret information that is disclosed to Employee or Employee otherwise learns in the course of employment such as, but not limited to, business plans, customer lists, financial statements, software diagrams, flow charts and product plans.

**JA1442**

GMS 001483

registered mail, return receipt requested, first-class postage prepaid, as follows:

If to Employer: 212 Denn Ln. Virginia Beach, VA 23462

If to Employee:

or to such other address designated by either party following notice to the other.

10. **Entire Agreement**

This Agreement contains the entire agreement and understanding by and between Employer and Employee with respect to the covenant against competition herein referred to, and no representations, promises, agreements or understandings, written or oral, not herein contained shall be of any force or effect. No change or modification hereof shall be valid or binding unless the same is in writing and signed by the party intended to be bound.

11. **No Waiver**.

No waiver of any provision of this Agreement shall be valid unless the same is in writing and signed by the party against whom such waiver is sought to be enforced; moreover, no valid waiver of any provision of this Agreement at any time shall be deemed a waiver of any other provision of this Agreement at such time or will be deemed a valid waiver of such provision at any other time.

12. **Headings**.

The headings used herein are for the convenience of the parties only and shall not be used to define, enlarge or limit any term of this Agreement.

IN WITNESS WHEREOF, Employer and Employee have duly executed this Agreement under seal as of the day and year first above written.

I have read and understand the **Employee Non-Compete Agreement**.

Signature: *Westly Greer* (signature)

Date: 04-03-2011

Printed Name: Westly Greer

GMS 001484

# Sales Agent Agreement

**THIS AGREEMENT** made as of _1-22-13_ (Date) between **GMS Industrial Supply** (the "Seller") of 212 Denn Ln. Virginia Beach, VA 23462 and _Gregory K. Spires_ (the "Agent") of _404 16th St Snyder OK. 73566_ (Agent Address) **WHEREAS**:

(A)     This agreement shall supersede any previous agreement between GMS Industrial Supply and the Agent

(B)     The Seller is a supplier of certain Industrial Maintenance products (the "Products").

(C)     The Agent wishes to become the non-exclusive sales agent of Seller for the Products in the state(s) of _Oklahoma_ (the "Territory");

**NOW THEREFORE** in consideration of the recitals, the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Non-exclusive Sales Agents of the Products for the Seller in the Territory. The Agent acknowledges and agrees that the Seller shall have the right to appoint one or more other agents within the Territory to sell the Products.

2.      The Agent can request extended training assistance from corporate personnel at a rate of $750.00/day. This fee can be waived on a case by case basis if the Sales Agent submits complete and regular ACR's to their Sales Manager.

3.      The Agent will be entitled to receive a commission of 5% - 25% dependent on the type of products sold to customers relating to orders procured by Agent, excluding applicable taxes. Commissions due to the Agent will be payable on the pay period in which the seller shipped the items, no later than two weeks after shipment is delivered. As a straight commission paid Agent, the Seller will issue a 1099 at the end of the year for tax purposes.

4.      The Agent will be responsible for all expenses unless otherwise approved in writing by an authorized representative of the Seller. Independent Sales Agents will be responsible for 40% of the cost for novelties/samples. Once a $300.00 threshold has been reached, agents will be responsible for 100% of the cost for novelty/sample materials. Deductions will be taken from bi-weekly commissions. Initial shipments of new products and novelties will be sent to the Agent at no additional cost. New Agent Kits will be provided to the Agent no initial cost.

5.      Commissions paid to the Agent on billings on which the customer defaults in payment will be charged back to the Agent when the customer has been in default thirty (30) days or more. If the customer pays at some future date, these commissions will be repaid to the Agent with a 10% penalty to the commission rate (25% -> 15%).

6.      The Agent agrees to aggressively promote the sale of the Products in the Territory and to service the customers of the Seller in a manner consistent with good sales procedure and customer relations, and to

Agent Initials _GKS_

GMS 001498

make regular calls on its customers at regular intervals. If it is determined that this is not the case, the Seller will notify the Agent. If upon 30 days from receipt of notification it is determined that the Agent is still not meeting the terms of this clause as determined by the Seller, the Seller reserves the right to terminate the contract in its entirety immediately.

7.   The Agent agrees that it will not promote the sale of, or sell, Products outside the Territory without the prior written consent of the Seller, which consent may be withheld by the Seller.

8.   The Agent agrees to abide by and comply with all sales policies and operating procedures of the Seller so long as they are not in conflict with governmental regulations.

9.   The Agent will not obligate or contract on behalf of the Seller unless it has specific written authority to do so from an authorized representative of the Seller.

10.   This Agreement shall commence on the date first written above and shall remain in full force and effect until terminated by either party hereby upon not less than sixty (60) days prior written notice to the other party except where allowed by.

11.   At the time of separation, initiated by either party, should the "New Agent Kit" not be returned within 30 (thirty days) from separation date, a cost of $1500.00 will be incurred by the Agent.

12.   The Agent will be paid commissions on all orders from the Territory accepted by the Seller prior to the effective termination date, even though such orders may be shipped after the effective date of termination. Final paycheck will be held for 60 days to ensure all customer accounts have paid in full.

13.   The Agent acknowledges that he/she may have access to the Seller's confidential and proprietary information. Such confidential information may include, without limitation: i) business and financial information, ii) business methods and practices, iii) technologies and technological strategies, iv) marketing strategies and v) other such information as the Seller may designate as confidential ("Confidential Information"). Agent agrees to not disclose to any other person (unless required by law) or use for personal gain any Confidential Information at any time during or after the Agreement Term, unless the Seller grants express, written consent of such a disclosure. In addition, Agent will use his/her best efforts to prevent any such disclosure. Confidential information will not include information that is in the public domain, unless such information falls into public domain through Agent's unauthorized actions.

14.   The Agent shall perform its services under this Agreement as an independent contractor. Nothing contained in this Agreement shall be deemed to create any association, partnership, joint venture, or relationship of principal and agent or employer and employee between the parties hereto or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party. The Agent also agrees that it will not hold itself out as a partner, joint venturer, co-principal or employee of the Seller by reason of the Agreement. In the event that the Seller is adjudicated to be a partner, joint venturer, co-principal or employer of or with the Agent, the Agent shall indemnify and hold harmless the Seller from and against any and all claims for loss, liability or damages arising therefrom.

Agent Initials  _G VLS_____

**JA1445**

GMS 001499

15. If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

16. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia. Any dispute that should arise will be handled accordingly.

17. This Agreement, including the Schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof and, except as stated herein or in the instruments and documents to be executed and delivered pursuant hereto, contain all the representations and warranties of the respective parties relating to the subject matter hereof.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first above written.

Sales Agent Name

Rachel Gorken, President, GMS Industrial Supply, Inc.

Agent Initials _____ G l S _____

GMS 001500

**JA1446**

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2023, I filed the foregoing with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Robert W. McFarland*
Robert W. McFarland

*Counsel for Defendant-Appellant*